**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF NEW YORK**

In re:

PRIME CAPITAL VENTURES, LLC,                    Case No. 24-11029-REL
                                                Chapter 11

                                    Debtor.

### DECLARATION OF CHRISTIAN H. DRIBUSCH IN SUPPORT OF ENTRY OF AN ORDER (I) APPROVING ADEQUACY OF SECOND AMENDED DISCLOSURE STATEMENT FOR FIRST AMENDED PLAN OF LIQUIDATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE AND (II) CONFIRMING FIRST AMENDED PLAN OF LIQUIDATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

I, Christian H. Dribusch, hereby declare that the following is true and correct to the best of my knowledge, information and belief:

1.      I am the Chapter 7 Trustee to the bankruptcy estate of Kris Daniel Roglieri (Case No. 24-10157). As the representative of the last remaining member of the Debtor, I have exercised the power under applicable Delaware law to revoke any dissolution and name the Bankruptcy Estate of Kris Daniel Roglieri as the sole member of the Debtor with the chapter 7 trustee of the Bankruptcy Estate of Kris Daniel Roglieri acting as the manager of the Debtor. Accordingly, I am currently the manager of the Debtor.

2.      I submit this declaration (the "Declaration") in support of entry of an Order (a "Confirmation Order"), a copy of which is annexed hereto as **Exhibit A**, (i) approving the *Second Amended Disclosure Statement for First Amended Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code*, dated January 9, 2025 [Docket No. 118] (the "Disclosure Statement") and (ii) confirming the *First Amended Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code*, dated December 23, 2024 [Docket No. 91] (the "Plan")[1].

---

[1] Unless otherwise defined herein, capitalized terms are used as defined in the Plan.

3.      Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, my review of relevant documents, or information supplied by and/or my discussions with the Debtor's general counsel, Klestadt Winters Jureller Southard & Stevens, LLP. If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.

4.      On or around July 26, 2006, Prime Commercial Lending, LLC ("Prime Commercial") was formed as a New York limited liability company.  Prime Commercial appears to have been a small lender making loans as small as $22,000 to businesses and up to $2 million on commercial real estate.

5.      On December 14, 2021, Kris Daniel Roglieri ("Roglieri") formed the Debtor as a Delaware limited liability company.  Upon information and belief, until on or around May 15, 2024, Roglieri was at all times the sole manager of the Debtor and its chief executive.  The concept was apparently that the Debtor would be Prime Commercial's division as "a fund specifically designed to provide capital for large development, commercial development and commercial real estate transactions from $50 million to more than $1 billion."[2]  The Debtor advertised that it would offer non-recourse lines of credit with rates at 4 to 6% with interest-only payments but would require borrowers to provide 20% cash upfront based on the total project cost to be placed in an interest credit account (each an "ICA Deposit").  The ICA Deposits would be held by the Debtor "'as prepaid interest throughout the term of the loan.'" The Debtor obtained millions of dollars in ICA Deposits from multiple companies throughout the country which, upon information and belief, was used in most cases by the Debtor and Roglieri before the loans were closed and funded.

---

[2] See Koplin, I., May 2, 2022, Roglieri Unveils Prime Capital Ventures, Prime Commercial Lending's Newest Fund, dealmaker-magazine.com, https://www.dealmaker-magazine.com/magazine/roglieri-unveils-prime-capital-ventures-prime-commercial-lendings-newest-fund (last known available on Dec. 16, 2023).

As set forth below, the Debtor's business was a fraudulent advance pay/Ponzi scheme.

6.    By December 2023, the Debtor was besieged by litigation largely from borrowers who did not get their loans funded and wanted the return of their ICA Deposits.  *See*, *e.g.*, *Tuss Financial LLC v. Prime Capital, et al.*, Index No. 2023/510389 (N.Y.Sup. Ct. Kings Cty. Apr. 5, 2023) (seeking and apparently obtaining the return of $13.4 million); *B&R Acquisition Partners v. Prime Capital* (JAMS Arb., Aug. 2023) (seeking the return of $4 million); *Sturm v. Prime Capital*, Case No. 23-cv-1033 (N.D.N.Y. Aug. 22, 2023) (seeking the return of $2 million); *Camshaft CRE 1, LLC v. Prime Capital*, Case No. 2023-023173 (Fla. Circ. Ct., Miami-Dade Cty., Sept. 15, 2023) (seeking the return of $13.4 million); *The Lion Group DFW, LLC v. Prime Capital*, Case No. 23-DCV-34617 (Tex. Dist. Ct., 146th Dist., Sept. 21, 2023) (demand unknown); *Onward Partners, LLC, v. Prime Capital, et al*., Case No. 23-cv-833 (D. Utah Nov. 13, 2023) (seeking the return of $20 million).

7.    On December 19, 2023, Compass-Charlotte 1031, LLC, 526 Murfreesboro, LLC, and Newlight Technologies, Inc. (collectively, the "Petitioning Creditors") filed an involuntary petition against the Debtor for relief under chapter 7 of the Bankruptcy Code commencing Case No. 23-11302 ("Case 1").  The Petitioning Creditors commenced Case 1 for the obvious purpose of ensuring that the Debtor's assets and liabilities could be liquidated in a single, public forum, and that no single creditor could win the proverbial "race to the courthouse".

8.    On December 22, 2023, upon order of the Court, the United States Trustee appointed me as the interim chapter 7 trustee of the Debtor's estate.

9.    Rather than submit to the orderly winddown or restructuring of the Debtor's business in Case 1, Roglieri pushed the Debtor in an entirely different direction.  Roglieri caused the Debtor to move for the dismissal of the involuntary petition on the basis that at least two of the

Petitioning Creditors' claims were subject to a bona fide dispute because litigation concerning their claims was pending. *See Debtor's Motion for Judgment Dismissing the Petition*, Case 1 Dkt. No. 72, p.1 (Jan. 8, 2024).

10.     On January 8, 2024, the Petitioning Creditors filed their own motion to dismiss Case 1 [Case 1 Dkt. No. 74], which motion was granted by the Court on January 9, 2024 [Case 1 Dkt. No. 87]. Thereafter, I was discharged from his duties as chapter 7 trustee.

11.     Three (3) days after dismissal of Case 1, on January 12, 2024, Petitioning Creditor Compass-Charlotte 1031, LLC commenced an action in the United States District Court for the Northern District of New York (the "District Court") under Case No. 24-cv-00055 (MAD) (CFH) (N.D.N.Y. Jan. 12, 1014) (the "Receivership Case"), seeking, among other things, the appointment of a federal equity receiver to take possession and control of the Debtor's assets and affairs. That same day, the District Court entered an order appointing Paul Levine as the temporary receiver (the "Receiver"). Receivership Case Dkt. No. 8.

12.     Again, Roglieri directed the Debtor's counsel to file an emergency motion on behalf of the Debtor to, among other things, dismiss the Receivership Case. *Id.* at Dkt. No. 12-14. On January 24, 2024, the District Court entered a memorandum decision and order making the Receiver's appointment permanent and defining his powers with respect to the Debtor and its property and denying the Debtor's motion to dismiss the case. *Id.* at Dkt. No. 56.

13.     On February 15, 2024, Roglieri filed a voluntary petition for relief under subchapter V of chapter 11 of the Bankruptcy Code commencing Case No. 24-10157 (REL) (the "Roglieri Case").

