**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF NEW YORK**

In re:

PRIME CAPITAL VENTURES, LLC,                    Case No. 24-11029-REL
                                                Chapter 11

                              Debtor.

**MEMORANDUM OF LAW IN SUPPORT OF ENTRY OF AN ORDER (I) APPROVING
ADEQUACY OF SECOND AMENDED DISCLOSURE STATEMENT FOR FIRST
AMENDED PLAN OF LIQUIDATION PURSUANT TO CHAPTER 11 OF THE
BANKRUPTCY CODE AND (II) CONFIRMING FIRST AMENDED PLAN OF
LIQUIDATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

Dated:   New York, New York
         February 20, 2025

                              **KLESTADT WINTERS JURELLER**
                                **SOUTHARD & STEVENS, LLP**
                              200 West 41st Street, 17th Floor
                              New York, NY 10036-7203
                              Telephone: (212) 972-3000
                              Facsimile: (212) 972-2245
                              Fred Stevens
                              Lauren C. Kiss

                              *Counsel to Prime Capital Ventures, LLC,*
                                *Debtor and Debtor in Possession*

## <u>TABLE OF CONTENTS</u>

**Page(s)**

I.      PRELIMINARY STATEMENT ................................................................2

II.     BACKGROUND AND OVERVIEW OF THE PLAN ....................................2

    A.  The Debtor's Bankruptcy Case and Receivership .........................................2

    B.  The Plan ......................................................................................6

    C.  The Solicitation of Votes and Noticing of Non-Voting Classes....................................7

III.    THE PLAN SHOULD BE CONFIRMED ..................................................9

    A.  The Plan Complies with the Applicable Provisions of Title 11 (11 U.S.C. § 1129(a)(1)) ............................................................................11

       i.      The Plan Designates Classes of Claims ............................................14

       ii.     Specification of Unimpaired Classes of Claims ..............................................14

       iii.    The Plan Specifies the Treatment of Impaired Classes ...................................14

       iv.     The Plan Provides the Same Treatment within Each Class ...........................15

       v.      The Plan Provides Adequate Means for Implementation ..............................15

       vi.     Prohibition on the Issuance of Non-Voting Securities ...................................16

       vii.    Selection of Trustees, Member and Manager ................................................16

       viii.   Impairment and Non-Impairment of Claims....................................................17

       ix.     Executory Contracts and Unexpired Leases ...................................................17

       x.      Retention of Claims ......................................................................18

       xi.     Sale of Property and Distribution of Proceeds................................................21

       xii.    Modification of Rights of Holders on Unsecured Claims ..............................22

       xiii.   The Plan Includes Other Provisions that are not Inconsistent with Applicable Sections of the Bankruptcy Code....................................................22

B. The Debtor Has Complied with the Applicable Provisions of Tile 11 (11 U.S.C. § 1129(a)(2)) ....................................................................................................23

C. The Plan was Proposed in Good Faith (11 U.S.C. § 1129(a)(3)) ..............................25

D. All Payments to be Made by the Estate in Connection with this Case is Subject to the Approval of the Court (11 U.S.C. § 1129(a)(4))..........................................................26

E. Disclosure of all Required Information Regarding Post-Confirmation Directors, Management and Insiders (11 U.S.C. § 1129(a)(5))....................................................27

F. The Plan Does Not Provide for any Rate Change Subject to Regulatory Approval (11 U.S.C. § 1129(a)(6)) ..................................................................................................30

G. The Plan Satisfies the "Best Interests" Test (11 U.S.C. § 1129(a)(7)) .......................30

H. Each Impaired Class Has Voted to Accept the Plan (11 U.S.C. § 1129(a)(8)) ...........32

I. The Plan Provides for the Payment of Priority Claims (11 U.S.C. § 1129(a)(9)) .......33

J. The Plan has been Accepted by at Least One Impaired, Non-Insider Class (11 U.S.C. § 1129(a)(10)) .............................................................................................................34

K. The Plan is Feasible or Feasibility Analysis Not Applicable (11 U.S.C. § 1129(a)(11)) ...............................................................................................34

L. The Plan Provides for the Payment of Certain Fees (11 U.S.C. § 1129(a)(12))..........35

M. Preservation of Retiree Benefits (11 U.S.C. § 1129(a)(13))........................................35

N. Domestic Support Obligations (11 U.S.C. § 1129(a)(14)) ..........................................35

O. Requirements for Individual Chapter 11 Cases (11 U.S.C. § 1129(a)(15)).................36

P. Property Transfers by Corporations or Trusts that are not Moneyed, Business or Commercial Corporations or Trusts (11 U.S.C. § 1129(a)(16))..................................36

Q. Cram Down is not Required (11 U.S.C. § 1129(b)) .....................................................36

R. Confirmation of One Plan (11 U.S.C. § 1129(c)) ........................................................37

S. The Principal Purpose of the Plan is Not Avoidance of Taxes or Section 5 of the Securities Act (11 U.S.C. § 1129(d))...........................................................................37

T. Compliance with Bankruptcy Rule 3016.....................................................................37

IV.   THE INJUNCTIONS AND EXCULPATIONS SHOULD BE APPROVED ..................38

        A.  The Injunctions .................................................................................................38

        B.  The Exculpation ................................................................................................41

V.    REQUEST FOR FINDING THAT THE DEBTOR WAS A "PONZI SCHEME" ..........44

        A.  Introduction......................................................................................................44

        B.  The Debtor's Business was Founded upon an Unworkable and Fraudulent Premise .45

        C.  The Debtor Fraudulently Claimed to Have Made Large Loans to Attract Victims.....50

        D.  The Only Way to Pay Old Victims was by Getting New Ones ...................................53

        E.  The Advance Pay/Ponzi Scheme Finding is Warranted ...............................................55

VI.   THE ONLY REMAINING LIMITED OBJECTION TO THE ADEQUACY OF THE
        DISCLOSURE STATEMENT SHOULD BE OVERRULED.........................................59

CONCLUSION....................................................................................................................62

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

*Cases:*

<u>ACC Bondholder Grp. v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)</u>,
361 B.R. 337 (S.D.N.Y. 2007)........................................................................................31

<u>ACC Bondholder Grp. v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)</u>
368 B.R. 140 (Bankr. S.D.N.Y. 2007)..............................................................10, 11, 44

<u>Argo Fund Ltd. v. Bd. of Dirs. Of Telecom Argentina, S.A. (In re Bd. of Dirs. Of Telecom
Argentina, S.A.)</u>, 528 F.3d 162 (2d Cir. 2008) ..............................................................25

<u>B&R Acquisition Partners v. Prime Capital</u> (JAMS Arb., Aug. 2023) ......................3, 54

<u>Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship</u>,
526 U.S. 434, 442 n. 13 (1999)......................................................................................31

<u>Bayou Superfund, LLC v. WAM Long/Short Fund II, L.P. (In re Bayou Group, LLC)</u>,
362 B.R. 624 (Bankr. S.D.N.Y. 2007)............................................................................56

<u>Capstone Diagnostics One, L.P., et al. v. Bailey LLC, et al.</u>,
Case No. 2022cv366001 (GA Sup. Ct., Fulton Cty., Sept. 22, 2024) ...........................10

<u>Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC
(In re Bayou Group, LLC)</u>, 439 B.R. 284 (S.D.N.Y. 2010) ...........................................59

<u>Coltex Loop Cent. Three Partners, L.P. v. BT/SAP Pool C Assocs., L.P.
(In re Coltex Loop Central Three Partners, L.P.)</u>, 138 F.3d 39, 44 (2d Cir. 1998) .......10

<u>Compass-Charlotte v. Prime Capital Ventures, LLC, et al.</u>,
Case No. 24-cv-55 (MAD) (N.D.N.Y. Jan. 12, 2024)....................................................52

<u>Corestates Bank, N.A. v. United Chem. Techs., Inc.</u>, 202 B.R. 33 (E.D. Pa. 1996) ....................11

<u>Davis v. Elliot Mgmt. Corp. (In re Lehman Bros. Holdings Inc.)</u>,
508 B.R. 283, 294 n. 9 (S.D.N.Y. 2014).........................................................................27

<u>Forman v. Salzano (In re Norvergence, Inc.)</u>, 405 B.R. 709 (Bankr. D.N.J. 2009) ......................58

<u>Gowan v. Amaranth Advisors LLC (In re Dreier LLP)</u>,
2014 WL 47774 (Bankr. S.D.N.Y. Jan. 2, 2014)............................................................56

<u>Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd. (In re Briscoe Enters., Ltd., II)</u>,
994 F.2d 1160 (5th Cir. 1993) ..................................................................................10, 11

In re 20 Bayard Views, LLC, 445 B.R. 98 (Bankr. E.D.N.Y. Mar. 7, 2011) ...............................31

In re A.B.C. Carpet Co., Inc., et al.,
Case No. 21-11591 (DSJ) (Bankr. S.D.N.Y. Mar. 3, 2022) [Docket No. 382] ......................19, 20

In re Agera Energy LLC, et al.,
Case No. 19-23802 (RDD) (Bankr. S.D.N.Y. June 16, 2020) [Docket No. 777].........................20

In re Bally Total Fitness of Greater N.Y., Inc.,
2007 Bankr. LEXIS 4729, 2007 WL 2779438 ......................................................................40, 42

In re Barney's New York, Inc., et al.,
Case No. 19-36300 (CGM) (Bankr. S.D.N.Y. Feb. 5, 2020) [Docket No. 789] .........................20

In re Best Prods. Co. Inc.,
168 B.R. 35 (Bankr. S.D.N.Y. 1994), aff'd, 68 F.3d 26 (2d Cir. 1995).......................................31

In re Borders Grp.,
Case No. 11-10614(MG) (Bankr. S.D.N.Y. Dec. 21, 2011) [Docket No. 2384].........................44

In re Cellular Info. Sys., Inc., 171 B.R. 926 (Bankr. S.D.N.Y. 1994)..........................................25

In re Cengage Learning, Inc.,
Case No. 13-44106 (ESS) (Bankr. E.D.N.Y. March 14, 2014) [Docket No. 1225].....................40

In re Copy Crafters Quickprint, Inc., 92 B.R. 973 (Bankr. N.D.N.Y. 1988) .........................60, 61

In re DBSD N. Am., Inc.,
419 B.R. 179 Bankr. S.D.N.Y. 2009), aff'd in part, rev'd in part, 627 F.3d 496 (2d Cir. 2010)..44

In re Drexel Burnham Lambert Group Inc., 138 B.R. 723 (Bankr. S.D.N.Y. 1992)...12, 13, 29, 31

In re Drexel Burnham Lambert Group, Inc., 960 F.2d 293 (2d Cir. 1992) ...................................42

In re Dowling College,
Case No. 16-75545 (REG) (Bankr. E.D.N.Y. Dec. 20, 20218) [Docket No. 662] ......................40

In re Ellis, 478 B.R. 132 (Bankr. N.D.N.Y. 2012) ......................................................................10

In re Future Energy Corp., 83 B.R. 470 (Bankr. S.D. Ohio 1988) ................................................27

In re Genco Shipping & Trading Ltd., 513 B.R. 233 (Bankr. S.D.N.Y. 2014) ............................25

In re Granite Broad. Corp., 369 B.R. 120 (Bankr. S.D.N.Y. 2007).........................................25, 26

In re iCap Enterprises, Inc., et al.,

Case No. 23-01243 (WLH), Dkt. No. 141, (Bankr. E.D.W.A. Oct. 18, 2024)..............................45

In re Ionsphere Clubs, Inc., 184 B.R. 648, 655 (S.D.N.Y. 1995)....................................................40

In re Jennifer Convertibles, Inc., 447 B.R. 713 (Bankr. S.D.N.Y. 2011)......................................31

In re Jersey City Med. Ctr., 817 F.2d 1055 (3d Cir. 1987)..............................................................12

In re Johns-Manville Corp., 68 B.R. 618 (Bankr. S.D.N.Y. 1986)................................................27

In re Journal Register Co., 407 B.R. 520 (Bankr. S.D.N.Y. 2009)................................................27

In re Leslie Fay Cos., Inc., 207 B.R. 764 (Bankr. S.D.N.Y. 1997) .........................................25, 31

In re Linda Vista Cinemas, L.L.C., 442 B.R. 724 (Bankr. D. Ariz. 2010)....................................29

In re Lionel L.L.C., 2008 WL 905928 (Bankr. S.D.N.Y. March 31, 2008) ............................25, 26

In re M. Burton Marshall,
Case No. 23-60263 (PGR) (Bankr. N.D.N.Y. July 22, 2024) [Docket No. 433, 436] ...........40, 45

In re Madison Hotel Assocs., 749 F.2d 410 (7th Cir. 1984)...........................................................25

In re MF Global Inc., 478 B.R. 611 (Bankr. S.D.N.Y. 2012)........................................................15

In re Momentum Mfg. Corp., 25 F.3d 1132 (2d Cir. 1994) ...........................................................40

In re Old Carco LLC, 406 B.R. 180 (Bankr. S.D.N.Y. 2009) ........................................................18

In re Oneida Ltd., 351 B.R. 79 (Bankr. S.D.N.Y. 2006) .........................................................25, 42

In re Penn Traffic Co., 524 F.3d 373 (2d Cir. 2008) .....................................................................18

In re Personal Communications Devices, LLC,
Case No. 13-74303 (AST) (Bankr. E.D.N.Y. April 14, 2014) [Docket No. 413] ........................40

In re PWS Holding Corp., 228 F.3d 224 (3d Cir. 2000)..........................................................26, 43

In re Quigley Co., Inc., 437 B.R. 102 (Bankr. S.D.N.Y. 2010)................................................10, 25

In re Richard Buick, Inc., 126 B.R. 840 (Bankr. E.D. Pa. 1991)..................................................10

In re Sabine Oil & Gas Corp., 555 B.R. 180 (Bankr. S.D.N.Y. 2016)  ..................................10, 12

In re Saint Vincent's Catholic Medical Centers of New York,
Case No. 10-11963 (CGM) (Bankr. S.D.N.Y. June 29, 2012) [Docket No. 3060] ......................41

In re Source Enters, Inc.,
2007 WL 2903954 (Bankr. S.D.N.Y. Oct. 1, 2007), aff'd, 392 B.R. 541 (S.D.N.Y. 2008)....13, 26

In re SunEdison, Inc., et al.,
Case No. 16-10992 (SMB) (Bankr. S.D.N.Y. July 28, 2017) [Docket No. 3735] ........................20

In re Texaco Inc., 84 B.R. 893 (Bankr. S.D.N.Y. 1988)................................................................12

In re Uno Rest. Holdings Corp.,
Case No. 10-10209(MG) (Bankr. S.D.N.Y. July 6, 2010 [Docket No. 559]................................44

In re Victory Constr. Co., Inc., 42 B.R. 145 (Bankr. C.D. Cal. 1984)..........................................31

In re Wash. Mut., Inc., 442 B.R. 314 (Bankr. D. Del. 2011) .......................................................32

In re WorldCom Inc., 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003)...................10, 11, 12

Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff),
528 F. Supp. 3d 219 (S.D.N.Y. 2021)...........................................................................................56

Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC, 531 B.R. 439 (Bankr. S.D.N.Y. 2015) ...56

Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.),
843 F.2d 636 (2d Cir. 1988).........................................................................................11, 12, 25

Kirk v. Texaco, Inc., 82 B.R. 678, 681 (Bankr. S.D.N.Y. 1988) ..................................................60

Koelbl v. Glessing (In re Koelbl), 751 F.2d 137 (2d Cir. 1984).....................................................25

Little Hearts Marks Fam. II L.P. v. Carter (In re 305 E. 61st St. Grp. LLC),
644 B.R. 75 (Bankr. S.D.N.Y. 2022) ...........................................................................................19

The Lion Group DFW, LLC v. Prime Capital,
Case No. 23-DCV-34617 (Tex. Dist. Ct., 146th Dist., Sept. 21, 2023).....................................4, 54

Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc., 756 F.2d 1043 (4th Cir. 1985)............18

Manhattan Inv. Fund, Ltd. V. Gredd (In re Manhattan Inv. Fund, Ltd.),
397 B.R. 1 (S.D.N.Y. 2007).........................................................................................................56

N.L.R.B. v. Bildisco & Bildisco, 465 U.S. 513 (1984) ................................................................18

Norwest Bank Worthington v. Ahlers, 485 U.S. 197 (1988)....................................................9, 10

Olympia & York Fla. Equity Corp. v. Bank of N.Y. (In re Holywell Corp.),
913 F.2d 873 (11th Cir. 1990) ...............................................................13

Onward Partners, LLC, v. Prime Capital, et al.,
Case No. 23-cv-833 (D. Utah Nov. 13, 2023) ........................................4, 54

Sturm v. Prime Capital, Case No. 23-cv-1033 (N.D.N.Y. Aug. 22, 2023) ..............................3, 54

Teamster's Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co., Inc.
(In re U.S. Truck Co., Inc.), 800 F.2d 581 (6th Cir. 1986)............................................13

Tex. Extrusion Corp. v. Lockheed Corp. (In re Texas Extrusion Corp.),
844 F.2d 1142 (5th Cir. 1988) ...............................................................25

Tuss Financial LLC v. Prime Capital, et al.,
Index No. 2023/510389 (N.Y.Sup. Ct. Kings Cty. Apr. 5, 2023) ....................................3

Upstream Energy Servs. v. Enron Corp. (In re Enron Corp.),
326 B.R. 497 (S.D.N.Y. 2005)..............................................................42, 43

United States v. Antonakopoulos, 399 F.3d 68, 72 (1st Cir. 2005)..............................................58

