**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x
In re:                                                    :
                                                          :          Chapter 11
PRIME CAPITAL VENTURES, LLC,          :
                                                          :          Case No. 24-11029-REL
                                    Debtor.          :
-----------------------------------------------------------x

### DEBTOR'S RESPONSE TO THE COURT'S ORDER TO SHOW CAUSE WHY A TRUSTEE SHOULD NOT BE APPOINTED PURSUANT TO 11 U.S.C. § 1104(a)

**TO THE HONORABLE ROBERT E. LITTLEFIELD, JR.,**
**UNITED STATES BANKRUPTCY JUDGE:**

Prime Capital Ventures, LLC, the above-captioned debtor (the "Debtor"), by and through

its counsel, Klestadt Winters Jureller Southard & Stevens, LLP, hereby submits this response to

the Court's Order to Show Cause, dated May 6, 2025 [Dkt. No. 233], why a Chapter 11 trustee

should not be appointed in the Debtor's case pursuant to 11 U.S.C. § 1104(a).  In support of this

response, the Debtor respectfully represents as follows:

### PRELIMINARY STATEMENT

The Court correctly identifies the conflict that exists between the bankruptcy estate of Kris

D. Roglieri (the "Roglieri Estate"), which is being administered by Christian H. Dribusch as

Chapter 7 trustee (the "Roglieri Trustee"), and the Debtor's bankruptcy estate (the "Prime Estate,"

and together with the Roglieri Estate, the "Estates"), which is currently controlled by the Roglieri

Trustee by virtue of the Roglieri Estate's ownership of all membership interests in the Debtor.

Specifically, the Court cites the conflict between the Estates with respect to a certain Richard Mille

Tourbillon watch (the "Watch") which was scheduled as an asset of both Estates, and the

admittedly inartful way in which the Roglieri Trustee initially proposed to sell the Watch.  The

Debtor agrees that the appointment of a Chapter 11 trustee for the Prime Estate would eliminate

any potential problems caused by the identified conflict.  However, the appointment of a Chapter

11 trustee would necessarily introduce significant uncertainly, delays, direct and indirect costs,

and disruptions, all of which significantly outweigh the risk posed by the identified conflicts.

The conflicts that exist between the Estates are identifiable and quantifiable, and can and

will be effectively addressed and dealt with as set forth below without causing any disruption to

the case and the significant efforts underway to investigate the Debtor's financial affairs and to

develop and implement a litigation recovery strategy.  Creditors have far more to lose by the

appointment of a Chapter 11 trustee than they do by the existence of remediable conflicts involving

a finite number of issues.  For all the reasons set forth below, the Debtor respectfully requests that

the Court decline to appoint a Chapter 11 trustee.

## JURISDICTION

1.      This Court has jurisdiction over the bankruptcy case pursuant to 28 U.S.C. §§ 157

and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), and Rule 81.1 of the

Local Rules for the United States District Court for the Northern District of New York referring

matters arising under Title 11 of the United States Code (the "Bankruptcy Code") to the

Bankruptcy Court (Jan. 1, 2024).

2.      Venue of this case is proper before this Court pursuant to 28 U.S.C. §§ 1408 and

1409.

3.      The statutory predicate for the relief relevant to this response is section 1104 of the

Bankruptcy Code.

## CASE BACKGROUND

### A.  The Debtor's Businesses

4.      The Debtor was created by its Principal, Kris Roglieri ("Roglieri"), in December

2021 as "a fund specifically designed to provide capital for large development, commercial

development and commercial real estate transactions from $50 million to more than $1 billion."[1]

The Debtor offered non-recourse loans with interest rates of 4 to 6% with interest only payments.[2]

5.      The Debtor required as a condition of providing a loan that its prospective borrower provide 20% of the contemplated loan as an upfront deposit (defined above as an "ICA Deposit," or collectively, the "ICA Deposits").  Roglieri stated that borrowers "have to come to the table with at least 20% and that's just an important function of how our product works."[3]  The Debtor claimed that it would hold the ICA Deposit "as prepaid interest throughout the term of the loan."[4] As interest payments became due, the Debtor represented that it "would just deduct it from the [ICA DEPOSIT]".[5]  The Debtor admitted that this was "a unique way of doing things" but claimed that it "ensures [the Debtor's] payback, and [the ICA Deposit] serves as additional collateral for the loan throughout the term."[6]

6.      The ICA Deposits were an investment by the borrowers to get access to the Debtor's promise of cheap and readily available capital.  A loan from the Debtor would theoretically allow a prospective borrower to invest in its underlying business and hopefully make big returns.  The Debtor's prospective borrowers did not appear to have any other viable source of capital, or at least not any as inexpensive as the Debtor.  The Debtor further enticed prospective borrowers with very little underwriting and collateral requirements.  The Debtor also did not require personal guarantees or recourse on the loans as far as the Debtor's professionals have been able to tell from the Debtor's books and records.

---

[1] See Petitioning Creditors' Motion for a Trustee, Case No. 23-11302, Dkt. No. 4, ¶¶ 22-23 (Dec. 19, 2023) (quoting May 2, 2022, marketing in DealMaker Magazine).
[2] See Id.
[3] See Koplin, I., May 2, 2022, Roglieri Unveils Prime Capital Ventures, Prime Commercial Lending's Newest Fund, dealmaker-magazine.com.
[4] See Id.
[5] Id.
[6] Id.

7.     The ICA Deposits that the Debtor claimed to be holding to service the prospective borrower's future interest payment were the Debtor's only known source of capital.  The Debtor did not segregate or hold the borrowers' ICA Deposits as it had represented.  In fact, many ICA Deposits were largely if not completely consumed the minute they were received by the Debtor to cover overdrafts in the Debtor's bank accounts.[7]  Much of the ICA Deposits were used to purchase luxury items for Roglieri personally, including the Watch at issue here.

