UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
ALBANY DIVISION

In re:

    PRIME CAPITAL VENTURES, LLC             Chapter 11
                                                            Case No.: 24-11029
                                        *Debtor*.

## UNITED STATES TRUSTEE'S RESPONSE TO COURT'S
## ORDER TO SHOW CAUSE

TO:     THE HONORABLE ROBERT E. LITTLEFIELD, JR.,
          UNITED STATES BANKRUPTCY JUDGE:

William K. Harrington, United States Trustee for Region 2, in furtherance of his duties and responsibilities set forth in 28 U.S.C. § 586(a) and in response to the Court's Order to Show Cause entered May 6, 2025. (ECF 233). The United States Trustee responds to the Order to Show Cause as follows:

In the Order to Show Cause, the Court states that it, "question(s) Dribusch's ability to effectively manage the Prime bankruptcy estate while serving as Chapter 7 trustee in Roglieri's bankruptcy," because there is a "strong indication that Dribusch currently faces a conflict of interest as a result of his positions in both the Prime and Roglieri bankruptcies."

The Court concluded that Mr. Dribusch's actions as trustee in the chapter 7 case of Mr. Roglieri have imperiled the recovery for creditors in the Prime case because, "[h]ad the Watch Motion been granted as proposed, the funds available for Prime's creditors would have been severely diminished." The Court also criticized the United States Trustee for not filing an objection to the watch motion.

"The standard for § 1104 appointment is very high." <u>In re Smart World Technologies,</u>

LLC, 423 F.3d 166, 176 (2d Cir.2005). Cause under 11 U.S.C. § 1104(a)(1) includes: fraud, dishonesty, incompetence or gross mismanagement of the affairs of the debtor, or similar. Management's failings must be substantial and rise to the level of "extraordinary." Id.

It is well-settled that the statutory list of circumstances constituting "cause" for the appointment of a trustee is nonexclusive. Other examples of cause for appointment of an 1104 trustee include such things as "inappropriate relations between corporate parents and subsidiaries, misuse of assets and funds, inadequate record-keeping and reporting, and various instances of conduct found to establish fraud or dishonesty, lack of credibility, and lack of creditor confidence." In re Futterman, 584 B.R. 609, 616 (Bankr. S.D.N.Y. 2018).

Federal Court Receivership

In addition to being a chapter 11 debtor-in-possession, Prime Capital Ventures, LLC ("Prime") is under federal court receivership pursuant to orders entered by U.S. District Court Judge Hon. Mae A. D'Agostino. By order entered January 12, 2024, Judge D'Agostino appointed Paul A. Levine, Esq. as temporary federal receiver of Prime. (Compass-Charlotte 1031, LLC v. Prime Capital Ventures, LLC et al., Case No. 24-cv-00055.

On January 24, 2024, Judge D'Agostino entered a final order appointing Mr. Levine as permanent receiver. Mr. Levine remains the federal receiver of Prime.[1] Two days after being made the permanent receiver, on January 26, 2024, Mr. Levine filed a status report in the District Court receivership case and disclosed that the "skull watch" was "purchased by Prime in January, 2023 for **$2,225,000**." (emphasis in original). The receiver's January 26, 2024 status

---

[1] By text order entered August 19, 2024, Judge D'Agostino stayed the receivership action pending adjudication of the criminal case against Mr. Roglieri and/or the appeal of the Bankruptcy Court's dismissal of the Prime chapter 11 case filed by Mr. Levine as receiver. (Case No. 24-10531). The receivership action remains pending.

2

report also was filed on this Court's docket in involuntary chapter 7 case of Prime on February 28, 2024. (Case No. 23-11302, ECF 140-3).

As the Court noted in the Order to Show Cause, Mr. Dribusch filed the "watch motion" on April 2, 2025 in the Roglieri chapter 7 case (in which he is the chapter 7 trustee) and a Notice of Intent to Sell in the Prime case. (Roglieri ECF 398; Prime ECF 181). The Notice of Motion set the hearing for April 23, 2025. Objections were due by April 16, 2025.

