> **THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.**

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF NEW YORK**

In re:

PRIME CAPITAL VENTURES, LLC,                    Case No. 24-11029-PGR
                                                Chapter 11

                        Debtor.

## DISCLOSURE STATEMENT FOR THE TRUSTEE'S PLAN OF LIQUIDATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

**GERON LEGAL ADVISORS LLC**
370 Lexington Avenue
Suite 1208
New York, New York 10017
Tel: (646) 560-3224
Yann Geron
Nicole N. Santucci

*General Counsel to Yann Geron, Chapter 11 Trustee of Prime Capital Ventures, LLC*

**KLESTADT WINTERS JURELLER SOUTHARD & STEVENS, LLP**
200 West 41st Street, 17th Floor
New York, New York 10036
Tel: (212) 972-3000
Fax: (212) 972-2245
Fred Stevens
Lauren C. Kiss

*Special Litigation Counsel to Yann Geron, Chapter 11 Trustee of Prine Capital Ventures, LLC*

Dated:  New York, New York
        December 16, 2025

# **TABLE OF CONTENTS**

I.      PURPOSE AND LIMITATIONS OF DISCLOSURE STATEMENT .........................1

   A.  Purpose of Disclosure Statement ...............................................................1

   B.  Definitions and Exhibits ............................................................................1

          i.   Exhibits ..........................................................................................1

   C.  Enclosures ..................................................................................................2

   D.  Representations and Limitations................................................................2

   E.  Important Dates..........................................................................................3

   F.  Solicitation Procedures ..............................................................................4

   G.  Recommendation ........................................................................................4

   H.  Inquiries .....................................................................................................5

II.     BACKGROUND .................................................................................................5

   A.  Debtor's History.........................................................................................5

   B.  Debtor's Bankruptcy Cases, Receivership, Roglieri Bankruptcy Case and Criminal
       Cases ..........................................................................................................6

          i.    Debtor's Case 1 – Case No. 23-11302 (REL) (Bankr. N.D.N.Y) ....................6

          ii.   Federal Equity Receivership – Case No. 24-cv-55 (MAD) (N.D.N.Y.)............7

          iii.  Roglieri Bankruptcy Case – Case No. 24-10157 (Bankr. N.D.N.Y) ................9

          iv.   Debtor's Case 2 – Case No. 24-10531 (REL) (Bankr. N.D.N.Y) ..................10

          v.    Roglieri's Criminal Case – Case No. 24-CR-00392
                (N.D.N.Y District Court) ...............................................................12

          vi.   Debtor's Case 3 – Case No. 24-11029 (REL) (Bankr. N.D.N.Y) ..................12

          vii.  Government's Civil Forfeiture Case – Case No. 24-cv-1345 (N.D.N.Y.
                District Court) ...............................................................................13

viii.    Snyder's Criminal Case – Case No. 25-CR-00195 (N.D.N.Y. District Court) ...................................................................................................15

ix.    Humphrey's Criminal Case – Case No. 25-CR-00238 (N.D.N.Y. District Court) ......................................................................................................15

C.  The Debtor was a Classic Ponzi Scheme ................................................16

III.    SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE .............................20

A.  Retention of Professionals ..............................................................20

B.  Schedules of Assets and Liabilities, Statement of Financial Affairs ...........................21

i.    Cash.....................................................................................21

ii.    Virginia Beach Property .............................................................22

iii.    Loan Receivable.......................................................................22

iv.    Richard Mille Watch ..................................................................22

v.    Causes of Action ......................................................................22

C.  Creditor Claims and the Bar Date for Filing of Claims Arising Prior to the Petition Date ..................................................................................................23

D.  Abandonment of Certain Claims .......................................................24

E.  Settlement Between the Debtor, the Roglieri Trustee, and the United States of America....................................................................................24

F.  The Virginia Beach Property ...........................................................25

G.  The Debtor's and Trustee's Investigation.............................................26

IV.    SUMMARY OF THE PLAN OF LIQUIDATION .......................................32

A.  General Plan Objectives.................................................................32

B.  Provisions Governing Order and Method for Distributions Under the Plan ..............33

C.  Classes of Claims and Equity Interests ................................................33

i.    Administrative Expense Claims.......................................................33

ii.    Priority Tax Claims.................................................................................34

iii.    Professional Fee Claims and Receiver Professional Fee Claims....................34

iv.    Class 1 (Secured Claims) ........................................................................35

v.    Class 2 (General Unsecured Claims)........................................................36

vi.    Class 3 (Equity Interests) ........................................................................37

V.    MEANS OF IMPLEMENTING THE PLAN..............................................................38

A. Plan Funding .............................................................................................38

B. Appointment of Plan Administrator...............................................................38

1.  Appointment of Plan Administrator...........................................................38

2.  Bond.....................................................................................................38

3.  Governance ...........................................................................................38

4.  Succession Matters.................................................................................38

5.  Funding of Plan Administrator's Activities..................................................39

6.  Indemnification ......................................................................................39

C. Powers and Duties of Plan Administrator........................................................39

1.  Powers and Duties..................................................................................39

D. Establishment of Oversight Committee ...........................................................41

1.  Appointment of Oversight Committee ........................................................41

2.  Reimbursement of Costs and Expenses .....................................................42

3.  Liability of Members of the Oversight Committee.........................................42

4.  Indemnification ......................................................................................42

E. Establishment of Disputed Claim Reserve ......................................................42

F. Preservation of Causes of Action ..................................................................43

G. General Disposition of Assets .................................................................................43

H. Exemption from Certain Transfer Taxes ................................................................43

I. Administrative Expense Claims Bar Date ...............................................................43

J. Deadline for Filing Applications For Payment of Professional Fee Claims and
Receiver Professional Fee Claims ..........................................................................44

K. Execution of Documents to Effectuate Plan ..........................................................44

L. Dissolution of the Debtor .......................................................................................44

M. Post-Confirmation Reports and Fees .....................................................................44

N. Insurance Preservation ...........................................................................................44

O. Claims Administration Responsibility ....................................................................45

　　1. Reservation of Rights ......................................................................................45

　　2. Objections to Claims .......................................................................................45

　　3. Filing Objections .............................................................................................45

　　4. Determination of Claims .................................................................................45

P. Treatment of Claims without Further Order of the Court ........................................46

　　1. Certain Scheduled Claims ...............................................................................46

　　2. Late Filed Claims ............................................................................................46

Q. Timing of Distributions on Disputed Claims Subsequently Allowed .......................46

R. No Payment or Distribution of Disputed Claim ......................................................46

S. Disputed Claims ......................................................................................................46

T. Limitations on Funding of Disputed Claims Reserve ..............................................47

U. Tax Requirements for Income Generated by Disputed Claims Reserve ...................47

VI.　EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...................................47

A. General Provisions ..................................................................................................47

B.   Notice of Deemed Rejection/Rejection Bar Date .........................................................48

C.   Compensation and Benefit Programs..........................................................................48

VII.   INJUNCTIONS; EXCULPATIONS .........................................................................48

A.   General Injunctions.....................................................................................................48

   i.   Injunctions Against Interference with Consummation or Implementation of
        Plan ................................................................................................................48

   ii.   Plan Injunction ...............................................................................................48

   iii.   Release of Collateral ......................................................................................49

B.   Exculpation .................................................................................................................49

C.   All Distributions Received in Full and Final Satisfaction ..........................................49

D.   No Modification...........................................................................................................50

E.   No Discharge of Claims...............................................................................................50

VIII.   CONDITIONS PRECEDENT .................................................................................50

A.   Conditions Precedent to Confirmation of the Plan .....................................................50

B.   Conditions Precedent to the Effective Date ................................................................50

C.   Waiver of Conditions Precedent .................................................................................51

IX.   PROCEDURES FOR DISTRIBUTIONS UNDER PLAN .......................................51

A.   Distributions by Plan Administrator ...........................................................................51

B.   Indefeasibility of Distributions ..................................................................................51

C.   Frequency of Distributions .........................................................................................51

D.   Payment in U.S. Dollars..............................................................................................51

E.   Claims in U.S. Dollars ................................................................................................51

F.   Distributions Only on Business Days .........................................................................52

G.   Transmittal of Payments and Notices .........................................................................52

H.  Record Date for Distributions ..................................................................52

I.  Unclaimed Distributions ........................................................................52

J.  No Payments of Fractional Cents or Distributions of Less
Than One Hundred Dollars .....................................................................52

K.  Setoff and Recoupment ..........................................................................53

L.  Payment of Taxes on Distributions Received Pursuant to the Plan ............................53

M.  Compliance With Tax Withholding and Reporting Requirements ...............................54

N.  Disputed Distribution ............................................................................54

X.    RETENTION OF JURISDICTION BY BANKRUPTCY COURT ...........................54

XI.    CERTAIN TAX CONSEQUENCES OF THE PLAN ...............................................55

A.  General ..............................................................................................55

B.  Tax Consequences of Payment of Allowed Claims Pursuant to Plan Generally .......56

i.    Recognition of Gain or Loss ...............................................................56

ii.    Bad Debt or Worthless Security Deduction ...........................................56

iii.    Receipt of Interest ...........................................................................56

XII.    CONFIRMATION OF PLAN – REQUIREMENTS ...................................................57

A.  Absolute Priority Rule ...........................................................................57

B.  Best Interest of Creditors Test; Liquidation Analysis ..................................58

XIII.    PLAN RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMATION
AND CONSUMMATION OF THE PLAN .................................................59

A.  Certain Bankruptcy-Related Considerations ...............................................59

i.    Parties in Interest May Object to the Debtor's Classification of Claims .........59

ii.    Risk of Plan Not Being Confirmed ......................................................59

iii.    Nonconsensual Confirmation ............................................................59

iv.    Risks that Conditions to Effectiveness Will Not Be Satisfied..........................60

v.    Actual Plan Distributions May Be Less Than Estimated for Purposes of the Disclosure Statement .........................................................................................60

vi.    Claims Objections/Reconciliation Process .......................................................60

B.  Alternatives to the Plan and Consequences of Rejection.............................................60

i.    Alternative Plans...............................................................................................60

ii.    Chapter 7 Liquidation .......................................................................................60

XIV.   PROCEDURES FOR VOTING ON PLAN ...................................................................61

XV.   COMBINED HEARING .............................................................................................62

XVI.  RECOMMENDATION ................................................................................................63

**PLEASE READ THIS DISCLOSURE STATEMENT CAREFULLY.  THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN WHICH IS ENCLOSED WITH THIS DISCLOSURE STATEMENT.   THE TRUSTEE BELIEVES THAT THE PLAN IS IN THE BEST INTERESTS OF THE DEBTOR'S ESTATE AND ITS CREDITORS AND PROVIDES THE HIGHEST AND MOST EXPEDITIOUS RECOVERIES TO HOLDERS OF ALLOWED CLAIMS AGAINST THE DEBTOR'S ESTATE.**

Yann Geron, as chapter 11 trustee (the "Trustee") of Prime Capital Ventures, LLC (the "Debtor") submits this disclosure statement (the "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code to accompany the Trustee's Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code dated December 16, 2025 (the "Plan"), which has been filed with the United States Bankruptcy Court for the Northern District of New York (the "Bankruptcy Court").[1]

## I.    PURPOSE AND LIMITATIONS OF DISCLOSURE STATEMENT

### A.   Purpose of Disclosure Statement

The purpose of the Disclosure Statement is to set forth information that (i) summarizes the Plan and alternatives to the Plan, (ii) advises holders of Claims and Equity Interests of their rights under the Plan, (iii) assists creditors entitled to vote in making informed decisions as to whether they should vote to accept or reject the Plan, and (iv) assists the Bankruptcy Court in determining whether the Plan complies with the provisions of chapter 11 of the Bankruptcy Code and should be confirmed.

You are urged to read the Disclosure Statement in order to determine what rights you may have to vote on or object to the Plan and before making any decision on any such course of action. Particular attention should be directed to the provisions of the Plan affecting or impairing your rights as they existed before the institution of this Chapter 11 Case.  Please note, however, that this Disclosure Statement cannot tell you everything about your rights.  For instance, this Disclosure Statement cannot and does not provide a complete description of the financial status of the Debtor's estate, all of the applicable provisions of the Bankruptcy Code, or other matters that may be deemed significant by creditors and other parties in interest.  You are also encouraged to consult with your lawyers and/or advisors as you review and consider the Disclosure Statement and the Plan to enable you to obtain more specific advice on how the Plan will affect you.

### B.   Definitions and Exhibits

Definitions  Unless otherwise defined herein, capitalized terms used in this Disclosure Statement will have the meanings ascribed to such terms in the Plan.

---

[1] This is the fourth disclosure statement and third plan of liquidation filed in the Debtor's case.  Prior to the Trustee's appointment, the Debtor filed three prior disclosure statements [Docket Nos. 78, 92 and 118] and two prior plans [Dkt. No. 77 and 91].  The Debtor's plan was unopposed and accepted by the only class of creditors entitled to vote. However, in a decision dated March 28, 2025 [Docket No. 178], the Court denied confirmation of the Debtor's plan, and the Trustee's appointment shortly followed.

    **i.**   **Exhibits**  The following exhibits are annexed hereto and expressly incorporated herein:

| Exhibit | Description |
|---------|-------------|
| A | Plan of Liquidation |
| B | Liquidation Analysis |

## C. Enclosures

The following materials are included with this Disclosure Statement:

1.  A copy of the Plan;

2.  A copy of the order (i) scheduling a combined hearing (the "Combined Hearing") on (a) the adequacy of this Disclosure Statement, and (b) confirmation of the Plan, (ii) approving form and manner of notice of the Combined Hearing, (iii) establishing procedures for objecting to (a) the Disclosure Statement or (b) the Plan, and (iv) approving the solicitation materials and solicitation procedures (the "Scheduling Order");

3.  Notice of Combined Hearing.  A copy of the notice of the deadline for submitting ballots to accept or reject the Plan and, among other things, the date, time and place of the Combined Hearing and the deadline for filing objections to approval of the Disclosure Statement or confirmation of the Plan (the "Combined Hearing Notice");

4.  A ballot (and return envelope) for voting to accept or reject the Plan;

5.  An assignment of Creditor Related Causes of Action for holders of Class 2 Claims who want to assign their Creditor Related Causes of Action, if any, and participate in any recovery of Creditor Related Causes of Action by the Plan Administrator; and

6.  A W-9 form to complete and return.

## D. Representations and Limitations

**NO PERSON IS AUTHORIZED IN CONNECTION WITH THE PLAN OR THE SOLICITATION OF VOTES THEREON TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ANNEXED HERETO OR INCORPORATED HEREIN BY REFERENCE OR REFERRED TO HEREIN, AND IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE TRUSTEE.**

**NO REPRESENTATIONS CONCERNING THE DEBTOR OR THE PLAN ARE AUTHORIZED OTHER THAN AS SET FORTH HEREIN. ANY REPRESENTATIONS OR INDUCEMENTS TO SECURE YOUR ACCEPTANCE OF THE PLAN OTHER THAN CONTAINED HEREIN SHOULD NOT BE RELIED UPON BY YOU.**

THE INFORMATION CONTAINED HEREIN HAS BEEN PREPARED BY THE TRUSTEE IN GOOD FAITH, BASED UPON UNAUDITED INFORMATION AVAILABLE TO HIM AS OF THE DATE HEREOF. ALTHOUGH THE TRUSTEE HAS USED BEST EFFORTS TO ENSURE THAT SUCH INFORMATION IS ACCURATE, THE INFORMATION CONTAINED HEREIN IS UNAUDITED. THE TRUSTEE BELIEVES THAT THIS DISCLOSURE STATEMENT COMPLIES WITH THE REQUIREMENTS OF THE BANKRUPTCY CODE.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH HEREIN SINCE THE DATE OF THIS DISCLOSURE STATEMENT OR THE DATE THAT THE MATERIALS RELIED UPON IN PREPARATION OF THIS DISCLOSURE STATEMENT WERE COMPILED.

THE DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN, AND NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE TRUSTEE, THE DEBTOR OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON HOLDERS OF CLAIMS AGAINST THE DEBTOR.

THE DESCRIPTION OF THE PLAN CONTAINED IN THIS DISCLOSURE STATEMENT IS INTENDED AS A SUMMARY ONLY AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN ITSELF. EACH CREDITOR IS ENCOURAGED TO READ, CONSIDER, AND CAREFULLY ANALYZE THE TERMS AND PROVISIONS OF THE PLAN.

E.  **Important Dates**

The date, time and place of the hearing to consider (a) approval of this Disclosure Statement and (b) confirmation of the Plan can be found in the Combined Hearing Notice. The hearing at which the Bankruptcy Court will determine whether to confirm the Plan and, to consider approval of this Disclosure Statement, will take place on **[February 10, 2026 at 10:30 a.m. (EST)]**.

Holders of Claims and other parties in interest may attend this hearing. Objections to confirmation of the Plan must be filed on or before **[February 3, 2026]** as set forth in the Combined Hearing Notice.

All Ballots with respect to the Plan must be completed in full and signed to be counted in the tabulation of the votes and must be received by the Trustee's special litigation counsel no later **[January 30, 2026].**

Completed and signed Ballots should be returned by first class mail to the Trustee's special litigation counsel at the below address in the enclosed self-addressed return envelope:

> Klestadt Winters Jureller Southard & Stevens, LLP
> 200 West 41st Street, 17th Floor
> New York, New York 10036
> Attn:  Fred Stevens & Lauren C. Kiss

All Creditor Assignments with respect to the Creditor Related Causes of Action by Holders of Class 2 Claims must be completed in full, signed, and received by the Trustee's special litigation counsel if such Creditor wants to participate in any Creditor Related Causes of Action Fund.

Completed and signed Creditor Assignments should be returned by first class mail to the Trustee's special litigation counsel by no later than [**January 30, 2026**].  The Trustee and Plan Administrator reserve the right to accept Creditor Assignments after that date.

> *By First Class Mail or Overnight/Hand Delivery:*
>
> Klestadt Winters Jureller Southard & Stevens, LLP
> 200 West 41st Street, 17th Floor
> New York, New York 10036
> Attn:  Fred Stevens & Lauren C. Kiss

Alternatively, scanned original copies of the completed and signed Creditor Assignments can be emailed to:

> Fred Stevens at fstevens@klestadt.com; and
> Lauren C. Kiss at lkiss@klestadt.com

## F.  Solicitation Procedures

Creditors holding Claims that are impaired have the right to vote to accept or reject the Plan. Generally speaking, a Claim is impaired if the Plan alters the legal, contractual or equitable rights of the holder of the Claim.  A Class of creditors accepts the Plan when creditors holding two-thirds in amount of such Class and more than one-half in number of the Claims in such Class who actually cast their ballots vote to accept the Plan.

In this Chapter 11 Case, the Plan contains two Classes of Claims, and one Class of Equity Interest holders.  The Plan provides that holders of Claims in one Class of Claims are impaired in that the Plan alters the legal, contractual and equitable rights of the holders of such Claims.

## G.  Recommendation

In the opinion of the Trustee, the treatment of creditors under the Plan contemplates a greater recovery than that which is likely to be achieved under any other alternative for the liquidation of the Debtor's assets under chapter 11 or chapter 7 of the Bankruptcy Code.  Accordingly, the Trustee

believes that confirmation of the Plan is in the best interests of the Debtor's creditors and recommends that all holders of Claims entitled to vote on the Plan vote to accept the Plan.

### H. Inquiries

Any interested party desiring further information about the Plan should contact the Trustee's special litigation counsel, Klestadt Winters Jureller Southard & Stevens, LLP, 400 West 41st Street, 17th Floor, New York, New York 10036, Attention: Fred Stevens or Lauren C. Kiss, (ii) by email, at fstevens@klestadt.com or lkiss@klestadt.com; or (iii) by telephone, at (212) 972-3000.

## II.    BACKGROUND

### A. Debtor's History

On or around July 26, 2006, Prime Commercial Lending, LLC ("Prime Commercial") was formed as a New York limited liability company. *See* Emergency Motion of Petitioning Creditors for Appointment of Interim Trustee Over Prime Capital Ventures, LLC and For Related Relief, Case 1[2], Docket No. 4, ¶4. Prime Commercial appears to have been a small lender making loans as small as $22,000 to businesses and up to $2 million on commercial real estate. *Id.* at ¶5.

On December 14, 2021, Kris Daniel Roglieri ("Roglieri") formed the Debtor as a Delaware limited liability company. *Id.* at ¶9. Upon information and belief, until on or around May 15, 2024, Roglieri was the manager of the Debtor and its chief executive. In addition, brother and sister Kimberly Humphrey, a/k/a Kimberly Owen ("Humphrey") and Christopher Snyder ("Snyder," and collectively with Roglieri and Humphrey, the "Debtor Insiders") assisted Roglieri in the operation of the Debtor and had intimate knowledge of the Debtor's operations. The concept was apparently that the Debtor would be Prime Commercial's division as "a fund specifically designed to provide capital for large development, commercial development and commercial real estate transactions from $50 million to more than $1 billion." *Id.* at ¶¶17, 22-23, Ex.G (quoting May 2, 2022 marketing in DealMaker Magazine). The Debtor advertised that it would offer non-recourse lines of credit with rates at 4 to 6% with interest-only payments but would require borrowers to provide 20% cash upfront based on the total project cost to be placed in an interest credit account (each an "ICA Deposit"). The ICA Deposits would be held by the Debtor "'as prepaid interest throughout the term of the loan.'" *Id.* at ¶26. The Debtor obtained millions of dollars in ICA Deposits from multiple companies throughout the country which, upon information and belief, in most cases was used by the Debtor and Debtor Insiders before the loans were closed and funded. *Id.* at ¶37.

By December 2023, the Debtor was besieged by litigation largely from borrowers who did not get their loans funded and wanted the return of their ICA Deposits. *See, e.g.*, *Truss Financial LLC v. Prime Capital, et al.*, Index No. 2023/510389 (N.Y.Sup. Ct. Kings Cty. Apr. 5, 2023) (seeking and apparently obtained the return of $13.4 million); *B&R Acquisition Partners v. Prime Capital* (JAMS Arb., Aug. 2023) (seeking return of $4 million); *Sturm v. Prime Capital*, Case No.

