UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

In re:

PRIME CAPITAL VENTURES, LLC,             Case No. 24-11029-PGR
                                                            Chapter 11

                                   Debtor.

**DECLARATION OF BRIAN RYNIKER IN SUPPORT OF CONFIRMATION
OF THE TRUSTEE'S PLAN OF LIQUIDATION PURSUANT TO CHAPTER
11 OF THE BANKRUPTCY CODE AND IN PARTICULAR IN SUPPORT
OF THE FINDING THAT THE DEBTOR WAS A "PONZI" SCHEME**

Brian Ryniker, being duly sworn, deposes and says:

1. I am a Certified Public Accountant, licensed under the laws of the State of New York and I am a member of RK Consultants LLC ("RKC"). RKC is a boutique financial advisory service firm with an office in Nassau County, New York. The facts set forth in this declaration (the "Declaration") are personally known to me and, if called as a witness, I could and would testify thereto.

2. This Declaration is submitted in support of confirmation of the Trustee's Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code (the "Plan")[1], and more specifically regarding the Debtor's pre-petition financial records and transactions and in support of the finding that the Debtor was a "Ponzi" scheme.

    A.     **Pre-Petition Financial Records**

3. By order dated October 16, 2024, this Court authorized the retention of RKC as financial advisor to Prime Capital Ventures, LLC (the "Debtor") [Docket No. 38]. Subsequently, Yann Geron, in his capacity as the chapter 11 trustee (the "Trustee") of the Debtor's estate has

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Plan.

1

continued RKC's retention as financial advisor and in that capacity, the Trustee requested RKC continue to review information and documents obtained from (i) the Debtor, (ii) the Roglieri Trustee, (iii) the Receiver and (iv) the targets of subpoenas issued under Federal Rule of Bankruptcy Procedure 2004. In connection therewith, RKC reviewed certain documents and filings included within the following:

- Debtor's Bankruptcy Case 1, *In re Prime Capital Ventures, LLC*, Case No. 23-11302 (Bankr. N.D.N.Y) (PGR);

- Receivership Case, including, but not limited to, the Fourth Report of the Receiver, *Compass-Charlotte 1031, LLC v. Prime Capital Ventures, LLC, et al.*, Case No. 24-cv-00055 (N.D.N.Y) (MAD/DJS) [Docket No. 173];

- Roglieri Bankruptcy Case, *In re Kris Daniel Roglieri*, Case No. 24-10157 (Bankr. N.D.N.Y.) (PGR);

- Debtor's Bankruptcy Case 2, *In re Prime Capital Ventures, LLC*, Case No. 24-10531 (Bankr. N.D.N.Y) (PGR);

- Roglieri's Criminal Case, *United States of America v. Kris Roglieri*, Case No. 24-CR-00392 (N.D.N.Y) (MAD);

- Debtor's Bankruptcy Case 3 (this case), *In re Prime Capital Ventures, LLC*, Case No. 24-11029 (Bankr. N.D.N.Y) (PGR); and

- Government's Civil Forfeiture Case, *United States of America v. One 2003 Ferrari Enzo AB Version E, et al.*, Case No. 24-cv-1345 (MAD/DJS).

RKC also reviewed various:

- Bank statements for the Debtor's and Roglieri's accounts and related support;

- Development line of credit agreements (inclusive of an Interest Credit Account ("ICA Deposit"));

- RBC loan documents and related investment account;

- Complaints filed against the Debtor; and

- Responses to subpoenas.

2

4. To date, I am aware of approximately twenty (20) bank and investment accounts which were used by the Debtor and one (1) loan account. Of the known bank and investment accounts, seven (7) have bank statements and related support which were available for analysis at this time. Statements are available on the Debtor's loan account for only three (3) monthly periods.

5. The seven (7) bank and investment accounts of the Debtor analyzed include:

   a. KeyBank acct #2233;

   b. CitiBank acct #6945 and #6953;

   c. Farmers Bank acct #5665;

   d. M&T Bank accts #5959 and #3147; and

   e. Royal Bank of Canada acct #5037.

6. The statements from the seven (7) bank accounts referenced above reflect over $197,000,000 in cash receipts and almost $189,000,000 in cash disbursements from 2022 to 2023.

7. Included in the cash receipts are $6,000,000 in loan proceeds in connection with a loan obtained by the Debtor from the Royal Bank of Canada ("RBC"). The RBC loan was secured by a cash ICA Deposit obtained from ER Tennessee LLC ("ER Tennessee") (further detailed below). Other than the loan received from RBC, we have been unable to locate any significant source of funds or capital other than ICA Deposits.

