UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

In re                                                  :

                                                       :        Chapter 11

PRIME CAPITAL VENTURES, LLC,                           :

                                                       :        Case No. 24-11029 (PGR)

            Debtor.                   :

---------------------------------------------------------------x

## MOTION OF YANN GERON, AS CHAPTER 11 TRUSTEE OF PRIME CAPITAL VENTURES, LLC, FOR AN ORDER PURSUANT TO FED. R. BANKR. P. 9019 APPROVING A CERTAIN STIPULATION SETTLING ALL CLAIMS AND CONTROVERSIES BETWEEN THE TRUSTEE AND COMPASS-CHARLOTTE 1031, LLC

**TO THE HONORABLE PATRICK G. RADEL,**
**UNITED STATES BANKRUPTCY JUDGE:**

Yann Geron, as chapter 11 trustee (the "Trustee") of Prime Capital Ventures, LLC ("Prime" or the "Debtor"), by and through his special litigation counsel, Klestadt Winters Jureller Southard & Stevens, LLP, hereby submits this motion (the "Motion") seeking the entry of an order, pursuant to Fed. R. Bankr. P. 9019, approving a certain stipulation between the Trustee and Compass-Charlotte 1031, LLC ("Compass-Charlotte"), a copy of which is annexed hereto as Exhibit A (the "Stipulation"), providing for the settlement of all claims and controversies between the Trustee and Compass-Charlotte. In support of the Motion, the Trustee represents as follows:

### PRELIMINARY STATEMENT

Prime was created by Roglieri in December 2021 as "a fund specifically designed to provide capital for large development, commercial development and commercial real estate transactions from \$50 million to more than \$1 billion."[1] Prime advertised that it would offer non-recourse lines of credit with rates at 4 to 6% with interest-only payments but would require

---

[1] *See Petitioning Creditors' Motion for a Trustee*, Case No. 23-11302, Dkt. No. 4, ¶¶22-23 (Dec. 19, 2023) (quoting May 2, 2022 marketing in DealMaker Magazine).

borrowers to provide 20% cash upfront based on the total project cost to establish an interest credit account (the "ICA Deposits").  The ICA Deposits would be held by Prime "'as prepaid interest throughout the term of the loan.'"[2]  Prime obtained millions of dollars in ICA Deposits from multiple companies throughout the country which in most cases, upon information and belief, were used by Prime and Roglieri before the loans were closed and funded.[3]

Compass-Charlotte is the largest victim/creditor of Prime's bankruptcy estate on account of a roughly $15 million ICA Deposit given to Prime that was not returned.  Compass-Charlotte was the principal driver of Case 1, the involuntary bankruptcy filing, that lasted approximately 20 days.[4]  Compass-Charlotte sought the dismissal of that case upon learning of the Berone Entities and needing a receivership process in order to get control over funds allegedly on deposit with the Berone Entities.  Compass has spent not less than $804,111.36 just as of May 31, 2024 on its efforts to force Prime into an organized, liquidating process prior to commencement of the instant bankruptcy case, Case 3.  Compass-Charlotte asserts a substantial contribution claim on account of these fees that it seeks allowed as an administrative claim in Prime's current bankruptcy case.

During Case 3, Judge Littlefield issued a decision denying, without prejudice, the Debtor's request to abandon any and all claims against the Petitioning Creditors under 11 U.S.C. § 303(i) on account of their filing of Case 1.

Compass-Charlotte and the Trustee have discussed Compass-Charlotte's request for a substantial contribution claim and issues related to such claim at length and in good faith and have reached an agreement to resolve these issues as set forth in the Stipulation.  In sum, pursuant the Stipulation, the Parties have agreed to resolve these matters as follows:

---

[2] *Id.*, ¶26.
[3] *Id.*, ¶37.
[4] While Case 1 has not been closed, it remains open because the Bankruptcy Court retained jurisdiction over certain matters.

1. Compass-Charlotte's substantial contribution claim shall be allowed in the amount of $650,000.00 as an administrative, priority claim.

2. Compass-Charlotte's general unsecured claim shall be reduced and allowed in the amount of $18,105,432.23 (reduced from $53,853,962.61), provided no other creditors are deemed to be entitled to treble damages on their claims.

3. Compass-Charlotte will assign to the Trustee and the bankruptcy estate all of its third-party claims, if any, against Prime's former attorneys, auditors, or other professionals, and any financial institutions used by Prime or its management, for aiding and abetting Prime and its management in the conduct of their fraudulent scheme. For the avoidance of doubt, Compass-Charlotte's assigned claims do not include Compass-Charlotte's claims against Roglieri's bankruptcy estate, or any victims' fund established by the government in connection with the criminal prosecution of Roglieri or other Prime management.

4. The Trustee, on behalf of Prime's bankruptcy estate, waives any entitlement to a 303(i) damages claim against Compass-Charlotte.

5. Case 1 shall be dismissed. Upon the Effective Date, the Trustee shall submit the proposed order annexed to the Stipulation as Exhibit A to the Bankruptcy Court in Case 1 for the Court's consideration and approval.

For all the reasons set forth below, the Trustee respectfully submits that the settlement embodied in the Stipulation is in the best interests of Prime's bankruptcy estate and respectfully requests that it be approved by the Court by "So Ordering" the Stipulation.

## JURISDICTION

1.      This Court has jurisdiction over the bankruptcy case and this Motion pursuant to

28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), and

Rule 81.1 of the Local Rules for the United States District Court for the Northern District of New

York referring matters arising under Title 11 of the United States Code (the "Bankruptcy Code")

to the Bankruptcy Court (Jan. 1, 2024).

2.      Venue of this case is proper before this Court pursuant to 28 U.S.C. §§ 1408 and

1409.

3.      The statutory predicate for the relief sought herein is Fed. R. Bankr. P. 9019.

## CASE BACKGROUND

4.      By December 2023, Prime was besieged by litigation largely from borrowers who

did not get their loans funded and wanted the return of their Borrower Prepayments.  *See*, *e.g.*,

*Tuss Financial LLC v. Prime Capital, et al.*, Index No. 2023/510389 (N.Y.Sup. Ct. Kings Cty.

