**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

In re:

PRIME CAPITAL VENTURES, LLC,                     Case No. 24-11029-PGR
                                                 Chapter 11

                              Debtor.
_____


**MEMORANDUM OF LAW IN SUPPORT OF ENTRY OF AN ORDER (I) APPROVING
ADEQUACY OF DISCLOSURE STATEMENT FOR THE TRUSTEE'S PLAN OF
LIQUIDATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE,
AS MODIFIED AND (II) CONFIRMING TRUSTEE'S PLAN OF LIQUIDATION
PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**


**GERON LEGAL ADVISORS LLC**           **KLESTADT WINTERS JURELLER**
370 Lexington Avenue                   **SOUTHARD & STEVENS, LLP**
Suite 1208                             200 West 41st Street, 17th Floor
New York, New York 10017               New York, New York 10036
Tel: (646) 560-3224                    Tel: (212) 972-3000
Yann Geron                             Fax: (212) 972-2245
Nicole N. Santucci                     Fred Stevens
                                       Lauren C. Kiss

_General Counsel to Yann Geron, Chapter_    _Special Litigation Counsel to Yann Geron,_
_  11 Trustee of Prime Capital Ventures,_   _  Chapter 11 Trustee of Prime Capital_
_  LLC_                                     _  Ventures, LLC_


Dated:  New York, New York
        February 5, 2026

## TABLE OF CONTENTS

**Page(s)**

I.  PRELIMINARY STATEMENT ........................................................................1

II. BACKGROUND AND OVERVIEW OF THE PLAN ....................................2

A.  The Debtor's Bankruptcy Case and Receivership ........................................2

B.  The Plan ...........................................................................................................7

C.  The Solicitation of Votes and Noticing of Non-Voting Classes....................8

III. THE PLAN SHOULD BE CONFIRMED ....................................................9

A.  The Plan Complies with the Applicable Provisions of Title 11 (11 U.S.C. §
    1129(a)(1)) ......................................................................................................11

    i.      The Plan Designates Classes of Claims....................................14

    ii.     Specification of Unimpaired Classes of Claims .......................14

    iii.    The Plan Specifies the Treatment of Impaired Classes .............14

    iv.     The Plan Provides the Same Treatment within Each Class .........15

    v.      The Plan Provides Adequate Means for Implementation ...........15

    vi.     Prohibition on the Issuance of Non-Voting Securities ...............16

    vii.    Selection of Trustees, Member and Manager .............................16

    viii.   Impairment and Non-Impairment of Claims..............................17

    ix.     Executory Contracts and Unexpired Leases ..............................17

    x.      Retention of Claims ..................................................................18

    xi.     Sale of Property and Distribution of Proceeds..........................21

    xii.    Modification of Rights of Holders on Unsecured Claims ..........22

    xiii.   The Plan Includes Other Provisions that are not Inconsistent with Applicable
            Sections of the Bankruptcy Code..............................................22

B.  The Trustee Has Complied with the Applicable Provisions of Tile 11 (11 U.S.C. § 1129(a)(2)) ..................................................................................................23

C.  The Plan was Proposed in Good Faith (11 U.S.C. § 1129(a)(3)) ..............................25

D.  All Payments to be Made by the Estate in Connection with this Case Are Subject to the Approval of the Court (11 U.S.C. § 1129(a)(4))....................................................27

E.  Disclosure of all Required Information Regarding Post-Confirmation Directors, Management and Insiders (11 U.S.C. § 1129(a)(5))....................................................28

F.  The Plan Does Not Provide for any Rate Change Subject to Regulatory Approval (11 U.S.C. § 1129(a)(6)) ..................................................................................................30

G.  The Plan Satisfies the "Best Interests" Test (11 U.S.C. § 1129(a)(7)) ........................30

H.  Section 1129(a)(9) of the Bankruptcy Code (Acceptance of Certain Classes) is Not Satisfied as to Class 3 (Equity Interests), but the Plan Can be Confirmed Notwithstanding this ..................................................................................................32

I.  The Plan Provides for the Payment of Priority Claims (11 U.S.C. § 1129(a)(9)) .......33

J.  The Plan has been Accepted by at Least One Impaired, Non-Insider Class (11 U.S.C. § 1129(a)(10)) ..............................................................................................34

K.  The Plan is Feasible or Feasibility Analysis Not Applicable (11 U.S.C. § 1129(a)(11)) ..............................................................................................34

L.  The Plan Provides for the Payment of Certain Fees (11 U.S.C. § 1129(a)(12)) ..........35

M.  Preservation of Retiree Benefits (11 U.S.C. § 1129(a)(13))........................................35

N.  Domestic Support Obligations (11 U.S.C. § 1129(a)(14)) ..........................................35

O.  Requirements for Individual Chapter 11 Cases (11 U.S.C. § 1129(a)(15))................36

P.  Property Transfers by Corporations or Trusts that are not Moneyed, Business or Commercial Corporations or Trusts (11 U.S.C. § 1129(a)(16))..................................36

Q.  Cram Down Requirements Have Been Satisfied (11 U.S.C. § 1129(b))....................36

R.  Confirmation of One Plan (11 U.S.C. § 1129(c))........................................................39

S.  The Principal Purpose of the Plan is Not Avoidance of Taxes or Section 5 of the Securities Act (11 U.S.C. § 1129(d))..........................................................................39

iii

T.  Compliance with Bankruptcy Rule 3016 .................................................................39

IV.  THE INJUNCTIONS AND EXCULPATIONS SHOULD BE APPROVED .................40

A.  The Injunctions ....................................................................................................40

B.  The Exculpation ...................................................................................................43

V.  REQUEST FOR FINDING THAT THE DEBTOR WAS A "PONZI SCHEME" .........46

A.  Introduction..........................................................................................................46

B.  The Debtor's Business was Founded upon an Unworkable and Fraudulent Premise .47

C.  The Debtor Fraudulently Claimed to Have Made Large Loans to Attract Victims.....52

D.  The Only Way to Pay Old Victims was by Getting New Ones ..................................56

E.  The Advance Pay/Ponzi Scheme Finding is Warranted ..............................................59

CONCLUSION......................................................................................................................64

# TABLE OF AUTHORITIES

**Page(s)**

*Cases:*

ACC Bondholder Grp. v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.),
361 B.R. 337 (S.D.N.Y. 2007)..................................................................................31

ACC Bondholder Grp. v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)
368 B.R. 140 (Bankr. S.D.N.Y. 2007)......................................................................10

Argo Fund Ltd. v. Bd. of Dirs. Of Telecom Argentina, S.A. (In re Bd. of Dirs. Of Telecom
Argentina, S.A.), 528 F.3d 162 (2d Cir. 2008) .........................................................25

B&R Acquisition Partners v. Prime Capital (JAMS Arb., Aug. 2023) ...................................3, 57

Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship,
526 U.S. 434, 442 n. 13 (1999)................................................................................31

Bayou Superfund, LLC v. WAM Long/Short Fund II, L.P. (In re Bayou Group, LLC),
362 B.R. 624 (Bankr. S.D.N.Y. 2007)......................................................................60

Capstone Diagnostics One, L.P., et al. v. Bailey LLC, et al.,
Case No. 2022cv366001 (GA Sup. Ct., Fulton Cty., Sept. 22, 2024) .........................54

Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC
(In re Bayou Group, LLC), 439 B.R. 284 (S.D.N.Y. 2010) ........................................63

Coltex Loop Cent. Three Partners, L.P. v. BT/SAP Pool C Assocs., L.P.
(In re Coltex Loop Central Three Partners, L.P.), 138 F.3d 39, 44 (2d Cir. 1998) ........9

Corestates Bank, N.A. v. United Chem. Techs., Inc., 202 B.R. 33 (E.D. Pa. 1996) ...................11

Davis v. Elliot Mgmt. Corp. (In re Lehman Bros. Holdings Inc.),
508 B.R. 283, 294 n. 9 (S.D.N.Y. 2014)...................................................................27

Forman v. Salzano (In re Norvergence, Inc.), 405 B.R. 709 (Bankr. D.N.J. 2009) .....................63

Gowan v. Amaranth Advisors LLC (In re Dreier LLP),
2014 WL 47774 (Bankr. S.D.N.Y. Jan. 2, 2014).......................................................60

Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd. (In re Briscoe Enters., Ltd., II),
994 F.2d 1160 (5th Cir. 1993) .............................................................................10, 11

In re 20 Bayard Views, LLC, 445 B.R. 98 (Bankr. E.D.N.Y. Mar. 7, 2011) ..............................31

In re A.B.C. Carpet Co., Inc., et al.,
Case No. 21-11591 (DSJ) (Bankr. S.D.N.Y. Mar. 3, 2022) [Docket No. 382] ......................19, 20

In re Agera Energy LLC, et al.,
Case No. 19-23802 (RDD) (Bankr. S.D.N.Y. June 16, 2020) [Docket No. 777].........................20

In re Bally Total Fitness of Greater N.Y., Inc.,
2007 Bankr. LEXIS 4729, 2007 WL 2779438 ......................................................................42, 44

In re Barney's New York, Inc., et al.,
Case No. 19-36300 (CGM) (Bankr. S.D.N.Y. Feb. 5, 2020) [Docket No. 789] .........................20

In re Best Prods. Co. Inc.,
168 B.R. 35 (Bankr. S.D.N.Y. 1994), aff'd, 68 F.3d 26 (2d Cir. 1995) ......................................31

In re Borders Grp.,
Case No. 11-10614(MG) (Bankr. S.D.N.Y. Dec. 21, 2011) [Docket No. 2384].........................46

In re Cellular Info. Sys., Inc., 171 B.R. 926 (Bankr. S.D.N.Y. 1994) ..........................................26

In re Cengage Learning, Inc.,
Case No. 13-44106 (ESS) (Bankr. E.D.N.Y. March 14, 2014) [Docket No. 1225]....................42

In re DBSD N. Am., Inc.,
419 B.R. 179 Bankr. S.D.N.Y. 2009), aff'd in part, rev'd in part, 627 F.3d 496 (2d Cir. 2010)..46

In re Drexel Burnham Lambert Group Inc.,
138 B.R. 723 (Bankr. S.D.N.Y. 1992) ...................................................................12, 13, 29, 31, 45

In re Dowling College,
Case No. 16-75545 (REG) (Bankr. E.D.N.Y. Dec. 20, 20218) [Docket No. 662] ......................42

In re Ellis, 478 B.R. 132 (Bankr. N.D.N.Y. 2012) ......................................................................10

In re Future Energy Corp., 83 B.R. 470 (Bankr. S.D. Ohio 1988) ................................................27

In re Genco Shipping & Trading Ltd., 513 B.R. 233 (Bankr. S.D.N.Y. 2014) ............................25

In re Granite Broad. Corp., 369 B.R. 120 (Bankr. S.D.N.Y. 2007)........................................25, 26

In re iCap Enterprises, Inc., et al.,
Case No. 23-01243 (WLH), Dkt. No. 141, (Bankr. E.D.W.A. Oct. 18, 2024)............................47

In re Ionsphere Clubs, Inc., 184 B.R. 648, 655 (S.D.N.Y. 1995)..................................................42

In re Jennifer Convertibles, Inc., 447 B.R. 713 (Bankr. S.D.N.Y. 2011) ......................................31

In re Jersey City Med. Ctr., 817 F.2d 1055 (3d Cir. 1987)..........................................12

In re Johns-Manville Corp., 68 B.R. 618 (Bankr. S.D.N.Y. 1986)...............................27

In re Journal Register Co., 407 B.R. 520 (Bankr. S.D.N.Y. 2009)...............................27

In re Leslie Fay Cos., Inc., 207 B.R. 764 (Bankr. S.D.N.Y. 1997) ........................25, 31

In re Linda Vista Cinemas, L.L.C., 442 B.R. 724 (Bankr. D. Ariz. 2010) ...................29

In re Lionel L.L.C., 2008 WL 905928 (Bankr. S.D.N.Y. March 31, 2008) ...................26

In re M. Burton Marshall,
Case No. 23-60263 (PGR) (Bankr. N.D.N.Y. July 22, 2024) [Docket No. 433, 436] ............42, 47

In re Madison Hotel Assocs., 749 F.2d 410 (7th Cir. 1984)..........................................25

In re MF Global Inc., 478 B.R. 611 (Bankr. S.D.N.Y. 2012)........................................15

In re Momentum Mfg. Corp., 25 F.3d 1132 (2d Cir. 1994) ...........................................41

In re Old Carco LLC, 406 B.R. 180 (Bankr. S.D.N.Y. 2009) ........................................18

In re Oneida Ltd., 351 B.R. 79 (Bankr. S.D.N.Y. 2006) ........................................25, 44

In re Penn Traffic Co., 524 F.3d 373 (2d Cir. 2008) .....................................................18

In re Personal Communications Devices, LLC,
Case No. 13-74303 (AST) (Bankr. E.D.N.Y. April 14, 2014) [Docket No. 413] ........................42

In re PWS Holding Corp., 228 F.3d 224 (3d Cir. 2000).........................................26, 45

In re Quigley Co., Inc., 437 B.R. 102 (Bankr. S.D.N.Y. 2010)................................10, 25

In re Richard Buick, Inc., 126 B.R. 840 (Bankr. E.D. Pa. 1991)...................................10

In re Sabine Oil & Gas Corp., 555 B.R. 180 (Bankr. S.D.N.Y. 2016)  ...................10, 12

In re Saint Vincent's Catholic Medical Centers of New York,
Case No. 10-11963 (CGM) (Bankr. S.D.N.Y. June 29, 2012) [Docket No. 3060]  ....................42

In re SunEdison, Inc., et al.,
Case No. 16-10992 (SMB) (Bankr. S.D.N.Y. July 28, 2017) [Docket No. 3735] ......................20

In re Texaco Inc., 84 B.R. 893 (Bankr. S.D.N.Y. 1988)................................................12

In re Uno Rest. Holdings Corp.,
Case No. 10-10209(MG) (Bankr. S.D.N.Y. July 6, 2010 [Docket No. 559].................................46

In re Victory Constr. Co., Inc., 42 B.R. 145 (Bankr. C.D. Cal. 1984)..........................................31

In re Wash. Mut., Inc., 442 B.R. 314 (Bankr. D. Del. 2011) .......................................................32

In re WorldCom Inc., 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003)..................10, 11, 12

Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff),
528 F. Supp. 3d 219 (S.D.N.Y. 2021)............................................................................................60

Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC, 531 B.R. 439 (Bankr. S.D.N.Y. 2015) ...59

Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.),
843 F.2d 636 (2d Cir. 1988)...........................................................................................................11

Koelbl v. Glessing (In re Koelbl), 751 F.2d 137 (2d Cir. 1984)....................................................25

Little Hearts Marks Fam. II L.P. v. Carter (In re 305 E. 61st St. Grp. LLC),
644 B.R. 75 (Bankr. S.D.N.Y. 2022)..............................................................................................19

The Lion Group DFW, LLC v. Prime Capital,
Case No. 23-DCV-34617 (Tex. Dist. Ct., 146th Dist., Sept. 21, 2023).....................................3, 57

Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc., 756 F.2d 1043 (4th Cir. 1985)............18

Manhattan Inv. Fund, Ltd. V. Gredd (In re Manhattan Inv. Fund, Ltd.),
397 B.R. 1 (S.D.N.Y. 2007).............................................................................................................59

N.L.R.B. v. Bildisco & Bildisco, 465 U.S. 513 (1984) ..................................................................18

Norwest Bank Worthington v. Ahlers, 485 U.S. 197 (1988)......................................................9, 37

Olympia & York Fla. Equity Corp. v. Bank of N.Y. (In re Holywell Corp.),
913 F.2d 873 (11th Cir. 1990) ........................................................................................................12

Onward Partners, LLC, v. Prime Capital, et al.,
Case No. 23-cv-833 (D. Utah Nov. 13, 2023) ...........................................................................4, 54

Sturm v. Prime Capital, Case No. 23-cv-1033 (N.D.N.Y. Aug. 22, 2023) ...............................3, 57

Teamster's Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co., Inc.
(In re U.S. Truck Co., Inc.), 800 F.2d 581 (6th Cir. 1986)............................................................13

Tex. Extrusion Corp. v. Lockheed Corp. (In re Texas Extrusion Corp.),
844 F.2d 1142 (5th Cir. 1988) ...................................................................................25

Tuss Financial LLC v. Prime Capital, et al.,
Index No. 2023/510389 (N.Y.Sup. Ct. Kings Cty. Apr. 5, 2023) ...................................................3

Upstream Energy Servs. v. Enron Corp. (In re Enron Corp.),
326 B.R. 497 (S.D.N.Y. 2005)......................................................................................42, 44, 45

United States v. Antonakopoulos, 399 F.3d 68, 72 (1st Cir. 2005).............................................63

United States of America v. One 2003 Ferrari Enzo AB Version E., et al.,
Case No. 24-cv-1345 (MAD/DJS), [Docket No. 20-1] .............................................................51

United States v. Sudeen, 434 F.3d 384, 386-87 (5th Cir. 2005)...................................................63

Westpointe L.P. v. Franke (In re Westpointe L.P.), 234 B.R. 431 (Bankr. E.D. Mo. 1999)........38

Williams v. Hibernia Nat'l Bank (In re Williams), 850 F.2d 250 (5th Cir. 1988) ........................9

Windels Marx Lane & Mittendorf, LLP v. Source Enters., Inc. (In re Source Enters., Inc.),
392 B.R. 541 (S.D.N.Y. 2008)....................................................................................13, 26

### *Treatises:*

3 Collier Bankruptcy Manual ¶ 1129.02[4] (3d ed. revised 2005) .........................................10, 37

7 Collier Bankruptcy Manual ¶1123.01[7]
(Alan N. Resnick & Henry J. Sommer, eds. 16th ed. 2010)....................................................16, 27