14.     On May 14, 2024, the Debtor, by and through the Receiver, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court commencing Case No.

24-10531 ("Case 2").

15.     On May 15, 2024, the Court entered an order converting Roglieri's case to one under chapter 7 of the Bankruptcy Code. Roglieri Case at Dkt. No. 159. Thereafter, the United States Trustee appointed me as the interim chapter 7 trustee. *Id.* at Dkt. No. 160. I have since qualified and I am currently serving as permanent trustee, defined above as the "Roglieri Trustee".

16.     On June 25, 2024, B and R Acquisition Partners, LLC ("B&R") and JHM Lending Ventures, LLC ("JHM" and together with B&R, the "B&R Parties") filed a motion to dismiss Case 2 on the basis that the Receiver was not authorized to file the petition on behalf of the Debtor because they asserted that he lacked the authority pursuant to the terms of the orders of the District Court. Case 2 at Dkt. No. 57.

17.     On July 23, 2024, the Court entered a memorandum decision and order dismissing Case 2 finding essentially that the Receiver did not have the authority to file Case 2 on behalf of the Debtor and that the Roglieri Trustee did not have the ability to waive the defect and ratify the filing *ex post facto* (the "Dismissal Order"). *Id.* at Dkt. No. 85. The Debtor took an appeal of the Dismissal Order, which appeal is pending before the District Court at Case No. 24-cv-000939.

18.     On September 16, 2024, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court commencing this bankruptcy case (the "Chapter 11 Case"). In this case, the Debtor is under my control as the Roglieri Trustee as the party in possession and control of all equity interests in the Debtor, who is acting as the manager of the Debtor.

19.     I have reviewed the Plan and corresponding Disclosure Statement, and proposed form of Confirmation Order and have discussed their contents with the Debtor's counsel. To the best of my knowledge, information, and belief formed after reasonable inquiry, and as set forth

more fully below, I believe that entry of the Confirmation Order is in the best interest of the Debtor, its estate, its creditors and all stakeholders.

### A. The Plan Complies with the Requirements of Section 1129(a)(1) of the Bankruptcy Code.

20.    Based on my review of the Plan and all related materials, I believe that the Plan complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code, including, without limitation, sections 1122 and 1123 of the Bankruptcy Code, which govern, respectively, the classification of claims and the contents of a plan.

i)    *The Plan Complies with Section 1122(a) of the Bankruptcy Code.*

21.    Section 1122(a) of the Bankruptcy Code provides that "a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."  11 U.S.C. § 1122(a).  In addition to Administrative Expense Claims, Professional Fee Claims, Receiver Professional Fee Claims, and Priority Tax Claims, which need not be designated pursuant to section 1123(a)(1) of the Bankruptcy Code, the Plan designates three (3) classes of Claims and Equity Interests.  Class 1 includes only Secured Claims.  Class 2 includes only General Unsecured Claims.  Class 3 includes only Equity Interests.  Thus, the Claims and Equity Interests placed in each Class are substantially similar to other Claims and Equity Interests in each such Class.  Accordingly, I believe that the Plan complies with section 1122 of the Bankruptcy Code.

ii)    *The Plan Complies with Section 1123 of the Bankruptcy Code.*

22.    Section 1123(a) of the Bankruptcy Code identifies eight (8) required contents of a plan.  Based upon my review of the Plan, the Plan contains each of these eight (8) required contents.

23.    Section 1123(a)(1) of the Bankruptcy Code requires that a chapter 11 plan designate classes of claims and interests other than claims of a kind specified in section 507(a)(2) of the Bankruptcy Code (administrative expense claims), section 507(a)(3) of the Bankruptcy Code (claims arising during the "gap" period in an involuntary bankruptcy case), and section 507(a)(8) of the Bankruptcy Code (priority tax claims).  Based upon my review of the Plan, Article 3 of the Plan satisfies this requirement by expressly classifying all Claims and Equity Interests, other than Administrative Expense Claims (other than professional fees and expenses), Priority Tax Claims, Professional Fee Claims, and Receiver Professional Fee Claims, as follows:  Class 1 (Secured Claims), Class 2 (General Unsecured Claims), and Class 3 (Equity Interests).

24.    Section 1123(a)(2) of Bankruptcy Code requires that a plan "specify any class of claims or interests that is not impaired under the plan." 11 U.S.C. § 1123(a)(2).  Based upon my review of the Plan, Article 3 of the Plan satisfies this requirement by specifying that Class 1 is not impaired under the Plan.  Accordingly, I believe that section 1123(a)(2) of the Bankruptcy Code is satisfied.

25.    Section 1123(a)(3) of the Bankruptcy Code requires that a plan "specify the treatment of any class of claims or interests that is impaired under the plan." 11 U.S.C. § 1123(a)(3).  Based upon my review of the Plan, Article 3 of the Plan specifies that Class 2 and

Class 3 are impaired under the Plan and Article 4 of the Plan specifies the treatment of each such Class. Accordingly, I believe that section 1123(a)(3) of the Bankruptcy Code is satisfied.

26.    Section 1123(a)(4) of the Bankruptcy Code requires that a plan "provide the same treatment for each claim or interest of a particular class." 11 U.S.C. § 1123(a)(4). Based upon my review of the Plan, Article 4 of the Plan satisfies this requirement by providing the same treatment to each Claim or Equity Interest in each respective Class. Accordingly, I believe section 1123(a)(4) of the Bankruptcy Code is satisfied.

27.    Section 1123(a)(5) of the Bankruptcy Code requires that a plan provide "adequate means" for its implementation. Based upon my review of the Plan, Article 5 of the Plan provides adequate and proper means for the implementation of the Plan. Section 5.1 provides that the Plan shall be funded from the proceeds of the sale of the Debtor's Assets.

28.    Sections 5.2 and 5.3 of the Plan provide for the appointment of a Plan Administrator to complete the wind-down of the Debtor's affairs and make distributions to Creditors. Section 5.5 of the Plan provides for the establishment of a Disputed Claims Reserve. In addition, Article 9 of the Plan provides procedures related to, among other things, distributions, resolution of disputed claims, and the means by which distributions will be transmitted. I believe that the foregoing provisions constitute adequate means for implementation of the Plan, and therefore section 1123(a)(5) of the Bankruptcy Code is satisfied.

29.    Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate documents prohibit the issuance of non-voting equity securities and related corporate governance matters. 11 U.S.C. §1123(a)(6). The Plan does not contemplate the issuance of new stock or equity

interests in the Debtor. Accordingly, I believe section 1123(a)(6) of the Bankruptcy Code is not applicable.

30.    Section 1123(a)(7) of the Bankruptcy Code requires that a plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan…." 11 U.S.C. § 1123(a)(7).  Section 5.2 of the Plan provides for the appointment of a Plan Administrator and the Plan identifies me as the Plan Administrator.  I have gained substantial knowledge and experience through my role as manager of the Debtor in my capacity as the Roglieri Trustee and believe this appointment to be consistent with the interests of Creditors and with public policy since it will be the most efficient and economical appointment.  In addition, section 5.4 of the Plan provides for the appointment of an Oversight Committee and the Plan Supplement identifies the following members of the Oversight Committee: (i) Compass-Charlotte 1031, LLC, (ii) ER Tennessee LLC, and (iii) Piper Capital Funding LLC.  Accordingly, I believe section 1123(a)(7) of the Bankruptcy Code is satisfied.