United States of America v. One 2003 Ferrari Enzo AB Version E., et al.,
Case No. 24-cv-1345 (MAD/DJS), [Docket No. 20-1] ...................................49

United States v. Sudeen, 434 F.3d 384, 386-87 (5th Cir. 2005)...........................................58

Williams v. Hibernia Nat'l Bank (In re Williams), 850 F.2d 250 (5th Cir. 1988) ..........................9

Windels Marx Lane & Mittendorf, LLP v. Source Enters., Inc. (In re Source Enters., Inc.),
392 B.R. 541 (S.D.N.Y. 2008)...............................................................13, 26

*Treatises:*

3 Collier Bankruptcy Manual ¶ 1129.02[4] (3d ed. revised 2005) ...............................................10

7 Collier Bankruptcy Manual ¶1123.01[7]
(Alan N. Resnick & Henry J. Sommer, eds. 16th ed. 2010)....................................16, 27

*Statutes and Rules:*

11 U.S.C. § 101(31)(B).......................................................................30

11 U.S.C. § 105(a) .......................................................................39, 40

11 U.S.C. § 365(a) .......................................................................18

11 U.S.C. § 506(b) ...................................................................................................23

11 U.S.C. § 507(a)(3) ..........................................................................................14, 33

11 U.S.C. § 1114 ......................................................................................................35

11 U.S.C. § 1122 ...................................................................................11, 12, 13, 23

11 U.S.C. § 1122(a) ...........................................................................................12, 13

11 U.S.C. § 1123 ...................................................................................11, 12, 23

11 U.S.C. § 1123(a) ..................................................................................................14

11 U.S.C. § 1123(a)(1) ......................................................................................13, 14

11 U.S.C. § 1123(a)(2) ..............................................................................................14

11 U.S.C. § 1123(a)(3) ........................................................................................14, 15

11 U.S.C. § 1123(a)(4) ..............................................................................................15

11 U.S.C. § 1123(a)(5) ........................................................................................15, 16

11 U.S.C. § 1123(a)(6) ..............................................................................................16

11 U.S.C. § 1123(a)(7) ..............................................................................................16

11 U.S.C. § 1123(a)(8) ..............................................................................................17

11 U.S.C. § 1123(b) ..................................................................................................17

11 U.S.C. § 1123(b)(1) ..............................................................................................17

11 U.S.C. § 1123(b)(2) ........................................................................................17, 18

11 U.S.C. § 1123(b)(3) ....................................................................................18, 19, 21

11 U.S.C. § 1123(b)(4) ........................................................................................21, 22

11 U.S.C. § 1123(b)(5) ..............................................................................................22

11 U.S.C. § 1123(b)(6) ..............................................................................................22

11 U.S.C. § 1123(c) ............................................................................................22, 23

11 U.S.C. § 1123(d) ........................................................................................................23

11 U.S.C. § 1125 ...........................................................................................................23

11 U.S.C. § 1126 .....................................................................................................24, 32

11 U.S.C. § 1126(a) .......................................................................................................24

11 U.S.C. § 1126(c) .......................................................................................................32

11 U.S.C. § 1126(f) .............................................................................................7, 24, 32

11 U.S.C. § 1126(g) ...............................................................................................7, 24

11 U.S.C. § 1129(a)(1) ......................................................................................11, 12, 23

11 U.S.C. § 1129(a)(2) .............................................................................................23, 25

11 U.S.C. § 1129(a)(3) .............................................................................................25, 26

11 U.S.C. § 1129(a)(4) .......................................................................................27, 28, 36

11 U.S.C. § 1129(a)(5) .................................................................................16, 28, 29, 30

11 U.S.C. § 1129(a)(6) ...................................................................................................30

11 U.S.C. § 1129(a)(7) .............................................................................................23, 30

11 U.S.C. § 1129(a)(8) .............................................................................................32, 33

11 U.S.C. § 1129(a)(9) ...................................................................................................33

11 U.S.C. § 1129(a)(10) ...........................................................................................33, 34

11 U.S.C. § 1129(a)(11) ...........................................................................................34, 35

11 U.S.C. § 1129(a)(12) ...........................................................................................34, 35

11 U.S.C. § 1129(a)(13) ...................................................................................................35

11 U.S.C. § 1129(a)(14) ...................................................................................................35

11 U.S.C. § 1129(a)(15) ...................................................................................................36

11 U.S.C. § 1129(a)(16) ...................................................................................................36

11 U.S.C. § 1129(b) ........................................................................................................23, 36, 37

11 U.S.C. § 1129(c) ...................................................................................................................37

11 U.S.C. § 1129(d) ..................................................................................................................37

28 U.S.C. § 1930(a)(6) ..............................................................................................................35

Bankruptcy Rule 3016(b) ..........................................................................................................38

Bankruptcy Rule 3016(c) ...........................................................................................................38

Securities Act of 1933 § 5..........................................................................................................37

Prime Capital Ventures, LLC, the above-captioned debtor (the "Debtor"), in the above-referenced chapter 11 case (the "Chapter 11 Case"), by and through its counsel, submits this *Memorandum of Law in Support of Entry of an Order (I) Approving Adequacy of Second Amended Disclosure Statement for First Amended Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code and (II) Confirming First Amended Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* (the "Memorandum of Law"), *Declaration of Christian H. Dribusch in Support of Entry of an Order (I) Approving Adequacy of Second Amended Disclosure Statement for First Amended Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code and (II) Confirming First Amended Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code*, dated February 20, 2025 (the "Dribusch Declaration"), *Declaration of Fred Stevens Regarding Solicitation of Votes and Tabulation of Ballots in Connection with the First Amended Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* (the "Voting Declaration"), and *Declaration of Brian Ryniker in Support of Confirmation of the Confirmation of the Debtor's First Amended Plan of Liquidation* (the "Ryniker Declaration") each as filed in support of confirmation of the *First Amended Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* (as may be further modified, amended, or supplemented, the "Plan")[1] [Docket No. 91], including the Plan Supplement, dated February 7, 2025 (as may be further modified, amended, or supplemented, the "Plan Supplement") [Docket No. 147], pursuant to section 1129 of title 11 of the United States Code (the "Bankruptcy Code").

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to them in the Plan.

## I.    PRELIMINARY STATEMENT

1.    Approximately five (5) months from the filing of the instant bankruptcy case, the Debtor is seeking approval of the disclosure statement and confirmation of a chapter 11 plan to complete the wind down of the Debtor's Estate with overwhelming support from the creditor body.

2.    The Plan represents the culmination of substantial efforts by the Debtor to propose a fair and equitable resolution of the financial and legal issues presented in this Chapter 11 Case. The Plan is the result of substantial input from the Debtor's most active creditors and the United States Trustee and is carefully designed to ensure that the Debtor's financial affairs are thoroughly investigated following confirmation, and the estate is in the best position possible for success in recovering assets for the benefit of creditors.

3.    As discussed more fully below, the Debtor submits that the Plan satisfies all applicable requirements of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the Local Bankruptcy Rules for the Northern District of New York (the "Local Rules").

4.    The Plan has been accepted by Class 2.  See Voting Declaration, Exhibit A.  Class 1 was not impaired under the Plan and therefore is conclusively presumed to accept the Plan.  The Debtor did not solicit votes from Class 3 because such holders of Equity Interests are deemed to reject the Plan because such holders are not entitled to receive or retain any property under the Plan on account of Equity Interests.

## II.    BACKGROUND AND OVERVIEW OF THE PLAN

### A.    The Debtor's Bankruptcy Case and Receivership

5.    On or around July 26, 2006, Prime Commercial Lending, LLC ("Prime Commercial") was formed as a New York limited liability company.  Prime Commercial appears to have been a small lender making loans as small as $22,000 to businesses and up to $2 million

2

on commercial real estate.

6.    On December 14, 2021, Kris Daniel Roglieri ("Roglieri") formed the Debtor as a Delaware limited liability company.  Upon information and belief, until on or around May 15, 2024, Roglieri was at all times the sole manager of the Debtor and its chief executive.  The concept was apparently that the Debtor would be Prime Commercial's division as "a fund specifically designed to provide capital for large development, commercial development and commercial real estate transactions from $50 million to more than $1 billion."[2]  The Debtor advertised that it would offer non-recourse lines of credit with rates at 4 to 6% with interest-only payments but would require borrowers to provide 20% cash upfront based on the total project cost to be placed in an interest credit account (each an "ICA Deposit").  The ICA Deposits would be held by the Debtor "'as prepaid interest throughout the term of the loan.'" The Debtor obtained millions of dollars in ICA Deposits from multiple companies throughout the country which, upon information and belief, was used in most cases by the Debtor and Roglieri before the loans were closed and funded. As set forth below, the Debtor's business was a fraudulent advance pay/Ponzi scheme.  *See* Dribusch Declaration, ¶5.

7.    By December 2023, the Debtor was besieged by litigation largely from borrowers who did not get their loans funded and wanted the return of their ICA Deposits.  See, e.g., Tuss Financial LLC v. Prime Capital, et al., Index No. 2023/510389 (N.Y.Sup. Ct. Kings Cty. Apr. 5, 2023) (seeking and apparently obtaining the return of $13.4 million); B&R Acquisition Partners v. Prime Capital (JAMS Arb., Aug. 2023) (seeking the return of $4 million); Sturm v. Prime Capital, Case No. 23-cv-1033 (N.D.N.Y. Aug. 22, 2023) (seeking the return of $2 million);

---

[2] See Koplin, I., May 2, 2022, Roglieri Unveils Prime Capital Ventures, Prime Commercial Lending's Newest Fund, dealmaker-magazine.com, https://www.dealmaker-magazine.com/magazine/roglieri-unveils-prime-capital-ventures-prime-commercial-lendings-newest-fund (last known available on Dec. 16, 2023).

*Camshaft CRE 1, LLC v. Prime Capital*, Case No. 2023-023173 (Fla. Circ. Ct., Miami-Dade Cty.,

Sept. 15, 2023) (seeking the return of $13.4 million); <u>The Lion Group DFW, LLC v. Prime Capital</u>,

Case No. 23-DCV-34617 (Tex. Dist. Ct., 146th Dist., Sept. 21, 2023) (demand unknown); <u>Onward</u>

<u>Partners, LLC, v. Prime Capital, et al.</u>, Case No. 23-cv-833 (D. Utah Nov. 13, 2023) (seeking the

return of $20 million). *See* Dribusch Declaration, ¶6.

8.      On December 19, 2023, Compass-Charlotte 1031, LLC, 526 Murfreesboro, LLC,

and Newlight Technologies, Inc. (collectively, the "<u>Petitioning Creditors</u>") filed an involuntary

petition against the Debtor for relief under chapter 7 of the Bankruptcy Code commencing Case

No. 23-11302 ("<u>Case 1</u>").  The Petitioning Creditors commenced Case 1 for the obvious purpose

of ensuring that the Debtor's assets and liabilities could be liquidated in a single, public forum,

and that no single creditor could win the proverbial "race to the courthouse". *See* Dribusch

Declaration, ¶7.

9.      On December 22, 2023, upon order of the Court, the United States Trustee

appointed Christian H. Dribusch ("<u>Dribusch</u>") as the interim chapter 7 trustee of the Debtor's

estate.

10.      Rather than submit to the orderly winddown or restructuring of the Debtor's

business in Case 1, Roglieri pushed the Debtor in an entirely different direction.  Roglieri caused

the Debtor to contest the involuntary petition on the basis that at least two of the Petitioning

Creditors' claims were allegedly subject to a bona fide dispute because litigation concerning their

claims was pending.  <u>See</u> <u>Debtor's Motion for Judgment Dismissing the Petition</u>, Case 1 Dkt. No.

72, p.1 (Jan. 8, 2024).

11.      On January 8, 2024, the Petitioning Creditors filed their own motion to dismiss

Case 1 [Case 1 Dkt. No. 74], which motion was granted by the Court on January 9, 2024 [Case 1

Dkt. No. 87]. Thereafter, Dribusch was discharged from his duties as chapter 7 trustee.

12.    Three (3) days after dismissal of Case 1, on January 12, 2024, Petitioning Creditor Compass-Charlotte 1031, LLC commenced an action in the United States District Court for the Northern District of New York (the "District Court") under Case No. 24-cv-00055 (MAD) (CFH) (N.D.N.Y. Jan. 12, 1014) (the "Receivership Case"), seeking, among other things, the appointment of a federal equity receiver to take possession and control of the Debtor's assets and affairs. That same day, the District Court entered an order appointing Paul Levine as the temporary receiver (the "Receiver"). Receivership Case Dkt. No. 8.

13.    Roglieri directed the Debtor to file an emergency motion on behalf of the Debtor to, among other things, dismiss the Receivership Case. Id. at Dkt. No. 12-14. On January 24, 2024, the District Court entered a memorandum decision and order making the Receiver's appointment permanent and defining his powers with respect to the Debtor and its property and denying the Debtor's motion to dismiss the case. Id. at Dkt. No. 56.

14.    On February 15, 2024, Roglieri filed a voluntary petition for relief under subchapter V of chapter 11 of the Bankruptcy Code commencing Case No. 24-10157 (REL) (the "Roglieri Case").

15.    On May 14, 2024, the Debtor, by and through the Receiver, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court commencing Case No. 24-10531 ("Case 2").

16.    On May 15, 2024, the Court entered an order converting Roglieri's case to one under chapter 7 of the Bankruptcy Code. Roglieri Case at Dkt. No. 159. Thereafter, the United States Trustee appointed Dribusch as the interim chapter 7 trustee. Id. at Dkt. No. 160. Dribusch has since qualified and is currently serving as permanent trustee (in such capacity, the "Roglieri

Trustee").

17.    On June 25, 2024, B and R Acquisition Partners, LLC ("B&R") and JHM Lending

Ventures, LLC ("JHM" and together with B&R, the "B&R Parties") filed a motion to dismiss Case

2 on the basis that the Receiver was not authorized to file the petition on behalf of the Debtor

because they asserted that he lacked the authority pursuant to the terms of the orders of the District

Court.  Case 2 at Dkt. No. 57.

18.    On July 23, 2024, the Court entered a memorandum decision and order dismissing

Case 2 finding essentially that the Receiver did not have the authority to file Case 2 on behalf of

the Debtor and that the Roglieri Trustee did not have the ability to waive the defect and ratify the

filing *ex post facto* (the "Dismissal Order").  Id. at Dkt. No. 85.  The Debtor took an appeal of the

Dismissal Order, which appeal is pending before the District Court at Case No. 24-cv-000939.

19.    On September 16, 2024, the Debtor filed a voluntary petition for relief under

chapter 11 of the Bankruptcy Code in this Court commencing this bankruptcy case.  In this case,

the Debtor is under the control of the Roglieri Trustee as the party in possession and control of all

equity interests in the Debtor, who is acting as the manager of the Debtor.

20.    No chapter 11 trustee, examiner, or creditors' committee has been appointed.

B.    The Plan

21.    The Plan provides for the classification of certain classes of Claims and Equity

Interests as impaired or not impaired.  The classification scheme is set forth in the table below.

| Class | Claim | Impairment | Entitled to Vote |
|-------|-------|------------|------------------|
| Class 1 | Secured Claims | Unimpaired | No – Presumed to Accept |
| Class 2 | General Unsecured Claims | Impaired | Yes |
| Class 3 | Equity Interests | Impaired | No – Presumed to Reject |

6

22.     Thus, other than claims that are not required to be classified under the Bankruptcy Code, the Plan provides for three (3) different classes of Claims and Equity Interests.

23.     Class 1 (Secured Claims) is not impaired under the Plan and is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the votes of holders of Class 1 Claims were not solicited.  See Dribusch Declaration, ¶ 44.

24.     Class 2 (the "Voting Class") is impaired under the Plan.  The votes of holders of Claims in the Voting Class were solicited. See Dribusch Declaration ¶ 43, Voting Declaration ¶ 6. The Voting Class voted to accept the Plan.  See Voting Declaration, Exhibit A.

25.     The Debtor did not solicit votes from Class 3 because such holders are not entitled to receive or retain any property under the Plan on account of such Equity Interests, and therefore holders of Equity Interests in Class 3 are deemed to have rejected the Plan.  See Dribusch Declaration, ¶ 45; see also 11 U.S.C. § 1126(g).

C.     The Solicitation of Votes and Noticing of Non-Voting Classes

26.     On December 23, 2024, the Debtor filed the *Debtor's Ex-Parte Motion for Entry of an Order (I) Scheduling a Combined Hearing on (A) Adequacy of the Disclosure Statement and (B) Confirmation of the Plan, (II) Approving Form and Manner of Notice of Combined Hearing, (III) Establishing Procedures for Objecting to (A) Disclosure Statement and/or (B) Plan, and (IV) Approving Solicitation Procedures* (the "Scheduling Motion") [Docket No. 94].

27.     On January 8, 2025 the Court entered its *Order (I) Scheduling a Combined Hearing on (A) Adequacy of the Disclosure Statement and (B) Confirmation of the Plan, (II) Approving Form and Manner of Notice of Combined Hearing, (III) Establishing Procedures for Objecting to (A) Disclosure Statement and/or (B) Plan, and (IV) Approving Solicitation Procedures* (the

7

"Scheduling Order") [Docket No. 114][3].   The Scheduling Order outlines the procedures for
solicitation and tabulation of votes on the Plan.

28.     As specified in the Scheduling Order, December 23, 2024 was established as the
record date for determining which creditors are entitled to vote on the Plan (the "Voting Record
Date").