8.     In order to sell a business model that seemed entirely impossible if properly understood, and to get prospective borrowers to give the Debtor new ICA Payments, the Debtor had to demonstrate that it actually made loans.  It did this by, among other ways, fraudulently claiming to have made a "$188,000,000 funding of ALUX Properties, LLC and their project 'The Bailey' which will be the only 5-star hotel in Atlanta".[8]  The Debtor made a glitzy promotional video published on YouTube and other social media outlets where it boasted about making this loan.  The alleged principal of ALUX Properties, LLC ("ALUX"), Brandon Wheeless, expressed

---

[7] For example, on April 7, 2023, creditor 526 Murfreesboro provided the Debtor with an ICA Deposit of $4,312,500 by wire transfer to the Debtor's account at Citibank.  At the time, the Citibank account was overdrawn in the amount of $4,094,514.75, so nearly the entire ICA Deposit was spent immediately to cover the Debtor's obligation to Citibank.  Similarly, on April 27, 2023, Compass-Charlotte provided the Debtor with an ICA Deposit of $15,902,250 by wire into the Debtor's Citibank account.  $6,525,669.33 of that ICA Deposit was consumed immediately to cover an overdraw.  See United States of America v. One 2003 Ferrari Enzo AB Version E., et al., Case No. 24-cv-1345 (MAD/DJS), Dkt. No. 20-1, Amended Complaint, ¶¶36-57 (N.D.N.Y. Jan. 15, 2025).

[8]     See Prime Commercial Lending, Prime Capital Ventures & The Bailey [Video], May 16, 2022, https://www.youtube.com/watch?v=A4_RKBepUkA (YouTube) at 0:13:



Prime Commercial Lending through its fund Prime Capital Ventures is proud to announce the $188,000,000 funding of ALux Properties, LLC and their project "The Bailey" which will be the only 5-star hotel in Atlanta.

A one of a kind luxury hotel and mixed use development that will transcend the meaning of luxury across the world.

See also, Prime Commercial Lending, March 17, 2022, Albany, New York's Prime Commercial Lending Funds the First 5-Star Hotel in Atlanta, GA Through Prime's Real Estate Fund, Prime Capital Ventures, [Press release].

his appreciation in the video stating that "access to this type of capital with trusted individuals that you close deals with definitely makes life a heck of a lot easier for us and the company so we are fast-tracking to grow at an exponential rate moving forward."[9]

9.      The problem, of course, is that the Debtor never made any such loan to ALUX. There is no "The Bailey" hotel in Atlanta and there is no sign that there was ever actually going to be.  According to the Debtor's books and records, Brandon Wheeless, the purported principal of ALUX and third-party borrower of the Debtor, was actually on the Debtor's payroll and received a total of $200,000 from the Debtor between July 7, 2022 and September 18, 2023.

10.      ALUX, the purported borrower in that fictitious transaction with the Debtor, was placed into a receivership by the Georgia Superior Court on September 13, 2022 in connection with a lawsuit where the plaintiffs alleged, among other things, to have been defrauded out of $10 million.[10]  Featured in that litigation was an entity called Blackwater Capital Group, LLC" ("Blackwater") which purported to act as a lender to the project, not unlike the Debtor in its promotional video.[11]  Blackwater's lending agreement was dated December 14, 2021, the exact date that the Debtor was formed, and was nearly identical in form and substance to the form of lending agreement employed by the Debtor.[12]  The Debtor suspects that Roglieri's observation of or relationship with Blackwater was the origin of the Debtor's fraudulent scheme.

**B.  The Debtor's Bankruptcy Cases and Receivership**

11.      The Debtor appears to have raised well in excess of $100 million in unreturned ICA Deposits.  By December 2023, the Debtor was besieged by litigation largely from borrowers who did not get their loans funded and wanted the return of their ICA Payments.  See, e.g., Tuss

---

[9]  See Id. at 3:44 (transcribed by counsel).
[10] See Capstone Diagnostics One, L.P., et al. v. Bailey LLC, et al., Case No. 2022cv366001 (GA Sup. Ct., Fulton Cty., Sept. 22, 2024).
[11] See Id., Judgment entered June 24, 2023.
[12] See Id., Verified Complaint, Exhibit E, executed June 9, 2022.

Financial LLC v. Prime Capital, et al., Index No. 2023/510389 (N.Y. Sup. Ct. Kings Cnty. Apr. 5, 2023) (seeking and apparently obtaining the return of $13.4 million); B&R Acquisition Partners v. Prime Capital (JAMS Arb., Aug. 2023) (seeking the return of $4 million); Sturm v. Prime Capital, Case No. 23-cv-1033 (N.D.N.Y. Aug. 22, 2023) (seeking the return of $2 million); Camshaft CRE 1, LLC v. Prime Capital, Case No. 2023-023173 (Fla. Circ. Ct., Miami-Dade Cnty., Sept. 15, 2023) (seeking the return of $13.4 million); The Lion Group DFW, LLC v. Prime Capital, Case No. 23-DCV-34617 (Tex. Dist. Ct., 146th Dist., Sept. 21, 2023) (demand unknown); Onward Partners, LLC, v. Prime Capital, et al., Case No. 23-cv-833 (D. Utah Nov. 13, 2023) (seeking the return of $20 million).

12.     On December 19, 2023, Compass-Charlotte 1031 ("Compass"), LLC, 526 Murfreesboro, LLC, and Newlight Technologies, Inc. (collectively, the "Petitioning Creditors") filed an involuntary petition against the Debtor for relief under chapter 7 of the Bankruptcy Code commencing Case No. 23-11302 ("Case 1").  The Petitioning Creditors commenced Case 1 for the obvious purpose of ensuring that the Debtor's assets and liabilities could be liquidated in a single, public forum, and that no single creditor could win the proverbial "race to the courthouse."

13.     On January 8, 2024, the Petitioning Creditors filed their own motion to dismiss Case 1 [Case 1 Dkt. No. 74], which motion was granted by the Court on January 9, 2024 [Case 1 Dkt. No. 87].

14.     Three (3) days after dismissal of Case 1, on January 12, 2024, Petitioning Creditor Compass commenced an action in the United States District Court for the Northern District of New York (the "District Court") under Case No. 24-cv-00055 (MAD) (CFH) (N.D.N.Y. Jan. 12, 1014) (the "Receivership Case"), seeking, among other things, the appointment of a federal equity receiver to take possession and control of the Debtor's assets and affairs.  That same day, the

6

District Court entered an order appointing Paul Levine as the temporary receiver (the "Receiver").
Receivership Case Dkt. No. 8.

15.     On February 15, 2024, Roglieri filed a voluntary petition for relief under subchapter
V of chapter 11 of the Bankruptcy Code commencing Case No. 24-10157 (REL) (the "Roglieri
Case").

16.     On May 14, 2024, the Debtor, by and through the Receiver, filed a voluntary
petition for relief under chapter 11 of the Bankruptcy Code in this Court commencing Case No.
24-10531 ("Case 2").