According to the trustee, his intention was to try to include the skull watch in the bankruptcy auction already approved by the Court, "together with the artwork during the Belmont weekend in Saratoga, New York." (Roglieri ECF 398 ¶ 18; Roglieri ECF 357).

The same day as Mr. Dribusch filed the watch motion, parties, including the United States Trustee, engaged in discussions with Mr. Dribusch about the Prime estate's alleged interest in the skull watch.

By April 7, 2025, five days after the watch motion was filed, Mr. Dribusch and his counsel Mr. Stevens had crafted and signed a stipulation with Mr. Levine (in his role as federal court receiver of Prime) regarding the turnover of the skull watch by Mr. Levine to the Prime bankruptcy estate. On April 7, 2025, the United States Trustee was provided with a copy of the signed stipulation. Upon information and belief, Mr. Dribusch was going to request an adjournment of the watch motion in order to seek Court approval of the stipulation. For this reason, the United States Trustee did not file an objection to the watch motion on April 16, 2025, the deadline to object.

Upon information and belief, the Court adjourned the watch motion into May 2025. However, on April 17, 2025 (one day after the objection deadline passed), the Court *sua sponte*

entered the Text Order below:

| 442 | 04/17/2025 | TEXT ORDER: At a hearing on April 16, 2025, the Court indicated that it would adjourn the motion by the Trustee for the turnover and sale of the Richard Mille watch. (ECF No. 398). After further consideration, the Court has concerns regarding the motion. As such, the hearing will be held as previously scheduled on April 23, 2025, at 1:00 p.m. So Ordered this 17th day of April 2025 by Judge Robert E. Littlefield, Jr., United States Bankruptcy Judge. (related document(s)398). (Villanueva, Lucy) (Entered: 04/17/2025) |

History Regarding the Skull Watch

In January 2024, upon his appointment as receiver by the District Court, Mr. Levine requested that Mr. Roglieri, as the sole member of Prime, turn over the certain "Richard Mille Tourbillion Skull RM 052 Watch" for safekeeping by the receiver. *See* Second Report of Temporary Receiver, Case No. 24-cv-55 (MAD/DJS), filed January 26, 2024 (ECF 61); and Involuntary Chapter 7 Case No. 23-11302 (ECF 140-3).

Upon information and belief, Mr. Roglieri, hand-delivered the skull watch to Mr. Levine or Mr. Levine's representative. Upon information and belief, Mr. Levine cannot, without an order from a federal court of competent jurisdiction, transfer or otherwise dispose of the skull watch. Upon information and belief, Mr. Levine, in his capacity as federal court receiver, continues in possession of the skull watch.

Mr. Roglieri filed a voluntary chapter 11 case on February 15, 2024. (Chapter 11 Case No. 24-10157). On March 22, 2024, Mr. Roglieri filed his Schedule A/B. (ECF 80). Notwithstanding that Mr. Roglieri, as sole member of Prime, had *already turned the watch over to the court-appointed receiver of Prime two months prior*, Mr. Roglieri listed the "Richard Mille Tourbillion Skull RM 052 Watch" as an asset on Scheule A/B and estimated the value to be

4

$2,200,000. (ECF 80).

The undersigned questioned Mr. Roglieri at his initial 341 meeting on March 14, 2024 and again on April 4, 2024 at which time the adjourned 341 was conducted in-person. During the April 4, 2024 adjourned 341, the undersigned questioned Mr. Roglieri about his assets, including vehicles and the skull watch. Mr. Roglieri's then-counsel, Joseph Barcalona interjected and the following exchange occurred:

> 15    MR. BARSALONA: So this is Joe Barsalona. To the
> 16    extent that there's some type of estate interest within the
> 17    vehicles and there are other property that you'll see within
> 18    the schedules that we have done this. If there's any type
> 19    of estate property interest in it, we have listed it; we
> 20    haven't completely kept it out. So you'll see a lot of
> 21    things in here that are potentially or actually in the
> 22    possession of Mr. Levine, such as the Skull watch, that Mr.
> 23    Roglieri personally insures, so there is some type of estate
> 24    interest in it, which is why it's listed on the schedules.
> 25        MS. PENPRAZE: Okay. so the total value of the