---

[2] As described in greater detail below, there have been three bankruptcy cases filed in this Court where the Debtor was the debtor or alleged debtor as follows: (i) Case No. 23-11302 filed on December 19, 2023 ("Case 1"); (ii) Case No. 24-10531 filed on May 14, 2024 ("Case 2"); and (iii) Case No. 24-11029 filed on September 16, 2024 ("Case 3").

23-cv-1033 (N.D.N.Y. Aug. 22, 2023) (seeking return of $2 million); *Camshaft CRE 1, LLC v. Prime Capital*, Case No. 2023-023173 (Fla. Circ. Ct., Miami-Dade Cty., Sept. 15, 2023) (seeking return of $13.4 million); *The Lion Group DFW, LLC v. Prime Capital*, Case No. 23-DCV-34617 (Tex. Dist. Ct., 146th Dist., Sept. 21, 2023) (demand unknown); *Onward Partners, LLC, v. Prime Capital, et al.*, Case No. 23-cv-833 (D. Utah Nov. 13, 2023) (seeking return of $20 million).

## B. Debtor's Bankruptcy Cases, Receivership, Roglieri Bankruptcy Case and Criminal Cases

### i. Debtor's Case 1 – Case No. 23-11302 (REL) (Bankr. N.D.N.Y)

On December 19, 2023, (the "Case 1 Petition Date"), Compass-Charlotte 1031, LLC ("Compass"), 526 Murfreesboro, LLC ("526 Murfreesboro") and Newlight Technologies, Inc. ("Newlight" and together with Compass and 526 Murfreesboro, the "Petitioning Creditors") filed an involuntary petition under chapter 7 of the Bankruptcy Code against Prime in the United States Bankruptcy Court for the Northern District of New York (the "Bankruptcy Court"), which case is pending under Case No. 23-11302 (REL). *See* Case 1, Docket No. 1. That same day, the Petitioning Creditors filed a motion seeking the appointment of an interim trustee [Docket No. 4] and on December 21, 2023, the Bankruptcy Court held an emergency hearing on the appointment of an interim trustee and following the hearing entered an order appointing an interim chapter 7 trustee. *Id.* at Docket No. 13. On December 22, 2023, the Office of the United States Trustee (the "U.S. Trustee") appointed Christian H. Dribusch as interim chapter 7 trustee (the "Interim Trustee"). *Id.* at Docket No. 15.

On January 5, 2024, the Debtor filed an answer (the "Answer") to the involuntary petition, denying that the requirements of section 303 of the Bankruptcy Code were satisfied by the Petitioning Creditors and requested that the Bankruptcy Court dismiss the involuntary petition with prejudice. *Id.* at Docket No. 55. In particular, the Debtor asserted that (i) the claims held by Compass and 526 Murfreesboro were subject to dispute[3], and (2) the Debtor was generally paying its debts as they became due except those that were subject to a bona fide dispute.[4] In response, the Petitioning Creditors requested discovery on the defenses raised in the Answer. *Id.* at Docket No. 62.

On January 8, 2024, the Debtor filed a motion for an order requiring the Petitioning Creditors to post a bond, pursuant to section 303(e) and rule 2001(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), in the amount of $37 million, representing the costs, fees and damages that Prime estimated it would incur on account of the Petitioning Creditors' alleged bad faith in filing the involuntary petition (the "Bond Motion"). *Id.* at Docket No. 69. These purported damages resulted from the Debtor's allegations that certain of the Petitioning Creditors were coercing the Debtor and interfering with its business, which resulted in deals falling through and the loss of line of credit fees. *Id.* at p. 9-10.

---

[3] Section 303(b)(1) requires that the Petitioning Creditors hold claims that are not subject of a bona fide dispute.
[4] Section 303(h)(1) requires the Bankruptcy Court to make a determination as to whether "the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount."

Also on January 8, 2024, the Debtor, through Hogan Lovells US LLP ("Hogan Lovells"), filed a motion seeking dismissal of the involuntary petition filed by the Petitioning Creditors pursuant to sections 303(b), 305(a)(1) and 1112(b)(1) of the Bankruptcy Code, Bankruptcy Rule 1011(b) and Rule 12(c) of the Federal Rules of Civil Procedure (the "Prime Motion to Dismiss"). *See* Case 1, Docket No. 72. In the Prime Motion to Dismiss, the Debtor asserted that (i) 526 Murfreesboro and Compass could not act as petitioning creditors because at the time of the Case 1 Petition Date, they were both engaged in litigation with the Debtor over disputed claims; (ii) dismissal of the involuntary petition under section 1112(b) was warranted because 526 Murfreesboro and Compass had recourse to an alternative forum to resolve their disputes with the Debtor since both had pending actions in federal court against the Debtor; and (iii) the Bankruptcy Court should abstain from hearing the bankruptcy case under section 305(a)(1) of the Bankruptcy Code because there are alternative forums for the adjudication of the claims at issues, those claims turned on state law rather than bankruptcy law, and there were questions about whether the petitioners brought the bankruptcy case for a proper purpose. *Id.* at p. 2.

On January 8, 2024, after discovering that the Debtor made multiple misstatements and misrepresentations to the Bankruptcy Court and recognizing that the Bankruptcy Court lacked jurisdiction over certain non-debtor entities that were believed to be holding certain of the ICA Deposits, the Petitioning Creditors filed a motion to dismiss Case 1 in order to pursue recovery of their deposits in a different forum (the "Petitioning Creditors Motion to Dismiss"). *See* Case 1, Docket No. 74. On January 9, 2024, the Bankruptcy Court granted the Petitioning Creditors' Motion to Dismiss and dismissed Case 1 without prejudice, and retained jurisdiction over all unresolved matters, including, the Bond Motion. *Id.* at Docket No. 87. To date, Case 1 remains open for these limited purposes.

## ii.    Federal Equity Receivership – Case No. 24-cv-55 (MAD) (N.D.N.Y.)

On January 12, 2024, Compass filed a complaint (the "District Court Complaint") with the United States District Court for the Northern District of New York (the "District Court") against (i) Berone Capital Fund, LP, (ii) Berone Capital Partners LLC, (iii) Berone Capital LLC, (iv) Berone Capital Equity Fund I, LP, and (v) 405 Motorsports LLC f/k/a Berone Capital Equity Partners LLC (collectively, the "Berone Entities")[5] and (vi) the Debtor (and together with the Berone Entities, the "District Court Defendants") asserting claims for breach of contract and fraud in the inducement against Prime, and claims for conversion and unfair and deceptive trade practice against all the District Court Defendants, which was assigned Case No. 24-cv-00055 (the "Receivership Action"). *See* Receivership Action, Docket No. 1. On January 12, 2024, Compass filed an emergency motion for appointment of a receiver and for expedited discovery (the "Receivership Motion"). *Id.* at Docket No. 6. Also on January 12, 2024, the District Court appointed Paul Levine as the temporary receiver (the "Interim Receiver") pending the hearing on the Receivership Motion and authorized the Receiver to conduct expedited discovery of the District Court Defendants and certain third-parties (the "Temporary Receivership Order"). *Id.* at Docket No. 8.

---

[5] During Case 1, Compass learned of a purported Joint Venture Agreement between the Debtor and the Berone Entities, pursuant to which the Berone Entities would assist the Debtor in obtaining the funds for the proposed lines of credit. *See* Receivership Action (as defined herein), Docket 1, at ¶¶ 92-100. The Debtor also asserted in Case 1 that the Berone Entities held millions of dollars in a bank account on behalf of Prime. *Id.* at ¶ 152. For these reasons, Compass included the Berone Entities in the Receivership Action.

On January 16, 2024, Roglieri directed Hogan Lovells, on behalf of Prime, himself, and Humphrey, to file an emergency motion to, among other things, dismiss the Receivership Action. *Id.* at Docket Nos. 12-14.

On January 19, 2024, the Interim Receiver filed his first status report (the "First Report") with the District Court, which highlighted significant evidence of misuse of client monies, misuse of corporate funds and other misconduct. *Id.* at Docket No. 37. In some instances, the ICA Deposits were used to refund deposits to other borrowers. *Id.* at ¶50. In other instances, the ICA Deposits were used by the Debtor Insiders for personal purchases of luxury watches, exotic automobiles, luxury travel by private plane and the purchase of a luxury home in Virginia Beach. *Id.* at ¶67.

On January 24, 2024, the District Court issued a Memorandum-Decision and Order granting the Receivership Motion, making the Interim Receiver the permanent receiver (the "Receiver") and defining his powers with respect to the Debtor and its property, and denying the Debtor's motion to dismiss the Receivership Action (the "Receivership Order"). *Id.* at Docket No. 56.

On January 26, 2024, Roglieri directed Hogan Lovells to file an interlocutory appeal of the Receivership Order (the "Receivership Order Appeal"). *Id.* at Docket No. 60. On or about June 14, 2024, the parties stipulated to withdraw the Receivership Order Appeal with prejudice. *See* Docket No. 42, Case No. 24-264 (2d Cir).

On January 26, 2024, the Receiver filed his second status report (the "Second Report"), informing the District Court of the Debtor's failure to provide the documents and information requested by the Receiver. *See* Receivership Action, Docket No. 61. Later that day, the Receiver filed an amended Second Report (the "Amended Second Report"), informing the District Court that a Richard Mille Skull Tourbillon watch, which was purchased by the Debor for $2,225,000, was delivered by the Debtor to the Receiver's counsel. *Id.* at Docket No. 65.

On February 7, 2024, the Receiver filed his third status report (the "Third Report"), informing the District Court of the assets of the District Court Defendants that he had identified, the third-party litigation involving the District Court Defendants, and the Receiver's strategy going forward, among other things. *Id.* at Docket No. 107.

On April 18, 2024, the Receiver filed his fourth status report (the "Fourth Report"), informing the District Court that the Receiver had hired BST & Co. CPAs, LLC ("BST") to conduct a forensic accounting analysis of the District Court Defendants' bank accounts. *Id.* at Docket No. 173. BST prepared a summary memo of its findings, which indicated that tens of millions of dollars were transferred by the Debtor to numerous third parties, some for potential personal expenditures. *Id.* at Docket No. 173, p. 2.

On July 22, 2024, the District Court So Ordered a stipulation dismissing the claims asserted against the Berone Entities from the Receivership Action without prejudice. *See* Receivership Action, Docket No. 187.

On August 19, 2024, the District Court *sua sponte*, issued an order staying the Receivership Action pending resolution of the Criminal Case (defined below) and Appeal (defined below) (the "Stay Order"). *Id.* at Docket No. 188.

On August 28, 2024, the Receiver filed his fifth status report (the "Fifth Report"), expressing his concerns to the District Court that, among other things, the Stay Order would prevent him from moving forward with any effort to liquidate Prime's assets. *Id.* at Docket No. 189.

### iii.   Roglieri Bankruptcy Case – Case No. 24-10157 (Bankr. N.D.N.Y).

On February 2, 2024, the Federal Bureau of Investigation (the "FBI") searched Roglieri's residence and seized several cars, watches, jewelry, and other property.

On February 15, 2024, Roglieri filed a voluntary petition for relief under subchapter V of Chapter 11 of the Bankruptcy Code with the Bankruptcy Court under Case No. 24-10157 (the "Roglieri Bankruptcy Case"). *See* Roglieri Bankruptcy Case, Docket No. 1.

Shortly after Roglieri filed for bankruptcy, the FBI executed a second federal search warrant on Roglieri's residence and seized additional cars.

On April 23, 2024, the U.S. Trustee filed a motion to convert the Roglieri Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code or to dismiss the Roglieri Bankruptcy Case on the basis of (i) substantial loss or diminution of the estate with no reasonable likelihood of rehabilitation; (ii) failure to timely file tax returns and pay income taxes owed, if any; and (iii) failure to maintain appropriate books and records (the "Motion to Convert"). *Id.* at Docket No. 119.  On May 15, 2024, the Bankruptcy Court entered an order granting the Motion to Convert, and entered an order converting the Roglieri Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code. *Id.* at Docket No. 159.  Also on May 15, 2024, the U.S. Trustee appointed Christian H. Dribusch as interim trustee for the Roglieri bankruptcy estate (the "Roglieri Bankruptcy Estate"). *Id.* at Docket No. 160.  From May 15, 2024 until in or around May 23, 2025, Dribusch served as permanent chapter 7 trustee of Roglieri's bankruptcy estate (in that capacity, Dribusch is referred to herein as the "Roglieri Trustee").

On May 16, 2024, the Roglieri Trustee filed a motion for an order directing Roglieri to turn over property of the Roglieri Bankruptcy Estate to the Roglieri Trustee for administration (the "Turnover Motion"). *Id.* at Docket No. 166.  In particular, the Roglieri Trustee sought the turnover of certain automobiles, watches, artwork, and Roglieri's 100% equity interest in certain entities. On May 22, 2024, the Bankruptcy Court entered an order granting the Turnover Motion (the "Turnover Order"). *Id.* at Docket No. 188.  As a result of Roglieri's arrest and detention which hindered Roglieri's ability to comply with the Turnover Order, on June 4, 2024, the Roglieri Trustee filed a supplemental motion for turnover (the "Supplemental Turnover Motion"), requesting a supplemental order authorizing the Roglieri Trustee to exercise governance control over the Roglieri Bankruptcy Estate's sole membership interest in the following entities to the exclusion of Roglieri and any representative purportedly acting through Roglieri:  (i) the Debtor, (ii) Shark Ventures, LLC, (iii) FUPME, LLC, (iv) National Alliance of Commercial Loan Brokers,

LLC, (v) Commercial Capital Training Group, LLC, and (vi) Prime Commercial Lending LLC (the "Estate Companies"). *Id.* at Docket No. 197. On June 10, 2024, the Bankruptcy Court entered an order granting the Supplemental Turnover Motion (the "Supplemental Turnover Order"). *Id.* at Docket No. 205.

On August 15, 2024, the Roglieri Trustee filed a complaint (the "Discharge Complaint") seeking to deny Roglieri a discharge under section 727 of the Bankruptcy Code based on, among other things, Roglieri's failure to disclose information on the Schedules and Statement of Financial Affairs. *Id.* at Docket No. 244. Roglieri failed to respond to the Discharge Complaint and on September 26, 2024, the Clerk of the Bankruptcy Court issued an Entry of Default against Roglieri. *See* Docket No. 9, Adv. Pro. No. 24-90015. On September 27, 2024, the Roglieri Trustee filed a motion for a default judgment seeking entry of an order denying Roglieri a discharge (the "Default Judgment Motion"). *Id.* at Docket No. 10. On November 4, 2024, the Bankruptcy Court entered an order granting the Default Judgment Motion and denying the Debtor a discharge, notice of which was mailed that day by the Clerk of the Bankruptcy Court. *Id.* at Docket Nos. 18 and 19.

In or around May 23, 2025, the Roglieri Trustee resigned and on May 27, 2025, Marianne T. O'Toole was appointed pursuant to section 703(a) of the Bankruptcy Code as successor interim trustee of the Roglieri bankruptcy estate (the "Successor Roglieri Trustee")

### iv.    Debtor's Case 2 – Case No. 24-10531 (REL) (Bankr. N.D.N.Y)

On May 14, 2024, the Receiver filed a chapter 11 bankruptcy petition for the Debtor with the Bankruptcy Court, under Case No. 24-10531 (REL). As set forth in the *Declaration of Paul A. Levine Regarding the Debtor's Assets and Operations and In Support of the Chapter 11 Petition and Initial Pleadings,* the precipitating cause of the bankruptcy filing was the need to commence a preference action under section 547(b) of the Bankruptcy Code in order to avoid the judgment of B and R Acquisition Partners LLC ("B&R") and JHM Lending Ventures LLC ("JHM" and together with B&R, the "B&R Parties") against the Debtor for $4,300,000 which was domesticated as a lien against the Debtor's luxury home located at 600 Linkhorn Drive, Virginia Beach, Virginia (the "Virginia Beach Property") on February 28, 2024. *See* Case 2, Docket No. 5, ¶4. The Debtor purchased the Virginia Beach Property on or about January 31, 2023 for $3,750,000 in cash. *Id.*

On May 31, 2024, Roglieri, now an individual debtor under chapter 7, directed Hogan Lovells to make a motion to dismiss Case 2 on behalf of the Debtor. *Id.* at Docket Nos. 36-37. That same day, the motion was withdrawn and dismissed by the Roglieri Trustee, who controlled all equity in the Debtor. *Id.* at Docket No. 40.

On June 25, 2024, the B&R Parties filed a motion to dismiss Case 2 for cause under section 1112(b), claiming that the Receiver lacked the "specific authorization" and "power of management" required to do so (the "Case 2 Motion to Dismiss"). *Id.* at Docket No. 57. The B&R Parties compared the language of the Interim Receivership Order with the Receivership Order, and concluded that the exclusion of the certain provisions from the Interim Receivership Order to the Receivership Order, means the Receiver does not have the authority over (i) "[a]ll claims, demands, or causes of action held by [Prime]; (ii) "[m]anagement of [Prime's] business; (iii) [t]he closing of existing deposit accounts and opening new ones in the Receiver's name": or (iv) "[t]he

retaining, employing, and paying for professional services in Receiver's discretion without the District Court's intervention." *Id.* at p. 2-3.   The B&R Parties argued that only those with the "power of management" that have "specific authorization" can file a petition commencing a bankruptcy case and that because the Receivership Order lacked such grant of authority, the Receiver lacked the ability to commence Case 2. *Id.* at p. 11.

On July 9, 2024, the Roglieri Trustee filed a statement of ratification on the authority for the Debtor to file Case 2 (the "Trustee Ratification").  *See* Case 2, Docket No. 66.

On July 10, 2024, Compass filed its opposition to the Case 2 Motion to Dismiss, asserting that the broad language of the Receivership Order empowered the Receiver to commence Case 2 and, moreover, the Roglieri Trustee had ratified the Receiver's filing of Case 2 on behalf of the Debtor. *Id.* at Docket No. 76.  That same day, the Receiver filed his opposition to the Case 2 Motion to Dismiss, arguing that (i) the Receiver was authorized to commence Case 2 pursuant to the Receiver Order because the Receiver was granted "exclusive dominion and control over all of the assets, books and records, operations, and business affairs of the Debtor", (ii) the Motion to Dismiss is moot because of the Trustee Ratification, and (iii) the B&R Parties lack standing to bring the Motion to Dismiss because the Supreme Court has held that creditors lack standing to challenge a debtor's authority to file bankruptcy. *Id.* at Docket No. 77.

On July 17, 2024, the Bankruptcy Court held a hearing to consider the Case 2 Motion to Dismiss and on July 23, 2024 the Bankruptcy Court issued a Memorandum Decision and Order (the "Case 2 Dismissal Order"), wherein the Bankruptcy Court granted the Case 2 Motion to Dismiss, finding that the Receiver did not have the authority to file Case 2 on behalf of the Debtor. *Id.* at Docket No. 85.  In addition, the Bankruptcy Court determined that the Trustee Ratification was ineffective and, therefore, did not cure the deficiency and, as a result, dismissal under section 1112(b) of the Bankruptcy Court was required.

On July 29, 2024, the Receiver, the Debtor, the Roglieri Trustee, and Compass (collectively, the "Appellants") jointly filed a notice of appeal of the Case 2 Dismissal Order (the "Appeal"). *Id.* at Docket No. 89.  The Appeal was pending before the District Court under Case No. 24-cv-939.  The following were the issues on appeal:

1.      Whether the Bankruptcy Court erred when it held that under Delaware law and the Debtor's operating agreement, the Roglieri Trustee had no authority to participate in the management of the Debtor and therefore ratify and validate the Debtor's bankruptcy case.

2.      Whether the Bankruptcy Court erred when it held that the Roglieri Trustee's ratification of the Debtor's bankruptcy case (Case 2) was not effective to validate the Debtor's bankruptcy case.

On August 15, 2024, the District Court denied the Appellants' motion for a stay pending the Appeal. *See* Docket No. 21, Case No. 24-cv-939.

On August 20, 2025, the District Court entered a decision (the "District Court Decision") affirming in part and vacating in part the Dismissal Order and remanding the matter to the

11

Bankruptcy Court to dismiss Case 2 for the reasons set forth in the District Court Decision. On September 4, 2025, the Bankruptcy Court directed the Clerk of the Court to close Case 2. On November 4, 2025, Case 2 was closed.

### v.    Roglieri's Criminal Case – Case No. 24-CR-00392 (N.D.N.Y District Court)

On May 28, 2024, a criminal complaint was filed by the United States of America (the "Government"), by and through the United States Attorney's Office, Northern District of New York (the "U.S. Attorney") against Roglieri commencing Case No. 24-cr-00392 (MAD) (N.D.N.Y.) (the "Roglieri Criminal Case"), wherein he is charged with five counts of wire fraud in violation of 18 U.S.C. § 1343, and for forfeiture of assets pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c). *Id.* at Docket No. 1 and Indictment at Docket No. 35 (Sept. 19, 2024). In the Roglieri Criminal Case, the government alleges, among other things, that Roglieri and others used the Debtor to operate a fraud and money laundering scheme. *Id.* at Docket No. 1, ¶4.

Roglieri was arrested on May 31, 2024. *Id.* at Docket. No. 12. Roglieri has been incarcerated since his arrest and his requests to modify his detention orders have been denied. *Id.* at Docket Nos. 32, 58, 71, 80.

On November 13, 2025, a plea agreement was filed, wherein Roglieri changed the previously-entered plea of not guilty and plead guilty to Count 1 charging conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1349, 1343. *Id.* at Docket No. 90 (the "Roglieri Plea").

Roglieri's sentencing is currently scheduled for March 11, 2026. *Id.* at Docket No. 91.

### vi.    Debtor's Case 3 – Case No. 24-11029 (REL) (Bankr. N.D.N.Y)

The Roglieri Trustee, who at the time was in possession and control of all membership interests of the Debtor by and through the Roglieri Bankruptcy Estate, exercised the necessary powers and executed the necessary documents to assume control of the Debtor. On September 16, 2024, the Roglieri Trustee, in his capacity as the authorized agent for the Debtor, filed a voluntary bankruptcy petition on behalf of the Debtor for relief under chapter 11 of the Bankruptcy Code. The Roglieri Trustee intended to use Case 3 as a legitimate and potentially only viable method of collecting the Debtor's assets, pursuing claims on behalf of the Debtor's estate, and distributing those assets to the Debtor's numerous and varied creditors.