8. The following is a summary of the Debtor's cashflows for 2022 and 2023 related to the seven (7) bank accounts reviewed:

|  | 2022 | 2023 | Grand Total |
|---|---:|---:|---:|
| Beginning Cash |  |  | $ - |
| **Cash Receipts** | **74,490,501** | **122,636,738** | **197,127,240** |
| **Cash Disbursments** |  |  |  |
| Insider Transfer | (23,660,725) | (38,742,584) | (62,403,309) |
| Borrower - Full Loan | (15,938,061) | (8,109,439) | (24,047,500) |
| Borrower - ICA Returned | - | (28,015,400) | (28,015,400) |
| Other | (27,066,438) | (47,529,642) | (74,596,080) |
| **Total Disbursments** | **(66,665,225)** | **(122,397,065)** | **(189,062,289)** |
| Change in Cash | 7,825,277 | 239,674 | 8,064,950 |
| Less: |  |  |  |
| Loan against RBC Account (ER Tennessee) |  |  | 6,000,000 |
| Ending Cash |  |  | $ 2,064,950 |

9.    The transactions reflected in these bank and investment accounts were summarized into various categories to assist in analyzing how cash received by the Debtor was disbursed. It should be noted that this analysis is a work-in-process and is based on the information currently available. As additional statements or transaction detail are received, transactions may be recharacterized. Further we have prepared a chart, attached hereto as **Exhibit A**, which illustrates the use of lending receipts related to ICA Deposits to pay for other loan commitments, insider transfers, an investment and various other activities. Below is a summary of certain transactions by category.

10.    Insider transfers is a broad category related to transfer to insiders, including Kris and Tina Roglieri, companies owned or controlled by Roglieri, as well as payments which were made for the benefit of Roglieri. Payments made for the benefit of Roglieri and other insiders include but are not limited to:

| Recipient - Insider Transfer | 22-23 Total |
|---|---:|
| RM Sotheby's | $ (9,067,455) |
| Prime Commercial Lending LLC | (5,632,893) |
| Interactive Brokers LLC | (5,600,000) |
| Scott Oliver Law | (5,538,908) |
| Kris Roglieri And Tina Roglieri | (5,227,784) |
| Commercial Capital Training Group | (5,087,626) |
| Bonhams Butterfields Trust | (3,811,000) |
| Priority Title And Escrow | (3,772,068) |
| Quad City Bank And Trust Company | (3,294,000) |
| Platinum Times LLC | (2,225,000) |
| New Country Group | (2,055,312) |
| Ai Design | (1,806,623) |
| Caruso Home Builders, LLC (Sage Estates Malta) | (1,577,570) |
| Topgear LLC | (1,300,000) |
| Xo Global LLC | (916,201) |
| Timepiece Trading LLC | (670,000) |
| Wrist Aficionado | (618,110) |
| National Alliance Of Commercial Loan Brokers LLC | (614,750) |
| Jk Technologies | (468,080) |
| 2023 Mercedes Maybach | (449,673) |
| 1Stdibs.Com Inc | (275,951) |
| Luxury Bazaar | (260,000) |
| Fenix Fam Inc | (233,500) |
| Cars Usa Shipping | (218,448) |
| Visbeen Architect | (215,189) |
| Cedric Dupont | (165,100) |
| S2T, LLC | (142,186) |
| Superior Auto Sa | (126,630) |
| Giganti And Giganti | (121,700) |
| Renntech, Inc | (110,582) |
| <100K | (800,972) |
| | $ (62,403,309) |

The foregoing includes over $62 million in expenditures for the benefit of insiders. Although further analysis is needed and will be conducted following confirmation, some examples of the foregoing expenditures were:

    a. over $9 million paid to RM Sotheby between November 2022 and September 2023 was used for, among other things, the following purchases:

        i. $4,729,745 to puchase a 2003 Ferrari Enzo AB Version E and a 2014 Ferrari LaFerrari;
        ii. $2,337.710 to purchase four (4) cars and a v-12 table;

5

    b. approximately $1.8 million paid to Ai Design, a high-end automotive shop, from December 2022 to October 2023, was for work on Roglieri's luxury vehicles; and

    c. approximately $0.9 million paid to Xo Global LLC was for private air travel.