Apr. 5, 2023) (seeking and apparently obtaining the return of $13.4 million); *B&R Acquisition*

*Partners v. Prime Capital* (JAMS Arb., Aug. 2023) (seeking the return of $4.3 million); *Sturm v.*

*Prime Capital*, Case No. 23-cv-1033 (N.D.N.Y. Aug. 22, 2023) (seeking the return of $2 million);

*Camshaft CRE 1, LLC v. Prime Capital*, Case No. 2023-023173 (Fla. Circ. Ct., Miami-Dade Cty.,

Sept. 15, 2023) (seeking the return of $12.4 million); *The Lion Group DFW, LLC v. Prime Capital*,

Case No. 23-DCV-34617 (Tex. Dist. Ct., 146th Dist., Sept. 21, 2023) (demand unknown); *Onward*

*Partners, LLC, v. Prime Capital, et al*., Case No. 23-cv-833 (D. Utah Nov. 13, 2023) (seeking the

return of $4 million).

5.      On April 24, 2023, Compass-Charlotte (as borrower) entered into a Development

Line of Credit with Prime (as purported lender), whereby Prime was to make a loan to Compass-

Charlotte in the principal amount of $79,511,250 (the "<u>Compass/Prime Agreement</u>").

6.      On April 27, 2023, Compass-Charlotte remitted $15,902,250 to Prime on account of the ICA Deposit required by the Compass/Prime Agreement (the "<u>Compass-Charlotte ICA Deposit</u>").  As of the date of the Stipulation, no portion of the Compass-Charlotte ICA Deposit has been returned to or recovered by Compass-Charlotte.

7.      On December 19, 2023, Compass-Charlotte, 526 Murfreesboro, LLC, and Newlight Technologies, Inc. (collectively, the "<u>Petitioning Creditors</u>") filed an involuntary petition against Prime for relief under chapter 7 of the Bankruptcy Code commencing Case No. 23-11302 ("<u>Case 1</u>").  The Petitioning Creditors commenced Case 1 for the obvious purpose of ensuring that Prime's assets and liabilities could be liquidated in a single, public forum, and that no single creditor could win the proverbial "race to the courthouse".  The standing of certain Petitioning Creditors to commence the involuntary case against Prime was aggressively contested by Prime while under Roglieri's control.

8.      On January 8, 2024, after discovering that Prime, while under Roglieri's control, made multiple misstatements and misrepresentations to the Bankruptcy Court and recognizing that the Bankruptcy Court lacked jurisdiction over certain non-debtor entities that were believed to be holding certain of the ICA Deposits, the Petitioning Creditors filed a motion to dismiss Case 1 in order to pursue recovery of their deposits in a different forum.  On January 9, 2024, the Bankruptcy Court granted the Petitioning Creditors' motion and dismissed Case 1 without prejudice, and retained jurisdiction over all unresolved matters, including the Debtor's claim for damages against the Petitioning Creditors pursuant to section 303(i) of the Bankruptcy Code ("<u>303(i) Damages Claim</u>").  Case 1 remains open to this day for purposes of determining whether Prime is entitled to any 303(i) Damages Claim.

9.      Following dismissal of Case 1, on January 12, 2024, Compass-Charlotte filed a complaint (the "District Court Complaint") with the United States District Court for the Northern District of New York (the "District Court") against (i) Berone Capital Fund, LP, (ii) Berone Capital Partners LLC, (iii) Berone Capital LLC, (iv) Berone Capital Equity Fund I, LP, and (v) 405 Motorsports LLC f/k/a Berone Capital Equity Partners LLC (collectively, the "Berone Entities")[5] and (vi) Prime (and together with the Berone Entities, the "District Court Defendants") asserting claims for breach of contract and fraud in the inducement against Prime, and claims for conversion and unfair and deceptive trade practice against all the District Court Defendants, which was assigned Case No. 24-cv-00055 (the "Receivership Action").  Paul A. Levine was appointed to serve as Prime's receiver (the "Receiver") in the Receivership Action.  The Receivership Action is currently pending but stayed and inactive.

10.      During the course of the Receivership Action, Compass-Charlotte, by and through its counsel, issued numerous subpoenas to third parties including financial institutions, vendees, and the Berone Entities, among others with knowledge and information related to Prime's financial affairs, and collected significant important and valuable information in the process.  Compass-Charlotte has provided all of the documents and information collected in that process to Prime, the Trustee, and the Receiver, together with information which Compass-Charlotte separately obtained from interviews and discussions with other creditors and its own investigations.

---

[5] During Case 1, Compass-Charlotte learned of a purported Joint Venture Agreement between Prime and the Berone Entities, pursuant to which the Berone Entities would assist Prime in obtaining the funds for the proposed lines of credit.  Prime also asserted in Case 1 that the Berone Entities held millions of dollars in a bank account on behalf of Prime.  For these reasons, Compass-Charlotte included the Berone Entities in the Receivership Action.

11.     On February 15, 2024, Roglieri filed a voluntary petition for relief under subchapter V of Chapter 11 of the Bankruptcy Code with the Bankruptcy Court under Case No. 24-10157 (the "Roglieri Bankruptcy Case").  On May 15, 2024, the Bankruptcy Court entered an order converting the Roglieri Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code.  Also on May 15, 2024, the U.S. Trustee appointed Christian H. Dribusch as interim trustee for the Roglieri bankruptcy estate (the "Former Roglieri Trustee").

12.     On May 14, 2024, the Receiver filed a Chapter 11 bankruptcy petition for Prime with the Bankruptcy Court, under Case No. 24-10531 (REL) ("Case 2").  On July 23, 2024, the Bankruptcy Court issued a Memorandum Decision and Order wherein the Bankruptcy Court dismissed Case 2 finding that the Receiver did not have the authority to file Case 2 on behalf of Prime.

13.     On September 16, 2024, the Former Roglieri Trustee, in his capacity as the authorized agent for Prime, filed a voluntary bankruptcy petition on behalf of Prime for relief under Chapter 11 of the Bankruptcy Code commencing the above-captioned case ("Case 3").