### *Statutes and Rules:*

11 U.S.C. § 101(31)(B)...........................................................................................30

11 U.S.C. § 105(a) ................................................................................................41

11 U.S.C. § 365(a) ................................................................................................18

11 U.S.C. § 506(b) ................................................................................................23

11 U.S.C. § 507(a)(3).........................................................................................14, 33

11 U.S.C. § 1114.................................................................................................35

11 U.S.C. § 1122.........................................................................................11, 12, 13, 23

11 U.S.C. § 1122(a) ...................................................................................12, 13

11 U.S.C. § 1123 ...............................................................................11, 12, 23

11 U.S.C. § 1123(a) ........................................................................................13

11 U.S.C. § 1123(a)(1) ..............................................................................13, 14

11 U.S.C. § 1123(a)(2) ....................................................................................14

11 U.S.C. § 1123(a)(3) ....................................................................................14

11 U.S.C. § 1123(a)(4) ....................................................................................15

11 U.S.C. § 1123(a)(5) ..............................................................................15, 16

11 U.S.C. § 1123(a)(6) ....................................................................................16

11 U.S.C. § 1123(a)(7) ....................................................................................16

11 U.S.C. § 1123(a)(8) ....................................................................................17

11 U.S.C. § 1123(b) ........................................................................................17

11 U.S.C. § 1123(b)(1) ....................................................................................17

11 U.S.C. § 1123(b)(2) ..............................................................................17, 18

11 U.S.C. § 1123(b)(3) ..........................................................................18, 19, 21

11 U.S.C. § 1123(b)(4) ..............................................................................21, 22

11 U.S.C. § 1123(b)(5) ....................................................................................22

11 U.S.C. § 1123(b)(6) ....................................................................................22

11 U.S.C. § 1123(c) ........................................................................................23

11 U.S.C. § 1123(d) ........................................................................................23

11 U.S.C. § 1125 ............................................................................................23

11 U.S.C. § 1126 ............................................................................................24

11 U.S.C. § 1126(a) ........................................................................................24

11 U.S.C. § 1126(c) ................................................................................................32, 33

11 U.S.C. § 1126(f) ............................................................................................7, 24, 32

11 U.S.C. § 1126(g) ......................................................................................7, 24, 25, 33

11 U.S.C. § 1129(a)(1) ....................................................................................11, 12, 23

11 U.S.C. § 1129(a)(2) ..........................................................................................23, 25

11 U.S.C. § 1129(a)(3) ..........................................................................................25, 26

11 U.S.C. § 1129(a)(4) ..........................................................................................27, 36

11 U.S.C. § 1129(a)(5) ................................................................................................16

11 U.S.C. § 1129(a)(5)(A)(i) ......................................................................................28, 29

11 U.S.C. § 1129(a)(5)(A)(ii) ........................................................................................29

11 U.S.C. § 1129(a)(5)(B) ............................................................................................30

11 U.S.C. § 1129(a)(6) ................................................................................................30

11 U.S.C. § 1129(a)(7) ..........................................................................................23, 30

11 U.S.C. § 1129(a)(8) ..........................................................................................32, 33

11 U.S.C. § 1129(a)(9) ................................................................................................33

11 U.S.C. § 1129(a)(9)(A) ............................................................................................33

11 U.S.C. § 1129(a)(9)(C) ............................................................................................33

11 U.S.C. § 1129(a)(10) ..............................................................................................34

11 U.S.C. § 1129(a)(11) ..........................................................................................34, 35

11 U.S.C. § 1129(a)(12) ..............................................................................................35

11 U.S.C. § 1129(a)(13) ..............................................................................................35

11 U.S.C. § 1129(a)(14) ..............................................................................................35

11 U.S.C. § 1129(a)(15) ..............................................................................................36

11 U.S.C. § 1129(a)(16)....................................................................................................36

11 U.S.C. § 1129(b).............................................................................23, 33, 36, 37, 38

11 U.S.C. § 1129(b)(2)(B)..............................................................................................38

11 U.S.C. § 1129(b)(2)(C)..............................................................................................38

11 U.S.C. § 1129(c)........................................................................................................39

11 U.S.C. § 1129(d)........................................................................................................39

28 U.S.C. § 1930(a)(6)...................................................................................................35

Bankruptcy Rule 3016(b).............................................................................................39

Bankruptcy Rule 3016(c).........................................................................................39, 40

H.R. Rep. No. 595, 95th Cong., 1st Sess. 412 (1977) ..................................................11

S. Rep. No. 989, 95th Cong., 2d Sess. 126 (1978) .......................................................11

Securities Act of 1933 § 5.............................................................................................39

Yann Geron, as chapter 11 trustee (the "Trustee") of Prime Capital Ventures, LLC (the "Debtor"), in the above-referenced chapter 11 case (the "Chapter 11 Case"), by and through his counsel, submits this *Memorandum of Law in Support of Entry of an Order (I) Approving Adequacy of Disclosure Statement for Trustee's Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code, as Modified and (II) Trustee's Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* (the "Memorandum of Law"), *Declaration of Yann Geron in Support of Entry of an Order (I) Approving Adequacy of Disclosure Statement for the Trustee's Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code, as Modified and (II) Trustee's Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code,* (the "Geron Declaration"), *Declaration of Fred Stevens Regarding Solicitation of Votes and Tabulation of Ballots in Connection with the Trustee's Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* (the "Voting Declaration"), and *Declaration of Brian Ryniker in Support of Confirmation of the Confirmation of the Trustee's Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code and in Particular in Support of the Finding that the Debtor was a "Ponzi" Scheme* (the "Ryniker Declaration") each as filed in support of confirmation of the *Trustee's Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* (as may be further modified, amended, or supplemented, the "Plan")[1] [Docket No. 369-1], including the Plan Supplement, dated January 23, 2026 (as may be further modified, amended, or supplemented, the "Plan Supplement") [Docket No. 380], pursuant to section 1129 of title 11 of the United States Code (the "Bankruptcy Code").

## I.    PRELIMINARY STATEMENT

1.    Approximately seventeen (17) months from the filing of the instant bankruptcy case, the Trustee is seeking approval of the disclosure statement and confirmation of a chapter 11

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to them in the Plan.

plan to complete the wind down of the Debtor's Estate with overwhelming support from the creditor body.

2.      The Plan represents the culmination of substantial efforts by the Trustee to propose a fair and equitable resolution of the financial and legal issues presented in this Chapter 11 Case. The Plan is the result of substantial input from the Debtor's most active creditors and the United States Trustee and is carefully designed to ensure that the Debtor's financial affairs are thoroughly investigated following confirmation, and the estate is in the best position possible for success in recovering assets for the benefit of creditors.

3.      As discussed more fully below, the Trustee submits that the Plan satisfies all applicable requirements of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the Local Bankruptcy Rules for the Northern District of New York (the "Local Rules").

4.      The Plan has been accepted by Class 2.  See Voting Declaration, Exhibit A.  Class 1 was not impaired under the Plan and therefore is conclusively presumed to accept the Plan.  The Trustee did not solicit votes from Class 3 because such holders of Equity Interests are deemed to reject the Plan because such holders are not entitled to receive or retain any property under the Plan on account of Equity Interests.

5.      No objections were filed to approval of the Disclosure Statement or confirmation of the Plan.

## II.   BACKGROUND AND OVERVIEW OF THE PLAN

### A.   The Debtor's Bankruptcy Case and Receivership

6.      On or around July 26, 2006, Prime Commercial Lending, LLC ("Prime Commercial") was formed as a New York limited liability company.  Prime Commercial appears to have been a small lender making loans as small as $22,000 to businesses and up to $2 million

on commercial real estate.

7.    On December 14, 2021, Kris Daniel Roglieri ("Roglieri") formed the Debtor as a Delaware limited liability company.  Upon information and belief, until on or around May 15, 2024, Roglieri was at all times the sole manager of the Debtor and its chief executive.  The concept was apparently that the Debtor would be Prime Commercial's division as "a fund specifically designed to provide capital for large development, commercial development and commercial real estate transactions from $50 million to more than $1 billion."[2]  The Debtor advertised that it would offer non-recourse lines of credit with rates at 4 to 6% with interest-only payments but would require borrowers to provide 20% cash upfront based on the total project cost to be placed in an interest credit account (each an "ICA Deposit").  The ICA Deposits would be held by the Debtor "'as prepaid interest throughout the term of the loan.'"  The Debtor obtained millions of dollars in ICA Deposits from multiple companies throughout the country which, upon information and belief, was used in most cases by the Debtor and Roglieri before the loans were closed and funded. As set forth below, the Debtor's business was a fraudulent advance pay/Ponzi scheme.  *See* Ryniker Declaration.

8.    By December 2023, the Debtor was besieged by litigation largely from borrowers who did not get their loans funded and wanted the return of their ICA Deposits.  See, e.g., Tuss Financial LLC v. Prime Capital, et al., Index No. 2023/510389 (N.Y.Sup. Ct. Kings Cty. Apr. 5, 2023) (seeking and apparently obtaining the return of $13.4 million); B&R Acquisition Partners v. Prime Capital (JAMS Arb., Aug. 2023) (seeking the return of $4.3 million); Sturm v. Prime Capital, Case No. 23-cv-1033 (N.D.N.Y. Aug. 22, 2023) (seeking the return of $2 million);

---

[2] See Koplin, I., May 2, 2022, Roglieri Unveils Prime Capital Ventures, Prime Commercial Lending's Newest Fund, dealmaker-magazine.com, https://www.dealmaker-magazine.com/magazine/roglieri-unveils-prime-capital-ventures-prime-commercial-lendings-newest-fund.

*Camshaft CRE 1, LLC v. Prime Capital*, Case No. 2023-023173 (Fla. Circ. Ct., Miami-Dade Cty.,

Sept. 15, 2023) (seeking the return of $12.4 million); The Lion Group DFW, LLC v. Prime Capital,

Case No. 23-DCV-34617 (Tex. Dist. Ct., 146th Dist., Sept. 21, 2023) (demand unknown); Onward

Partners, LLC, v. Prime Capital, et al., Case No. 23-cv-833 (D. Utah Nov. 13, 2023) (seeking the

return of $4 million). *See* Geron Declaration, ¶ 6.

9.     On December 19, 2023, Compass-Charlotte 1031 ("Compass"), LLC, 526

Murfreesboro, LLC ("526 Murfreesboro"), and Newlight Technologies, Inc. (Newlight, and

together with Compass and 525 Murfreesboro, the "Petitioning Creditors") filed an involuntary

petition against the Debtor for relief under chapter 7 of the Bankruptcy Code commencing Case

No. 23-11302 ("Case 1").  The Petitioning Creditors commenced Case 1 for the obvious purpose

of ensuring that the Debtor's assets and liabilities could be liquidated in a single, public forum,

and that no single creditor could win the proverbial "race to the courthouse". *See* Geron

Declaration, ¶ 7.

10.     On December 22, 2023, upon order of the Court, the United States Trustee (the

"U.S. Trustee") appointed Christian H. Dribusch ("Dribusch") as the interim chapter 7 trustee of

the Debtor's estate.

11.     Rather than submit to the orderly winddown or restructuring of the Debtor's

business in Case 1, Roglieri pushed the Debtor in an entirely different direction.  Roglieri caused

the Debtor to contest the involuntary petition on the basis that at least two of the Petitioning

Creditors' claims were allegedly subject to a bona fide dispute because litigation concerning their

claims was pending.  See Debtor's Motion for Judgment Dismissing the Petition, Case 1 Dkt. No.

72, p.1.

12.     On January 8, 2024, the Petitioning Creditors filed their own motion to dismiss

Case 1 [Case 1 Dkt. No. 74], which motion was granted by the Court on January 9, 2024 [Case 1

Dkt. No. 87]. Thereafter, Dribusch was discharged from his duties as chapter 7 trustee.

13.    Three days after dismissal of Case 1, on January 12, 2024, Petitioning Creditor

Compass commenced an action in the United States District Court for the Northern District of New

York (the "District Court") under Case No. 24-cv-00055 (MAD) (CFH) (N.D.N.Y. Jan. 12, 1014)

(the "Receivership Case"), seeking, among other things, the appointment of a federal equity

receiver to take possession and control of the Debtor's assets and affairs. That same day, the

District Court entered an order appointing Paul Levine as the temporary receiver (the "Receiver")

[Receivership Case Dkt. No. 8].

14.    Roglieri directed the Debtor to file an emergency motion on behalf of the Debtor

to, among other things, dismiss the Receivership Case. [Id. at Dkt. No. 12-14]. On January 24,

2024, the District Court entered a memorandum decision and order making the Receiver's

appointment permanent and defining his powers with respect to the Debtor and its property and

denying the Debtor's motion to dismiss the case. [Id. at Dkt. No. 56].

15.    On February 15, 2024, Roglieri filed a voluntary petition for relief under subchapter

V of chapter 11 of the Bankruptcy Code commencing Case No. 24-10157 (REL) (the "Roglieri

Case").

16.    On May 14, 2024, the Debtor, by and through the Receiver, filed a voluntary

petition for relief under chapter 11 of the Bankruptcy Code in this Court commencing Case No.

24-10531 ("Case 2").

17.    On May 15, 2024, the Court entered an order converting Roglieri's case to one

under chapter 7 of the Bankruptcy Code. Roglieri Case at Dkt. No. 159. Thereafter, the U.S.

Trustee appointed Dribusch as the interim chapter 7 trustee (the "Roglieri Trustee") [Id. at Dkt.

No. 160].

18.     On June 25, 2024, B and R Acquisition Partners, LLC ("B&R") and JHM Lending

Ventures, LLC ("JHM" and together with B&R, the "B&R Parties") filed a motion to dismiss Case

2 on the basis that the Receiver was not authorized to file the petition on behalf of the Debtor

because they asserted that he lacked the authority pursuant to the terms of the orders of the District

Court [Case 2 at Dkt. No. 57].

19.     On July 23, 2024, the Court entered a memorandum decision and order dismissing

Case 2 finding essentially that the Receiver did not have the authority to file Case 2 on behalf of

the Debtor and that the Roglieri Trustee did not have the ability to waive the defect and ratify the

filing *ex post facto* (the "Dismissal Order") [Id. at Dkt. No. 85].  The Debtor took an appeal of the

Dismissal Order and on August 20, 2025, the District Court entered a decision (the "District Court

Decision") affirming in part and vacating in part the Dismissal Order and remanding the matter to

the Bankruptcy Court to dismiss Case 2 for the reasons set forth in the District Court Decision.

On September 4, 2025, the Bankruptcy Court directed the Clerk of the Court to close Case 2.  On

November 4, 2025, Case 2 was closed.

20.     The Roglieri Trustee, who at the time was in possession and control of all

membership interests of the Debtor by and through the Roglieri Bankruptcy Estate, exercised the

necessary powers and executed the necessary documents to assume control of the Debtor.   On

September 16, 2024, the Roglieri Trustee, in his capacity as the authorized agent for the Debtor,

filed a voluntary bankruptcy petition on behalf of the Debtor for relief under chapter 11 of the

Bankruptcy Code.

21.     In or around May 23, 2025, the Roglieri Trustee resigned and on May 27, 2025, the

Successor Roglieri Trustee was appointed.  On June 3, 2025, the Successor Roglieri Trustee filed

a consent to the appointment of a chapter 11 trustee in the Debtor's case [Docket No. 280].   On

June 5, 2025, the Court entered an order directing the U.S. Trustee to appoint a chapter 11 trustee

[Docket No. 282], and that same day the U.S. Trustee appointed the Trustee [Docket No. 285],

which appointment was confirmed by order of the Bankruptcy Court on June 10, 2025 [Docket

No. 287].  The Trustee has been serving in that capacity since that time.

22.     No examiner, or creditors' committee has been appointed.

B.     The Plan

23.     The Plan provides for the classification of certain classes of Claims and Equity

Interests as impaired or not impaired.  The classification scheme is set forth in the table below.

| Class | Claim | Impairment | Entitled to Vote |
|-------|-------|------------|------------------|
| Class 1 | Secured Claims | Unimpaired | No – Presumed to Accept |
| Class 2 | General Unsecured Claims | Impaired | Yes |
| Class 3 | Equity Interests | Impaired | No – Presumed to Reject |

24.     Thus, other than claims that are not required to be classified under the Bankruptcy

Code, the Plan provides for three different classes of Claims and Equity Interests.

25.     Class 1 (Secured Claims) is not impaired under the Plan and is conclusively

presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

Therefore, the votes of holders of Class 1 Claims were not solicited.  See Geron Declaration, ¶ 47.

26.     Class 2 (the "Voting Class") is impaired under the Plan.  The votes of holders of

Claims in the Voting Class were solicited.  See Geron Declaration ¶ 46, Voting Declaration ¶ 6.

The Voting Class voted to accept the Plan.  See Voting Declaration.

27.     The Trustee did not solicit votes from Class 3 because such holders are not entitled

to receive or retain any property under the Plan on account of such Equity Interests, and therefore

holders of Equity Interests in Class 3 are deemed to have rejected the Plan. See Geron Declaration, ¶ 48; see also 11 U.S.C. § 1126(g).

    C.    <u>The Solicitation of Votes and Noticing of Non-Voting Classes</u>

28.    On December 16, 2025, the Trustee filed the *Trustee's Ex-Parte Motion for Entry of an Order (I) Scheduling a Combined Hearing on (A) Adequacy of the Disclosure Statement and (B) Confirmation of the Plan, (II) Approving Form and Manner of Notice of Combined Hearing, (III) Establishing Procedures for Objecting to (A) Disclosure Statement or (B) Plan, and (IV) Approving Solicitation Procedures* (the "<u>Scheduling Motion</u>") [Docket No. 367].

29.    On December 18, 2025, the Court entered its *Order (I) Scheduling a Combined Hearing on (A) Adequacy of the Disclosure Statement and (B) Confirmation of the Plan, (II) Approving Form and Manner of Notice of Combined Hearing, (III) Establishing Procedures for Objecting to (A) Disclosure Statement or (B) Plan, and (IV) Approving Solicitation Procedures* (the "<u>Scheduling Order</u>") [Docket No. 368][3]. The Scheduling Order outlines the procedures for solicitation and tabulation of votes on the Plan.

30.    As specified in the Scheduling Order, December 16, 2025 was established as the record date for determining which creditors are entitled to vote on the Plan (the "<u>Voting Record Date</u>").