31.    Section 1123(a)(8) of the Bankruptcy Code requires that, if the debtor is an individual, the plan shall "provide for the payment to creditors under the plan of all or such portion of earnings from personal services performed by the debtor after the commencement of the case or other future income of the debtor as is necessary for the execution of the plan."  11 U.S.C. §

1123(a)(8).  The Debtor is not an individual.  Therefore, section 1123(a)(8) of the Bankruptcy

Code is not applicable.

32.      Section 1123(b) of the Bankruptcy Code identifies various discretionary provisions

that may be included in a plan but are not required.

33.      Section 1123(b)(1) states that a plan may "impair or leave unimpaired any class of

claims, secured or unsecured, or of interests." 11 U.S.C. § 1123(b)(1).  Based upon my review of

the Plan, it provides that Class 1 (Secured Claims) is not impaired and Class 2 (General Unsecured

Claims) and Class 3 (Equity Interests) are impaired.  See Plan, Articles 3 and 4.  I believe that the

foregoing treatment of Claims as set forth in Article 3 and Article 4 of the Plan is consistent section

1123(b)(1).

34.      Section 1123(b)(2) of the Bankruptcy Code provides that a plan may, subject to

section 365 of the Bankruptcy Code, "provide for the assumption, rejection, or assignment of any

executory contract or unexpired lease of the debtor not previously rejected under such section."

The Plan provides that any and all executory contracts and unexpired leases shall be deemed

rejected as of the Effective Date, unless a particular executory contract or unexpired lease (i) has

previously been assumed or rejected pursuant to an Order of this Court or (ii) has expired or

otherwise terminated pursuant to its terms.  See Plan, § 6.1.  I believe that the provisions of the

Plan regarding the treatment of potential executory contracts and unexpired leases are fair and

reasonable, and that the treatment is consistent with sections 365(a) and 1123(b)(2) of the

Bankruptcy Code.

35.      Section 1123(b)(3) of the Bankruptcy Code provides that a plan may provide for

"(a) the settlement or adjustment of any claim or interest belonging to the debtor or to the estate;

or (b) the retention and enforcement by the debtor, by the trustee, or by a representative of the

estate appointed for such purpose, of any such claim or interest."   Section 5.6 of the Plan

specifically preserves all Claims or Causes of Action that the Debtor or the Estate may have against

any person or entity and clarifies standing to pursue such Claims and Causes of Action lies with

the Plan Administrator.   As such, I believe these provisions of the Plan are consistent with section

1123(b)(3) of the Bankruptcy Code.

36.      Section 1123(b)(4) of the Bankruptcy Code provides that a plan may provide "for

the sale of substantially all of the property of the estate, and the distribution of the proceeds of

such sale among holders of claims or interests." 11 U.S.C. § 1123(b)(4).   The Plan will be funded

by a combination of the proceeds of sale of the Debtor's Assets and proceeds from liquidation of

remaining Assets and the Plan Administrator is responsible for disposing or otherwise realizing

the value of all the remaining Assets.   See Plan §§ 5.1, 5.3(viii).   Accordingly, I believe that the

Plan is consistent with section 1123(b)(4) of the Bankruptcy Code.

37.      Section 1123(b)(5) provides that a plan may "modify the rights of holders of

secured claims, other than a claim secured only by a security interest in real property that is the

debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of

holders of any class of claims."   Based upon my review of the Plan, the Plan modifies the rights

of holders of unsecured claims (Class 2).   See Plan § 4.2.   I believe that the modification of such

rights is consistent with section 1123(b)(5) of the Bankruptcy Code.

38.      Section 1123(b)(6) of the Bankruptcy Code provides that a Plan may "include any

other appropriate provision not inconsistent with the applicable provisions of this title." The Plan

does provide additional appropriate provisions that are not inconsistent with applicable sections of

the Bankruptcy Code, including, but not limited to: (i) Plan § 5.2 (appointment of Plan

Administrator); (ii) Plan § 5.5 (establishment of reserves); Plan § 8.1 (injunctions against

interference with consummation or implementation of Plan); (iv) Plan § 8.2 (exculpations); and (v) Plan § 9.10 (no distributions of less than two hundred dollars). I believe that these provisions are appropriate and consistent with the Bankruptcy Code, and thus, the Plan complies with section 1123(b) of the Bankruptcy Code.

39.    Section 1123(c) of the Bankruptcy Code requires that in a case involving an individual, that "a plan proposed by an entity other than the debtor may not provide for the use, sale, or lease of property exempted under section 522 of this title, unless the debtor consents to such use, sale or lease." 11 U.S.C. § 1123(c). The Debtor is not an individual, and accordingly, section 1123(c) is not applicable.

40.    Section 1123(d) of the Bankruptcy Code states that "[n]otwithstanding subsection (a) of this section and sections 506(b), 1129(a)(7), and 1129(b) of this title, if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law." 11 U.S.C. § 1123(d). Based upon my review of the Plan, the Plan does not contemplate the curing of any default. Accordingly, I believe that section 1123(d) is not applicable.

### B. The Debtor Has Complied with the Requirements of Section 1129(a)(2) of the Bankruptcy Code.

41.    Section 1129(a)(2) of the Bankruptcy Code requires that the plan proponent "compl[y] with the applicable provisions of [title 11 of the Bankruptcy Code]," including, without limitation, sections 1125 and 1126 of the Bankruptcy Code. 11 U.S.C. § 1129(a)(2).

42.    The Debtor requested that the approval of the Disclosure Statement and confirmation of the Plan be heard at the same time and the Court approved such request in the Scheduling Order. The Scheduling Order outlines the procedures for the solicitation and tabulation of votes on the Plan.

43.     As set forth in the *Certificates of Service*, sworn to on January 9, 2025 and January 15, 2025 (the "Solicitation Affidavits") [Docket Nos. 121 and 129], the Debtor fully complied with the requirements of the Scheduling Order.  See, generally, Solicitation Affidavits.

44.     The Confirmation Order contains a finding and conclusion that, pursuant to section 1125 of the Bankruptcy Code the Disclosure Statement contains "adequate information" and is approved in all respects.

45.     As set forth in the Solicitation Affidavits, in accordance with section 1126 of the Bankruptcy Code, the Debtor's counsel solicited votes on the Plan from holders of Claims in Class 2 (the "Voting Class").  The Voting Class is impaired under the Plan, and may, subject to the absolute priority rule, receive distributions under the Plan.  Accordingly, pursuant to section 1126(a) of the Bankruptcy Code, holders of Claims in the Voting Class were entitled to vote to accept or reject the Plan.

46.     Class 1 (Secured Claims) is not impaired under the Plan.  See Plan §§ 3.2, 4.1.  As a result, pursuant to section 1126(f) of the Bankruptcy Code, holders of Claims in Class 1 are conclusively presumed to have accepted the Plan.  As such, the votes of holders of Class 1 Claims were not solicited.  See Solicitation Affidavits.