29.     On January 9, 2025, the Debtor commenced solicitation (the "Solicitation") of votes
on the Plan, by mailing to the members of each of the Voting Class, a package (the "Solicitation
Package") containing the (a) Disclosure Statement, (b) Plan, (c) Scheduling Order, (d) notice of
the Combined Hearing (the "Combined Hearing Notice") [Docket No. 120], (e) ballot, a copy of
which was attached to the Solicitation Affidavit (defined herein) as Exhibit F, (f) assignment of
claim form, a copy of which was attached to the Solicitation Affidavit (defined herein) as Exhibit
C, and (g) pre-addressed return envelopes.   See Certificate of Service of Lauren C. Kiss, dated
January 9, 2025 (the "Solicitation Affidavit") [Docket No. 121], Exhibit E.

30.     On January 15, 2025, the Court held a hearing to consider a letter filed by creditor
Starsight.io, Inc. ("Starsight") seeking to allow its claim, filed after the bar date, as a timely filed
claim and the Court subsequently entered an order allowing the late filed claim.   *See* Docket No.
128.   After the hearing on January 15, 2025, the Debtor's counsel mailed the Solicitation Package
to Starsight.   See Certificate of Service of Lauren C. Kiss, dated January 15, 2025 (the
"Supplemental Solicitation Affidavit" and together with the Solicitation Affidavit, the
"Solicitation Affidavits") [Docket No. 129].

31.     In addition, as required by the Scheduling Order, on January 9, 2025, Kris Roglieri

---

[3] Pursuant to the Scheduling Order, approval of the Disclosure Statement and confirmation of the Plan is being heard
at the same time (the "Combined Hearing").

was mailed a package containing the (a) Disclosure Statement, (b) Plan, (c) Scheduling Order, (d) Notice of Combined Hearing, and (e) notice of non-voting status (the "Notice of Non-Voting Status"), a copy of which was attached to the Solicitation Affidavit as Exhibit B.  See Solicitation Affidavit, Exhibit G.

32.    Further, as required by the Scheduling Order, on January 9, 2025, holders of Unclassified Claims and Class 1 Claims and Class 3 Equity Interests were mailed a package containing (a) the Combined Hearing Notice and (b) the Notice of Non-Voting Status.  See Solicitation Affidavit, Exhibit D.

33.    Finally, all other interested parties were mailed the Combined Hearing Notice.  See Solicitation Affidavit, Exhibit I.

34.    As provided in the Scheduling Order, the deadline to vote on the Plan was set for February 14, 2025.

35.    As set forth in the Voting Declaration, the Voting Class voted to accept the Plan. See Voting Declaration, Exhibit A.

36.    The Bankruptcy Court scheduled the Combined Hearing for 9:30 a.m. on February 26, 2025 and set an objection deadline of February 19, 2025.  Notice of the dates and times for the Combined Hearing and objection deadline was included in the Combined Hearing Notice.

## III.    THE PLAN SHOULD BE CONFIRMED

37.    Applicable case law holds that when considering confirmation of a chapter 11 plan, creditor democracy, an integral element in a chapter 11 case, should be afforded substantial deference in the absence of a clear impediment to plan confirmation.  See, e.g., Williams v. Hibernia Nat'l Bank (In re Williams), 850 F.2d 250, 253 (5th Cir. 1988).  Further, the United States Supreme Court has emphasized that creditors should be permitted to decide whether the proposed plan treatment is in their best interests.  See Norwest Bank Worthington v. Ahlers, 485 U.S. 197,

207 (1988); see also Coltex Loop Cent. Three Partners, L.P. v. BT/SAP Pool C Assocs., L.P. (In

re Coltex Loop Central Three Partners, L.P.), 138 F.3d 39, 44 (2d Cir. 1998) ("The Code thus

strikes a considered balance between creditor and debtor interests, which . . . courts must

scrupulously respect."). In this case, the Voting Class voted to accept the Plan.

38.     However, the Court has an independent duty to ensure that the Plan satisfies each

of the requirements of section 1129 of the Bankruptcy Code.

39.     The Debtor, as proponent of the Plan, bears the burden of proof on all elements

necessary for confirmation. See, e.g., 3 COLLIER BANKRUPTCY MANUAL ¶ 1129.02[4], at 1129 – 6

(3d ed. revised 2005); see also In re Sabine Oil & Gas Corp., 555 B.R. 180, 310 (Bankr. S.D.N.Y.

2016), motion to certify appeal denied, No. 16-CV-2561 (JGK), 2016 WL 6238616 (S.D.N.Y. Oct.

24, 2016), and appeal dismissed as moot, No. 16 CIV. 6054 (LAP), 2017 WL 477780 (S.D.N.Y.

Feb. 3, 2017); In re Ellis, 478 B.R. 132, 139 (Bankr. N.D.N.Y. 2012) ("The Debtor has the burden

to establish all of the elements essential to confirmation of the Plan."); In re Adelphia Comm'ns

Corp., 368 B.R. 140, 252 (Bankr. S.D.N.Y. 2007) (plan proponent possesses burden to establish

the satisfaction of the best interests test); see also In re WorldCom Inc., No. 02-13533(AJG), 2003

WL 23861928, at *46 (Bankr. S.D.N.Y. Oct. 31, 2003) ("A debtor, as the proponent of the Plan,

bears the burden of proof under section 1129 of the Bankruptcy Code"); see also In re Richard

Buick, Inc., 126 B.R. 840, 851 (Bankr. E.D. Pa. 1991). To meet this burden, the Debtor must

demonstrate that the Plan complies with the provisions of the Bankruptcy Code by a preponderance

of the evidence. See, e.g., Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd. (In re Briscoe

Enters., Ltd., II), 994 F.2d 1160, 1165 (5th Cir. 1993) (preponderance of evidence is debtors'

appropriate standard of proof); see also In re Quigley Co., Inc., 437 B.R. 102, 125 (Bankr.

S.D.N.Y. 2010) ("The proponent of confirmation bears the burden of proof by a preponderance of

the evidence."); In re Adelphia Comm'ns Corp., 368 B.R. at 252 (under best interests test, plan

proponent possesses burden to establish its satisfaction by preponderance of the evidence); see

also In re WorldCom Inc., 2003 WL 23861928, at *46 (debtor must meet the burden by a

preponderance of the evidence under section 1129 of the Bankruptcy Code); see also Corestates

Bank, N.A. v. United Chem. Techs., Inc., 202 B.R. 33, 45 (E.D. Pa. 1996) (preponderance of

evidence is appropriate standard of proof under "both § 1129(a) and in a cram down") (quoting In

re Briscoe Enters., Ltd., II, 994 F.2d at 1165).

40.     To confirm the Plan, the Bankruptcy Court must find that both the Plan and the plan

proponent comply with each of the requirements of section 1129(a) of the Bankruptcy Code.  See

Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.), 843 F.2d 636, 648 (2d Cir. 1988)

(plan must comply with section 1129(a) requirements).

41.     As further described herein, and as evidenced by the Voting Declaration and the

Dribusch Declaration, the Debtor has satisfied its burden, by at least a preponderance of the

evidence, that all of the requirements of the Bankruptcy Code, the Bankruptcy Rules and the Local

Bankruptcy Rules have been satisfied.  Accordingly, the Debtor respectfully submits that the Plan

should be confirmed.

A.     The Plan Complies With The Applicable Provisions
       Of Title 11  (11 U.S.C. § 1129(a)(l))

42.     Section 1129(a)(1) of the Bankruptcy Code provides that a plan may be confirmed

only if "[t]he plan complies with the applicable provisions of this title." 11 U.S.C. § 1129(a)(1).

43.     The legislative history of section 1129(a)(1) explains that this provision embodies

the requirements of, among others, sections 1122 and 1123 of the Bankruptcy Code governing,

respectively, the classification of claims and the contents of the plan.  H.R. Rep. No. 595, 95th

Cong., 1st Sess. 412 (1977); S. Rep. No. 989, 95th Cong., 2d Sess. 126 (1978); see also In re Johns-

Manville Corp., 843 F.2d at 648–49 ("[T]he legislative history of subsection 1129(a)(1) suggests that Congress intended the phrase 'applicable provisions' in this subsection to mean provisions of Chapter 11 that concern the form and content of reorganization plans."); In re WorldCom Inc., 2003 WL 23861928, at *46 ("the legislative history of section 1129(a)(1) explains that this provision encompasses the requirement of section 1122 and 1123 governing classification of claims and contents of a plan, respectively"); In re Drexel Burnham Lambert Group Inc., 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992) (same); In re Sabine Oil & Gas Corp., 555 B.R. 180, 310 (Bankr. S.D.N.Y. 2016) ("In order to determine whether a plan complies with section 1129(a)(1) of the Code, a court must ensure that the requirements of sections 1122 and 1123 are met."); In re Texaco Inc., 84 B.R. 893, 905 (Bankr. S.D.N.Y. 1988) ("In determining whether a plan complies with section 1129(a)(1), reference must be made to Code §§ 1122 and 1123 with respect to the classification of claims and the contents of a plan of reorganization").

44.     Section 1122 of the Bankruptcy Code provides:

> (a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

> (b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

11 U.S.C. § 1122.

45.     The relevant inquiry under section 1122(a) is whether all claims in a class have substantially similar rights to the Debtor's assets.  Thus, plan proponent has significant flexibility in classifying claims under section 1122, as long as a reasonable legal and/or factual basis exists for the proposed classifications, and all claims within a particular class are substantially similar. See, e.g., In re Jersey City Med. Ctr., 817 F.2d 1055, 1060–61 (3d Cir. 1987) ("Congress intended

to afford bankruptcy judges broad discretion [pursuant to section 1122] to decide the propriety of plans in light of the facts"); Olympia & York Fla. Equity Corp. v. Bank of N.Y. (In re Holywell Corp.), 913 F.2d 873, 880 (11th Cir. 1990) (proponent of plan has considerable discretion in classifying claims and interests according to relevant facts and circumstance of case); Teamster's Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co., Inc. (In re U.S. Truck Co., Inc.), 800 F.2d 581, 586 (6th Cir. 1986) (noting court's "broad discretion" to determine proper classifications); Windels Marx Lane & Mittendorf, LLP v. Source Enters., Inc. (In re Source Enters., Inc.), 392 B.R. 541, 556 (S.D.N.Y. 2008) ("Moreover, '[a] plan proponent is afforded significant flexibility in classifying claims under § 1122(a) if there is a reasonable basis for the classification scheme and if all claims within a particular class are substantially similar.") (quoting In re Drexel Burnham Lambert Grp., Inc., 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992)).

46.    In addition to the Administrative Expense Claims, Professional Fee Claims, Receiver Professional Fee Claims and Priority Tax Claims, which need not be designated pursuant to section 1123(a)(1) of the Bankruptcy Code, the Plan designates three (3) classes of Claims and Equity Interests.  Class 1 includes only Secured Claims.  Class 2 includes only General Unsecured Claims.  Class 3 includes only Equity Interests.  Thus, the Claims and Equity Interests placed in each Class are substantially similar to other Claims or Equity Interests in each such Class.

47.    Valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims and Equity Interests created under the Plan, and such Classes do not unfairly discriminate between holders of Claims and Equity Interests in any particular class.  The Debtor respectfully submits that classification scheme in the Plan satisfies section 1122 of the Bankruptcy Code.

13

48.     Section 1123(a) of the Bankruptcy Code identifies eight (8) required features of a plan. The Plan fully complies with section 1123(a).

      i.   <u>The Plan Designates Classes Of Claims</u>

49.     Section 1123(a)(1) of the Bankruptcy Code requires that a Chapter 11 plan designate classes of claims and interests other than claims of a kind specified in section 507(a)(2) of the Bankruptcy Code (administrative expense claims), section 507(a)(3) of the Bankruptcy Code (claims arising during the "gap" period in an involuntary bankruptcy case), and section 507(a)(8) of the Bankruptcy Code (priority tax claims). 11 U.S.C. § 1123(a)(1). Article 3 of the Plan satisfies this requirement by expressly classifying all Claims and Equity Interests, other than Administrative Expense Claims (other than professional fees and expenses), Priority Tax Claims, Professional Fee Claims, and Receiver Professional Fee Claims as follows: Class 1 (Secured Claims), Class 2 (General Unsecured Claims), and Class 3 (Equity Interests).

50.     Therefore, the Debtor respectfully submits that section 1123(a)(1) of the Bankruptcy Code is satisfied.

      ii.   <u>Specification of Unimpaired Classes Of Claims</u>

51.     Section 1123(a)(2) of Bankruptcy Code requires that a plan "specify any class of claims or interests that is not impaired under the plan." 11 U.S.C. § 1123(a)(2). Article 3 of the Plan satisfies this requirement by specifying that Class 1 is not impaired under the Plan.

      iii.   <u>The Plan Specifies The Treatment Of Impaired Classes</u>

52.     Section 1123(a)(3) of the Bankruptcy Code requires that a plan "specify the treatment of any class of claims or interests that is impaired under the plan." 11 U.S.C. § 1123(a)(3). Article 3 of the Plan specifies that Class 2 and Class 3 are impaired under the Plan

and Article 4 of the Plan specifies the treatment of such Classes.  Accordingly, section 1123(a)(3) of the Bankruptcy Code is satisfied.

iv.   <u>The Plan Provides The Same Treatment Within Each Class</u>

53.    Section 1123(a)(4) of the Bankruptcy Code requires that a plan "provide the same treatment for each claim or interest of a particular class." 11 U.S.C. § 1123(a)(4).   Article 4 of the Plan satisfies this requirement by providing the same treatment to each Claim or Equity Interest in each respective Class.  Accordingly, section 1123(a)(4) of the Bankruptcy Code is satisfied.

v.   <u>The Plan Provides Adequate Means For Implementation</u>

54.    Section 1123(a)(5) of the Bankruptcy Code requires that a plan provide "adequate means" for its implementation. 11 U.S.C. § 1123(a)(5).  Adequate means for implementation of a plan may include, *inter alia*, retention by the debtor of all or part of its property and the transfer of property of the estate to one or more entities.  <u>See</u>  <u>In re MF Global Inc.</u>, 478 B.R. 611, 618 (Bankr. S.D.N.Y. 2012) ("Section 1123(a)(5) provides a means for the estate to transfer property as part of a confirmed plan, requiring that a plan of reorganization provide means for implementation . . . .").

55.    Article 5 of the Plan provides adequate and proper means for the implementation of the Plan.  Following confirmation of the Plan, the Debtor intends to liquidate its remaining Assets.  The Plan provides for vesting of all Assets, including Causes of Action, in the Plan Administrator, free and clear of all Liens, Claims, charges or other encumbrances.  The Plan appoints a Plan Administrator, who will complete the wind-down of the Debtor's affairs, evaluate and potentially pursue the Causes of Action and make Distributions to holders of Allowed Claims.

56.     Further, the Plan shall be funded by the proceeds of sale of the Debtor's Assets. Section 5.5 of the Plan provides for the establishment of a Disputed Claims Reserve.  In addition,

15

Article 9 of the Plan provides procedures related to, among other things, distributions, resolution of disputed claims, and the means by which distributions will be transmitted. The foregoing provisions constitute adequate means for implementation of the Plan, and therefore section 1123(a)(5) of the Bankruptcy Code is satisfied.

vi.    <u>Prohibition On The Issuance Of Non-Voting Securities</u>

57.    Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate documents prohibit the issuance of non-voting equity securities and related corporate governance matters. 11 U.S.C. §1123(a)(6).  The Plan does not contemplate the issuance of new stock or other equity interests in the Debtor.  Accordingly, section 1123(a)(6) of the Bankruptcy Code is not applicable.

vii.    <u>Selection Of Trustees, Member And Manager</u>

58.    Section 1123(a)(7) of the Bankruptcy Code requires that a plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan." 11 U.S.C. § 1123(a)(7).  This provision is supplemented by section 1129(a)(5) of the Bankruptcy Code, which directs the Bankruptcy Court to scrutinize the methods by which the management of a reorganized corporation is to be chosen to provide adequate representation of those whose investments are involved in the bankruptcy – i.e., creditors and equity holders.  <u>See</u> <u>7 Collier on Bankruptcy</u> ¶1123.01[7] (Alan N. Resnick & Henry J. Sommer, eds. 16th ed. 2010). The Debtor will not have continued operations following confirmation of the Plan.  No new officers or directors are appointed under the Plan, nor will any new officers or directors be appointed following confirmation of the Plan.  Section 5.2 of the Plan provides for the appointment of a Plan Administrator, and the Plan identifies Christian H. Dribusch as the Plan Administrator,

who is currently the Roglieri Trustee.  In addition, section 5.4 of the Plan provides for the appointment of an Oversight Committee and the Plan Supplement identifies the following members of the Oversight Committee: (i) Compass-Charlotte 1031, LLC, (ii) ER Tennessee LLC, and (iii) Piper Capital Funding LLC.  Such appointments are due to the respective appointee's substantial knowledge and experience gained in current roles in the Chapter 11 Case and are consistent with the interests of Creditors and with public policy.

59.     Section 1123(a)(8) of the Bankruptcy Code requires that, if the debtor is an individual, the plan shall "provide for the payment to creditors under the plan of all or such portion of earnings from personal services performed by the debtor after the commencement of the case or other future income of the debtor as is necessary for the execution of the plan."  11 U.S.C. § 1123(a)(8).  Here, the Debtor is not an individual and, accordingly, section 1123(a)(8) of the Bankruptcy Code does not apply.

60.     Section 1123(b) of the Bankruptcy Code identifies various discretionary provisions that may be included in a plan, but are not required.