17.     On May 15, 2024, the Court entered an order converting Roglieri's case to one
under chapter 7 of the Bankruptcy Code.  Roglieri Case at Dkt. No. 159.  Thereafter, the United
States Trustee appointed Christian H. Dribusch ("Dribusch") as the interim chapter 7 trustee.  Id.
at Dkt. No. 160.  Dribusch has since qualified and is currently serving as permanent trustee, defined
above as the "Roglieri Trustee."

18.     On June 25, 2024, B and R Acquisitions Partners, LLC and JHM Lending Ventures,
LLC filed a motion to dismiss Case 2, claiming that the Receiver was not authorized to file the
petition on behalf of the Debtor because he lacked the authority to do so pursuant to the terms of
the orders of the District Court.  Case 2 at Dkt. No. 57.

19.     On July 23, 2024, the Court entered a memorandum decision and order dismissing
Case 2 finding essentially that the Receiver did not have the authority to file Case 2 on behalf of
the Debtor and that the Roglieri Trustee did not have the ability to waive the defect and ratify the
filing *ex post facto*.  Id. at Dkt. No. 85.  The Debtor appealed that decision and order, which appeal
is pending before the District Court at Case No. 24-civ-000939.

20.     On September 16, 2024, the Debtor filed a voluntary petition for relief under

chapter 11 of the Bankruptcy Code in this Court commencing this bankruptcy case.  In this case,

the Debtor is under the control of the Roglieri Trustee as the party in possession and control of all

equity interests in the Debtor, who is acting as the manager of the Debtor.

### C. *Roglieri's Current Incarceration, Criminal Charges, and Criminal Forfeiture*

21.    On May 28, 2024, a criminal complaint was filed by the United States of America

(the "Government") against Roglieri commencing Case No. 24-cr-00392 (MAD) (N.D.N.Y.) (the

"Criminal Case"), wherein Roglieri is charged with five counts of wire fraud in violation of 18

U.S.C. § 1343, and for forfeiture of assets pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. §

2461(c).[13]  In the Criminal Case, the Government alleges, among other things, that Roglieri and

others used the Debtor to operate a fraud and money laundering scheme.[14]  Roglieri was arrested

on May 31, 2024[15].

22.    Roglieri is currently incarcerated pending trial, which has been scheduled for

January 5, 2026, and has been combative with the Roglieri Trustee and Debtor from his detention

facility.  See, e.g., Roglieri Request for Payment of $100,000 seized by the Roglieri Trustee to

Roglieri's criminal counsel, Roglieri Case Dkt. No. 269 (Oct. 7, 2024); Roglieri's Objection to

Debtor's Proposed Abandonment of Property, Dkt. No. 39 (Oct. 15, 2024); Roglieri's Motion to

Remove the Trustee, Roglieri Case Dkt. No. 345 (Feb. 3, 2025).

23.    Moreover, in text messages discovered by the Government, Roglieri has admitted

to an undisclosed person to committing criminal acts and trying to conceal that fact as follows:

---

[13] Criminal Case, Dkt. No. 1 and Indictment at Dkt. No. 35 (Sept. 19, 2024).
[14] Criminal Case, Dkt. No. 1, ¶4.
[15] Id. at Dkt. No. 12.

| Date | Time | From | Message |
|------|------|------|---------|
| 1/4/2024 | 11:20:42 am | Unknown | Can't you just keep working on those companies?<br><br>I know it might be hard at first, but look what you build this up to beat from nothing |
| 1/4/2024 | 11:20:56 am | Roglieri | Yea I can but not when I'm in f—king prison |
| 1/4/2024 | 11:21:09 am | Unknown | Why do you think that's gonna happen?<br><br>Why can't it just be a bankruptcy? |
| 1/4/2024 | 11:21:47 am | Roglieri | Because I unused others money to fund deals<br><br>I already told you this |
| 1/4/2024 | 11:22:02 am | Unknown | And that's illegal? |
| 1/4/2024 | 11:22:15 am | Roglieri | Yes |
| 1/4/2024 | 11:22:36 am | Unknown | How bad . I mean, what's the worst you do a couple years who cares<br><br>You have your family<br><br>This whole family will support you through this<br><br>It's a civil case it's not a criminal case |
| 1/4/2024 | 11:27:42 am | Roglieri | **It will turn criminal as soon as they get into bank statements** |

Criminal Case, Dkt. No. 6-1 (June 3, 2024) (emphasis added) (typographical and grammatical errors in originals).

24.     In a recent decision on Roglieri's motions for release pending trial in the Criminal Case, the District Court found, among other things, that "the Government has met its burden of proving by clear and convincing evidence that [Roglieri] poses a danger to the community" and "that there are no conditions or set of conditions that would ensure the safety of the community if he was released."  Criminal Case, Dkt. No. 71 at 41 (Jan. 30, 2025).

### D. Government's Civil Forfeiture Claims Against Real and Personal Property

25.     Most of the property that Roglieri obtained with the Debtor's money is not available to either the Prime Estate or Roglieri Estate.  On November 5, 2024, the Government filed a verified complaint for forfeiture *in rem*, commencing Case No. 24-cv-1345 (MAD/DJS) (N.D.N.Y.) (the "Civil Forfeiture Case"), wherein the Government seeks the forfeiture of Roglieri's assets pursuant to 18 U.S.C. §§ 981(a)(1)(A-C).  The action was commenced against various assets owned by Roglieri, including luxury automobiles, cash, and watches, as proceeds of offenses in violation of 18 U.S.C. §§ 1343 and 1439 (wire fraud and wire fraud conspiracy), and as property involved in offenses in violation of 18 U.S.C. §§ 1956 and 1957 (money laundering).