Upon further questioning, Mr. Roglieri conceded that the skull watch was bought and paid for by Prime.

```
 7          MR. LEVINE:  With regard to the Skull watch,
 8   that's the watch that you turned over to my possession?
 9          MR. ROGLIERI:  That's correct.
10          MR. LEVINE:  Do you allege an ownership interest
11   in that?
12          MR. ROGLIERI:  I do.  Yeah, I do, because I paid
13   for it.
14          MR. LEVINE:  I'm sorry?
15          MR. ROGLIERI:  No, I do.
16          MR. LEVINE:  Because why?
17          MR. ROGLIERI:  Because I insure it personally.
18          MR. LEVINE:  Any other reason?
19          MR. ROGLIERI:  No, that's the reason.
20          MR. LEVINE:  But the money to pay for that watch
21   came from Prime Capital Ventures?
22          MR. ROGLIERI:  Correct.
```

On May 15, 2024, on the motion of the United States Trustee, the Court converted Mr. Roglieri's chapter 11 case to chapter 7. (ECF 159). On May 16, 2024, the United States Trustee appointed Mr. Dribusch as chapter 7 trustee. Thereafter, Mr. Dribusch filed a motion for turnover and to secure all property of the estate in the possession and control of Mr. Roglieri. (ECF 166). The trustee identified three vehicles, a long list of artwork, sculpture, watches, and firearms that the trustee sought control over.

Recognizing that the skull watch was already in the possession of the permanent receiver and Prime's claim as to the ownership of the skull watch, the trustee did not include the skull watch in the extensive list of assets required to be turned over by Mr. Roglieri. (ECF 166).

6

Similarly, the trustee did not include items already in the possession of the FBI.[2]

In response to the turnover motion, on May 20, 2024, Mr. Levine as permanent receiver on Prime filed a Reservation of Rights in which he asserted Prime's rights as to *all assets of the chapter 7 estate* including but not limited to the assets identified by the chapter 7 trustee in the turnover motion:

> Although Prime does not object to the relief sought in the Motion, Prime does, however, reserve any and all rights, claims, interests, and remedies it may have with respect to the Estate Assets, the Residence, and the ownership interests in the Estate Companies (collectively, the "Debtor's Assets"), which may have been purchased and/or funded, in whole or in part, with Prime's property, cash, and/or assets, including the right to assert that any such property is property of Prime not the Debtor.

(ECF 181, ¶ 6).

Neither Mr. Dribusch nor any other party objected to Mr. Levine's reservation of rights. Upon information and belief, the reservation of rights that Mr. Levine filed on May 20, 2024 on behalf of Prime remains in full force and effect, thus preserving Prime's rights vis-à-vis the assets the Roglieri estate. Unless the Court determines otherwise, it appears that the reservation of rights preserves Prime's interests in all of the chapter 7 assets, including but not limited to the skull watch.

Mr. Roglieri and Pieter Van Tol, Esq. (who identified himself as "litigation counsel for Mr. Roglieri") appeared in-person at the May 21, 2024 hearing on the chapter 7 trustee's

---

[2] By the time the Court converted the Roglieri case, Mr. Roglieri's residence had been twice raided by the FBI. According to the complaint filed in the civil forfeiture proceeding, the government seized twelve highly modified supercars, over $540,000 in cash, two Richard Mille watches, five Rolex watches, and a beach-front mansion in Virginia Beach. See civil forfeiture complaint at pgs. 18-31. Copies of the civil forfeiture complaint and amended complaint are attached hereto as Exhibit "1" and "2," respectively.

7

turnover motion. Mr. Roglieri gave an extensive oral presentation requesting a delay in entry of the turnover order, but the Court overruled his oral objection and granted the trustee's turnover motion.

The Court entered the turnover order on May 22, 2024. (ECF 188). Attached to the Court's turnover order is a three-page list of assets subject to the order. Among other things, the turnover order lists seven watches – including two Richard Mille watches – but not the skull watch. Unlike the other assets, only the skull watch was in the possession of the deferral court receiver.