On May 6, 2025, the Bankruptcy Court entered an order to show cause why a Chapter 11 trustee should not be appointed in this Chapter 11 Case. Docket No. 233. Among other things, the Court cited issues of potential conflict over that certain Richard Mille Tourbillion watch and potential competing claims to the watch by the Debtor's and Roglieri's estates.

In or around May 23, 2025, the Roglieri Trustee resigned and on May 27, 2025, the Successor Roglieri Trustee was appointed. On June 3, 2025, the Successor Roglieri Trustee filed a consent to the appointment of a chapter 11 trustee in the Debtor's case. Docket No. 280. On June 5, 2025, the Court entered an order directing the U.S. Trustee to appoint a chapter 11 trustee

12

[Docket No. 282], and that same day the U.S. Trustee appointed the Trustee [Docket No. 285], which appointment was confirmed by order of the Bankruptcy Court on June 10, 2025 [Docket No. 287]. The Trustee has been serving in that capacity since that time.

### vii. Government's Civil Forfeiture Case – Case No. 24-cv-1345 (N.D.N.Y. District Court)

Related to the Roglieri Criminal Case, on November 5, 2024, the Government filed a verified complaint for forfeiture *in rem*, commencing Case No. 24-cv-1345 (MAD/DJS) (N.D.N.Y.) (the "Civil Forfeiture Case"), wherein the Government seeks the forfeiture of Roglieri's assets pursuant to 18 U.S.C. §§ 981(a)(1)(A-C). The action was commenced against various assets owned by Roglieri, including luxury automobiles, cash, and watches, as proceeds of offenses in violation of 18 U.S.C. §§ 1343 and 1439 (wire fraud and wire fraud conspiracy), and as property involved in offenses in violation of 18 U.S.C. §§ 1956 and 1957 (money laundering). As part of the Civil Forfeiture Case, the Government provided a detailed report of the Debtor's financial accounts and the misuse of the Debtor's funds by Roglieri. On January 15, 2025, the Government filed an amended verified complaint for forfeiture *in rem* to include certain real property to the civil forfeiture action.

It is commonplace for the Government to pursue claims for criminal and civil forfeiture of assets in tandem (the Government's claims for both criminal and civil forfeiture of Roglieri's or the Debtor's assets are collectively referred to herein as the "Forfeiture Claims"). Criminal Forfeiture Claims are *in personam*, or against the person, and require the Government to obtain a criminal conviction against Roglieri in order to be successful. The burden of proof for the criminal conviction of Roglieri is beyond a reasonable doubt. Criminal forfeiture is limited to the property interests of Roglieri, including any proceeds earned by Roglieri's alleged illegal activity. Criminal forfeiture is generally limited to the property involved in the particular counts on which the defendant is convicted. If Roglieri is convicted, as part of sentencing, the District Court may order the forfeiture of specific property listed in the indictment, a sum of money as a money judgment, or other property as substitute property. The Government must establish by a preponderance of the evidence the requisite connection between the crime of conviction and the asset. After a preliminary order of forfeiture is entered, a separate, ancillary proceeding begins to determine any third-party ownership interests in the property the government seeks to forfeit. The District Court then will enter a final order of forfeiture.

On the other hand, civil Forfeiture Claims are *in rem*, or against the named property that was derived from or used to commit an offense, rather than against a person who committed an offense. Unlike criminal Forfeiture Claims, there is no criminal conviction of Roglieri required, although the Government is still required to prove in court by a preponderance of evidence that the property was linked to criminal activity (as opposed to the heightened beyond a reasonable doubt standard in the Roglieri Criminal Case to be successful in the criminal Forfeiture Claims). The Civil Forfeiture Case allows the District Court to gather anyone with an interest in the property in the same case and resolve all the issues with the property at one time. In the Civil Forfeiture Case, the Government is the plaintiff, the named property is considered the defendants,

and any person who claims an interest in the property is a claimant.[6]  Civil forfeiture allows the Government to file cases against property that would not be reachable through criminal Forfeiture Claims, such as property of fugitives, terrorists, and other criminals located outside the United States.

If the Government is successful with respect to any of its Forfeiture Claims, the subject property will be deemed property of the Government and all third-party rights, including those of Prime, Roglieri, or their respective bankruptcy estates, will be fully and finally extinguished (such property defined herein as "Forfeited Property").  While the Government may use the proceeds of Forfeited Property for a wide variety of purposes[7], returning forfeited funds to victims has been a key part of the Department of Justice's Asset Forfeiture Program.  In connection with that, the Government employees are required to "make their best efforts to see that crime victims are notified of, and accorded, the rights described in" the Crime Victims' Rights Act,[8] which includes the "right to full and timely restitution as provided in law."[9]  This process is handled by Money Laundering and Asset Recovery Section of the U.S. Department of Justice ("MLARS").

A person eligible for remission of Forfeited Property from MLARS may be an individual, partnership, corporate, joint business enterprise, estate, or other legal entity capable of owning property (an "Alleged Victim," and once entitlement is proven or accepted, a "Victim").  Any Alleged Victim cannot (i) have knowingly contributed to or benefited from the underlying criminal offense, (ii) have been compensated or have recourse to other reasonably available assets or compensation, or (iii) seek recovery for torts that are associated with the offense but are not the

---

[6] The property named in the Civil Forfeiture Case (the "Forfeiture Property") includes: (i) one 2003 Ferrari Enzo AB Version E (VIN #ZFFCZ56B000132659); (ii) one 2014 Ferrari LaFerrari (VIN #ZFF76ZHB000203166); (iii) one 2022 Mercedes Benz (VIN #W1NYC8AJXNX445045; (iv) one 1982 Mercedes Benz 500SL (VIN #WDB10704612001675); (v) one 1989 Mercedez Benz 560 SEL (VIN #WDB1260391A497466; (vi) one 2007 Mercedes Benz SLR McLaren (VIN #WDDAJ76F27M001391); (vii) one 1987 Mercedes Benz 560 (VIN #WDB1260451A315331); (viii) one 2004 Porsche Carrera (VIN #WP0ZZZ98Z4L000069); (ix) one 2022 Ferrari 812 Competizione (VIN #ZFF03TLA5N0277054); (x) one 2020 Mercedes Benz GT63C4S (VIN #WDD7X8KB3LA012445); (xi) one 2006 Maserati MC 12 Corse (VIN #ZAMDF44B000029626); (xii) one 2023 Mercedes Benz (VIN #W1K6X7KB5PA204980); (xiii) one Ferrari Engine Table; (xiv) $223,365 seized from a Thread Bank account (**7554) held in the name of ABBJ, LLC; (xv) $467,810 seized from a Thread Bank account (**1832) held in the name of Capital Investments US, LLC; (xvi) refund in the amount of $72,825.83 seized from Ai Design; (xvii) one Richard Mille RM011 watch (#2722); (xvii) one Richard Mille RM 65-01 watch; (xviii) one Rolex watch (#Y74R6549); (xix) one Rolex watch (#7P65S042); (xx) one Rolex watch (#0WU66577); (xxi) one Rolex watch (#65R11547); (xxii) one Rolex watch (#8S927086); and (xxiii) the real property commonly known as 600 Linkhorn Drive, Virginia Beach, VA 23451.

[7] For example, the Government has used the proceeds of forfeited property to finance an array of services and equipment, including: (i) a drug and alcohol treatment facility; (ii) transportation to drug treatment services; (iii) Naloxone rescue kits for opioid overdose victims; (iv) a job skills program; (v) a youth program aimed at drug and crime prevention; (vi) afterschool programming; (vii) bomb-sniffing canines; (viii) 911 call center equipment; (ix) care for abused and rescued animals seized for forfeiture; (x) gun buy-back programs; (xi) personal protective equipment for first responders; (xii) community and crime-fighting organizations (xiii) community gardens and public service projects; (xiv) upgraded technology and devices for local police departments; (xv) forensic training programs for law enforcement; (xvi) housing initiative funding; (xvii) garbage and pesticide removal from public lands. https://www.fbi.gov/investigate/white-collar-crime/asset-forfeiture (last visited Dec. 17, 2024).

[8] 18 U.S.C. § 3771(c)(1).

[9] Dep't of Justice, Office for Victims of Crimes, Attorney General Guidelines for Victim and Witness Assistance Art. V.H. (2011 ed., rev. May 2012) (citing 18 U.S.C. §3771(a)(6)).

bases for forfeiture.[10]  A Victim can only recover the amount of their eligible pecuniary loss which is limited to the fair market value of the property as of the date of the occurrence of the loss.[11] Thus, a Victim generally cannot recover interest on their loss or additional forms of damages and remedies that may otherwise be available to them in a civil suit against the perpetrator.[12]  A successful petition by an Alleged Victim requires documentary evidence of the pecuniary loss.

To seek remission, an Alleged Victim must complete a petition for remission and submit it to the U.S. Attorney.[13]  The U.S. Attorney and MLARS are responsible for adjudicating the petitions of Alleged Victims.  If a petition is denied, an Alleged Victim may request reconsideration from MLARS or, if applicable, the U.S. Attorney, within 10 days of receipt of the denial notification, in which case the reconsideration request will be heard by a different official in the agency, but in each case the agency is the arbiter of who qualifies as a Victim and the amount of the Victim's pecuniary loss.[14]  Funds are generally distributed to the Victims on a pro rata basis in accordance with the amount of loss suffered by each Victim.[15]  The agency however has discretion to give priority to particular victims in appropriate circumstances.

###### viii.    Snyder's Criminal Case – Case No. 25-CR-00195 (N.D.N.Y District Court)

On May 16, 2025, a criminal complaint was filed by the Government, by and through the U.S. Attorney, against Snyder commencing Case No. 25-cr-00195 (MAD) (N.D.N.Y.) in connection with alleged criminal conduct in connection with the operation of the Debtor (the "Snyder Criminal Case").  Immediately following commencement of the Snyder Criminal Case, Snyder entered into a plea agreement (the "Snyder Plea") pursuant to which he pled guilty to one count of conspiracy to commit wire fraud in violation of 18 U.S.C. §§ 1343 and 1349, and consented to the entry of a restitution judgment in the amount of $233,000.  *Id.* at Docket No. 3.

Snyder's sentencing is currently scheduled for April 16, 2026.  *Id.* at Docket No. 18.

###### ix.    Humphrey's Criminal Case – Case No. 25-CR-00238 (N.D.N.Y. District Court)

On June 10, 2025, a criminal complaint was filed by the Government, by and through the U.S. Attorney, against Humphrey commencing Case No. 25-cr-00238 (MAD) (N.D.N.Y.) in connection with alleged criminal conduct in connection with the operation of the Debtor and an unrelated health care fraud scheme (the "Humphrey Criminal Case").  Immediately following commencement of the Humphrey Criminal Case, Humphrey entered into a plea agreement (the "Humphrey Plea") pursuant to which she pled guilty to one count of conspiracy to commit wire fraud in violation of 18 U.S.C. §§ 1343 and 1349, one count of health care fraud in violation of 18

---

[10] 28 C.F.R. § 9.8(b), (c).
[11] 28 C.F.R. § 9.8(c).
[12] *See* 28 C.F.R. § 938(b)(1), (c).
[13] MLARS' public website provides a sample petition and instructions for completing and filing the petition on line. *See Petitions*, FORFEITURE.GOV, https://www.forfeiture.gov/FilingPetition.htm (last visited December 17, 2024).
[14] 28 C.F.R. § 9.4(k).
[15] 28 C.F.R. § 9.8(f).

U.S.C. § 1347, and consented to the entry of a restitution judgments in the amounts of $512,500 and $486,194.68 in connection with each count, respectively. *Id.* at Docket No. 4.

Humphrey's sentencing is currently scheduled for April 17, 2026. *Id.* at Docket No. 21.

## C. The Debtor was a Classic Ponzi Scheme

In a Ponzi scheme, multiple victims are defrauded over the course of months or years, and the perpetrator forestalls discovery of the scheme by using newer victims' money to pay back earlier-in-time victims. Payouts are used to create the appearance of a legitimate, money-making enterprise; however, in reality, investors are the only source of funding and the person(s) involved in the Ponzi scheme will siphon off investor funds for their own personal gain. *See Securities Fraud Awareness & Prevention Tips*, FBI.gov.[16] "Ponzi schemes have no exact definition, since they manifest a kaleidoscopic variety of configurations." Honorable Dorothy T. Eisenberg, Nicholas W. Quesenberry, *Ponzi Schemes in Bankruptcy*, 30 Touro Law Review p. 502. "Thus, 'courts look for a general pattern, rather than specific requirements.'" *Id.*, citing *Manhattan Inv. Fund, Ltd. V. Gredd (In re Manhattan Inv. Fund, Ltd.)*, 397 B.R. 1, 12 (S.D.N.Y. 2007) (stating there is no precise ponzi scheme definition).

Some courts use a four-factor test in determining whether a Ponzi scheme exists and consider whether: "1) deposits were made by investors; 2) the Debtor conducted little or no legitimate business operations as represented to investors; 3) the purported business operation of the Debtor produced little or no profits or earnings; and 4) the source of payments to investors was from cash infused by new investors." *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 531 B.R. 439, 471 (Bankr. S.D.N.Y. 2015). Other courts identify "badges of fraud," "including the absence of legitimate business connected to the investment program, the unrealistic promises of low risk and high returns, commingling investor money, the use of agents and brokers paid high commissions to perpetuate the scheme, misuse of investor funds, the 'payment' of excessively large fees to the perpetrator and the use of false financial statements." *Gowan v. Amaranth Advisors LLC (In re Dreier LLP)*, No. 08-15051, 2014 WL 47774, at *9 (Bankr. S.D.N.Y. Jan. 3, 2014); *see Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff)*, 528 F. Supp. 3d 219, 237-41 (S.D.N.Y. 2021), *aff'd sub nom., Picard v. Jaba Assocs. LP, 49 f.4TH 170 2D Cir. 2022).*

In the end, and most significantly, "the label 'Ponzi scheme' has been applied to *any sort of inherently fraudulent arrangement under which the debtor-transferor must utilize after-acquired investment funds to pay off previous investors in order to forestall disclosure of the fraud*." *Bayou Superfund, LLC v. WAM Long/Short Fund II, L.P. (In re Bayou Group, LLC)*, 362 B.R. 624, 633 (Bankr. S.D.N.Y. 2007) (emphasis added).

The Debtor had all the classic hallmarks of a Ponzi scheme. *First*, the Debtor received deposits from investors in the form of ICA Deposits. The intention of making such deposits was to secure future funding which did not materialize in an overwhelming majority of the cases. *Second*, the Debtor conducted little or no legitimate business operations as represented to those who made the ICA Deposits. The Debtor appears to have taken in at least $100 million in ICA

---

[16] https://www.fbi.gov/stats-services/publications/securities-fraud (last visited Nov. 15, 2024).

Deposits from over 20 potential third-party borrowers.  At the same time, it only closed on 5 loans.
The value of its loan portfolio is still being assessed.  *Third*, the business operation of the Debtor
produced little or no profits or earnings.  All profits were to be interest earned on loans made
prefunded by the borrower's corresponding ICA Deposit.  However, the Debtor never had a
sufficient loan portfolio to produce any profits.  Moreover, the Debtor never booked any profits
and never filed tax returns declaring any profits.

Indeed, the Debtor was, since its very inception, based upon a fraudulent premise.  In order
to sell a business model that seemed entirely impossible if properly understood, and to get
prospective borrowers to give the Debtor new ICA Payments, the Debtor had to demonstrate that
it actually made loans.  It did this by, among other ways, fraudulently claiming to have made a
"$188,000,000 funding of ALUX Properties, LLC and their project 'The Bailey' which will be the
only 5-star hotel in Atlanta".[17]  The Debtor made a glitzy promotional video published on YouTube
where it boasted about making this loan.  The video featured Roglieri and others trapsing around
the wooded area in Atlanta where "The Bailey" was going to be constructed.  The alleged principal
of ALUX Properties, LLC ("ALUX"), Brandon Wheeless, expressed his appreciation in the video
stating that "access to this type of capital with trusted individuals that you close deals with
definitely makes life a heck of a lot easier for us and the company so we are fast-tracking to grow
at an exponential rate moving forward."[18]  The problem, of course, is that the Debtor never made
any such loan to ALUX.  There is no "The Bailey" hotel in Atlanta and there is no sign that there
was ever actually going to be.  According to the Debtor's books and records, Brandon Wheeless,
the purported principal of ALUX and third-party borrower of the Debtor, was actually on the
Debtor's payroll and received a total of $200,000 from the Debtor between July 7, 2022 and
September 18, 2023.  Thus, the Debtor was founded upon a false premise and the Debtor Insiders
never had any intention of operating a legitimate lending enterprise.

Finally, and most significantly, the source of payments to the Debtor's prospective
borrowers and ICA Depositors was from cash infused by new investor/borrowers.  For example:

- 526 Murfreesboro delivered a $4,312,500 ICA Deposit to the Debtor on April 7, 2023.
  On April 17, 2023, the Debtor used $2,000,000 of that ICA Deposit to repay a prior
  portion of the ICA Deposit received in September 2022 from borrower Onward

---

[17]    *See* Prime Commercial Lending, Prime Capital Ventures & The Bailey [Video], May 16, 2022,
https://www.youtube.com/watch?v=A4_RKBepUkA (YouTube) at 0:13:



*See also,* Prime Commercial Lending, March 17, 2022, Albany, New York's Prime Commercial Lending Funds the
First 5-Star Hotel in Atlanta, GA Through Prime's Real Estate Fund, Prime Capital Ventures, [Press release].
[18]  *See* Id. at 3:44 (transcribed by counsel).

Partners LLC, and another $2,000,000 of that ICA Deposit to repay a prior portion of the ICA Deposit from another client identified as "Business-1" by the Government.[19] Thus, the near entirety of 526 Murfreesboro's ICA Deposit was used to repay prior borrower/investors.

- Compass delivered a $15,902,250 ICA Deposit to the Debtor on April 27, 2023, and HCW Biologics Inc. ("HCW") delivered a $5,250,000 ICA Deposit to the Debtor that same day. Compass and HCW's ICA Deposits were commingled and were used for the following purposes, among others, not related to those borrowers: (i) $6,525,669.33 was used to fund a preexisting overdraw in the Debtor's bank account (Citibank No. **6945); and (ii) $3,700,000 was transferred to a law firm and used, upon information and belief, in connection with another loan.

- Newlight delivered a $2,500,000 ICA Deposit to the Debtor on May 24, 2023, which was largely used for unrelated purposes in the one week period that followed.[20]

The Debtor's Ponzi scheme is also consistent with what the U.S. Securities and Exchange Commission has dubbed a fraudulent advance fee scheme. In such a scheme, the perpetrator gets the victim to pay an upfront fee based on the promise that the fee will enable large sums of money to flow to the victim. After the victim sends the fee, the perpetrator keeps the fee and never delivers the promised loan, windfall, etc. *See Updated Investor Alert: Be on the Lookout for Advance Fee Fraud*, SEC.gov.[21] This is precisely what the Debtor was doing here.

While conducting its fraudulent advance pay/Ponzi scheme, the Debtor's principal lavishly spent significant amounts of the Debtor's funds derived from prospective borrowers' ICA Deposits on himself. Among other things, the Debtor purchased or funded the following purchases, among many others, for the principal personal benefit of Roglieri:

- $916,201 in private jets from June 2022 to October 2023;

- $1,778,154.77 to Ai Design, a high-end automotive shop from December 2022 to October 2023;

- $3,194,454 to purchase a rare Mercedes-Benz "hybercar", which never materialized;

- $3,672,067.50 to purchase the Virginia Beach Property;

- $2,225,000 to purchase a single wristwatch called "RM-52-01 Tourbillion Skull";

- $4,729,745 to RM Sotheby's to purchase a 2003 Ferrari Enzo AB Version E and a 2014 Ferrari LaFerrari;

---

[19] *See* Civil Forfeiture Case Complaint, Dkt. No. 1, ¶39.

[20] *See Id.* at ¶60-62.

[21] https://www.sec.gov/resources-for-investors/investor-alerts-bulletins/ia_lookforaff (last visited Nov. 15, 2024).

- $260,810 for a table constructed using a Ferrari V-12 engine;

- $2,076,900 for the combined purchase of a 1982 Mercedes Benz 500SL, a 1989 Mercedes Benz 560 SEL, a 2007 Mercedes Banz SLR McLaren, and a 1987 Mercedes Benz 560;

- $1,300,000 to TopGear Imports for a 2004 Porsche Carrera;

- $2,055,312 to Wide World Farrari for a 2022 Ferrari 812 Competizione;

- $3,811,000 to Bonhams Butterfields Trust for the purchase of a 2006 Maserati MC 12 Corse;

- $355,000 to Timepiece Trading for the purchase of a Richard Mille RM 65-01 watch; and

- $260,000 to Luxury Bazaar for the purchase of two Rolex watches.

There is no basis to dispute that the Debtor was at all relevant times an advance fee/Ponzi scheme, but perhaps the most compelling admission is found in text messages between Roglieri and an undisclosed individual as follows:

| Date | Time | From | Message |
|------|------|------|---------|
| 1/4/2024 | 11:20:42 am | Unknown | Can't you just keep working on those companies? <br> I know it might be hard at first, but look what you build this up to beat from nothing |
| 1/4/2024 | 11:20:56 am | Roglieri | Yea I can but not when I'm in f—king prison |
| 1/4/2024 | 11:21:09 am | Unknown | Why do you think that's gonna happen? <br> Why can't it just be a bankruptcy? |
| 1/4/2024 | 11:21:47 am | Roglieri | Because I unused others money to fund deals <br> I already told you this |
| 1/4/2024 | 11:22:02 am | Unknown | And that's illegal? |
| 1/4/2024 | 11:22:15 am | Roglieri | Yes |
| 1/4/2024 | 11:22:36 am | Unknown | How bad .  I mean, what's the worst you do a couple years who cares <br> You have your family <br> This whole family will support you through this <br> It's a civil case it's not a criminal case |
| 1/4/2024 | 11:27:42 am | Roglieri | **It will turn criminal as soon as they get into bank statements** |

Roglieri Criminal Case, Docket No. 6-1 (June 3, 2024) (emphasis added) (typographical and grammatical errors in original).