11. In addition, our detailed analysis has raised numerous questions regarding various transactions, such as:

    a. Aspen Commercial Lending LLC ("Aspen") received two (2) payments for a total of $260,000. Aspen appears to be a commercial lender offering the financing arrangements previously offered by Roglieri's other entities.

    b. Brandon Wheeless received a total of 20 payments for $200,000, as detailed below:

| Date | Account | Amount | Fund Recipient |
|---|---|---|---|
| 7/7/2022 | 2233 | $ (10,000) | Brandon Wheeless |
| 7/21/2022 | 2233 | (10,000) | Brandon Wheeless |
| 8/4/2022 | 2233 | (10,000) | Brandon Wheeless |
| 8/24/2022 | 2233 | (10,000) | Brandon Wheeless |
| 9/13/2022 | 2233 | (10,000) | Brandon Wheeless |
| 10/3/2022 | 2233 | (10,000) | Brandon Wheeless |
| 10/26/2022 | 2233 | (5,000) | Brandon Wheeless |
| 11/10/2022 | 2233 | (10,000) | Brandon Wheeless |
| 11/28/2022 | 2233 | (10,000) | Brandon Wheeless |
| 12/12/2022 | 2233 | (10,000) | Brandon Wheeless |
| 1/4/2023 | 2233 | (10,000) | Brandon Wheeless |
| 1/18/2023 | 2233 | (10,000) | Brandon Wheeless |
| 2/10/2023 | 2233 | (10,000) | Brandon Wheeless |
| 3/8/2023 | 6945 | (10,000) | Brandon Wheeless |
| 4/13/2023 | 2233 | (10,000) | Brandon Wheeless |
| 4/25/2023 | 2233 | (15,000) | Brandon Wheeless |
| 6/7/2023 | 2233 | (10,000) | Brandon Wheeless |
| 7/19/2023 | 2233 | (10,000) | Brandon Wheeless |
| 8/25/2023 | 2233 | (10,000) | Brandon Wheeless |
| 9/18/2023 | 2233 | (10,000) | Brandon Wheeless |
|  |  | $ (200,000) |  |

    c. Christopher Synder and Fenix Fam Inc. received a total of 27 payments for $392,500. Mr. Snyder is the former Chief Operating Officer at Prime Commercial Lending.

**B. Finding that the Debtor was a "Ponzi" Scheme**

12. The Trustee's professionals estimate that at least $100 million in fraudulently obtained funds have yet to be returned to the Debtor's victims.[2] Obtaining recompence for the

---

[2] After duplicate claims are eliminated and the three separate claims of Berone Capital LLC (Claim Nos. 25-27) are

Debtor's victims will be the primary objective of the Plan Administrator after the confirmation of the Plan.

13. The Trustee seeks a finding that the Debtor was in fact a fraudulent Ponzi/advance pay lending scheme as part of the order confirming the Plan. That finding will help the Plan Administrator streamline the process to recover money and other property fraudulently transferred by the Debtor in furtherance of its scheme, and liquidate claims filed against the Debtor's estate.

14. The Debtor was formed on December 14, 2021, and purported to be a legitimate alternative (or nonbank) commercial lender. The Debtor advertised proudly that:



See Prime Commercial Lending, Prime Capital Ventures & The Bailey [Video], May 16, 2022, https://www.youtube.com/watch?v=A4_RKBepUkA (YouTube) at 0:21.

15. Generally, alternative lenders offer borrowers some significant benefits over traditional bank lenders by having simpler application processes, fewer underwriting requirements, different and more flexible financing products, and more rapid funding.[3] Roglieri confirmed that

---

counted a single time in the amount of $30,000,000, there are currently approximately $210 million in claims asserted against the Debtor's estate. The Plan Administrator intends to investigate each claim fully following confirmation to determine the proper amount of each creditor's claim and the actual amount of each creditor victim's ICA Deposit.

[3] See Calio, V., June 20, 2024, Traditional Bank vs. Alternative Lender, kapitus.com,

this was the Debtor's business model claiming that he "saw a rising demand from borrowers who needed to move projects forward with as little static as possible" and that the Debtor could "provide solutions that are less restrictive than your average bank and offer generous terms that favor borrowers."[4] The disadvantage of going to an alternative lender is that they typically charge higher interest rates than what may be available at a traditional bank.[5]  The Debtor on the other hand offered all of the advantages of an alternative lender, while offering interest rates well below market as explained below.

16. On May 2, 2022, the Debtor described its business in an article in DealMaker Magazine as "a fund specifically designed to provide capital for large development, commercial development and commercial real estate transactions from $50 million to more than $1 billion."[6] The Debtor offered non-recourse loans with interest rates of 4 to 6% with interest only payments.[7] At the exact same time, interest rates were rising rapidly in response to inflationary pressure.  At the time of the Debtor's advertisement (May 2022), the prime interest rate was 4%, rising to 4.75% a month later, then to 6.25% by September 21, 2022, and peaking at 8.5% on July 26, 2023.[8]  15-year mortgages followed the same trend starting at 4.52% on May 5, 2022 and peaking at 7.03% on October 26, 2023.[9]