14.     On September 30, 2024, Compass-Charlotte filed a proof of claim against Prime's bankruptcy estate asserting a general, unsecured claim in the amount of $53,853,962.61, on account of the Compass-Charlotte ICA Deposit, due diligence deposit, and interest thereon in the amount of $17,951,320.87, plus $35,902,641.74 representing a trebling of the actual damages to which Compass-Charlotte claims to be entitled pursuant to 18 U.S.C. § 1964 and N.C. Gen. Stat. 75-16 [Claim 2-1], together with attorneys' fees in an undetermined amount (the "Compass-Charlotte GUC Claim").

15.     In the Compass-Charlotte GUC Claim, Compass-Charlotte also asserted and reserved all rights with respective to "an administrative expense claim pursuant to 11 USC 105 and 503(b) for the costs and expenses it has incurred which have made a substantial contribution to this case . . . ."

16.     On June 10, 2025, the Bankruptcy Court entered an order approving the U.S. Trustee's appointment of the Trustee on June 5, 2025, and consequently, since June 5, 2025, the Trustee has been in control of Prime's bankruptcy estate and is the sole representative of Prime.

17.     In addition to the Compass-Charlotte GUC Claim, Compass-Charlotte asserts a claim for no less than $804,111.36 on account of its payments for the services of four law firms, Crowell & Moring LLP, Hinkley, Allen & Snyder LLP, Nolan Heller Kauffman LLP, and Parker Poe, in connection with prosecuting Case 1 and the Receivership Action and the alleged substantial contribution and benefits such efforts bestowed upon Prime's bankruptcy estate (the "Compass-Charlotte 503(b) Claim").  Compass-Charlotte has provided all billing statements in connection with the Compass-Charlotte 503(b) Claim to the Trustee.  While those bills stop May 31, 2024, Compass-Charlotte continued to expend resources in connection with this Case 2, Case 3, and the Receivership Action for which it believes it is similarly entitled to an administrative priority.

18.     Compass-Charlotte also believes that it may have valid claims against (i) various financial institutions where Prime was a customer, and (ii) legal, accounting, or other professional firms that advised Prime, in connection with Compass-Charlotte's loss for aiding and abetting Prime's fraud, among potentially other things (collectively, "Compass-Charlotte Third-Party Claims").

19.    The Parties have had extensive discussions regarding, among other things, the allowability of the Compass-Charlotte Claim and the Compass-Charlotte 503(b) Claim, and the Trustee's potential entitlement to a 303(i) Damages Claim.  Following good faith negotiations, the Parties reached the agreement set forth in the Stipulation.

## THE STIPULATION

20.    The salient terms of the Stipulation are as follows[6]:

- Bankruptcy Court Approval Required.  The Stipulation is subject in all respects to the approval of the Bankruptcy Court evidenced by the entry of the Stipulation "So Ordered" by the Bankruptcy Court or the entry of an Order approving the Stipulation in its entirety in Case 3 (an "Approval Order").

- Conditions Precedent.  The effective date of the Stipulation will be the 15th day following entry of the Approval Order provided no party has filed a notice of appeal from, or motion for reconsideration or other relief from, the Approval Order (the "Effective Date").

- Reduction and Allowance of the Compass-Charlotte 503(b) Claim.  The Compass-Charlotte 503(b) Claim shall be reduced and allowed in the amount of $650,000.00 as an administrative, priority claim.  Compass-Charlotte waives its right to payment of its allowed Compass-Charlotte 503(b) Claim on the effective date of any plan of liquidation confirmed in Prime's case, provided, however, that all other allowed priority, administrative claims shall be paid in the same proportion(s) and at the same time(s) as the Compass-Charlotte 503(b) Claim.

- Reduction and Allowance of the Compass-Charlotte GUC Claim.  The Compass-Charlotte GUC Claim shall be reduced and allowed in the amount of $18,105,432.23 as a general, unsecured claim.  This reduction in the amount of the Compass-Charlotte GUC Claim is specifically contingent upon no other creditor in Prime's bankruptcy being allowed a claim amount which includes double, treble, punitive or similar damages in excess of compensatory damages ("Exemplary Damages").  To the extent any other creditor in the Prime bankruptcy case is allowed Exemplary Damages, then the allowed Compass-Charlotte GUC Claim shall be increased to allow for Exemplary Damages as requested in the filed proof of claim. This provision is required to ensure that all victim creditors are treated equitably.

- Waiver of 303(i) Damages Claim.  The Trustee, on behalf of Prime's bankruptcy estate, hereby waives, releases, and discharges any entitlement to a 303(i) Damages Claim

---

[6] The following is a summary of the terms of the Stipulation and is included as a matter of convenience.  However, parties should not rely exclusively on the summary and are encouraged to review the terms of the Stipulation in their entirety.

against Compass-Charlotte.