31.    On December 22, 2025, the Trustee commenced solicitation (the "<u>Solicitation</u>") of votes on the Plan, by mailing to the members of each of the Voting Class, a package (the "<u>Solicitation Package</u>") containing the (a) Disclosure Statement, (b) Plan, (c) Scheduling Order, (d) notice of the Combined Hearing (the "<u>Combined Hearing Notice</u>") [Docket No. 370], (e) ballot, a copy of which was attached to the Solicitation Affidavit (defined herein) as Exhibit F, (f)

---

[3] Pursuant to the Scheduling Order, approval of the Disclosure Statement and confirmation of the Plan is being heard at the same time (the "<u>Combined Hearing</u>").

assignment of claim form, a copy of which was attached to the Solicitation Affidavit (defined herein) as Exhibit C, and (g) pre-addressed return envelopes.  See Certificate of Service of Lauren C. Kiss, dated December 23, 2025 (the "Solicitation Affidavit") [Docket No. 371], Exhibit E.

32.    Further, as required by the Scheduling Order, on December 22, 2025, holders of Unclassified Claims and Class 1 Claims and Class 3 Equity Interests were mailed a package containing (a) the Combined Hearing Notice and (b) the Notice of Non-Voting Status.  See Solicitation Affidavit, Exhibit D.

33.     Finally, all other interested parties were mailed the Combined Hearing Notice.  See Solicitation Affidavit, Exhibit I.

34.    As provided in the Scheduling Order, the deadline to vote on the Plan was set for January 30, 2026.

35.    As set forth in the Voting Declaration, the Voting Class voted to accept the Plan. See Voting Declaration, Exhibit A.

36.    The Bankruptcy Court scheduled the Combined Hearing for 10:30 a.m. on February 10, 2026 and set an objection deadline of February 3, 2026.  Notice of the dates and times for the Combined Hearing and objection deadline was included in the Combined Hearing Notice.

## III.    THE PLAN SHOULD BE CONFIRMED

37.    Applicable case law holds that when considering confirmation of a chapter 11 plan, creditor democracy, an integral element in a chapter 11 case, should be afforded substantial deference in the absence of a clear impediment to plan confirmation.  See, e.g., Williams v. Hibernia Nat'l Bank (In re Williams), 850 F.2d 250, 253 (5th Cir. 1988).  Further, the United States Supreme Court has emphasized that creditors should be permitted to decide whether the proposed plan treatment is in their best interests.  See Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 207 (1988); see also Coltex Loop Cent. Three Partners, L.P. v. BT/SAP Pool C Assocs., L.P. (In

re Coltex Loop Central Three Partners, L.P.), 138 F.3d 39, 44 (2d Cir. 1998) ("The Code thus

strikes a considered balance between creditor and debtor interests, which . . . courts must

scrupulously respect.").  In this case, the Voting Class voted to accept the Plan.

38.    However, the Court has an independent duty to ensure that the Plan satisfies each

of the requirements of section 1129 of the Bankruptcy Code.

39.    The Trustee, as proponent of the Plan, bears the burden of proof on all elements

necessary for confirmation. See, e.g., 3 COLLIER BANKRUPTCY MANUAL ¶ 1129.02[4], at 1129 – 6

(3d ed. revised 2005); see also In re Sabine Oil & Gas Corp., 555 B.R. 180, 310 (Bankr. S.D.N.Y.

2016), motion to certify appeal denied, No. 16-CV-2561 (JGK), 2016 WL 6238616 (S.D.N.Y. Oct.

24, 2016), and appeal dismissed as moot, No. 16 CIV. 6054 (LAP), 2017 WL 477780 (S.D.N.Y.

Feb. 3, 2017); In re Ellis, 478 B.R. 132, 139 (Bankr. N.D.N.Y. 2012) ("The Debtor has the burden

to establish all of the elements essential to confirmation of the Plan."); In re Adelphia Comm'ns

Corp., 368 B.R. 140, 252 (Bankr. S.D.N.Y. 2007) (plan proponent possesses burden to establish

the satisfaction of the best interests test); see also In re WorldCom Inc., No. 02-13533(AJG), 2003

WL 23861928, at *46 (Bankr. S.D.N.Y. Oct. 31, 2003) ("A debtor, as the proponent of the Plan,

bears the burden of proof under section 1129 of the Bankruptcy Code"); see also In re Richard

Buick, Inc., 126 B.R. 840, 851 (Bankr. E.D. Pa. 1991).  To meet this burden, the Trustee must

demonstrate that the Plan complies with the provisions of the Bankruptcy Code by a preponderance

of the evidence.  See, e.g., Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd. (In re Briscoe

Enters., Ltd., II), 994 F.2d 1160, 1165 (5th Cir. 1993) (preponderance of evidence is debtors'

appropriate standard of proof); see also In re Quigley Co., Inc., 437 B.R. 102, 125 (Bankr.

S.D.N.Y. 2010) ("The proponent of confirmation bears the burden of proof by a preponderance of

the evidence."); In re Adelphia Comm'ns Corp., 368 B.R. at 252 (under best interests test, plan

10

proponent possesses burden to establish its satisfaction by preponderance of the evidence); see also In re WorldCom Inc., 2003 WL 23861928, at *46 (debtor must meet the burden by a preponderance of the evidence under section 1129 of the Bankruptcy Code); see also Corestates Bank, N.A. v. United Chem. Techs., Inc., 202 B.R. 33, 45 (E.D. Pa. 1996) (preponderance of evidence is appropriate standard of proof under "both § 1129(a) and in a cram down") (quoting In re Briscoe Enters., Ltd., II, 994 F.2d at 1165).

40.     To confirm the Plan, the Bankruptcy Court must find that both the Plan and the plan proponent comply with each of the requirements of section 1129(a) of the Bankruptcy Code.  See Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.), 843 F.2d 636, 648 (2d Cir. 1988) (plan must comply with section 1129(a) requirements).

41.     As further described herein, and as evidenced by the Voting Declaration and the Geron Declaration, the Trustee has satisfied his burden, by at least a preponderance of the evidence, that all of the requirements of the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules have been satisfied.  Accordingly, the Trustee respectfully submits that the Plan should be confirmed.

A.     The Plan Complies With The Applicable Provisions
Of Title 11  (11 U.S.C. § 1129(a)(l))

42.     Section 1129(a)(1) of the Bankruptcy Code provides that a plan may be confirmed only if "[t]he plan complies with the applicable provisions of this title." 11 U.S.C. § 1129(a)(1).

43.     The legislative history of section 1129(a)(1) explains that this provision embodies the requirements of, among others, sections 1122 and 1123 of the Bankruptcy Code governing, respectively, the classification of claims and the contents of the plan.  H.R. Rep. No. 595, 95th Cong., 1st Sess. 412 (1977); S. Rep. No. 989, 95th Cong., 2d Sess. 126 (1978);  see also In re Johns-Manville Corp., 843 F.2d at 648–49 ("[T]he legislative history of subsection 1129(a)(1) suggests

that Congress intended the phrase 'applicable provisions' in this subsection to mean provisions of

Chapter 11 that concern the form and content of reorganization plans."); <u>In re WorldCom Inc.</u>,

2003 WL 23861928, at *46 ("the legislative history of section 1129(a)(1) explains that this

provision encompasses the requirement of section 1122 and 1123 governing classification of

claims and contents of a plan, respectively"); <u>In re Drexel Burnham Lambert Group Inc.</u>, 138 B.R.

723, 757 (Bankr. S.D.N.Y. 1992) (same); <u>In re Sabine Oil & Gas Corp.</u>, 555 B.R. 180, 310 (Bankr.

S.D.N.Y. 2016) ("In order to determine whether a plan complies with section 1129(a)(1) of the

Code, a court must ensure that the requirements of sections 1122 and 1123 are met."); <u>In re Texaco</u>

<u>Inc.</u>, 84 B.R. 893, 905 (Bankr. S.D.N.Y. 1988) ("In determining whether a plan complies with

section 1129(a)(1), reference must be made to Code §§ 1122 and 1123 with respect to the

classification of claims and the contents of a plan of reorganization").

44.     Section 1122 of the Bankruptcy Code provides:

> (a) Except as provided in subsection (b) of this section, a plan may place a
> claim or an interest in a particular class only if such claim or interest is
> substantially similar to the other claims or interests of such class.

> (b) A plan may designate a separate class of claims consisting only of every
> unsecured claim that is less than or reduced to an amount that the court
> approves as reasonable and necessary for administrative convenience.

11 U.S.C. § 1122.

45.     The relevant inquiry under section 1122(a) is whether all claims in a class have

substantially similar rights to the Debtor's assets.  Thus, plan proponent has significant flexibility

in classifying claims under section 1122, as long as a reasonable legal or factual basis exists for

the proposed classifications, and all claims within a particular class are substantially similar.  <u>See</u>,

<u>e.g.</u>, <u>In re Jersey City Med. Ctr.</u>, 817 F.2d 1055, 1060–61 (3d Cir. 1987) ("Congress intended to

afford bankruptcy judges broad discretion [pursuant to section 1122] to decide the propriety of

plans in light of the facts"); <u>Olympia & York Fla. Equity Corp. v. Bank of N.Y. (In re Holywell</u> <u>Corp.)</u>, 913 F.2d 873, 880 (11th Cir. 1990) (proponent of plan has considerable discretion in classifying claims and interests according to relevant facts and circumstance of case); <u>Teamster's</u> <u>Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co., Inc. (In re U.S. Truck Co., Inc.)</u>, 800 F.2d 581, 586 (6th Cir. 1986) (noting court's "broad discretion" to determine proper classifications); <u>Windels Marx Lane & Mittendorf, LLP v. Source Enters., Inc. (In re Source</u> <u>Enters., Inc.)</u>, 392 B.R. 541, 556 (S.D.N.Y. 2008) ("Moreover, '[a] plan proponent is afforded significant flexibility in classifying claims under § 1122(a) if there is a reasonable basis for the classification scheme and if all claims within a particular class are substantially similar.") (quoting <u>In re Drexel Burnham Lambert Grp., Inc.</u>, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992)).

46.    In addition to the Administrative Expense Claims, Professional Fee Claims, Receiver Professional Fee Claims and Priority Tax Claims, which need not be designated pursuant to section 1123(a)(1) of the Bankruptcy Code, the Plan designates three (3) classes of Claims and Equity Interests.  Class 1 includes only Secured Claims.  Class 2 includes only General Unsecured Claims.  Class 3 includes only Equity Interests.  Thus, the Claims and Equity Interests placed in each Class are substantially similar to other Claims or Equity Interests in each such Class.

47.    Valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims and Equity Interests created under the Plan, and such Classes do not unfairly discriminate between holders of Claims and Equity Interests in any particular class.  The Trustee respectfully submits that classification scheme in the Plan satisfies section 1122 of the Bankruptcy Code.

48.    Section 1123(a) of the Bankruptcy Code identifies eight required features of a plan. The Plan fully complies with section 1123(a).

### i.    The Plan Designates Classes Of Claims

49.    Section 1123(a)(1) of the Bankruptcy Code requires that a Chapter 11 plan designate classes of claims and interests other than claims of a kind specified in section 507(a)(2) of the Bankruptcy Code (administrative expense claims), section 507(a)(3) of the Bankruptcy Code (claims arising during the "gap" period in an involuntary bankruptcy case), and section 507(a)(8) of the Bankruptcy Code (priority tax claims). 11 U.S.C. § 1123(a)(1).  Article 3 of the Plan satisfies this requirement by expressly classifying all Claims and Equity Interests, other than Administrative Expense Claims (other than professional fees and expenses), Priority Tax Claims, Professional Fee Claims, and Receiver Professional Fee Claims as follows: Class 1 (Secured Claims), Class 2 (General Unsecured Claims), and Class 3 (Equity Interests).

50.    Therefore, the Trustee respectfully submits that section 1123(a)(1) of the Bankruptcy Code is satisfied.

### ii.    Specification of Unimpaired Classes Of Claims

51.    Section 1123(a)(2) of Bankruptcy Code requires that a plan "specify any class of claims or interests that is not impaired under the plan." 11 U.S.C. § 1123(a)(2).   Article 3 of the Plan satisfies this requirement by specifying that Class 1 is not impaired under the Plan.

### iii.    The Plan Specifies The Treatment Of Impaired Classes

52.    Section 1123(a)(3) of the Bankruptcy Code requires that a plan "specify the treatment of any class of claims or interests that is impaired under the plan." 11 U.S.C. § 1123(a)(3).  Article 3 of the Plan specifies that Class 2 and Class 3 are impaired under the Plan and Article 4 of the Plan specifies the treatment of such Classes.  Accordingly, section 1123(a)(3) of the Bankruptcy Code is satisfied.

### iv.  The Plan Provides The Same Treatment Within Each Class

53.    Section 1123(a)(4) of the Bankruptcy Code requires that a plan "provide the same treatment for each claim or interest of a particular class." 11 U.S.C. § 1123(a)(4).  Article 4 of the Plan satisfies this requirement by providing the same treatment to each Claim or Equity Interest in each respective Class.  Accordingly, section 1123(a)(4) of the Bankruptcy Code is satisfied.

### v.  The Plan Provides Adequate Means For Implementation

54.    Section 1123(a)(5) of the Bankruptcy Code requires that a plan provide "adequate means" for its implementation. 11 U.S.C. § 1123(a)(5).  Adequate means for implementation of a plan may include, *inter alia*, retention by the debtor of all or part of its property and the transfer of property of the estate to one or more entities.  See  In re MF Global Inc., 478 B.R. 611, 618 (Bankr. S.D.N.Y. 2012) ("Section 1123(a)(5) provides a means for the estate to transfer property as part of a confirmed plan, requiring that a plan of reorganization provide means for implementation . . . .").

55.    Article 5 of the Plan provides adequate and proper means for the implementation of the Plan.  Following confirmation of the Plan, the Trustee intends to liquidate the Debtor's remaining Assets.  The Plan provides for vesting of all Assets, including Causes of Action, in the Plan Administrator, free and clear of all Liens, Claims, charges or other encumbrances.  The Plan appoints a Plan Administrator, who will complete the wind-down of the Debtor's affairs, evaluate and potentially pursue the Causes of Action and make Distributions to holders of Allowed Claims.

56.    Further, the Plan shall be funded from a combination of the proceeds of sale of the Debtor's Assets and proceeds from liquidation of remaining Assets.  Section 5.5 of the Plan provides for the establishment of a Disputed Claims Reserve.  In addition, Article 9 of the Plan provides procedures related to, among other things, distributions, resolution of disputed claims,

and the means by which distributions will be transmitted. The foregoing provisions constitute adequate means for implementation of the Plan, and therefore section 1123(a)(5) of the Bankruptcy Code is satisfied.

### vi.  Prohibition On The Issuance Of Non-Voting Securities

57.     Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate documents prohibit the issuance of non-voting equity securities and related corporate governance matters.  11 U.S.C. §1123(a)(6).  The Plan does not contemplate the issuance of new stock or other equity interests in the Debtor.  Accordingly, section 1123(a)(6) of the Bankruptcy Code is not applicable.

### vii.  Selection Of Trustees, Member And Manager

58.     Section 1123(a)(7) of the Bankruptcy Code requires that a plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan." 11 U.S.C. § 1123(a)(7).  This provision is supplemented by section 1129(a)(5) of the Bankruptcy Code, which directs the Bankruptcy Court to scrutinize the methods by which the management of a reorganized corporation is to be chosen to provide adequate representation of those whose investments are involved in the bankruptcy – i.e., creditors and equity holders.  See 7 Collier on Bankruptcy ¶1123.01[7] (Alan N. Resnick & Henry J. Sommer, eds. 16th ed. 2010). The Debtor will not have continued operations following confirmation of the Plan.  No new officers or directors are appointed under the Plan, nor will any new officers or directors be appointed following confirmation of the Plan.  Section 5.2 of the Plan provides for the appointment of a Plan Administrator, and the Plan identifies Yann Geron as the Plan Administrator, who is currently the Trustee.  In addition, section 5.4 of the Plan provides for the appointment of an

16

Oversight Committee and the Plan Supplement identifies the following members of the Oversight Committee: (i) Compass, (ii) ER Tennessee LLC, (iii) Piper Capital Funding LLC, and (iv) 526 Murfreesboro. Such appointments are due to the respective appointee's substantial knowledge and experience gained in current roles in the Chapter 11 Case and are consistent with the interests of creditors and with public policy.

59.    Section 1123(a)(8) of the Bankruptcy Code requires that, if the debtor is an individual, the plan shall "provide for the payment to creditors under the plan of all or such portion of earnings from personal services performed by the debtor after the commencement of the case or other future income of the debtor as is necessary for the execution of the plan."  11 U.S.C. § 1123(a)(8).  Here, the Debtor is not an individual and, accordingly, section 1123(a)(8) of the Bankruptcy Code does not apply.

60.    Section 1123(b) of the Bankruptcy Code identifies various discretionary provisions that may be included in a plan, but are not required.

### viii.    Impairment and Non-Impairment of Claims

61.    Section 1123(b)(1) provides that a plan may "impair or leave unimpaired any class of claims, secured or unsecured, or of interests." 11 U.S.C. § 1123(b)(1).

62.    The Plan provides that Class 1 (Secured Claims) is left unimpaired, and Class 2 (General Unsecured Claims) and Class 3 (Equity Interests) are impaired.  See Plan, Article 4.  The Trustee respectfully submits that such treatment is permissible under section 1123(b)(1).

### ix.    Executory Contracts and Unexpired Leases

63.    Section 1123(b)(2) of the Bankruptcy Code provides that a plan may, subject to section 365 of the Bankruptcy Code, "provide for the assumption, rejection, or assignment of any

executory contract or unexpired lease of the debtor not previously rejected under such section." 11

U.S.C. § 1123(b)(2).

64.    The Plan provides that any and all executory contracts (not otherwise previously

assumed or rejected or the subject of a motion to assume or reject pending on the Confirmation

Date), shall be deemed rejected by the Trustee.  See Plan, § 6.1.  The Plan constitutes a motion

under section 365(a) of the Bankruptcy Code for the authorization to reject executory contracts

and unexpired leases not previously assumed, assigned or rejected.  Section 365(a) of the

Bankruptcy Code states that a debtor, "subject to the court's approval, may assume or reject any

executory contract or unexpired lease of the debtor" if such action represents a reasonable exercise

of its business judgment.  11 U.S.C. § 365(a).  If the Court finds a debtor's business judgment has

been reasonably exercised, the proposed rejection should be approved.  See N.L.R.B. v. Bildisco

& Bildisco, 465 U.S. 513, 523 (1984); In re Penn Traffic Co., 524 F.3d 373, 377 (2d Cir. 2008).