47.     The Debtor did not solicit votes from Class 3 (Equity Interests) because such holders of Equity Interests are not entitled to receive or retain any property under the Plan on account of such Equity Interest unless and until holders of Allowed Claims in Classes senior in priority to them have been paid in full, which is not expected to occur.  Section 1126(g) of the Bankruptcy Code provides that "a class is deemed not to have accepted a plan if such plan provides that the claims or interests of such class do not entitle the holders of such claims or interests to receive or retain any property under the plan on account of such claims or interests" and, as such,

the votes of holders of Class 3 Equity Interests were not solicited.  11 U.S.C. § 1126(g); <u>see</u>

Solicitation Affidavits.

### C.  Section 1129(a)(3) of the Bankruptcy Code is Satisfied.

48.    Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in

good faith and not by any means forbidden by law."  The Plan has been proposed in good faith,

with the legitimate and honest purpose of maximizing the value of the Debtor's estate.

49.    The Plan shall be funded by a combination of the proceeds of sale of the Debtor's

Assets.

50.    I believe that the Plan maximizes value and that there is no alternative to the Plan

that would return more value to Creditors, and accordingly, believe that section 1129(a)(3) of the

Bankruptcy Code is satisfied.

### D.  The Plan Complies with Section 1129(a)(4) of the Bankruptcy Code.

51.    Section 1129(a)(4) of the Bankruptcy Code requires that: "[a]ny payment made or

to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property

under the plan, for services or for costs and expenses in or in connection with the case, or in

connection with the plan and incident to the case, has been approved by, or is subject to the

approval of, the court as reasonable."  In this Chapter 11 Case, the only such payments are to the

Debtor's retained professionals, Receiver's professionals, and any party filing an administrative

claim for substantial contribution.  Based upon my review of the Plan, with respect to the Debtor's

retained professionals and Receiver's professionals, section 5.10 of the Plan requires such persons

to file final applications for allowance of professional fees and reimbursement of expenses within

30 days of the Effective Date of the Plan.  With respect to administrative claims, such as claims

pursuant to sections 503(b)(3)(D) and 503(b)(4) for allowance and payment of counsel fees and

expenses incurred in making a substantial contribution in the Chapter 11 Case, section 5.9 of the

Plan requires such persons to file requests for payment of Administrative Expense Claims within

30 days of the Effective Date of the Plan.  In addition, sections 11.1(a) and 11.1(b) of the Plan

provide that the Bankruptcy Court will retain jurisdiction after the Effective Date to hear and

determine all requests for Administrative Expense Claims and applications for professional fees

and reimbursement of expenses.  I therefore believe that the Plan complies with section 1129(a)(4)

of the Bankruptcy Code.

### E.   The Debtor Has Complied with Section 1129(a)(5) of the Bankruptcy Code.

52.     Section 1129(a)(5)(A)(i) requires that the proponent of a plan disclose the identity

and affiliations of any individual proposed to serve, after confirmation of a plan, as director, officer

or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor,

or a successor to the debtor under the Plan.  The Plan satisfies section 1129(a)(5)(A)(i).  The Plan

discloses (a) that I will serve as Plan Administrator to complete the Debtor's wind-down and to

make distributions and (b) the formation of the Oversight Committee, comprised of nor more than

five (5) members.  See Plan §§ 5.2, 5.4.  The Plan relates solely to the Debtor and not to any other

person or entity.  Thus, I believe that the Plan complies with section 1129(a)(5)(A)(i) of the

Bankruptcy Code to the extent applicable.

53.     Section 1129(a)(5)(A)(ii) requires that the appointment of the person identified in

accordance with section 1129(a)(5)(A)(i) be "consistent with the interests of creditors and equity

security holders and with public policy."  11 U.S.C. § 1129(a)(5)(A)(ii).  As described above, the

Plan contemplates my appointment as Plan Administrator.  I believe that such appointment is

consistent with the interests of creditors and with public policy because, among other things, I have

substantial knowledge of the Debtor's remaining assets and have led the Debtor's wind-down

activities since my appointment as Roglieri Trustee and filing of the Chapter 11 Case. I believe that my completion of such activities will therefore be the most economical and efficient and therefore satisfies section 1129(a)(5)(A)(ii) of the Bankruptcy Code.

54.     Section 1129(a)(5)(B) of the Bankruptcy Code states that a plan may be confirmed if the proponent discloses the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.   11 U.S.C. § 1129(a)(5)(B).

55.     In my capacity as the Roglieri Trustee, I am in control of the Debtor's Estate. As a result, pursuant to section 101(31)(B) of the Bankruptcy Code, I am an "insider." As described above, I will be appointed as Plan Administrator. It is my expectation that I will be compensated for being the Plan Administrator at the rate of 2% of disbursements, plus reimbursement of expenses. I respectfully submit that the foregoing statements satisfy section 1129(a)(5)(B) of the Bankruptcy Code.

**F.  Section 1129(a)(6) of the Bankruptcy Code is Not Applicable.**

56.     Section 1129(a)(6) of the Bankruptcy Code requires, with respect to a debtor the rates of which are subject to governmental regulation following confirmation, that appropriate governmental approval has been obtained for any rate change provided for in the plan, or that such rate change be expressly conditioned on such approval. 11 U.S.C. § 1129(a)(6). Because there is no governmental regulatory commission that has jurisdiction over any rates of the Debtor, I believe that section 1129(a)(6) of the Bankruptcy Code is not applicable.

**G.  Section 1129(a)(7) of the Bankruptcy Code is Satisfied.**

57.     The "best interests of creditors" test as set forth in section 1129(a)(7) of the Bankruptcy Code requires that, with respect to each impaired class of claims or interests, each

16

holder of a claim or interest has accepted the plan or will receive property of a value not less than what such holder would receive if the debtor were liquidated under Chapter 7.

58.     The Voting Class has voted to accept the Plan.  <u>See</u> *Certification of Fred Stevens Regarding Solicitation of Votes and Tabulation of Ballots Cast on the First Amended Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code*, dated February 19, 2025 (the "<u>Voting Declaration</u>") [Docket No. 152].  There were no Creditors who voted to reject the Plan in the Voting Class.  <u>See</u> Voting Declaration, Exhibit A.

59.     The Plan provides Class 2 (General Unsecured Claims) with better treatment than would result if the Debtor was liquidated under Chapter 7.  The Liquidation Analysis demonstrates the treatments for each Class under the Plan and in a hypothetical Chapter 7 scenario. Based upon the Liquidation Analysis and discussions with my retained professionals, it is undisputable that for those Creditors who voted to reject the Plan, such holder will receive value under the Plan that is not less than such holder would receive if the Debtor was liquidated in Chapter 7.

60.     Accordingly, I believe that the "best interests of creditors" test in section 1129(a)(7) is satisfied as to the Voting Class because any theoretical dissenting holder of a Claim in each such Class will receive or retain under the Plan, on account of such Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would receive in a Chapter 7 liquidation of the Debtor's assets on such date.