### viii.  Impairment and Non-Impairment of Claims

61.     Section 1123(b)(1) provides that a plan may "impair or leave unimpaired any class of claims, secured or unsecured, or of interests." 11 U.S.C. § 1123(b)(1).

62.     The Plan provides that Class 1 (Secured Claims) is left unimpaired, and Class 2 (General Unsecured Claims) and Class 3 (Equity Interests) are impaired.  See Plan, Article 4.  The Debtor respectfully submits that such treatment is permissible under section 1123(b)(1).

### ix.  Executory Contracts and Unexpired Leases

63.     Section 1123(b)(2) of the Bankruptcy Code provides that a plan may, subject to section 365 of the Bankruptcy Code, "provide for the assumption, rejection, or assignment of any

executory contract or unexpired lease of the debtor not previously rejected under such section." 11 U.S.C. § 1123(b)(2).

64.     The Plan provides that any and all executory contracts (not otherwise previously assumed or rejected or the subject of a motion to assume or reject pending on the Confirmation Date), shall be deemed rejected by the Debtor.  See Plan, § 6.1.  The Plan constitutes a motion under section 365(a) of the Bankruptcy Code for the authorization to reject executory contracts and unexpired leases not previously assumed, assigned or rejected.   Section 365(a) of the Bankruptcy Code states that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor" if such action represents a reasonable exercise of its business judgment.  11 U.S.C. § 365(a).  If the Court finds a debtor's business judgment has been reasonably exercised, the proposed rejection should be approved. See N.L.R.B. v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984); In re Penn Traffic Co., 524 F.3d 373, 377 (2d Cir. 2008). Under the business judgment standard, courts will approve a debtor's business decision unless that judgment is the product of bad faith, whim, or caprice.  See Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc., 756 F.2d 1043, 1047 (4th Cir. 1985); In re Old Carco LLC, 406 B.R. 180, 190 (Bankr. S.D.N.Y. 2009).

65.     The Debtor respectfully submits that the provisions of the Plan regarding the treatment of executory contracts are fair and reasonable under the circumstances, and comply with sections 365(a) and 1123(b)(2) of the Bankruptcy Code.

x.   Retention of Claims

66.     Section 1123(b)(3) of the Bankruptcy Code provides that a plan may "provide for (a) the settlement or adjustment of any claim or interest belonging to the debtor or to the estate; or

18

(b) the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest." 11 U.S.C. § 1123(b)(3).

67.     Pursuant to the Plan, the Plan Administrator is authorized to act on behalf of the Debtor and its Estate in all adversary proceedings and contested matters (including, without limitation, any Avoidance Actions, Causes of Action, and Creditor Related Causes of Action), then pending or that can be commenced in the Court and in all actions and proceedings pending or commenced elsewhere, and to settle, retain, enforce, or dispute any adversary proceedings or contested matters.  Pursuant to section 5.3(a)(vii), the Plan Administrator is given the power, "upon consultation with the Oversight Committee, to determine whether to bring, settle, release, or compromise Avoidance Actions, Causes of Action, and Creditor Related Causes of Action without the need for Court approval (all compromises must be approved by the Oversight Committee or the Court to the extent the Oversight Committee objects)."  Plan, § 5.3(a)(vii).

68.     Courts in the Second Circuit have approved provisions in plans that permit representatives of the estate to enter into settlements of causes of action that occur post-confirmation without a hearing or Court approval.  See, e.g., Little Hearts Marks Fam. II L.P. v. Carter (In re 305 E. 61st St. Grp. LLC), 644 B.R. 75, 82 (Bankr. S.D.N.Y. 2022) (Section 2.2(j) of the Creditor Trust Agreement between the Debtor and Creditor Trustee gave the Creditor Trustee the power to "settle, retain, enforce, or dispute any adversary proceedings or contested matters (including, without limitation, any Causes of Action) and otherwise pursue actions involving Creditor Trust Assets that could arise or be asserted at any time under the Bankruptcy Code or otherwise, unless otherwise specifically waived or relinquished in the Plan. The Creditor Trust shall be authorized to enter into settlements of Causes of Action without a hearing or Court approval[.]"); In re A.B.C. Carpet Co., Inc., et al., Case No. 21-11591 (DSJ) (Bankr. S.D.N.Y.

Mar. 3, 2022) [Docket No. 382] (Article IV(L)(4)(iii) of confirmed plan gave the Liquidating Trustee "the power to pursue, prosecute, resolve, compromise and settle any Causes of Action against any other Person or Entity without notice to or approval from the Bankruptcy Court"); In re Agera Energy LLC, et al., Case No. 19-23802 (RDD) (Bankr. S.D.N.Y. June 16, 2020) [Docket No. 777] (section 5.6(c) of the confirmed plan gave the Liquidating Trustee the following powers, rights, and responsibilities, among others, "asserting, prosecuting, objecting to, pursuing, compromising, and settling in accordance with the Liquidation Trustee's reasonable business judgment, all matters affecting the Estates, including, without limitation, Disputed Claims and/or other Causes of Action related thereto, to the extent set forth in the Liquidation Trust Agreement and except as provided therein, without further order of the Bankruptcy Court"); In re Barney's New York, Inc., et al., Case No. 19-36300 (CGM) (Bankr. S.D.N.Y. Feb. 5, 2020) [Docket No. 789] (Article IV(M) of confirmed plan authorized the Wind-Down Debtors "to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court."); In re SunEdison, Inc., et al., Case No. 16-10992 (SMB) (Bankr. S.D.N.Y. July 28, 2017) [Docket No. 3735] (Section 7.6(b) of confirmed plan provided that "[t]he GUC/Litigation Trust, with the consent of the Reorganized Debtors to the extent such GUC/Litigation Trust Causes of Action interfere with (i) the Reorganized Debtors' collection of Earnout Proceeds, Residual Assets Proceeds, or Repatriated Cash or (ii) the continuing operations of TERP, shall determine whether to bring, settle, release, compromise, or enforce such GUC/Litigation Trust Causes of Action (or decline to do any of the foregoing), and shall not be required to seek further approval of the Bankruptcy Court for such action.").

69.    Further, Creditor Related Causes of Action may exist that are related to the Debtor's and Roglieri's conduct of the Debtor's businesses.  Creditor Related Causes of Action include, but may not be limited to: (i) any Claims against the Debtor's former attorneys, accountants, auditors, or other professionals, in connection with aiding and abetting any breach of fiduciary duty owed by Roglieri to the Debtor and/or its Creditors, fraud, aiding and abetting fraud on the part of the Debtor and/or Roglieri, or otherwise; (ii) any Claims against banks or any other financial institutions used by the Debtor and/or Roglieri, or that are involved in transactions with the Debtor, in connection with aiding and abetting any breach of fiduciary duty owed by Roglieri to the Debtor and/or its Creditors, fraud, aiding and abetting fraud on the part of the Debtor and/or Roglieri, or otherwise; and (iii) any other Claims against third parties that if pursued by the Debtor or its estate may be subject to the defense of *in pari delicto* or the Wagoner Rule.

70.    The Plan provides Creditors with the opportunity to assign their Creditor Related Causes of Action to the Plan Administrator for prosecution.  Creditors that choose not to assign their Creditor Related Causes of Action to the Plan Administrator shall be permitted to pursue such claim individually but shall lose any entitlement to participate in the Plan Administrator's Creditor Related Causes of Action Fund, if any.  See Plan § 4.2.  The Debtor respectfully submits that these provisions of the Plan comply with section 1123(b)(3) of the Bankruptcy Code.

xi.    Sale of Property and Distribution of Proceeds

71.    Section 1123(b)(4) of the Bankruptcy Code provides that a plan may provide "for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests." 11 U.S.C. § 1123(b)(4).

21

72.     The Plan shall be funded by the proceeds of sale of the Debtor's Assets.  The Debtor respectfully submits that these provisions of the Plan comply with section 1123(b)(4) of the Bankruptcy Code.

xii.   Modification of Rights of Holders of Unsecured Claims

73.     Section 1123(b)(5) provides that a plan may "modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims." 11 U.S.C. § 1123(b)(5).

74.     The Plan modifies the rights of holders of general unsecured claims (Class 2).  See Plan, § 4.2.  The Debtor submits that the modification of such rights is consistent with section 1123(b)(5) of the Bankruptcy Code.  The Plan does not modify the rights of holders of secured Claims.  Thus, the Plan complies with section 1123(b)(5) of the Bankruptcy Code.

xiii.   The Plan Includes Other Provisions That Are Not
        Inconsistent With Applicable Sections Of The Bankruptcy Code

75.     Section 1123(b)(6) of the Bankruptcy Code provides that a Plan may "include any other appropriate provision not inconsistent with the applicable provisions of this title." 11 U.S.C. § 1123(b)(6).  The Plan does provide additional appropriate provisions that are not inconsistent with applicable sections of the Bankruptcy Code, including, but not limited to:  (i) Plan § 5.2 (appointment of Plan Administrator); (ii) Plan, § 5.5 (establishment of reserves); Plan § 8.1 (injunctions against interference with consummation or implementation of Plan); and (ii) Plan § 9.10 (no distributions of less than one hundred dollars).  These provisions are consistent with the Bankruptcy Code, and thus, the Plan complies with section 1123(b)(6) of the Bankruptcy Code.

76.     Section 1123(c) of the Bankruptcy Code requires in a case involving an individual, that "a plan proposed by an entity other than the debtor may not provide for the use, sale, or lease

of property exempted under section 522 of this title, unless the debtor consents to such use, sale or lease." 11 U.S.C. § 1123(c).  The Debtor is not an individual, and accordingly, section 1123(c) is not applicable.

77.    Section 1123(d) of the Bankruptcy Code provides that "[n]otwithstanding subsection (a) of this section and sections 506(b), 1129(a)(7), and 1129(b) of this title, if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law."  11 U.S.C. § 1123(d).  The Plan does not contemplate the curing of any default.  Accordingly, section 1123(d) is not applicable.

78.    Based upon the foregoing, the Debtor respectfully submits that the Plan complies with the applicable provisions sections 1122 and 1123 of the Bankruptcy Code and, therefore, meets the requirements of section 1129(a)(1) of the Bankruptcy Code.

B.    The Debtor Has Complied With The
       Applicable Provisions Of Title 11 (11 U.S.C. § 1129(a)(2))

79.    As noted above, the Court has scheduled a Combined Hearing to consider approval of the Disclosure Statement and confirmation of the Plan.  The proposed order approving the Disclosure Statement and confirming the Plan contains a finding and conclusion that, pursuant to section 1125 of the Bankruptcy Code the Disclosure Statement (i) contains "adequate information", within the meaning of section 1125 of the Bankruptcy Code, and (ii) is approved in all respects.

80.    The Scheduling Order outlines the procedures for the solicitation and tabulation of votes on the Plan.  As set forth in the Voting Declaration, the Debtor fully complied with the requirements of the Scheduling Order.  See, generally, Voting Declaration.

81.     Section 1126 of the Bankruptcy Code specifies the requirements for acceptance of a plan.  Under section 1126, only holders of allowed claims and allowed equity interests in impaired classes of claims or equity interests that will receive or retain property under a plan on account of such claims or equity interests may vote to accept or reject such plan.  See 11 U.S.C. § 1126.

82.     As set forth in the Solicitation Affidavits, in accordance with section 1126 of the Bankruptcy Code, the Debtor solicited votes on the Plan from holders of Claims in the Voting Class.  See Solicitation Affidavit, Exhibit E and Supplemental Solicitation Affidavit.  The Voting Class is impaired under the Plan and will or may receive distributions under the Plan.  See Plan, §§ 3.2, 4.2.  Accordingly, pursuant to section 1126(a) of the Bankruptcy Code, holders of Claims in Class 2 were entitled to vote to accept or reject the Plan.  See Plan, § 10.4.

83.     Class 1 (Secured Claims) is not impaired under the Plan.  See Plan §§ 3.2, 4.1.  As a result, pursuant to section 1126(f) of the Bankruptcy Code, holders of Claims in Class 1 are conclusively presumed to have accepted the Plan.  As such, the votes of holders of Class 1 were not solicited.

84.     In addition, the Debtor did not solicit votes from Class 3 – Equity Interests because such holders are not entitled to receive or retain any property under the Plan on account of such Equity Interest unless and until holders of Allowed Claims in Classes senior in priority to them have been paid in full, which is not expected to occur.  Section 1126(g) of the Bankruptcy Code provides that "a class is deemed not to have accepted a plan if such plan provides that the claims or interests of such class do not entitle the holders of such claims or interests to receive or retain any property under the plan on account of such claims or interests" and, as such, the votes of holders of Class 3 Equity Interests were not solicited.  11 U.S.C. § 1126(g).

24

85.     Based upon the foregoing, the Debtor respectfully submits that the requirements of section 1129(a)(2) of the Bankruptcy Code have been satisfied.

C.     The Plan Was Proposed In Good Faith (11 U.S.C. § 1129(a)(3))

86.     Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3).  Courts within the Second Circuit have defined the good faith standard to require "a showing that the plan was proposed with 'honesty, good intentions' and with a basis for expecting that a reorganization can be effected." In re Granite Broad. Corp., 369 B.R. 120, 128 (Bankr. S.D.N.Y. 2007) ("The Second Circuit has construed the standard as requiring a showing that 'the plan [was] proposed with honesty and good intentions and with a basis for expecting that a reorganization can be effected.'") (quoting In re Johns-Manville Corp., 843 F.2d at 649); Argo Fund Ltd. v. Bd. of Dirs. Of Telecom Argentina, S.A. (In re Bd. of Dirs. Of Telecom Argentina, S.A.), 528 F.3d 162, 174 (2d Cir. 2008) (quoting Koelbl v. Glessing (In re Koelbl), 751 F.2d 137, 139 (2d Cir. 1984)). In the context of a Chapter 11 plan, courts have held that "a plan is proposed in good faith if there is a likelihood that the plan will achieve a result consistent with the standards prescribed under the [Bankruptcy] Code.'" In re Genco Shipping & Trading Ltd., 513 B.R. 233, 261 (Bankr. S.D.N.Y. 2014) (quoting In re Leslie Fay Cos., Inc., 207 B.R. 764, 781 (Bankr. S.D.N.Y. 1997)). Good faith is to be determined "in light of the totality of the circumstances surrounding" formulation of the plan.  In re Quigley Co., Inc., 437 B.R. 102, 126 (Bankr. S.D.N.Y. 2010) (citing In re Madison Hotel Assocs., 749 F.2d 410, 425 (7th Cir. 1984)); see also Tex. Extrusion Corp. v. Lockheed Corp. (In re Texas Extrusion Corp.), 844 F.2d 1142, 1160 (5th Cir. 1988); In re Oneida Ltd., 351 B.R. 79, 85 (Bankr. S.D.N.Y. 2006) ("Good faith should be evaluated 'in light of the totality of the circumstances surrounding confirmation.'") (quoting In re Cellular Info. Sys., Inc., 171 B.R. 926, 945 (Bankr. S.D.N.Y. 1994)); In re Lionel L.L.C., No. 04-17324 (BRL), 2008 WL 905928, at *6

25

(Bankr. S.D.N.Y. March 31, 2008) (looking to totality of the circumstances in order to determine

a plan proposed in good faith under section 1129(a)(3)). In determining whether the good faith

requirement has been satisfied, the court will focus on "the plan itself and whether such plan will

fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." In re

Granite Broad. Corp., 369 B.R. 120, 128 (Bankr. S.D.N.Y. 2007) (quoting In re PWS Holding

Corp., 228 F.3d 224, 242 (3d Cir. 2000)). Accordingly, bankruptcy courts have held that the good

faith requirement is satisfied if the plan has been proposed for the purpose of preserving the value

of the bankruptcy estate and distributing that value to creditors. In re Source Enters, Inc., No. 06-

11707 (AJG), 2007 WL 2903954, at *6 (Bankr. S.D.N.Y. Oct. 1, 2007) (the good faith requirement

was satisfied in plan filed with the legitimate and honest purposes of maximizing value of estate

and effectuating equitable distribution), aff'd, 392 B.R. 541 (S.D.N.Y. 2008).

87.     The Plan has been proposed by the Debtor in good faith, with the legitimate and

honest purpose of maximizing the value of the Debtor's estate. See Dribusch Declaration, ¶ 46.

88.     The overwhelming support of the Voting Class reflects the overall fairness of the

Plan and the acknowledgment by the Voting Class that the Plan has been proposed in good faith

and for proper purposes.

89.     Further, the Debtor submits that the absence of any unresolved objections being

filed to the Plan reflects the overall fairness of the Plan and the acknowledgment by parties in

interest that the Plan has been proposed in good faith and for proper purposes.[4] Accordingly, the

Debtor respectfully submits that section 1129(a)(3) of the Bankruptcy Code is satisfied.

---

[4] There is one unresolved limited objection to the adequacy of the disclosure statement filed by Hogan Lovells US LLP.