26.     Specifically, the Government seeks forfeiture of the following property in connection with the Civil Forfeiture Case: (i) one 2003 Ferrari Enzo AB Version E; (ii) one 2014 Ferrari LaFerrari; (iii) one 2022 Mercedes Benz; (iv) one 1982 Mercedes Benz 500SL; (v) one 1989 Mercedez Benz 560 SEL; (vi) one 2007 Mercedes Benz SLR McLaren; (vii) one 1987 Mercedes Benz 560; (viii) one 2004 Porsche Carrera; (ix) one 2022 Ferrari 812 Competizione; (x) one 2020 Mercedes Benz GT63C4S; (xi) one 2006 Maserati MC 12 Corse; (xii) one 2023 Mercedes Benz; (xiii) one Ferrari Engine Table; (xiv) $223,365 seized from a Thread Bank account (**7554) held in the name of ABBJ, LLC; (xv) $467,810 seized from a Thread Bank account (**1832) held in the name of Capital Investments US, LLC; (xvi) refund in the amount of $72,825.83 seized from Ai Design; (xvii) one Richard Mille RM011 watch; (xvii) one Richard Mille RM 65-01 watch; (xviii) five Rolex watches; and (xix) a luxury home located at 600 Linkhorn Drive, Virginia Beach, Virginia.  The Watch was one of the few significant pieces of personal property purchased with the Debtor's funds that was excluded from the Civil Forfeiture Case.

27.     Pursuant to the terms of a stipulation "So Ordered" by this Court on January 29,
2025 [Dkt. No. 136], the Government, the Prime Estate, and the Roglieri Estate, settled and
resolved any issues between the Estates and the Government with respect to the Civil Forfeiture
Case.  Therein, the Estates agreed not to contest the Government's claims in the Civil Forfeiture
Case, and the Government turned over four (4) vehicles previously seized from Roglieri: (i) one
2020 Lamborghini Aventador; (ii) one 2009 Mercedez Benz SL65; (iii) one 2014 Mercedes Benz
SLS; and (iv) one 2015 Ferrari 458.  Those vehicles were turned over to the Prime Estate for
liquidation, with the majority of the proceeds to be distributed to the Debtor's creditors to the
extent that they were deemed by the Government to be victims of the Debtor's and Roglieri's
fraud.

### E.   *The Plan and the Proposed Mechanism for Dealing with Inter-Estate Conflicts*

28.     On December 23, 2024, the Debtor filed a first amended plan of liquidation (the
"Plan") [Dkt. No. 91], and on January 9, 2025, the Debtor filed a second amended disclosure
statement with respect to the Plan (the "Disclosure Statement") [Dkt. No. 118].

29.     On January 8, 2025, the Court entered an order (i) scheduling a combined hearing
on adequacy of the Disclosure Statement and confirmation of the Plan, (ii) approving the form and
manner of notice of the combined hearing, (iii) establishing procedures for objecting to the
Disclosure Statement or Plan, and (iv) approving solicitation procedures (the "Plan Scheduling
Order") [Dkt. No. 114].

30.     The Debtor solicited acceptances and rejections of the Plan in accordance with the
Plan Scheduling Order and creditors entitled to vote overwhelmingly voted to accept the Plan.  In
all, five creditors holding claims totaling $103,768,468.84 voted to accept the Plan, and no
creditors voted to reject.  In addition, one other creditor with a claim in the amount of
$10,658,259.84 voted late to accept the Plan.  See Declaration of Fred Stevens, Dkt. No. 152 (Feb.

11

19, 2025).

31.     The Plan proposed to appoint Dribusch as the Plan Administrator and establish an Oversight Committee of three (3) to five (5) creditors to oversee the Plan Administrator's administration of the Prime Estate.  Beginning on September 25, 2024, just nine (9) days after the commencement of the instant bankruptcy case, the Roglieri Trustee reached out to creditors to ask if they would be interested in participating on the Oversight Committee.  The Oversight Committee would have been available to review, approve, or object to any matters where the Prime Estate and Roglieri Estate were in conflict.  See Plan, §5.3.

32.     A hearing to consider approval of the Disclosure Statement and confirmation of the Plan was held before the Court on March 4, 2025.  All objections to confirmation were resolved consensually prior to the hearing and no creditors or other parties objected at the hearing.  On March 28, 2025, the Court entered a memorandum decision and order denying confirmation of the Plan (the "Plan Decision") [Dkt. No. 178].

33.     Among other things, in the Plan Decision, the Court made it clear that the Court's involvement was required in certain matters including the Debtor's proposed extensive investigation. See Plan Decision, §(D)(1).  The Court also raised issues with the sufficiency of the Debtor's liquidation analysis and the details regarding the assets and recoveries that may be available to pay creditors.  See Id., §(C) ("[u]pon review, the Court identified several concerns with the liquidation analysis provided.")

34.     Since entry of the Plan Decision, the Debtor has focused its efforts on its investigation in full view of the Court as contemplated by the Plan Decision and as set forth in detail below.  The Debtor's intent is to collect significant information related to potential claims and recoveries of the Prime Estate through this discovery so that it will be able to propose a new

Plan that resolves the Court's concerns set forth in the Plan Decision.

### F. The Debtor's Investigation to Date

35.    The Debtor has established a database through a secure web-based service hosted by Innovative Driven's Relativity platform (the "Database"). The Database currently houses all discovery obtained to date through third parties in an organized, searchable format. All documents are maintained in their native form with all attendant metadata intact. The Debtor has also commenced significant efforts to obtain documents and information from third parties as set forth in detail below. All documents and information discovered will be added to the Database and used in the conduct of the Debtor's investigation.

36.    First, by order dated December 2, 2024 [Dkt. No. 73], this Court authorized the Debtor to serve a subpoena *duces tecum* upon Barclay Damon LLP, a law firm that represented the Debtor and several of its affiliates for over ten (10) years. At this time, Barclay Damon LLP has turned over all responsive documents and those documents have been added to the Database.

37.    Second, on April 24, 2025, this Court entered orders authorizing the Debtor to examine financial institutions used by the Debtor or its affiliates and law firms that previously represented the Debtor [Dkt. Nos. 203 and 204, respectively]. In connection therewith, the Debtor issued fifteen (15) subpoenas *duces tecum* to: (i) ABNB Federal Credit Union; (ii) Citibank NA; (iii) Farmers State Bank; (iv) Interactive Brokers; (v) KeyBank; (vi) M&T Bank; (vii) Quad City; (viii) Royal Bank of Canada; (ix) United Bank; (x) THREAD Bank; (xi) Wells Fargo; (xii) Cullen and Dykman LLP; (xiii) Girvin & Ferlazzo, P.C.; (xiv) Hill Ward Henders; and (xv) Sheppard, Mullin, Richter & Hampton [Dkt. Nos. 209-223].