Value of Assets

One of the Court's concerns with Mr. Dribusch's performance in this chapter 11 bankruptcy estate includes the conclusion that, "had the Watch Motion been granted as proposed, the funds available for Prime's creditors would have been severely diminished" by approximately 25% of the estimated estate.[3] This conclusion, however, does not take into account the extraordinary overlap between the Roglieri chapter 7 case and the Prime chapter 11 case.

On Schedule A/B, Mr. Roglieri estimated the value of "his" assets to be over $27 million:

---

[3] The Court pointed to its conclusion that Mr. Dribusch, "would have been entitled to a commission pursuant to 11 U.S.C. § 326 by selling the Watch in the Roglieri bankruptcy" as further evidence of a conflict of interest. *See* Order to Show Cause, pg. 4 and fn 5. The Court's conclusion ignores the following: (i) that chapter 7 trustee commissions are based on disbursements, not receipts; (ii) certain disbursements are statutorily excluded from the commission calculation; and (iii) chapter 7 trustee compensation is subject to review and approval of the Court, on notice.

8



The criminal complaint and the civil forfeiture complaint paint a different portrait as to ownership of assets and the run-up to bankruptcy. See Exhibits 1 and 2. These documents substantially rebut Mr. Roglieri's prior claim that *he* owns these assets.

> 23. The FBI's review of records associated with these financial accounts show that Prime Capital used ICA payments from certain of its borrower clients to repay or fund loans to its other borrower clients, consistent with a fraudulent advance fee/Ponzi scheme.[2]
>
> 24. Set forth below are examples of Prime Capital's use of client ICA payments to repay or fund other clients, or to pay other expenses and fund other purchases, unrelated to the client from which the ICA payment was obtained.

The U.S. Attorney named the following creditor/victims whose identifiable deposits were transferred out of Prime accounts and/or used to make purchases unrelated to the depositor/victim's projects:

  a. Onward Holding, LLC;

  b. 526 Murfreesboro;

      c.    Compass-Charolotte and HCW Biologics;

      d.    Newlight; and

      e.    ER Tennessee.

<u>Unity of Interests</u>

As demonstrated by the government's forfeiture complaint, there is a significant overlap between the creditors of Prime and the creditors of Mr. Roglieri. The claims registers in the two cases show that fourteen creditors have filed proofs of claim in *both* cases. These include some of the largest victims of Prime/Roglieri: Compass-Charlotte; ER Tennessee; CoNextions; 1800 Park (who lost $5 million to Prime/Roglieri in December 2023 during the pendency of the involuntary chapter 7); Onward Holdings; 526 Murfreesboro; and B and R Acquisitions.

These same creditor/victims may become beneficiaries of the FBI's seizures and the federal government's pursuit of civil forfeiture. Upon information and belief, the creditor/victims are seeking to recover their losses, whether whole or in-part, regardless of how Mr. Roglieri unilaterally decided to title the assets.

As explained by the government in the forfeiture complaint, immediately transferring the creditor/victims' deposit monies and then using those funds to make extravagant purchases was central to Mr. Roglieri's alleged money laundering scheme. "The FBI's financial analysis indicates that the fraudulently obtained ICA payments were often laundered via purchases of real estate, vehicles, and jewelry, and were otherwise used in a manner inconsistent with the expenditures associated with a legitimate lending business." Exhibit 1, ¶ 77.

Equity should not allow the creditor/victims to be further victimized as the result of how Mr. Roglieri otherwise concealed the true ownership of their deposits and the assets purchased

with the ill-gotten gains (their money).

Standard for Replacing Management Under 11 U.S.C. § 1104

"The appointment of a § 1104 trustee is an extraordinary remedy." In re Ionosphere Clubs, Inc., 113 B.R. 164, 167 (Bankr. S.D.N.Y. 1990); *see also* In re Univ. Heights Ass'n, Inc., No. 06-12672, 2007 WL 316281, at *2 (Bankr. N.D.N.Y. Jan. 22, 2007).  The Second Circuit has established the very high standard required to justify displacing debtor's management in favor of an 1104 trustee.  "The U.S. Trustee has the burden of showing by 'clear and convincing evidence' that the appointment … is warranted." In re Bayou Group, LLC, 564 F.3d 541, 546 (2d Cir. 2009).