The plea agreements entered into by the Debtor Insiders contain numerous admissions that support the contention that the Debtor was at all times an advance fee/Ponzi scheme as follows:

- Roglieri admitted that he and Humphrey "began claiming that [the Debtor] had the present ability to make large commercial loans, including loans in the tens of millions of dollars, through funding agreements with third-party hedge funds. As the defendant knew at all relevant times, [the Debtor] had obtained no funds of its own and never had the present ability to independently make commercial loans of any size, and funding was based on possible third-party sources and funding agreements." Roglieri Plea, p.8, § 5(c); Humphrey Plea, p.6, §5(b) and (g).

- Despite representations to prospective borrowers to the contrary ICA Deposits "were not deposited into a pledged account or accounts", "were not used to cover interest payments on loans", and portions of ICA Deposits were used to "fund [Roglieri's] purchases of luxury goods". Roglieri Plea, pp.8-9, §5(e); Humphrey Plea, p.9, §5(i).

- "Because [the Debtor] never ultimatey secured a proven, demonstrated or realized a source of loan funding, [Roglieri and the other Debtor Insiders] used ICA [Deposits] from newer borrower clients to partially fund loans to, and to refund ICA [Deposits] to, older borrower clients." Roglieri Plea, p.10, §5(g).

The Trustee is seeking a finding that the Debtor Insiders were conducting an advance fee/Ponzi scheme by and through the Debtor.

## III.    SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE

### A.    Retention of Professionals

On October 16, 2024, the Bankruptcy Court entered an order granting the application to employ Klestadt Winters Jureller Southard & Stevens ("KWJS&S") as general counsel to the Debtor effective as of September 16, 2024 [Docket No. 37].

Also on October 16, 2024, the Bankruptcy Court entered an order granting the application to employ RK Consultants, LLC as financial advisors to the Debtor effective as of September 16, 2024 [Docket No. 38].

On July 15, 2025, the Bankruptcy Court entered an order granting the application to employ Geron Legal Advisors LLC as general bankruptcy counsel to the Trustee effective as of June 5, 2025 [Docket No. 309].

On June 16, 2025, the Trustee filed an application to retain KWJS&S as special litigation counsel to the Trustee effective as of June 6, 2025 (the "KWJS&S Retention Application") [Docket No. 292]. On July 15, 2025, the Bankruptcy Court entered an order granting the KWJS&S Retention Application (the "KWJS&S Retention Order") [Docket No. 310].[22]

---

[22] The KWJS&S Retention Order that was entered was KWJS&S's retention order as counsel to the Debtor. The Trustee will be seeking a correction of the KWJS&S Retention Order.

**B.  Schedules of Assets and Liabilities, Statement of Financial Affairs**

On September 16, 2024, the Debtor filed schedules of assets and liabilities and a statement of financial affairs [Docket No. 1].

The Debtor's Schedules listed the following assets, among others:

### i.  Cash

As of the Petition Date, the Debtor had cash held at Citibank, N.A. ("Citibank") and M&T Bank ("M&T") in the aggregate amount of approximately $1.9 million.  Since the beginning of the Chapter 11 Case, the Debtor has been engaged in discussions with Citibank regarding the transfer of funds held at Citibank, totaling approximately $750,000 (the "Debtor Funds"), from the Debtor's account to the Debtor's DIP account.  On December 30, 2024, the Debtor filed a motion seeking entry of an order directing Citibank to turn over to the Debtor the Debtor Funds.  *See* Case 3, Docket No. 103.  On January 29, 2025, the Court entered an order directing Citibank to turnover the Debtor Funds to the Debtor.  *Id.* at Docket No. 135.  On February 3, 2025, the Debtor Funds were released to the Debtor.

The funds held at M&T in the approximate amount of $1.2 million were turned over to the Debtor by the Receiver (the "Remaining ER Funds").  The Trustee currently has possession, custody and control of the Remaining ER Funds.  The source of the Remaining ER Funds was a bank account at RBC Bank in the Debtor's name that exclusively held the ICA Deposit of 1322 Developments, LLC, which was funded by ER Tennessee LLC ("ER Tennessee").  ER Tennessee has asserted that it has a superior claim to the Remaining ER Funds under the theory that the Remaining ER Funds were held in an express or constructive trust, and that accordingly, the Remaining ER Funds should be turned over to ER Tennessee.  If ER Tennessee were successful in its trust claim, the Debtor's Estate would be deprived of the use of the Remaining ER Funds.  The Trustee disputes ER Tennessee's claims.

On April 17, 2025, ER Tennessee filed a complaint against the Debtor seeking a declaratory judgment in favor of ER Tennessee and against the Debtor that: (i) the Remaining ER Funds are not property of the Debtor's bankruptcy estate, but rather are being held in trust for the benefit of ER Tennessee; (ii) that the Debtor holds, at best, mere legal title to the Remaining ER Funds and not an equitable interest in them; (iii) any claimed exemption in the ER Tennessee Funds is invalid because the Remaining ER Funds are not property of their estate; and (iv) an express trust be imposed and the Remaining ER Funds be turned over to ER Tennessee.  *See ER Tennessee LLC v. Prime Capital Ventures, LLC*, Adv. Pro. No. 25-90008, Docket No. 1.

ER Tennessee and the Trustee have discussed ER Tennessee's claims and the Trustee's defenses at length and in good faith and have reached an agreement to resolve these issues as set forth in that certain *Stipulation Settling and Resolving Adversary Proceeding and Claims* (the "ER Tennessee Stipulation").  In summary, the Stipulation provides for the following:  (1)  the Remaining ER Funds will be divided and released as follows: (a) $749,021.90 (60%) to ER Tennessee; and (b) $499,347.94 (40%) to the Debtor's bankruptcy estate; (2) the Debtor's bankruptcy estate will have the exclusive right to pursue the recovery of any of the ER Funds that were transferred by Prime to third parties as fraudulent transfers or otherwise; (3) ER Tennessee

will assign all of its third-party claims, if any, against the Debtor's former attorneys, auditors, or other professionals, and any financial institutions used by the Debtor or its management, for aiding and abetting the Debtor and its management in the conduct of their fraudulent scheme; and (4) ER Tennessee's claim against the Debtor's bankruptcy estate will be fixed and allowed as a general, unsecured claim in the amount of $15,024,307.86. On November 25, 2025, the Trustee filed a motion pursuant to Bankruptcy Rule 9019 seeking approval of the ER Tennessee Stipulation. *Id.* at Docket No. 15.

### ii. Virginia Beach Property

The Debtor purchased the Virginia Beach Property, located at 600 Linkhorn Drive, Virginia Beach, Virginia 23451 on or about January 31, 2023 for $3,750,000 in cash. The Virginia Beach Property was intended to be used by Humphrey as a temporary residence. *See* Humphrey Plea, p.13, §5(q). As detailed in Section III(F) below, the U.S. Attorney filed an amended complaint in the Civil Forfeiture Case naming the Virginia Beach Property as additional property subject to civil forfeiture. Civil Forfeiture Case, Docket No. 20-1. Roglieri admitted that the Virginia Beach Property is subject to forfeiture in his plea agreement. Roglieri Plea, pp.23-24, §(H).

### iii. Loan Receivables

The Loan Receivables consist of the loans funded by the Debtor, in whole or in part, to third parties including, but not limited to, the following parties: (i) Indigo Pharmaceutical LLC, (ii) Norwell Ventures LLC, and (iii) additional parties that the Trustee is investigating. The value of the Loan Receivables is currently unknown.

### iv. Richard Mille Watch

The Richard Mille Skull Tourbillon watch purchased by the Debtor for $2,225,000 in January of 2023. *See* Receivership Action, Docket No. 61, ¶5. The Richard Mille Watch is currently stored in a safe deposit box at M&T Bank. The Trustee and Successor Roglieri Trustee are currently in discussions over the insurance and storage of the watch, and the settlement of each estate's competing claims over title to the watch.

### v. Causes of Action

As a result of the Debtor's Ponzi scheme, the Trustee is entitled to a legal presumption that any transfers by the Debtor were done in furtherance of the Ponzi scheme and are thereby actual fraudulent transfers subject to avoidance pursuant to section 548(a)(1)(A) of the Bankruptcy Code, and under other theories of recovery under both federal and state law. Even absent a Ponzi presumption, the Trustee believes that a significant portion of the transfers made by the Debtor are independently subject to avoidance as actual or constructive fraudulent transfers. The Trustee intends to seek the recovery of transfers of the Debtor's property so that they can be distributed pro rata to all general unsecured creditors.

The Trustee and the Debtor's creditors may also have Causes of Action against parties with knowledge of, association with, participation in, or recipients of the Debtor's alleged fraudulent

activities including, among others, insiders and affiliates of the Debtor, professional firms, and financial institutions.  As part of the Plan, the Trustee will seek the voluntary assignment of such claims from creditors in exchange for the right to share in any recoveries as a result of those claims.

Separately, prior to the Petition Date, on February 15, 2023, the Debtor filed a complaint against Reign Financial International, Inc. ("Reign") in the District Court commencing Case No. 23-cv-207 (FJS/DJS) seeking the recovery of $20,000,000 allegedly due and owing to the Debtor based upon a breach of a certain Trade Agreement for Prime Capital Ventures, LLC, dated October 3, 2022 (the "Reign Action").  On March 9, 2023, the Debtor filed an amended complaint (the "Reign Complaint") against Reign, Giorgio Johnson ("Johnson"), Gary Mills ("Mills") and Martin Karo ("Karo") asserting the following claims:  (i) fraud against all defendants, (ii) fraudulent concealment against Reign, Mills and Johnson, (iii) breach of contract against Reign, and (iv) conversion against Reign.  *See* Reign Action, Docket No. 8.  According to the Debtor, the defendants in the Reign Action induced the Debtor to deposit $20,000,000 with Berone Capital Fund, L.P. under the pretense that the funds would be used by Reign to participate in a program involving private placement programs.  *Id.* at ¶ 12.

## C.  **Creditor Claims and the Bar Date for Filing of Claims Arising Prior to the Petition Date**

The Schedules filed by the Debtor on September 16, 2024 listed the following amounts outstanding: (i) secured claims totaling approximately $4.34 million, of which $4.3 million is listed as contingent and disputed, (ii) priority tax claims totaling approximately $1.5 million, which are listed as contingent, unliquidated and disputed, and (iii) approximately fifty (50) unsecured claims totaling approximately $240 million, all of which are listed as contingent, unliquidated, and disputed [Docket No. 3].  Each claim scheduled by the Debtor is referred to as a "Scheduled Claim," and collectively, "Scheduled Claims".

On September 26, 2024, the Bankruptcy Court entered an amended order (the "Bar Date Order") [Docket No. 29] fixing a deadline (the "Bar Date") and establishing procedures for filing proofs of claim against the Debtor and its bankruptcy estate pursuant to Bankruptcy Rule 3003(c)(3).  The Bar Date Order fixed December 16, 2024 as the bar date by which all Claims which arose prior to September 16, 2024, other than for governmental units, with respect to the Debtor had to be filed.  The Bar Date Order also set a bar date of March 17, 2025 with respect to governmental entities.

In accordance with Bankruptcy Rule 3003(c)(2), holders of Claims who failed to comply with the terms of the Bar Date Order, are forever barred from (i) filing a proof of claim with respect to such Claim, (ii) asserting such Claims against the Debtor or its Estate and property, (iii) voting on any plan filed in this Chapter 11 Case, and (iv) participating in any Distribution in the Chapter 11 Case on account of such Claims.

As of the date of this Disclosure Statement, a total of thirty-one (31) claims were filed against the Debtor and its bankruptcy estate.  The claims asserted the following amounts: (i) secured claims in the amount of approximately $10 million; and (iii) unsecured claims in the amount of approximately $238 million.

The Trustee has been working to reconcile the Scheduled Claims and proofs of Claim filed to determine which, if any, warrant objection. As set forth in the Plan, the Plan Administrator shall have the right to object to Claims in accordance with section 502(a) of the Bankruptcy Code following confirmation of the Plan.

### D. <u>Abandonment of Certain Claims</u>

Following the hearing held on September 25, 2024, the Debtor submitted for the Court's consideration proposed orders (1) (i) confirming the Debtor's abandonment of any claims against the Petitioning Creditors on account of their commencement of Case 1, and (ii) dismissing the Bond Motion and (2) dismissing Case 1. *See* Case 3, Docket No. 28. On October 2, 2024, the Bankruptcy Court entered an order (i) authorizing the Debtor's abandonment of any claims against the Petitioning Creditors in connection with their filing of Case 1 and (ii) withdrawing the Bond Motion, unless an objection is filed with the Bankruptcy Court by no later than October 16, 2024 (the "<u>Abandonment Order</u>"). *Id.* at Docket No. 31. On October 15, 2024, Roglieri filed an objection to the Abandonment Order (the "<u>Roglieri Objection</u>"). *Id.* at Docket No. 39. On October 25, 2024, the Debtor filed its response to the Roglieri Objection. *Id.* at Docket No. 43. On November 6, 2024, Hogan Lovells, as an alleged creditor of the Debtor, filed an objection to the proposed abandonment couched as a response to the Roglieri Objection. *Id.* at Docket No. 50. On January 10, 2025, the Bankruptcy Court found that Roglieri had standing to object to the proposed abandonment despite having no demonstrable economic interest in the Debtor's bankruptcy estate, disregarded Hogan Lovells' objection as untimely, and denied the Debtor's requested abandonment without prejudice to renewing the request with additional evidence. *Id.* at Docket No. 122.

### E. <u>Settlement Between the Debtor, the Roglieri Trustee, and the Government</u>

The Debtor, the Trustee, and the Roglieri Trustee have the ability under certain circumstances to challenge the Government's Forfeiture Claims. Assuming that the Government is otherwise successful in its criminal Forfeiture Claims (*i.e.*, Roglieri is convicted or admits to the alleged crimes) and a final forfeiture order is entered by the District Court, parties could challenge the Government's claim to forfeited property by commencement of an ancillary proceeding pursuant to 21 U.S.C. § 853(n)(2). To be successful in such a proceeding, the third party would have to show that it has a superior right, title, or interest to Roglieri to the property, or that it is a bona fide purchaser of the property for value. In the Civil Forfeiture Case, the Debtor and Roglieri Trustee would have to file a claim with respect to specific Forfeiture Property wherein they would have to demonstrate either that Roglieri did not commit the alleged criminal acts or that the Forfeiture Property is not sufficiently linked to the alleged criminal acts to be subject to civil forfeiture.

The Roglieri Trustee, the Debtor, and the U.S. Attorney had extensive discussions with respect to resolving any issues with respect to the Forfeiture Claims and reached a stipulation of settlement (the "<u>Government Stipulation</u>") that provides generally as follows: (i) the Government will turnover to the Debtor four (4) vehicles (the "<u>Subject Vehicles</u>")[23] seized in connection with

---

[23] The Subject Vehicles include:

the Roglieri Criminal Case that are not named in the Civil Forfeiture Action; (ii) the Debtor will pay any outstanding expenses of the United States Marshals Service (the "USMS") in connection with the seizure and storage of the Subject Vehicles; (iii) the Debtor will sell the Subject Vehicles; (iv) the Debtor will distribute $25,000 of the net proceeds of such sales to Roglieri's bankruptcy estate, $25,000 to the Debtor's estate, and the remainder to a segregated account to be preserved for the benefit of victims of the Debtor's alleged criminal conduct (the "Victim Fund"); and (iv) the Roglieri Trustee and the Debtor waive any challenge to the Forfeiture Claims with respect to the Forfeiture Property, except to the extent that the Government, either voluntarily or involuntarily, withdraws, is unsuccessful in prosecuting, or fails to obtain a judgment in its favor, with respect to any of the Forfeiture Claims against any of the named Forfeiture Property rendering such property excluded from forfeiture.

The Roglieri Trustee and Debtor considered numerous factors and challenges including, among other things: (i) the Roglieri Trustee's and the Debtor's interest in obtaining some or all of the Subject Vehicles for administration by their respective bankruptcy estates; (ii) the time, delays, costs, likelihood of success (or lack thereof), and other important factors implicated in any future litigation of the Forfeiture Claims; and (iii) the Government's ability, if successful in its Forfeiture Claims, to unilaterally determine who qualifies as a Victim and the amount of such Victim's claim. The Debtor concluded that entry into the Government Stipulation is in the best interest of its estate as it permits it to secure the Subject Vehicles, resolve any Forfeiture Claims, and help secure distributions to Victims whether by the Plan Administrator or the Government, most if not all of which are creditors of the Debtor.  On December 30, 2024, the Debtor and the Roglieri Trustee filed a joint motion seeking entry of an order approving the Government Stipulation, which was approved by the Court by order dated January 29, 2025.  *See* Case 3, Docket Nos. 105 and 136. The vehicles were sold by the Trustee at auction on September 20, 2025, and he is currently holding the net proceeds of such sale.  *See* Sale Order at Docket No. 341 (Sept. 3, 2025); and Auctioneer's Report of Sale at Docket No. 345 (Oct. 20, 2025).

### F.  The Virginia Beach Property

On November 19, 2024, the B&R Parties filed a motion seeking relief from the automatic stay seeking to exercise all of their rights and remedies against the Virginia Beach Property as a judgment lien holder (the "Stay Relief Motion").  *See* Case 3, Docket No. 56.

On November 20, 2024, the Debtor filed a motion seeking the entry of an order directing the turnover of the Virginia Beach Property to the Debtor in order to remove the unlawful occupants from the Virginia Beach Property (the "Debtor Turnover Motion").  *See* Case 3, Docket No. 59.

---

| Car No. | Year | Make | Model | VIN |
|---------|------|------|-------|-----|
| Car 1 | 2020 | Lamborghini | Aventador | VIN #: ZHWUM6ZD9LLA09436 |
| Car 2 | 2009 | Mercedes Benz | SL65 | VIN #: WDBSK79F79F158279 |
| Car 3 | 2014 | Mercedes Benz | SLS | VIN #: WDDRJ7HA7EA010865 |
| Car 4 | 2015 | Ferrari | 458 | VIN #: ZFF75VFA3F0209725 |

At a hearing held before the Bankruptcy Court on December 18, 2024, the Bankruptcy Court granted the Stay Relief Motion and Debtor Turnover Motion and the orders approving the Stay Relief Motion and Debtor Turnover Motion were entered on December 30, 2024. *See* Case 3, Docket Nos. 102 and 107.

On January 15, 2025, the U.S. Attorney filed an amended complaint in the Civil Forfeiture Case naming the Virginia Beach Property as additional property subject to civil forfeiture. Civil Forfeiture Case, Docket No. 20-1. Roglieri admitted that the Virginia Beach Property is subject to forfeiture in his plea agreement. Roglieri Plea, pp.23-24, §(H). However, the Government's forfeiture claim is still subject to challenge by B&R. *See, e.g.,* B&R's Response in Opposition to Motion to Strike, Civil Forfeiture Case, Docket No. 60 (Sep. 15, 2025).

If the Government is successful in the forfeiture claim against the Virginia Beach Property, then the property will no longer be a potential asset of the Debtor's bankruptcy estate. However, if B&R is successful in contesting the Government's claim, the Trustee believes that the judgment lien asserted by the B&R Parties against the Virginia Beach Property is subject to challenge as avoidable as (i) obtained in violation of the District Court's orders granting the Receiver exclusive control over the Virginia Beach Property and the Debtor's other assets, and/or (ii) a fraudulent transfer, among other potential theories.

### G. The Debtor's and Trustee's Investigation

Over the last eight months, the Trustee (and Debtor before him) has engaged in a significant investigation of third parties to determine what, if any, assets of and transfers made by the Debtor may be recoverable for the benefit of the Debtor's creditors. In connection therewith, the Debtor and Trustee have issued over 65 subpoenas *duces tecum* as authorized by orders of the Bankruptcy Court and the Trustee has amassed a significant database of documents deposited into a Driven/Relativity searchable database for use in connection with the investigation and prospective litigation and recovery effort. The Debtor and Trustee have filed a series of applications for authority to conduct discovery pursuant to Bankruptcy Rule 2004, batched by type of transfer or relationship at issue. Those various applications and related investigatory purpose are discussed in chronological order below.

On October 30, 2024, the Debtor filed an application for authority to obtain the complete client files of Barclay Damon LLP, the Debtor's and Prime Commercial's longtime counsel. Docket No. 45. That application was granted by order dated December 2, 2024, and the Debtor subsequently issued a subpoena and obtained a full production of the firm's client files. Docket No. 73.

On April 2, 2025, the Debtor filed an application for authority to obtain the complete client files of other law firms that had represented the Debtor including: (i) Cullen and Dykman LLP; (ii) Sheppard, Mullin, Richter & Hampton LLP; (iii) Hogan Lovells US LLP (discovery of Hogan Lovells may take place within a current contested matter rather than by examination pursuant to Fed. R. Bankr. P. 2004); (iv) Hill Ward Henderson; and (v) Girvin & Ferlazzo, P.C. Docket No. 179. That application was granted by order dated April 24, 2025, and the Debtor subsequently

issued subpoenas and obtained a full production from all firms except for Hogan Lovells which continues to have an outstanding objection to the application.  Docket No. 204.