---

https://kapitus.com/blog/manage-your-money/financing/traditional-bank-vs-alternative-lender-which-is-better-for-your-small-business-kapitus/, a copy of which is attached hereto as **Exhibit B**.
[4] Prime Commercial Lending, March 17, 2022, Albany, New York's Prime Commercial Lending Funds the First 5-Star Hotel in Atlanta, GA Through Prime's Real Estate Fund, Prime Capital Ventures, [Press release] https://www.prnewswire.com/news-releases/albany-new-yorks-prime-commercial-lending-funds-the-first-5-star-hotel-in-atlanta-ga-through-primes-real-estate-fund-prime-capital-ventures-301505069.html, a copy of which is attached hereto as **Exhibit C**.
[5] See Calio, V., June 20, 2024, Traditional Bank vs. Alternative Lender, *supra* (Exhibit B).
[6] See Koplin, I., May 2, 2022, Roglieri Unveils Prime Capital Ventures, Prime Commercial Lending's Newest Fund, dealmaker-magazine.com, https://www.dealmaker-magazine.com/magazine/roglieri-unveils-prime-capital-ventures-prime-commercial-lendings-newest-fund, a copy of which is attached hereto as **Exhibit D**.
[7] See Id.
[8] See https://www.fedprimerate.com/wall_street_journal_prime_rate_history.htm, a copy of which is attached hereto as **Exhibit E**.
[9] See Freddie Mac (https://www.freddiemac.com/pmms), a copy of which is attached hereto as **Exhibit F**.

17. The Debtor's business model sounds completely implausible because it was. For any lender to be successful, it must pay a lower cost of capital than it receives from its borrowers. Banks would never survive if they paid their depositors a higher rate of interest than they receive from their borrowers. This assertion can be easily verified by contrasting what Citibank will pay a depositor today for a 5-year certificate of deposit (1.98%)[10] versus the average 5-year commercial mortgage rate (6.22%)[11]. In simple terms, in order to be a successful lender, the Debtor would have had the impossible task of obtaining capital at well below the 4 to 6% that it was offering to its prospective borrowers. In truth, the Debtor had no known legitimate source of capital to lend to prospective borrowers. Instead, it obtained its capital by converting its prospective borrowers' own funds.

18. The Debtor did this by requiring as a condition of providing a loan that its prospective borrower provide 20% of the contemplated loan as an upfront deposit – an ICA Deposit. Roglieri stated that borrowers "have to come to the table with at least 20% and that's just an important function of how our product works."[12] The Debtor claimed that it would hold the ICA Deposit "as prepaid interest throughout the term of the loan."[13] As interest payments became due, the Debtor represented that it "would just deduct it from the [ICA Deposit]".[14] The Debtor admitted that this was "a unique way of doing things" but claimed that it "ensures [the Debtor's] payback, and [the ICA Deposit] serves as additional collateral for the loan throughout the term."[15]

19. The ICA Deposits were an investment by the borrowers to get access to the

---

[10] See Source https://www.citi.com/banking/current-interest-rates/cd (last viewed Jan. 30, 2026), a copy of which is attached hereto as **Exhibit G**.
[11] See Source https://www.commloan.com/commercial-mortgages/mortgage-rates (last viewed Jan. 30, 2026), a copy of which is attached hereto as **Exhibit H**.
[12] See Koplin, I., May 2, 2022, Roglieri Unveils Prime Capital Ventures, Prime Commercial Lending's Newest Fund, dealmaker-magazine.com (Exhibit D).
[13] See Id.
[14] Id.
[15] Id.

9

Debtor's promise of cheap and readily available capital. A loan from the Debtor would theoretically allow a prospective borrower to invest in its underlying business and hopefully make big returns. The Debtor's prospective borrowers did not appear to have any other viable source of capital, or at least not any as inexpensive as the Debtor. The Debtor further enticed prospective borrowers with what appear to have been very little underwriting and collateral requirements. The Debtor also did not require personal guarantees or recourse on the loans based upon those that I and the Trustee's professionals have been able to tell from reviewing the Debtor's books and records.

20. Of course, the ICA Deposits that the Debtor claimed to be holding to service the prospective borrower's future interest payment were the Debtor's only known source of capital. The Debtor did not segregate or hold the borrowers' ICA Deposits as it had represented. In fact, based upon the detailed allegations of the Government, many ICA Deposits were largely if not completely consumed the minute they were received by the Debtor to cover large and pervasive overdrafts in the Debtor's bank accounts.[16]

21. ICA Deposits were used to fund advances to other borrowers, return ICA Deposits to other parties who were aggressively demanding their return, and to buy luxury items and property for the exclusive benefit and enjoyment of Roglieri. For example, according to the Government, Roglieri spent the funds misappropriated from the Debtor's prospective borrowers in the following ways[17]:

---

[16] For example, on April 7, 2023, creditor 526 Murfreesboro provided the Debtor with an ICA Deposit of $4,312,500 by wire transfer to the Debtor's account at Citibank. At the time, the Citibank account was overdrawn in the amount of $4,094,514.75, so nearly the entire ICA Deposit was spent immediately to cover the Debtor's obligation to Citibank. Similarly, on April 27, 2023, Compass-Charlotte provided the Debtor with an ICA Deposit of $15,902,250 by wire into the Debtor's Citibank account. $6,525,669.33 of that ICA Deposit was consumed immediately to cover an overdraw. See United States of America v. One 2003 Ferrari Enzo AB Version E., et al., Case No. 24-cv-1345 (MAD/DJS), Docket No. 20-1, Amended Complaint, ¶¶36-57 (N.D.N.Y. Jan. 15, 2025), a copy of which is attached hereto as **Exhibit I**.
[17] See Id. at ¶¶80-162.