- <u>Assignment of Third-Party Claims</u>.  Provided that the pending Chapter 11 bankruptcy plan filed by the Trustee is confirmed by the Court, Compass-Charlotte does hereby irrevocably assign, give over, transfer, and convey, to the Trustee and bankruptcy estate, any and all Compass-Charlotte Third-Party Claims including claims, demands, causes of action, class in action, and other obligations of any type or description, whether known or unknown, liquidated or unliquidated, asserted or unasserted, whether arising in tort, contract or other basis or theory, which Compass-Charlotte has or may have that are related to Prime's conduct of its business, and Compass-Charlotte's claim against Prime's or Roglieri's bankruptcy estates.  Such Compass-Charlotte Third-Party Claims include, but may not be limited to: (i) any claims against Prime's former attorneys, accountants, auditors, or other professionals, in connection with aiding and abetting any breach of fiduciary duty owed by Roglieri or other principals (collectively, "<u>Prime Management</u>") to Prime or Prime's creditors, fraud, aiding and abetting fraud on the part of Prime and/or Prime Management, or otherwise; (ii) any claims against banks or any other financial institutions used by Prime and Prime Management, or that are involved in transactions with Prime, in connection with aiding and abetting any breach of fiduciary duty owed by Prime Management to Prime and its creditors, fraud, aiding and abetting fraud on the part of Prime and Prime Management, unjust enrichment, aiding and abetting conversion by Prime and Prime Management, or otherwise; and (iii) any other claims against third parties related to Prime's and Prime Management's wrongdoing that if pursued by Prime or its bankruptcy estate may be subject to the defense of *in pari delicto* or the Wagoner Rule (collectively, the "<u>Assigned Claims</u>").  The assignment of the Assigned Claims is made without warranty or representation of any kind other than that undersigned represents that the Assigned Claims have not previously been assigned or conveyed to any other persons.  This assignment entitles Compass-Charlotte to participate in the distribution of any recoveries on account of Assigned Claims, net of professional fees and other costs of the recovery, on account of the Compass-Charlotte GUC Claim.  The estate's distribution of any recovery on account of the Assigned Claims, net of all costs and fees related to such recovery plus any costs of the estate associated with administering the funds, in any plan of liquidation or otherwise, shall be limited to creditors of Prime's bankruptcy estate that: (i) are similarly situated to Compass-Charlotte in that their claims relate solely to an unreturned ICA Deposit; and (ii) execute a substantially identical assignment of third-party claims to Prime's bankruptcy estate.  In the event that the Trustee proposes, or the Bankruptcy Court approves, any use of the net proceeds of the Assigned Claims that violates these conditions, then Compass-Charlotte's assignment of the Assigned Claims shall be deemed null and void and the Assigned Claims shall be revested in Compass-Charlotte.  For the avoidance of doubt, the Assigned Claims do <u>not</u> include Compass-Charlotte's claims against Roglieri's bankruptcy estate[7], or any victims' fund established by the government in connection

---

[7] *See In re Kris Daniel Roglieri*, Chapter 7 Case No. 24-10157 (PGR) (Bankr. N.D.N.Y. Feb. 15, 2024).

with the criminal prosecution of Prime Management.[8]

- <u>Release of Claims by the Trustee and the Debtor's Estate.</u>  Upon the Effective Date, the Trustee on behalf of himself and on behalf of Prime, and Prime's estate, shall be deemed to have waived, set aside, discharged, settled, compromised and released any and all claims (to be interpreted in the broadest manner possible), causes of action, rights and remedies he has, had or may have, against Compass-Charlotte, except for any rights and benefits set forth in the Stipulation.

- <u>Release of Claims by Compass-Charlotte.</u>  Upon the Effective Date, Compass-Charlotte shall be deemed to have waived, set aside, discharged, settled, compromised and released any and all claims (to be interpreted in the broadest manner possible), causes of action, rights and remedies it has, had or may have, against the Trustee, Prime, and Prime's bankruptcy estate, except for the rights and benefits set forth in the Stipulation.  This release by Compass-Charlotte of the Trustee, Prime and Prime's bankruptcy estate shall have no affect upon the Assigned Claims or serve as a defense or release for any party under the Assigned Claims.  All rights in connection with the Assigned Claims are specifically preserved by the Parties.

- <u>Dismissal of Case 1</u>.  Case 1 shall be dismissed.  Upon the Effective Date, the Trustee shall submit the proposed order annexed to the Stipulation as <u>Exhibit A</u> to the Bankruptcy Court in Case 1 for the Court's consideration and approval.

## **RELIEF REQUESTED**

21.     The Trustee respectfully requests that the Court enter an Approval Order by "So Ordering" and entering the Stipulation pursuant to Fed. R. Bankr. P. 9019.

## **BASIS FOR RELIEF REQUESTED**

22.     By this Motion, the Trustee seeks this Court's approval of the Stipulation, and asserts that the terms, conditions, and compromises contained therein are fair and reasonable under the circumstances, and that approval of the Stipulation is in the best interest of the Debtor's estate and its creditors.

---

[8] *See:* (i) *United States of America v. Kris Roglieri*, Case No. 24-cr-261 (N.D.N.Y. May 28, 2024); (ii) *United States of America v. One 2003 Ferrari Enzo AB Version E., et al.*, Case No. 24-cv-1345 (N.D.N.Y. Oct. 22, 2024); (iii) *United States of America v. Christopher Snyder*, Case No. 25-cr-195 (N.D.N.Y. May 16, 2025); and (iv) *United States of America v. Kimberly Humphrey*, Case No. 25-cr-238 (N.D.N.Y. June 10, 2025).

23.     Bankruptcy Rule 9019 provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." FED. R. BANKR. P. 9019(a). In ruling on a motion pursuant to Bankruptcy Rule 9019(a), the court must find that the proposed settlement is fair and equitable and is in the best interests of the estate. Protective Comm. for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414 (1968); Fischer v. Pereira (In re 47-49 Charles Street, Inc.), 209 B.R. 618, 620 (S.D.N.Y. 1997); In re Ionosphere Clubs, Inc., 156 B.R. 414, 426 (S.D.N.Y. 1993), aff'd 17 F.3d 600 (2d Cir. 1994); In re Fugazy, 150 B.R. 103 (Bankr. S.D.N.Y. 1993).

24.     In order to reach such a decision, the Court must be apprised "of all facts necessary for an intelligent and objective opinion" of whether the claim will be successful, the likely expense, length and the degree of complexity of the litigation, the potential difficulties of collecting on a judgment "and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise." TMT Trailer Ferry, 390 U.S. at 424.

25.     To constitute a fair and equitable compromise or settlement, the Court must find that the settlement does not "fall below the lowest point in the range of reasonableness." Cosoff v. Rodman (In re W.T. Grant Co)., 699 F.2d 599, 608 (2d Cir. 1983); In re Drexel Burnham Lambert Group, Inc., 138 B.R. 723, 758-59 (Bankr. S.D.N.Y. 1992); In re Int'l Distribution Centers, Inc., 103 B.R. 420, 423 (Bankr. S.D.N.Y. 1989).