Under the business judgment standard, courts will approve a debtor's business decision unless that

judgment is the product of bad faith, whim, or caprice.  See Lubrizol Enters., Inc. v. Richmond

Metal Finishers, Inc., 756 F.2d 1043, 1047 (4th Cir. 1985); In re Old Carco LLC, 406 B.R. 180,

190 (Bankr. S.D.N.Y. 2009).

65.    The Trustee respectfully submits that the provisions of the Plan regarding the

treatment of executory contracts are fair and reasonable under the circumstances, and comply with

sections 365(a) and 1123(b)(2) of the Bankruptcy Code.

x.  Retention of Claims

66.    Section 1123(b)(3) of the Bankruptcy Code provides that a plan may "provide for

(a) the settlement or adjustment of any claim or interest belonging to the debtor or to the estate; or

(b) the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest." 11 U.S.C. § 1123(b)(3).

67.    Pursuant to the Plan, the Plan Administrator is authorized to act on behalf of the Debtor's Estate in all adversary proceedings and contested matters (including, without limitation, any Avoidance Actions, Causes of Action, and Creditor Related Causes of Action), then pending or that can be commenced in the Court and in all actions and proceedings pending or commenced elsewhere, and to settle, retain, enforce, or dispute any adversary proceedings or contested matters. Pursuant to section 5.3(a)(vii), the Plan Administrator is given the power,  "upon consultation with the Oversight Committee, to determine whether to bring, settle, release, or compromise Avoidance Actions, Causes of Action, and Creditor Related Causes of Action without the need for Court approval (all compromises must be approved by the Oversight Committee or the Court to the extent the Oversight Committee objects)."  Plan, § 5.3(a)(vii).

68.    Courts in the Second Circuit have approved provisions in plans that permit representatives of the estate to enter into settlements of causes of action that occur post-confirmation without a hearing or Court approval.  See, e.g., Little Hearts Marks Fam. II L.P. v. Carter (In re 305 E. 61st St. Grp. LLC), 644 B.R. 75, 82 (Bankr. S.D.N.Y. 2022) (Section 2.2(j) of the Creditor Trust Agreement between the Debtor and Creditor Trustee gave the Creditor Trustee the power to "settle, retain, enforce, or dispute any adversary proceedings or contested matters (including, without limitation, any Causes of Action) and otherwise pursue actions involving Creditor Trust Assets that could arise or be asserted at any time under the Bankruptcy Code or otherwise, unless otherwise specifically waived or relinquished in the Plan. The Creditor Trust shall be authorized to enter into settlements of Causes of Action without a hearing or Court approval[.]"); In re A.B.C. Carpet Co., Inc., et al., Case No. 21-11591 (DSJ) (Bankr. S.D.N.Y.

Mar. 3, 2022) [Docket No. 382] (Article IV(L)(4)(iii) of confirmed plan gave the Liquidating Trustee "the power to pursue, prosecute, resolve, compromise and settle any Causes of Action against any other Person or Entity without notice to or approval from the Bankruptcy Court"); In re Agera Energy LLC, et al., Case No. 19-23802 (RDD) (Bankr. S.D.N.Y. June 16, 2020) [Docket No. 777] (section 5.6(c) of the confirmed plan gave the Liquidating Trustee the following powers, rights, and responsibilities, among others, "asserting, prosecuting, objecting to, pursuing, compromising, and settling in accordance with the Liquidation Trustee's reasonable business judgment, all matters affecting the Estates, including, without limitation, Disputed Claims and other Causes of Action related thereto, to the extent set forth in the Liquidation Trust Agreement and except as provided therein, without further order of the Bankruptcy Court"); In re Barney's New York, Inc., et al., Case No. 19-36300 (CGM) (Bankr. S.D.N.Y. Feb. 5, 2020) [Docket No. 789] (Article IV(M) of confirmed plan authorized the Wind-Down Debtors "to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court."); In re SunEdison, Inc., et al., Case No. 16-10992 (SMB) (Bankr. S.D.N.Y. July 28, 2017) [Docket No. 3735] (Section 7.6(b) of confirmed plan provided that "[t]he GUC/Litigation Trust, with the consent of the Reorganized Debtors to the extent such GUC/Litigation Trust Causes of Action interfere with (i) the Reorganized Debtors' collection of Earnout Proceeds, Residual Assets Proceeds, or Repatriated Cash or (ii) the continuing operations of TERP, shall determine whether to bring, settle, release, compromise, or enforce such GUC/Litigation Trust Causes of Action (or decline to do any of the foregoing), and shall not be required to seek further approval of the Bankruptcy Court for such action.").

69.     Further, Creditor Related Causes of Action may exist that are related to the Debtor's and Roglieri's conduct of the Debtor's businesses.  Creditor Related Causes of Action include, but may not be limited to: (i) any Claims against the Debtor's former attorneys, accountants, auditors, or other professionals, in connection with aiding and abetting any breach of fiduciary duty owed by Roglieri to the Debtor or its Creditors, fraud, aiding and abetting fraud on the part of the Debtor or Roglieri, or otherwise; (ii) any Claims against banks or any other financial institutions used by the Debtor or Roglieri, or that are involved in transactions with the Debtor, in connection with aiding and abetting any breach of fiduciary duty owed by Roglieri to the Debtor and its Creditors, fraud, aiding and abetting fraud on the part of the Debtor or Roglieri, or otherwise; and (iii) any other Claims against third parties that if pursued by the Debtor or its estate may be subject to the defense of *in pari delicto* or the Wagoner Rule.

70.     The Plan provides Creditors with the opportunity to assign their Creditor Related Causes of Action to the Plan Administrator for prosecution.  Creditors that choose not to assign their Creditor Related Causes of Action to the Plan Administrator shall be permitted to pursue such claim individually but shall lose any entitlement to participate in the Plan Administrator's Creditor Related Causes of Action Fund, if any.  See Plan § 4.2.  The Trustee respectfully submits that these provisions of the Plan comply with section 1123(b)(3) of the Bankruptcy Code.

xi.    Sale of Property and Distribution of Proceeds

71.     Section 1123(b)(4) of the Bankruptcy Code provides that a plan may provide "for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests." 11 U.S.C. § 1123(b)(4).

72.     Section 5 of the Plan provides that it will be funded by a combination of the proceeds of the sale of the Debtor's Assets and proceeds from liquidation of remaining Assets, and

21

that the Plan Administrator is responsible for disposing or otherwise realizing the value of all the remaining Assets.  The Trustee respectfully submits that these provisions of the Plan comply with section 1123(b)(4) of the Bankruptcy Code.

xii.   Modification of Rights of Holders of Unsecured Claims

73.     Section 1123(b)(5) provides that a plan may "modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims." 11 U.S.C. § 1123(b)(5).

74.     Section 4.2 of the Plan modifies the rights of holders of general unsecured claims (Class 2).  The Trustee submits that the modification of such rights is consistent with section 1123(b)(5) of the Bankruptcy Code.  The Plan does not modify the rights of holders of secured Claims.  Thus, the Plan complies with section 1123(b)(5) of the Bankruptcy Code.

xiii.   The Plan Includes Other Provisions That Are Not
Inconsistent With Applicable Sections Of The Bankruptcy Code

75.     Section 1123(b)(6) of the Bankruptcy Code provides that a Plan may "include any other appropriate provision not inconsistent with the applicable provisions of this title." 11 U.S.C. § 1123(b)(6).  The Plan does provide additional appropriate provisions that are not inconsistent with applicable sections of the Bankruptcy Code, including, but not limited to:  (i) Section 5.2 of the Plan (appointment of Plan Administrator); (ii) Section 5.5 of the Plan (establishment of reserves); Section 8.1 of the Plan (injunctions against interference with consummation or implementation of Plan); (iv) Section 8.2 of the Plan (exculpations); and (v) Section 9.10 of the Plan (no distributions of less than two hundred dollars).  These provisions are consistent with the Bankruptcy Code, and thus, the Plan complies with section 1123(b)(6) of the Bankruptcy Code.

22

76.     Section 1123(c) of the Bankruptcy Code requires in a case involving an individual, that "a plan proposed by an entity other than the debtor may not provide for the use, sale, or lease of property exempted under section 522 of this title, unless the debtor consents to such use, sale or lease." 11 U.S.C. § 1123(c).  The Debtor is not an individual, and accordingly, section 1123(c) is not applicable.

77.     Section 1123(d) of the Bankruptcy Code provides that "[n]otwithstanding subsection (a) of this section and sections 506(b), 1129(a)(7), and 1129(b) of this title, if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law."  11 U.S.C. § 1123(d).  The Plan does not contemplate the curing of any default.  Accordingly, section 1123(d) is not applicable.

78.     Based upon the foregoing, the Trustee respectfully submits that the Plan complies with the applicable provisions sections 1122 and 1123 of the Bankruptcy Code and, therefore, meets the requirements of section 1129(a)(1) of the Bankruptcy Code.

B.     The Trustee Has Complied With The
Applicable Provisions Of Title 11 (11 U.S.C. § 1129(a)(2))

79.     As noted above, the Court has scheduled a Combined Hearing to consider approval of the Disclosure Statement and confirmation of the Plan.  The proposed order approving the Disclosure Statement and confirming the Plan contains a finding and conclusion that, pursuant to section 1125 of the Bankruptcy Code the Disclosure Statement (i) contains "adequate information", within the meaning of section 1125 of the Bankruptcy Code, and (ii) is approved in all respects.

80.    The Scheduling Order outlines the procedures for the solicitation and tabulation of votes on the Plan.  As set forth in the Voting Declaration, the Trustee fully complied with the requirements of the Scheduling Order.  See, generally, Voting Declaration.

81.    Section 1126 of the Bankruptcy Code specifies the requirements for acceptance of a plan.  Under section 1126, only holders of allowed claims and allowed equity interests in impaired classes of claims or equity interests that will receive or retain property under a plan on account of such claims or equity interests may vote to accept or reject such plan.  See 11 U.S.C. § 1126.

82.    As set forth in the Solicitation Affidavit, in accordance with section 1126 of the Bankruptcy Code, the Trustee solicited votes on the Plan from holders of Claims in the Voting Class.  See Solicitation Affidavit, Exhibit E and Supplemental Solicitation Affidavit.  The Voting Class is impaired under the Plan and will or may receive distributions under the Plan.  See Plan, §§ 3.2, 4.2.  Accordingly, pursuant to section 1126(a) of the Bankruptcy Code, holders of Claims in Class 2 were entitled to vote to accept or reject the Plan.  See Plan, § 10.4.

83.    Class 1 (Secured Claims) is not impaired under the Plan.  See Plan §§ 3.2, 4.1.  As a result, pursuant to section 1126(f) of the Bankruptcy Code, holders of Claims in Class 1 are conclusively presumed to have accepted the Plan.  As such, the votes of holders of Class 1 were not solicited.

84.    In addition, the Trustee did not solicit votes from Class 3 – Equity Interests because such holders are not entitled to receive or retain any property under the Plan on account of such Equity Interest unless and until holders of Allowed Claims in Classes senior in priority to them have been paid in full, which is not expected to occur.  Section 1126(g) of the Bankruptcy Code provides that "a class is deemed not to have accepted a plan if such plan provides that the claims

24

or interests of such class do not entitle the holders of such claims or interests to receive or retain

any property under the plan on account of such claims or interests" and, as such, the votes of

holders of Class 3 Equity Interests were not solicited.  11 U.S.C. § 1126(g).

85.    Based upon the foregoing, the Trustee respectfully submits that the requirements of

section 1129(a)(2) of the Bankruptcy Code have been satisfied.

C.    The Plan Was Proposed In Good Faith (11 U.S.C. § 1129(a)(3))

86.    Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in

good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3).  Courts within the

Second Circuit have defined the good faith standard to require "a showing that the plan was

proposed with 'honesty, good intentions' and with a basis for expecting that a reorganization can

be effected." In re Granite Broad. Corp., 369 B.R. 120, 128 (Bankr. S.D.N.Y. 2007) ("The Second

Circuit has construed the standard as requiring a showing that 'the plan [was] proposed with

honesty and good intentions and with a basis for expecting that a reorganization can be effected.'")

(quoting In re Johns-Manville Corp., 843 F.2d at 649); Argo Fund Ltd. v. Bd. of Dirs. Of Telecom

Argentina, S.A. (In re Bd. of Dirs. Of Telecom Argentina, S.A.), 528 F.3d 162, 174 (2d Cir. 2008)

(quoting Koelbl v. Glessing (In re Koelbl), 751 F.2d 137, 139 (2d Cir. 1984)). In the context of a

Chapter 11 plan, courts have held that "a plan is proposed in good faith if there is a likelihood that

the plan will achieve a result consistent with the standards prescribed under the [Bankruptcy]

Code.'" In re Genco Shipping & Trading Ltd., 513 B.R. 233, 261 (Bankr. S.D.N.Y. 2014) (quoting

In re Leslie Fay Cos., Inc., 207 B.R. 764, 781 (Bankr. S.D.N.Y. 1997)). Good faith is to be

determined "in light of the totality of the circumstances surrounding" formulation of the plan.  In

re Quigley Co., Inc., 437 B.R. 102, 126 (Bankr. S.D.N.Y. 2010) (citing In re Madison Hotel

Assocs., 749 F.2d 410, 425 (7th Cir. 1984)); see also Tex. Extrusion Corp. v. Lockheed Corp. (In

re Texas Extrusion Corp.), 844 F.2d 1142, 1160 (5th Cir. 1988); In re Oneida Ltd., 351 B.R. 79,

85 (Bankr. S.D.N.Y. 2006) ("Good faith should be evaluated 'in light of the totality of the circumstances surrounding confirmation.'") (quoting In re Cellular Info. Sys., Inc., 171 B.R. 926, 945 (Bankr. S.D.N.Y. 1994)); In re Lionel L.L.C., No. 04-17324 (BRL), 2008 WL 905928, at *6 (Bankr. S.D.N.Y. March 31, 2008) (looking to totality of the circumstances in order to determine a plan proposed in good faith under section 1129(a)(3)). In determining whether the good faith requirement has been satisfied, the court will focus on "the plan itself and whether such plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." In re Granite Broad. Corp., 369 B.R. 120, 128 (Bankr. S.D.N.Y. 2007) (quoting In re PWS Holding Corp., 228 F.3d 224, 242 (3d Cir. 2000)). Accordingly, bankruptcy courts have held that the good faith requirement is satisfied if the plan has been proposed for the purpose of preserving the value of the bankruptcy estate and distributing that value to creditors. In re Source Enters, Inc., No. 06-11707 (AJG), 2007 WL 2903954, at *6 (Bankr. S.D.N.Y. Oct. 1, 2007) (the good faith requirement was satisfied in plan filed with the legitimate and honest purposes of maximizing value of estate and effectuating equitable distribution), aff'd, 392 B.R. 541 (S.D.N.Y. 2008).

87.    The Plan has been proposed by the Trustee in good faith, with the legitimate and honest purpose of maximizing the value of the Debtor's estate. See Geron Declaration, ¶ 49.

88.    The overwhelming support of the Voting Class reflects the overall fairness of the Plan and the acknowledgment by the Voting Class that the Plan has been proposed in good faith and for proper purposes.

89.    Further, the Trustee submits that the absence of any objections being filed to the Plan reflects the overall fairness of the Plan and the acknowledgment by parties in interest that the Plan has been proposed in good faith and for proper purposes. Accordingly, the Trustee respectfully submits that section 1129(a)(3) of the Bankruptcy Code is satisfied.

D.    All Payments To Be Made By The Estate In Connection With This Case Are
Subject To The Approval Of The Court (11 U.S.C. § 1129(a)(4))

90.    Section 1129(a)(4) of the Bankruptcy Code requires that: "[a]ny payment made or
to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property
under the plan, for services or for costs and expenses in or in connection with the case, or in
connection with the plan and incident to the case, has been approved by, or is subject to the
approval of, the court as reasonable." 11 U.S.C. § 1129(a)(4).  In essence, this subsection requires
that any and all fees promised or received from the estate in connection with or in contemplation
of a chapter 11 case must be disclosed and made subject to the court's approval.  Davis v. Elliot
Mgmt. Corp. (In re Lehman Bros. Holdings Inc.), 508 B.R. 283, 294 n. 9 (S.D.N.Y. 2014)
("Section 1129(a)(4) is partly focused on ensuring disclosure of payments made in connection with
the plan, but not written into the plan."); In re Journal Register Co., 407 B.R. 520, 537 (Bankr.
S.D.N.Y. 2009); see In re Johns-Manville Corp., 68 B.R. 618, 632 (Bankr. S.D.N.Y. 1986)
(implying that court must be permitted to review and approve reasonableness of professional fees
made from estate assets).  The court in In re Journal Register Co., 407 B.R. 520, 537 (Bankr.
S.D.N.Y. 2009), held that the requirements of section 1129(a)(4) are twofold: first, there must be
disclosure and second that the court must approve the reasonableness of the payments.  (quoting 7
Collier on Bankruptcy 1129.03[4].  "Section 1129(a)(4) is designed to insure compliance with the
policies of the Code that (1) the bankruptcy court should police the awarding of fees in title 11
cases and (2) holders of claims and interests should have the benefit of such information as might
affect the claimants' decision to accept or reject the plan."  Id. (quoting In re Future Energy Corp.,
83 B.R. 470, 488 (Bankr. S.D. Ohio 1988)).

91.    In this Chapter 11 Case, the only such payments are to the retained professionals of
the Debtor, the Trustee and his retained professionals, the Receiver and his professionals, and any

parties that submit claims for substantial contribution, which are all subject to Bankruptcy Court

approval.  The Plan requires professionals to file final applications for allowance of professional

fees and reimbursement of expenses on or before the date that is 30 days after notice of the

Effective Date has been mailed, see Plan, § 5.10, and such fees and expense reimbursements shall

be paid only in the amount allowed by the Court.  In addition, section 11.1(b) of the Plan provides

that the Bankruptcy Court will retain jurisdiction after the Effective Date to hear and determine all

applications for professional fees and reimbursement of expenses.

92.     Further, parties asserting an Administrative Expense Claim, including a claim for

substantial contribution, must file such request on or before the date that is 30 days after notice of

the Effective Date has been mailed, see Plan, § 5.9, and such payment request shall be paid only

in the amount allowed by the Court.