61.     Finally, the docket of the Chapter 11 Case does not reflect an election by any Class pursuant to § 1111(b)(2) of the Bankruptcy Code. Accordingly, I believe that the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

**H.  Section 1129(a)(8) of the Bankruptcy Code is Satisfied.**

62.      Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests under a plan has either accepted the plan or is not impaired under the plan.  With respect to an unimpaired class of claims, under section 1126 of the Bankruptcy Code, any such unimpaired class of claims is "conclusively presumed" to have accepted the plan and need not be further examined under section 1129(a)(8). 11 U.S.C. § 1126(f).  Class 1 (Secured Claims) is not impaired and is therefore conclusively presumed to have accepted the Plan.  See Plan §§ 3.2, 4.1.

63.      As to each Impaired Class, section 1126(c) of the Bankruptcy Code provides that a plan is accepted if the accepting class members hold at least two-thirds in amount and more than one-half in number of the claims held by the class members that have cast votes on the plan, excluding any holder designated pursuant to section 1126(e) of the Bankruptcy Code. 11 U.S.C. § 1126(c).

64.      As set forth herein above, the Voting Class voted to accept the Plan.  As such, Section 1129(a)(8) is satisfied.

**I.  Section 1129(a)(9) of the Bankruptcy Code is Satisfied.**

65.      Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be paid in full on the effective date of a plan.  Based upon my review of the Plan, the Plan satisfies each of the requirements of section 1129(a)(9).  First, consistent with section 1129(a)(9)(A), the Plan provides for all Allowed Administrative Claims (i.e., § 507(a)(2)  and § 507(a)(3) claims) to be paid in full in Cash (a) as soon as practicable following the later of the Effective Date or the date upon which the Court enters a Final Order allowing any such Administrative Expense Claim, or (b) upon such other terms as may exist in accordance with the ordinary course of the Debtor's

liquidation, or (c) as may be agreed upon between the holder of any such Administrative Expense Claim and the Plan Administrator.  See Plan § 2.1(a).

66.    Second, the Plan provides that Priority Tax Claims will be treated consistently with section 1129(a)(9)(C), in that each holder of an Allowed Priority Tax Claim shall be paid (a) an amount in Cash equal to the Allowed amount of such Priority Tax Claim, or (b) such other treatment as to which the Plan Administrator and the holder of such Allowed Priority Tax Claim shall have agreed upon in writing.  See Plan § 2.1(b).

67.    Thus, I believe that the Plan complies with each of the requirements of section 1129(a)(9) of the Bankruptcy Code.

**J.    Section 1129(a)(10) of the Bankruptcy Code is Satisfied.**

68.    Section 1129(a)(10) of the Bankruptcy Code states that "[i]f a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider".  11 U.S.C. § 1129(a)(10).  I believe that this requirement has been satisfied.  As described above, the Plan has been accepted by Class 2 which does not count any votes cast by any insiders.

69.    As a result, at least one Class of Claims that is Impaired under the Plan has accepted the Plan, determined without including any acceptance of the Plan by any insider, as required by section 1129(a)(10) of the Bankruptcy Code.

**K.    Section 1129(a)(11) of the Bankruptcy Code is Satisfied.**

70.    Pursuant to section 1129(a)(11) of the Bankruptcy Code, a plan may be confirmed only if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."  11 U.S.C. § 1129(a)(11).

71.     As described in detail in the Disclosure Statement, the Plan shall be funded by the proceeds of sale of the Debtor's Assets.  In addition, the Plan provides that Causes of Action will be vested for further prosecution under the management of the Plan Administrator.  As a result, no further liquidation or reorganization will be required after confirmation of the Plan.

72.     As such, I submit that the requirements of section 1129(a)(11) are not applicable. However, to the extent Bankruptcy Code section 1129(a)(11) applies to implementation of the Plan, I believe that the feasibility requirement of section 1129(a)(11) is satisfied, because the Estate will have sufficient assets on hand to implement the Plan as proposed.

73.     I do not believe further liquidation or reorganization will be required after confirmation of the Plan.  I therefore believe that the feasibility requirement of section 1129(a)(11) is satisfied.

### L.   The Plan Satisfies Section 1129(a)(12) of the Bankruptcy Code.

74.     Section 1129(a)(12) of the Bankruptcy Code requires that certain fees listed in 28 U.S.C. § 1930, determined by the court at the hearing on confirmation of a plan, be paid or that provision be made for their payment.  11 U.S.C. § 1129(a)(12).  Based upon my review of the Plan, this requirement has been satisfied.  The Plan provides that all fees payable pursuant to section 1930 of Title 28 of the United States Code shall be paid on the Effective Date (if any are due) by the Plan Administrator.  The Plan also provides for the payment, when due, of all United States Trustee quarterly fees under 28 U.S.C. § 1930(a)(6) from the Effective Date until the Chapter 11 Case is closed.  See Plan, section 5.13.

### M. Sections 1129(a)(13)-(16) of the Bankruptcy Code are Not Applicable.

75.     The Debtor (i) has no obligation to provide retiree benefits, (ii) does not have any domestic support obligations, and (iii) is not a nonprofit entity.  In addition, there are no unresolved

objections by Allowed unsecured creditors were received to the Plan[3].  Accordingly, I believe that

sections 1129(a)(13) through (16) of the Bankruptcy Code to be inapplicable.

### N. Invocation of Section 1129(b) of the Bankruptcy Code Is Not Required.

76.     Section 1129(b)(1) of the Bankruptcy Code provides that, "if all of the applicable

requirements of subsection (a) of this section other than paragraph (8) are met with respect to a

plan, the court, on request of the proponent under the plan, shall confirm the plan notwithstanding

the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and

equitable, with respect to each class of claims or interests that is impaired under, and has not

accepted, the plan."

77.     As set forth above, Class 2 was the only impaired Class and Class 2 voted to accept

the Plan.  As a result, section 1129(b) is not applicable.

### O. Section 1129(c) of the Bankruptcy Code is Satisfied.

78.     Bankruptcy Code section 1129(c) states that a court "may only confirm one plan."

11 U.S.C. § 1129(c).  The Plan is the only plan that has been filed in this Chapter 11 Case.

Accordingly, I believe that section 1129(c) of the Bankruptcy Code is satisfied.

### R. Section 1129(d) of the Bankruptcy Code is Satisfied.

79.     Section 1129(d) of the Bankruptcy Code states that "the court may not confirm a

plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of the application

of section 5 of the Securities Act of 1933."  The purpose of the Plan is not to avoid taxes or the

application of section 5 of the Securities Act of 1933.  Moreover, no party that is a governmental

unit, or any other entity, has requested that the Court decline to confirm the Plan on the grounds

that the principal purpose of the Plan is the avoidance of taxes or the avoidance of the application

---

[3]  There is remaining one unresolved limited objection to the adequacy of the Disclosure Statement filed by Hogan
Lovells US LLP [Dkt. No. 150].

of section 5 of the Securities Act of 1933. Accordingly, I believe that the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

### S.  Finding that the Debtor was a "Ponzi" Scheme

80.      The Debtor's professionals estimate that at least $100 million in fraudulently obtained funds have yet to be returned to the Debtor's victims.[4]  Obtaining recompence for the Debtor's victims will be the primary objective of the Plan Administrator after the confirmation of the Plan.

81.      The Debtor seeks a finding that it was in fact a fraudulent Ponzi/advance pay lending scheme as part of the order confirming the Plan.  That finding will help the Plan Administrator streamline the process to recover money and other property fraudulently transferred by the Debtor in furtherance of its scheme, and liquidate claims filed against the Debtor's estate.