D.    All Payments To Be Made By The Estate In Connection With This Case Is
Subject To The Approval Of The Court (11 U.S.C. § 1129(a)(4))

90.    Section 1129(a)(4) of the Bankruptcy Code requires that: "[a]ny payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable." 11 U.S.C. § 1129(a)(4).  In essence, this subsection requires that any and all fees promised or received from the estate in connection with or in contemplation of a chapter 11 case must be disclosed and made subject to the court's approval.  Davis v. Elliot Mgmt. Corp. (In re Lehman Bros. Holdings Inc.), 508 B.R. 283, 294 n. 9 (S.D.N.Y. 2014) ("Section 1129(a)(4) is partly focused on ensuring disclosure of payments made in connection with the plan, but not written into the plan."); In re Journal Register Co., 407 B.R. 520, 537 (Bankr. S.D.N.Y. 2009); see In re Johns-Manville Corp., 68 B.R. 618, 632 (Bankr. S.D.N.Y. 1986) (implying that court must be permitted to review and approve reasonableness of professional fees made from estate assets).  The court in In re Journal Register Co., 407 B.R. 520, 537 (Bankr. S.D.N.Y. 2009), held that the requirements of section 1129(a)(4) are twofold: first, there must be disclosure and second that the court must approve the reasonableness of the payments.  (quoting 7 *Collier on Bankruptcy* 1129.03[4].  "Section 1129(a)(4) is designed to insure compliance with the policies of the Code that (1) the bankruptcy court should police the awarding of fees in title 11 cases and (2) holders of claims and interests should have the benefit of such information as might affect the claimants' decision to accept or reject the plan."  Id. (quoting In re Future Energy Corp., 83 B.R. 470, 488 (Bankr. S.D. Ohio 1988)).

91.    In this Chapter 11 Case, the only such payments are to the retained professionals of the Debtor and Receiver and any parties that submit claims for substantial contribution, which are

27

all subject to Bankruptcy Court approval.  The Plan requires professionals to file final applications for allowance of professional fees and reimbursement of expenses on or before the date that is 30 days after notice of the Effective Date has been mailed, <u>see</u> Plan, § 5.10, and such fees and expense reimbursements shall be paid only in the amount allowed by the Court.  In addition, section 11.1(b) of the Plan provides that the Bankruptcy Court will retain jurisdiction after the Effective Date to hear and determine all applications for professional fees and reimbursement of expenses.

92.    Further, parties asserting an Administrative Expense Claim, including a claim for substantial contribution, must file such request on or before the date that is 30 days after notice of the Effective Date has been mailed, <u>see</u> Plan, § 5.9, and such payment request shall be paid only in the amount allowed by the Court.

93.    Accordingly, the Debtor respectfully submits that the Plan complies with the requirements of section 1129(a)(4) of the Bankruptcy Code.

E.    Disclosure Of All Required Information Regarding Post-Confirmation Directors, <u>Management And Insiders (11 U.S.C. § 1129(a)(5))</u>

94.    Section 1129(a)(5)(A)(i) requires that the proponent of a plan disclose the identity and affiliations of any individual proposed to serve, after confirmation of a plan, as director, officer or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the Plan.

95.    The Plan satisfies section 1129(a)(5)(A)(i).  The Plan discloses that Christian H. Dribusch will serve as Plan Administrator to complete the Debtor's wind-down and to make distributions to certain Classes of Creditors.  <u>See</u> Plan, §§ 5.2, 5.3.  The Plan further discloses the appointment of the Oversight Committee, comprised of not more than five (5) members to oversee the activities of the Plan Administrator.  <u>See</u> Plan § 5.4.  The Plan relates solely to the Debtor and

not to any other person or entity. Thus, the Plan complies with section 1129(a)(5)(A)(i) of the
Bankruptcy Code to the extent applicable.

96.     Section 1129(a)(5)(A)(ii) requires that the appointment of the person identified in
accordance with section 1129(a)(5)(A)(i) "is consistent with the interests of creditors and equity
security holders and with public policy." 11 U.S.C. § 1129(a)(5)(A)(ii). Thus, section
1129(a)(5)(A)(ii) asks the bankruptcy court to ensure that post-confirmation governance is in
"good hands," which has been interpreted by courts to mean that, without limitation: (a) the
proposed directors and officers have experience in the debtor's business and industry and in
financial and management matters; (b) control of the reorganized entity by the proposed
individuals will be beneficial; and (c) the appointment of such persons does not "perpetuate[]
incompetence, lack of discretion, inexperience, or affiliation[] with groups inimical to the best
interests of the debtor." In re Linda Vista Cinemas, L.L.C., 442 B.R. 724, 735 (Bankr. D. Ariz.
2010); See, e.g., In re Drexel Burnham Lambert Grp, Inc., 138 B.R. at 760 (citations omitted).

97.     The Debtor believes that appointments described above are in fact consistent with
the interests of creditors and equity security holders and with public policy. The Plan Administrator
is the Roglieri Trustee who is acting as the manager of the Debtor, as the party in possession and
control of all equity interests in the Debtor and, as a result, has substantial knowledge of the
Debtor's remaining Assets and has participated in the Debtor's wind-down activities, and his
completion of such activities after the Effective Date will therefore be the most economical and
efficient and therefore satisfies section 1129(a)(5)(A)(ii) of the Bankruptcy Code.    The
appointment of the Oversight Committee satisfies section 1129(a)(5)(A)(ii) of the Bankruptcy
Code because those appointees will represent the interests of the General Unsecured Creditors.

Therefore, the Debtor believes that the requirements of section 1129(a)(5)(A)(ii) of the Bankruptcy Code are satisfied.  See Stevens Declaration, ¶ 51.

98.     Section 1129(a)(5)(B) of the Bankruptcy Code provides that a plan may be confirmed if the proponent discloses the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider. 11 U.S.C. § 1129(a)(5)(B).

99.     Christian H. Dribusch, the proposed Plan Administrator, is currently the Roglieri Trustee in charge of the Debtor's bankruptcy estate, and therefore is an "insider" within the meaning of section 101(31)(B) of the Bankruptcy Code.  Mr. Dribusch disclosed, in the Plan Administrator Agreement, his expected compensation.  In particular, Mr. Dribusch disclosed that he expected to be compensated at the rate of 2% of disbursements, plus reimbursement of expenses.  See Plan Administrator Agreement, § 2.2.  The Debtor submits that the foregoing disclosure satisfies section 1129(a)(5)(B) of the Bankruptcy Code.

F.    The Plan Does Not Provide For Any Rate Change
      Subject To Regulatory Approval (11 U.S.C. § 1129(a)(6))

100.     Section 1129(a)(6) of the Bankruptcy Code requires, with respect to a debtor whose rates are subject to governmental regulation following confirmation, that appropriate governmental approval has been obtained for any rate change provided for in the plan, or that such rate change be expressly conditioned on such approval. 11 U.S.C. §1129(a)(6).  Section 1129(a)(6) of the Bankruptcy Code does not apply to the Plan as there is no governmental regulatory commission that has jurisdiction over any rates of the Debtor.

G.    The Plan Satisfies The "Best Interests" Test (11 U.S.C. § 1129(a)(7))

101.     The "best interests of creditors" test as set forth in section 1129(a)(7) of the Bankruptcy Code requires that, with respect to each impaired class of claims or interests, each

holder of a claim or interest has accepted the plan or will receive property of a value not less than what such holder would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code. In re Jennifer Convertibles, Inc., 447 B.R. 713, 724 (Bankr. S.D.N.Y. 2011).

102.   The best interests test focuses on individual dissenting creditors rather than classes of claims. In re Drexel Burnham Lambert Grp., Inc., 138 B.R. at 761; see also ACC Bondholder Grp. v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.), 361 B.R. 337, 364 (S.D.N.Y. 2007) ("The best interest of creditors test 'applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan.' If even one dissenting member of an impaired class would get less under the Plan than in a hypothetical liquidation, the fact that the class as a whole approved the Plan is immaterial") (quoting Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S. 434, 442 n. 13 (1999)). The analysis requires that each holder of a claim or interest either accept the plan or receive or retain under the plan property having a present value, as of the effective date of the plan, not less than the amount such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code. In re 20 Bayard Views, LLC, 445 B.R. at 98 (Bankr. E.D.N.Y. Mar. 7, 2011) (the "best interests test" focuses on whether creditors would receive at least as much in a chapter 7 distribution of debtor's assets as under reorganization plan); In re Best Prods. Co. Inc., 168 B.R. 35, 72 (Bankr. S.D.N.Y. 1994) (best interests test met when classes voting against plan would receive either the same or larger distribution than under chapter 7 liquidation), appeal dismissed, 177 B.R. 791 (S.D.N.Y.), aff'd, 68 F.3d 26 (2d Cir. 1995); see In re Leslie Fay Co., Inc., 207 B.R. at 787 (best interests test requires court to "find that each [dissenting] creditor will receive or retain value that is not less than the amount he [or she] would receive if the debtor were liquidated") (quoting In re Victory Constr. Co., Inc., 42 B.R. 145, 151 (Bankr. C.D. Cal. 1984)). Accordingly, if the Court finds that

31

each nonconsenting member of an impaired class will receive at least as much under the Plan as it would receive in a chapter 7 liquidation, the Plan satisfies the best interests of creditors test. <u>See</u> <u>In re Wash. Mut., Inc.</u>, 442 B.R. 314, 356 (Bankr. D. Del. 2011).

103.    As set forth above, the Voting Class has voted to accept the Plan.  There were no Creditors who voted to reject the Plan in the Voting Class.  <u>See</u> Voting Declaration, Exhibit A.

104.    As set forth in the Dribusch Declaration, the Plan provides for the liquidation of the Debtor's remaining assets.  Attached to the Disclosure Statement as Exhibit A is a liquidation analysis (the "<u>Liquidation Analysis</u>") that demonstrates the projected recoveries for each Class under the Plan and in a hypothetical chapter 7 scenario.  Based upon the Liquidation Analysis, it is undisputable that holders of Claims and Equity Interests will receive value under the Plan that is not less than such holder would receive if the Debtor was liquidated in Chapter 7.

H.    <u>Each Impaired Class Has Voted to Accept the Plan (11 U.S.C. § 1129(a)(8))</u>

105.    Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests under a plan has either accepted the plan or is not impaired under the plan.  With respect to an unimpaired class of claims, under section 1126 of the Bankruptcy Code, any such unimpaired class of claims is "conclusively presumed" to have accepted the plan and need not be further examined under section 1129(a)(8). 11 U.S.C. § 1126(f).  Class 1 is not impaired and is therefore conclusively presumed to have accepted the Plan.  <u>See</u> Plan, §§ 3.2, 4.1.

106.    With respect to an impaired class of claims, acceptance of a plan is determined by reference to section 1126(c) of the Bankruptcy Code, which identifies the members of a class who may vote and the number and amount of votes necessary for the acceptance of a plan by a class of claims.  In particular, section 1126(c) of the Bankruptcy Code provides that a plan is accepted by an impaired class of claims if the class members accepting hold at least two-thirds in amount and

more than one-half in number of the claims held by the class members that have cast votes on the plan. 11 U.S.C. § 1126(c).

107.    As set forth in the Voting Declaration and herein above, the Voting Class voted to accept the Plan.  As such, Section 1129(a)(8) is satisfied.

I.    The Plan Provides For The Payment Of Priority Claims (11 U.S.C. § 1129(a)(9))

108.    Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be paid in full on the effective date of a plan.  The Plan satisfies each of the requirements of section 1129(a)(9).  First, consistent with section 1129(a)(9)(A), the Plan provides for all Allowed Administrative Claims (i.e., § 507(a)(2)  and § 507(a)(3) claims) to be paid in full in Cash (a) as soon as practicable following the later of the Effective Date or the date upon which the Court enters a Final Order allowing any such Administrative Expense Claim, or (b) upon such other terms as may exist in accordance with the ordinary course of the Debtor's liquidation, or (c) as may be agreed upon between the holder of any such Administrative Expense Claim and the Plan Administrator.  See Plan § 2.1(a).

109.    Second, the Plan provides that Priority Tax Claims will be treated consistently with section 1129(a)(9)(C), in that each holder of an Allowed Priority Tax Claim shall be paid (a) an amount in Cash equal to the Allowed amount of such Priority Tax Claim, or (b) such other treatment as to which the Plan Administrator and the holder of such Allowed Priority Tax Claim shall have agreed upon in writing.  See Plan § 2.1(b).

110.    Thus, the Plan complies with the requirements of section 1129(a)(9) of the Bankruptcy Code.

J.    The Plan Has Been Accepted By At Least One
Impaired, Non-Insider Class (11 U.S.C. § 1129(a)(10))

111.    Section 1129(a)(10) of the Bankruptcy Code provides that "[i]f a class of claims is

impaired under the plan, at least one class of claims that is impaired under the plan has accepted

the plan, determined without including any acceptance of the plan by any insider". 11 U.S.C. §

1129(a)(10).

112.    The Plan satisfies this requirement. As described above and in the Voting

Declaration, the Plan has been accepted by Class 2 which does not include the votes cast by any

insiders.  As a result, at least one Class of Claims that is impaired under the Plan has accepted the

Plan, determined without including any acceptance of the Plan by any insider, as required by

section 1129(a)(10) of the Bankruptcy Code.

K.    The Plan Is Feasible or Feasibility Analysis
Not Applicable (11 U.S.C. § 1129(a)(11))

113.    Pursuant to section 1129(a)(11) of the Bankruptcy Code, a plan may be confirmed

only if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for

further financial reorganization, of the debtor or any successor to the debtor under the plan, unless

such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11).

114.    As described in detail in the Disclosure Statement, the Plan shall be funded by the

proceeds from liquidation of the Debtor's Assets.  In addition, the Plan provides that Causes of

Action will be vested in the Post-Confirmation Debtor for further prosecution under the

management of the Plan Administrator.  As a result, no further liquidation or reorganization will

be required after confirmation of the Plan.  Therefore, the Debtor submits that the requirements of

section 1129(a)(11) are not applicable. However, to the extent Bankruptcy Code section

1129(a)(11) applies to implementation of the Plan, the Debtor submits that the feasibility

requirement of section 1129(a)(11) is satisfied, because, after the sale of substantially all of the Debtor's Assets, the Debtor's estate has sufficient assets on hand to implement the Plan as proposed.  See Plan Article 5, Dribusch Declaration ¶¶ 68–71.

> L.    The Plan Provides For The Payment Of Certain Fees (11 U.S.C. § 1129(a)(12))

115.    Section 1129(a)(12) of the Bankruptcy Code requires that certain fees listed in 28 U.S.C. § 1930, determined by the court at the hearing on confirmation of a plan, be paid or that provision be made for their payment. 11 U.S.C. § 1129(a)(12).  The Plan provides that all fees payable pursuant to section 1930 of Title 28 of the United States Code shall be paid by the Debtor and/or the Plan Administrator.  The Plan also provides for the payment, when due, of all United States Trustee quarterly fees under 28 U.S.C. § 1930(a)(6) until the Chapter 11 Case is closed.  See Plan § 5.13.

> M.    Preservation of Retiree Benefits (11 U.S.C. § 1129(a)(13))

116.    Section 1129(a)(13) of the Bankruptcy Code requires that a plan provide for the continuation, after the plan's effective date, of all retiree benefits at the level established by agreement or by court order pursuant to section 1114 of the Bankruptcy Code at any time prior to confirmation of the plan, for the duration of the period that the debtor has obligated itself to provide such benefits. 11 U.S.C. § 1129(a)(13).

117.    The Debtor has no obligation to provide any retiree benefits, and accordingly, section 1129(a)(13) of the Bankruptcy Code is not applicable.

> N.    Domestic Support Obligations (11 U.S.C. § 1129(a)(14)

118.    Section 1129(a)(14) of the Bankruptcy Code requires a debtor to pay all domestic support obligations that first become payable after the date of the filing of the petition. 11 U.S.C. § 1129(a)(14).

35

119.    The Debtor does not have any domestic support obligations, and accordingly, section 1129(a)(4) of the Bankruptcy Code is not applicable.

O.    Requirements for Individual Chapter 11 Cases (11 U.S.C. § 1129(a)(15)

120.    Section 1129(a)(15) of the Bankruptcy Code provides that "[i]n a case in which the debtor is an individual and in which the holder of an allowed unsecured claim objects to the confirmation of the plan, either (a) the value, as of the effective date of the plan, of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or (b) the value of the property to be distributed under the plan is not less than the projected disposable income of the debtor (as defined by section 1325(b)(2)) to be received during the 5-year period beginning on the date that the first payment is due under the plan, or during the period for which the plan provides payments, whichever is longer." 11 U.S.C. § 1129(a)(15).  The Debtor is not an individual, and accordingly, section 1129(a)(15) of the Bankruptcy Code is not applicable.

P.    Property Transfers By Corporations or Trusts that are not Moneyed, Business or Commercial Corporations or Trusts (11 U.S.C. § 1129(a)(16)

119.    Section 1129(a)(16) of the Bankruptcy Code requires that "[a]ll transfers of property under the plan shall be made in accordance with any applicable provisions of nonbankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business or commercial corporation or trust." 11 U.S.C. § 1129(a)(16).  The Debtor is not a nonprofit entity.  As a result, section 1129(a)(16) is inapplicable to the Plan.

Q.    Cram Down is Not Required (11 U.S.C. § 1129(b))

122.    Section 1129(b) of the Bankruptcy Code provides a mechanism (known colloquially as "cram down") for confirmation of a chapter 11 plan in circumstances where the plan is not accepted by all impaired classes of claims.  Under section 1129(b), the court may "cram down" a plan over the dissenting vote of an impaired class or classes of claims or interests as long

as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to such dissenting class or classes.

123.    Here, cram down is not necessary because Class 2 was the only impaired Class and Class 2 voted to accept the Plan.  As a result, section 1129(b) is not applicable.

R.    Confirmation of One Plan (11 U.S.C. § 1129(c))

124.    The Plan is the only plan that has been filed in this Chapter 11 Case.  Accordingly, section 1129(c) of the Bankruptcy Code is satisfied.