38.    Importantly, the subpoenas issued to the financial institutions go beyond typical discovery related to the tracing and ultimate disposition of the Debtor's funds, and seek any and all documents, records, reports, and other information related to such financial institutions'

implementation, enforcement, and compliance with their Know Your Customer (KYC) and Anti-Money Laundering (AML) programs, and compliance with the Bank Secrecy Act and US Patriot Act, including, but not limited to, suspicious activity reports, large transaction reports, investigation case summaries, and alerts of potentially unusual, irregular, improper, and/or suspicious account activity. The Debtor is actively investigating any possible means of recovery for the estate and its creditor victims.

39.    Third, on May 7, 2025, this Court entered orders authorizing the Debtor to examine former insiders of the Debtor and its affiliates and parties involved in the ALUX Properties / "The Bailey" project in Atlanta, Georgia [Dkt. Nos. 236 and 237, respectively]. In connection therewith, the Debtor issued twenty-four (24) subpoenas *duces tecum* to: (i) Adam Steinberg; (ii) Alex Vasilakos; (iii) Andrew Altschuler; (iv) Brandon Wheeless (as an insider); (v) Chris Snyder; (vi) Gary Lockwood; (vii) Jon Cosentino; (viii) Kimberly Humphrey, a/k/a Kimberly Owen; (ix) Lukas Bull; (x) Michael Geisler; (xi) Thor Mault; (xii) Victoria Swann; (xiii) ALUX Properties, LLC; (xiv) Bailey Atlanta, LLC; (xv) Bailey Hotel, LLC; (xvi) Bailey Wellness Center, LLC; (xvii) Bailey, LLC; (xviii) Bailey-ATL Atlanta, LLC; (xix) Blackwater Capital Group, LLC; (xx) Brandon Wheeless (as an ALUX participant); (xxi) Chamblee Ryan, P.C.; (xxii) Kim Firm LLC; (xxiii) Taylor English Duma LLP; and (xxiv) Vanguard Holdings Group, LLC [Dkt. Nos. 240-263].

40.    Fourth, on May 6, 2025, the Debtor filed applications for authority to issue subpoenas *duces tecum* upon individuals and entities that may have knowledge or information related to: (a) the Debtor's $5.25 million in transfers to Matthew Thacker-Rhodes and Bravo Enterprises Mid-South, LLC [Dkt. No. 224]; (b) the Debtor's $20 million in transfers to Indigo Pharmaceutical LLC [Dkt. No. 226]; and (c) the Debtor's $20 million transfer to Berone Capital

Fund LP [Dkt. No. 228]. If those applications are granted, the Debtor intends to serve thirty (30) subpoenas *duces tecum* upon: (i) Matthew Thacker-Rhodes; (ii) Bravo Enterprises Mid-South, LLC; (iii) Indigo Pharmaceutical LLC; (iv) ARX, Accurate RX Specialty Pharmacy, Corp.; (v) Dr. Murray Friedman; (vi) Truss Financial LLC; (vii) REV2, LLC; (viii) CJI Trading LLC; (ix) Berone Capital Fund LP; (x) Berone Capital Partners LLC; (xi) Berone Capital LLC; (xii) Berone Capital Equity Fund I, LP; (xiii) 405 Motorsports LLC, f/k/a Berone Capital Equity Partners LLC; (xiv) Jeremiah Beguesse; (xv) Fabian Stone; (xvi) Reign Financial International, Inc.; (xvii) QuatReign Capital Sourcing LLC; (xviii) Giorgio Johnson; (xix) Dr. Adam Klein; (xx) Gary Mills; (xxi) Martin Karo; (xxii) Juan Carlos Marquez; (xxiii) Aaron Etra; (xxiv) BNP Paribas; (xxv) FDIC as Receiver for Signature Bank; (xxvi) Flagstar Bank; (xxvii) Interactive Brokers; (xxviii) JPMorgan Chase Bank; (xxix) Royal Bank of Canada; (xxx) TD Bank; (xxxi) Wells Fargo.

41.     Fifth, on May 7, 2025, the Debtor filed applications for authority to issue subpoenas *duces tecum* upon individuals and entities that may have knowledge or information related to: (a) the Debtor's approximately $24 million in transfers to twenty individual or entities for the apparent exclusive benefit of Roglieri [Dkt. No. 265]; and (b) the Debtor's actual or contemplated transfers of $12.6 million to Hudson & Hudson LLC and Norwell Ventures, LLC [Dkt. No. 267]. If those applications are granted, the Debtor intends to serve twenty-five (25) subpoenas *duces tecum* upon (i) 1stDibs.Com Inc.; (ii) Automotive Intellect Design, d/b/a Ai Design; (iii) Bonhams Butterfields Trust; (iv) Cars USA Shipping LLC; (v) Cedric DuPont Antiques; (vi) Giganti & Giganti Fine Jewelry; (vii) G-Man LLC (and City National Bank for identity purposes); (viii) Hunter Motorsports; (ix) Luxury Bazaar; (x) JK Technologies; (xi) New Country Motor Car Group; (xii) Platinum Times LLC; (xiii) RENNtech, Inc.; (xiv) RM Sotheby's; (xv) S2T LLC; (xvi) Timepiece Trading, LLC; (xvii) Topgear LLC Top Gear Imports; (xviii) Visbeen Architects; (xix) Wrist

Aficianado; (xx) XO Global LLC; (xxi) Hudson & Hudson, LLC; (xxii) Norwell Ventures, LLC;

(xxiii) Lindsey Fisher-Hudson; (xxiv) Henry Fisher; and (xxv) HF Rentals, LLC.

42.     Thus, the Debtor is well underway with an extensive discovery effort intended to

learn the origin of the Debtor's fraud, where the Debtor's funds went, and how and from who the

Debtor's funds can be recovered.

### G. The Watch and Proposed Method of Proceeding With Liquidation

43.     On March 22, 2024, Roglieri filed his schedules of assets and liabilities in the

Roglieri Case wherein he claimed to be the owner of the Watch.  <u>See</u> Roglieri Case, Dkt. No. 80,

Schedule B, Question 12 (Mar. 22, 2024).  Roglieri's primary basis for claiming that the Watch

was his asset was presumably because he intended the Watch for his own personal use and not for

the corporate business of the Debtor.