Hon. Patrick G. Radel recently appointed a chapter 11 trustee in a large Ponzi case. In re: R. Burton Marshall, Memorandum-Decision and Order Granting Motion to Appoint a Trustee September 20, 2023 (Case No.: 23-60263-6-pgr).  The United States Trustee appointed Fred Stevens as 1104 trustee in the Burton Marshall case.

> In sum, it is undisputed that the Debtor incurred more than $90 million dollars in unsecured debt (much of it from friends and neighbors) while operating small businesses engaged in relatively modest pursuits (tax preparation, insurance sales, printing, property management) in a rural community in upstate New York. There is no credible or conceivable explanation for this circumstance that does not entail fraud, dishonesty, incompetence, and/or gross mismanagement by the Debtor.

Based on the criminal complaint and the civil forfeiture complaint, it is hard to conclude anything but that Mr. Roglieri, either himself or through Prime and the other companies, operated a Ponzi fraud scheme.  Unlike the Burton Marshall case, however, Mr. Roglieri was displaced from management in January 2024 when Hon. Mae A. D'Agostino appointed Mr.

11

Levine as receiver of Prime.

The Order to Show Cause does not allege that Mr. Dribusch has engaged in self-dealing, fraud, or gross mismanagement. Nor does the Order to Show Cause address the role of Mr. Levine, the federal receiver, in overseeing Mr. Dribusch's actions vis-à-vis Prime. Mr. Levine has remained engaged in the chapter 11 case during the pendency of the appeal on Case No.: 24-10531.

Also unaddressed in the Order to Show Cause is the effect of Prime's Reservation of Rights, filed on the docket in this case on May 20, 2024. (ECF 181). The Court has already approved a number of sales by Mr. Dribusch as trustee in the chapter 7 case. There is nothing in the record to indicate that Prime's reservation of rights is *not* effective as to the completed sales. Therefore, if the Reservation of Rights is in effect, the Prime estate *is protected* as to its right to make a claim to the skull watch and any proceeds from the sale thereof (although the Court denied the sale motion, therefore, that issue is moot at the present time).

Conflict of Interest

When the management of a debtor-in-possession has a "material conflict" with the estate, then the appointment of an 1104 trustee is appropriate. Examples of such situations include where the sole shareholder/manager has a personal financial interest in settling (or not) ongoing litigation that could pay all claims, holding a significant, adverse interest in related litigation (In re Vascular Access Centers, L.P., 645 B.R. 804, (Bankr. E.D. Pa., Dec. 1, 2022); inappropriate relations between and among related companies and misuse of debtor funds (In re Klaynberg, 643 B.R. 309, (Bankr. S.D.N.Y., Sept. 19, 2022); refusal to fulfill fiduciary duties related to ownership interest of wife of company manager (In re Grasso, 490 B.R. 500, (Bankr. E.D. Pa.,

Apr. 4, 2013).

There is no indication in the Order to Show Cause that Mr. Dribusch's actions on behalf of the bankruptcy estate have been tainted by fraud, self-dealing, or gross mismanagement. The United States Trustee will continue to vigilantly monitor this case, as it does all chapter 11 cases filed in the Albany Division, and take all necessary steps to protect the integrity of the bankruptcy system and perform his statutory duties.

Dated: Albany, New York
      May 19, 2025

Respectfully submitted,

WILLIAM K. HARRINGTON
UNITED STATES TRUSTEE, REGION 2

By: /s/ Lisa M. Penpraze
Assistant United States Trustee
Leo O'Brien Federal Building
11A Clinton Ave., Room 620
Albany, NY 12207
Bar Roll No.: 105165
lisa.penpraze@usdoj.gov
Voice: (518) 434-4553
Fax:   (518) 434-4459