On April 2, 2025, the Debtor filed an application for authority to obtain the complete records of numerous financial institutions which handled the Debtor's and its creditors' money in various capacities including (i) Interactive Brokers; (ii) Wells Fargo; (iii) KeyBank; (iv) M&T Bank; (v) Royal Bank of Canada; (vi) Shore United Bank; (vii) Citibank; (viii) Quad City; (ix) Farmers State Bank; (x) Thread Bank; and (xi) ABNB Federal Credit Union. Docket No. 183. That application was granted by order dated April 24, 2025, and the Debtor subsequently issued subpoenas and has been working to obtain a full production.  Docket No. 203.  Importantly, the subpoenas issued to the financial institutions include requests for documents or information concerning each institution's efforts to comply with the various laws and regulations of the United States, its territories, and relevant regulatory bodies, related to "know your customer rules" and anti-money laundering compliance, including, but not limited to, the Federal Financial Institutions Examination Council Bank Secrecy Act/Anti-Money Laundering Examination Manual, and the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT) Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 (2001).  Such documents are critical to evaluating any claims that may belong to the Debtor or its creditor victims against any Financial Institutions.

On April 16, 2025, the Debtor filed an application for authority to obtain discovery from all former officers, representatives, employees, and agents of the Debtor or its affiliates like Prime Commercial including:

| INDIVIDUAL | RELATIONSHIP |
|---|---|
| Andrew Altschuler | VP of Business Development of the Debtor and its affiliates |
| Lukas Bull | Loan Officer for the Debtor and its affiliates |
| Jon Cosentino | EVP of the Debtor and its affiliates |
| Michael Geisler | SVP of Enrollment for the Debtor and its affiliates |
| Kimberly Humphrey a/k/a Kimberly Owen | VP of the Debtor and its affiliates |
| Gary Lockwood | Director of Working Capital Products for the Debtor and its affiliates |
| Thor Mault | Person in charge of IT and Technology for the Debtor and its affiliates |
| Sam Perez | Client Relationship Manager for the Debtor and its affiliates |
| Chris Snyder | COO of the Debtor and its affiliates |
| Adam Steinberg | Client Relationship Manager for the Debtor and its affiliates |
| Victoria Swann | Associate Marketing Director of the Debtor and its affiliates |
| Alex Vasilakos | CMO of the Debtor and its affiliates |
| Brandon Wheeless | Consultant to the Debtor |

Docket No. 187.  That application was granted by order dated May 7, 2025, and the Debtor subsequently issued subpoenas and has production from certain individuals, while many others have continued to evade providing documents and responding to their respective subpoenas. Docket No. 204.

27

On April 16, 2025, the Debtor filed an application for authority to obtain discovery from the various individuals and entities involved in the ALUX/Bailey project and the fraudulent claim that precipitated the Debtor's fraud including:

| EXAMINEE(S) | RELATIONSHIP |
|---|---|
| ALUX Properties, LLC | The purported borrower of the Debtor and owner of "The Bailey" Hotel. |
| Bailey, LLC<br>Bailey-ATL Atlanta, LLC<br>Bailey Atlanta, LLC<br>Bailey Hotel, LLC<br>Bailey Wellness Center, LLC | Entities identified in the lending documents between Blackwater and ALUX as related to ALUX and "The Bailey" hotel project. |
| Blackwater Capital Group, LLC | Lender to ALUX with a nearly identical agreement to that later used by the Debtor. |
| Chamblee Ryan, P.C. | Counsel to Blackwater in the transaction. |
| Kim Firm LLC | Counsel to ALUX and Bailey related entities. |
| Taylor English Duma LLP | Designated counsel to ALUX pursuant to Blackwater agreement. |
| Vanguard Holdings Group, LLC | Recipient of the Blackwater's Borrower Prepayment from ALUX |
| Wheeless, Brandon[24] | Principal of the ALUX and Bailey related entities. |

Docket No. 189. That application was granted by order dated May 7, 2025, and the Debtor subsequently issued subpoenas. Docket No. 237. The recipients of subpoenas outside of the law firms have either been unable to be located and served, or have refused to cooperate and comply with the subpoenas.

On May 6, 2025, the Debtor filed an application for authority to obtain documents and information from Bravo Enterprises Mid-South LLC and Matthew Thacker-Rhodes with respect to a $5 million transfer from the Debtor. Docket No. 224. That application was granted by order dated June 20, 2025 following the appointment of the Trustee, and the Trustee subsequently issued subpoenas and obtained a full production from the subpoena parties. Docket No. 299.

On May 6, 2025, the Debtor filed an application for authority to obtain documents and information from various parties related to an approximately $20 million loan receivable of the Debtor including the following:

| EXAMINEE(S) | RELATIONSHIP |
|---|---|
| Indigo Pharmaceutical LLC | Borrower in $20+ million loan with the Debtor. |
| ARX, Accurate RX Specialty Pharmacy, Corp. | Related company to Indigo and original applicant for the loan and beneficiary of loan proceeds. |

---

[24] Authority to examine Brandon Wheeless has also been sought by the Debtor in the application filed contemporaneously as a potential "insider" of the Debtor due to the $200,000 in transfers received from the Debtor.

| EXAMINEE(S) | RELATIONSHIP |
|---|---|
| Dr. Murray Friedman | Chairman of Indigo's Board who provided a lengthy explanation of the Debtor's business model in online videos. |
| Truss Financial LLC ("Truss") | Funder of a portion of Indigo's Borrower Prepayment to the Debtor. Entity also funded other of the Debtor's loans and commenced litigation against the Debtor. |
| REV2, LLC | Loan broker for Truss's funding to Indigo. |
| CJI Trading LLC | Designated by Truss as party to repay Indigo's obligations to Truss. Recipient of $3,048,750 transfer from the Debtor on August 30, 2022. |

Docket No. 226. That application was granted by order dated June 20, 2025 following the appointment of the Trustee, and the Trustee subsequently issued subpoenas and obtained a full production from the subpoena parties. Docket No. 300.

On May 6, 2025, the Debtor filed an application for authority to obtain documents and information from various parties related to the $20 million transfer made to Berone Capital Fund LP, the series of transfers that followed, and the financial institutions where the funds flowed, including the following:

| PARTY EXAMINEE(S) | RELATIONSHIP |
|---|---|
| Berone Capital Fund LP | Original recipient of the Debtor's $20 million. |
| Berone Capital Partners LLC | Entities related to Berone Capital Fund LP. |
| Berone Capital LLC | |
| Berone Capital Equity Fund I, LP | |
| 405 Motorsports LLC, f/k/a Berone Capital Equity Partners LLC | |
| Jeremiah Beguesse | Principal of Berone. Signatory on transfer requests to Karo's escrow account. |
| Fabian Stone | COO of Berone. |
| Reign Financial International, Inc. | Entity involved in transactions with the Debtor and believed recipient and/or beneficiary of $11.9 million of the $20 million transferred to Berone. |
| QuatReign Capital Sourcing LLC | Purported lender in that certain draft escrow agreement with Prime dated January 10, 2023. |
| Giorgio Johnson | Executive Director of QuantReign Capital Sourcing, LLC |
| Dr. Adam Klein | President of Reign according to the escrow agreement naming Etra as the escrow agent. |
| Gary Mills | Alleged by the Debtor to be a participant in inducing the Debtor's $20 million transfer to Berone. |
| Martin Karo | Attorney and party to a draft escrow agreement. Received $11.9 million of Debtor's funds from Berone into IOLTA account. |

| PARTY EXAMINEE(S) | RELATIONSHIP |
|---|---|
| Juan Carlos Marquez | Co-escrow agent to Karo under a draft escrow agreement. Counsel to Reign in escrow agreement with Etra. Documents name him as Treasurer of QuantReign. |
| Aaron Etra | Escrow agent pursuant to executed agreement with Reign and the Debtor.  Pursuant to that agreement, Juan Carlos Marquez served as Reign's counsel. |

| BANK EXAMINEE(S) | RELATIONSHIP |
|---|---|
| BNP Paribas | Holder of Reign related account where Reign allegedly held funds that were to be returned to the Debtor. |
| FDIC as Receiver for Signature Bank | Bank where Berone held business accounts and transferred portions of the Debtor's funds. |
| Flagstar Bank | Successor to Signature Bank and holder of certain documents and information relevant to Berone's accounts there. |
| Interactive Brokers | Bank where Berone held business accounts. |
| JPMorgan Chase Bank | Bank where Karo has IOLTA account that received $6 million of Prime's funds from Berone. |
| Royal Bank of Canada | Bank where Berone held business accounts that took in the Debtor's deposit. |
| TD Bank | Bank where Berone held business accounts. |
| Wells Fargo | Bank where Karo has IOLTA account that received $5.9 million of Prime's funds from Berone. |

Docket No. 228.  That application was and continues to be opposed by the Berone and Reign parties on the basis that there is pending litigation before the District Court involving these matters. The adjourned hearing on the application is scheduled for December 23, 2025.

On May 15, 2025, the Debtor filed an application for authority to obtain documents and information from various parties related to $24 million in transfers made to third parties for the benefit of Roglieri, Humphrey or others, including the following:

| EXAMINEE(S) | EXAMINEE'S BUSINESS | TRANSFERS IDENTIFIED TO EXAMINEE |
|---|---|---|
| 1stDibs.Com Inc. | Seller of high-end furniture, lighting, décor, gifts, art, watches, and jewelry. www.1stdibs.com | $275,951 |
| Automative Intellect Design Inc., d/b/a Ai Design | Customizer of high-end cars. www.aidesign.com | $1,788,155 |
| Bonhams Butterfields Trust | Auctioneer of high-end art, cars, and other fine collectables. www.bonhams.com | $3,811,000 |

| EXAMINEE(S) | EXAMINEE'S BUSINESS | TRANSFERS IDENTIFIED TO EXAMINEE |
|---|---|---|
| Cars USA Shipping LLC | Shippers of high-end automobiles. www.carsworldwide.com | $218,448 |
| Cedric DuPont Antiques | Dealer in high-end antiquities. www.cedricdupontantiques.com | $165,100 |
| Giganti & Giganti Fine Jewelry | Seller of fine jewelry and watches. https://gigantijewelry.com/ | $121,000 |
| G-Man LLC -and- City National Bank | Debtor transferred $340,000 to "G-MAN LLC" from its Citi account on May 10, 2023. Debtor needs to first subpoena the recipient bank, CNB, to identify "G-MAN LLC". | $340,000 |
| Hunter Motorsports | Motorcycle dealer. https://huntermotorcycle.com/ | $70,000 |
| Luxury Bazaar | Seller of luxury watches. https://www.luxurybazaar.com/ | $260,000 |
| JK Technologies | "[S]pecializes in the importation of vehicles destined for private collections and museums." https://jktechnologies.net/ | $468,080 |
| New Country Motor Car Group | Dealer of luxury automobiles. https://www.newcountry.com/ | $2,055,312 |
| Platinum Times LLC | Seller of luxury watches. https://platinumtimesco.com/ | $2,225,000 |
| RENNtech, Inc. | "[P]remier Mercedes-Benz specialist". https://www.renntechmercedes.com/ | $110,582 |
| RM Sotheby's | Collector car auction company. https://rmsothebys.com/ | $8,289,090 |
| S2T LLC | Lamborghini dealer. https://www.lamborghini.com/en-en/dealerships/lamborghini-paramus | $142,186 |
| Timepiece Trading, LLC | Seller of luxury watches. https://timepiecetradingllc.com/ | $545,000 |
| Topgear LLC Top Gear Imports | Seller of rare and collectible automobiles. https://www.topgearporsche.com/ | $1,300,000 |
| Visbeen Architects | Architectural firm. https://www.visbeen.com/ | $215,189 |
| Wrist Aficionado | Seller of luxury watches. https://wristaficionado.com/ | $618,110 |
| XO Global LLC | Seller of private jet services. https://flyxo.com/ | $835,132 |

Docket No. 265.  That application was granted by order dated June 20, 2025 following the appointment of the Trustee, and the Trustee subsequently issued subpoenas and obtained production from most of the subpoena targets.  Docket No. 301.

On May 15, 2025, the Debtor filed an application for authority to obtain documents and information from various parties related to actual or contemplated loans to Hudson & Hudson LLC and Norwell Ventures, LLC in connection with real estate holdings in Carbondale, Illinois, as follows:

| EXAMINEE(S) | RELATIONSHIP |
| --- | --- |
| Hudson & Hudson LLC | Contemplated borrower of $5.25 million pursuant to agreement with the Debtor. |
| Norwell Ventures, LLC | Borrower of $7.35 million pursuant to agreement with the Debtor. |
| Lindsey Fisher-Hudson | Principal of Hudson & Hudson LLC and Norwell Ventures, LLC. |
| Henry Fisher | Father of Ms. Fisher-Hudson and principal of HF Rentals, LLC, a seller of property to Norwell. |
| HF Rentals, LLC | Entity owned by Henry Fisher and seller of properties to Norwell in Debtor funded deal. |

Docket No. 267.  That application was granted by order dated June 20, 2025 following the appointment of the Trustee, and the Trustee subsequently issued subpoenas and is working to obtain production.  Docket No. 302.

## IV.    SUMMARY OF THE PLAN OF LIQUIDATION

### A.  General Plan Objectives

Chapter 11 is the chapter of the Bankruptcy Code primarily used for business reorganization but can also be used by individuals.  Asset sales, stock sales, and other liquidation efforts, however, can also be conducted during a chapter 11 case or pursuant to a chapter 11 plan.  Under chapter 11, the individual or company endeavors to restructure its finances such that it maximizes recovery to its creditors.

Formulation of a chapter 11 plan is the primary purpose of a chapter 11 case.  A chapter 11 plan sets forth and governs the treatment and rights to be afforded to creditors with respect to their claims against the debtor.  According to section 1125 of the Bankruptcy Code, acceptances of a chapter 11 plan may be solicited by the proponent of a plan only after a written disclosure statement has been provided to each creditor or equity holder who is entitled to vote on the plan.

The Plan is a plan of liquidation.  In general, a chapter 11 plan of liquidation (i) divides claims into separate classes, (ii) specifies the property that each class is to receive under the plan, and (iii) contains other provisions necessary to implement the Plan.  Under the Bankruptcy Code, "claims" are classified rather than "creditors" because such entities may hold claims in more than one class.

## B.  Provisions Governing Order and Method for Distributions Under the Plan

The Plan divides Claims against the Debtor and Equity Interests into three "Classes" according to the underlying basis and subsequent treatment for each.  Claims within the same Class are treated identically and each Class in the Plan is treated differently.

Administrative Expense Claims, including the Professional Fee Claims and Receiver Professional Fee Claims, and the Priority Tax Claims are not classified but are treated in the manner set forth in Article 3 of the Plan and summarized below.

## C.  Classes of Claims and Equity Interests

The following Classes of Claims and Equity Interests are designated pursuant to and in accordance with section 1123(a)(1) of the Bankruptcy Code, which Classes shall be mutually exclusive:

| Class | Claim | Treatment | Status | Voting Rights | Estimated Distribution |
|-------|-------|-----------|--------|---------------|------------------------|
| Class 1 | Secured Claims | Plan § 4.1 | Unimpaired | Deemed to Accept | See treatment of Class 1 |
| Class 2 | General Unsecured Claims | Plan § 4.2 | Impaired | Entitled to Vote | To Be Determined |
| Class 3 | Equity Interests | Plan § 4.3 | Impaired | Presumed to Reject | 0% |

### i.    Administrative Expense Claims

Administrative Expense Claims are not classified consistent with section 1123(a)(1) of the Bankruptcy Code. All Allowed Administrative Expense Claims, other than Professional Fee Claims and Receiver Professional Fee Claims, shall be paid by the Plan Administrator from the Post-Confirmation Estate Fund, in Cash, in such amounts as are incurred in the ordinary course of the liquidation of the Debtor, or in such amounts as may be Allowed by the Bankruptcy Court (a) as soon as practicable following the later of the Effective Date or the date upon which the Court enters a Final Order allowing any such Administrative Expense Claim, or (b) upon such other terms as may exist in accordance with the ordinary course of the Debtor's liquidation, or (c) as may be agreed upon between the holder of any such Administrative Expense Claim and the Plan Administrator.  In the event there exists any Disputed Administrative Expense Claims on the Effective Date, the Plan Administrator shall hold and maintain Cash in an amount equal to that portion of a Disputed Claims Reserve attributable to all Disputed Administrative Expense Claims until such dispute is resolved consensually or by order of the Bankruptcy Court. Administrative Expense Claims are not Impaired by the Plan.

As of the filing of this Disclosure Statement, no parties other than the Professionals have filed or otherwise asserted Administrative Expense Claims.  However, the Debtor is anticipating that Compass will file a motion for the allowance of an Administrative Expense Claim of approximately $800,000 on the basis that it made a substantial contribution to the Debtor's estate

in connection with its efforts in pursuing legal actions in Case 1 and the Receivership Action that led to the Debtor's liquidation under judicial oversight which will be alleged to have directly benefited the estate and creditors. The Trustee reserves all rights with respect to Compass's anticipated motion for allowance of an Administrative Expense Claim.

It is important to note that no bar date for Administrative Expense Claims has been established in this Chapter 11 Case. Moreover, though the Trustee believes that he and the Debtor have timely paid the necessary and beneficial costs of administering this Chapter 11 Case, it is possible that additional Administrative Expense Claims may be asserted in the future. Pursuant to Section 5.9 of the Plan, the bar date for Administrative Expense Claims will be thirty (30) days after mailing of notice that the Effective Date (as defined in the Plan) has occurred.

### ii.    Priority Tax Claims

Priority Tax Claims are not classified consistent with section 1123(a)(1) of the Bankruptcy Code. On the Effective Date, or as soon thereafter as is reasonably practical, in full and final satisfaction of such Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive (a) an amount in Cash equal to the Allowed amount of such Priority Tax Claim to be paid from the Post-Confirmation Estate Fund, or (b) such other treatment as to which the Plan Administrator and the holder of such Allowed Priority Tax Claim shall have agreed upon in writing. In the event any Disputed Priority Tax Claims exist on the Effective Date, the Plan Administrator shall hold and maintain Cash in an amount equal to that portion of a Disputed Claims Reserve attributable to all Disputed Priority Tax Claims until such dispute is resolved consensually or by order of the Bankruptcy Court. Priority Tax Claims are not Impaired by the Plan.

For the avoidance of doubt, the treatment of Priority Tax Claims that are secured by tax liens or warrants shall be treated consistent with section 1129(a)(9)(D) of the Bankruptcy Code.

As of the filing of this Disclosure Statement, no parties have filed Priority Tax Claims.

### iii.    Professional Fee Claims and Receiver Professional Fee Claims

The Plan Administrator shall pay all Professional Fee Claims and Receiver Professional Fee Claims from the Post-Confirmation Estate Fund in the amount Allowed by the Bankruptcy Court as soon as practicable after entry of a Final Order awarding such compensation and reimbursement of expenses pursuant to proper application in accordance with Section 5.10 hereof. In the event any Disputed Professional Fee Claims or Disputed Receiver Professional Fee Claims exist on the Effective Date, the Plan Administrator shall hold and maintain Cash in an amount equal to that portion of a Disputed Claims Reserve attributable to all Disputed Professional Fee Claims or Receiver Professional Fee Claims until such dispute is resolved consensually or by order of the Bankruptcy Court. Professional Fee Claims and Receiver Professional Fee Claims are not Impaired by the Plan.

The outstanding and unpaid Professional Fee Claims as of November 30, 2025 are set forth in the below chart. Additional Professional Fee Claims will accrue until the Effective Date of the Plan.

| Firm | Accrued and Unpaid Fees or Commissions | Accrued and Unpaid Expenses | Total Accrued and Unpaid Fees, Commissions and Expenses |
|---|---|---|---|
| Klestadt Winters Jureller Southard & Stevens, LLP

*General Counsel to the Debtor* | $759,702.50 | $13,668.00 | $773,370.50 |
| RK Consultants, LLC

*Financial Advisor to the Debtor and Chapter 11 Trustee* | $35,000 | $0.00 | $ 35,000.00 |
| Klestadt Winters Jureller Southard & Stevens, LLP

*Special Litigation Counsel to the Chapter 11 Trustee* | $215,295.25 | $4,587.06 | $219,882.31 |
| Geron Legal Advisors LLC

*General Counsel to the Chapter 11 Trustee* | $185,00.00 | $0.00 | $185,000.00 |
| Yann Geron, Chapter 7 Trustee | $30,250.00 | $0.00 | $30,250.00 |
| **TOTAL:** | **$1,040,247.75** | **$18,255.06** | **$1,243,502.81** |

The estimated outstanding and unpaid Receiver Professional Fee Claims are set forth in the below chart.

| Firm | Accrued and Unpaid Fees | Accrued and Unpaid Expenses | Total Accrued and Unpaid Fees and Expenses |
|---|---|---|---|
| Paul A. Levine

*Receiver* | $39,567.88 | $0.00 | $39,567.88 |
| Bond, Schoeneck & King, PLLC

*Counsel to the Debtor in Case 2* | $233,624.75 | $0.00 | $233,624.75 |
| **TOTAL:** | **$273,192.63** | **$0.00** | **$273,192.63** |

### iv.    Class 1 (Secured Claims)

On the Effective Date, or as soon thereafter as is reasonably practical, each holder of an Allowed Secured Claim shall receive either (i) delivery of collateral securing such Allowed Secured Claim, (ii) the net proceeds, if any, of the sale or other disposition of the Assets on which such Holder has a Lien; or (iii) such other, less favorable treatment as may be agreed to in writing

by the holder of such Allowed Secured Claim and the Plan Administrator. Any Deficiency Claim which may arise on account of the lack of Collateral or otherwise resulting from the aforesaid treatment shall be treated as a Class 2 General Unsecured Claim.

Class 1 is unimpaired and Holders of Class 1 Secured Claims are presumed to accept the foregoing treatment and therefore are not entitled to vote on the Plan.

There are two scheduled Class 1 Claims against the Debtor in the amount of approximately $4.34 million. The Debtor listed the B&R Parties on Schedule D as holding a judgment lien against the Virginia Beach Property in the amount of $4,300,000. The Debtor listed this claim as contingent and disputed given the circumstances under which the judgment lien was obtained. Also listed on Schedule D was the Virginia Beach City Treasurer, which is owed approximately $40,000 on account of 2023 and 2024 property taxes.

As of the date of this Disclosure Statement, four parties have filed Class 1 Claims against the Debtor in the aggregate amount of approximately $10 million. The Trustee estimates that after reconciliation of such claims is complete and either negotiations or objections are concluded, there will be no Class 1 Secured Claims against the Debtor and that those claims, totaling approximately $4.5 million, will be reclassified and treated as Class 2 General Unsecured Claims consistent with section 506(a)(1) of the Bankruptcy Code.