10

- $916,201 in private jets from June 2022 to October 2023;

- $1,778,154.77 to Ai Design, a high-end automotive shop from December 2022 to October 2023;

- $3,194,454 to purchase a rare Mercedes-Benz "hybercar", which never materialized;

- $3,672,067.50 to purchase the Virginia Beach Property;

- $2,225,000 to purchase a single wristwatch called "RM-52-01 Tourbillion Skull";

- $4,729,745 to RM Sotheby's to purchase a 2003 Ferrari Enzo AB Version E and a 2014 Ferrari LaFerrari;

- $260,810 for a table constructed using a Ferrari V-12 engine;

- $2,337,710 for the combined purchase of a 1982 Mercedes Benz 500SL, a 1989 Mercedes Benz 560 SEL, a 2007 Mercedes Benz SLR McLaren, and a 1987 Mercedes Benz 560;

- $1,300,000 to TopGear Imports for a 2004 Porsche Carrera;

- $2,055,312 to Wide World Farrari for a 2022 Ferrari 812 Competizione;

- $3,811,000 to Bonhams Butterfields Trust for the purchase of a 2006 Maserati MC 12 Corse;

- $355,000 to Timepiece Trading for the purchase of a Richard Mille RM 65-01 watch; and

- $260,000 to Luxury Bazaar for the purchase of two Rolex watches.

22.     In order to sell a business model that seemed entirely impossible if properly understood, and to get prospective borrowers to give the Debtor new ICA Payments, the Debtor had to demonstrate that it actually made loans. It did this by, among other ways, fraudulently claiming to have made a "$188,000,000 funding of ALUX Properties, LLC and their project 'The Bailey' which will be the only 5-star hotel in Atlanta".[18] The Debtor made a glitzy promotional

---

[18] See Prime Commercial Lending, Prime Capital Ventures & The Bailey [Video], May 16, 2022, https://www.youtube.com/watch?v=A4_RKBepUkA (YouTube) at 0:13:

video published on YouTube where it boasted about making this loan. The video featured Roglieri and others trapsing around the wooded area in Atlanta where "The Bailey" was going to be constructed. The alleged principal of ALUX Properties, LLC ("ALUX"), Brandon Wheeless, expressed his appreciation in the video stating that "access to this type of capital with trusted individuals that you close deals with definitely makes life a heck of a lot easier for us and the company so we are fast-tracking to grow at an exponential rate moving forward."[19] Depicted here are Messrs. Wheeless and Roglieri surveying the site, along with the "after" rendering of "The Bailey" contained in the Debtor's video advertisement[20]:



23.   The problem, of course, is that the Debtor never made any such loan to ALUX. There is no "The Bailey" hotel in Atlanta and there is no sign that there was ever actually going to be. In fact, ALUX, the purported borrower, was placed into a receivership by the Georgia Superior

---



See also, Prime Commercial Lending, March 17, 2022, Albany, New York's Prime Commercial Lending Funds the First 5-Star Hotel in Atlanta, GA Through Prime's Real Estate Fund, Prime Capital Ventures, [Press release] (Exhibit C).

[19] See Id. at 3:44 (transcribed by counsel).
[20] See Id. at 2:58 and 1:35, respectively.

Court on September 13, 2022 in connection with a lawsuit where the plaintiffs alleged, among other things, to have been defrauded out of $10 million.[21] Featured in that litigation was an entity called Blackwater Capital Group, LLC" ("Blackwater") which purported to act as a lender to the project, not unlike the Debtor in its promotional video.[22] Blackwater's lending agreement was dated December 14, 2021, the exact date that the Debtor was formed, and was nearly identical in form and substance to the form of lending agreement employed by the Debtor.[23] Compared here are the first pages of the table of contents of Blackwater's December 14, 2021 lending agreement (on the left), and the Debtor's April 24, 2023 lending agreement with creditor Compass (on the right)[24]:

[Side-by-side comparison of two tables of contents — Blackwater's agreement (left) and Debtor's Compass agreement (right). Both contain the same articles and sections: RECITALS; ARTICLE 1 DEFINITIONS (Section 1.1 Certain Defined Terms); ARTICLE 2 THE CREDIT (Sections 2.1 Line of Credit Amount, 2.2 Line of Credit Documents); ARTICLE 3 TERM, INTEREST AND PAYMENTS (Sections 3.1 Initial Term, 3.2 Extended Term, 3.3 Applicable Interest Period, 3.4 Interest Rate Calculation, 3.5 Interest Payments, 3.6 Reserves, 3.7 Risk Management Protection for ICA Payment / Intentionally Omitted, 3.8 Prepayment, 3.9 Interest Credit Account, 3.10 Fees / LOC Fee, 3.11 Line of Credit Extension Fees, 3.12 Legal and Incidental Fees, Charges and Costs, 3.13 Line of Credit Disbursement Account / Taxes, 3.14 Taxes); ARTICLE 4 CONDITIONS TO CLOSING AND DISBURSEMENT (Sections 4.1–4.15); ARTICLE 5 USE OF LINE OF CREDIT PROCEEDS (Section 5.1 Development Costs).]

---

[21] See *Capstone Diagnostics One, L.P., et al. v. Bailey LLC, et al.*, Case No. 2022cv366001 (GA Sup. Ct., Fulton Cty., Sept. 13, 2024), a copy of which is attached hereto as **Exhibit J**.
[22] See *Id.*, Judgment entered June 24, 2023, a copy of which is attached hereto as **Exhibit K**.
[23] See *Id.*, Verified Complaint, Exhibit E, a copy of which is attached hereto as **Exhibit L**.
[24] See *Id.*, compared to Exhibit 29 to the Complaint filed in *Compass-Charlotte v. Prime Capital Ventures, LLC, et al.*, Case No. 24-cv-55 (MAD) (N.D.N.Y. Jan. 12, 2024), a copy of which is attached hereto as **Exhibit M**.

24. Like the Debtor, Blackwater required the payment of an ICA Deposit under its agreement. Blackwater was ultimately paid its $10 million ICA Deposit. However, the source of that ICA Deposit did not come from ALUX (the borrower) but from funding from the plaintiffs in the litigation who sued to recover their money. Ultimately, the Georgia Superior Court found that "[t]he testimony evidence brought forth at the hearing revealed the [Blackwater lending agreement] to be a 'total fraud'".[25] Although the relationship between Blackwater and the Debtor is not yet understood, both entities and/or their principals were using the same fraud model to defraud prospective borrowers out of ICA Deposits.

25. Fortunately for Blackwater's victim(s) in the ALUX transaction, but unfortunately for the Debtor's victim(s), Blackwater appears to have been discovered and stopped relatively quickly, whereas the Debtor continued on until at least in or around December 2023, obtaining an estimated $100 million in ICA Deposits that have yet to be repaid.

26. In addition to the fraudulent claim that the Debtor has loaned $188 million to ALUX to build "The Bailey", the Debtor also fraudulently claimed to have "gained prominence by committing $17 billion with a South Korean firm for projects in the United States and abroad."[26] The Debtor also claimed that it had provided "$2.3 billion in funding for the first stage of a massive

---

[25] See Id., Judgment entered June 24, 2023, p.4 (Exhibit K).
[26] See Prime Commercial Lending, March 17, 2022, Albany, New York's Prime Commercial Lending Funds the First 5-Star Hotel in Atlanta, GA Through Prime's Real Estate Fund, Prime Capital Ventures, [Press release] (Exhibit C); see also Prime Commercial Lending, Prime Commercial Lending Commits to Lending $17 Billion [Video], Jan. 21, 2022, https://www.youtube.com/watch?v=PmvtmdkBUlo (YouTube) at 0:13:

> Prime Commercial Lending recently committed to funding 17 Billion dollars of projects for a South Korean investor.

five-year, five-stage $22 billion project" "[i]n the heart of Dubai".[27] There is absolutely no indication that any of that is true.

27. The Debtor's business was never legitimate. It was founded upon lies. Those lies were compounded when prospective borrowers' ICA Deposits were immediately converted and never reserved for interest payments as represented. Finally, those lies were discovered when the Debtor was unable to fund the loans promised to prospective borrowers who had already made ICA Deposits. Once most of the borrowers discovered that the Debtor could not fund their loans, they demanded a return of their ICA Deposits and began to rush to courthouses all over the country.[28]

28. For a few of the Debtor's earliest prospective borrowers, the Debtor was able to obtain sufficient additional ICA Deposits from new prospective borrowers to fund those loans. Even though the Debtor advertised that its transactions ranged from $50 million to $1 billion, none of the loans that it actually made even came close to the advertised $50 million floor. In fact, the largest loan was to Indigo Pharmaceuticals and was for Project LOC Amount of $20 million by agreement dated June 2, 2022.[29] The Trustee and his professionals believe that other loans were partially or fully funded and they are currently investigating such loans.