26.     The Court should also consider the fair and reasonable course of action for the debtor's estate, with the limited available assets, giving consideration to the interests of creditors and the avoidance of burdening the estate with undue waste or needless or fruitless litigation. In re Del Grosso, 106 B.R. 165, 167-168 (Bankr. N.D. Ill. 1989); see also In re Culmtech, Ltd., 118

B.R. 237, 238 (Bankr. M.D. Pa. 1990); <u>In re Lawrence & Erausguin, Inc.</u>, 124 B.R. 37, 38 (Bankr.

N.D. Ohio 1990); <u>In re Bell & Beckwith</u>, 93 B.R. 569, 574-75 (Bankr. N.D. Ohio 1988).

27.    The Court is not required conclusively to determine the merits of a claim subject to

compromise or to find that a proposed settlement constitutes the best results obtainable to ensure

that the settlement reaches the threshold of reasonableness.  Instead, the Court should "canvass the

issues" to determine whether the proposed settlement is fair and equitable, is in the best interests

of the estate and otherwise does not fall outside the range of reasonableness.  <u>In re Apex Oil Co.</u>,

92 B.R. 847, 867 (Bankr. E.D. Mo. 1988).

28.    In concluding that the settlement embodied in the Stipulation is in the best interests

of the Debtor's estate, the Trustee considered the following key factors: (i) the significant benefits

that Prime and its bankruptcy estate received as a result of Compass-Charlotte's efforts; (ii) the

elimination of Exemplary Damages from the Compass-Charlotte GUC Claim, thereby providing

equality among the creditor victims, (iii) the potential value of the Assigned Claims; and   (iv) the

resolution of the 303(i) Damages Claim.

29.    Upon careful consideration of these issues and as discussed below, the Trustee

concluded that entry into the Stipulation is in the best interests of the Debtor's estate.

### A.  Compass-Charlotte's Substantial Contribution Claim and General Unsecured Claim

30.    The Bankruptcy Code provides that an administrative expense claim "shall be

allowed" to a creditor for expenses incurred "in making a *substantial contribution* in a case under

chapter 9 or 11 of this title", including recovery of reasonable attorneys' fees incurred in making

that contribution.  11 U.S.C. §§ 503(b)(3)(D), 503(b)(4) (emphasis added).  The phrase "substantial

contribution" is not defined in the Bankruptcy Code but is generally viewed as "extraordinary

creditor actions which lead directly to tangible benefits to the creditors, debtor or estate" or when

a "creditor played a leadership role that normally would be expected of an estate-compensated professional but was not so performed." *In re Bayou Grp., LLC*, 431 B.R. 549, 560, 562 (Bankr. S.D.N.Y. 2010); *see also Lebron v. Mechem Fin. Inc.*, 27 F.3d 937, 944 (3d Cir. 1994) ("the applicable test is whether the efforts of the applicant resulted in an actual and demonstrable benefit to the debtor's estate and the creditors.")

31.     In other words, "[s]ervices that warrant a substantial contribution award 'generally take the form of constructive contributions in key reorganizational aspects, when *but for* the role of the creditor, the movement towards final reorganization would have been substantially diminished.'" *In re Synergy Pharm.*, 621 B.R. 588, 610 (Bankr. S.D.N.Y. 2020) (emphasis added) (quoting *In re AMR Corp.*, Case No. 11-15463 (SHL), 2014 Bankr. LEXIS 3298, at *5 (Bankr. S.D.N.Y. Aug. 5, 2014)). "The integrity of section 503(b) can only be maintained by strictly limiting compensation to extraordinary creditor actions which lead directly to tangible benefits to the creditors, debtor or estate." *In re Best Prods. Co., Inc.*, 173 B.R. 862, 866 (Bankr. S.D.N.Y. 1994).

32.     Courts in the Second Circuit analyze three factors as to whether the substantial contribution test has been satisfied:

> (i) whether the services in question were provided to benefit all parties in the case (not merely a class or creditors or interest holders);
> (ii) whether the services conferred a direct, significant and demonstrably positive benefit to the estate; and
> (iii) whether the services were duplicative of services performed by others (such as estate professionals).

*In re Celsius Network LLC*, Case No. 22-10964 (MG), 2024 Bankr. LEXIS 493, at *30 (Bankr. S.D.N.Y. Feb. 29, 2024) (citing *In re Synergy Pharm.*, 621 B.R. at 609).

33.     A recovery of substantial contribution fees and expenses is not limited to post-petition activity but also extends to the *pre-petition* activity of a creditor and its counsel which

substantially contributes to a later-filed bankruptcy case. *See Lebron*, 27 F.3d at 946 ("[I]f the substantial contribution test is met, expenses incurred by a creditor prior to the filing of a chapter 11 petition, or while a chapter 11 case is pending, are recoverable pursuant to § 503(b)(3)(D)."); *In re Lister*, 846 F.2d 55, 57 (10th Cir. 1988) ("Administrative expenses incurred prior to the filing of a bankruptcy petition are compensable under 11 U.S.C. § 503(b)(3)(D), if those expenses are incurred in efforts which were intended to benefit, and which did directly benefit, the bankruptcy estate."); *In re Bayou Grp.*, 431 B.R. 549 (awarding substantial contribution administrative expense claim for prepetition attorneys' fees incurred by unofficial creditors committee counsel).

34.     Here, Compass-Charlotte provided its services to benefit all of Prime's victims, including Prime itself, whose assets were being stolen by Roglieri for his personal benefit. This is demonstrated by (a) Compass, together with the other Petitioning Creditors, filing Case 1 (rather than a collection lawsuit which would only benefit itself); (b) obtaining the appointment of a receiver over Prime to recover and protect assets for the benefit of all creditors; (c) organizing an unofficial committee of creditors; and (d) providing information to the U.S. Attorney's office that led to the seizure of Prime's assets (thereby safeguarding them from further dissipation).

35.     Second, Compass-Charlotte's services provided a direct, significant and demonstrably positive benefit to the estate. For instance, all of the work which Compass-Charlotte did on third party subpoena discovery is work that the estate has not needed to duplicate in order to locate assets and understand Roglieri's fraud. Moreover, Compass-Charlotte's efforts have led to all of Roglieri's and Prime's assets being placed first under the control of the Receiver and now the Trustee (or the U.S. Attorney), where such assets will be available to satisfy creditor claims, rather than being further dissipated by Roglieri and his co-conspirators.