93.     Accordingly, the Trustee respectfully submits that the Plan complies with the

requirements of section 1129(a)(4) of the Bankruptcy Code.

E.     Disclosure Of All Required Information Regarding Post-Confirmation Directors,
       Management And Insiders (11 U.S.C. § 1129(a)(5))

94.     Section 1129(a)(5)(A)(i) requires that the proponent of a plan disclose the identity

and affiliations of any individual proposed to serve, after confirmation of a plan, as director, officer

or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor,

or a successor to the debtor under the Plan.

95.     The Plan satisfies section 1129(a)(5)(A)(i).  The Plan discloses that Yann Geron

will serve as Plan Administrator to complete the Debtor's wind-down and to make distributions to

certain Classes of Creditors.  See Plan, §§ 5.2, 5.3.  The Plan further discloses the appointment of

the Oversight Committee, comprised of not more than five members to oversee the activities of

the Plan Administrator.  See Plan § 5.4.  The Plan relates solely to the Debtor and not to any other

person or entity. Thus, the Plan complies with section 1129(a)(5)(A)(i) of the Bankruptcy Code to the extent applicable.

96.    Section 1129(a)(5)(A)(ii) requires that the appointment of the person identified in accordance with section 1129(a)(5)(A)(i) "is consistent with the interests of creditors and equity security holders and with public policy." 11 U.S.C. § 1129(a)(5)(A)(ii). Thus, section 1129(a)(5)(A)(ii) asks the bankruptcy court to ensure that post-confirmation governance is in "good hands," which has been interpreted by courts to mean that, without limitation: (a) the proposed directors and officers have experience in the debtor's business and industry and in financial and management matters; (b) control of the reorganized entity by the proposed individuals will be beneficial; and (c) the appointment of such persons does not "perpetuate[] incompetence, lack of discretion, inexperience, or affiliation[] with groups inimical to the best interests of the debtor." In re Linda Vista Cinemas, L.L.C., 442 B.R. 724, 735 (Bankr. D. Ariz. 2010); See, e.g., In re Drexel Burnham Lambert Grp, Inc., 138 B.R. at 760 (citations omitted).

97.    The Trustee believes that appointments described above are in fact consistent with the interests of creditors and equity security holders and with public policy. The Plan Administrator is the Trustee who is the party in possession and control of all equity interests in the Debtor and, as a result, has substantial knowledge of the Debtor's remaining Assets and has participated in the Debtor's wind-down activities, and his completion of such activities after the Effective Date will therefore be the most economical and efficient and therefore satisfies section 1129(a)(5)(A)(ii) of the Bankruptcy Code. The appointment of the Oversight Committee satisfies section 1129(a)(5)(A)(ii) of the Bankruptcy Code because those appointees will represent the interests of the General Unsecured Creditors. Therefore, the Trustee believes that the requirements of section 1129(a)(5)(A)(ii) of the Bankruptcy Code are satisfied. See Geron Declaration, ¶ 54.

29

98.     Section 1129(a)(5)(B) of the Bankruptcy Code provides that a plan may be confirmed if the proponent discloses the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider. 11 U.S.C. § 1129(a)(5)(B).

99.     Yann Geron, the proposed Plan Administrator, is currently the Trustee in charge of the Debtor's bankruptcy estate, and therefore is an "insider" within the meaning of section 101(31)(B) of the Bankruptcy Code.  Mr. Geron disclosed, in the Plan Administrator Agreement, his expected compensation.  In particular, Mr. Geron disclosed that he expected to be compensated at the rate of 2% of disbursements, plus reimbursement of expenses.  See Plan Administrator Agreement, § 2.2.   The Trustee submits that the foregoing disclosure satisfies section 1129(a)(5)(B) of the Bankruptcy Code.

F.    The Plan Does Not Provide For Any Rate Change
      Subject To Regulatory Approval (11 U.S.C. § 1129(a)(6))

100.     Section 1129(a)(6) of the Bankruptcy Code requires, with respect to a debtor whose rates are subject to governmental regulation following confirmation, that appropriate governmental approval has been obtained for any rate change provided for in the plan, or that such rate change be expressly conditioned on such approval. 11 U.S.C. §1129(a)(6).  Section 1129(a)(6) of the Bankruptcy Code does not apply to the Plan as there is no governmental regulatory commission that has jurisdiction over any rates of the Debtor.

G.    The Plan Satisfies The "Best Interests" Test (11 U.S.C. § 1129(a)(7))

101.     The "best interests of creditors" test as set forth in section 1129(a)(7) of the Bankruptcy Code requires that, with respect to each impaired class of claims or interests, each holder of a claim or interest has accepted the plan or will receive property of a value not less than

what such holder would receive if the debtor were liquidated under chapter 7 of the Bankruptcy

Code. In re Jennifer Convertibles, Inc., 447 B.R. 713, 724 (Bankr. S.D.N.Y. 2011).

102.    The best interests test focuses on individual dissenting creditors rather than classes

of claims. In re Drexel Burnham Lambert Grp., Inc., 138 B.R. at 761; see also ACC Bondholder

Grp. v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.), 361 B.R. 337, 364 (S.D.N.Y.

2007) ("The best interest of creditors test 'applies to individual creditors holding impaired claims,

even if the class as a whole votes to accept the plan.' If even one dissenting member of an impaired

class would get less under the Plan than in a hypothetical liquidation, the fact that the class as a

whole approved the Plan is immaterial") (quoting Bank of Am. Nat'l Trust & Sav. Ass'n v. 203

N. LaSalle St. P'ship, 526 U.S. 434, 442 n. 13 (1999)). The analysis requires that each holder of

a claim or interest either accept the plan or receive or retain under the plan property having a

present value, as of the effective date of the plan, not less than the amount such holder would

receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code. In re 20

Bayard Views, LLC, 445 B.R. at 98 (Bankr. E.D.N.Y. Mar. 7, 2011) (the "best interests test"

focuses on whether creditors would receive at least as much in a chapter 7 distribution of debtor's

assets as under reorganization plan); In re Best Prods. Co. Inc., 168 B.R. 35, 72 (Bankr. S.D.N.Y.

1994) (best interests test met when classes voting against plan would receive either the same or

larger distribution than under chapter 7 liquidation), appeal dismissed, 177 B.R. 791 (S.D.N.Y.),

aff'd, 68 F.3d 26 (2d Cir. 1995); see In re Leslie Fay Co., Inc., 207 B.R. at 787 (best interests test

requires court to "find that each [dissenting] creditor will receive or retain value that is not less

than the amount he [or she] would receive if the debtor were liquidated") (quoting In re Victory

Constr. Co., Inc., 42 B.R. 145, 151 (Bankr. C.D. Cal. 1984)). Accordingly, if the Court finds that

each nonconsenting member of an impaired class will receive at least as much under the Plan as it

would receive in a chapter 7 liquidation, the Plan satisfies the best interests of creditors test.  See

In re Wash. Mut., Inc., 442 B.R. 314, 356 (Bankr. D. Del. 2011).

103.    As set forth above, the Voting Class has voted to accept the Plan.  There was one

(1) Creditor who voted to reject the Plan in the Voting Class but its vote was not counted in the

tabulation of votes because it was a flawed vote.  See Voting Declaration.

104.    As set forth in the Geron Declaration, the Plan provides for the liquidation of the

Debtor's remaining Assets.  Attached to the Disclosure Statement as Exhibit B is a liquidation

analysis (the "Liquidation Analysis") that demonstrates the projected recoveries for each Class

under the Plan and in a hypothetical chapter 7 scenario.  Based upon the Liquidation Analysis, it

is undisputable that holders of Claims and Equity Interests will receive value under the Plan that

is not less than such holder would receive if the Debtor was liquidated in Chapter 7.

H.    Section 1129(a)(8) of the Bankruptcy Code (Acceptance of
Certain Classes) is Not Satisfied as to Class 3 (Equity Interests),
but the Plan Can be Confirmed Notwithstanding this

105.    Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or

interests under a plan has either accepted the plan or is not impaired under the plan.  With respect

to an unimpaired class of claims, under section 1126 of the Bankruptcy Code, any such unimpaired

class of claims is "conclusively presumed" to have accepted the plan and need not be further

examined under section 1129(a)(8). 11 U.S.C. § 1126(f).  Class 1 is not impaired and is therefore

conclusively presumed to have accepted the Plan.  See Plan, §§ 3.2, 4.1.

106.    With respect to an impaired class of claims, acceptance of a plan is determined by

reference to section 1126(c) of the Bankruptcy Code, which identifies the members of a class who

may vote and the number and amount of votes necessary for the acceptance of a plan by a class of

claims.  In particular, section 1126(c) of the Bankruptcy Code provides that a plan is accepted by

an impaired class of claims if the class members accepting hold at least two-thirds in amount and

more than one-half in number of the claims held by the class members that have cast votes on the

plan. 11 U.S.C. § 1126(c).

107.    As set forth in the Voting Declaration and herein above, the Voting Class voted to

accept the Plan.  As such, Section 1129(a)(8) is satisfied as to Class 2.

108.    Class 3 (Equity Interests) is the only Class that is Impaired and is deemed to have

rejected the Plan under section 1126(g) of the Bankruptcy Code.  Notwithstanding the foregoing,

the Plan satisfies the cramdown requirements of section 1129(b) of the Bankruptcy Code as to

Class 3, as discussed more fully in Section (Q) below.

I.    <u>The Plan Provides For The Payment Of Priority Claims (11 U.S.C. § 1129(a)(9))</u>

109.    Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be

paid in full on the effective date of a plan.  The Plan satisfies each of the requirements of section

1129(a)(9).  First, consistent with section 1129(a)(9)(A), the Plan provides for all Allowed

Administrative Claims (i.e., § 507(a)(2)  and § 507(a)(3) claims) to be paid in full in Cash (a) as

soon as practicable following the later of the Effective Date or the date upon which the Court enters

a Final Order allowing any such Administrative Expense Claim, or (b) upon such other terms as

may exist in accordance with the ordinary course of the Debtor's liquidation, or (c) as may be

agreed upon between the holder of any such Administrative Expense Claim and the Plan

Administrator.  <u>See</u> Plan § 2.1(a).

110.    Second, the Plan provides that Priority Tax Claims will be treated consistently with

section 1129(a)(9)(C), in that each holder of an Allowed Priority Tax Claim shall be paid (a) an

amount in Cash equal to the Allowed amount of such Priority Tax Claim, or (b) such other

treatment as to which the Plan Administrator and the holder of such Allowed Priority Tax Claim

shall have agreed upon in writing.  <u>See</u> Plan § 2.1(b).

111. Thus, the Plan complies with the requirements of section 1129(a)(9) of the Bankruptcy Code.

J.    The Plan Has Been Accepted By At Least One
      Impaired, Non-Insider Class (11 U.S.C. § 1129(a)(10))

112. Section 1129(a)(10) of the Bankruptcy Code provides that "[i]f a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider". 11 U.S.C. § 1129(a)(10).

113. The Plan satisfies this requirement. As described above and in the Voting Declaration, the Plan has been accepted by Class 2 which does not include the votes cast by any insiders. As a result, at least one Class of Claims that is impaired under the Plan has accepted the Plan, determined without including any acceptance of the Plan by any insider, as required by section 1129(a)(10) of the Bankruptcy Code.

K.    The Plan Is Feasible or Feasibility Analysis
      Not Applicable (11 U.S.C. § 1129(a)(11))

114. Pursuant to section 1129(a)(11) of the Bankruptcy Code, a plan may be confirmed only if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11).

115. As described in detail in the Disclosure Statement, the Plan shall be funded by a combination of the proceeds of sale of the Debtor's Assets and proceeds from liquidation of remaining Assets. In addition, the Plan provides that Causes of Action will be prosecuted under the management of the Plan Administrator. As a result, no further liquidation or reorganization will be required after confirmation of the Plan. Therefore, the Trustee submits that the

requirements of section 1129(a)(11) are not applicable. However, to the extent Bankruptcy Code

section 1129(a)(11) applies to implementation of the Plan, the Trustee submits that the feasibility

requirement of section 1129(a)(11) is satisfied, because, after the sale of substantially all of the

Debtor's Assets, the Debtor's estate has sufficient assets on hand to implement the Plan as

proposed.  See Plan Article 5, Geron Declaration ¶¶ 72-74.

     L.    The Plan Provides For The Payment Of Certain Fees (11 U.S.C. § 1129(a)(12))

116.    Section 1129(a)(12) of the Bankruptcy Code requires that certain fees listed in 28

U.S.C. § 1930, determined by the court at the hearing on confirmation of a plan, be paid or that

provision be made for their payment. 11 U.S.C. § 1129(a)(12).  The Plan provides that all fees

payable pursuant to section 1930 of Title 28 of the United States Code shall be paid by the Trustee

or the Plan Administrator.  The Plan also provides for the payment, when due, of all U.S. Trustee

quarterly fees under 28 U.S.C. § 1930(a)(6) until the Chapter 11 Case is closed.  See Plan § 5.13.

     M.    Preservation of Retiree Benefits (11 U.S.C. § 1129(a)(13))

117.    Section 1129(a)(13) of the Bankruptcy Code requires that a plan provide for the

continuation, after the plan's effective date, of all retiree benefits at the level established by

agreement or by court order pursuant to section 1114 of the Bankruptcy Code at any time prior to

confirmation of the plan, for the duration of the period that the debtor has obligated itself to provide

such benefits.  11 U.S.C. § 1129(a)(13).

118.    The Debtor has no obligation to provide any retiree benefits, and accordingly,

section 1129(a)(13) of the Bankruptcy Code is not applicable.

     N.    Domestic Support Obligations (11 U.S.C. § 1129(a)(14)

119.    Section 1129(a)(14) of the Bankruptcy Code requires a debtor to pay all domestic

support obligations that first become payable after the date of the filing of the petition.  11 U.S.C.

§ 1129(a)(14).

120.    The Debtor does not have any domestic support obligations, and accordingly, section 1129(a)(4) of the Bankruptcy Code is not applicable.

O.    Requirements for Individual Chapter 11 Cases (11 U.S.C. § 1129(a)(15)

121.    Section 1129(a)(15) of the Bankruptcy Code provides that "[i]n a case in which the debtor is an individual and in which the holder of an allowed unsecured claim objects to the confirmation of the plan, either (a) the value, as of the effective date of the plan, of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or (b) the value of the property to be distributed under the plan is not less than the projected disposable income of the debtor (as defined by section 1325(b)(2)) to be received during the 5-year period beginning on the date that the first payment is due under the plan, or during the period for which the plan provides payments, whichever is longer." 11 U.S.C. § 1129(a)(15). The Debtor is not an individual, and accordingly, section 1129(a)(15) of the Bankruptcy Code is not applicable.

P.    Property Transfers By Corporations or Trusts that are not Moneyed, Business or Commercial Corporations or Trusts (11 U.S.C. § 1129(a)(16)

122.    Section 1129(a)(16) of the Bankruptcy Code requires that "[a]ll transfers of property under the plan shall be made in accordance with any applicable provisions of nonbankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business or commercial corporation or trust." 11 U.S.C. § 1129(a)(16). The Debtor is not a nonprofit entity. As a result, section 1129(a)(16) is inapplicable to the Plan.

Q.    Cram Down Requirements Have Been Satisfied (11 U.S.C. § 1129(b))

123.    Section 1129(b) of the Bankruptcy Code provides a mechanism (known colloquially as "cram down") for confirmation of a chapter 11 plan in circumstances where the plan is not accepted by all impaired classes of claims. Under section 1129(b), the court may "cram down" a plan over the dissenting vote of an impaired class or classes of claims or interests as long

as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to such
dissenting class or classes.

124.    Here, cram down is relevant to Equity Interests in Class 3 as Class 3 is an Impaired
class which is deemed to have rejected the Plan.  The Plan may be confirmed as to this Class
pursuant to the "cram down" provisions of section 1129(b) of the Bankruptcy Code.

125.    Although Congress did not define "discriminate unfairly," the case law has
interpreted this standard to mean that creditors or interest holders with similar legal rights should
not receive materially different treatment under a proposed plan.  See, e.g., In re Johns-Manville
Corp., 68 B.R. at 636).  The test for whether the discrimination is unfair "boils down to whether
the proposed discrimination has a reasonable basis and is necessary for reorganization."  See 3
COLLIER BANKRUPTCY MANUAL ¶ 1129.04[3][a] at 1129-41 (3rd ed. revised 2005), citing, In re
203 North LaSalle St. Ltd. P'ship, 190 B.R. 567, 585-86 (Bankr. N.D. Ill. 1995) ("Firstly, any
discrimination must be supported . . . by a legally acceptable rationale. . . . Second, the extent of
the discrimination must be necessary in light of the rationale").

126.    In light of the foregoing standards, the Trustee submits that the Plan does not
discriminate unfairly with regard to Class 3 of the Plan.  The Equity Interests within this Class are
not similarly situated to Claims in other Classes and the treatment of Equity Interests in Class 3 is
the result of the priority scheme set forth in the Bankruptcy Code.  As such, the Plan does not
discriminate unfairly.

127.    In addition to not discriminating unfairly, the Plan must be fair and equitable with
respect to Class 3.  See Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 202 (1988) ("fair and
equitable" means that a plan must "comply with the absolute priority rule"); In re Montgomery Ct
Apartments of Ingham County, Ltd., 141 B.R. 324, 343 (Bankr. S.D. Ohio 1992) (fair and

equitable standard means that "[holders] of junior claims or interests cannot receive distributions under a proposed plan unless senior creditors have been fully paid"). Section 1129(b) of the Bankruptcy Code provides explicit guidance as to the meaning of "fair and equitable."

128.    With respect to an unsecured claim, the "fair and equitable" standard, also known as the "absolute priority rule," requires that a dissenting class receive full compensation for its allowed claim before any junior class receives or retains any property under the Plan. See 11 U.S.C. § 1129(b)(2)(B). If the holders of any impaired class vote to reject the Plan, the Plan may be confirmed under section 1129(b) of the Bankruptcy Code if all holders of claims and equity interests junior to those of the impaired class do not receive or retain any property under the Plan. See Westpointe L.P. v. Franke (In re Westpointe L.P.), 234 B.R. 431, 438 (Bankr. E.D. Mo. 1999).