82.      The Debtor was formed on December 14, 2021, and purported to be a legitimate alternative (or nonbank) commercial lender.  The Debtor advertised proudly that:



---

[4]  After duplicate claims are eliminated and the three separate claims of Berone Capital LLC (Claim Nos. 25-27) are counted a single time in the amount of $30,000,000, there are currently $209,736,694.10 in claims asserted against the Debtor's estate.  The Plan Administrator intends to investigate each claim fully following confirmation to determine the proper amount of each creditor's claim and the actual amount of each creditor victim's ICA Deposit.

*See* Prime Commercial Lending, Prime Capital Ventures & The Bailey [Video], May 16, 2022,

https://www.youtube.com/watch?v=A4_RKBepUkA (YouTube) at 0:21.

83.    Generally, alternative lenders offer borrowers some significant benefits over traditional bank lenders by having simpler application processes, fewer underwriting requirements, different and more flexible financing products, and more rapid funding.[5]  Roglieri confirmed that this was the Debtor's business model claiming that he "saw a rising demand from borrowers who needed to move projects forward with as little static as possible" and that the Debtor could "provide solutions that are less restrictive than your average bank and offer generous terms that favor borrowers."[6] The disadvantage of going to an alternative lender is that they typically charge higher interest rates than what may be available at a traditional bank.[7]  The Debtor on the other hand offered all of the advantages of an alternative lender, while offering interest rates well below market as explained below.

84.    On May 2, 2022, the Debtor described its business in an article in DealMaker Magazine as "a fund specifically designed to provide capital for large development, commercial development and commercial real estate transactions from $50 million to more than $1 billion."[8] The Debtor offered non-recourse loans with interest rates of 4 to 6% with interest only payments.[9] At the exact same time, interest rates were rising rapidly in response to inflationary pressure.  At the time of the Debtor's advertisement, the prime interest rate was 4%, rising to 4.75% a month

---

[5]  See Calio, V., June 20, 2024, Traditional Bank vs. Alternative Lender, kapitus.com, https://kapitus.com/blog/manage-your-money/financing/traditional-bank-vs-alternative-lender-which-is-better-for-your-small-business-kapitus/.

[6]  Prime Commercial Lending, March 17, 2022, Albany, New York's Prime Commercial Lending Funds the First 5-Star Hotel in Atlanta, GA Through Prime's Real Estate Fund, Prime Capital Ventures, [Press release] https://www.prnewswire.com/news-releases/albany-new-yorks-prime-commercial-lending-funds-the-first-5-star-hotel-in-atlanta-ga-through-primes-real-estate-fund-prime-capital-ventures-301505069.html.

[7]  See Calio, V., June 20, 2024, Traditional Bank vs. Alternative Lender, *supra.*

[8]  See Koplin, I., May 2, 2022, Roglieri Unveils Prime Capital Ventures, Prime Commercial Lending's Newest Fund, dealmaker-magazine.com,  https://www.dealmaker-magazine.com/magazine/roglieri-unveils-prime-capital-ventures-prime-commercial-lendings-newest-fund (last known available on Dec. 16, 2023).

[9]  See Id.

later, then to 6.25% by September 22, 2022, and peaking at 8.5% on July 27, 2023.[10]  15-year

mortgages followed the same trend starting at 4.52% on May 5, 2022 and peaking at 7.03% on

October 26, 2023.[11]

85.    The Debtor's business model sounds completely implausible because it was.  For

any lender to be successful, it must pay a lower cost of capital than it receives from its borrowers.

Banks would never survive if they paid their depositors a higher rate of interest than they receive

from their borrowers.  This assertion can be easily verified by contrasting what Citibank will pay

a depositor today for a 5-year certificate of deposit (1.98%)[12] versus the average 5-year commercial

mortgage rate (6.54%)[13]. In simple terms, in order to be a successful lender, the Debtor would have

had the impossible task of obtaining capital at well below the 4 to 6% that it was offering to its

prospective borrowers.  In truth, the Debtor had no known legitimate source of capital to lend to

prospective borrowers.  Instead, it obtained its capital by converting its prospective borrowers'

own funds.

86.    The Debtor did this by requiring as a condition of providing a loan that its

prospective borrower provide 20% of the contemplated loan as an upfront deposit (defined above

as an "ICA Deposit," or collectively, the "ICA Deposits").  Roglieri stated that borrowers "have

to come to the table with at least 20% and that's just an important function of how our product

works."[14]  The Debtor claimed that it would hold the ICA Deposit "as prepaid interest throughout

the term of the loan."[15]  As interest payments became due, the Debtor represented that it "would

---

[10]  See https://www.fedprimerate.com/wall_street_journal_prime_rate_history.htm.
[11]  See Freddie Mac (https://www.freddiemac.com/pmms).
[12]  See Source https://www.citi.com/banking/current-interest-rates/cd (last viewed Feb. 4, 2025).
[13]  See Source https://www.commloan.com/commercial-mortgages/mortgage-rates (last viewed Feb. 3, 2025).
[14] See Koplin, I., May 2, 2022, Roglieri Unveils Prime Capital Ventures, Prime Commercial Lending's Newest
Fund, dealmaker-magazine.com.
[15] See Id.

just deduct it from the [ICA Deposit]".[16]  The Debtor admitted that this was "a unique way of doing things" but claimed that it "ensures [the Debtor's] payback, and [the ICA Deposit] serves as additional collateral for the loan throughout the term."[17]

87.    The ICA Deposits were an investment by the borrowers to get access to the Debtor's promise of cheap and readily available capital.  A loan from the Debtor would theoretically allow a prospective borrower to invest in its underlying business and hopefully make big returns.  The Debtor's prospective borrowers did not appear to have any other viable source of capital, or at least not any as inexpensive as the Debtor.  The Debtor further enticed prospective borrowers with what appear to have been very little underwriting and collateral requirements.  The Debtor also did not require personal guarantees or recourse on the loans based upon those that I and the Debtor's professionals have been able to tell from the Debtor's books and records.

88.    Of course, the ICA Deposits that the Debtor claimed to be holding to service the prospective borrower's future interest payment, were the Debtor's only known source of capital. The Debtor did not segregate or hold the borrowers' ICA Deposits as it had represented.  In fact, based upon the detailed allegations of the Government, many ICA Deposits were largely if not completely consumed the minute they were received by the Debtor to cover large and pervasive overdrafts in the Debtor's bank accounts.[18]

89.    A few of the ICA Deposits were used to fund one of the only five loans that the Debtor actually made as discussed below.  Others were used to buy luxury items for the exclusive

---

[16] Id.

[17] Id.