S.    The Principal Purpose of the Plan is Not Avoidance
      of Taxes or Section 5 of the Securities Act (11 U.S.C. § 1129(d))

125.    Section 1129(d) of the Bankruptcy Code states that "the court may not confirm a plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933."  11 U.S.C. § 1129(d).  The purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933.  Moreover, no party that is a governmental unit, or any other entity, has requested that the Court decline to confirm the Plan on the grounds that the principal purpose of the Plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933.  Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

T.    Compliance with Bankruptcy Rule 3016

126.    Bankruptcy Rule 3016(a) requires that "[e]very proposed plan and any modification thereof shall be dated and, in a chapter 11 case, identified with the name of the entities or entity submitting or filing it."  This requirement is satisfied because the Plan is dated, as of December 23, 2024, and the Plan identifies the Debtor as the party filing it.

127.    Bankruptcy Rule 3016(b) requires that a disclosure statement be filed with the plan or within a time fixed by the Court.  The Debtor satisfied this requirement by filing the initial Disclosure Statement contemporaneously with the Plan.

128.    Bankruptcy Rule 3016(c) requires that "[i]f a plan provides for an injunction against conduct not otherwise enjoined under the Code, the plan and disclosure statement shall describe in specific and conspicuous language (bold, italic or underlined text) all acts to be enjoined and identify the entities that would be subject to the injunction." Article 8 of the Plan provides for certain injunctions and exculpations, which are specifically and conspicuously identified by the use of bold typeface. Accordingly, the Plan complies with Bankruptcy Rule 3016(c).

## IV.    THE INJUNCTIONS AND EXCULPATIONS SHOULD BE APPROVED

129.    The Debtor requests approval of certain injunctions and exculpations as part of the Plan and submit that such provisions are customary and should be approved in all respects.

130.    The Debtor requests approval of certain injunctions and exculpations of certain parties for their acts during the Chapter 11 Case.  All injunctive and exculpation provisions were included in the Plan and the Disclosure Statement in bold typeface in order to draw attention to these provisions and ensure their due consideration by holders of Claims entitled to vote on the Plan.  Significantly, as evidenced by the overwhelming acceptance of the Plan by the voting classes, the injunctions and exculpations were approved by a substantial majority of holders of Claims that voted on the Plan. The Debtor therefore submits that the injunctions and exculpations should be approved in all respects.

### A.    The Injunctions

131.    Section 8.1 of the Plan contains two (2) injunctions: an injunction against interference with consummation or implementation of the plan (the "Consummation Injunction"), see Plan § 8.1(a); and a general injunction against attempts to collect or otherwise enforce claims

38

in any manner inconsistent with the Plan (the "Plan Injunction," and together with the Consummation Injunction, the "Injunctions"), see Plan § 8.1(b).

132.     The Consummation Injunction enjoins any holder of a Claim from commencing or continuing any action, or employing any process, against the Debtor, the Estate, the Roglieri Trustee, the Plan Administrator, or the Oversight Committee (and its members) with the intent of interfering with consummation or implementation of the Plan.   This standard, necessary and appropriate injunction ensures that those who are responsible for making payments and Distributions under the Plan are able to do so unfettered.

133.     The Plan Injunction enjoins all Persons from extra-Plan efforts to collect on Claims by prohibiting: (i) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order; (ii) the creation, perfection or enforcement of any encumbrance of any kind; and or (iii) the assertion of any right of setoff, counterclaim, exculpation, or subrogation of any kind, in each case against the Debtor, the Estate, the Roglieri Trustee, the Plan Administrator, or the Oversight Committee (and its members).   This injunction, like the Consummation Injunction, is a standard, necessary and appropriate aid to implementation of the Plan.

134.     The Injunctions are appropriate, consistent with applicable law, and should be approved in their entirety. They are narrowly tailored to their purpose of implementing the Plan. Further, the Injunctions are well within the scope of section 105(a) of the Bankruptcy Code and well within the Court's authority to approve.

135.     Bankruptcy Courts are empowered to issue permanent injunctions under a chapter 11 plan pursuant to section 105(a) of the Bankruptcy Code.   Section 105(a) authorizes a bankruptcy court to "issue any order, process or judgment that is necessary or appropriate to carry out the

provisions of [title 11]."  Under section 105(a) of the Bankruptcy Code, the Court has expansive

equitable powers to fashion any order or decree that is in the interest of preserving or protecting

the value of a debtor's assets and to facilitate the efficient administration of the chapter 11 case.

See, e.g., In re Momentum Mfg. Corp., 25 F.3d 1132, 1136 (2d Cir. 1994) ("It is well settled that

bankruptcy courts are courts of equity, empowered to invoke equitable principles to achieve

fairness and justice in the reorganization process.").

136.    In the Second Circuit, bankruptcy courts previously have approved injunctions in

situations where injunctions were an integral part of the chapter 11 plan, conferred material

benefits on a debtor's estate and its creditors, or were necessary to effectuate the plan. See In re

Bally Total Fitness, 2007 WL 2779438, at *8 (finding injunctions provisions appropriate because

they were fair and equitable, necessary to a successful reorganization, and integral to the plan); In

re Ionsphere Clubs, Inc., 184 B.R. 648, 655 (S.D.N.Y. 1995) ("Courts may issue injunctions

enjoining creditors from suing third parties…in order to resolve finally all claims in connection

with the estate and to give finality to a reorganization plan.").  Similar injunction provisions have

been approved by this Court and other courts in this Circuit. See e.g., In re M. Burton Marshall,

Case No. 23-60263 (PGR) (Bankr. N.D.N.Y. July 22, 2024) [Docket No. 436] (approving an

injunction against interference with consummation or implementation of the plan and general

injunction against attempts to collecting or enforcing claims in a manner inconsistent with the

plan); In re Dowling College, Case No. 16-75545 (REG) (Bankr. E.D.N.Y. Dec. 20, 20218)

[Docket No. 662] (same) ; In re Personal Communications Devices, LLC, Case No. 13-74303

(AST) (Bankr. E.D.N.Y. April 14, 2014) [Docket No. 413] (approving general injunction of all

claims related to the administration of the chapter 11 case or the plan); In re Cengage Learning,

Inc., Case No. 13-44106 (ESS) (Bankr. E.D.N.Y. March 14, 2014) [Docket No. 1225] (approving

40

general injunction necessary to preserve and enforce releases, exculpations and compromises and settlements under the plan); In re Saint Vincent's Catholic Medical Centers of New York, Case No. 10-11963 (CGM) (Bankr. S.D.N.Y. June 29, 2012) [Docket No. 3060] (approving general injunction of actions related to claims released under plan or that would contradict plan provisions).

137.    Based on the relevant case law, the facts and circumstances of the Chapter 11 Case, and in light of the benefits that the Debtor and the Debtor's Estate will receive from the Injunctions in section 8.1 of the Plan are reasonable, well-justified and should be approved.

B.      The Exculpation

138.    Section 8.2 of the Plan includes a customary exculpatory provision, which, with certain limitations, protects specified parties from liability that might arise from the administration of certain aspects of the Chapter 11 Case (the "Exculpation").  The Exculpation, among other things, augments the proposed Injunctions and provides that except as otherwise set forth in the Plan, the Debtor and its professionals shall not have or incur any liability to any holder of a Claim or any other Person for any act or omission taken or not taken in good faith in connection with, or arising out of, the Chapter 11 Case, the Disclosure Statement, the Plan, or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan, or any act taken or omitted to be taken during the Chapter 11 Case, the solicitation of votes for and the pursuit of confirmation of the Plan, the consummation of the Plan, including, without limitation, the steps taken to effectuate the transactions described in Article 5 of the Plan, the administration of the Plan or the property to be distributed under the Plan.

139.    Notwithstanding anything in section 8.2 of the Plan to the contrary, the provisions of section 8.2 of the Plan do not limit the liability of any Person that would otherwise result from any act or omission to the extent such act or omission is determined by Final Order to have

41

constituted fraud, willful misconduct or gross negligence.  The Debtor submits that, for the reasons set forth herein, the Exculpation contained in the Plan is appropriate and should be approved.

140.    Exculpations like those contained in section 8.2 of the Plan, which are limited to certain parties instrumental in the administration of the Chapter 11 Case from liability for acts and omissions related to the Chapter 11 Case, other than liability for fraud, willful misconduct and gross negligence, are viewed as reasonable and customary in this jurisdiction.  Indeed, courts have recognized that, without the protections afforded by limited exculpation provisions, "negotiation of a [plan in a reorganization case] would not…[be] possible.  In re Enron Corp., 326 B.R. 497, 501-03 (S.D.N.Y. 2005) (endorsing the findings of the bankruptcy court concerning the propriety and justification for the limited exculpation contained in that plan); In re Oneida Ltd., 351 B.R. 79, 94 n. 22 (Bankr. S.D.N.Y. 2006) (exculpation provision contained in chapter 11 plan which provided for a release of prepetition and postpetition claims related to various matters associated with confirmation of a chapter 11 plan "sufficiently narrow to be unexceptionable.").

141.    Courts in the Second Circuit evaluate the appropriateness of similar exculpation provisions based on a number of factors, including whether the plan was proposed in good faith, whether the provision is integral to the plan, and whether the exculpation provision was necessary for plan negotiations.  See, e.g., In re Bally Total Fitness, 2007 WL 2779438 at*8 (finding exculpation, release and injunction provisions appropriate because they were necessary to successful reorganization and integral to plan); Upstream Energy Servs. v. Enron Corp. (In re Enron Corp.), 326 B.R. 497, 501, 503-04 (S.D.N.Y. 2005) (affirming approval of exculpation provision where it was necessary to effectuate plan and excluded gross negligence and willful misconduct; also noting that excising similar exculpation provisions would "tend to unravel the

42

entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition").

142.    Thus, courts have found that exculpation for participating in the chapter 11 process is appropriate when the plan has been proposed in good faith and otherwise meets the requirements for plan confirmation, and plan negotiations could not have occurred without protection from liability for parties involved in those negotiations. See In re Drexel Burnham Lambert Group, Inc., 960 F.2d at 293 (finding that where a debtor's plan of reorganization requires the settlement of numerous, complex issues, protection of third parties against legal exposure may be a key component of the settlement). Indeed, failing to include an exculpation provision in a chapter 11 plan could deter the critical participation of the debtor's management and advisors, as well as essential parties in interest and creditor groups from fully participating in a chapter 11 case and plan negotiations. See id.; In re Enron Corp., 326 B.R. at 503 (finding that without such protection from liability, key constituents might not actively participate in plan process or might abandon efforts to help a debtor).

143.    In general, the effect of an appropriate exculpation provision is to set a standard of case liability as that of gross negligence or willful misconduct in future litigation by a non-releasing party against an "exculpated party" for acts arising out of a debtor's restructuring. See In re PWS Holding Corp., 228 F.3d 224, 245 (3d Cir. 2000) (holding an exculpation provision is "apparently a commonplace provision in Chapter 11 Plans, [and] does not affect the liability of these parties, but rather states a different standard of care under the Code"); see also In re Enron Corp., 326 B.R. at 501 (finding exculpation provision was appropriate where such provision excluded gross negligence and willful misconduct).

43

144.    Accordingly, exculpation provisions appropriately prevent collateral attacks against parties that have made substantial contributions to a debtor's chapter 11 case and have negotiated a chapter 11 plan that is ultimately confirmed by the Court. Parties to be exculpated from liability may include those that are indemnified by a debtor or that provide substantial contributions to the debtor and the debtor's case. See, e.g., In re Borders Grp., Case No. 11-10614(MG) (Bankr. S.D.N.Y. Dec. 21, 2011) [Docket No. 2384]; In re Uno Rest. Holdings Corp., Case No. 10-10209(MG) (Bankr. S.D.N.Y. July 6, 2010 [Docket No. 559].

145.    Based on this widely accepted precedent, the Exculpation contained in section 8.2 of the Plan is wholly justified, properly limited, and should be approved. The Exculpation is appropriately crafted so as to insulate those parties whose efforts have been instrumental in connection with the formulation and development, confirmation and consummation of the Plan, as well as the overall success of the Chapter 11 Case, from certain types of liability. Moreover, the Exculpation, including its carve-out for fraud, willful misconduct and gross negligence, is entirely consistent with established practice in this circuit. See, e.g., In re DBSD N. Am., Inc., 419 B.R. 179, 217-18 (Bankr. S.D.N.Y. 2009), aff'd in part, rev'd in part, 627 F.3d 496 (2d Cir. 2010); ACC Bondholder Grp. v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.), 368 B.R. at 267 (same). Accordingly, the Exculpation is reasonable, consistent with prior case law in this circuit, and should be approved.

## V.    REQUEST FOR FINDING THAT THE DEBTOR WAS A "PONZI" SCHEME

### A.    Introduction

146.    The Debtor was a fraudulent Ponzi/advance pay investment and lending scheme perpetrated by Roglieri, the Debtor's former principal, among possibly others. The Debtor used lies and deceit to fraudulently obtain funds from unsuspecting victims who were hoping to obtain much needed capital for their businesses and investment projects. Like all schemes of this nature,

some of the very early "investors" received what they were promised, but most were left holding

the bag.  In all, the Debtor's professionals estimate that at least $100 million in fraudulently

obtained funds have yet to be returned to the Debtor's victims.[5]  Obtaining recompence for the

Debtor's victims will be the primary objective of the Plan Administrator after the confirmation of

the Plan.

147.    The Debtor seeks a finding that it was in fact a fraudulent Ponzi/advance pay

lending scheme as part of the order confirming the Plan.  That finding will help the Plan

Administrator streamline the process to recover money and other property fraudulently transferred

by the Debtor in furtherance of its scheme, and liquidate claims filed against the Debtor's estate.

Such relief is often granted by bankruptcy courts in cases like this as part of confirmation or other

general orders.  See, e.g., In re iCap Enterprises, Inc., et al., Case No. 23-01243 (WLH), Dkt. No.

1414, ¶17 (Bankr. E.D.W.A. Oct. 18, 2024) (finding that the debtors perpetrated a Ponzi scheme

in the confirmation order); In re M. Burton Marshall, Case No. 23-60263 (PGR), Dkt. No. 433,

¶¶32-43 (Bankr. N.D.N.Y. July 22, 2024) (finding that the debtor perpetrated a Ponzi scheme as

part of an omnibus order liquidating victim claims).

148.    For all the reasons set forth in detail below, the Debtor respectfully seeks a Ponzi

finding here.

B.      The Debtor's "Business" Was Founded
        Upon an Unworkable and Fraudulent Premise

149.    The Debtor was formed on December 14, 2021, and purported to be a legitimate

alternative (or nonbank) commercial lender.  The Debtor advertised proudly that:

---

[5]  After duplicate claims are eliminated and the three separate claims of Berone Capital LLC (Claim Nos. 25-27) are counted a single time in the amount of $30,000,000, there are currently $209,736,694.10 in claims asserted against the Debtor's estate.  The Debtor intends to investigate each claim fully following confirmation to determine the proper amount of each creditor's claim and the actual amount of each creditor victim's ICA Deposit.  *See* Dribusch Declaration, ¶80.



*See* Prime Commercial Lending, <u>Prime Capital Ventures & The Bailey</u> [Video], May 16, 2022,

<u>https://www.youtube.com/watch?v=A4_RKBepUkA</u> (YouTube) at 0:21; Dribusch Declaration,

¶82.

150.    Generally, alternative lenders offer borrowers some significant benefits over

traditional bank lenders by having simpler application processes, fewer underwriting requirements,

different and more flexible financing products, and more rapid funding.[6]  Roglieri confirmed that

this was the Debtor's business model claiming that he "saw a rising demand from borrowers who

needed to move projects forward with as little static as possible" and that the Debtor could "provide

solutions that are less restrictive than your average bank and offer generous terms that favor

borrowers."[7] The disadvantage of going to an alternative lender is that they typically charge higher

interest rates than what may be available at a traditional bank.[8]   The Debtor on the other hand

---

[6] <u>See</u> Calio, V., June 20, 2024, <u>Traditional Bank vs. Alternative Lender</u>, kapitus.com,
<u>https://kapitus.com/blog/manage-your-money/financing/traditional-bank-vs-alternative-lender-which-is-better-for-your-small-business-kapitus/</u>; Dribusch Declaration, ¶83.
[7] Prime Commercial Lending, March 17, 2022, <u>Albany, New York's Prime Commercial Lending Funds the First 5-Star Hotel in Atlanta, GA Through Prime's Real Estate Fund, Prime Capital Ventures</u>, [Press release]
<u>https://www.prnewswire.com/news-releases/albany-new-yorks-prime-commercial-lending-funds-the-first-5-star-hotel-in-atlanta-ga-through-primes-real-estate-fund-prime-capital-ventures-301505069.html</u>.
[8] <u>See</u> Calio, V., June 20, 2024, <u>Traditional Bank vs. Alternative Lender</u>, *supra.*

offered all of the advantages of an alternative lender, while offering interest rates well below market as explained below. *See* Dribusch Declaration, ¶83.

151.    On May 2, 2022, the Debtor described its business in an article in DealMaker Magazine as "a fund specifically designed to provide capital for large development, commercial development and commercial real estate transactions from $50 million to more than $1 billion."[9] The Debtor offered non-recourse loans with interest rates of 4 to 6% with interest only payments.[10] At the exact same time, interest rates were rising rapidly in response to inflationary pressure.  At the time of the Debtor's advertisement, the prime interest rate was 4%, rising to 4.75% a month later, then to 6.25% by September 22, 2022, and peaking at 8.5% on July 27, 2023.[11]  15-year mortgages followed the same trend starting at 4.52% on May 5, 2022 and peaking at 7.03% on October 26, 2023.[12] *See* Dribusch Declaration, ¶84.