44.     On September 16, 2024, the Debtor filed its schedules of assets and liabilities in

this case where it claimed to be the owner of the Watch.  <u>See</u> Dkt. No. 1, Schedule B, Question 77

(Sept. 16, 2024).  The Debtor had good reason to claim the Watch as its asset.  To begin, the

January 3, 2023 invoice for the watch was issued to the Debtor as follows:



45.     In addition, the primary payment for the Watch was made by the Debtor from its

Citibank Acct. No. ***6945 as follows:

```
01/09/23  32300900115  SAME DAY DR TRANSFER                                    2,225,000.00
          650000000571  GID:D0330090085741 CHP0393681 USER REF:D00936370977
                        REF:D00936370977 CR BK ID:0002 CR BK:JPMORGAN CHASE
                        BANK BENEF:352213018 PLATINUM TIMES LLC INSTRUCT
                        DATE:01/09/23 ADVICE TYPE:NONE
```

The Debtor also believes that it has identified the initial $50,000.00 deposit to secure the Watch,

although it was sent to Wrist Aficionado rather than Platinum Times LLC:

```
01/03/23  32300300108  SAME DAY DR TRANSFER                                       50,000.00
          650000000571  GID:D0330031583901 FED20230103MMQFMPYZ024485 USER
                        REF:D00335160995 REF:D00335160995 CR BK ID:026013576
                        CR BK:SIGNATURE BANK BENEF:1504388545 WRIST
                        AFICONADO INSTRUCT DATE:01/03/23 ADVICE TYPE:NONE
```

46.    On August 7, 2024, the Court entered an order authorizing the Roglieri Trustee to

retain Saratoga Automobile Museum as his auctioneer in the Roglieri Case.  See Roglieri Case,

Dkt. No. 241.

47.    On April 2, 2025, the Roglieri Trustee filed a motion seeking an order directing the

Receiver to turn the Watch over to the Roglieri Trustee and authorizing the Roglieri Trustee to sell

the Watch (the "Watch Sale Motion").  Id. at Dkt. No. 398.

48.    Almost immediately upon filing the Watch Sale Motion, the Receiver and certain

creditors of the Debtor raised the issue with respect to whether the Watch was owned by the

Roglieri Estate or Prime Estate.  The Roglieri Trustee immediately conceded that: (i) the Watch

Sale Motion was unartfully drafted; and (ii) his only intent was to liquidate the Watch for the

benefit of all stakeholders at an upcoming auction on June 4, 5, and 6, 2025 (coinciding with the

Belmont Stakes weekend), which would feature similar items and be likely to attract bidders.  The

Roglieri Trustee believed that liquidation of the Watch in the Roglieri Case, subject to the rights

of the Debtor, made eminent sense because the Roglieri Estate already had a sales mechanism

approved by the Court, a retained sale agent, and a bond.

49.    Further, by April 3, 2025, one day after the Watch Sale Motion was filed, the

Debtor's undersigned counsel had proposed the terms of a stipulation (the "Watch Stipulation") between the Debtor and Receiver providing for the turnover of the watch to the Debtor, and an inter-estate agreement between the Debtor and the Roglieri Trustee permitting the Roglieri Trustee to sell the Watch and hold the proceeds in a segregated account subject to any and all rights of the Prime Estate (the "Inter-Estate Agreement").  The intent of the Roglieri Trustee was to delay reaching the issue of title of the Watch until the Debtor could propose another plan which would create an oversight committee to, among other things, deal with the minimal issues of conflict between the Estates.  Alternatively, the Estates could develop and agree upon the proper allocation and present to this Court for consideration in a manner similar to the stipulation entered into with the Government in the Civil Forfeiture Case.

50.    On April 16, 2025, the Roglieri Trustee requested an adjournment of the April 23, 2025, hearing to consider the Watch Sale Motion in order to give him and the Debtor an opportunity to document and put before the Court on notice to all parties the proposed Watch Stipulation and Inter-Estate Agreement.  Given the requested adjournment and the negotiation of the proposed Watch Stipulation and Inter-Estate Agreement, the Debtor did not file any formal opposition or response to the Watch Sale Motion on the docket.

51.    The Court initially granted the adjournment but then after further consideration decided to convene the hearing on April 23, 2025, in order to address the conflict issues more formally raised by the Court in its Order to Show Cause.  See Text Order at Dkt. No. 442.  At the April 23rd hearing, the Court raised the conflict issues and then entered an order denying the Watch Sale Motion [Dkt. No. 456].  That was followed by the issuance of the Order to Show Cause in the Debtor's case two weeks later.

52.    The Debtor proposes that the issues with the Watch be resolved as follows.  First,

the Watch should be sold by one of the two Estates in a manner approved by this Court on notice

to all creditors of both Estates. Second, the proceeds of the sale should be placed in a segregated,

interest-bearing account subject to the rights of both Estates. Third, the rights of the Estates should

be resolved by this Court on notice to all creditors. The third step can be accomplished in at least

two different ways in order to address the conflict. If the Debtor confirms a plan that appoints an

oversight committee prior to reaching the issue, then the oversight committee can be granted

exclusive control of the Prime Estate with respect to issues related to the Watch or any other place

where a conflict may arise. If the issue is to be resolved before, then the Estates can propose a

solution and all facts in support of that solution by motion on notice to all creditors of both Estates.

The latter method was precisely how the Estates successfully resolved issues with the Civil

Forfeiture Case and secured the Government's turnover of four (4) vehicles previously confiscated.

## <u>RESPONSE TO THE ORDER TO SHOW CAUSE</u>

53.    The Bankruptcy Code provides for two independent bases for appointing a trustee

in a Chapter 11 case. Section 1104(a) of the Bankruptcy Code provides that the court shall order

the appointment of a trustee --

> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement
> of the affairs of the debtor by current management, either before or after the
> commencement of the case, or similar cause, but not including the number of
> holders of securities of the debtor or the amount of assets or liabilities of the debtor;
> or
>
> (2) if such appointment is in the interests of creditors, any equity security holders,
> and other interests of the estate, without regard to the number of holders of
> securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104(a).

54.    In considering a motion for the appointment of a trustee, "a bankruptcy court is not

required to conduct a full evidentiary hearing." In re Ionosphere Clubs, Inc., 113 B.R. 164, 167

19

(Bankr. S.D.N.Y. 1990). The decision whether to appoint a trustee is committed to the sound discretion of the bankruptcy court and the party moving for appointment of a Chapter 11 trustee bears the burden of showing cause by clear and convincing evidence. In re Taub, 427 B.R. 208, 225 (Bankr. E.D.N.Y. 2010), aff'd, 2011 WL 1322390 (E.D.N.Y. May. 31, 2011).