### v.    Class 2 (General Unsecured Claims)

Class 2 consists of General Unsecured Claims in the Chapter 11 Case that are asserted, filed or scheduled against the Debtor. Each Holder of an Allowed General Unsecured Claim shall receive their *pro rata* share from the remaining portion of the Post-Confirmation Estate Fund, after satisfaction in full of senior Claims. The *pro rata* share of each Holder's Allowed Class 2 Claim shall be determined by a formula, the numerator of which is the then unsatisfied amount of such Holders' Class 2 Allowed Claim and the denominator of which is the aggregate unsatisfied amount of the remaining Allowed Class 2 Claims.

Distributions to holders of Allowed Class 2 Claims shall be made by the Plan Administrator from the Post-Confirmation Estate Fund until all Allowed Class 2 Claims are paid in full or the Post-Confirmation Estate Fund is depleted.

Class 2 is Impaired and Holders of General Unsecured Claims are therefore entitled to vote on the Plan.

Creditor Assignors, Holders of Allowed Class 2 Claims that choose to execute a Creditor Assignment and assign their Creditor Related Causes of Action to the Plan Administrator for prosecution, shall receive, after payment and satisfaction of any outstanding Post-Confirmation Expenses, such Creditor Assignors' *pro rata* share of the Creditor Related Causes of Action Fund. Unless otherwise fixed by the Bankruptcy Court, each Creditor Assignor's share of the Creditor Related Causes of Action Fund shall be presumed to be *pro rata* based upon the amount of such Creditor Assignor's outstanding Allowed Class 2 Claim. However, the Plan Administrator retains the right to seek an adjustment of each Claim Assignor's distributive share of any Creditor Related Causes of Action Fund if warranted. In the event that a Creditor Assignor only assigns some but

not all Creditor Related Causes of Action to the Plan Administrator, such Creditor Assignor may not take part in the distribution of proceeds emanating from any Creditor Related Cause of Action that particular Creditor Assignor did not assign.

Holders of Allowed Class 2 Claims that choose not to assign their Creditor Related Causes of Action to the Plan Administrator shall be permitted to pursue any such claims individually but shall have no right to participate in the Creditor Related Causes of Action Fund, if any.

Pursuant to the Government Stipulation, holders of Allowed Class 2 Claims will be permitted to share *pro rata* in the Victim Fund comprised of the net proceeds of the Subject Vehicles and other seized property voluntarily turned over to the Debtor, the Trustee, or the Plan Administrator by the Government unless the Government determines that any holders of Allowed Class 2 Claims are not Victims of the Debtor's fraud, in which case such holders of Allowed Class 2 Claims will be excluded from the sharing in distributions from the Victim Fund, but will retain the right and ability to share in all other distributions to which holders of Allowed Class 2 Claims are entitled under the Plan. The determination of who qualifies as a Victim and the amount of such Victim's pecuniary loss will be determined by the Government in the normal course pursuant to the process set forth in Section II(B)(vii), *supra*. If at the time the Plan Administrator seeks to make a distribution from the Victim Fund and the Government has not fully and final determined the list of Victims and the amount of their claims, then in accordance with the terms of the Government Stipulation, each holder of an Allowed Class 2 Claim will be deemed to be a Victim by the Plan Administrator and the list of all Allowed Class 2 Claims will be transmitted to the U.S. Attorney which shall have thirty (30) days to review the list of Allowed Class 2 Claims and raise any objection to the inclusion of such claimants participating in the Victim Fund. Otherwise, if the U.S. Attorney has not yet established its list of Victims and determined each Victim's pecuniary loss, and fails to object to the inclusion of any Allowed Class 2 Claims as participants in the Victim Fund, then each holder of an Allowed Class 2 Claim shall be permitted to share in the Victim Fund on a *pro rata* basis based on the amount of their Allowed Claim.[25] The Plan Administrator's administration of the Victim Fund will be overseen by the Oversight Committee consistent with all other activities of the Plan Administrator under the Plan.

As of the date of the Disclosure Statement, approximately thirty (30) parties have filed or otherwise hold scheduled Class 2 Claims in the aggregate amount of approximately $200 million.

### vi.   Class 3 (Equity Interests)

Class 3 consists of the Equity Interests in the Debtor. Class 3 Equity Interests are Impaired as they will receive no Distribution under the Plan. Class 3 Equity Interests are deemed to reject the Plan and, as such, are not entitled to vote to accept or reject the Plan.

---

[25] The costs associated with administering the Victim Fund shall be born by Prime's bankruptcy estate, which has been compensated by way of the $25,000 payment pursuant to the Government Stipulation. To the extent that the Plan Administrator is requested by the Government to administer any other assets subject to Forfeiture Claims, the Plan Administrator shall deduct and retain three (3%) percent of the net proceeds of such additional assets in order to offset the costs of administering them and making distributions from the Victim Fund.

On the Effective Date, all Class 3 Equity Interests will be deemed canceled, null and void and of no force and effect.

## V.    MEANS OF IMPLEMENTING THE PLAN

### A. Plan Funding

The Plan shall be funded by a combination of the proceeds of sale of the Debtor's Assets, and proceeds from liquidation of remaining Assets.  The Plan Administrator shall utilize the Post-Confirmation Estate Fund and in certain cases, the Creditor Related Causes of Action Fund, for purposes of making distributions to holders of Allowed Claims in Classes 1 and 2 after payment of Allowed Administrative Expense Claims and reserving for Disputed Claims.

### B. Appointment of Plan Administrator

(a)    Appointment of Plan Administrator. The Confirmation Order shall provide for the appointment of the Plan Administrator.  The Plan Administrator shall be deemed the Post-Confirmation Estate's exclusive representative in accordance with section 1123 of the Bankruptcy Code and shall have all powers, authority and responsibilities specified under sections 704 and 1106 of the Bankruptcy Code.

(b)    Bond. The Plan Administrator shall serve without a bond. The Oversight Committee, at its option, may require the Plan Administrator to obtain a bond, provided that there is sufficient Cash available in the Post-Confirmation Estate to purchase a bond.

(c)    Governance. The Plan Administrator shall be governed by the Plan and the Plan Administrator Agreement.

(d)    Succession Matters.  In the event the Plan Administrator dies, is terminated, or resigns for any reason, the Oversight Committee shall designate a successor. If the Oversight Committee is unable to designate such a successor, the Bankruptcy Court may appoint a successor Plan Administrator from any candidate proposed by a party in interest. Such successor Plan Administrator shall be deemed to succeed the Plan Administrator in all respects, without the need for further order of the Bankruptcy Court.  In the event of resignation or removal of the Plan Administrator, the departing Plan Administrator shall promptly (a) execute and deliver such documents, instruments and other writings as reasonably requested by the successor Plan Administrator or as ordered by the Bankruptcy Court; (b) turn over to the successor Plan Administrator all property of the Estate in his or her possession, custody and control, including, but not limited to all funds held in bank accounts, and all files, books and records and other documents and information related to the Debtor; and (c) otherwise assist and cooperate in affecting the assumption of his or her obligations and functions by the successor Plan Administrator.  The successor Plan Administrator may, in his or her discretion, retain such professionals as he or she deems necessary, including the Professionals of the departing Plan Administrator.  If the Plan Administrator is replaced, the Professionals retained by the Plan Administrator shall be entitled to payment of their reasonable, undisputed fees and expenses from the Estate through the date of the Plan Administrator's replacement.

(e)     Funding of Plan Administrator's Activities. The source of payment for the Plan Administrator and his or her professionals shall be from the Post Confirmation Estate Fund and any Creditor Related Causes of Action Fund as applicable, and any additional recoveries by the Estate after the confirmation of the Plan.

(f)     Indemnification. The Plan Administrator and his or her designees, employees or professionals or any duly designated agent or representative of the Plan Administrator shall not be liable for any act or omission taken or omitted to be taken in their respective capacities other than for acts or omissions resulting from willful misconduct, gross negligence, or fraud as determined by Final Order of the Bankruptcy Court. The Plan Administrator may, in connection with the performance of his or her functions, and in his or her sole and absolute discretion, consult with attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in good faith reliance on the advice or opinions rendered by such attorneys, accountants, financial advisors and agents, or any Final Order of the Bankruptcy Court. Notwithstanding such authority, the Plan Administrator shall not be under any obligation to consult with attorneys, accountants, financial advisors or agents, and his or her determination not to do so shall not result in the imposition of liability, unless such determination is based on willful misconduct, gross negligence or fraud as determined by Final Order of the Bankruptcy Court. The Debtor shall indemnify and hold harmless the Plan Administrator and his or her designees and Professionals, and all duly designated agents and representatives (in their capacity as such) from and against all liabilities, losses, damages, claims, costs and expenses, including, but not limited to attorneys' fees and costs arising out of or due to such actions or omissions, or consequences of their actions or omissions with respect or related to the performance of their duties or the implementation or administration of the Plan; provided however, that no such indemnification will be made to such Persons for such actions or omissions as a result of willful misconduct, gross negligence or fraud.

## C. **Powers and Duties of Plan Administrator**

(a)     Powers and Duties. On the Effective Date, the Plan Administrator shall succeed to all of the rights of the Trustee and the Debtor's Estate as otherwise provided herein, with all powers necessary to protect, conserve, and liquidate all Assets, including, without limitation, control over (including the right to waive) all attorney-client privileges, work-product privileges, accountant-client privileges and any other evidentiary privileges relating to the Assets that, prior to the Effective Date, belonged to the Debtor pursuant to applicable law. The powers and duties of the Plan Administrator shall include, without further order of the Court, except where expressly stated otherwise, the rights:

i.     to open and close bank accounts for the Post-Confirmation Debtor and its Estate as the sole signatory, invest Cash in accordance with section 345 of the Bankruptcy Code, and withdraw and make distributions of Cash to Holders of Allowed Claims and pay taxes and other obligations in connection with the wind-down of the Post-Confirmation Estate in accordance with the Plan;

ii.     to engage attorneys, consultants, agents, employees and all professional persons, to assist the Plan Administrator with respect to the Plan Administrator's responsibilities,

39

including professional persons that may have represented the Debtor or the Trustee prior to confirmation of the Plan;

iii.  to execute and deliver all documents, and take all actions, necessary to consummate the Plan and wind-down the Post-Confirmation Estate;

iv.  to act on behalf of the Debtor and the Post-Confirmation Estate in all adversary proceedings and contested matters (including, without limitation, any Avoidance Actions and Causes of Action, and Creditor Related Causes of Action to the extent of Creditor Assignments), then pending or that may be commenced in the Court and in all actions and proceedings pending or commenced elsewhere, and, subject to consultation with the Oversight Committee as stated below, to settle, retain, enforce, or dispute any adversary proceedings or contested matters (including, without limitation, any Causes of Action or Creditor Related Causes of Action to the extent of Creditor Assignments) and otherwise pursue actions involving Assets that could arise or be asserted at any time under the Bankruptcy Code or otherwise, unless otherwise specifically waived or relinquished in the Plan;

v.  to investigate the financial affairs of the Debtor and any of its affiliates, parents, partners, or subsidiaries, including through the issuance of formal subpoenas pursuant to Bankruptcy Rule 2004 without the need for the issuance of additional Bankruptcy Court orders beyond the Confirmation Order;

vi.  to negotiate and accept assignments of claims, demands, and causes of action for the benefit of the Holders of Creditor Related Causes of Action, upon determining in the Plan Administrator's discretion that such claims, demands, and causes of action assert colorable and meritorious claims, and to recognize the claims of the assignor for purposes of participating in and receiving a distribution from the Creditor Related Causes of Action Fund;

vii.  upon consultation with the Oversight Committee, to determine whether to bring, settle, release, or compromise Avoidance Actions, Causes of Action, and Creditor Related Causes of Action without the need for Court approval (all compromises must be approved by the Oversight Committee or the Court to the extent the Oversight Committee objects);

viii.  to dispose of, and deliver title to or otherwise realize the value of, all the remaining Assets;

ix.  to coordinate the storage, maintenance and disposal of the Records as he or she determines in his or her reasonable discretion in compliance with any applicable state and federal rules;

x.  to dissolve the Debtor in accordance with Section 5.12 of the Plan;

xi.  to oversee compliance with the Debtor's accounting, finance and reporting obligations;

xii.     to prepare United States Trustee quarterly reports and financial statements, and such other reports and financial statements as may be necessary or helpful to the Plan Administrator to carry out his or her duties, and to manage the calculation and disbursement of U.S. Trustee fees;

xiii.    to oversee the filing of final tax returns, audits and other corporate dissolution documents if required;

xiv.     upon consultation with the Oversight Committee, to object to Claims against the Debtor and its Estate;

xv.      upon consultation with the Oversight Committee, to seek an adjustment of Creditor Assignors' entitlements to a share of the Creditor Related Causes of Action Fund to something other than *pro rata* based upon the amount of the Creditor Assignor's Allowed Class 2 Claim;

xvi.     with the Oversight Committee, to compromise and settle Claims by and against the Debtor and its Estate without the need for Bankruptcy Court approval (to the extent the Oversight Committee declines to approve a compromise recommended by the Plan Administrator, the Plan Administrator may seek Bankruptcy Court approval of such compromise over the objection of the Oversight Committee);

xvii.    to perform any additional corporate actions as necessary to carry out the wind-down, liquidation and ultimate dissolution of the Debtor;

xviii.   to implement and/or enforce all provisions of the Plan;

xix.     to implement and/or enforce all agreements entered into prior to the Effective Date;

xx.      upon consultation with the Oversight Committee, to abandon any Assets without the need for approval of the Court, and upon such abandonment, such Assets shall cease to be Assets of the Post-Confirmation Estate; and

xxi.     to use such other powers as may be vested in or assumed by the Plan Administrator pursuant to the Plan or Order of the Bankruptcy Court or as may be necessary and proper to carry out the provisions of the Plan.

**D.   <u>Establishment of Oversight Committee</u>**

(a) <u>Appointment of Oversight Committee</u>. On or after the Effective Date, the Oversight Committee shall be appointed and shall consist of holders of Allowed Class 2 Claims willing to serve.  Members of the Oversight Committee will be selected by the Trustee (or the Plan Administrator as the case may be) upon consultation with the U.S. Trustee.  Members of the Oversight Committee must not have received any transfer by the Debtor that may be subject to avoidance by the Plan Administrator.  The Oversight Committee shall not exceed five (5) members.  The Oversight Committee shall have the authority specified in the Plan and Plan Administrator Agreement.  Any actions taken by the Oversight Committee shall be by majority

41

vote. The Plan Administrator shall consult with and provide information to the Oversight Committee with respect to any material action to be taken or not to be taken by the Plan Administrator as set forth in the Plan and the Plan Administrator Agreement.

(b) <u>Reimbursement of Costs and Expenses</u>. Except for the reimbursement of reasonable, actual costs and expenses incurred in connection with their duties as members of the Oversight Committee, the members of the Oversight Committee shall serve without compensation. Reasonable expenses incurred by members of the Oversight Committee may be paid by the Plan Administrator upon presentation of proper documentation without the need for Court approval. To the extent that the Oversight Committee declines to approve a settlement proposed by the Plan Administrator and the Plan Administrator opts to seek Bankruptcy Court approval of the settlement over the objection of the Oversight Committee, then the Oversight Committee may retain attorneys to prosecute its objection, the reasonable costs of which will be paid by the Plan Administrator in the same manner as the Plan Administrator's professionals.

(c) <u>Liability of Members of the Oversight Committee</u>. Subject to any applicable law, the members of the Oversight Committee shall not be liable for any act done or omitted by any member in such capacity, while acting in good faith and in the exercise of business judgment. Members of the Oversight Committee shall not be liable in any event except for gross negligence or willful misconduct in the performance of their duties hereunder.

(d) <u>Indemnification</u>. Except as otherwise set forth in the Plan and to the extent permitted by applicable law, the members of the Oversight Committee shall not be liable for any act or omission taken or omitted to be taken in their respective capacities other than for acts or omissions resulting from willful misconduct, gross negligence, or fraud as determined by Final Order of the Bankruptcy Court. The Post-Confirmation Estate shall indemnify and hold harmless the members of the Oversight Committee from and against all liabilities, losses, damages, claims, costs and expenses, including, but not limited to attorneys' fees and costs arising out of or due to such actions or omissions, or consequences of their actions or omissions with respect or related to the performance of their duties; provided however, that no such indemnification will be made to such Persons for such actions or omissions as a result of willful misconduct, gross negligence or fraud.

**E.   Establishment of Disputed Claim Reserves**

<u>Disputed Claim Reserves</u>. As soon as practicable following the Effective Date, the Disputed Claim Reserves shall be established by the Plan Administrator if and as required; provided, however, that the Plan Administrator shall have no obligation to fund the Disputed Claim Reserves until, at the latest, immediately prior to the making of a Distribution to Holders of Allowed Claims of the same Class as the Disputed Claims. The Disputed Claim Reserves shall be funded from available Cash in an amount equal to the amount Holders of Disputed Claims would have otherwise been entitled but for the dispute. The funds in the Disputed Claim Reserves shall be held separately from other assets held by the Plan Administrator subject to an allocable share of all expenses and obligations, on account of Disputed Claims. Funds shall be removed from the Disputed Claims Reserves as the Disputed Claims are resolved, which funds shall be distributed as provided in Section 9.20 of the Plan. Notwithstanding any other provision of the Plan to the contrary, subject to definitive guidance from the Internal Revenue Service or a court of competent

jurisdiction to the contrary, the Plan Administrator may treat any assets allocable to, or retained on account of, the Disputed Claims Reserves as held by one or more discrete entities holding Disputed Claims for federal, and applicable state, local or other, income tax purposes, and may determine that such entity or entities shall constitute "disputed ownership funds" under, and may make the election permitted by, Treasury Regulation 1.468B-9, or any successor provision thereto.

### F.  Preservation of Causes of Action

Except as otherwise provided in the Plan or in any contract, instrument, release or agreement entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, all Claims or Causes of Action that the Debtor or the Estate may have against any person or entity are preserved, including without limitation any and all Causes of Action under sections 502, 510, 522(f), 522(h), 542, 543, 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code, and any Creditor Related Causes of Action that may be assigned to the Plan Administrator and Post-Confirmation Estate by Creditor Assignments.

### G.  General Disposition of Assets

Pursuant to section 1123(a)(5) of the Bankruptcy Code and subject to the terms of the Plan, as soon as is reasonably practicable following the Effective Date, the Plan Administrator shall sell or otherwise dispose of, and liquidate to or otherwise convert to Cash, any non-Cash Assets in such manner as the Plan Administrator shall determine is in the best interests of the Post-Confirmation Estate and holders of Allowed Claims.

### H.  Exemption from Certain Transfer Taxes

To the maximum extent provided by section 1146(a) of the Bankruptcy Code, any Post-Confirmation sale or transfer of any of the Assets, or any sale or transfer of, from or by the Plan Administrator, pursuant to, in contemplation of, or in connection with the Plan or pursuant to the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, in each case to the extent permitted by applicable bankruptcy law, and the appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### I.  Administrative Expense Claims Bar Date

With the exception of Professional Fee Claims and Receiver Professional Fee Claims, persons asserting an Administrative Expense Claim must file a request for payment of such Administrative Expense Claim on or before 5:00 p.m. prevailing Eastern Time on the date that is 30 days after notice of the Effective Date has been mailed (the "Administrative Expense Claims Bar Date").  No payment or Distributions will be made on account of any Administrative Expense

43

Claim until such Claim becomes an Allowed Claim. Any person asserting an Administrative Expense Claim that fails to file and serve an Administrative Expense Claim on or before the Administrative Expense Claims Bar Date shall be forever barred from asserting any such right to payment against the Debtor, its Estate, the Trustee, the Plan Administrator, the Post-Confirmation Estate, or the Oversight Committee.

**J.    Deadline for Filing Applications For Payment of Professional Fee Claims and Receiver Professional Fee Claims**

All parties seeking payment of Professional Fee Claims arising prior to the Effective Date, or Receiver Professional Fee Claims, must file with the Bankruptcy Court a final application and/or an application for payment of reasonable fees and expenses on or before the date that is 30 days after notice of the Effective Date has been mailed (the "Fee Application Deadline"). Any Professional or Receiver Professional failing to file and serve such application on or before the Fee Application Deadline shall be forever barred from asserting any such right to payment against the Debtor, its Estate, the Trustee, the Plan Administrator, the Post-Confirmation Estate, or the Oversight Committee.

**K.    Execution of Documents to Effectuate Plan**

From and after the Effective Date, the Plan Administrator shall have the exclusive power and authority to execute any instrument or document to effectuate the provisions of the Plan. Entry of the Confirmation Order shall authorize the Plan Administrator to take, or cause to be taken, all actions necessary or appropriate to consummate and implement the provisions of the Plan. All such actions shall be deemed to have occurred and shall be in effect pursuant to applicable non-bankruptcy law and the Bankruptcy Code, without any requirement of further action.

**L.    Dissolution of the Debtor**

Following the Effective Date, the Debtor, through the activities of the Plan Administrator, shall continue in existence for the purposes of, among other things, completing the liquidation of Assets, winding up affairs and filing appropriate tax returns. Upon the entry of an order closing the case, the Debtor shall be deemed dissolved for all purposes. No other actions or filings or payments shall be required in furtherance of such dissolution.

**M.    Post-Confirmation Reports and Fees**

Reporting to Office of the United States Trustee. Following the Effective Date and until the Chapter 11 Case is closed, not less than once every ninety (90) days, the Plan Administrator shall file all post-Effective Date reports required during such periods and shall pay from the Post-Confirmation Estate Fund all post-Effective Date fees charged or assessed against the Estate under 28 U.S.C. § 1930 during such periods together with applicable interest pursuant to 31 U.S.C. § 3717.

**N.    Insurance Preservation**

Nothing in the Plan shall diminish or impair the enforceability of any Insurance Policies that may cover Claims against the Debtor or any other Person.