---

[27] Koplin, I., May 2, 2022, Roglieri Unveils Prime Capital Ventures, Prime Commercial Lending's Newest Fund, dealmaker-magazine.com, https://www.dealmaker-magazine.com/magazine/roglieri-unveils-prime-capital-ventures-prime-commercial-lendings-newest-fund (Exhibit D).

[28] See, e.g., Truss Financial LLC v. Prime Capital, et al., Index No. 2023/510389 (N.Y.Sup. Ct. Kings Cty. Apr. 5, 2023) (seeking and apparently obtained the return of $13.4 million) (a copy of the Summons with Notice is attached hereto as **Exhibit N**); B&R Acquisition Partners v. Prime Capital (JAMS Arb., Aug. 2023) (seeking return of $4.3 million) (a copy of the JAMS Arbitration Award is attached hereto as **Exhibit O**); Sturm v. Prime Capital, Case No. 23-cv-1033 (N.D.N.Y. Aug. 22, 2023) (seeking return of $2 million) (a copy of the complaint is attached hereto as **Exhibit P**); Camshaft CRE 1, LLC v. Prime Capital, Case No. 2023-023173 (Fla. Circ. Ct., Miami-Dade Cty., Sept. 15, 2023) (seeking return of $12.4 million) (a copy of the complaint is attached hereto as **Exhibit Q**); The Lion Group DFW, LLC v. Prime Capital, Case No. 23-DCV-34617 (Tex. Dist. Ct., 146th Dist., Sept. 21, 2023) (demand unknown) (a copy of the docket is attached hereto as **Exhibit R**); Onward Partners, LLC, v. Prime Capital, et al., Case No. 23-cv-833 (D. Utah Nov. 13, 2023) (seeking return of $4 million) (a copy of the complaint is attached hereto as **Exhibit S**).

[29] See Prime Commercial Lending, Prime Capital Ventures Presents Indigo Pharmaceutical in Las Vegas, NV [Video],

29.     When the Debtor was no longer able to fund loans and borrowers began to sue, the only way for the Debtor to forestall discovery of its fraud was to obtain more ICA Deposits to repay those who had discovered what was going on. In at least the following situations, the Debtor used new ICA Deposits to try to satisfy the claims of earlier prospective borrowers:

- 526 Murfreesboro delivered a $4,312,500 ICA Deposit to the Debtor on April 7, 2023. On April 17, 2023, the Debtor used $2,000,000 of that ICA Deposit to repay a prior portion of the ICA Deposit received in September 2022 from borrower Onward Partners LLC, and another $2,000,000 of that ICA Deposit to repay a prior portion of the ICA Deposit from another client identified as "Business-1" by the Government.[30] Thus, the near entirety of 526 Murfreesboro's ICA Deposit was used to repay prior borrower/investors.

- Compass delivered a $15,902,250 ICA Deposit to the Debtor on April 27, 2023, and HCW Biologics Inc. ("HCW") delivered a $5,250,000 ICA Deposit to the Debtor that same day. Compass and HCW's ICA Deposits were commingled and were used for the following purposes, among others, not related to those borrowers: (i) $6,525,669.33 was used to fund a preexisting overdraw in the Debtor's bank account (Citibank No. **6945); and (ii) $3,700,000 was transferred to a law firm and used, upon information and belief, in connection with another loan.[31]

- Newlight delivered a $2,500,000 ICA Deposit to the Debtor on May 24, 2023, which was largely used for unrelated purposes in the one- week period that followed.[32]

- As required by the Line of Credit Agreement between ER Tennessee and the Debtor, $15 million was required to be advanced by ER Tennessee as an ICA Deposit and held in a separate bank account. On September 21, 2023, the Debtor received two (2) deposits of $9,2621,416 and $4,987,416.00, respectively, representing ER Tennessee's ICA Deposit. The ICA Deposit was deposited into the Debtor's newly formed account at RBC (#0017). On September 26, 2023, the Debtor transferred $7,000,000 of ER Tennessee's ICA Deposit to another newly formed Debtor bank account at Quad City / Farmer Bank account (#5665). That same day, the Debtor issued six (6) wires from Farmers Bank account totaling $6,569,400.00 in various amounts to recipients Lion Group, Ketan Masters, Redeem Temple Courtyard, Lofts Phases 2 & 3 LLC, and Barclay Damon LLP (two separate transfers). It is believed that most, if not all, of those transfers were to replace other prospective borrowers' ICA Deposits.