36.     Finally, Compass-Charlotte's services were not duplicative of the work done by any other party or estate professional.  Had Roglieri not misled this Court about having paid more than $50 million in ICA Deposits to the Berone Entities, it is likely that Case 1 would not have been dismissed and recovery of at least some of Prime's and Roglieri's assets could have been pursued by the interim trustee over Prime Case 1.  But as a result of those fabrications by Roglieri, Compass-Charlotte pursued the Receivership Action, including taking robust discovery, to ensure that *all* assets would be returned for the benefit of all creditors—an action that no other creditor pursued.  And these efforts proved fruitful: Compass-Charlotte's discovery in the Receivership Action, which Compass-Charlotte provided to the U.S. Attorney's office and the Receiver, led to the seizure of Prime and Roglieri's assets and the U.S. Attorney, on behalf of the United States of America, filing a complaint against various persons and entities related to Roglieri, all of which have (and will) benefit Prime's victim creditors.

37.     Absent Compass-Charlotte's actions at every step of these cases and all of the other pending matters related hereto, Prime and Roglieri would have been able to continue to perpetrate their fraudulent scheme, and creditors would have been left in a far worse position.

38.     In *In re Bayou Group, LLC*, 431 B.R. 549 (Bankr. S.D.N.Y. 2010), a creditor group sought a substantial contribution claim by virtue of their actions in exposing a Ponzi scheme.  In that case, it became apparent that a group of funds were run as a Ponzi scheme, yet various government agencies did not move for appointment of a receiver over those entities.  *Id.* at 553. To address that unique situation, certain *Bayou* creditors (like Compass-Charlotte did here) formed an unofficial committee of creditors, hired counsel, and began taking steps to maximize recovery from the Ponzi scheme for all creditors.  *Id.* at 554.  The *Bayou* unofficial committee effectively "laid the groundwork for what became [the] chapter 11 case, including the means for administering

16

the case." *Id*. at 555.  Among other things, the *Bayou* committee, like Compass-Charlotte in the

present case, (a) researched claims; (b) located a receiver; (c) researched and prepared a complaint

and motion for appointment of receiver; and (d) shared its legal research about claims with the

receiver, who subsequently placed the companies into bankruptcy.  *Id.* at 556.

39.     The *Bayou* court held that these services of the unofficial committee were

conducted for the benefit of all creditors and the bankruptcy estate and provided a substantial

contribution.  *Id.* at 565–66.  It awarded an administrative expense claim in the amount of

$627,829.17 for reasonable attorneys' fees incurred by the committee's counsel.  *Id.* at 567; *see

also In re Celsius Network LLC*, 2024 Bankr. LEXIS 493, at *62, *64 (awarding $479,643.94 as

an administrative expense claim for creditor's efforts in providing evidence of a Ponzi enterprise

and without which efforts "the scope of the fraud would not have come to light").

40.     The Trustee noted the similarities between the facts here and the *Bayou* case.  In

taking a leadership role throughout the process, and taking actions to ensure that Prime's and

Roglieri's assets have been preserved for the benefit of *all* creditors, Compass-Charlotte has made

a substantial contribution to this bankruptcy case and should have a portion of its fees reimbursed.

41.     The question for the Trustee was how much of Compass-Charlotte's fees, totaling

at least $804,111.36, should be entitled to administrative expense as a substantial contribution

claim.  Given that Case 1 was dismissed by the Petitioning Creditors' own request (albeit as a

result of a falsehood pedaled by Roglieri), the Trustee thought it was appropriate to reduce the

amount sought by Compass-Charlotte by the amount incurred by Compass-Charlotte during the

prosecution of Case 1, which included fees totaling $92,300.12 in charges incurred prior to

December 31, 2023, plus at least $65,000 incurred in January 2024 for work on Case 1.

42.    With respect to the Compass-Charlotte GUC Claim, Compass-Charlotte included in its claim amount approximately $35 million in treble damages pursuant to 18 U.S.C. § 1964 and N.C. Gen. Stat. 75-16.   Most victim creditors did not include treble damages in their claim amounts.   In fact, only four other creditors included treble damages in their claim amount (Newlight Technologies, Inc., 1800 Park Avenue LLC, Onward Holding, LLC, and 526 Murfreesboro, LLC (collectively, the "Treble Damage Claimants").

43.    The Trustee believes that in order to ensure an equality of distribution, all victim claims should be amended to either (i) reflect the victim's actual loss or (ii) provide for treble damages.   Since most creditor victims did not include treble damages, the elimination of Exemplary Damages was included in the Stipulation to ensure that all victim creditors are treated equitably.  The Trustee intends to negotiate with the Treble Damage Claimants and eliminate treble damages from their respective claim amounts as well.   If the Trustee is not successful in this endeavor, Compass-Charlotte retains the right to seek Exemplary Damages.

**B.   The Assignment of the Assigned Claims to the Estate**

44.    The Trustee asserts that Prime was operated as a Ponzi/advance pay lending scheme.   In the criminal case against Roglieri, the government also alleged, among other things, that Roglieri and others used the Debtor to operate a fraud and money laundering scheme.[9]   The Trustee believes that creditors including Compass-Charlotte may have claims against, among others, financial institutions where Prime banked for aiding and abetting Prime's and Roglieri's fraudulent scheme.   Financial institutions permitted Prime to transact business and use their institutions to commit fraud in connection with the institutions' repeated failures to adhere with

---

[9]  *See United States v. Roglieri*, Case No. 24-cr-00392 (MAD) (N.D.N.Y.), Dkt. No. 1, ¶4.  In connection with the criminal case, Roglieri was charged with five counts of wire fraud in violation of 18 U.S.C. § 1343, and for forfeiture of assets pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), in connection with his operation of Prime.

federal know-your-customer and anti-money laundering statutes, rules, and regulations.  This may result in liability by the relevant institutions to Prime's creditor victims.  By the Stipulation, Compass-Charlotte is assigning these claims to the estate provided that any net recovery only be shared with other creditor/victims who similarly assign their claims.  The plan proposed by the Trustee provides for the appointment of a plan administrator to seek similar assignments and investigate and potentially prosecute the Assigned Claims.  These claims could prove to be of significant value for the estate and assigning creditor victims.