129.    With respect to equity interests, "fair and equitable" means that each equity interest holder (a) will receive or retain property of a value, as of the effective date of the Plan, equal to the greatest of (i) the allowed amount of any fixed liquidation preference to which such holder is entitled, (ii) any fixed redemption price to which such holder is entitled, or (iii) the value of such interest; or (b) the holder of any interest that is junior to the interests of such class will not receive or retain any property under the Plan on account of such junior interest. See 11 U.S.C. § 1129(b)(2)(C).

130.    The Trustee submits that the Plan's treatment of Equity Interests in Class 3 is both fair and equitable because the Plan distribution scheme follows the absolute priority rule and does not provide for any junior classes to receive recovery before recovery is had by senior classes. Class 3 is clearly treated in accordance with the absolute priority rule. Thus, the Plan is "fair and equitable" and, therefore, consistent with the requirements of section 1129(b) of the Bankruptcy Code.

R.     Confirmation of One Plan (11 U.S.C. § 1129(c))

131.    The Plan is the only plan that has been filed in this Chapter 11 Case.[4]  Accordingly,

section 1129(c) of the Bankruptcy Code is satisfied.

S.     The Principal Purpose of the Plan is Not Avoidance
       of Taxes or Section 5 of the Securities Act (11 U.S.C. § 1129(d))

132.    Section 1129(d) of the Bankruptcy Code states that "the court may not confirm a

plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of the application

of section 5 of the Securities Act of 1933."  11 U.S.C. § 1129(d).  The purpose of the Plan is not

to avoid taxes or the application of section 5 of the Securities Act of 1933.  Moreover, no party

that is a governmental unit, or any other entity, has requested that the Court decline to confirm the

Plan on the grounds that the principal purpose of the Plan is the avoidance of taxes or the avoidance

of the application of section 5 of the Securities Act of 1933.  Accordingly, the Plan satisfies the

requirements of section 1129(d) of the Bankruptcy Code.

T.     Compliance with Bankruptcy Rule 3016

133.    Bankruptcy Rule 3016(a) requires that "[e]very proposed plan and any modification

thereof shall be dated and, in a chapter 11 case, identified with the name of the entities or entity

submitting or filing it."  This requirement is satisfied because the Plan is dated, as of December

16, 2025, and the Plan identifies the Trustee as the party filing it.

134.    Bankruptcy Rule 3016(b) requires that a disclosure statement be filed with the plan

or within a time fixed by the Court.  The Trustee satisfied this requirement by filing the initial

Disclosure Statement contemporaneously with the Plan.

135.    Bankruptcy Rule 3016(c) requires that "[i]f a plan provides for an injunction against

conduct not otherwise enjoined under the Code, the plan and disclosure statement shall describe

---

[4] The plan proposed by the Debtor was denied by the Bankruptcy Court and, as a result, is moot. *See* Docket No. 178.

in specific and conspicuous language (bold, italic or underlined text) all acts to be enjoined and identify the entities that would be subject to the injunction." Article 8 of the Plan provides for certain injunctions and exculpations, which are specifically and conspicuously identified by the use of bold typeface. Accordingly, the Plan complies with Bankruptcy Rule 3016(c).

## IV.    THE INJUNCTIONS AND EXCULPATIONS SHOULD BE APPROVED

136.    The Trustee requests approval of certain injunctions and exculpations as part of the Plan and submit that such provisions are customary and should be approved in all respects.

137.    The Trustee requests approval of certain injunctions and exculpations of certain parties for their acts during the Chapter 11 Case.  All injunctive and exculpation provisions were included in the Plan and the Disclosure Statement in bold typeface in order to draw attention to these provisions and ensure their due consideration by holders of Claims entitled to vote on the Plan.  Significantly, as evidenced by the overwhelming acceptance of the Plan by the voting classes, the injunctions and exculpations were approved by a substantial majority of holders of Claims that voted on the Plan.  The Trustee therefore submits that the injunctions and exculpations should be approved in all respects.

### A.    The Injunctions

138.    Section 8.1 of the Plan contains two (2) injunctions: an injunction against interference with consummation or implementation of the plan (the "Consummation Injunction"), see Plan § 8.1(a); and a general injunction against attempts to collect or otherwise enforce claims in any manner inconsistent with the Plan (the "Plan Injunction," and together with the Consummation Injunction, the "Injunctions"), see Plan § 8.1(b).

139.    The Consummation Injunction enjoins any holder of a Claim from commencing or continuing any action, or employing any process, against the Debtor, the Estate, the Trustee, the Post-Confirmation Estate, Roglieri Trustee, the Successor Roglieri Trustee, the Plan

40

Administrator, or the Oversight Committee (and its members) with the intent of interfering with consummation or implementation of the Plan.  This standard, necessary and appropriate injunction ensures that those who are responsible for making payments and Distributions under the Plan are able to do so unfettered.

140.    The Plan Injunction enjoins all Persons from extra-Plan efforts to collect on Claims by prohibiting: (i) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order; (ii) the creation, perfection or enforcement of any encumbrance of any kind; and or (iii) the assertion of any right of setoff, counterclaim, exculpation, or subrogation of any kind, in each case against the Debtor, the Estate, the Trustee, the Post-Confirmation Estate, Roglieri Trustee, the Successor Roglieri Trustee, the Plan Administrator, or the Oversight Committee (and its members).  This injunction, like the Consummation Injunction, is a standard, necessary and appropriate aid to implementation of the Plan.

141.    The Injunctions are appropriate, consistent with applicable law, and should be approved in their entirety. They are narrowly tailored to their purpose of implementing the Plan. Further, the Injunctions are well within the scope of section 105(a) of the Bankruptcy Code and well within the Court's authority to approve.

142.    Bankruptcy Courts are empowered to issue permanent injunctions under a chapter 11 plan pursuant to section 105(a) of the Bankruptcy Code.  Section 105(a) authorizes a bankruptcy court to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [title 11]."  Under section 105(a) of the Bankruptcy Code, the Court has expansive equitable powers to fashion any order or decree that is in the interest of preserving or protecting the value of a debtor's assets and to facilitate the efficient administration of the chapter 11 case. See, e.g., In re Momentum Mfg. Corp., 25 F.3d 1132, 1136 (2d Cir. 1994) ("It is well settled that

bankruptcy courts are courts of equity, empowered to invoke equitable principles to achieve fairness and justice in the reorganization process.").

143.    In the Second Circuit, bankruptcy courts previously have approved injunctions in situations where injunctions were an integral part of the chapter 11 plan, conferred material benefits on a debtor's estate and its creditors, or were necessary to effectuate the plan. See In re Bally Total Fitness, 2007 WL 2779438, at *8 (finding injunctions provisions appropriate because they were fair and equitable, necessary to a successful reorganization, and integral to the plan); In re Ionsphere Clubs, Inc., 184 B.R. 648, 655 (S.D.N.Y. 1995) ("Courts may issue injunctions enjoining creditors from suing third parties…in order to resolve finally all claims in connection with the estate and to give finality to a reorganization plan.").  Similar injunction provisions have been approved by this Court and other courts in this Circuit. See e.g., In re M. Burton Marshall, Case No. 23-60263 (PGR) (Bankr. N.D.N.Y. July 22, 2024) [Docket No. 436] (approving an injunction against interference with consummation or implementation of the plan and general injunction against attempts to collecting or enforcing claims in a manner inconsistent with the plan); In re Dowling College, Case No. 16-75545 (REG) (Bankr. E.D.N.Y. Dec. 20, 20218) [Docket No. 662] (same) ; In re Personal Communications Devices, LLC, Case No. 13-74303 (AST) (Bankr. E.D.N.Y. April 14, 2014) [Docket No. 413] (approving general injunction of all claims related to the administration of the chapter 11 case or the plan); In re Cengage Learning, Inc., Case No. 13-44106 (ESS) (Bankr. E.D.N.Y. March 14, 2014) [Docket No. 1225] (approving general injunction necessary to preserve and enforce releases, exculpations and compromises and settlements under the plan); In re Saint Vincent's Catholic Medical Centers of New York, Case No. 10-11963 (CGM) (Bankr. S.D.N.Y. June 29, 2012) [Docket No. 3060] (approving general

injunction of actions related to claims released under plan or that would contradict plan provisions).

144.    Based on the relevant case law, the facts and circumstances of the Chapter 11 Case, and in light of the benefits that the Trustee and the Debtor's Estate will receive from the Injunctions in section 8.1 of the Plan are reasonable, well-justified and should be approved.

B.    The Exculpation

145.    Section 8.2 of the Plan includes a customary exculpatory provision, which, with certain limitations, protects specified parties from liability that might arise from the administration of certain aspects of the Chapter 11 Case (the "Exculpation").  The Exculpation, among other things, augments the proposed Injunctions and provides that except as otherwise set forth in the Plan, the Trustee and his professionals shall not have or incur any liability to any holder of a Claim or any other Person for any act or omission taken or not taken in good faith in connection with, or arising out of, the Chapter 11 Case, the Disclosure Statement, the Plan, or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan, or any act taken or omitted to be taken during the Chapter 11 Case, the solicitation of votes for and the pursuit of confirmation of the Plan, the consummation of the Plan, including, without limitation, the steps taken to effectuate the transactions described in Article 5 of the Plan, the administration of the Plan or the property to be distributed under the Plan.

146.    Notwithstanding anything in section 8.2 of the Plan to the contrary, the provisions of section 8.2 of the Plan do not limit the liability of any Person that would otherwise result from any act or omission to the extent such act or omission is determined by Final Order to have constituted fraud, willful misconduct or gross negligence.  The Trustee submits that, for the reasons set forth herein, the Exculpation contained in the Plan is appropriate and should be approved.

43

147.    Exculpations like those contained in section 8.2 of the Plan, which are limited to certain parties instrumental in the administration of the Chapter 11 Case from liability for acts and omissions related to the Chapter 11 Case, other than liability for fraud, willful misconduct and gross negligence, are viewed as reasonable and customary in this jurisdiction.  Indeed, courts have recognized that, without the protections afforded by limited exculpation provisions, "negotiation of a [plan in a reorganization case] would not…[be] possible.  In re Enron Corp., 326 B.R. 497, 501-03 (S.D.N.Y. 2005) (endorsing the findings of the bankruptcy court concerning the propriety and justification for the limited exculpation contained in that plan); In re Oneida Ltd., 351 B.R. 79, 94 n. 22 (Bankr. S.D.N.Y. 2006) (exculpation provision contained in chapter 11 plan which provided for a release of prepetition and postpetition claims related to various matters associated with confirmation of a chapter 11 plan "sufficiently narrow to be unexceptionable.").

148.    Courts in the Second Circuit evaluate the appropriateness of similar exculpation provisions based on a number of factors, including whether the plan was proposed in good faith, whether the provision is integral to the plan, and whether the exculpation provision was necessary for plan negotiations.  See, e.g., In re Bally Total Fitness, 2007 WL 2779438 at*8 (finding exculpation, release and injunction provisions appropriate because they were necessary to successful reorganization and integral to plan); Upstream Energy Servs. v. Enron Corp. (In re Enron Corp.), 326 B.R. 497, 501, 503-04 (S.D.N.Y. 2005) (affirming approval of exculpation provision where it was necessary to effectuate plan and excluded gross negligence and willful misconduct; also noting that excising similar exculpation provisions would "tend to unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition").

149.    Thus, courts have found that exculpation for participating in the chapter 11 process is appropriate when the plan has been proposed in good faith and otherwise meets the requirements for plan confirmation, and plan negotiations could not have occurred without protection from liability for parties involved in those negotiations. See In re Drexel Burnham Lambert Group, Inc., 960 F.2d at 293 (finding that where a debtor's plan of reorganization requires the settlement of numerous, complex issues, protection of third parties against legal exposure may be a key component of the settlement). Indeed, failing to include an exculpation provision in a chapter 11 plan could deter the critical participation of the debtor's management and advisors, as well as essential parties in interest and creditor groups from fully participating in a chapter 11 case and plan negotiations. See id.; In re Enron Corp., 326 B.R. at 503 (finding that without such protection from liability, key constituents might not actively participate in plan process or might abandon efforts to help a debtor).

150.    In general, the effect of an appropriate exculpation provision is to set a standard of case liability as that of gross negligence or willful misconduct in future litigation by a non-releasing party against an "exculpated party" for acts arising out of a debtor's restructuring. See In re PWS Holding Corp., 228 F.3d 224, 245 (3d Cir. 2000) (holding an exculpation provision is "apparently a commonplace provision in Chapter 11 Plans, [and] does not affect the liability of these parties, but rather states a different standard of care under the Code"); see also In re Enron Corp., 326 B.R. at 501 (finding exculpation provision was appropriate where such provision excluded gross negligence and willful misconduct).

151.    Accordingly, exculpation provisions appropriately prevent collateral attacks against parties that have made substantial contributions to a debtor's chapter 11 case and have negotiated a chapter 11 plan that is ultimately confirmed by the Court.  Parties to be exculpated

45

from liability may include those that are indemnified by a debtor or that provide substantial contributions to the debtor and the debtor's case.  See, e.g., In re Borders Grp., Case No. 11-10614(MG) (Bankr. S.D.N.Y. Dec. 21, 2011) [Docket No. 2384]; In re Uno Rest. Holdings Corp., Case No. 10-10209(MG) (Bankr. S.D.N.Y. July 6, 2010 [Docket No. 559].

152.    Based on this widely accepted precedent, the Exculpation contained in section 8.2 of the Plan is wholly justified, properly limited, and should be approved.  The Exculpation is appropriately crafted so as to insulate those parties whose efforts have been instrumental in connection with the formulation and development, confirmation and consummation of the Plan, as well as the overall success of the Chapter 11 Case, from certain types of liability.  Moreover, the Exculpation, including its carve-out for fraud, willful misconduct and gross negligence, is entirely consistent with established practice in this circuit.  See, e.g., In re DBSD N. Am., Inc., 419 B.R. 179, 217-18 (Bankr. S.D.N.Y. 2009), *aff'd in part, rev'd in part*, 627 F.3d 496 (2d Cir. 2010); ACC Bondholder Grp. v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.), 368 B.R. at 267 (same). Accordingly, the Exculpation is reasonable, consistent with prior case law in this circuit, and should be approved.

## V.    REQUEST FOR FINDING THAT THE DEBTOR WAS A "PONZI" SCHEME

### A.    Introduction

153.    The Debtor was a fraudulent Ponzi/advance pay investment and lending scheme perpetrated by Roglieri, the Debtor's former principal, among possibly others.  The Debtor used lies and deceit to fraudulently obtain funds from unsuspecting victims who were hoping to obtain much needed capital for their businesses and investment projects.  Like all schemes of this nature, some of the very early "investors" received what they were promised, but most were left holding the bag.  In all, the Debtor's professionals estimate that at least $100 million in fraudulently

obtained funds have yet to be returned to the Debtor's victims.[5]  Obtaining recompence for the

Debtor's victims will be the primary objective of the Plan Administrator after the confirmation of

the Plan.

154.    The Trustee seeks a finding that the Debtor was in fact a fraudulent Ponzi/advance

pay lending scheme as part of the order confirming the Plan.  That finding will help the Plan

Administrator streamline the process to recover money and other property fraudulently transferred

by the Debtor in furtherance of its scheme, and liquidate claims filed against the Debtor's estate.

Such relief is often granted by bankruptcy courts in cases like this as part of confirmation or other

general orders.  See, e.g., In re iCap Enterprises, Inc., et al., Case No. 23-01243 (WLH), Dkt. No.

1414, ¶17 (Bankr. E.D.W.A. Oct. 18, 2024) (finding that the debtors perpetrated a Ponzi scheme

in the confirmation order); In re M. Burton Marshall, Case No. 23-60263 (PGR), Dkt. No. 433,

¶¶32-43 (Bankr. N.D.N.Y. July 22, 2024) (finding that the debtor perpetrated a Ponzi scheme as

part of an omnibus order liquidating victim claims).

155.    For all the reasons set forth in detail below, the Trustee respectfully seeks a Ponzi

finding here.

B.    The Debtor's "Business" Was Founded
       Upon an Unworkable and Fraudulent Premise

156.    The Debtor was formed on December 14, 2021, and purported to be a legitimate

alternative (or nonbank) commercial lender.  The Debtor advertised proudly that:

---

[5] After duplicate claims are eliminated and the three separate claims of Berone Capital LLC (Claim Nos. 25-27) are counted a single time in the amount of $30,000,000, there are currently approximately $210 million in claims asserted against the Debtor's estate.  The Plan Administrator intends to investigate each claim fully following confirmation to determine the proper amount of each creditor's claim and the actual amount of each creditor victim's ICA Deposit.



*See* Prime Commercial Lending, <u>Prime Capital Ventures & The Bailey</u> [Video], May 16, 2022,

<u>https://www.youtube.com/watch?v=A4_RKBepUkA</u> (YouTube) at 0:21; Ryniker Declaration, ¶

14.

157.    Generally, alternative lenders offer borrowers some significant benefits over

traditional bank lenders by having simpler application processes, fewer underwriting requirements,

different and more flexible financing products, and more rapid funding.[6]  Roglieri confirmed that

this was the Debtor's business model claiming that he "saw a rising demand from borrowers who

needed to move projects forward with as little static as possible" and that the Debtor could "provide

solutions that are less restrictive than your average bank and offer generous terms that favor

borrowers."[7] The disadvantage of going to an alternative lender is that they typically charge higher

interest rates than what may be available at a traditional bank.[8]   The Debtor on the other hand

---

[6]  <u>See</u> Calio, V., June 20, 2024, <u>Traditional Bank vs. Alternative Lender</u>, kapitus.com,
<u>https://kapitus.com/blog/manage-your-money/financing/traditional-bank-vs-alternative-lender-which-is-better-for-your-small-business-kapitus/</u>; a copy of which was attached as <u>Exhibit B</u> to the Ryniker Declaration.

[7] Prime Commercial Lending, March 17, 2022, <u>Albany, New York's Prime Commercial Lending Funds the First 5-Star Hotel in Atlanta, GA Through Prime's Real Estate Fund, Prime Capital Ventures</u>, [Press release]
<u>https://www.prnewswire.com/news-releases/albany-new-yorks-prime-commercial-lending-funds-the-first-5-star-hotel-in-atlanta-ga-through-primes-real-estate-fund-prime-capital-ventures-301505069.html</u>, a copy of which was attached as <u>Exhibit C</u> to the Ryniker Declaration.