[18] For example, on April 7, 2023, creditor 526 Murfreesboro provided the Debtor with an ICA Deposit of $4,312,500 by wire transfer to the Debtor's account at Citibank.  At the time, the Citibank account was overdrawn in the amount of $4,094,514.75, so nearly the entire ICA Deposit was spent immediately to cover the Debtor's obligation to Citibank. Similarly, on April 27, 2023, Compass-Charlotte provided the Debtor with an ICA Deposit of $15,902,250 by wire into the Debtor's Citibank account.  $6,525,669.33 of that ICA Deposit was consumed immediately to cover an overdraw.  See United States of America v. One 2003 Ferrari Enzo AB Version E., et al., Case No. 24-cv-1345 (MAD/DJS), Dkt. No. 20-1, Amended Complaint, ¶¶36-57 (N.D.N.Y. Jan. 15, 2025).

benefit and enjoyment of Roglieri.  For example, according to the Government, Roglieri spent the

funds misappropriated from the Debtor's prospective borrowers in the following ways[19]:

- $916,201 in private jets from June 2022 to October 2023;

- $1,778,154.77 to Ai Design, a high-end automotive shop from December 2022 to October 2023;

- $3,194,454 to purchase a rare Mercedes-Benz "hybercar", which never materialized;

- $3,672,067.50 to purchase the Virginia Beach Property;

- $2,225,000 to purchase a single wristwatch called "RM-52-01 Tourbillion Skull";

- $4,729,745 to RM Sotheby's to purchase a 2003 Ferrari Enzo AB Version E and a 2014 Ferrari LaFerrari;

- $260,810 for a table constructed using a Ferrari V-12 engine;

- $2,076,900 for the combined purchase of a 1982 Mercedes Benz 500SL, a 1989 Mercedes Benz 560 SEL, a 2007 Mercedes Banz SLR McLaren, and a 1987 Mercedes Benz 560;

- $1,300,000 to TopGear Imports for a 2004 Porsche Carrera;

- $2,055,312 to Wide World Farrari for a 2022 Ferrari 812 Competizione;

- $3,811,000 to Bonhams Butterfields Trust for the purchase of a 2006 Maserati MC 12 Corse;

- $355,000 to Timepiece Trading for the purchase of a Richard Mille RM 65-01 watch; and

- $260,000 to Luxury Bazaar for the purchase of two Rolex watches.

90.    In order to sell a business model that seemed entirely impossible if properly

understood, and to get prospective borrowers to give the Debtor new ICA Payments, the Debtor

had to demonstrate that it actually made loans.  It did this by, among other ways, fraudulently

claiming to have made a "$188,000,000 funding of ALUX Properties, LLC and their project 'The

---

[19] See Id. at ¶¶80-162.

Bailey' which will be the only 5-star hotel in Atlanta".[20]  The Debtor made a glitzy promotional video published on YouTube where it boasted about making this loan.  The video featured Roglieri and others trapsing around the wooded area in Atlanta where "The Bailey" was going to be constructed.  The alleged principal of ALUX Properties, LLC ("ALUX"), Brandon Wheeless, expressed his appreciation in the video stating that "access to this type of capital with trusted individuals that you close deals with definitely makes life a heck of a lot easier for us and the company so we are fast-tracking to grow at an exponential rate moving forward."[21]  Depicted here are Mssrs. Wheeless and Roglieri surveying the site, along with the "after" rendering of "The Bailey" contained in the Debtor's video advertisement[22]:

 

[20]    See Prime Commercial Lending, Prime Capital Ventures & The Bailey [Video], May 16, 2022,
https://www.youtube.com/watch?v=A4_RKBepUkA (YouTube) at 0:13:

Prime Commercial Lending through its fund Prime Capital Ventures
is proud to announce the $188,000,000 funding of
ALux Properties, LLC and their project "The Bailey"
which will be the only 5-star hotel in Atlanta.

A one of a kind luxury hotel and mixed use development that will
transcend the meaning of luxury across the world.

See also, Prime Commercial Lending, March 17, 2022, Albany, New York's Prime Commercial Lending Funds the First 5-Star Hotel in Atlanta, GA Through Prime's Real Estate Fund, Prime Capital Ventures, [Press release].
[21]    See Id. at 3:44 (transcribed by counsel).
[22]    See Id. at 2:58 and 1:35, respectively.

91.    The problem, of course, is that the Debtor never made any such loan to ALUX. There is no "The Bailey" hotel in Atlanta and there is no sign that there was ever actually going to be.  In fact, ALUX, the purported borrower, was placed into a receivership by the Georgia Superior Court on September 13, 2022 in connection with a lawsuit where the plaintiffs alleged, among other things, to have been defrauded out of $10 million.[23]  Featured in that litigation was an entity called Blackwater Capital Group, LLC" ("Blackwater") which purported to act as a lender to the project, not unlike the Debtor in its promotional video.[24]  Blackwater's lending agreement was dated December 14, 2021, the exact date that the Debtor was formed, and was nearly identical in form and substance to the form of lending agreement employed by the Debtor.[25]  Compared here are the first pages of the table of contents of Blackwater's December 14, 2021 lending agreement (on the left), and the Debtor's April 24, 2023 lending agreement with creditor Compass (on the right)[26]:

---

[23] See Capstone Diagnostics One, L.P., et al. v. Bailey LLC, et al., Case No. 2022cv366001 (GA Sup. Ct., Fulton Cty., Sept. 22, 2024).
[24] See Id., Judgment entered June 24, 2023.
[25] See Id., Verified Complaint, Exhibit E, executed June 9, 2022.
[26] See Id., compared to Exhibit 29 to the Complaint filed in Compass-Charlotte v. Prime Capital Ventures, LLC, et al., Case No. 24-cv-55 (MAD) (N.D.N.Y. Jan. 12, 2024).

92.    Like the Debtor, Blackwater required the payment of an ICA Deposit under its agreement.  Blackwater was ultimately paid its $10 million ICA Deposit.  However, the source of that ICA Deposit did not come from ALUX but from funding from the plaintiffs in the litigation. Ultimately, the Georgia Superior Court found that "[t]he testimony evidence brought forth at the hearing revealed the [Blackwater lending agreement] to be a 'total fraud'".[27]  Although the relationship between the Blackwater and the Debtor is not yet understood, both entities and/or their principals were using the same fraud model to defraud prospective borrowers out of ICA Deposits.

93.    Fortunately for Blackwater's victim(s) in the ALUX transaction, but unfortunately for the Debtor's, Blackwater appears to have been discovered and stopped relatively quickly, whereas the Debtor continued on until at least in or around December 2023, obtaining an estimated $100 million in ICA Deposits that have yet to be repaid.

94.    In addition to the fraudulent claim that the Debtor has loaned $188 million to ALUX to build "The Bailey", the Debtor also fraudulently claimed to have "gained prominence by committing $17 billion with a South Korean firm for projects in the United States and abroad."[28] The Debtor also claimed that it had provided "$2.3 billion in funding for the first stage of a massive five-year, five-stage $22 billion project" "[i]n the heart of Dubai".[29]  There is absolutely no indication that any of that is true.

---

[27] See Id., Judgment entered June 24, 2023, p.4.

[28] See Prime Commercial Lending, March 17, 2022, Albany, New York's Prime Commercial Lending Funds the First 5-Star Hotel in Atlanta, GA Through Prime's Real Estate Fund, Prime Capital Ventures, [Press release]; see also Prime Commercial Lending, Prime Commercial Lending Commits to Lending $17 Billion [Video], Jan. 21, 2022, https://www.youtube.com/watch?v=PmvtmdkBUlo (YouTube) at 0:13:

Prime Commercial Lending recently committed to funding 17 Billion dollars of projects for a South Korean investor.