152.    The Debtor's business model sounds completely implausible because it was.  For any lender to be successful, it must pay a lower cost of capital than it receives from its borrowers. Banks would never survive if they paid their depositors a higher rate of interest than they receive from their borrowers.  This assertion can be easily verified by contrasting what Citibank will pay a depositor today for a 5-year certificate of deposit (1.98%)[13] versus the average 5-year commercial mortgage rate (6.54%)[14]. In simple terms, to be a successful lender, the Debtor would have had the impossible task of obtaining capital at well below the 4 to 6% that it was offering to its prospective borrowers.  In truth, the Debtor had no legitimate source of capital to lend to prospective

---

[9]  *See* Koplin, I., May 2, 2022, <u>Roglieri Unveils Prime Capital Ventures, Prime Commercial Lending's Newest Fund</u>, dealmaker-magazine.com, <u>https://www.dealmaker-magazine.com/magazine/roglieri-unveils-prime-capital-ventures-prime-commercial-lendings-newest-fund</u> (last known available on Dec. 16, 2023).

[10]  <u>See</u> <u>Id</u>.

[11]  <u>See</u> <u>https://www.fedprimerate.com/wall_street_journal_prime_rate_history.htm</u>.

[12]  <u>See</u> <u>Freddie Mac</u> (<u>https://www.freddiemac.com/pmms</u>).

[13]  <u>See</u> Source <u>https://www.citi.com/banking/current-interest-rates/cd</u> (last viewed Feb. 4, 2025).

[14]  <u>See</u> Source <u>https://www.commloan.com/commercial-mortgages/mortgage-rates</u> (last viewed Feb. 3, 2025).

borrowers.  Instead, it obtained its capital by converting its prospective borrowers' own funds.  *See* Dribusch Declaration, ¶85.

153.    The Debtor did this by requiring as a condition of providing a loan that its prospective borrower provide 20% of the contemplated loan as an upfront deposit (defined above as an "ICA Deposit," or collectively, the "ICA Deposits").  Roglieri stated that borrowers "have to come to the table with at least 20% and that's just an important function of how our product works."[15]  The Debtor claimed that it would hold the ICA Deposit "as prepaid interest throughout the term of the loan."[16]  As interest payments became due, the Debtor represented that it "would just deduct it from the [ICA DEPOSIT]".[17]  The Debtor admitted that this was "a unique way of doing things" but claimed that it "ensures [the Debtor's] payback, and [the ICA Deposit] serves as additional collateral for the loan throughout the term."[18]  *See* Dribusch Declaration, ¶86.

154.    The ICA Deposits were an investment by the borrowers to get access to the Debtor's promise of cheap and readily available capital.  A loan from the Debtor would theoretically allow a prospective borrower to invest in its underlying business and hopefully make big returns.  The Debtor's prospective borrowers did not appear to have any other viable source of capital, or at least not any as inexpensive as the Debtor.  The Debtor further enticed prospective borrowers with very little underwriting and collateral requirements.  The Debtor also did not require personal guarantees or recourse on the loans as far as the Debtor's professionals have been able to tell from the Debtor's books and records.  *See* Dribusch Declaration, ¶87.

---

[15] See Koplin, I., May 2, 2022, <u>Roglieri Unveils Prime Capital Ventures, Prime Commercial Lending's Newest Fund</u>, dealmaker-magazine.com.
[16] <u>See</u> <u>Id</u>.
[17] <u>Id</u>.
[18] <u>Id</u>.

155.    Of course, the ICA Deposits that the Debtor claimed to be holding to service the

prospective borrower's future interest payment, were the Debtor's only known source of capital.

The Debtor did not segregate or hold the borrowers' ICA Deposits as it had represented.  In fact,

many ICA Deposits were largely if not completely consumed the minute they were received by

the Debtor to cover large and pervasive overdrafts in the Debtor's bank accounts.[19]

156.    A few of the ICA Deposits were used to fund one of the only five loans that the

Debtor actually made as discussed below.  Others were used to buy luxury items for the exclusive

benefit and enjoyment of Roglieri.  For example, according to the Government, Roglieri spent the

funds misappropriated from the Debtor's prospective borrowers in the following ways[20]:

- $916,201 in private jets from June 2022 to October 2023;

- $1,778,154.77 to Ai Design, a high-end automotive shop from December 2022 to October 2023;

- $3,194,454 to purchase a rare Mercedes-Benz "hybercar", which never materialized;

- $3,672,067.50 to purchase the Virginia Beach Property;

- $2,225,000 to purchase a single wristwatch called "RM-52-01 Tourbillion Skull";

- $4,729,745 to RM Sotheby's to purchase a 2003 Ferrari Enzo AB Version E and a 2014 Ferrari LaFerrari;

- $260,810 for a table constructed using a Ferrari V-12 engine;

- $2,076,900 for the combined purchase of a 1982 Mercedes Benz 500SL, a 1989 Mercedes Benz 560 SEL, a 2007 Mercedes Banz SLR McLaren, and a 1987 Mercedes Benz 560;

---

[19] For example, on April 7, 2023, creditor 526 Murfreesboro provided the Debtor with an ICA Deposit of $4,312,500 by wire transfer to the Debtor's account at Citibank.  At the time, the Citibank account was overdrawn in the amount of $4,094,514.75, so nearly the entire ICA Deposit was spent immediately to cover the Debtor's obligation to Citibank.  Similarly, on April 27, 2023, Compass-Charlotte provided the Debtor with an ICA Deposit of $15,902,250 by wire into the Debtor's Citibank account.  $6,525,669.33 of that ICA Deposit was consumed immediately to cover an overdraw.  See United States of America v. One 2003 Ferrari Enzo AB Version E., et al., Case No. 24-cv-1345 (MAD/DJS), Dkt. No. 20-1, Amended Complaint, ¶¶36-57 (N.D.N.Y. Jan. 15, 2025); Dribusch Declaration, ¶88.
[20] See Id. at ¶¶80-162; Dribusch Declaration, ¶89; Ryniker Declaration, ¶10.

- $1,300,000 to TopGear Imports for a 2004 Porsche Carrera;

- $2,055,312 to Wide World Farrari for a 2022 Ferrari 812 Competizione;

- $3,811,000 to Bonhams Butterfields Trust for the purchase of a 2006 Maserati MC 12 Corse;

- $355,000 to Timepiece Trading for the purchase of a Richard Mille RM 65-01 watch; and

- $260,000 to Luxury Bazaar for the purchase of two Rolex watches.

C.    The Debtor Fraudulently Claimed to Have Made Large Loans to Attract Victims

157.    In order to sell a business model that seemed entirely impossible if properly understood, and to get prospective borrowers to give the Debtor new ICA Payments, the Debtor had to demonstrate that it actually made loans.  It did this by, among other ways, fraudulently claiming to have made a "$188,000,000 funding of ALUX Properties, LLC and their project 'The Bailey' which will be the only 5-star hotel in Atlanta".[21]  The Debtor made a glitzy promotional video published on YouTube where it boasted about making this loan.  The video featured Roglieri and others trapsing around the wooded area in Atlanta where "The Bailey" was going to be constructed.  The alleged principal of ALUX Properties, LLC ("ALUX"), Brandon Wheeless, expressed his appreciation in the video stating that "access to this type of capital with trusted

---

[21]    See Prime Commercial Lending, Prime Capital Ventures & The Bailey [Video], May 16, 2022, https://www.youtube.com/watch?v=A4_RKBepUkA (YouTube) at 0:13:



See also, Prime Commercial Lending, March 17, 2022, Albany, New York's Prime Commercial Lending Funds the First 5-Star Hotel in Atlanta, GA Through Prime's Real Estate Fund, Prime Capital Ventures, [Press release].

individuals that you close deals with definitely makes life a heck of a lot easier for us and the company so we are fast-tracking to grow at an exponential rate moving forward."[22]  Depicted here are Mssrs. Wheeless and Roglieri surveying the site, along with the "after" rendering of "The Bailey" contained in the Debtor's video advertisement[23]:

 

See Dribusch Declaration, ¶90.

158.    The problem, of course, is that the Debtor never made any such loan to ALUX. There is no "The Bailey" hotel in Atlanta and there is no sign that there was ever actually going to be.  According to the Debtor's books and records, Brandon Wheeless, the purported principal of ALUX and third-party borrower of the Debtor, was actually on the Debtor's payroll and received a total of $200,000 from the Debtor between July 7, 2022 and September 18, 2023.  See Ryniker Declaration, ¶11.

159.    Indeed, ALUX, the purported borrower, was placed into a receivership by the Georgia Superior Court on September 13, 2022 in connection with a lawsuit where the plaintiffs alleged, among other things, to have been defrauded out of $10 million.[24]  Featured in that litigation was an entity called Blackwater Capital Group, LLC" ("Blackwater") which purported to act as a

---

[22]  See Id. at 3:44 (transcribed by counsel).
[23]  See Id. at 2:58 and 1:35, respectively.
[24]  See Capstone Diagnostics One, L.P., et al. v. Bailey LLC, et al., Case No. 2022cv366001 (GA Sup. Ct., Fulton Cty., Sept. 22, 2024).

lender to the project, not unlike the Debtor in its promotional video.[25]  Blackwater's lending agreement was dated December 14, 2021, the exact date that the Debtor was formed, and was nearly identical in form and substance to the form of lending agreement employed by the Debtor.[26] Compared here are the first pages of the table of contents of Blackwater's December 14, 2021 lending agreement (on the left), and the Debtor's April 24, 2023 lending agreement with creditor Compass (on the right)[27]:

Case 1:24-cv-00055-MAD-PJE    Document 1-21    Filed 01/12/24    Page 92 of 302

TABLE OF CONTENTS

| | Page |
|---|---|
| RECITALS | 1 |
| ARTICLE 1 DEFINITIONS | |
| Section 1.1. Certain Defined Terms | 2 |
| ARTICLE 2 THE CREDIT | |
| Section 2.1. Line of Credit Amount | 4 |
| Section 2.2. Line of Credit Documents | 4 |
| ARTICLE 3 TERM, INTEREST AND PAYMENTS | |
| Section 3.1. Initial Term | 5 |
| Section 3.2. Extended Term | 5 |
| Section 3.3. Applicable Interest Period | 5 |
| Section 3.4. Interest Rate Calculation | 5 |
| Section 3.5. Interest Payments | 6 |
| Section 3.6. Reserves | 6 |
| Section 3.7. Risk Management Protection for ICA Payment | 6 |
| Section 3.8. Prepayment | 6 |
| Section 3.9. Interest Credit Account | 6 |
| Section 3.10. Fees | 7 |
| Section 3.11. Line of Credit Extension Fees | 7 |
| Section 3.12. Legal and Incidental Fees, Charges and Costs | 7 |
| Section 3.13. Line of Credit Disbursement Account | 7 |
| Section 3.14. Taxes | 8 |
| ARTICLE 4 CONDITIONS TO CLOSING AND DISBURSEMENT | |
| Section 4.1. Delivery of the LOC Documents | 8 |
| Section 4.2. Authority | 8 |
| Section 4.3. Liens | 8 |
| Section 4.4. Litigation | 9 |
| Section 4.5. Events of Default | 9 |
| Section 4.6. Purchase and Agreement Contracts | 9 |
| Section 4.7. Compliance with Certain Requirements | 9 |
| Section 4.8. Evidence of Insurance | 9 |
| Section 4.9. Financial Statements | 10 |
| Section 4.10. Business Pro Forma | 10 |
| Section 4.11. Management Plan | 10 |
| Section 4.12. Material Change | 10 |
| Section 4.13. Non-Subordination | 10 |
| Section 4.14. Borrower JV Governing Agreement | 10 |
| Section 4.15. Securitization | 11 |
| ARTICLE 5 USE OF LINE OF CREDIT PROCEEDS | |
| Section 5.1. Development Costs | 11 |

Case 1:24-cv-00055-MAD-PJE    Document 1-29    Filed 01/12/24    Page 3 of 61

TABLE OF CONTENTS

| | Page |
|---|---|
| RECITALS | 1 |
| ARTICLE 1 DEFINITIONS | |
| Section 1.1. Certain Defined Terms | 2 |
| ARTICLE 2 THE CREDIT | |
| Section 2.1. Line of Credit Amount | 4 |
| Section 2.2. Line of Credit Documents | 4 |
| ARTICLE 3 TERM, INTEREST AND PAYMENTS | |
| Section 3.1. Initial Term | 5 |
| Section 3.2. Extended Term | 5 |
| Section 3.3. Applicable Interest Period | 5 |
| Section 3.4. Interest Rate Calculation | 5 |
| Section 3.5. Interest Payments | 6 |
| Section 3.6. Reserves | 6 |
| Section 3.7. Intentionally Omitted | 6 |
| Section 3.8. Prepayment | 6 |
| Section 3.9. Interest Credit Account | 6 |
| Section 3.10. LOC Fee | 7 |
| Section 3.11. Line of Credit Extension Fees | 7 |
| Section 3.12. Legal and Incidental Fees, Charges and Costs | 7 |
| Section 3.13. Taxes | 8 |
| ARTICLE 4 CONDITIONS TO CLOSING AND DISBURSEMENT | |
| Section 4.1. Delivery of the LOC Documents | 8 |
| Section 4.2. Authority | 8 |
| Section 4.3. Liens | 9 |
| Section 4.4. Litigation | 9 |
| Section 4.5. Events of Default | 9 |
| Section 4.6. Purchase and Agreement Contracts | 9 |
| Section 4.7. Compliance with Certain Requirements | 9 |
| Section 4.8. Evidence of Insurance | 9 |
| Section 4.9. Financial Statements | 10 |
| Section 4.10. Business Pro Forma | 10 |
| Section 4.11. Management Plan | 10 |
| Section 4.12. Material Change | 10 |
| Section 4.13. Non-Subordination | 10 |
| Section 4.14. Borrower Governing Agreement(s) | 11 |
| Section 4.15. Securitization | 11 |
| ARTICLE 5 USE OF LINE OF CREDIT PROCEEDS | |
| Section 5.1. Development Costs | 11 |

*See* Dribusch Declaration, ¶91.

160.    Like the Debtor, Blackwater required the payment of an ICA Deposit under its agreement, and Blackwater was ultimately paid its $10 million ICA Deposit.  However, the source of that ICA Deposit did not come from ALUX but from funding from the plaintiffs in the litigation. Ultimately, the Georgia Superior Court found that "[t]he testimony evidence brought forth at the hearing revealed the [Blackwater lending agreement] to be a 'total fraud'".[28]  Although the

---

[25] See Id., Judgment entered June 24, 2023.
[26] See Id., Verified Complaint, Exhibit E, executed June 9, 2022.
[27] See Id., compared to Exhibit 29 to the Complaint filed in Compass-Charlotte v. Prime Capital Ventures, LLC, et al., Case No. 24-cv-55 (MAD) (N.D.N.Y. Jan. 12, 2024).
[28] See Id., Judgment entered June 24, 2023, p.4.

relationship between the Blackwater and the Debtor is not yet understood, both entities and/or their principals were using the same fraud model to defraud prospective borrowers out of ICA Deposits. *See* Dribusch Declaration, ¶92.

161.    Fortunately for Blackwater's victim(s) in the ALUX transaction, but unfortunately for the Debtor's, Blackwater appears to have been discovered and stopped relatively quickly, whereas the Debtor continued on until at least in or around December 2023, obtaining an estimated $100 million in ICA Deposits that have yet to be repaid. *See* Dribusch Declaration, ¶93.

162.    In addition to the fraudulent claim that the Debtor has loaned $188 million to ALUX to build "The Bailey", the Debtor also fraudulently claimed to have "gained prominence by committing $17 billion with a South Korean firm for projects in the United States and abroad."[29] The Debtor also claimed that it had provided "$2.3 billion in funding for the first stage of a massive five-year, five-stage $22 billion project" "[i]n the heart of Dubai".[30]    There is absolutely no indication that any of that is true.    *See* Dribusch Declaration, ¶94.

   D.    The Only Way to Pay Old Victims Was by Getting New Ones

163.    The Debtor's business was never legitimate.    It was founded upon lies.    Those lies were compounded when prospective borrowers' ICA Deposits were immediately converted and never reserved for interest payments as represented.    Finally, those lies were discovered when the

---

[29] See Prime Commercial Lending, March 17, 2022, Albany, New York's Prime Commercial Lending Funds the First 5-Star Hotel in Atlanta, GA Through Prime's Real Estate Fund, Prime Capital Ventures, [Press release]; see also Prime Commercial Lending, Prime Commercial Lending Commits to Lending $17 Billion [Video], Jan. 21, 2022, https://www.youtube.com/watch?v=PmvtmdkBUlo (YouTube) at 0:13:



[30] Koplin, I., May 2, 2022, Roglieri Unveils Prime Capital Ventures, Prime Commercial Lending's Newest Fund, dealmaker-magazine.com, https://www.dealmaker-magazine.com/magazine/roglieri-unveils-prime-capital-ventures-prime-commercial-lendings-newest-fund (last known available on Dec. 16, 2023).

Debtor was unable to fund the loans promised to prospective borrowers who had already made ICA Deposits.  Once most of the borrowers discovered that the Debtor could not fund their loans, they demanded a return of their ICA Deposits and began to rush to courthouses all over the country.[31]  *See* Dribusch Declaration, ¶95.