55.    The appointment of a trustee is an extraordinary and disfavored remedy to be exercised only in the most dire of circumstances. See In re Adelphia Commc'ns Corp., 336 B.R. 610, 655 (Bankr. S.D.N.Y. 2006); see also Smart World Techs., LLC v. Juno Online Servs., Inc. (In re Smart World Technologies, LLC), 423 F.3d 166, 176 (2d Cir. 2005) (noting that "standard for 1104 appointment is very high"); In re W.R. Grace & Co., 285 B.R. 148, 158 (Bankr. D. Del. 2002) (appointment of a trustee is warranted only as "a last resort"). There are no such dire circumstances here.

56.    "The appointment of a trustee in a Chapter 11 case is not the usual procedure because 11 U.S.C. § 1108 contemplates that the debtor will continue to manage its property and operate its business." In re Stein & Day, Inc., 87 B.R. 290, 294 (Bankr. S.D.N.Y. 1988). The movant bears the burden of rebutting the "strong presumption" that the chapter 11 debtor should remain in possession. See In re Fairwood Corp., Debtor, Case No. 99 CIV. 3177, 2000 WL 264319, at *2 (S.D.N.Y. Mar. 9, 2000).

57.    The Second Circuit Court of Appeals has cautioned that, "[i]n determining whether a § 1104 appointment is warranted or in the best interests of creditors, the bankruptcy court must bear in mind that the appointment of a trustee may impose a substantial financial burden on a hard pressed debtor seeking relief under the Bankruptcy Code, by incurring the expenditure of substantial administrative expenses caused by further delay in the bankruptcy proceedings."

Adams v. Marwil (In re Bayou Group, LLC), 564 F.3d 541, 546-47 (2d Cir. 2009) (internal citations omitted).

### A. The Conflict Does Not Warrant the Appointment of a Trustee Under § 1104(a)(1)

58.     The court may appoint a Chapter 11 trustee for "cause" under section 1104(a)(1) of the Bankruptcy Code, "including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management", none of which are found here.  Neither the Court nor any other party is accusing the Roglieri Trustee of any of the examples of cause enumerated in section 1104(a)(1) of the Bankruptcy Code.  Rather, the Court cites the conflict of interest that exists between the Roglieri Estate and Prime Estate and questions whether that constitutes sufficient cause to appoint a Chapter 11 trustee for the Prime Estate.  The Debtor respectfully submits that it should not.

59.     The Court is certainly correct that it is not limited to the examples of cause enumerated in section 1104(a)(1) in finding cause justifying the appointment of a Chapter 11 trustee.  See, e.g., In re Sillerman, 605 B.R. 631, 641-42 (Bankr. S.D.N.Y. 2019).  The Court also properly notes that conflicts of interest can constitute "cause" for the appointment of a Chapter 11 trustee. Id.

60.     However, in each case reviewed by the Debtor where conflicts of interest constitute cause for the appointment of a Chapter 11 trustee, there were far more serious issues than there are here where you have an independent, honest, and competent fiduciary who is addressing competing estate claims to property in good faith and in full view of the Court and creditors.  See, e.g., In re Intercat, Inc., 247 B.R. 911, 922-23 (Bankr. S.D. Ga. 2000) (in addition to conflicts of interest, management was found to have, among other things, willfully infringed on the debtor's rights, favored personal compensation over the interests of the estate, charged thousands in personal luxury travel to the estate, personally collected and converted royalties due the debtor,

and committed fraud upon creditors); In re Funge Sys., 2002 Bankr. LEXIS 1937, at \*21-22

(Bankr. E.D. Va. Oct. 17, 2002) (court found that conflicts of interest warranted the appointment

of a trustee when controlling shareholders froze out other shareholders and treated them disparately

under the plan given "the potential for vast gain on the part of [those] shareholders"); In re Cajun

Elec. Power Coop., 191 B.R. 659, 662 (Bankr. M.D. La. 1995) (court found conflicts of interest

warranted appointment of a trustee where the debtor in possession could not act as a fiduciary to

the estate and to its members and customers in light of "the number of consumers involved and

the potential loss to the taxpayers of this country"); In re Altman, 230 B.R. 6, 16 (Bankr. D. Conn.

1999) (court appointed a trustee after finding that the individual debtor deliberately or negligently

transferred a painting numerous times without any documentary record in order to obscure the

identity of those who had an ownership or security interest in the painting, including the estate's

own interest).

61.    Nothing here rises to the level of cause necessitating the appointment of a Chapter

11 trustee.  There is no allegation, much less proof, of fraud, dishonesty, incompetence, or gross

mismanagement.  The conflicts that exist are identifiable and completely manageable under the

sound supervision of this Court.

### B. *The Appointment of a Trustee is Not in the Best Interests of Creditors Under 11 U.S.C. § 1104(a)(2)*

62.    Even if the Court does not find that "cause" exists to appoint a Chapter 11 trustee

under section 1104(a)(1), the Court may still appoint a trustee if it "is in the interests of creditors.

. . and other interests of the estate."  11 U.S.C. § 1104(a)(2).  Section 1104(a)(2) "envisions a

flexible standard" and "gives the district court discretion to appoint a trustee when doing so would

serve the parties' and estate's interests." In re Marvel Entm't, 140 F.3d 463, 474 (3d Cir. 1998)

(quoting In re Sharon Steel Corp., 871 F.2d 1217, 1226 (3d Cir. 1989).  Although the standard

necessarily involves a great deal of judicial discretion, courts have considered several factors including: "(i) the trustworthiness of the debtor; (ii) the debtor in possession's past and present performance and prospects of the debtor's rehabilitation; (iii) the confidence -- or lack thereof -- of the business community and of the creditors in present management; and (iv) the benefits derived by the appointment of a trustee, balanced against the cost of appointment." Euro-American Lodging Corp., 365 B.R. 421, 427 (Bankr. S.D.N.Y. 2007) (quoting In re Ionosphere, 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990) (citations omitted)).

63.     The appointment of a Chapter 11 trustee is not in the best interests of creditors.  To the contrary, appointment of a Chapter 11 trustee would only serve to delay the administration of this complicated case and provide yet another layer of administrative expenses which will consequently have to be absorbed by creditors.  The Debtor considers the factors considered by courts in the order set forth in Euro-American Lodging Corp.