44

**O. Claims Administration Responsibility**

1.    _Reservation of Rights_.  Unless a Claim is specifically Allowed prior to or after the Effective Date, the Trustee, and after the Effective Date, the Plan Administrator, reserve any and all objections to any and all Claims and motions or requests for the payment of Claims, whether administrative expense, secured or unsecured, including without limitation any and all objections to the validity or amount of any and all alleged Administrative Expense Claims, Priority Tax Claims, or Priority Non-Tax Claims, liens and security interests, whether under the Bankruptcy Code, other applicable law or contract.  The failure to object to any Claim prior to the Effective Date shall be without prejudice to the Plan Administrator's rights to contest or otherwise defend against such Claim in the Bankruptcy Court when and if such Claim is sought to be enforced by the holder of the Claim.

2.    _Objections to Claims_.  Prior to the Effective Date, the Trustee shall be responsible for pursuing any objection to the allowance of any Claim.  From and after the Effective Date, the Plan Administrator may dispute, object to, compromise or otherwise resolve all Claims, in accordance with Sections 5.2 and 5.3 hereof.  Unless otherwise provided in the Plan or ordered by the Bankruptcy Court, all objections to Claims shall be filed and served no later than one hundred eighty (180) days after the Effective Date, provided that the Plan Administrator may request (and the Bankruptcy Court may grant) one or more extensions of time by filing a motion with the Bankruptcy Court.  Notwithstanding the foregoing, the Plan Administrator's time to seek an allocation of any recovery on a Creditor Related Causes of Action amongst the Creditor Assignors other than _pro rata_ based upon the amount of each Creditor Assignor's Allowed Class 2 Claim shall be ninety (90) days after the Plan Administrator receives the relevant recovery on the Creditor Related Causes of Action into the Creditor Related Causes of Action Fund.

3.    _Filing Objections_.  An objection to a Claim shall be deemed properly served on the claimant if the Trustee or Plan Administrator, as applicable, effect service of any such objection in accordance with Rule 3007 of the Bankruptcy Rules by mailing or otherwise delivering the objection and a notice of hearing thereon to the claimant at the address set forth on such claimant's Proof of Claim at least thirty (30) days prior to the hearing thereon. The Trustee or the Plan Administrator may also effectuate service of an objection to a claim: (i) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004; (ii) to the extent counsel for a claimant is unknown, by first class mail, postage prepaid, to the signatory on the Proof of Claim or interest or other representative identified on the Proof of Claim or interest or any attachment thereto or; (iii) by first class mail, postage prepaid, on counsel that has appeared on the behalf of the claimant in the Chapter 11 Case.

4.    _Determination of Claims_.  Except as otherwise agreed by the Trustee or Plan Administrator, any Claim as to which a Proof of Claim or motion or request for payment was timely filed in the Chapter 11 Case may be determined and liquidated after the Effective Date pursuant to (i) an order of the Bankruptcy Court (which order has not been stayed, reversed or amended and as to which determination or any revision, modification or amendment thereof, and the time to appeal or seek review or rehearing thereof, has expired, and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending), or (ii) applicable non-

bankruptcy law.  Any Claim determined to be an Allowed Claim after the Effective Date pursuant to this section shall be treated as an Allowed Claim in accordance with the Plan.

**P.  Treatment of Claims without Further Order of the Court**

1.    Certain Scheduled Claims.  As of the Effective Date, any Scheduled Claim designated as disputed, contingent or unliquidated in amount, and for which a Proof of Claim has not been filed by the Creditor, shall be deemed Disallowed and expunged.  All Scheduled Claims that correspond to a Proof of Claim filed by a particular Creditor shall be deemed to have been superseded by such later filed Proof of Claim and the Scheduled Claims, regardless of priority, shall be expunged from the claims register; provided however, that such Proofs of Claim shall be subject to objection in accordance with Section 9.15 hereof.

2.    Late Filed Claims.  Any and all Proofs of Claim filed after the applicable Claims Bar Date shall be deemed Disallowed as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless on or before the Confirmation of the Plan, such late filed Claim has been deemed timely filed by a Final Order.

**Q.  Timing of Distributions on Disputed Claims Subsequently Allowed**

In the event that a Disputed Claim is Allowed, in whole or in part, after the Effective Date, a Distribution shall be made on account of such Allowed Claim on the next Distribution Date that is at least fifteen (15) business days after such Claim is Allowed.

**R.  No Payment or Distribution of Disputed Claim**

Notwithstanding any provision to the contrary herein, no payments or other Distributions shall be made on account of any Disputed Claim, or any portion thereof, unless and until such Claim or some portion thereof is allowed by Final Order of the Bankruptcy Court.  For the avoidance of doubt, no portion of any Disputed Claim is entitled to a Distribution.  Holders of Disputed Claims shall be bound, obligated and governed in all respects by the Plan.

**S.  Disputed Claims**

1.    Except to the extent the Bankruptcy Court determines that a lesser amount is adequate, the Plan Administrator shall, on each Distribution Date, deposit in a Disputed Claims Reserve, Cash equal to the Distributions that would have been made to holders of Disputed Claims if such Claims were Allowed Claims in their full amounts or such lower amount as to which the holder of such Claim has agreed in writing or, in the case where any such Claim is unliquidated or contingent, the greater of (i) $1, and (ii) such other amount as is reserved by order of the Bankruptcy Court made upon motion of the Trustee, the Plan Administrator, or the holder of such Claim.

2.    For purposes of effectuating the provisions of Section 9.17 of the Plan and the Distributions to holders of Allowed Claims, the Bankruptcy Court, upon the request of any holder of a Claim, on the one hand, or the Plan Administrator, on the other hand, may estimate the amount

of Disputed Claims pursuant to section 502(c) of the Bankruptcy Code, in which event the amounts estimated shall be deemed to be the aggregate amounts of the Disputed Claims pursuant to section 502(c) of the Bankruptcy Code for purposes of Distribution under the Plan and for purposes of the Disputed Claims Reserve.

3.      When a Disputed Claim becomes an Allowed Claim, there shall be distributed to the holder of such Allowed Claim, in accordance with the provisions of the Plan (but in no event later than the next succeeding Distribution Date), Cash in the amount of all Distributions to which such holder would have been entitled if such holder's Claim were Allowed on the Effective Date, to the extent of available Cash to make such Distribution.

4.      In no event shall any holder of any Disputed Claim be entitled to receive (under the Plan or otherwise) any Cash payment which is greater than the amount reserved, if any, for such Disputed Claim pursuant to Section 9.17 of the Plan.  In no event shall the Plan Administrator have any responsibility or liability for any loss to or of any amount reserved under the Plan unless such loss is the result of that party's fraud, willful misconduct, or gross negligence.  In no event may any Creditor whose Disputed Claim is subsequently allowed, pursue or recover or from any other Creditor in respect of any funds received as Distributions under the Plan.

5.      To the extent that a Disputed Claim ultimately becomes an Allowed Claim and is entitled to a Distribution in an amount less than the amount reserved for such Disputed Claim, then on the next succeeding Distribution Date, the Plan Administrator shall make, in accordance with the terms of the Plan, a Distribution of the excess amount reserved for such Disputed Claim.

6.      Any Disputed Claims Reserve shall be treated as a disputed ownership fund, within the meaning of Treasury Regulation section 1.468B-9, for all purposes associated with taxation.

**T.  Limitations on Funding of Disputed Claims Reserve**

Except as expressly set forth in the Plan, or otherwise agreed to in writing or ordered by the Court, the Plan Administrator shall have no obligation or duty to fund the Disputed Claims Reserve.

**U.  Tax Requirements for Income Generated by Disputed Claims Reserve**

The Plan Administrator shall pay, or cause to be paid, out of the funds held in a Disputed Claims Reserve, any tax imposed by any federal, state, or local taxing authority on the income generated by the funds or property held in a Disputed Claims Reserve.  The Plan Administrator shall file, or cause to be filed, any tax or information return related to a Disputed Claims Reserve that is required by any federal, state, or local taxing authority.

**VI.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**A.  General Provisions**

All executory contracts and unexpired leases of the Debtor shall be deemed rejected as of the Effective Date, unless a particular executory contract or unexpired lease (i) has previously been

assumed or rejected pursuant to order of the Bankruptcy Court or applicable provisions of the Bankruptcy Code, or (ii) has expired or otherwise terminated pursuant to its terms.

**B. Notice of Deemed Rejection/Rejection Bar Date**

Any party to an executory contract or unexpired lease that is rejected in accordance with Section 6.1 of the Plan shall file a Proof of Claim for damages from such rejection no later than thirty (30) days after the Effective Date. The failure to timely file a Proof of Claim shall be deemed a waiver of any Claim in connection with the rejection of such contract or lease.

**C. Compensation and Benefit Programs**

To the extent not previously terminated, all employment and severance agreements and policies, and all employee compensation and benefit plans, policies and programs of the Debtor applicable generally to their employees, independent contractors or officers in effect on the Effective Date, including, without limitation, all savings plans, retirement plans, health care plans, disability plans, severance benefit plans, incentive plans and life, accidental death and dismemberment insurance plans, shall be terminated as of the Effective Date.

**VII.  INJUNCTIONS; EXCULPATIONS**

**A. General Injunctions**

**The following provisions shall apply and shall be fully set forth in the Confirmation Order.**

> **i.  Injunctions Against Interference with Consummation or Implementation of Plan**

**All holders of Claims shall be enjoined from commencing or continuing any judicial or administrative proceeding or employing any process against the Debtor, the Estate, the Trustee, the Post-Confirmation Estate, the Roglieri Trustee, the Successor Roglieri Trustee, the Plan Administrator, or the Oversight Committee (and its members) with the intent or effect of interfering with the consummation and implementation of the Plan and the transfers, payments and Distributions to be made hereunder.**

> **ii.  Plan Injunction**

**Except as otherwise specifically provided for by the Plan, as of and from the Effective Date, all Persons shall be enjoined from (i) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order; (ii) the creation, perfection or enforcement of any encumbrance of any kind; and/or (iii) the assertion of any right of setoff, counterclaim, exculpation, or subrogation of any kind, in each case against the Debtor, the Estate, the Trustee, the Post-Confirmation Estate, the Roglieri Trustee, the Successor Roglieri Trustee, the Plan Administrator, or the Oversight Committee (and its members) to the fullest extent authorized or provided by the Bankruptcy Code.**

### iii.    Release of Collateral

Except as expressly provided otherwise in the Plan, unless a Holder of a Secured Claim receives a return of its Collateral in respect of such Claim under the Plan, each Holder of (A) an Allowed Secured Claim; and (B) an Allowed Claim that is purportedly secured, on the Effective Date shall (x) turn over and release to the Trustee any and all property that secures or purportedly secures such Claim; and (y) execute such documents and instruments as the Trustee requires to evidence such claimant's release of such property; and (ii) on the Effective Date, all claims, rights, title and interest in such property shall revert to the Debtor's Estate, free and clear of all Claims against the Debtor and its Estate, including (without limitation) liens, charges, pledges, encumbrances or security interests of any kind. No Distribution hereunder shall be made to or on behalf of any Holder of such Claim unless and until such Holder executes and delivers to the Trustee such release of liens. Any such Holder that fails to execute and deliver such release of liens within 60 days of any demand thereof shall be deemed to have no further Claim and shall not participate in any Distribution hereunder. Notwithstanding the immediately preceding sentence, a Holder of a Disputed Claim shall not be required to execute and deliver such release of liens until the time such Claim is Allowed or Disallowed.

### B. Exculpation

As of the Confirmation Date, the Trustee and his professionals (including professional firms and individuals within such firms) shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code. To the fullest extent permitted by section 1125(e) of the Bankruptcy Code, the Debtor and its professionals (including professional firms and individuals within such firms), as well as the Trustee and his professionals (including professional firms and individuals within such firms), shall not have or incur any liability to any holder of any Claim or any other Person for any act or omission taken or not taken in good faith in connection with, or arising out of, the Chapter 11 Case, the Disclosure Statement, the Plan, or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan, or any act taken or omitted to be taken during the Chapter 11 Case, the solicitation of votes for and the pursuit of confirmation of the Plan, the consummation of the Plan, including, without limitation, the steps taken to effectuate the transactions described in Article 5 of the Plan, the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions constituting fraud, willful misconduct or gross negligence as determined by a Final Order; and in all respects such parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

### C. All Distributions Received in Full and Final Satisfaction

Except as otherwise set forth herein, all payments, all Distributions to be made in accordance with the Plan on account of Claims, and all rights conferred under the Plan shall be received in full and final satisfaction of the Estate's obligations for such Claims as against the Debtor, its property and the Estate, including the Post-Confirmation Estate.

### D. <u>No Modification</u>

The provisions of this Section 7 (Article 8 of the Plan) are not intended, and shall not be construed, to modify the res judicata effect of any order entered in the Chapter 11 Case, including, without limitation, the Confirmation Order and any order finally determining Professional Fee Claims to any Professional.

### E. <u>No Discharge of Claims.</u>

Pursuant to section 1141(d)(3) of the Bankruptcy Code, the Confirmation Order will not discharge the Debtor of any debts.

## VIII.  <u>CONDITIONS PRECEDENT</u>

### A. <u>Conditions Precedent to Confirmation of the Plan.</u>

The following conditions must be satisfied, or otherwise waived in accordance with Section 7.3 of the Plan, on or before the Confirmation Date:

(a)    The Disclosure Statement Approval Order shall have been entered and shall have become a Final Order; and

(b)    Entry of the Confirmation Order shall contain provisions that, among other things:

  (i)    authorizes the implementation of the Plan in accordance with its terms;

  (ii)   approves in all respects the other settlements, transactions, and agreements to be effected pursuant to the Plan;

  (iii)  finds that the Plan complies with all applicable provisions of the Bankruptcy Code, including that the Plan was proposed in good faith and that the Confirmation Order was not procured by fraud;

  (iv)   approves the Plan Administrator Agreement; and

  (v)    establishes the Administrative Expense Claims Bar Date.

### B. <u>Conditions Precedent to the Effective Date.</u>

The Effective Date shall not occur and no obligations under the Plan shall come into existence, unless each of the following conditions is met or, alternatively, is waived in accordance with Section 7.3 of the Plan, on or before the Effective Date:

(a)    The Confirmation Order shall have become a Final Order;

(b)    The Confirmation Order shall have authorized and approved the appointment of the Plan Administrator and the Oversight Committee; and

(c)    The Trustee shall have sufficient Cash on hand to pay all Administrative Expense Claims.

## C. Waiver of Conditions Precedent

Each of the conditions precedent in Sections 7.1 and 7.2 of the Plan may be waived or modified without further Court approval, in whole or in part, but only with the consent of the Trustee.

## IX. PROCEDURES FOR DISTRIBUTIONS UNDER PLAN

Article 9 of the Plan establishes the procedures and guidelines for Distributions to be made to the terms of the Plan to the holders of Claims, including the timing, procedures and notice provisions related to same.  Distributions shall be made by the Plan Administrator as follows.

### A. Distributions by Plan Administrator

The Plan Administrator shall make Distributions on account of Allowed Claims in accordance with Article 4 of the Plan. The Plan Administrator may use the services of a third party to aid in the Distributions required to be made under the Plan, including the Distribution Agent.

### B. Indefeasibility of Distributions

All Distributions made under the Plan shall be indefeasible.

### C. Frequency of Distributions

The Plan Administrator shall make Distribution(s) as soon as practicable after the Effective Date and at such other times as may be determined to be appropriate by the Plan Administrator in consultation with the Oversight Committee.

### D. Payments in U.S. Dollars

All Cash payments required under the Plan shall be made in U.S. dollars by checks drawn on domestic bank(s) selected by the Plan Administrator in accordance with the Plan or by wire transfer from a domestic bank.

### E. Claims In U.S. Dollars

Any Claims asserted in foreign currencies shall be converted to United States Dollars in accordance with the prevailing exchange rates published by the Wall Street Journal on the Confirmation Date.

## F.  **Distributions Only on Business Days**

Notwithstanding the foregoing provisions, if any Distribution called for under the Plan is due on a day other than a Business Day, then such Distribution shall instead be due the next Business Day.

## G.  **Transmittal of Payments and Notices**

Except as otherwise provided in the Plan, all Distributions shall be made to the holder of an Allowed Claim by regular first-class mail, postage prepaid, in an envelope addressed to such holder at the address listed on its Proof of Claim filed with the Bankruptcy Court or, if no Proof of Claim was filed, (i) at the address listed on the Debtor's Schedules, or (ii) at such address that a holder of a Claim provides to the Plan Administrator after the Effective Date in writing at least fifteen (15) business days prior to a Distribution Date. The Plan Administrator shall be under no obligation to ascertain the mailing address of any holder of an Allowed Claim other than as set forth herein. The date of payment or delivery shall be deemed to be the date of mailing.  Payments made in accordance with the provisions of this Section shall be deemed made to the holder regardless of whether such holder actually receives the payment.

## H.  **Record Date for Distributions**

Except as otherwise provided in a Final Order of the Bankruptcy Court, transferees of Allowed Claims that are transferred pursuant to Bankruptcy Rule 3001 with appropriate filings ("Claim Transfer Document") made on or before the Effective Date (the "Distribution Record Date") shall be treated as the holders of those Allowed Claims for all purposes of the Plan, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to the transfer(s) may not have expired prior to the Distribution Record Date.  The Plan Administrator shall be under no obligation to recognize any transfer of any Allowed Claim occurring after the Distribution Record Date. In making a Distribution with respect to any Allowed Claim, the Plan Administrator shall be entitled to recognize and deal for all purposes hereunder only with the Person who is listed on the Proof of Claim filed with respect to such Allowed Claim, on the Schedules as the holder thereof, and upon such other evidence or record of transfer or assignment filed as of the Distribution Record Date.

## I.  **Unclaimed Distributions**

Unclaimed Distributions (including Distributions made by checks that fail to be cashed or otherwise negotiated within ninety (90) days after the Distribution Date or which Distributions are returned to the Plan Administrator as undeliverable to the addresses of record as of the Distribution Record Date, shall be canceled (by a stop payment order or otherwise), the Claim(s) relating to such Distribution(s) shall be deemed forfeited and expunged without any further action or order of the Bankruptcy Court.  Any such Unclaimed Distributions shall, as soon as is practicable, be redistributed pursuant to the provisions of the Plan.

## J.  **No Payments of Fractional Cents or Distributions of Less Than One Hundred Dollars**

1.      Notwithstanding any provision to the contrary herein, for purposes of administrative convenience, no payment of fractional cents shall be made pursuant to the Plan.

52

Whenever any payment of a fraction of a cent under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding of such fraction to the nearest whole penny (up or down), with a half-penny or less being rounded down and fractions in excess of half of a penny being rounded up.

2. Notwithstanding any provision to the contrary herein, for purposes of administrative convenience, no Distribution of less than One Hundred Dollars ($100) shall be made pursuant to the Plan. Whenever any Distribution of less than One Hundred Dollars ($100) under the Plan would otherwise be required, such funds will be retained by the Plan Administrator for the account of the recipient until such time that successive Distributions aggregate to One Hundred Dollars ($100), at which time such payment shall be made, and if successive Distributions do not ever reach One Hundred Dollars ($100) in the aggregate, then such Distributions shall revert to the Post-Confirmation Estate and be redistributed in accordance with the Plan.

**K. Setoff and Recoupment**

Except as otherwise provided in the Plan, the Plan Administrator may, but shall not be required to, set off against, or recoup from, any Claim and the Distributions to be made pursuant to the Plan in respect thereof, any Claims, defenses or Causes of Action of any nature whatsoever that the Plan Administrator may have, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Plan Administrator of any right of setoff or recoupment against the holder of any Claim.

**L. Payment of Taxes on Distributions Received Pursuant to the Plan**

1. The Trustee shall provide the Plan Administrator with all available tax identification or social security numbers that he may possess for Creditors (collectively the "Tax Information") and the Plan Administrator may rely upon the same for purposes of Distributions and associated tax reporting and compliance.  Notwithstanding any provision to the contrary herein, as a condition to payment of any Distribution to a Creditor under the Plan, each Creditor shall provide a valid Tax Information if requested by the Plan Administrator for purposes of tax reporting.  All Persons that receive Distributions under the Plan shall be responsible for reporting and paying, as applicable, any taxes on account of their Distributions.

2. At such time as the Plan Administrator believes that Distributions to a particular Class of Claims is likely, the Plan Administrator shall review the available Tax Information provided by the Trustee and where necessary, request Tax Information in writing from Creditors (the "Tax Information Request").  Any Creditor who fails to respond to the Tax Information Request within ninety (90) days from the date identified on the Tax Information Request, shall forfeit all Distributions such Creditor may otherwise be entitled to under the Plan and such forfeited funds will revert to the Post-Confirmation Estate to be disbursed in accordance with the terms and priorities established in the Plan.

**M.** **Compliance With Tax Withholding and Reporting Requirements**

With respect to all Distributions made under the Plan, the Plan Administrator will comply with all withholding and reporting requirements of any federal, state, local or foreign taxing authority.

**N.** **Disputed Distribution**

If a dispute arises as to the identity of a holder of an Allowed Claim who is to receive a Distribution, the Plan Administrator may, in lieu of making such Distribution to such holder, hold such amount until the dispute is resolved by Final Order of the Bankruptcy Court or by written agreement among the parties to such dispute.