---

Apr. 20, 2023, https://www.youtube.com/watch?v=GvmECqnuBkY (YouTube) at 0:13; Prime Commercial Lending, Prime Capital Ventures Presents Home Rentals in Carbondale, IL [Video], Mar. 3, 2023, https://www.youtube.com/watch?v=8D5GRnKecG0 (YouTube).
[30] See Civil Forfeiture Case Amended Complaint, Docket No. 20-1, ¶42 (Exhibit I).
[31] See Id. at ¶¶45-57.
[32] See Id. at ¶¶58-65.

Further, in early October 2023, the Debtor obtained a $6,000,000 line of credit from RBC using the remainder to ER Tennessee's ICA Deposit in acct #0017 as collateral. Immediately, on October 11, 2023, $5,000,000 of the RBC loan proceeds was transferred to the Debtor's Key Bank acct #2233 and then further transferred to Matthew Thacker. On October 16, 2023, the Debtor transferred the remaining $1,000,000 of the RBC loan proceeds to Key Bank acct #2233. When the Debtor defaulted on the terms of the RBC loan, RBC was repaid from the remainder of ER Tennessee's ICA Deposit which was used as collateral for the loan.

30. I believe as the Government has alleged that the Debtor was at all relevant times an advance fee/Ponzi scheme. Perhaps the most compelling admission is found in text messages between Roglieri and an undisclosed individual as follows:

| Date | Time | From | Message |
|---|---|---|---|
| 1/4/2024 | 11:20:42 am | Unknown | Can't you just keep working on those companies?<br>I know it might be hard at first, but look what you build this up to beat from nothing |
| 1/4/2024 | 11:20:56 am | Roglieri | Yea I can but not when I'm in f—king prison |
| 1/4/2024 | 11:21:09 am | Unknown | Why do you think that's gonna happen?<br>Why can't it just be a bankruptcy? |
| 1/4/2024 | 11:21:47 am | Roglieri | **Because I unused others money to fund deals**<br>I already told you this |
| 1/4/2024 | 11:22:02 am | Unknown | And that's illegal? |
| 1/4/2024 | 11:22:15 am | Roglieri | Yes |
| 1/4/2024 | 11:22:36 am | Unknown | How bad . I mean, what's the worst you do a couple years who cares<br>You have your family<br>This whole family will support you through this<br>It's a civil case it's not a criminal case |
| 1/4/2024 | 11:27:42 am | Roglieri | **It will turn criminal as soon as they get into bank statements** |

*United States of America v. Kris Roglieri*, Case No. 24-cr-00392 (MAD) (N.D.N.Y.) (the "Roglieri Criminal Case"), Docket No. 6-1, p. 20-24 (June 3, 2024) (emphasis added) (typographical and grammatical errors in original), a copy of which is attached hereto as **Exhibit T**.

31. The plea agreements entered into by insiders of the Debtor contain numerous admissions that support the contention that the Debtor was at all times an advance fee/Ponzi scheme as follows:

17

- Roglieri admitted that he and Humphrey "began claiming that [the Debtor] had the present ability to make large commercial loans, including loans in the tens of millions of dollars, through funding agreements with third-party hedge funds. As the defendant knew at all relevant times, [the Debtor] had obtained no funds of its own and never had the present ability to independently make commercial loans of any size, and funding was based on possible third-party sources and funding agreements." Roglieri Criminal Case, Docket No. 90 (the "Roglieri Plea"), p.8, § 5(c), a copy of which is attached hereto as **Exhibit U**; *United States v. Kimberly Humphrey a/k/a Kimberly Owen,* Case No. 25-cr-00238 (MAD) (N.D.N.Y.), Docket No. 4 (the "Humphrey Plea"), p.6, §5(b) and (g), a copy of which is attached hereto as **Exhibit V**.

- Despite representations to prospective borrowers to the contrary ICA Deposits "were not deposited into a pledged account or accounts", "were not used to cover interest payments on loans", and portions of ICA Deposits were used to "fund [Roglieri's] purchases of luxury goods". Roglieri Plea, pp.8-9, §5(e); Humphrey Plea, p.9, §5(i).

- "Because [the Debtor] never ultimately secured a proven, demonstrated or realized a source of loan funding, [Roglieri and the other Debtor Insiders] used ICA [Deposits] from newer borrower clients to partially fund loans to, and to refund ICA [Deposits] to, older borrower clients." Roglieri Plea, p.10, §5(g).

32.    Based upon the foregoing and as set forth in the Trustee's accompanying Memorandum of Law in support of approval of his Disclosure Statement and confirmation of the Plan, the Trustee seeks a finding in connection with confirmation of the Plan that the Debtor was an advance fee/Ponzi scheme.

33.    To the best of my knowledge, information, and belief, after a thorough analysis, the above is true, correct, and accurate.

I declare under penalty of perjury that the foregoing is true and correct on this the 30th day of January, 2026.

                                            */s/ Brian Ryniker*
                                            Brian Ryniker