### C.  303(i) Damages Claim and Dismissal of Case 1

45.    Following the hearing held on September 25, 2024, Prime submitted for the Court's consideration a proposed order confirming Prime's abandonment of any claims against the Petitioning Creditors on account of their commencement of Case 1.  *See* Case 3, Docket No. 28.

46.    On October 2, 2024, the Bankruptcy Court entered an order authorizing Prime's abandonment of the 303(i) Damages Claim unless an objection was filed with the Bankruptcy Court by no later than October 16, 2024 (the "Abandonment Order").  *Id.* at Docket No. 31. On October 15, 2024, Roglieri filed an objection to the Abandonment Order (the "Roglieri Objection").  *Id.* at Docket No. 39.  On October 25, 2024, Prime filed its response to the Roglieri Objection.  *Id.* at Docket No. 43.  On November 6, 2024, Hogan Lovells US LLP ("Hogan Lovells"), as an alleged creditor of Prime, filed an objection to the proposed abandonment couched as a response to the Roglieri Objection.  *Id.* at Docket No. 50.  On January 10, 2025, the Bankruptcy Court denied  Prime's  requested abandonment without prejudice to renewing the request with additional evidence.  *Id*. at Docket No. 122.

47.    The 303(i) Damages Claim against the Petitioning Creditors are for the payment of: (i) costs or reasonable attorneys' fees in connection with obtaining dismissal of the involuntary

petition (*see* 11 U.S.C. § 303(i)(1)(A) and (B)) ("Fees and Costs")[10]; and (ii) in the event the

Petitioning Creditors are found to have filed the involuntary petition in bad faith, any damages

proximately caused by such filing and/or punitive damages (*see* 11 U.S.C. § 303(i)(2)(A) and (B))

("Damages").

48.      The decision of whether to abandon property is within the discretion of the debtor

or trustee in the exercise of its business judgment.  *See In re Republic Airways Holdings Inc.*, 547

B.R. 578, 582 (Bankr. S.D.N.Y. 2016) ("[t]he trustee's power to abandon property is

discretionary and is bounded only by that of the court") (internal quotations omitted); *In re*

*Interpictures, Inc.*, 168 B.R. 526, 535 (Bankr. E.D.N.Y. 1994) ("[f]rom the beginning of

modern bankruptcy law, the courts have uniformly held that a trustee's power to abandon property

is discretionary").

49.      As part of the Stipulation, the Trustee is waiving the 303(i) Damages Claim because

he does not believe, in his business judgment, that the 303(i) Damages Claim has any significant

value or that it is otherwise in the estate's best interest to pursue the 303(i) Damages Claim.

50.      To begin, all evidence indicates that the Petitioning Creditors were defrauded

out of approximately $22.7 million collectively by Prime and Roglieri, and that they commenced

Case 1 in a legitimate effort to liquidate Prime under a single legal proceeding, which would

allow Prime's assets to be discovered and liquidated in a public and transparent proceeding where

---

[10] Hogan Lovells US LLP asserts that it incurred $398,692.50 in Fees and Costs associated with representing the
Debtor (then an alleged debtor) in Case 1, and that such Fees and Costs should be recovered from the Petitioning
Creditors pursuant to section 303(i)(1) of the Bankruptcy Code.  On November 6, 2024, Hogan Lovells filed a proof
of claim against the Debtor, which was assigned Claim No. 7 (the "Hogan Lovells Claim").  As set forth in the rider
(the "Rider") to the Hogan Lovells Claim, the aggregate amount of legal services that Hogan Lovells provided to the
Debtor is $1,558,743.29.  *See* Rider, p. 2.  Of this amount, $398,692.50 was incurred by Hogan Lovells during Case
1.  *Id.*  To say the least, $400,000 for ten (10) days' work here appears to at least potentially be excessive and not
reasonable.

all parties in interest could be heard, and would prevent any single creditor from winning the proverbial race to the courthouse.

51.    On the contrary, Prime then controlled by Roglieri, had no stated legitimate business purpose in seeking the dismissal of Case 1.  In fact, at the exact same time that Roglieri was seeking the dismissal of Case 1, Roglieri was actively defrauding the last known victim, 1800 Park Avenue LLC, out of an approximately $5 million ICA Deposit, and admitting via text messages discovered by the Government that what he was doing was illegal and that he was trying to avoid discovery of Prime's bank statements:

| Date | Time | From | Message |
|------|------|------|---------|
| 1/4/2024 | 11:20:42 am | Unknown | Can't you just keep working on those companies? <br><br> I know it might be hard at first, but look what you build this up to beat from nothing |
| 1/4/2024 | 11:20:56 am | Roglieri | Yea I can but not when I'm in f—king prison |
| 1/4/2024 | 11:21:09 am | Unknown | Why do you think that's gonna happen? <br><br> Why can't it just be a bankruptcy? |
| 1/4/2024 | 11:21:47 am | Roglieri | Because I unused others money to fund deals <br><br> I already told you this |
| 1/4/2024 | 11:22:02 am | Unknown | And that's illegal? |
| 1/4/2024 | 11:22:15 am | Roglieri | Yes |
| 1/4/2024 | 11:22:36 am | Unknown | How bad .  I mean, what's the worst you do a couple years who cares <br><br> You have your family <br><br> This whole family will support you through this <br><br> It's a civil case it's not a criminal case |
| 1/4/2024 | 11:27:42 am | Roglieri | **It will turn criminal as soon as they get into bank statements** |

*United States of America v. Kris Roglieri,* Case No. 24-cr-00392 (MAD) (N.D.N.Y.), Dkt. No. 6-1 (June 3, 2024) (emphasis added) (typographical and grammatical errors in originals).