[8] <u>See</u> Calio, V., June 20, 2024, <u>Traditional Bank vs. Alternative Lender</u>, *supra* (Exhibit B to the Ryniker Declaration).

offered all of the advantages of an alternative lender, while offering interest rates well below market as explained below. *See* Ryniker Declaration, ¶ 15.

158.    On May 2, 2022, the Debtor described its business in an article in DealMaker Magazine as "a fund specifically designed to provide capital for large development, commercial development and commercial real estate transactions from $50 million to more than $1 billion."[9] The Debtor offered non-recourse loans with interest rates of 4 to 6% with interest only payments.[10] At the exact same time, interest rates were rising rapidly in response to inflationary pressure.  At the time of the Debtor's advertisement (May 2022), the prime interest rate was 4%, rising to 4.75% a month later, then to 6.25% by September 21, 2022, and peaking at 8.5% on July 26, 2023.[11]  15-year mortgages followed the same trend starting at 4.52% on May 5, 2022 and peaking at 7.03% on October 26, 2023.[12] *See* Ryniker Declaration, ¶ 16.

159.    The Debtor's business model sounds completely implausible because it was.  For any lender to be successful, it must pay a lower cost of capital than it receives from its borrowers.  Banks would never survive if they paid their depositors a higher rate of interest than they receive from their borrowers.  This assertion can be easily verified by contrasting what Citibank will pay a depositor today for a 5-year certificate of deposit (1.98%)[13] versus the average 5-year commercial mortgage rate (6.22%)[14]. In simple terms, in order to be a successful lender, the Debtor

---

[9]  See Koplin, I., May 2, 2022, Roglieri Unveils Prime Capital Ventures, Prime Commercial Lending's Newest Fund, dealmaker-magazine.com, https://www.dealmaker-magazine.com/magazine/roglieri-unveils-prime-capital-ventures-prime-commercial-lendings-newest-fund, a copy of which was attached as Exhibit D to the Ryniker Declaration.

[10]  See Id.

[11]  See https://www.fedprimerate.com/wall_street_journal_prime_rate_history.htm, a copy of which was attached as Exhibit E to the Ryniker Declaration.

[12]  See Freddie Mac (https://www.freddiemac.com/pmms), a copy of which was attached as Exhibit F to the Ryniker Declaration.

[13]  See Source https://www.citi.com/banking/current-interest-rates/cd (last viewed Jan. 30, 2026), a copy of which was attached as Exhibit G to the Ryniker Declaration.

[14]  See Source https://www.commloan.com/commercial-mortgages/mortgage-rates (last viewed Jan. 30, 2026), a copy of which was attached as Exhibit H to the Ryniker Declaration.

would have had the impossible task of obtaining capital at well below the 4 to 6% that it was offering to its prospective borrowers. In truth, the Debtor had no known legitimate source of capital to lend to prospective borrowers. Instead, it obtained its capital by converting its prospective borrowers' own funds. *See* Ryniker Declaration, ¶ 17.

160. The Debtor did this by requiring as a condition of providing a loan that its prospective borrower provide 20% of the contemplated loan as an upfront deposit (defined above as an "ICA Deposit," or collectively, the "ICA Deposits"). Roglieri stated that borrowers "have to come to the table with at least 20% and that's just an important function of how our product works."[15] The Debtor claimed that it would hold the ICA Deposit "as prepaid interest throughout the term of the loan."[16] As interest payments became due, the Debtor represented that it "would just deduct it from the [ICA DEPOSIT]".[17] The Debtor admitted that this was "a unique way of doing things" but claimed that it "ensures [the Debtor's] payback, and [the ICA Deposit] serves as additional collateral for the loan throughout the term."[18] *See* Ryniker Declaration, ¶ 18.

161. The ICA Deposits were an investment by the borrowers to get access to the Debtor's promise of cheap and readily available capital. A loan from the Debtor would theoretically allow a prospective borrower to invest in its underlying business and hopefully make big returns. The Debtor's prospective borrowers did not appear to have any other viable source of capital, or at least not any as inexpensive as the Debtor. The Debtor further enticed prospective borrowers with what appear to have been very little underwriting and collateral requirements. The Debtor also did not require personal guarantees or recourse on the loans as far as the Trustee's

---

[15] See Koplin, I., May 2, 2022, <u>Roglieri Unveils Prime Capital Ventures, Prime Commercial Lending's Newest Fund</u>, dealmaker-magazine.com (Exhibit D to the Ryniker Declaration).
[16] <u>See</u> <u>Id</u>.
[17] <u>Id</u>.
[18] <u>Id</u>.

professionals have been able to tell from reviewing the Debtor's books and records. *See Ryniker Declaration*, ¶ 19.

162.    Of course, the ICA Deposits that the Debtor claimed to be holding to service the prospective borrower's future interest payment were the Debtor's only known source of capital. The Debtor did not segregate or hold the borrowers' ICA Deposits as it had represented.  In fact, based upon the detailed allegations of the Government, many ICA Deposits were largely if not completely consumed the minute they were received by the Debtor to cover large and pervasive overdrafts in the Debtor's bank accounts.[19]  *See Ryniker Declaration*, ¶ 20.

163.    A few of the ICA Deposits were used to fund one of the five loans that the Debtor actually made as discussed below.  Others were used to buy luxury items and property for the exclusive benefit and enjoyment of Roglieri.  For example, according to the Government, Roglieri spent the funds misappropriated from the Debtor's prospective borrowers in the following ways[20]:

- $916,201 in private jets from June 2022 to October 2023;

- $1,778,154.77 to Ai Design, a high-end automotive shop from December 2022 to October 2023;

- $3,194,454 to purchase a rare Mercedes-Benz "hybercar", which never materialized;

- $3,672,067.50 to purchase the Virginia Beach Property;

- $2,225,000 to purchase a single wristwatch called "RM-52-01 Tourbillion Skull";

- $4,729,745 to RM Sotheby's to purchase a 2003 Ferrari Enzo AB Version E and a 2014 Ferrari LaFerrari;

---

[19] For example, on April 7, 2023, creditor 526 Murfreesboro provided the Debtor with an ICA Deposit of $4,312,500 by wire transfer to the Debtor's account at Citibank.  At the time, the Citibank account was overdrawn in the amount of $4,094,514.75, so nearly the entire ICA Deposit was spent immediately to cover the Debtor's obligation to Citibank. Similarly, on April 27, 2023, Compass-Charlotte provided the Debtor with an ICA Deposit of $15,902,250 by wire into the Debtor's Citibank account.  $6,525,669.33 of that ICA Deposit was consumed immediately to cover an overdraw.  See United States of America v. One 2003 Ferrari Enzo AB Version E., et al., Case No. 24-cv-1345 (MAD/DJS), Dkt. No. 20-1, Amended Complaint, ¶¶36-57 (N.D.N.Y. Jan. 15, 2025), a copy of which was attached to the Ryniker Declaration as Exhibit I.
[20] See Id. at ¶¶80-162; Ryniker Declaration, ¶ 21.

- $260,810 for a table constructed using a Ferrari V-12 engine;

- $2,076,900 for the combined purchase of a 1982 Mercedes Benz 500SL, a 1989 Mercedes Benz 560 SEL, a 2007 Mercedes Banz SLR McLaren, and a 1987 Mercedes Benz 560;

- $1,300,000 to TopGear Imports for a 2004 Porsche Carrera;

- $2,055,312 to Wide World Farrari for a 2022 Ferrari 812 Competizione;

- $3,811,000 to Bonhams Butterfields Trust for the purchase of a 2006 Maserati MC 12 Corse;

- $355,000 to Timepiece Trading for the purchase of a Richard Mille RM 65-01 watch; and

- $260,000 to Luxury Bazaar for the purchase of two Rolex watches.

C.    The Debtor Fraudulently Claimed to Have Made Large Loans to Attract Victims

164.    In order to sell a business model that seemed entirely impossible if properly understood, and to get prospective borrowers to give the Debtor new ICA Payments, the Debtor had to demonstrate that it actually made loans.  It did this by, among other ways, fraudulently claiming to have made a "$188,000,000 funding of ALUX Properties, LLC and their project 'The Bailey' which will be the only 5-star hotel in Atlanta".[21]  The Debtor made a glitzy promotional video published on YouTube where it boasted about making this loan.  The video featured Roglieri

---

[21]    See Prime Commercial Lending, Prime Capital Ventures & The Bailey [Video], May 16, 2022, https://www.youtube.com/watch?v=A4_RKBepUkA (YouTube) at 0:13:



Prime Commercial Lending through its fund Prime Capital Ventures is proud to announce the $188,000,000 funding of ALux Properties, LLC and their project "The Bailey" which will be the only 5-star hotel in Atlanta.

A one of a kind luxury hotel and mixed use development that will transcend the meaning of luxury across the world.

See also, Prime Commercial Lending, March 17, 2022, Albany, New York's Prime Commercial Lending Funds the First 5-Star Hotel in Atlanta, GA Through Prime's Real Estate Fund, Prime Capital Ventures, [Press release] (Exhibit C to the Ryniker Declaration).

and others trapsing around the wooded area in Atlanta where "The Bailey" was going to be constructed.  The alleged principal of ALUX Properties, LLC ("<u>ALUX</u>"), Brandon Wheeless, expressed his appreciation in the video stating that "access to this type of capital with trusted individuals that you close deals with definitely makes life a heck of a lot easier for us and the company so we are fast-tracking to grow at an exponential rate moving forward."[22]  Depicted here are Messrs. Wheeless and Roglieri surveying the site, along with the "after" rendering of "The Bailey" contained in the Debtor's video advertisement[23]:

 

*See* Ryniker Declaration, ¶ 22.

165.    The problem, of course, is that the Debtor never made any such loan to ALUX. There is no "The Bailey" hotel in Atlanta and there is no sign that there was ever actually going to be.  *See* Ryniker Declaration, ¶ 23.  According to the Debtor's books and records, Brandon Wheeless, the purported principal of ALUX and third-party borrower of the Debtor, was actually on the Debtor's payroll and received a total of $200,000 from the Debtor between July 7, 2022 and September 18, 2023.  *See* Ryniker Declaration, ¶ 11.

166.    Indeed, ALUX, the purported borrower, was placed into a receivership by the Georgia Superior Court on September 13, 2022 in connection with a lawsuit where the plaintiffs

---

[22]  <u>See</u> <u>Id</u>. at 3:44 (transcribed by counsel).
[23]  <u>See</u> <u>Id</u>. at 2:58 and 1:35, respectively.

alleged, among other things, to have been defrauded out of $10 million.[24]    Featured in that

litigation was an entity called Blackwater Capital Group, LLC" ("Blackwater") which purported

to act as a lender to the project, not unlike the Debtor in its promotional video.[25]    Blackwater's

lending agreement was dated December 14, 2021, the exact date that the Debtor was formed, and

was nearly identical in form and substance to the form of lending agreement employed by the

Debtor.[26]    Compared here are the first pages of the table of contents of Blackwater's December

14, 2021 lending agreement (on the left), and the Debtor's April 24, 2023 lending agreement with

creditor Compass (on the right)[27]:

---

[24] See Capstone Diagnostics One, L.P., et al. v. Bailey LLC, et al., Case No. 2022cv366001 (GA Sup. Ct., Fulton Cty., Sept. 22, 2024), a copy of which was attached to the Ryniker Declaration as Exhibit J.

[25] See Id., Judgment entered June 24, 2023, a copy of which was attached to the Ryniker Declaration as Exhibit K.

[26] See Id., Verified Complaint, Exhibit E, executed June 9, 2022, a copy of which was attached to the Ryniker Declaration as Exhibit L.

[27] See Id., compared to Exhibit 29 to the Complaint filed in Compass-Charlotte v. Prime Capital Ventures, LLC, et al., Case No. 24-cv-55 (MAD) (N.D.N.Y. Jan. 12, 2024), a copy of which was attached to the Ryniker Declaration as Exhibit M.

Case 1:24-cv-00055-MAD-PJE    Document 1-21    Filed 01/12/24    Page 92 of 302
DocuSign Envelope ID: 0C4FC338-732D-4304-B32B-FA205CA8AA4E

**TABLE OF CONTENTS**

| | Page |
|---|---|
| RECITALS | 1 |
| **ARTICLE 1 DEFINITIONS** | |
| Section 1.1. Certain Defined Terms | 2 |
| **ARTICLE 2 THE CREDIT** | |
| Section 2.1. Line of Credit Amount | 4 |
| Section 2.2. Line of Credit Documents | 4 |
| **ARTICLE 3 TERM, INTEREST AND PAYMENTS** | |
| Section 3.1. Initial Term | 5 |
| Section 3.2. Extended Term | 5 |
| Section 3.3. Applicable Interest Period | 5 |
| Section 3.4. Interest Rate Calculation | 5 |
| Section 3.5. Interest Payments | 6 |
| Section 3.6. Reserves | 6 |
| Section 3.7. Risk Management Protection for ICA Payment | 6 |
| Section 3.8 Prepayment | 6 |
| Section 3.9. Interest Credit Account | 6 |
| Section 3.10. Fees | 7 |
| Section 3.11. Line of Credit Extension Fees | 7 |
| Section 3.12. Legal and Incidental Fees, Charges and Costs | 7 |
| Section 3.13. Line of Credit Disbursement Account | 7 |
| Section 3.14. Taxes | 8 |
| **ARTICLE 4 CONDITIONS TO CLOSING AND DISBURSEMENT** | |
| Section 4.1. Delivery of the LOC Documents | 8 |
| Section 4.2. Authority | 8 |
| Section 4.3. Liens | 9 |
| Section 4.4. Litigation | 9 |
| Section 4.5. Events of Default | 9 |
| Section 4.6. Purchase and Agreement Contracts | 9 |
| Section 4.7. Compliance with Certain Requirements | 9 |
| Section 4.8. Evidence of Insurance | 9 |
| Section 4.9. Financial Statements | 10 |
| Section 4.10. Business Pro Forma | 10 |
| Section 4.11. Management Plan | 10 |
| Section 4.12. Material Change | 10 |
| Section 4.13. Non-Subordination | 10 |
| Section 4.14. Borrower JV Governing Agreement | 10 |
| Section 4.15. Securitization | 11 |
| **ARTICLE 5 USE OF LINE OF CREDIT PROCEEDS** | |
| Section 5.1. Development Costs | 11 |

Revised 3/17/21

Case 1:24-cv-00055-MAD-PJE    Document 1-29    Filed 01/12/24    Page 3 of 61
DocuSign Envelope ID: C865A71A-07AF-4D40-B24B-5B9E4B61DAA4

**TABLE OF CONTENTS**

| | Page |
|---|---|
| RECITALS | 1 |
| **ARTICLE 1 DEFINITIONS** | |
| Section 1.1. Certain Defined Terms | 2 |
| **ARTICLE 2 THE CREDIT** | |
| Section 2.1. Line of Credit Amount | 4 |
| Section 2.2. Line of Credit Documents | 4 |
| **ARTICLE 3 TERM, INTEREST AND PAYMENTS** | |
| Section 3.1. Initial Term | 5 |
| Section 3.2. Extended Term | 5 |
| Section 3.3. Applicable Interest Period | 5 |
| Section 3.4. Interest Rate Calculation | 5 |
| Section 3.5. Interest Payments | 6 |
| Section 3.6. Reserves | 6 |
| Section 3.7. Intentionally Omitted | 6 |
| Section 3.8. Prepayment | 6 |
| Section 3.9. Interest Credit Account | 6 |
| Section 3.10. LOC Fee | 7 |
| Section 3.11. Line of Credit Extension Fees | 7 |
| Section 3.12. Legal and Incidental Fees, Charges and Costs | 7 |
| Section 3.13. Taxes | 8 |
| **ARTICLE 4 CONDITIONS TO CLOSING AND DISBURSEMENT** | |
| Section 4.1. Delivery of the LOC Documents | 8 |
| Section 4.2. Authority | 8 |
| Section 4.3. Liens | 9 |
| Section 4.4. Litigation | 9 |
| Section 4.5. Events of Default | 9 |
| Section 4.6. Purchase and Agreement Contracts | 9 |
| Section 4.7. Compliance with Certain Requirements | 9 |
| Section 4.8. Evidence of Insurance | 9 |
| Section 4.9. Financial Statements | 10 |
| Section 4.10. Business Pro Forma | 10 |
| Section 4.11. Management Plan | 10 |
| Section 4.12. Material Change | 10 |
| Section 4.13. Non-Subordination | 10 |
| Section 4.14. Borrower Governing Agreement(s) | 10 |
| Section 4.15. Securitization | 11 |
| **ARTICLE 5 USE OF LINE OF CREDIT PROCEEDS** | |
| Section 5.1. Development Costs | 11 |

*See* Ryniker Declaration, ¶ 23.

167.    Like the Debtor, Blackwater required the payment of an ICA Deposit under its agreement, and Blackwater was ultimately paid its $10 million ICA Deposit.  However, the source of that ICA Deposit did not come from ALUX (the borrower) but from funding from the plaintiffs in the litigation who sued to recover their money.  Ultimately, the Georgia Superior Court found that "[t]he testimony evidence brought forth at the hearing revealed the [Blackwater lending

agreement] to be a 'total fraud'".[28]  Although the relationship between Blackwater and the Debtor is not yet understood, both entities and/or their principals were using the same fraud model to defraud prospective borrowers out of ICA Deposits.[29]  *See* Ryniker Declaration, ¶ 24.

168.    Fortunately for Blackwater's victim(s) in the ALUX transaction, but unfortunately for the Debtor's victims, Blackwater appears to have been discovered and stopped relatively quickly, whereas the Debtor continued on until at least in or around December 2023, obtaining an estimated $100 million in ICA Deposits that have yet to be repaid.  *See* Ryniker Declaration, ¶ 25.

169.    In addition to the fraudulent claim that the Debtor has loaned $188 million to ALUX to build "The Bailey", the Debtor also fraudulently claimed to have "gained prominence by committing $17 billion with a South Korean firm for projects in the United States and abroad."[30] The Debtor also claimed that it had provided "$2.3 billion in funding for the first stage of a massive five-year, five-stage $22 billion project" "[i]n the heart of Dubai".[31]  There is absolutely no indication that any of that is true.  *See* Ryniker Declaration, ¶ 26.