[29] Koplin, I., May 2, 2022, Roglieri Unveils Prime Capital Ventures, Prime Commercial Lending's Newest Fund, dealmaker-magazine.com,  https://www.dealmaker-magazine.com/magazine/roglieri-unveils-prime-capital-ventures-

95.    The Debtor's business was never legitimate.  It was founded upon lies.  Those lies were compounded when prospective borrowers' ICA Deposits were immediately converted and never reserved for interest payments as represented.  Finally, those lies were discovered when the Debtor was unable to fund the loans promised to prospective borrowers who had already made ICA Deposits.  Once most of the borrowers discovered that the Debtor could not fund their loans, they demanded a return of their ICA Deposits and began to rush to courthouses all over the country.[30]

96.    For five of the Debtor's earliest prospective borrowers, the Debtor was able to obtain sufficient additional ICA Deposits from new prospective borrowers to fund those loans. Even though the Debtor advertised that its transactions ranged from $50 million to $1 billion, none of the loans that it actually made even came close to the advertised $50 million floor.  In fact, the largest loan was to Indigo Pharmaceuticals and was for $20 million by agreement dated June 2, 2022.[31]  The other four were as follows: (i) to 135 Railroad, LLC for principal of $2 million closed Jan. 26, 2023; (ii) to Hudson & Hudson, LLC for principal of $5 million closed March 2, 2023; (iii) to SRA-CH Richland I LLC for principal of $16.5 million closed June 9, 2023; and (iv) to Brightsmith Tulsa LLP for principal of $7.5 million closed Sep. 12, 2023.  In addition, the Debtor partially funded a loan to Caruso Home Builders in the approximate amount of $2.4 million, after reducing it by the ICA Deposit and related fees.

---

prime-commercial-lendings-newest-fund (last known available on Dec. 16, 2023).

[30] See, e.g., Truss Financial LLC v. Prime Capital, et al., Index No. 2023/510389 (N.Y.Sup. Ct. Kings Cty. Apr. 5, 2023) (seeking and apparently obtained the return of $13.4 million); B&R Acquisition Partners v. Prime Capital (JAMS Arb., Aug. 2023) (seeking return of $4 million); Sturm v. Prime Capital, Case No. 23-cv-1033 (N.D.N.Y. Aug. 22, 2023) (seeking return of $2 million); Camshaft CRE 1, LLC v. Prime Capital, Case No. 2023-023173 (Fla. Circ. Ct., Miami-Dade Cty., Sept. 15, 2023) (seeking return of $13.4 million); The Lion Group DFW, LLC v. Prime Capital, Case No. 23-DCV-34617 (Tex. Dist. Ct., 146th Dist., Sept. 21, 2023) (demand unknown); Onward Partners, LLC, v. Prime Capital, et al., Case No. 23-cv-833 (D. Utah Nov. 13, 2023) (seeking return of $20 million).

[31] See Prime Commercial Lending, Prime Capital Ventures Presents Indigo Pharmaceutical in Las Vegas, NV [Video], Apr. 20, 2023, https://www.youtube.com/watch?v=GvmECqnuBkY (YouTube) at 0:13; Prime Commercial Lending, Prime Capital Ventures Presents Home Rentals in Carbondale, IL [Video], Mar. 3, 2023, https://www.youtube.com/watch?v=8D5GRnKecG0 (YouTube).

97.     When the Debtor was no longer able to fund loans and borrowers began to sue, the
only way for the Debtor to forestall discovery of its fraud was to obtain more ICA Deposits in
order to repay those who had discovered what was going on.  In at least the following situations,
the Debtor used new ICA Deposits to try to satisfy the claims of earlier prospective borrowers:

- 526 Murfreesboro delivered a $4,312,500 ICA Deposit to the Debtor on April 7, 2023.
  On April 17, 2023, the Debtor used $2,000,000 of that ICA Deposit to repay a prior
  portion of the ICA Deposit received in September 2022 from borrower Onward
  Partners LLC, and another $2,000,000 of that ICA Deposit to repay a prior portion of
  the ICA Deposit from another client identified as "Business-1" by the Government.[32]
  Thus, the near entirety of 526 Murfreesboro's ICA Deposit was used to repay prior
  borrower/investors.

- Compass delivered a $15,902,250 ICA Deposit to the Debtor on April 27, 2023, and
  HCW Biologics Inc. ("HCW") delivered a $5,250,000 ICA Deposit to the Debtor that
  same day.  Compass and HCW's ICA Deposits were commingled and were used for
  the following purposes, among others, not related to those borrowers: (i) $6,525,669.33
  was used to fund a preexisting overdraw in the Debtor's bank account (Citibank No.
  **6945); and (ii) $3,700,000 was transferred to a law firm and used, upon information
  and belief, in connection with another loan.[33]

- Newlight delivered a $2,500,000 ICA Deposit to the Debtor on May 24, 2023, which
  was largely used for unrelated purposes in the one- week period that followed.[34]

98.     I believe as the Government has alleged that the Debtor was at all relevant times an
advance fee/Ponzi scheme.  Perhaps the most compelling admission is found in text messages
between Roglieri and an undisclosed individual as follows:

| Date | Time | From | Message |
|------|------|------|---------|
| 1/4/2024 | 11:20:42 am | Unknown | Can't you just keep working on those companies? I know it might be hard at first, but look what you build this up to beat from nothing |
| 1/4/2024 | 11:20:56 am | Roglieri | Yea I can but not when I'm in f—king prison |
| 1/4/2024 | 11:21:09 am | Unknown | Why do you think that's gonna happen? Why can't it just be a bankruptcy? |
| 1/4/2024 | 11:21:47 am | Roglieri | **Because I unused others money to fund deals** I already told you this |
| 1/4/2024 | 11:22:02 am | Unknown | And that's illegal? |

---

[32] See Civil Forfeiture Case Amended Complaint, Dkt. No. 20-1, ¶42.
[33] See Id. at ¶¶45-57.
[34] See Id. at ¶¶58-65.

| Date | Time | From | Message |
|------|------|------|---------|
| 1/4/2024 | 11:22:15 am | Roglieri | Yes |
| 1/4/2024 | 11:22:36 am | Unknown | How bad .  I mean, what's the worst you do a couple years who cares<br>You have your family<br>This whole family will support you through this<br>It's a civil case it's not a criminal case |
| 1/4/2024 | 11:27:42 am | Roglieri | **It will turn criminal as soon as they get into bank statements** |

Criminal Case, Docket No. 6-1 (June 3, 2024) (emphasis added) (typographical and grammatical errors in original).

99.    Based upon the foregoing and as set forth in the Debtor's accompanying Memorandum of Law in support of approval of its Disclosure Statement and confirmation of the Plan, the Debtor seeks a finding in connection with confirmation of the Plan that the Debtor was an advance fee/Ponzi scheme.

## **CONCLUSION**

As evidenced by the fact that there are no remaining objections to confirmation of the Plan and overwhelming approval by the Voting Class, the Plan is fair and reasonable and has been proposed in good faith and for proper purposes.  The Plan will enable the maximization of value for the benefit of the Debtor's creditors and all parties-in-interest.  For all of these reasons, I respectfully submit that the Court should confirm the Plan.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this the 20th day of February, 2025, in Albany, New York.

*/s/ Christian H. Dribusch*
Christian H. Dribusch

## **Exhibit A**

Confirmation Order