164.    For five of the Debtor's earliest prospective borrowers, the Debtor was able to obtain sufficient additional ICA Deposits from new prospective borrowers to fund those loans. Even though the Debtor advertised that its transactions ranged from $50 million to $1 billion, none of the loans that it actually made even came close to the advertised $50 million floor.  In fact, the largest loan was to Indigo Pharmaceuticals and was for $20 million by agreement dated June 2, 2022.[32]  The other four were as follows: (i) to 135 Railroad, LLC for principal of $2 million closed Jan. 26, 2023; (ii) to Hudson & Hudson, LLC for principal of $5 million closed March 2, 2023; (iii) to SRA-CH Richland I LLC for principal of $16.5 million closed June 9, 2023; and (iv) to Brightsmith Tulsa LLP for principal of $7.5 million closed Sep. 12, 2023.  In addition, the Debtor partially funded a loan to Caruso Home Builders in the approximate amount of $2.4 million, after reducing it by the ICA Deposit and related fees.  *See* Dribusch Declaration, ¶96.

165.    When the Debtor was no longer able to fund loans and borrowers began to sue, the only way for the Debtor to forestall discovery of its fraud was to obtain more ICA Deposits in

---

[31] See, e.g., Truss Financial LLC v. Prime Capital, et al., Index No. 2023/510389 (N.Y.Sup. Ct. Kings Cty. Apr. 5, 2023) (seeking and apparently obtained the return of $13.4 million); B&R Acquisition Partners v. Prime Capital (JAMS Arb., Aug. 2023) (seeking return of $4 million); Sturm v. Prime Capital, Case No. 23-cv-1033 (N.D.N.Y. Aug. 22, 2023) (seeking return of $2 million); Camshaft CRE 1, LLC v. Prime Capital, Case No. 2023-023173 (Fla. Circ. Ct., Miami-Dade Cty., Sept. 15, 2023) (seeking return of $13.4 million); The Lion Group DFW, LLC v. Prime Capital, Case No. 23-DCV-34617 (Tex. Dist. Ct., 146th Dist., Sept. 21, 2023) (demand unknown); Onward Partners, LLC, v. Prime Capital, et al., Case No. 23-cv-833 (D. Utah Nov. 13, 2023) (seeking return of $20 million).
[32] See Prime Commercial Lending, Prime Capital Ventures Presents Indigo Pharmaceutical in Las Vegas, NV [Video], Apr. 20, 2023, https://www.youtube.com/watch?v=GvmECqnuBkY (YouTube) at 0:13; Prime Commercial Lending, Prime Capital Ventures Presents Home Rentals in Carbondale, IL [Video], Mar. 3, 2023, https://www.youtube.com/watch?v=8D5GRnKecG0 (YouTube).

order to repay those who had discovered what was going on.  In at least the following situations, the Debtor used new ICA Deposits to try to satisfy the claims of earlier prospective borrowers:

- 526 Murfreesboro delivered a $4,312,500 ICA Deposit to the Debtor on April 7, 2023. On April 17, 2023, the Debtor used $2,000,000 of that ICA Deposit to repay a prior portion of the ICA Deposit received in September 2022 from borrower Onward Partners LLC, and another $2,000,000 of that ICA Deposit to repay a prior portion of the ICA Deposit from another client identified as "Business-1" by the Government.[33] Thus, the near entirety of 526 Murfreesboro's ICA Deposit was used to repay prior borrower/investors.

- Compass delivered a $15,902,250 ICA Deposit to the Debtor on April 27, 2023, and HCW Biologics Inc. ("HCW") delivered a $5,250,000 ICA Deposit to the Debtor that same day.  Compass and HCW's ICA Deposits were commingled and were used for the following purposes, among others, not related to those borrowers: (i) $6,525,669.33 was used to fund a preexisting overdraw in the Debtor's bank account (Citibank No. **6945); and (ii) $3,700,000 was transferred to a law firm and used, upon information and belief, in connection with another loan.[34]

- Newlight delivered a $2,500,000 ICA Deposit to the Debtor on May 24, 2023, which was largely used for unrelated purposes in the one- week period that followed.[35]

E.    The Advance Pay/Ponzi Scheme Finding is Warranted

166.    In a Ponzi scheme, multiple victims are defrauded over the course of months or years, and the perpetrator forestalls discovery of the scheme by using newer victims' money to pay back earlier-in-time victims.  Payouts are used to create the appearance of a legitimate, money-making enterprise; however, in reality, investors are the only source of funding and the person(s) involved in the Ponzi scheme will siphon off investor funds for their own personal gain.  See Securities Fraud Awareness & Prevention Tips, FBI.gov.[36]  "Ponzi schemes have no exact definition, since they manifest a kaleidoscopic variety of configurations."  Honorable Dorothy T. Eisenberg, Nicholas W. Quesenberry, Ponzi Schemes in Bankruptcy, 30 Touro Law Review p.

---

[33] See Civil Forfeiture Case Amended Complaint, Dkt. No. 20-1, ¶42.
[34] See Id. at ¶¶45-57.
[35] See Id. at ¶¶58-65; Dribusch Declaration, ¶96; Ryniker Declaration, ¶12.
[36] https://www.fbi.gov/stats-services/publications/securities-fraud (last visited Nov. 15, 2024).

502. "Thus, 'courts look for a general pattern, rather than specific requirements.'" <u>Id.</u>, citing <u>Manhattan Inv. Fund, Ltd. V. Gredd</u> (<u>In re Manhattan Inv. Fund, Ltd.</u>), 397 B.R. 1, 12 (S.D.N.Y. 2007) (stating there is no precise Ponzi scheme definition).

167.    Some courts use a four-factor test in determining whether a Ponzi scheme exists and consider whether: "1) deposits were made by investors; 2) the Debtor conducted little or no legitimate business operations as represented to investors; 3) the purported business operation of the Debtor produced little or no profits or earnings; and 4) the source of payments to investors was from cash infused by new investors." <u>Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC</u>, 531 B.R. 439, 471 (Bankr. S.D.N.Y. 2015).  Other courts identify "badges of fraud," "including the absence of any legitimate business connected to the investment program, the unrealistic promises of low risk and high returns, commingling investor money, the use of agents and brokers paid high commissions to perpetuate the scheme, misuse of investor funds, the 'payment' of excessively large fees to the perpetrator and the use of false financial statements." <u>Gowan v. Amaranth Advisors LLC</u> (<u>In re Dreier LLP</u>), No. 08-15051, 2014 WL 47774, at *9 (Bankr. S.D.N.Y. Jan. 2, 2014); <u>see</u> <u>Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC</u> (<u>In re Madoff</u>), 528 F. Supp. 3d 219, 237-41 (S.D.N.Y. 2021), aff'd sub nom., Picard v. Jaba Assocs. LP, 49 F.4th 170 (2d Cir. 2022).

168.    In the end, and most significantly, "the label 'Ponzi scheme' has been applied to *any sort of inherently fraudulent arrangement under which the debtor-transferor must utilize after-acquired investment funds to pay off previous investors in order to forestall disclosure of the fraud*." <u>Bayou Superfund, LLC v. WAM Long/Short Fund II, L.P.</u> (<u>In re Bayou Group, LLC</u>), 362 B.R. 624, 633 (Bankr. S.D.N.Y. 2007) (emphasis added).  The Debtor had all the classic hallmarks of a Ponzi scheme.

169.    The Debtor's Ponzi scheme is also consistent with what the U.S. Securities and Exchange Commission has dubbed a fraudulent advance fee scheme.  In such a scheme, the perpetrator gets the victim to pay an upfront fee based on the promise that the fee will enable large sums of money to flow to the victim.  After the victim sends the fee, the perpetrator keeps the fee and never delivers the promised loan, windfall, etc.  See Updated Investor Alert: Be on the Lookout for Advance Fee Fraud, SEC.gov.[37]  This is precisely what the Debtor was doing here.

170.    There is no basis to dispute that the Debtor was at all relevant times an advance fee/Ponzi scheme, but perhaps the most compelling admission is found in text messages between Roglieri and an undisclosed individual as follows:

| Date | Time | From | Message |
|------|------|------|---------|
| 1/4/2024 | 11:20:42 am | Unknown | Can't you just keep working on those companies? I know it might be hard at first, but look what you build this up to beat from nothing |
| 1/4/2024 | 11:20:56 am | Roglieri | Yea I can but not when I'm in f—king prison |
| 1/4/2024 | 11:21:09 am | Unknown | Why do you think that's gonna happen? Why can't it just be a bankruptcy? |
| 1/4/2024 | 11:21:47 am | Roglieri | **Because I unused others money to fund deals** I already told you this |
| 1/4/2024 | 11:22:02 am | Unknown | And that's illegal? |
| 1/4/2024 | 11:22:15 am | Roglieri | Yes |
| 1/4/2024 | 11:22:36 am | Unknown | How bad .  I mean, what's the worst you do a couple years who cares You have your family This whole family will support you through this It's a civil case it's not a criminal case |
| 1/4/2024 | 11:27:42 am | Roglieri | **It will turn criminal as soon as they get into bank statements** |

Criminal Case, Docket No. 6-1 (June 3, 2024) (emphasis added) (typographical and grammatical errors in original).

171.    While prospective borrowers were not investing in the Debtor in the traditional sense, their ICA Deposit was very much an investment for all intents and purposes.  The ICA Deposits were made for the express purpose of obtaining much needed and impossibly low-priced

---

[37]  https://www.sec.gov/resources-for-investors/investor-alerts-bulletins/ia_lookforaff (last visited Nov. 15, 2024).

capital amounting to at least five times the amount of the ICA Deposit. That capital was needed by the prospective borrowers for their projects and businesses. The Debtor obtained the ICA Deposits not only on the promise of providing low-priced capital, but on the representation that the ICA Deposit would be held and used to pay down the prospective borrower's interest during the life of the contemplated loan.[38] The Debtor never retained the ICA Deposits in "trust" as represented but rather used them for: (i) in the rare five instances, funding actual loans; (ii) returning other prospective borrowers' ICA Deposits when the Debtor could not fund the promised loans in order to keep the fraud from being discovered; and (iii) buying a beach house, expensive cars, luxury wristwatches, private jet travel, and other extravagances for Roglieri. Most importantly, the only source of capital for any of the Debtor's activities was obtaining more ICA Deposits from new prospective borrowers, which were not supposed to be used for anything other than servicing the respective prospective borrower's loan obligations.

172. It is difficult to describe the Debtor's fraudulent scheme as anything but a Ponzi scheme. Regardless, even if the Debtor had any divergence from the classic Ponzi scheme model, "[c]ase law has revealed that a clever twist on the Ponzi concept will not remove a fraudulent scheme from the definition of Ponzi." Forman v. Salzano (In re Norvergence, Inc.), 405 B.R. 709, 730 (Bankr. D.N.J. 2009), citing United States v. Sudeen, 434 F.3d 384, 386-87 (5th Cir. 2005); United States v. Antonakopoulos, 399 F.3d 68, 72 (1st Cir. 2005). What is most important is that

---

[38] The principal of Indigo Pharmaceutical explained his expectations of precisely how the ICA Deposit works in the YouTube promotional video reference above as follows:

> So with Prime, they are committed just as much as we are because we put the money in, that is true, **but the money goes into a trust,** and you wait for the documentation of a trust meaning you have already been accepted. It's just a matter of time until you get funded. So once you understand that, although you're waiting and that sometimes can give people agita, but you know that the loan is going to come through because the trust has accepted all your documentation in advance and you know whether it's sixty or ninety days, or banking days actually, you're going to get funded. It's just a matter of time.

Prime Commercial Lending, Prime Capital Ventures Presents Indigo Pharmaceutical in Las Vegas, NV [Video], Apr. 20, 2023, *supra*, starting at 4:01 (transcription by counsel).

the Debtor and its former principal knew that the pool of prospective borrowers would at some point run dry, the scheme would consequently inevitably collapse, and those prospective borrowers with outstanding ICA Deposits would lose their money.  This is the very essence of a Ponzi scheme.  See Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Group, LLC), 439 B.R. 284, 306 n.19 (S.D.N.Y. 2010).

173.    For all the foregoing reasons, the Debtor respectfully submits that it was an advance pay/Ponzi scheme and respectfully requests such finding by the Court as part of the order confirming the Plan.

## VI.    THE ONLY REMAINING LIMITED OBJECTION TO THE ADEQUACY OF THE DISCLOSURE STATEMENT SHOULD BE OVERRULED

174.    There was one informal objection to confirmation of the plan by Caruso Home Builders, LLC and Sage Estates Malta, LLC, and one formal objection to confirmation of the plan by B and R Acquisition Partners, LLC and JHM Lending Ventures, LLC at Dkt. No. 153.  Both objections are resolved by consensual language set forth in the proposed order confirming the Plan filed with the Court contemporaneously with the filing of this Memorandum of Law.  Accordingly, there are no remaining objections to confirmation.

175.    There was one limited objection to approval of the Disclosure Statement.  The limited objection to the approval of the Disclosure Statement was filed by Hogan Lovells US LLP ("Hogan Lovells") which expresses concern that the language of the Disclosure Statement "improperly downplays potential claims against the alleged creditors that filed the initial. . . involuntary bankruptcy case against the Debtor in 2023" which "this Court has denied the Debtor permission to abandon."  Objection, Dkt. No. 150, ¶2 (Feb. 19, 2025).  Since the Debtor has already solicited acceptances of and rejections of the Plan, the Debtor cannot resolve this objection.

176.    First, it is important to note that the Court entered the Scheduling Order on January 8, 2025, which required, among other things, that the Solicitation Package including the Disclosure Statement be served by January 10, 2025.  In compliance with the Scheduling Order, the Debtor served the Solicitation Package on January 9, 2025, and confirmed that in the Solicitation Affidavit filed with the Court.  On January 10, 2025, <u>after</u> entry of the Solicitation Order and service of the Solicitation Package, the Court entered its decision denying without prejudice the Debtor's request to abandon certain potential claims against the Petitioning Creditors based upon the record before the Court at the time (the "<u>Abandonment Decision</u>").  Thus, as a preliminary matter, there is no mischaracterization of the contents of the Abandonment Decision in the Disclosure Statement because the Abandonment Decision had not been issued at the time of solicitation.  The contents of the Disclosure Statement with respect to the issues underlying the Abandonment Decision were absolutely consistent with the Debtor's pleadings on the issues.  Hogan Lovells' disagreement with the Debtor on the abandonment is duly noted and a matter of record.  However, Hogan Lovells' disagreement with the Debtor's characterization is not a basis deny approval of the Disclosure Statement and compel the Debtor to amend the Disclosure Statement and resolicit votes on the Plan.

177.    A disclosure statement must, as a whole, provide information that is sufficient to permit an informed judgment by parties in interest entitled to vote on the chapter 11 plan.  <u>See Kirk v. Texaco, Inc.</u>, 82 B.R. 678, 681 (Bankr. S.D.N.Y. 1988); <u>In re Copy Crafters Quickprint, Inc.</u>, 92 B.R. 973, 979 (Bankr. N.D.N.Y. 1988) ("[Adequacy] is to be determined on a case-specific basis under a flexible standard that can promote the policy of chapter 11 towards fair settlement through a negotiation process between informed interested parties.").  In measuring the adequacy of the information contained in a disclosure statement, a bankruptcy court has broad discretion.

See In re Ionosphere Clubs, Inc., 179 B.R. 24, 29 (Bankr. S.D.N.Y. 1995). Accordingly, the determination of whether a disclosure statement contains adequate information is to be made on a case-by-case basis, focusing on the unique facts and circumstances of each case. See In re Copy Crafters Quickprint, 92 B.R. at 979.

178.    The test here is not whether the disclosures regarding any facet of the case are to any particular party's liking but whether the disclosures are adequate for creditors to make an informed decision whether to vote to accept or reject the Plan. Hogan Lovells does not argue in its objection that additional or altered detail on this one small aspect of the case would change any creditors' vote or assist any creditor in being able to make an informed decision on how or whether to vote, just that it believes that claims against the Petitioning Creditors should be pursued and that such pursuit is consistent with the Court's Abandonment Decision.

179.    The Debtor respectfully disagrees that this necessitates any modification of the Disclosure Statement, and the expenditure of time and expense associated with a re-solicitation of votes and delayed confirmation. Creditors voted overwhelmingly to accept the Plan, and all other pieces are aligned for confirmation. For the avoidance of doubt, the Debtor fully acknowledges the contents of this Court's Abandonment Decision and is bound thereby. However, the Debtor respectfully submits that no alteration of the Disclosure Statement is warranted or necessary. After over a year of wrestling with three separate bankruptcy cases for the Debtor, and a federal equity receivership, it is long past time for the Debtor to close this chapter and get started on the hard work of investigating the Debtor's financial affairs and recovering money for the benefit of the Debtor's creditors. Accordingly, the Debtor respectfully submits that the Hogan Lovells' limited objection should be overruled.

## **CONCLUSION**

Based upon the foregoing, the Debtor respectfully submit that (i) the Plan satisfies all of the applicable requirements of the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules; (ii) the Debtor has satisfied the applicable requirements of the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules; and (iii) the Objections should be overruled.  Accordingly, for all of these reasons the Debtor respectfully request that the Court enter an order confirming the Plan and overruling the only remaining Objection.

Dated:    New York, New York
          February 20, 2025

                              **KLESTADT WINTERS JURELLER**
                              **SOUTHARD & STEVENS, LLP**


                         By:  */s/ Fred Stevens*
                              _____
                              Fred Stevens
                              Lauren C. Kiss
                              200 West 41st Street, 17th Floor
                              New York, New York 10036
                              Tel: (212) 972-3000
                              Fax: (212) 972-2245
                              Email: fstevens@klestadt.com
                                     lkiss@klestadt.com

                              *Counsel to Prime Capital Ventures, LLC*