### 1)  The Debtor is Trustworthy

64.     This factor firmly militates against the discretionary appointment of a Chapter 11 trustee.  Nobody has accused Dribusch of being dishonest in any way.

### 2)  The Debtor's Past and Present Performance

65.     No party has raised an issue with the Debtor's performance under Dribusch.  The Debtor has made significant progress towards exiting the bankruptcy case by proposal of the Plan.  Although confirmation of the Plan was denied by the Court, the Debtor is reconfiguring and intends to propose a plan that will address the Court's concerns once the Debtor has made material progress with its investigation.  It is also worth noting that while the Court denied confirmation of the Plan for certain specified reasons, the Court did not raise any issue or complaint with respect to the Debtor's efforts or good faith in proposing the Plan.  The Debtor's proposal of the Plan was indeed

done in consultation with creditors and in a good faith attempt to exit the debtor in possession phase of this case.  Now, the Debtor is fully immersed in the significant and necessary investigation of the Debtor's financial affairs.

### 3)  The Confidence of Creditors

66.     No creditors have complained about the Debtor or expressed a lack of confidence in Dribusch as manager.  Indeed, although the Court denied confirmation of the Plan, the Plan was universally supported and accepted by the creditor body.  The Debtor and presumably creditors have every confidence that the Debtor, with Dribusch and its professional team, will be able to exit bankruptcy and maximize the return to creditors.

67.     Moreover, the Debtor and its current team of professionals are steeped in the significant investigation that needs to be undertaken here.  With the Court's permission, the Debtor has already issued forty (40) subpoenas to financial institutions, law firms, insiders of the Debtor, and parties involved in the purported ALUX transaction.  The Debtor also has three (3) applications pending and returnable on May 28, 2025.  If all three (3) are granted, the Debtor intends to issue an additional thirty-one (31) subpoenas intended to obtain vital information related to: (i) the $5.25 million transferred by the Debtor to Matthew Thacker-Rhodes or his entity; (ii) the $20 million lending transactions between the Debtor and Indigo Pharmaceutical; and (iii) the $20 million mysteriously transferred by the Debtor to Berone Capital.  The Debtor has also filed two (2) more applications returnable on June 11, 2025.  If granted, the Debtor intends to issue an additional twenty-five (25) subpoenas intended to obtain information related to: (a) approximately $24 million transferred by the Debtor to twenty (20) third parties related to expenditures for Roglieri's personal benefit; and (b) the approximately $12.6 million lending transactions between the Debtor and Lindsey Fisher-Hudson's entities.

68.     The Debtor and its current team is deeply invested in this case and its success and there is no indication that creditors lack confidence.

### 4) The Benefits of a Trustee are Significantly Outweighed by the Costs

69.     The most recognizable benefit of the appointment of a Chapter 11 trustee for the Debtor is a total elimination of any issues caused by the conflicts between the Estates with respect to the Watch (and any other matter should one arise).  However, the conflict can and will be dealt with in the manner proposed above, either through the appointment of an oversight committee in the Debtor's case, or by a proposed resolution to be approved by this Court upon notice to all creditors and parties in interest in both cases.  In either scenario, the monetary risk caused by the conflict is likely to be reduced to nothing, and both scenarios could be implemented without any significant or additional cost.

70.     The cost of a Chapter 11 trustee on the other hand is unpredictable and significant. First, a Chapter 11 trustee is entitled to statutory commissions for any disbursements made pursuant to the sliding scale set forth in section 326 of the Bankruptcy Code.  The commissions due to a Chapter 11 trustee on the approximately $1,970,000.00 held in the estate right now alone is $82,350.00.  On the other hand, the Debtor's present management is not entitled to any compensation unless he is granted a role in the Debtor's case following the confirmation of a plan.

71.     Second, Dribusch himself has significant institutional knowledge that is valuable to the Debtor's administration.  Dribusch lived through Case 1, and is living through the Roglieri Case.  He knows through his own difficult experiences and hard work all of the players, creditors, assets and issues.  That level of institutional knowledge will be incredibly expensive and time consuming to replicate, to the extent that it could ever be replicated.

72.     Third, a Chapter 11 trustee will have absolute discretion with respect to the hiring of professionals.  The Debtor's current slate of professionals is completely entrenched in the case and the investigation that is necessary to develop a litigation strategy to recover value for the estate and its creditors.  The termination and/or disruption of current professionals and their work would result in potential loss of work product in any transition, duplicative work and billings, and delays in administration.  This case cannot and should not have to bear those costs and delays.  After already dealing with the disruptions of two prior bankruptcy cases and the Receivership Case, the Debtor's case and its administration is finally on a sound and consistent track towards where it needs to go.  Any disruption to that hard-earned progress could inflict significant damages on the Estates in the form of costs and delays.

73.     While the potential issues caused by the conflict between the Estates is identifiable and quantifiable, the costs associated with the appointment of a Chapter 11 trustee are significant and almost impossible to quantify.  While the appointment of a Chapter 11 trustee would cure any issues with the conflict, it would create significantly more problems than it would resolve.  It is hard to imagine how creditors would be better served with the appointment of a Chapter 11 trustee as opposed to a resolution of the conflict issues in the manner proposed herein.

**CONCLUSION**

74.     For all the foregoing reasons, the Debtor respectfully submits that no cause exists mandating the appointment of a Chapter 11 trustee, and that the Prime Estate and its creditors are far better served by permitting the current management and professional team to continue the job that they are doing.  To the extent that the Court believes that it is necessary to have this matter reviewed by an independent party, the Debtor respectfully suggests that the appointment of an examiner to review and report on the conflict issue and sufficiency of the proposed resolution

thereof would be a far less caustic mechanism for addressing the Court's concerns than would the wholesale change of management at this late stage in the case.

75.    Based upon the foregoing, the Debtor submits that no Chapter 11 trustee should be appointed.

Dated:    New York, New York
          May 19, 2025

                        **KLESTADT WINTERS JURELLER**
                        **SOUTHARD & STEVENS, LLP**


                By:    */s/ Fred Stevens*
                       Fred Stevens
                       Lauren C. Kiss
                       Kevin Collins
                       200 West 41st Street, 17th Floor
                       New York, New York 10036
                       Tel: (212) 972-3000
                       Fax: (212) 972-2245
                       Email: fstevens@klestadt.com
                              lkiss@klestadt.com
                              kcollins@klestadt.com

                       *Counsel to Debtor Prime Capital Ventures,*
                       *LLC*