**X.** **RETENTION OF JURISDICTION BY BANKRUPTCY COURT**

From the Confirmation Date until entry of a final decree closing the Chapter 11 Case, the Bankruptcy Court shall retain such jurisdiction as is legally permissible over the Chapter 11 Case for the following purposes:

(a) to hear and determine any and all objections to the allowance of any Claim, or any controversy as to the classification of Claims or any matters which may directly, indirectly or contingently affect the obligations of the Debtor to any Creditors, holders of Claims, or other parties in interest;

(b) to hear and determine any and all applications for compensation and reimbursement of expenses by Professionals;

(c) to hear and determine any and all pending motions for the assumption or rejection of executory contracts and unexpired leases, and to fix any Claims resulting therefrom;

(d) to adjudicate through final judgment such contested matters and adversary proceedings as may be pending or subsequently initiated in the Court including, but not limited to, the Causes of Action and the Creditor Related Causes of Action;

(e) to enforce and interpret the provisions of the Plan, the Confirmation Order, and the Plan Administrator Agreement;

(f) to hear and determine any matters relating to the appointment and replacement of the Plan Administrator;

(g) to issue any injunction or other relief appropriate to implement the intent of the Plan, and to enter such further orders enforcing any injunctions or other relief issued under the Plan or pursuant to the Confirmation Order;

(h) to modify the Plan pursuant to section 1127 of the Bankruptcy Code and the applicable Bankruptcy Rules;

(i)  to correct any defect, cure any omission, or reconcile any inconsistency in the Plan, the Confirmation Order, or the Plan Administrator Agreement, as may be necessary to carry out the purposes and the intent of the Plan;

(j)  to interpret and determine such other matters as the Confirmation Order may provide for, or as may be authorized under the Bankruptcy Code;

(k)  to enter and implement such orders as may be appropriate in the event the Confirmation Order is, for any reason, stayed, reversed, revoked, modified or vacated; and

(l)  to adjudicate any disputes between the members of the Oversight Committee or between the Oversight Committee and the Plan Administrator.

## XI.    CERTAIN TAX CONSEQUENCES OF THE PLAN

### A.  General

**THE DESCRIPTION OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN PROVIDED BELOW IS LIMITED TO THE SPECIFIC FEDERAL INCOME TAX MATTERS DESCRIBED HEREIN.   IT IS POSSIBLE THAT ADDITIONAL ISSUES MAY EXIST THAT COULD AFFECT THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN OR OTHER FEDERAL INCOME TAX MATTERS DISCUSSED HEREIN AND THIS DISCUSSION DOES NOT CONSIDER OR PROVIDE ANY CONCLUSIONS WITH RESPECT TO ANY SUCH ADDITIONAL ISSUES. EACH TAXPAYER IS STRONGLY URGED TO SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM SUCH TAXPAYER'S INDEPENDENT TAX ADVISOR.**

**THE DESCRIPTION OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN PROVIDED BELOW IS SOLELY FOR THE PURPOSE OF COMPLIANCE WITH SECTION 1125(a) OF THE BANKRUPTCY CODE. THE DESCRIPTION IS BASED ON THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "INTERNAL REVENUE CODE") TREASURY REGULATIONS, JUDICIAL DECISIONS AND ADMINISTRATIVE DETERMINATIONS, ALL AS IN EFFECT ON THE DATE OF THIS DISCLOSURE STATEMENT. CHANGES IN ANY OF THESE AUTHORITIES OR IN THEIR INTERPRETATION MAY HAVE RETROACTIVE EFFECT, WHICH MAY CAUSE THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO DIFFER MATERIALLY FROM THE CONSEQUENCES DESCRIBED BELOW.   NO RULING HAS BEEN REQUESTED FROM THE INTERNAL REVENUE SERVICE (THE "IRS") AND NO LEGAL OPINION HAS BEEN REQUESTED FROM COUNSEL CONCERNING ANY TAX CONSEQUENCE OF THE PLAN, AND NO TAX OPINION OR ADVICE IS GIVEN BY THIS DISCLOSURE STATEMENT.**

This description does not cover all aspects of federal income taxation that may be relevant to the Debtor's estate or Holders of Claims.  For example, the description does not address issues of special concern to certain types of taxpayers, such as dealers in securities, life insurance

companies, financial institutions, tax exempt organizations and foreign taxpayers, nor is it intended to address all of the possible federal income tax consequences to Holders of Claims against the Debtor's estate. This description also does not discuss the possible state tax or non-U.S. tax consequences that might apply to the Debtor or to Holders of Claims.

**B.  Tax Consequences of Payment of Allowed Claims Pursuant to Plan Generally**

The federal income tax consequences of the implementation of the Plan to the Holders of Allowed Claims will depend, among other things, on the consideration to be received by the Holder, whether the Holder reports income on the accrual or cash method, whether the Holder's Claim is Allowed or Disputed on the Effective Date, and whether the Holder has taken a bad debt deduction or a worthless security deduction with respect to its Claim.  All Holders of Claims are urged to consult with their tax advisors concerning the tax consequences applicable under the Plan. Nothing contained herein shall be relied upon as tax advice.

### i.    Recognition of Gain or Loss

In general, a Holder of an Allowed Claim should recognize gain or loss equal to the amount realized under the Plan in respect of its Claim less the Holder's tax basis in the Claim. Any gain or loss recognized in the exchange may be long-term or short-term capital gain or loss or ordinary income or loss, depending upon the nature of the Allowed Claim and the Holder, the length of time the Holder held the Claim and whether the Claim was acquired at a market discount or premium. If the Holder realizes a capital loss, the Holder's deduction of the loss may be subject to limitation. The Holder's tax basis for any property received under the Plan generally will equal the amount realized.

### ii.    Bad Debt or Worthless Security Deduction

A Holder who receives in respect of an Allowed Claim an amount less than the Holder's tax basis in the Claim may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction in some amount under section 166 of the Internal Revenue Code. The rules governing the availability, character, timing and amount of bad debt deductions place considerable emphasis on the facts and circumstances of the Holder, the obligor and the instrument with respect to which a deduction is claimed. Holders of Allowed Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

### iii.    Receipt of Interest

The Plan does not address the allocation of the aggregate consideration to be distributed to Holders between principal and interest and the Trustee cannot make any representations as to how the IRS will address the allocation of consideration under the Plan. In general, to the extent that any amount of consideration received by a Holder is treated as received in satisfaction of unpaid interest that accrued during such Holder's holding period, such amount will be taxable to the Holder as interest income (if not previously included in the Holder's gross income and not otherwise exempt from U.S. federal income tax). Conversely, a Holder may be allowed a bad debt deduction to the extent any accrued interest was previously included in its gross income but

subsequently not paid in full. However, the IRS may take the position that any such loss must be characterized based on the character of the underlying obligation, such that the loss will be a capital loss if the underlying obligation is a capital asset. Again, Holders of Allowed Claims should address all potential tax implications with their own tax advisors.

## XII.    CONFIRMATION OF PLAN – REQUIREMENTS

In order for the Plan to be confirmed, the Bankruptcy Code requires, among other things, that the Plan be proposed in good faith, that the Trustee disclose specified information concerning payments made or promised to insiders, and that the Plan comply with the applicable provisions of chapter 11 of the Bankruptcy Code. Section 1129(a) of the Bankruptcy Code also requires that at least one Class of Claims has accepted the Plan ("Minimum Voting Threshold"), that Confirmation of the Plan is not likely to be followed by the need for further financial reorganization, and that the Plan be fair and equitable with respect to each Class of Claims that is impaired under the Plan. The Bankruptcy Court can confirm the Plan if it finds that all of the requirements of section 1129(a) have been met. The Trustee believes that the Plan meets all of these required elements. With respect to the so-called "feasibility" test (i.e., that the Plan is not likely to be followed by the need for further financial reorganization), the Plan provides for an orderly liquidation of the Debtor's assets and the Trustee believes that he will be able to consummate the Plan fully.

In the event that a Class of Claims votes to reject the Plan, the Plan does not satisfy all of the requirements of section 1129(a) of the Bankruptcy Code. Although the Minimum Voting Threshold is not met, the Bankruptcy Court nevertheless may confirm the Plan under the "cram down" provisions of section 1129(b) of the Bankruptcy Code if all of the other provisions of section 1129(a) of the Bankruptcy Code are met. Thus, the Trustee presently intends, to the extent necessary, (i) to undertake to have the Bankruptcy Court confirm the Plan under the "cram down" provisions of section 1129(b) of the Bankruptcy Code, and (ii) to amend the Plan to the extent necessary to obtain entry of the Confirmation Order.

In order to confirm a Plan over the dissenting vote of an impaired Class under section 1129(b) of the Bankruptcy Code that satisfies the remaining provisions of section 1129(a) of the Bankruptcy Code, the Bankruptcy Court, on request of the proponent of a plan, "shall" confirm the Plan if the Plan does not discriminate unfairly, and is fair and equitable with respect to each Class of Claims that is impaired under, and has not accepted, the Plan. For purposes of section 1129(b) of the Bankruptcy Code, a Plan is "fair and equitable" with respect to a class of unsecured Creditors if, at a minimum, it satisfies the "absolute "priority rule" and the "best interests of creditors test."

### A.    Absolute Priority Rule

To satisfy the absolute priority rule, the Plan must provide that the holder of any Claim that is junior to the Claims of the dissenting Class will not receive or retain under the Plan on account of such junior Claim any property unless the Claims of the dissenting Class are paid in full.

The Trustee believes that the Plan satisfies the absolute priority rule. The Trustee further believes that all non-accepting impaired Classes will receive or retain payment or Distribution, as

the case may be, on account of their Claims, sufficient to permit full satisfaction of such Claims before junior Classes receive or retain any property on account of such junior Claims.

### B. Best Interest of Creditors Test; Liquidation Analysis

Under the best interest of creditors test, the Plan is confirmable if, with respect to each impaired Class of Claims, each holder of an Allowed Claim in such Class has either (i) accepted the Plan, or (ii) receives or retains under the Plan, on account of its Claim, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtor was to be liquidated under chapter 7 of the Bankruptcy Code.

To determine what the holders of each Class of Claims would receive if the Debtor's Estate was to be liquidated under chapter 7 of the Bankruptcy Code, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtor's remaining assets in a chapter 7 liquidation case. The amount that would be available for satisfaction of the Allowed Claims of the Debtor would consist of the proceeds resulting from the disposition of the remaining assets of the Debtor augmented by the cash held by the Debtor at the time of the conversion of the chapter 11 case to a chapter 7 case. Such amounts would be reduced by the costs and expenses of the liquidation and by such additional Administrative Expense Claims and other priority Claims that might result from the chapter 7 case.

Here, the Plan contemplates the creation of a Plan Administrator to continue the wind-down of the Debtor's Estate. The Trustee believes that a conversion of the Chapter 11 Case to a case under chapter 7 would disrupt an orderly plan process which is expected to result in an initial distribution to Holders of Allowed Class 2 General Unsecured Claims, and that Creditors would be harmed by the delay and expense that would result.

To determine if the Plan, as proposed, is in the best interests of Creditors, the present value of the distributions likely to be made to each class in a liquidation if the bankruptcy case proceeded under chapter 7 are compared with the present value of the distributions to each impaired Class provided for by the Plan.

In applying the best interest test, it is possible that Claims in a chapter 7 case may not be classified in the same manner as provided for by the Plan. Priorities and order of distribution of estate assets are established by the applicable provisions of chapter 7. Under those provisions, each class of Claims is paid in a descending order of priority. No junior classes of Claims are paid until all senior classes have received payment in full. In the event that available assets are insufficient to pay all members of such class in full, then each member of the class shares on a *pro rata* basis.

The Trustee believes that the primary advantages of the Plan over a chapter 7 liquidation is that Creditors will likely receive more under the Plan than they would in a chapter 7 case and receive their Distributions earlier. Here, the Plan Administrator has agreed to a cap on his compensation at 2% of Distributions in excess of $1 million, whereas commissions for a chapter 7 trustee are capped at 3% for money distributed in excess of $1 million, thereby saving the Estate the sum of approximately 1% of the total amount distributed. In addition, costs would increase by

the amount of the additional administrative expenses likely to be incurred in such a chapter 7 case, including the costs of time-consuming investigations and discovery. Under the Plan, the process of other Claims resolution will proceed without the necessity for additional investigation by a chapter 7 trustee and his or her separate and new professionals. The Plan offers the opportunity to avoid additional administrative costs and the resulting delay which would result from a chapter 7 liquidation.

The Trustee therefore believes that the Plan will result in lower total administrative costs, and higher recoveries for Creditors than would the liquidation of the Debtor's Assets under chapter 7 of the Bankruptcy Code. A liquidation analysis that demonstrates the lower recovery for creditors in a chapter 7 liquidation is annexed hereto as **Exhibit B**.

Thus, the Trustee believes the Plan satisfies the "best interests of creditors test," and, indeed, that the Plan is in the best interests of Creditors.

## XIII. **PLAN RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

### A. **Certain Bankruptcy-Related Considerations**

#### i. **Parties in Interest May Object to the Debtor's Classification of Claims**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim in a particular class only if such claim is substantially similar to the other claims in such class. The Trustee believes that the classification of Claims under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

#### ii. **Risk of Plan Not Being Confirmed**

Although the Trustee believes the Plan satisfies all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. There can also be no assurance that modifications of the Plan will not be required for Confirmation, that any negotiations regarding such modifications would not adversely affect the holders of the Allowed Claims or that any such modifications would not necessitate the re-solicitation of votes.

#### iii. **Nonconsensual Confirmation**

As set forth above, in the event any impaired class of claims does not accept a plan, a bankruptcy court may nevertheless confirm such plan of liquidation at the proponent's request if at least one impaired class has accepted the plan of liquidation (with such acceptance being determined without including the acceptance of any "insider" in such class) and, as to each impaired class which has not accepted the plan of liquidation, the bankruptcy court determines that the plan of liquidation "does not discriminate unfairly" and is "fair and equitable" with respect to non-accepting impaired classes.

In the event that any Impaired Class of Claims fails to accept the Plan in accordance with section 1129(a)(8) of the Bankruptcy Code, the Trustee reserves the right to seek nonconsensual confirmation of the Plan in accordance with section 1129(b) of the Bankruptcy Code.

### iv.     Risks that Conditions to Effectiveness Will Not Be Satisfied

Article 7 of the Plan contains certain conditions precedent to the effectiveness of the Plan. There can be no assurances that the conditions contained in Article 7 of the Plan will be satisfied.

### v.     Actual Plan Distributions May Be Less Than Estimated for Purposes of the Disclosure Statement

The Trustee projects that the Claims asserted against the Debtor will be resolved in and reduced to an amount that approximates the estimates set forth herein.  However, there can be no assurances that these estimates will prove accurate.  In the event that the allowed amounts of such Claims are materially higher than the projected estimates, actual distributions to Holders of Allowed Claims could be materially less than estimated herein.

### vi.     Claims Objections/Reconciliation Process

The Trustee and the Plan Administrator, as applicable, reserve the right to object to the amount of any Claim, except as provided in the Plan.  The estimates set forth herein cannot be relied on by any Holder of a Claim whose Claim is subject to an objection.  Any such Holder of a Claim may not receive its specified share of the estimated distributions described in the Disclosure Statement.

### B.     Alternatives to the Plan and Consequences of Rejection

Among the possible consequences if the Plan is rejected or if the Bankruptcy Court refuses to confirm the Plan are the following: (i) an alternative plan could be proposed or confirmed; or (ii) the Chapter 11 Case could be converted to a liquidation case under chapter 7 of the Bankruptcy Code.

### i.     Alternative Plans

With respect to an alternative plan, the Trustee has explored various alternative scenarios and believe that the Plan enables the Holders of Claims to realize the maximum recovery under the circumstances.  The Trustee believes the Plan is the best plan that can be proposed and serves the best interests of the Debtor, its creditors, and other parties-in-interest.

### ii.     Chapter 7 Liquidation

As discussed above, with respect to each Class of Impaired Claims, either each Holder of a Claim of such Class has accepted the Plan, or will receive under the Plan on account of such Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtor was liquidated on such date under chapter 7 of the Bankruptcy Code. The Trustee believes that significant costs would be incurred by the

Trustee as a result of the delay that would be caused by conversion of the Chapter 11 Case to a case under chapter 7, resulting in a reduced distribution to all Creditors.

## XIV.   **PROCEDURES FOR VOTING ON PLAN**

As noted above, pursuant to the Bankruptcy Code, a plan groups various claims into classes, each consisting of parties having similar legal rights in relation to a debtor.  Each class may then be treated as either "impaired" or "unimpaired" under a plan.  There are three ways in which a plan may leave a claim or interest "unimpaired." First, a plan may not propose to alter the legal, equitable or contractual rights of the holder of the claim or interest.  Second, all defaults (excluding those covered by section 365(b)(2) of the Bankruptcy Code) may be cured and the original terms of the obligation reinstated.  Third, a plan may provide for the payment in full of the obligation to the holder of the claim or interest.  If a class is unimpaired, then it is conclusively presumed to vote in favor of a plan.

An impaired class that would receive nothing under a plan is deemed to have rejected such a plan.

An impaired class that is proposed to receive any Distribution (whether in Cash, securities or other property) has the right to vote, as a class, to accept or reject the plan.  A class of Creditors accepts a plan if more than one-half (1/2) of the ballots that are timely received from members of such class, representing at least two thirds (2/3) of the dollar amount of Claims for which ballots are timely received, vote in favor of such plan.  Section 1126(e) of the Bankruptcy Code provides that a Creditor's vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that the Creditor's vote either to accept or reject a plan was not solicited or cast in good faith, or in compliance with the Bankruptcy Code.  A plan under which any class of Claims is impaired may be confirmed by the Bankruptcy Court only if it has been accepted by at least one such class.

Each holder of an Allowed Claim in an impaired Class which retains or receives property under the Plan shall be entitled to vote separately to accept or reject the Plan and shall indicate such vote on a duly executed and delivered Ballot as provided in such order as is entered by the Bankruptcy Court establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Bankruptcy Court.

Holders of Claims in an impaired Class entitled to vote will receive, together with this Disclosure Statement, a Ballot to be used in voting to accept or reject the Plan.  Voting instructions will accompany the Ballot.

Each Creditor should first carefully review this Disclosure Statement and the Plan.  The Creditor should then complete the portions of the Ballot indicating the Class in which the Creditor's Claim falls and the total dollar amount of the Claim.  It is critical that the Class and amounts(s) of the Claim be correctly stated on the Ballot, so that the Creditor's vote can be properly counted.

Next, the Creditor should mark in the space provided on the Ballot whether the Creditor wishes to accept or to reject the Plan.  Please be sure to fill in the name of the Creditor for whom the Ballot is being filed.  Finally, the Ballot must be signed by the Creditor, or by an officer, partner, or other authorized agent of the Creditor.  Please note that the Trustee reserves the right to object to the allowance, designation of Class or allowable amount of any Claim set forth in a Ballot for purposes of voting or Distribution under the Plan.

Completed and signed Ballots should be returned to Trustee's special litigation counsel at the following address:

Klestadt Winters Jureller Southard & Stevens, LLP
200 West 41st Street, 17th Floor
New York, New York 10036
Attn:  Fred Stevens & Lauren C. Kiss

Completed Ballots should be returned as soon as possible, and in any event so that they are RECEIVED NO LATER THAN [**JANUARY 30, 2026**].  ANY BALLOTS WHICH ARE RECEIVED BY THE VOTING AGENT AFTER [**JANUARY 30, 2026**] SHALL NOT BE COUNTED IN DETERMINING ACCEPTANCE OR REJECTION OF THE PLAN.

## XV.   COMBINED HEARING

The Combined Hearing will be held before the Honorable Patrick G. Radel, United States Bankruptcy Judge for the Northern District of New York, in the James T. Foley U.S. Courthouse, 445 Broadway, Suite 330, Albany, New York 12207 on [**February 10, 2026**] **at 10:30 a.m. (EST)**, as such date may be continued or adjourned by the Court.  Any party wishing to appear at the hearing may do so in-person at the courthouse **or** by video via Teams, for which pre-registration is required by 3:00 PM one business day before the hearing at https://www.nynb.uscourts.gov/Remote-Hearing-Appearances.  At that hearing, the Bankruptcy Court will decide whether the Disclosure Statement should be approved, whether the Plan should be confirmed, and will hear and decide any and all objections to the Disclosure Statement or the Plan.  Any Creditor, or other party in interest who wishes to object to, approval of the Disclosure Statement, confirmation of the Plan, or to the classification of Claims or Equity Interests provided in the Plan, must, not later than [**February 3, 2026**], file an objection with the Clerk of the United States Bankruptcy Court, Northern District of New York, James T. Foley U.S. Courthouse, 445 Broadway, Suite 330, Albany, New York 12207, and serve a copy of the objection on the following persons:  (a) Geron Legal Advisors LLC, 370 Lexington Avenue, Suite 1208, New York, New York, 10017, Attention:  Yann Geron and Nicole N. Santucci, general counsel to the Trustee, (b) Klestadt Winters Jureller Southard & Stevens, LLP, 200 West 41st Floor, New York, New York 10036, Attn:  Fred Stevens and Lauren C. Kiss; special counsel to the Trustee, (c) the Office of the United States Trustee for the Northern District of New York, 11A Clinton Avenue, Room 620, Albany, New York 12207, Attn:  Lisa M. Penpraze, and (d) parties filing a notice of appearance and request for service herein.

Any objections to the Disclosure Statement and Plan which are not filed and served by the above date may not be considered by the Bankruptcy Court.  Any person or entity who files an

objection to Confirmation of the Plan or to the classification of Claims provided in the Plan must also attend the Confirmation Hearing, either in person or through counsel.

If the Plan is confirmed, its provisions will bind the Estate and any and all Persons, including all holders of Claims, whether or not the Claim of such Holder is impaired under the Plan and whether or not the Holder has, either individually or by a Class, voted to accept the Plan.

## XVI.   <u>RECOMMENDATION</u>

The Trustee believes that the Plan provides for the fair and equitable treatment of the Debtor's Creditors and therefore recommends that Creditors vote to accept the Plan.

[*Signature Page Follows*]

Dated: December 16, 2025

                                    **PRIME CAPITAL VENTURES, LLC**


                         By:   */s/ Yann Geron*
                                    Yann Geron, in his capacity as the Chapter 11
                                    Trustee of Prime Capital Ventures, LLC


Approved as to form:

**KLESTADT WINTERS JURELLER
    SOUTHARD & STEVENS, LLP**


By:   */s/ Fred Stevens*
        Fred Stevens
        Lauren C. Kiss
        200 West 41st Street, 17th Floor
        New York, New York 10036
        Tel: (212) 972-3000
        Fax: (212) 972-2245
        Email: fstevens@klestadt.com
                lkiss@klestadt.com

*Special Litigation Counsel to Yann Geron,
    Chapter 11 Trustee of Prine Capital
    Ventures, LLC*