52.     While Prime contested the standing of two of the Petitioning Creditors to file the involuntary petition by alleging that the claims were not fully liquidated, that does not make the Petitioning Creditors' alleged claims against Prime any less legitimate, Prime seeking the dismissal in the best interests of Prime and its creditors (as opposed to Roglieri who was actively trying to avoid discovery of his crimes), or the inevitable liquidation of Prime in a formal proceeding any less necessary.  Indeed, the Bankruptcy Court was never given the opportunity to reach the merits of those arguments because the Petitioning Creditors sought the dismissal of Case 1 in order to commence the Receivership Action because of the mistaken belief that Prime had over $50 million in an account due to the falsified bank statement submitted by Roglieri.  The Petitioning Creditors maintain that had the litigation over the involuntary petition played out that they would have emerged victorious with the entry of an order for relief in Case 1.

53.     The Trustee is far more concerned with why Prime's management, who have plead guilty to wire fraud and have entered into plea agreements with the government, sought the dismissal of Case 1, and pursued a strategy that served no ultimate purpose other than to frustrate creditors and prolong Roglieri's and Prime's inevitable reckoning.  To that point, the dismissal of Case 1 permitted certain creditors, B and R Acquisitions Partners, LLC and JHM Lending Ventures, LLC, to take action against certain of the Debtor's assets and potentially obtain a preferred return over other, similarly situated creditors.  Thus, Roglieri's efforts in seeking the dismissal of Case 1 caused real and actual harm to Prime and its estate to the extent that Prime is unable to unwind the preferred return received by certain creditors following dismissal of Case 1.

54.     For these reasons, the Trustee has concluded that Prime's 303(i) Damages Claim against the Petitioning Creditors for Fees and Costs is of little value.  Further, any claim for Damages should clearly be abandoned for myriad reasons.  First and foremost, there is absolutely

no competent evidence that the Petitioning Creditors commenced Case 1 in bad faith, a necessary prerequisite for a claim for Damages.

55.    "Because 'bad faith' is not defined in the [B]ankruptcy [C]ode, and because there is no legislative history addressing the intended meaning of this language, courts have used different approaches to determine whether a petition was filed in bad faith for purposes of § 303(i)(2)." *Lubow Mach. Co. v. Bayshore Wire Prods. Corp. (In re Bayshore Wire Prods. Corp.)*, 209 F.3d 100, 105 (2d Cir. 2000). Moreover, petitioning creditors are presumed to have acted in good faith by filing an involuntary petition, and the objecting party has the burden of proving bad faith. *See In re Synergistic Techs., Inc*., No. 07-31733-SGJ-7, 2007 Bankr. LEXIS 2660, 2007 WL 2264700, at *6 (Bankr. N.D. Tex. Aug. 6, 2007); *In re Reveley*, 148 B.R. 398, 406 (Bankr. S.D.N.Y. 1992). It is unclear whether the standard of proof for establishing bad faith is clear and convincing evidence or preponderance of the evidence. *In re Synergistic Techs., Inc*., 2007 Bankr. LEXIS 2660, 2007 WL 2264700, at *6-7 (preponderance of the evidence); *In re Reveley*, 148 B.R. at 406 (same); *but see Revson v. Cinque & Cinque*, 221 F.3d 71, 79 (2d Cir. 2000) (concluding that "bad faith" must be shown to impose sanctions under inherent power of the court or 28 U.S.C. § 1927, and "to impose sanctions under either authority, the trial court must find clear evidence that (1) the offending party's claims were entirely meritless and (2) the party acted for improper purposes"); *In re Green*, 422 B.R. 469, 474 (Bankr. S.D.N.Y. 2010) (in awarding sanctions under inherent power of the court, the court must find bad faith based on clear evidence).

56.    The Trustee is unaware of any evidence that would lead to the Court's conclusion that the Petitioning Creditors acted in bad faith under the legal standards at play. To the contrary, the Petitioning Creditors' actions appear to have been done in good faith and for the attempted benefit of <u>all</u> of Prime's creditors. Rather than race to the courthouse for a preferred return on

Prime's assets like certain creditors, the Petitioning Creditors commenced Case 1 in order to try to provide a fair and transparent method of recovering assets and distributing the proceeds to creditors as provided under the Bankruptcy Code.

57.     Finally, even if bad faith on the part of the Petitioning Creditors could be demonstrated, there is absolutely no proof that filing Case 1 and its pendency for less than a month caused any actual Damages to Prime or its estate.

58.     Through the Stipulation, the 303(i) Damages Claim will be waived and the Trustee will submit a proposed order dismissing Case 1 for the Court's consideration.  Assuming that the Stipulation is approved by the Court, then no purpose would be served by keeping Case 1 open, with the administration of Prime's estate being actively pursued before this Court in Case 3.

### D.  Approval of the Stipulation is in the Best Interests of the Estate

59.     The Stipulation constitutes a positive and productive resolution of complicated issues between the Parties.  Further, the settlement avoids the need for additional litigation and the uncertainty that it would bring.  Based upon the foregoing, the Trustee respectfully submits that approval of the Stipulation is in the best interests of the Debtor's estate and respectfully requests that the Stipulation be approved.

### NOTICE

60.     Notice of this Motion will be given to the Office of the United States Trustee for the Northern District of New York, and all parties entitled to notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure, by First Class Mail.  In light of the nature of the relief requested herein, the Trustee submits that no further notice is required.

## NO PRIOR RELIEF

61.     Except as specifically stated, no previous application for the relief sought herein

has been made to this or any other court.

**WHEREFORE**, the Trustee respectfully requests that the relief requested herein be

granted, that the Court approve the Stipulation by "So Ordering" it and entering it on the Court's

docket, and that the Court grant such other and further relief as is just and proper.

Dated:    New York, New York
          February 5, 2026

                                        **KLESTADT WINTERS JURELLER
                                        SOUTHARD & STEVENS, LLP**


                              By:    */s/ Fred Stevens*
                                     Fred Stevens
                                     Lauren C. Kiss
                                     200 West 41st Street, 17th Floor
                                     New York, New York 10036
                                     Tel: (212) 972-3000
                                     Email: fstevens@klestadt.com
                                          lkiss@klestadt.com

                                     *Special Litigation Counsel to Yann Geron,
                                     Chapter 11 Trustee of Prime Capital
                                     Ventures, LLC*