---

[28] See Id., Judgment entered June 24, 2023, p.4.

[29] Since submission of the Ryniker Declaration, the Trustee became aware of discovery in the Georgia state court litigation that indicated that Prime Commercial acted as some form of a broker between Blackwater and Alux, but much of the relationship remains a mystery.

[30] See Prime Commercial Lending, March 17, 2022, Albany, New York's Prime Commercial Lending Funds the First 5-Star Hotel in Atlanta, GA Through Prime's Real Estate Fund, Prime Capital Ventures, [Press release]; see also Prime Commercial Lending, Prime Commercial Lending Commits to Lending $17 Billion [Video], Jan. 21, 2022, https://www.youtube.com/watch?v=PmvtmdkBUlo (YouTube) at 0:13:



[31] Koplin, I., May 2, 2022, Roglieri Unveils Prime Capital Ventures, Prime Commercial Lending's Newest Fund, dealmaker-magazine.com, https://www.dealmaker-magazine.com/magazine/roglieri-unveils-prime-capital-ventures-prime-commercial-lendings-newest-fund (Exhibit D to the Ryniker Declaration).

D.    The Only Way to Pay Old Victims Was by Getting New Ones

170.    The Debtor's business was never legitimate.  It was founded upon lies.  Those lies were compounded when prospective borrowers' ICA Deposits were immediately converted and never reserved for interest payments as represented.  Finally, those lies were discovered when the Debtor was unable to fund the loans promised to prospective borrowers who had already made ICA Deposits.  Once most of the borrowers discovered that the Debtor could not fund their loans, they demanded a return of their ICA Deposits and began to rush to courthouses all over the country.[32] *See* Ryniker Declaration, ¶ 27.

171.    For a few of the Debtor's earliest prospective borrowers, the Debtor was able to obtain sufficient additional ICA Deposits from new prospective borrowers to fund those loans. Even though the Debtor advertised that its transactions ranged from $50 million to $1 billion, none of the loans that it actually made even came close to the advertised $50 million floor.  In fact, the largest loan was to Indigo Pharmaceuticals and was for principal of $20 million by agreement dated June 2, 2022.[33]  The Trustee and his professionals believe that other loans were partially or fully funded and they are currently investigating such loans.  *See* Ryniker Declaration, ¶ 28.

---

[32] See, e.g., Truss Financial LLC v. Prime Capital, et al., Index No. 2023/510389 (N.Y.Sup. Ct. Kings Cty. Apr. 5, 2023) (seeking and apparently obtained the return of $13.4 million) (a copy of the Summons with Notice was attached to the Ryniker Declaration as Exhibit N); B&R Acquisition Partners v. Prime Capital (JAMS Arb., Aug. 2023) (seeking return of $4.3 million) (a copy of the JAMS Arbitration Award was attached to the Ryniker Declaration as Exhibit O); Sturm v. Prime Capital, Case No. 23-cv-1033 (N.D.N.Y. Aug. 22, 2023) (seeking return of $2 million) (a copy of the complaint was attached to the Ryniker Declaration as Exhibit P); Camshaft CRE 1, LLC v. Prime Capital, Case No. 2023-023173 (Fla. Circ. Ct., Miami-Dade Cty., Sept. 15, 2023) (seeking return of $12.4 million) (a copy of the complaint was attached to the Ryniker Declaration as Exhibit Q); The Lion Group DFW, LLC v. Prime Capital, Case No. 23-DCV-34617 (Tex. Dist. Ct., 146th Dist., Sept. 21, 2023) (demand unknown) (a copy of the docket was attached to the Ryniker Declaration as Exhibit R); Onward Partners, LLC, v. Prime Capital, et al., Case No. 23-cv-833 (D. Utah Nov. 13, 2023) (seeking return of $4 million) (a copy of the complaint was attached to the Ryniker Declaration as Exhibit S).

[33] See Prime Commercial Lending, Prime Capital Ventures Presents Indigo Pharmaceutical in Las Vegas, NV [Video], Apr. 20, 2023, https://www.youtube.com/watch?v=GvmECqnuBkY (YouTube) at 0:13; Prime Commercial Lending, Prime Capital Ventures Presents Home Rentals in Carbondale, IL [Video], Mar. 3, 2023, https://www.youtube.com/watch?v=8D5GRnKecG0 (YouTube).

172.    When the Debtor was no longer able to fund loans and borrowers began to sue, the only way for the Debtor to forestall discovery of its fraud was to obtain more ICA Deposits to repay those who had discovered what was going on.  In at least the following situations, the Debtor used new ICA Deposits to try to satisfy the claims of earlier prospective borrowers:

- 526 Murfreesboro delivered a $4,312,500 ICA Deposit to the Debtor on April 7, 2023.  On April 17, 2023, the Debtor used $2,000,000 of that ICA Deposit to repay a prior portion of the ICA Deposit received in September 2022 from borrower Onward Partners LLC, and another $2,000,000 of that ICA Deposit to repay a prior portion of the ICA Deposit from another client identified as "Business-1" by the Government.[34]  Thus, the near entirety of 526 Murfreesboro's ICA Deposit was used to repay prior borrower/investors.

  - Compass delivered a $15,902,250 ICA Deposit to the Debtor on April 27, 2023, and HCW Biologics Inc. ("HCW") delivered a $5,250,000 ICA Deposit to the Debtor that same day.  Compass and HCW's ICA Deposits were commingled and were used for the following purposes, among others, not related to those borrowers: (i) $6,525,669.33 was used to fund a preexisting overdraw in the Debtor's bank account (Citibank No. **6945); and (ii) $3,700,000 was transferred to a law firm and used, upon information and belief, in connection with another loan.[35]

  - Newlight delivered a $2,500,000 ICA Deposit to the Debtor on May 24, 2023, which was largely used for unrelated purposes in the one- week period that followed.[36]

  - As required by the Line of Credit Agreement between ER Tennessee and the Debtor, $15 million was required to be advanced by ER Tennessee as an ICA Deposit and held in a separate bank account. On September 21, 2023, the Debtor received two (2) deposits of $9,2621,416 and $4,987,416.00, respectively, representing ER Tennessee's ICA Deposit.  The ICA Deposit was deposited into the Debtor's newly formed account at RBC (#0017).  On September 26, 2023, the Debtor transferred $7,000,000 of ER Tennessee's ICA Deposit to another newly formed Debtor bank account at Quad City / Farmer Bank account (#5665).  That same day, the Debtor issued six (6) wires from Farmers Bank account totaling $6,569,400.00 in various amounts to recipients Lion Group, Ketan Masters, Redeem Temple Courtyard, Lofts Phases 2 & 3 LLC, and Barclay Damon LLP (two separate transfers).  It is believed that most, if not all, of those transfers were to replace other prospective borrowers' ICA Deposits.

    Further, in early October 2023, the Debtor obtained a $6,000,000 line of credit from RBC using the remainder to ER Tennessee's ICA Deposit in acct #0017 as

---

[34] See Civil Forfeiture Case Amended Complaint, Dkt. No. 20-1, ¶42 (Exhibit I to the Ryniker Declaration).
[35] See Id. at ¶¶45-57.
[36] See Id. at ¶¶58-65.

58

> collateral. Immediately, on October 11, 2023, $5,000,000 of the RBC loan
> proceeds was transferred to the Debtor's Key Bank acct #2233 and then further
> transferred to Matthew Thacker. On October 16, 2023, the Debtor transferred the
> remaining $1,000,000 of the RBC loan proceeds to Key Bank acct #2233. When
> the Debtor defaulted on the terms of the RBC loan, RBC was repaid from the
> remainder of ER Tennessee's ICA Deposit which was used as collateral for the
> loan.

*See* Ryniker Declaration, ¶ 29.

      E.      The Advance Pay/Ponzi Scheme Finding is Warranted

173.     In a Ponzi scheme, multiple victims are defrauded over the course of months or years, and the perpetrator forestalls discovery of the scheme by using newer victims' money to pay back earlier-in-time victims. Payouts are used to create the appearance of a legitimate, money-making enterprise; however, in reality, investors are the only source of funding and the person(s) involved in the Ponzi scheme will siphon off investor funds for their own personal gain. See Securities Fraud Awareness & Prevention Tips, FBI.gov.[37] "Ponzi schemes have no exact definition, since they manifest a kaleidoscopic variety of configurations." Honorable Dorothy T. Eisenberg, Nicholas W. Quesenberry, Ponzi Schemes in Bankruptcy, 30 Touro Law Review p. 502. "Thus, 'courts look for a general pattern, rather than specific requirements.'" Id., citing Manhattan Inv. Fund, Ltd. V. Gredd (In re Manhattan Inv. Fund, Ltd.), 397 B.R. 1, 12 (S.D.N.Y. 2007) (stating there is no precise Ponzi scheme definition).

174.     Some courts use a four-factor test in determining whether a Ponzi scheme exists and consider whether: "1) deposits were made by investors; 2) the Debtor conducted little or no legitimate business operations as represented to investors; 3) the purported business operation of the Debtor produced little or no profits or earnings; and 4) the source of payments to investors was from cash infused by new investors." Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,

---

[37] https://www.fbi.gov/stats-services/publications/securities-fraud (last visited Nov. 15, 2024).

531 B.R. 439, 471 (Bankr. S.D.N.Y. 2015).  Other courts identify "badges of fraud," "including the absence of any legitimate business connected to the investment program, the unrealistic promises of low risk and high returns, commingling investor money, the use of agents and brokers paid high commissions to perpetuate the scheme, misuse of investor funds, the 'payment' of excessively large fees to the perpetrator and the use of false financial statements." Gowan v. Amaranth Advisors LLC (In re Dreier LLP), No. 08-15051, 2014 WL 47774, at *9 (Bankr. S.D.N.Y. Jan. 2, 2014); see Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff), 528 F. Supp. 3d 219, 237-41 (S.D.N.Y. 2021), aff'd sub nom., Picard v. Jaba Assocs. LP, 49 F.4th 170 (2d Cir. 2022).

175.    In the end, and most significantly, "the label 'Ponzi scheme' has been applied to *any sort of inherently fraudulent arrangement under which the debtor-transferor must utilize after-acquired investment funds to pay off previous investors in order to forestall disclosure of the fraud*." Bayou Superfund, LLC v. WAM Long/Short Fund II, L.P. (In re Bayou Group, LLC), 362 B.R. 624, 633 (Bankr. S.D.N.Y. 2007) (emphasis added).  The Debtor had all the classic hallmarks of a Ponzi scheme.

176.    The Debtor's Ponzi scheme is also consistent with what the U.S. Securities and Exchange Commission has dubbed a fraudulent advance fee scheme.  In such a scheme, the perpetrator gets the victim to pay an upfront fee based on the promise that the fee will enable large sums of money to flow to the victim.  After the victim sends the fee, the perpetrator keeps the fee and never delivers the promised loan, windfall, etc.  See Updated Investor Alert: Be on the Lookout for Advance Fee Fraud, SEC.gov.[38]  This is precisely what the Debtor was doing here.

---

[38] https://www.sec.gov/resources-for-investors/investor-alerts-bulletins/ia_lookforaff (last visited Nov. 15, 2024).

177.    There is no basis to dispute that the Debtor was at all relevant times an advance

fee/Ponzi scheme, but perhaps the most compelling admission is found in text messages between

Roglieri and an undisclosed individual as follows:

| Date | Time | From | Message |
|------|------|------|---------|
| 1/4/2024 | 11:20:42 am | Unknown | Can't you just keep working on those companies? I know it might be hard at first, but look what you build this up to beat from nothing |
| 1/4/2024 | 11:20:56 am | Roglieri | Yea I can but not when I'm in f—king prison |
| 1/4/2024 | 11:21:09 am | Unknown | Why do you think that's gonna happen? Why can't it just be a bankruptcy? |
| 1/4/2024 | 11:21:47 am | Roglieri | **Because I unused others money to fund deals** I already told you this |
| 1/4/2024 | 11:22:02 am | Unknown | And that's illegal? |
| 1/4/2024 | 11:22:15 am | Roglieri | Yes |
| 1/4/2024 | 11:22:36 am | Unknown | How bad .  I mean, what's the worst you do a couple years who cares You have your family This whole family will support you through this It's a civil case it's not a criminal case |
| 1/4/2024 | 11:27:42 am | Roglieri | **It will turn criminal as soon as they get into bank statements** |

*United States of America v. Kris Roglieri*, Case No. 24-cr-00392 (MAD) (N.D.N.Y.) (the "Roglieri

Criminal Case"), Docket No. 6-1, p. 20-24 (June 3, 2024) (emphasis added) (typographical and

grammatical errors in original), a copy of which was attached to the Ryniker Declaration as Exhibit

T. *See* Ryniker Declaration, ¶ 30.

178.    The plea agreements entered into by insiders of the Debtor contain numerous

admissions that support the contention that the Debtor was at all times an advance fee/Ponzi

scheme as follows:

- Roglieri admitted that he and Humphrey "began claiming that [the Debtor] had the present ability to make large commercial loans, including loans in the tens of millions of dollars, through funding agreements with third-party hedge funds.  As the defendant knew at all relevant times, [the Debtor] had obtained no funds of its own and never had the present ability to independently make commercial loans of any size, and funding was based on possible third-party sources and funding agreements."  Roglieri Criminal Case, Docket No. 90 (the "Roglieri Plea"), p.8, § 5(c), a copy of which was attached to the Ryniker Declaration as Exhibit U; *United States v. Kimberly Humphrey a/k/a Kimberly Owen,* Case No. 25-cr-00238 (MAD) (N.D.N.Y.), Docket No. 4 (the

"Humphrey Plea"), p.6, §5(b) and (g), a copy of which was attached to the Ryniker Declaration as Exhibit V.

- Despite representations to prospective borrowers to the contrary ICA Deposits "were not deposited into a pledged account or accounts", "were not used to cover interest payments on loans", and portions of ICA Deposits were used to "fund [Roglieri's] purchases of luxury goods". Roglieri Plea, pp.8-9, §5(e); Humphrey Plea, p.9, §5(i).

- "Because [the Debtor] never ultimately secured a proven, demonstrated or realized a source of loan funding, [Roglieri and the other Debtor Insiders] used ICA [Deposits] from newer borrower clients to partially fund loans to, and to refund ICA [Deposits] to, older borrower clients." Roglieri Plea, p.10, §5(g).

See Ryniker Declaration, ¶ 31.

179.    While prospective borrowers were not investing in the Debtor in the traditional sense, their ICA Deposit was very much an investment for all intents and purposes. The ICA Deposits were made for the express purpose of obtaining much needed and impossibly low-priced capital amounting to at least five times the amount of the ICA Deposit. That capital was needed by the prospective borrowers for their projects and businesses. The Debtor obtained the ICA Deposits not only on the promise of providing low-priced capital, but on the representation that the ICA Deposit would be held and used to pay down the prospective borrower's interest during the life of the contemplated loan.[39] The Debtor never retained the ICA Deposits in "trust" as represented but rather used them for: (i) in the rare instances, funding actual loans; (ii) returning other prospective borrowers' ICA Deposits when the Debtor could not fund the promised loans in

---

[39] The principal of Indigo Pharmaceutical explained his expectations of precisely how the ICA Deposit works in the YouTube promotional video reference above as follows:

So with Prime, they are committed just as much as we are because we put the money in, that is true, **but the money goes into a trust,** and you wait for the documentation of a trust meaning you have already been accepted. It's just a matter of time until you get funded. So once you understand that, although you're waiting and that sometimes can give people agita, but you know that the loan is going to come through because the trust has accepted all your documentation in advance and you know whether it's sixty or ninety days, or banking days actually, you're going to get funded. It's just a matter of time.

Prime Commercial Lending, Prime Capital Ventures Presents Indigo Pharmaceutical in Las Vegas, NV [Video], Apr. 20, 2023, supra, starting at 4:01 (transcription by counsel).

order to keep the fraud from being discovered; and (iii) buying a beach house, expensive cars, luxury wristwatches, private jet travel, and other extravagances for Roglieri.  Most importantly, the only source of capital for any of the Debtor's activities was obtaining more ICA Deposits from new prospective borrowers, which were not supposed to be used for anything other than servicing the respective prospective borrower's loan obligations.

180.    It is difficult to describe the Debtor's fraudulent scheme as anything but a Ponzi scheme.  Regardless, even if the Debtor had any divergence from the classic Ponzi scheme model, "[c]ase law has revealed that a clever twist on the Ponzi concept will not remove a fraudulent scheme from the definition of Ponzi." Forman v. Salzano (In re Norvergence, Inc.), 405 B.R. 709, 730 (Bankr. D.N.J. 2009), citing United States v. Sudeen, 434 F.3d 384, 386-87 (5th Cir. 2005); United States v. Antonakopoulos, 399 F.3d 68, 72 (1st Cir. 2005).  What is most important is that the Debtor and its former principal knew that the pool of prospective borrowers would at some point run dry, the scheme would consequently inevitably collapse, and those prospective borrowers with outstanding ICA Deposits would lose their money.  This is the very essence of a Ponzi scheme.  See Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Group, LLC), 439 B.R. 284, 306 n.19 (S.D.N.Y. 2010).

181.    For all the foregoing reasons, the Trustee respectfully submits that the Debtor was an advance pay/Ponzi scheme and respectfully requests such finding by the Court as part of the order confirming the Plan.

*[Continued on Next Page]*

63

## CONCLUSION

Based upon the foregoing, the Trustee respectfully submit that (i) the Plan satisfies all of the applicable requirements of the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules and (ii) the Trustee has satisfied the applicable requirements of the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules.  Accordingly, for all of these reasons the Trustee respectfully request that the Court enter an order approving the Disclosure Statement and confirming the Plan.

Dated:    New York, New York
          February 5, 2026

**KLESTADT WINTERS JURELLER**
**SOUTHARD & STEVENS, LLP**


By:    */s/ Fred Stevens*
       Fred Stevens
       Lauren C. Kiss
       200 West 41st Street, 17th Floor
       New York, New York 10036
       Tel: (212) 972-3000
       Fax: (212) 972-2205
       Email: fstevens@klestadt.com
              lkiss@klestadt.com

       *Special Litigation Counsel to Yann Geron,*
       *Chapter 11 Trustee of Prime Capital*
       *Ventures, LLC*
