**KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS, LLP**
286 Madison Avenue, 11th Floor
New York, NY 10017
Telephone: (212) 972-3000
Facsimile: (212) 972-2245
Fred Stevens
Lauren C. Kiss
Kevin B. Collins

*Counsel to Plaintiff Fred Stevens, Plan Administrator*

**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>PRIME CAPITAL VENTURES, LLC,<br><br>Debtor. | Chapter 11<br><br>Case No. 24-11029 (PGR) |
| FRED STEVENS, as Plan Administrator, and as assignee of third-party claims by creditor victims of Prime Capital Ventures, LLC,<br><br>Plaintiff,<br><br>-against-<br><br>RBC CAPITAL MARKETS, LLC and ROYAL BANK OF CANADA,<br><br>Defendants. | Adv. Pro. No. 26-________ |

**COMPLAINT SEEKING (I) THE AVOIDANCE OF FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. §§ 544(a) AND 548(a)(1)(A) AND N.Y. DCL §§ 273(a)(1), (II) THE RECOVERY OF AVOIDABLE TRANSFERS FROM ALL INITIAL, IMMEDIATE OR MEDIATE TRANSFEREES, OR BENEFICIARIES OF SUCH TRANSFERS, PURSUANT TO 11 U.S.C. § 550(a); (III) DAMAGES FOR AIDING AND ABETTING FRAUD, CONVERSION, AND/OR BREACH OF FIDUCIARY DUTIES; (IV) RELATED RELIEF; AND (V) PAYMENT OF PRE-JUDGMENT INTEREST AND ATTORNEYS' FEES**

# TABLE OF CONTENTS


PRELIMINARY STATEMENT ..... 1

JURISDICTION AND VENUE ..... 4

BASIS FOR RELIEF ..... 4

PARTIES ..... 4

FACTS COMMON TO ALL CAUSES OF ACTION ..... 7

A. The Players ..... 7

B. The Ponzi Scheme ..... 10

(i) The Fraud Concept ..... 10

(ii) The Origin of the Fraud ..... 14

(iii) The Proliferation of the Fraud ..... 17

(iv) The Collapse ..... 18

C. The Bankruptcy Cases and Federal Equity Receivership ..... 20

D. The Ponzi Finding ..... 25

E. The Criminal Convictions of Roglieri, Humphrey, and Snyder, and Related Forfeiture ..... 25

(i) Roglieri – Criminal and Civil Forfeiture Cases ..... 25

(ii) Humphrey – Criminal Case ..... 28

(iii) Snyder – Criminal Case ..... 28

F. Defendants' Legal Obligations and Establishment of the Berone Accounts ..... 29

(i) Defendants' Know Your Customer Duties Under Federal Law ..... 29

(ii) RBC Capital's KYC Process and Onboarding of Berone ..... 34

(iii) Establishment and Early Use of Berone's RBC Accounts ..... 36

G. The Berone/Reign Fraud and Illicit Use of the Berone RBC Account ..... 36

(i) Hooking Roglieri – The Berone/Reign Parties Got Prime Capital's $20 Million ..... 36

(ii) Unbeknownst to Roglieri, the Enterprise Defendants Took Prime Capital's Money 39

(iii) Highly Suspicious Activity Related to the Fraud Was Ignored by RBC Capital ..... 43

(iv) Berone was Using the Berone RBC Account to Operate a Clear Pass-Through Money Laundering Scheme With the Proceeds of its Fraud ..... 46

(v) Prime Capital Realized Something was Wrong and Demanded its Money Back ..... 48

(vi) Prime Capital Sued the Reign Parties (but not the Berone Parties) ..... 48

H. Prime Capital Opened its Own Account at RBC Capital Under the Berone Umbrella Which Prime Capital Used in its own Fraud ..... 50

(i) RBC Capital's KYC Process and Onboarding of Prime Capital ..... 50

(ii) Prime Capital Uses the Prime Capital RBC Account to Defraud ER Tennessee...... 51
(iii) The Highly Suspicious RBC Prime Capital Loan .................................................... 52
(iv) Prime Capital Finally Figured Out That it was Defrauded by the Berone Parties .... 54
(v) Berone Named as Defendants in the Receivership Action....................................... 55
(vi) RBC Capital Finally Debanks Berone..................................................................... 58
(vii) The SEC Sued Berone, Reign, and Their Respective Principals ............................. 58
(viii) The Plan Administrator has Standing to Assert Claims Against RBC and RBC Capital That Originally Belonged to Victims ........................................................................ 59
I. RBC has a Recent and Well-Document History of Failing to Comply with AML Standards ....................................................................................................................... 60
FIRST CAUSE OF ACTION .......................................................................................... 61
SECOND CAUSE OF ACTION ...................................................................................... 63
THIRD CAUSE OF ACTION .......................................................................................... 64
FOURTH CAUSE OF ACTION ...................................................................................... 66
FIFTH CAUSE OF ACTION ........................................................................................... 68
SIXTH CAUSE OF ACTION .......................................................................................... 69
SEVENTH CAUSE OF ACTION .................................................................................... 71
EIGHTH CAUSE OF ACTION ....................................................................................... 73

Fred Stevens (the "Plan Administrator" or "Plaintiff"), in his capacity as the Plan Administrator for Prime Capital Ventures, LLC, the above-captioned debtor ("Prime Capital" or the "Debtor"), by and through his counsel, Klestadt Winters Jureller Southard & Stevens, LLP, as and for his complaint (the "Complaint") herein against RBC Capital Markets, LLC, including its divisions RBC Advisor Services, RBC Clearing & Custody, and RBC Wealth Management ("RBC Capital") and Royal Bank of Canada ("RBC", collectively with RBC Capital, the "Defendants," each a "Defendant"), seeking, among other things, (I) the avoidance of fraudulent transfers pursuant to 11 U.S.C. §§ 544(a) and 548(a)(1)(A) and N.Y. Debtor and Creditor Law § 273(a)(1), (II) the recovery of avoidable transfers from all initial, immediate, or mediate transferees, or beneficiaries of such transfers, pursuant to 11 U.S.C. § 550(a), (III) damages for aiding and abetting fraud, conversion, and breaches of the fiduciary duties, (IV) related relief, and (V) payment of all pre-judgment interest and attorneys' fees; alleges as follows:

## PRELIMINARY STATEMENT

Prime Capital was an advance-pay lending and Ponzi scheme created and operated by its principal, Kris Roglieri ("Roglieri"), and his co-conspirator, Kimberly Humphrey ("Humphrey"). Roglieri and Humphrey defrauded dozens of prospective borrowers out of well over $100 million based upon the false premise that Prime Capital had the present ability to fund large commercial loans to the victims. Prime Capital told the victims that the deposits were a precondition to Prime Capital funding the loans. In truth, Prime Capital had no ability to fund any loans as its only source of funds was the deposits obtained from new victims. Predictably, Prime Capital's fraud only lasted two short years from December 2021 to December 2023 before imploding under the weight of lawsuits brought by victims throughout the country seeking the return of their deposits and other damages.

Prime Capital took in at least $179 million in victim deposits and it used the proceeds of its fraud to: (i) purchase over $25 million in automobiles, jewelry, and other luxury items, for Roglieri and Humphrey; (ii) purchase a $4 million luxury property in Virginia Beach for Humphrey's use; (iii) prop up unrelated business ventures with over $10 million in cash transfers; (iv) make a $20 million highly speculative investment which itself turned out to be a fraud on Prime Capital; and (v) return deposits or make advances under the loans totaling approximately $109 million using the deposits from new victims in order to avoid the fraud from being discovered. Roglieri, Humphrey, and Humphrey's brother, Chris Snyder, have all been convicted of wire fraud charges and/or other crimes in connection with their operation of the Prime Capital Ponzi scheme.

RBC Capital was in the unique and unfortunate position of banking two separate fraudulent schemes that resulted in a loss of not less than $35 million to Prime Capital's victims. First, purported hedge fund and investment advisor Berone Capital Fund, LP, and its affiliates and principals and co-conspirators, used its account at RBC Capital to defraud Prime Capital out of $20 million. Second, Prime Capital opened and used an account at RBC Capital under Berone's account umbrella to defraud one of its victims out of $15 million. Neither of these frauds could have occurred without RBC Capital's substantial assistance and permissive use of its reputation and institutional legitimacy. RBC, RBC Capital's parent, also ignored numerous red flags in order to engage in an entirely nonsensical lending transaction where it loaned $6 million to Prime Capital in a risk-free loan secured by Prime Capital's own cash deposits at RBC Capital whereby RBC earned interest at a rate of 7.5% just for Prime Capital to borrow against its own cash.

The Defendants had a common law, statutory and regulatory duty to detect and terminate fraudulent, illicit, and potentially criminal banking activities in Berone's and Prime Capital's

accounts. The Defendants intentionally abrogated those duties and permitted highly irregular and suspicious banking transactions to occur repeatedly, many of which had no legitimate purpose. The Defendants intentionally ignored significant suspicious account activity violative of Bank Secrecy Act/Anti-Money Laundering laws ("BSA/AML"), policies, and procedures, solely to continue to earn fees, interest, and other incentives through their relationships with Berone and Prime Capital. Somewhat amazingly, the Defendants were so slow to act that they did not provide notice of their intent to debank Berone until March 4, 2024, forty (40) days after the United States District Court for the Northern District of New York appointed a receiver to take control of the assets of Berone and Prime Capital. Unfortunately, the damage was already done.

The Plan Administrator seeks to recover from the Defendants actual damages totaling **$31,136,630.16**[1], plus all pre- and post-judgment interest, attorneys' fees, and costs, under the following three categories of claims:

1) In his capacity as Plan Administrator for Prime Capital, damages of not less than $18,135,000.00 on account of RBC Capital's knowing substantial assistance to Berone in defrauding Prime Capital;
2) In his capacity as assignee of the claims of Prime Capital's victims, namely ER Tennessee LLC, damages of not less than $13,001,630.16 on account of RBC Capital's knowing substantial assistance to Prime Capital in operating its Ponzi scheme; and
3) Avoidance of the grant of an interest in Prime Capital's case and subsequent transfer of that cash to RBC in the amount of $6,122,813.73 upon the return of which RBC will have an allowed general, unsecured claim against Prime Capital's bankruptcy estate for

[1] Note that while different theories of recovery apply to different named Defendants, Categories 2 and 3 seek redress for the same damages so only the larger Category 2 damages is included in the total number.

the amount of the returned transfer.

## JURISDICTION AND VENUE

1. This adversary proceeding relates to the chapter 11 bankruptcy case captioned *In re Prime Capital Ventures, LLC*, Case No. 24-11029 (PGR), pending in the United States Bankruptcy Court for the Northern District of New York before the Honorable Patrick G. Radel, United States Bankruptcy Judge (the "Bankruptcy Court").

2. The Bankruptcy Court has jurisdiction over this adversary proceeding by virtue of 28 U.S.C. §§ 157(a) and (b) and 1334(b), and Rule 81.1 of the Local Rules for the United States District Court for the Northern District of New York referring matters arising under Title 11 of the United States Code (the "Bankruptcy Code") to the Bankruptcy Court.

3. The Plan Administrator consents to the entry of final orders or judgments by the Bankruptcy Court with respect to all matters and claims raised by this Complaint.

4. Venue is proper in this district pursuant to 28 U.S.C. § 1409(a) because this proceeding arises in a case under the Bankruptcy Code pending in this district.

## BASIS FOR RELIEF

5. This adversary proceeding is brought pursuant to sections 544(a), 548(a)(1)(A) and 550(a)(1) of the Bankruptcy Code, sections 273(a)(1) and 276-a of the New York Debtor and Creditor Law ("NY DCL"), and the common law theories of unjust enrichment, aiding and abetting conversion, aiding and abetting breach of fiduciary duties, and aiding and abetting fraud.

## PARTIES

6. Pursuant to the terms of that certain *Trustee's Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan") [Docket No. 369-1][2] confirmed by Order of the

[2] Any citation to "Docket No." contained herein shall refer to the docket entries within the bankruptcy case fashioned

Bankruptcy Court dated February 11, 2026 [Docket No. 401], the Plan Administrator and his predecessor were appointed and granted the standing, power, and authority to assert the claims in this Complaint. The Plan Administrator maintains offices at c/o Klestadt Winters Jureller Southard & Stevens, LLP, 286 Madison Avenue, 11th Floor, New York, New York 10017. In addition, the Plan Administrator has been assigned certain claims of creditor victims of the Debtor's Ponzi scheme and asserts certain claims in that capacity.

7. Prime Capital is a limited liability company organized under the laws of the state of Delaware. While it was operating, Prime Capital's principal place of business was 66 South Pearl Street, Albany, New York 12207. Prime Capital's bankruptcy estate is now under the control of the Plan Administrator and overseen by its Oversight Board comprised of Compass-Charlotte 1031, LLC, 526 Murfreesboro, LLC, Piper Capital Funding, LLC, and ER Tennessee LLC.

8. Roglieri is an individual who is currently residing at the Danbury Federal Correctional Facility, 33 ½ Pembroke Station, Route 37, Danbury, Connecticut 06811. Roglieri was the sole owner of Prime Capital's membership interests.

9. Humphrey is an individual who is, upon information and belief, currently residing at 506 Cavalier Drive, Virginia Beach, Virginia 23451. Humphrey is awaiting sentencing and potential incarceration. Humphrey was the Executive Vice President of Prime Capital.

10. Berone Capital, LLC ("<u>Berone Capital</u>") is or was a limited liability company formed under the laws of the state of Delaware and is owned and/or operated by Jeremiah Beguesse and Fabian Stone. Berone Capital maintains or maintained offices at and/or has designated the following addresses for the service of process in its proof of claim filed in the Prime Capital

---

*In re Prime Capital Ventures, LLC*, Case No. 24-11029 (PGR) before the United States Bankruptcy Court for the Northern District of New York.

bankruptcy case: 3595 Canton Road, Marietta, Georgia 30066. According to public records, Berone Capital voluntarily dissolved on November 29, 2023.

11. Berone Capital Fund, LP (the "Berone Fund," and together with Berone Capital, "Berone") is or was a private and unregistered pooled investment vehicle formed as a Delaware limited partnership on or around July 12, 2021. Berone Capital is or was the General Partner of the Berone Fund. Berone Capital maintains offices at and/or has designated the following addresses for the service of process in its proof of claim filed in the Prime Capital bankruptcy case: 3595 Canton Road, Marietta, Georgia 30066.

12. Jeremiah Beguesse ("Beguesse") is a resident of Miramar, Florida. Beguesse is an owner and is identified as the Manager and Chief Compliance Officer for Berone Capital. Beguesse maintains a residence at 2371 SW 83rd Avenue, Miramar, Florida 33025.

13. Fabian Stone ("Stone," and together with Berone Capital, the Berone Fund, and Beguesse, the "Berone Parties") is a resident of Cobb County, Georgia. Stone is an owner and is listed as a manager of Berone Capital. Stone maintains a residence at 530 Delphinium Way NW, Acworth, Georgia 30102, and/or 202 Bankside Point NW, Kennesaw, Georgia 30144.

14. Reign Financial International, Inc. ("Reign") is a corporation formed under the laws of the state of Delaware and is owned and/or operated by Giorgio Johnson and Gary Mills.

15. Giorgio Johnson ("Johnson") is a resident of Oregon City, Oregon. Johnson is the owner and Chief Executive Officer of Reign. Johnson maintains a residence at 14474 Livesay Road, Oregon City, Oregon 97045.

16. Gary Mills ("Mills") is a resident of Palm Beach County, Florida. Mills is or was the Chief Operating Officer of Reign. Mills maintains a residence at 9275 Legare Street, Boca Raton, Florida 33434.

17. Martin Karo ("Karo") is a resident of St. Johns County, Florida, and Bucks County, Pennsylvania. Karo is a licensed attorney in the State of Pennsylvania. Karo maintains a residence at 661 County Road 13 South, Saint Augustine, Florida 32092, and/or 205 Garber Drive, Yardley, Pennsylvania 19067.

18. Juan Carlos A. Marquez ("Marquez," and together with Reign, Johnson, Mills, and Karo, the "Reign Parties," and together with the Berone Parties, the "Berone/Reign Parties") is a resident of Fairfax County, Virginia. Marquez is or was the general counsel for Reign and is licensed to practice law in the District of Columbia. Marquez maintains a residence at 6402 Caleb Court, Alexandria, Virginia 22315.

19. RBC Capital Markets, LLC, is a limited liability company organized and existing under the laws of Minnesota. RBC Capital is a broker-dealer registered to do business in the United States. RBC Capital's principal place of business at 200 Vesey Street, New York, New York 10281. RBC Capital has also designated the following address for service of process: RBC Capital Markets, LLC, c/o Corporation Service Company, 80 State Street, Albany, New York 12207. RBC Capital is wholly-owned by RBC through two Delaware holding companies, RBC US Group Holdings LLC and RBC USA Holdco Corporation.

20. Royal Bank of Canada is a Canadian legal entity that actively conducts business as a bank in the United States. RBC's principal place of business in the United States is 200 Vesey Street, New York, New York 10281.

## FACTS COMMON TO ALL CAUSES OF ACTION

### A. The Players

21. Roglieri is an Albany-area entrepreneur and commercial finance executive who was actively involved in the commercial lending and finance training sectors.

22. Prior to the formation of Prime Capital, Roglieri created, owned, and managed several other businesses.

23. On or around July 26, 2006, Prime Commercial Lending, LLC ("Prime Commercial") was formed by Roglieri as a New York limited liability company. Prime Commercial was a small lender that made loans as small as $22,000 to businesses and up to $2 million on commercial real estate.

24. Other businesses created and operated by Roglieri include Commercial Capital Training Group ("CCTG"), a training organization for commercial finance brokers, and The Finance Marketing Group, a marketing company serving financial services businesses.

25. Roglieri also maintained certain entities associated with his collecting and showing exotic luxury sports cars including Shark Ventures LLC and FUPME, LLC.

26. Prior to his arrest in May 2024, Roglieri maintained a larger-than-life persona. Among other things, Roglieri wore flashy clothes, collected luxury wristwatches, smoked expensive cigars, and maintained a large fleet of luxury sportscars that he would show with the team name and Instagram handle "@teamloansharks" often emblazoned with the moniker "F—K YOU…PAY ME". Pictured here is Roglieri from his now removed Instagram page smoking a cigar while leaning against a sportscar after being pulled over by the police, in his garage amongst some of his cars, partying in Las Vegas with his girlfriend, on a private jet (actually posted from @postureupson with @teamloansharks tagged), and gambling at the Casino de Monte-Carlo, and partying with three friends on a yacht in the French Riviera from a video taken in October 2023 while Prime Capital was imploding:

















27. Roglieri was by all counts very successful in his prior ventures and already lived an opulent lifestyle long before starting Prime Capital in December 2021.

28. Humphrey is a lifelong resident of Virginia Beach, Virginia. Roglieri met Humphrey in or around the late 2010's when she allegedly purchased and took a commercial loan broker training course from Roglieri's CCTG along with her brother, Chris Snyder ("Snyder").

29. In 2020, CCTG published an hourlong podcast interview of Humphrey by Roglieri where the two talk at length about her history, their professional relationship, and the commercial

loan business:[3]




30. According to Humphrey's LinkedIn page, she sourced "the Debt and Equity for Deals $100MM+", and started as an Executive Vice President of Prime Commercial in or around November 2019.[4]

31. Upon information and belief based upon Humphrey's statements on the CCTG podcast, Snyder was partners with Humphrey in their lending enterprise, Capital Atlantic Solutions, which operated at or around the same time that Humphrey was also working for Prime Commercial.

**B. The Ponzi Scheme**

***(i) The Fraud Concept***

32. Prime Capital was formed on December 14, 2021, and purported to be a legitimate alternative (or nonbank) commercial lender. Prime Capital advertised proudly that:

---

[3] See Commercial Capital Training Group, LLC, Entrepreneurs in Finance | Episode 7 | Kimmy Humphrey [Video], August 24, 2022, https://www.youtube.com/watch?v=aL3qXCAYP-M&t=1437s (YouTube) at 11:36.
[4] See Kimberly H, *LinkedIn*, https://www.linkedin.com/in/kimberly-h-351800198/ (last visited July 22, 2026).




*See* Prime Commercial Lending, Prime Capital Ventures & The Bailey [Video], May 16, 2022, https://www.youtube.com/watch?v=A4_RKBepUkA (YouTube) at 0:21.

33. Generally, alternative lenders offer borrowers some significant benefits over traditional bank lenders by having simpler application processes, fewer underwriting requirements, different and more flexible financing products, and more rapid funding.[5] Roglieri confirmed that this was Prime Capital's business model claiming that he "saw a rising demand from borrowers who needed to move projects forward with as little static as possible" and that Prime Capital could "provide solutions that are less restrictive than your average bank and offer generous terms that favor borrowers."[6] The disadvantage of going to an alternative lender is that they typically charge higher interest rates than what may be available at a traditional bank.[7] Prime Capital on the other hand offered all of the advantages of an alternative lender, while offering interest rates well below market.

34. On May 2, 2022, Prime Capital described its business in an article in DealMaker Magazine, a publication that Roglieri purportedly owned or started, as "a fund specifically

---

[5] See Calio, V., June 20, 2024, Traditional Bank vs. Alternative Lender, kapitus.com, https://kapitus.com/blog/manage-your-money/financing/traditional-bank-vs-alternative-lender-which-is-better-for-your-small-business-kapitus/.

[6] Prime Commercial Lending, March 17, 2022, Albany, New York's Prime Commercial Lending Funds the First 5-Star Hotel in Atlanta, GA Through Prime's Real Estate Fund, Prime Capital Ventures, [Press release] https://www.prnewswire.com/news-releases/albany-new-yorks-prime-commercial-lending-funds-the-first-5-star-hotel-in-atlanta-ga-through-primes-real-estate-fund-prime-capital-ventures-301505069.html.

[7] See Calio, V., June 20, 2024, Traditional Bank vs. Alternative Lender, *supra*.

designed to provide capital for large development, commercial development and commercial real estate transactions from $50 million to more than $1 billion."[8] Prime Capital offered non-recourse loans with interest rates of 4 to 6% with interest only payments.[9] At the exact same time, interest rates were rising rapidly in response to inflationary pressure. At the time of Prime Capital's advertisement (May 2022), the prime interest rate was 4%, rising to 4.75% a month later, then to 6.25% by September 21, 2022, and peaking at 8.5% on July 26, 2023.[10] 15-year mortgages followed the same trend starting at 4.52% on May 5, 2022 and peaking at 7.03% on October 26, 2023.[11]

35. In order to be a successful lender, Prime Capital would have had the impossible task of obtaining capital at well below the 4 to 6% that it was offering to its prospective borrowers. In truth, Prime Capital had no known legitimate source of capital to lend to prospective borrowers. Instead, it obtained its capital by converting its prospective borrowers' own funds.

36. Prime Capital required as a condition of providing a loan that its prospective borrower provide 20% of the contemplated loan as an upfront deposit (defined as an "ICA Deposit," or collectively, the "ICA Deposits"). Roglieri stated that borrowers "have to come to the table with at least 20% and that's just an important function of how our product works."[12] Prime Capital claimed that it would hold the ICA Deposit "as prepaid interest throughout the term of the loan."[13] As interest payments became due, Prime Capital represented that it "would just

[8] See Koplin, I., May 2, 2022, Roglieri Unveils Prime Capital Ventures, Prime Commercial Lending's Newest Fund, dealmaker-magazine.com, https://www.dealmaker-magazine.com/magazine/roglieri-unveils-prime-capital-ventures-prime-commercial-lendings-newest-fund.
[9] See Id.
[10] See https://www.fedprimerate.com/wall_street_journal_prime_rate_history.htm.
[11] See Freddie Mac https://www.freddiemac.com/pmms.
[12] See Koplin, I., May 2, 2022, Roglieri Unveils Prime Capital Ventures, Prime Commercial Lending's Newest Fund, dealmaker-magazine.com.
[13] See Id.

deduct it from the [ICA DEPOSIT]".[14] Prime Capital admitted that this was "a unique way of doing things" but claimed that it "ensures [Prime Capital's] payback, and [the ICA Deposit] serves as additional collateral for the loan throughout the term."[15]

37. In an email dated April 27, 2023, Humphrey responded as follows to a prospective client's question about whether Prime Capital could transfer an ICA Deposit without a client's permission:

> When we pull through the hf [hedge fund], it [the ICA Deposit] gets locked by RBC [Royal Bank of Canada], Goldman [Sachs] or Interactive [Brokers] themselves. And it doesn't get unlocked until the line is completely paid back. In other words, if the ICA is $10m and the facility is $50m- RBC locks the 10m at the time they make the 50m facility available. It doesn't leave the account but we can't do anything with if bc [because] they collateralized it. Once we pay the 50m back they unlock the 10m.[16]

38. As Roglieri explained to a borrower client during a recorded Zoom call in December 2023:

> So with our process, we usually require anywhere from 20 to 30 percent down on, based on the total capital stack. . . We call that the essentially the ICA, it's an Interest Credit Account. We require that down payment in the form of cash to us because we view it as, it really performs three functions for us . . . number one, the ICA is considered essentially additional collateral for the loan throughout the term. Number two, it acts as pre-paid interest reserves, so theoretically our client never has to make a payment for us, payment to us on a quarterly or monthly basis when that money gets deposited in an account that we control in our name. The client . . . would get a statement every month or every quarter showing how much was drawn down and the interest that is due on that and that is essentially how we get paid back through that ICA account through the term. . . . There really isn't any risk. The [ICA] money gets put into a pledged account.[17]

39. All of Prime Capital's representations regarding the ICA Deposits and Prime Capital's ability to fund loans were false. ICA Deposits were not deposited into pledged accounts

---

[14] Id.
[15] Id.
[16] See USA v. Humphrey, Case No. 25-cr-00238, Docket No. 4, ¶5(d) (N.D.N.Y. June 10, 2025).
[17] See USA v. Roglieri, Case No. 24-cr-00392, Docket No. 90, ¶5(e) (N.D.N.Y. Nov. 13, 2025).

and Prime Capital had no ability to fund loans. In fact, Prime Capital's only source of capital was from obtaining ICA Deposits from victims, and many ICA Deposits were consumed immediately upon receipt by Prime Capital.

40. The ICA Deposits were an investment by the borrower victims to get access to Prime Capital's promise of cheap and readily available capital. A loan from Prime Capital would theoretically allow a prospective borrower to invest in its underlying business and hopefully make big returns. Prime Capital's prospective borrowers did not appear to have other viable sources of capital, or at least not any as inexpensive as what Prime Capital was offering. Prime Capital further enticed prospective borrowers with what appear to have been very little underwriting and collateral requirements. Prime Capital also did not require personal guarantees or recourse on the loans.

***(ii) The Origin of the Fraud***

41. In order to sell a business model that seemed entirely impossible if properly understood, and to get prospective borrowers to give Prime Capital new ICA Deposits, Prime Capital had to demonstrate that it actually made loans. It did this by, among other ways, fraudulently claiming to have made a "$188,000,000 funding of ALUX Properties, LLC and their project 'The Bailey' which will be the only 5-star hotel in Atlanta".[18]

---

[18] See Prime Commercial Lending, Prime Capital Ventures & The Bailey [Video], May 16, 2022, https://www.youtube.com/watch?v=A4_RKBepUkA (YouTube) at 0:13:




See also, Prime Commercial Lending, March 17, 2022, Albany, New York's Prime Commercial Lending Funds the First 5-Star Hotel in Atlanta, GA Through Prime's Real Estate Fund, Prime Capital Ventures, [Press release].

42. Prime Capital made a glitzy promotional video published on YouTube in May 2022 where it boasted about making this loan. The video featured Roglieri and others traipsing around the wooded area in Atlanta where "The Bailey" was going to be constructed. The alleged principal of ALUX Properties, LLC ("ALUX"), Brandon Wheeless, expressed his appreciation in the video stating that "access to this type of capital with trusted individuals that you close deals with definitely makes life a heck of a lot easier for us and the company so we are fast-tracking to grow at an exponential rate moving forward."[19] Depicted here are Messrs. Wheeless and Roglieri surveying the site, along with the "after" rendering of "The Bailey" contained in Prime Capital's video advertisement[20]:






43. In reality, Prime Capital never made any such loan to ALUX. There is no "The Bailey" hotel in Atlanta. According to Prime Capital's books and records, Brandon Wheeless, the purported principal of ALUX and third-party borrower of Prime Capital, was actually on Prime Capital's payroll and received a total of $200,000 from Prime Capital in $10,000 monthly payments between July 7, 2022 and September 18, 2023.

44. ALUX, the purported borrower, was placed into a receivership by the Georgia Superior Court on September 13, 2022 in connection with a lawsuit where the plaintiffs alleged,

---

[19] See Id. at 3:44 (transcribed by counsel).
[20] See Id. at 2:58 and 1:35, respectively.

among other things, to have been defrauded out of $10 million.[21] Featured in that litigation was an entity called Blackwater Capital Group, LLC ("Blackwater") which purported to act as a lender to the project, not unlike Prime Capital in its promotional video.[22] Blackwater's lending agreement was dated December 14, 2021, the exact date that Prime Capital was formed, and was nearly identical in form and substance to the form of lending agreement employed by Prime Capital.[23] Compared here are the first pages of the table of contents of Blackwater's December 14, 2021 lending agreement (on the left), and Prime Capital's April 24, 2023 lending agreement with creditor Compass-Charlotte (on the right)[24]:

Case 1:24-cv-00055-MAD-PJE Document 1-21 Filed 01/12/24 Page 92 of 302

DocuSign Envelope ID: 0CAFC338-732D-4304-B32B-FA350CA8AA9E

TABLE OF CONTENTS


| | Page |
|---|---|
| RECITALS | 1 |
| **ARTICLE 1 DEFINITIONS** | |
| **Section 1.1.** Certain Defined Terms | 2 |
| **ARTICLE 2 THE CREDIT** | |
| **Section 2.1.** Line of Credit Amount | 4 |
| **Section 2.2.** Line of Credit Documents | 4 |
| **ARTICLE 3 TERM, INTEREST AND PAYMENTS** | |
| **Section 3.1.** Initial Term | 5 |
| **Section 3.2.** Extended Term | 5 |
| **Section 3.3.** Applicable Interest Period | 5 |
| **Section 3.4.** Interest Rate Calculation | 5 |
| **Section 3.5.** Interest Payments | 6 |
| **Section 3.6.** Reserves | 6 |
| **Section 3.7.** Risk Management Protection for ICA Payment | 6 |
| **Section 3.8** Prepayment | 6 |
| **Section 3.9.** Interest Credit Account | 6 |
| **Section 3.10.** Fees | 7 |
| **Section 3.11.** Line of Credit Extension Fees | 7 |
| **Section 3.12.** Legal and Incidental Fees, Charges and Costs | 7 |
| **Section 3.13.** Line of Credit Disbursement Account | 7 |
| **Section 3.14.** Taxes | 8 |
| **ARTICLE 4 CONDITIONS TO CLOSING AND DISBURSEMENT** | |
| **Section 4.1.** Delivery of the LOC Documents | 8 |
| **Section 4.2.** Authority | 8 |
| **Section 4.3.** Liens | 9 |
| **Section 4.4.** Litigation | 9 |
| **Section 4.5.** Events of Default | 9 |
| **Section 4.6.** Purchase and Agreement Contracts | 9 |
| **Section 4.7.** Compliance with Certain Requirements | 9 |
| **Section 4.8.** Evidence of Insurance | 9 |
| **Section 4.9.** Financial Statements | 10 |
| **Section 4.10.** Business Pro Forma | 10 |
| **Section 4.11.** Management Plan | 10 |
| **Section 4.12.** Material Change | 10 |
| **Section 4.13.** Non-Subordination | 10 |
| **Section 4.14.** Borrower JV Governing Agreement | 10 |
| **Section 4.15.** Securitization | 11 |
| **ARTICLE 5 USE OF LINE OF CREDIT PROCEEDS** | |
| **Section 5.1.** Development Costs | 11 |


Revised 3/17/21

DocuSign Envelope ID: Case 1:24-cv-00055-MAD-PJE Document 1-29 Filed 01/12/24 Page 3 of 61

TABLE OF CONTENTS


| | Page |
|---|---|
| RECITALS | 1 |
| **ARTICLE 1 DEFINITIONS** | |
| **Section 1.1.** Certain Defined Terms | 2 |
| **ARTICLE 2 THE CREDIT** | |
| **Section 2.1.** Line of Credit Amount | 4 |
| **Section 2.2.** Line of Credit Documents | 4 |
| **ARTICLE 3 TERM, INTEREST AND PAYMENTS** | |
| **Section 3.1.** Initial Term | 5 |
| **Section 3.2.** Extended Term | 5 |
| **Section 3.3.** Applicable Interest Period | 5 |
| **Section 3.4.** Interest Rate Calculation | 5 |
| **Section 3.5.** Interest Payments | 6 |
| **Section 3.6.** Reserves | 6 |
| **Section 3.7.** Intentionally Omitted | 6 |
| **Section 3.8.** Prepayment | 6 |
| **Section 3.9.** Interest Credit Account | 6 |
| **Section 3.10.** LOC Fee | 7 |
| **Section 3.11.** Line of Credit Extension Fees | 7 |
| **Section 3.12.** Legal and Incidental Fees, Charges and Costs | 7 |
| **Section 3.13.** Taxes | 8 |
| **ARTICLE 4 CONDITIONS TO CLOSING AND DISBURSEMENT** | |
| **Section 4.1.** Delivery of the LOC Documents | 8 |
| **Section 4.2.** Authority | 8 |
| **Section 4.3.** Liens | 9 |
| **Section 4.4.** Litigation | 9 |
| **Section 4.5.** Events of Default | 9 |
| **Section 4.6.** Purchase and Agreement Contracts | 9 |
| **Section 4.7.** Compliance with Certain Requirements | 9 |
| **Section 4.8.** Evidence of Insurance | 9 |
| **Section 4.9.** Financial Statements | 10 |
| **Section 4.10.** Business Pro Forma | 10 |
| **Section 4.11.** Management Plan | 10 |
| **Section 4.12.** Material Change | 10 |
| **Section 4.13.** Non-Subordination | 10 |
| **Section 4.14.** Borrower Governing Agreement(s) | 10 |
| **Section 4.15.** Securitization | 11 |
| **ARTICLE 5 USE OF LINE OF CREDIT PROCEEDS** | |
| **Section 5.1.** Development Costs | 11 |


---

[21] See Capstone Diagnostics One, L.P., et al. v. Bailey LLC, et al., Case No. 2022cv366001 (GA Sup. Ct., Fulton Cty., Sept. 22, 2024).

[22] See Id., Judgment entered June 24, 2023.

[23] See Id., Verified Complaint, Exhibit E, executed June 9, 2022.

[24] See Id., compared to Exhibit 29 to the Complaint filed in Compass-Charlotte v. Prime Capital Ventures, LLC, et al., Case No. 24-cv-55 (MAD) (N.D.N.Y. Jan. 12, 2024).

45. Upon information and belief, Roglieri and Humphrey met Blackwater and ALUX in connection with trying to arrange the funding for ALUX's ICA Deposit to Blackwater through Prime Commercial. That is where they learned of the concept and decided to form Prime Capital to copy the fraudulent concept apparently devised by Blackwater.

***(iii) The Proliferation of the Fraud***

46. Roglieri and Humphrey saw "success" almost immediately with the Prime Capital fraud. ICA Deposits on loans that Prime Capital had absolutely no ability to fund started flowing in at a rapid rate.

47. Prime Capital took several steps to advertise and proliferate its fraud. Among other things, it:

a. advertised heavily on YouTube by boasting about loans that never existed including the alleged $188 million to ALUX to build "The Bailey", that it "gained prominence by committing $17 billion with a South Korean firm for projects in the United States and abroad,"[25] and that it had provided "$2.3 billion in funding for the first stage of a massive five-year, five-stage $22 billion project" "[i]n the heart of Dubai";[26]

---

[25] See Prime Commercial Lending, March 17, 2022, Albany, New York's Prime Commercial Lending Funds the First 5-Star Hotel in Atlanta, GA Through Prime's Real Estate Fund, Prime Capital Ventures, [Press release]; see also Prime Commercial Lending, Prime Commercial Lending Commits to Lending $17 Billion [Video], Jan. 21, 2022, https://www.youtube.com/watch?v=PmvtmdkBUlo (YouTube) at 0:13:




[26] Koplin, I., May 2, 2022, Roglieri Unveils Prime Capital Ventures, Prime Commercial Lending's Newest Fund, dealmaker-magazine.com, https://www.dealmaker-magazine.com/magazine/roglieri-unveils-prime-capital-ventures-prime-commercial-lendings-newest-fund.

b. used large law firms like Sheppard, Mullin, Richter & Hampton LLP, to represent it in its loan transactions to add legitimacy to its business model, and even featured Ned Trombly, a partner of Barclay Damon LLP, as its "Lead Counsel" on its website; and

c. in the few loans that it funded in whole or in part, it got the borrowers to participate in video advertisements designed to attract new victims to the fraud.[27]

48. Prime Capital got its first ICA Deposit for prospective borrower Indigo Pharmaceutical, LLC ("Indigo") on June 3, 2022 and July 22, 2022 in the amounts of $1 million and $2 million, respectively. From there, the ICA Deposits started to flow – (i) on July 18, 2022 Prime Capital received a $1.4 million ICA Deposit for Norwell Ventures, LLC, (ii) on September 21, 2022 and September 22, 2022 Prime Capital received a $20 million ICA Deposit for Onward Partners, LLC and (iii) on October 13, 2022, Prime Capital received a $3 million ICA Deposit for Lake's Edge Development Group, LLC.

49. In total, Prime Capital took in approximately $179 million in ICA Deposits, of which approximately $109 million were returned to borrowers or advanced under the respective line of credit agreement and approximately $70 million was consumed by Roglieri, Humphrey, and Snyder, leaving no less than 16 victims left holding the bag with claims totaling over $100 million.

***(iv) The Collapse***

50. Having no legitimate source of capital to fund loans, Prime Capital's collapse was inevitable.

---

[27] See Prime Commercial Lending, Prime Capital Ventures Presents Indigo Pharmaceutical in Las Vegas, NV [Video], April 20, 2023, https://www.youtube.com/watch?v=GvmECqnuBkY&t=326s (YouTube); and Prime Commercial Lending, Prime Capital Ventures Presents Home Rentals in Carbondale, IL [Video], March 3, 2023, https://www.youtube.com/watch?v=8D5GRnKecG0.

51. Near the beginning, Humphrey expressed some concern over the inability to fund promised loans but was quickly shut down by Roglieri. For example, in June 2022, Prime Capital accepted a $1 million ICA Deposit from Indigo even though it had no ability to fund the $20 million loan that Indigo was seeking. On July 8, 2022, Humphrey sent an email to Roglieri titled "Do not sign docs for pharmacy," in which she wrote, "You have no way to get them funded in 60 days now. You never ducking listen. Should have never taken in the money. But we're down to 60 days so do not sign the docs." Roglieri responded "Get yourself under control. NOW." Roglieri signed the documents and Humphrey continued to participate actively in Prime Capital's fraud from that time until its collapse.

52. Once prospective borrowers realized that they were not getting their loans funded, they began demanding the return of the ICA Deposits. However, Prime Capital had squandered tens of millions of dollars in the ICA Deposits for the benefit of Roglieri, Humphrey, and Snyder, on speculative investments, propping up Roglieri's other businesses, and to purchase million-dollar vehicles, luxury watches and jewelry, domestic and international travel by private jet, and a home in Virginia Beach for Humphrey's use. Thus, when prospective borrowers demanded the return of their ICA Deposits, Prime Capital was unable to meet the demand unless it could obtain new ICA Deposits from additional victims.

53. By the end of 2023, Prime Capital was besieged by litigation brought by its victims leading to its final collapse.[28] Text messages between Humphrey and Snyder revealed Prime

---

[28] See, e.g., Truss Financial LLC v. Prime Capital, et al., Index No. 2023/510389 (N.Y.Sup. Ct. Kings Cty. Apr. 5, 2023) (seeking and subsequently obtained the return of $13.4 million); B&R Acquisition Partners v. Prime Capital (JAMS Arb., Aug. 2023) (seeking return of $4.3 million); Sturm v. Prime Capital, Case No. 23-cv-1033 (N.D.N.Y. Aug. 22, 2023) (seeking return of $2 million); Camshaft CRE 1, LLC v. Prime Capital, Case No. 2023-023173 (Fla. Circ. Ct., Miami-Dade Cty., Sept. 15, 2023) (seeking return of $12.4 million); The Lion Group DFW, LLC v. Prime Capital, Case No. 23-DCV-34617 (Tex. Dist. Ct., 146th Dist., Sept. 21, 2023) (demand unknown); Onward Holding, LLC, v. Prime Capital, et al., Case No. 23-cv-833 (D. Utah Nov. 13, 2023) (seeking return of $4 million).

Capital's desperation to keep defrauding new victims. For example, on April 9, 2023, the two had the following text exchange:

| Sender | Message |
|---|---|
| Humphrey | Fuck |
| | 350 is not coming |
| Snyder | At all?? |
| | Shit |
| | Why? |
| Humphrey | Bc [a borrower]'s investor wants to look over all docs |
| | And said it will take a couple days |
| | We need it for [a different borrower] today |

and on September 19, 2023, the two corresponded as follows:

| Sender | Message |
|---|---|
| Humphrey | If we don't get a closing in today |
| | It's over |
| | Nothing we can do anymore |
| Snyder | We gotta start selling some stuff off so we can pay our bills. I need cash. |
| | Is there any point in having the csll [call] w [a prospective borrower] today then? He won't be able to wire today |
| Humphrey | Doubtful |
| | It killed us when, no LOIs [letters of intent] or closings happened |
| | Everyone requested ICA and dds [due diligence fees] back |
| | And we can't come back from it |
| | There are [law]suits all over |
| | Kris threw in the towel |

See USA v. Humphrey, Case No. 25-cr-00238, Dkt. No. 4, ¶5(i) (N.D.N.Y. June 10, 2025).

54. Even after those damning text exchanges, Prime Capital continued to solicit, take in, and rapidly consume ICA Deposits including those from 1322 Developments, LLC, by its lender ER Tennessee, in September 2023 in the amount of $14,249,832, and 1800 Park Avenue LLC in December 2023 in the amount of $5 million.

**C. The Bankruptcy Cases and Federal Equity Receivership**

55. On December 19, 2023, Compass-Charlotte 1031, LLC ("Compass-Charlotte"),

526 Murfreesboro, LLC ("526 Murfreesboro"), and Newlight Technologies, Inc. (Newlight, and together with Compass-Charlotte and 526 Murfreesboro, the "Petitioning Creditors") filed an involuntary petition against Prime Capital for relief under chapter 7 of the Bankruptcy Code commencing Case No. 23-11302 ("Case 1"). The Petitioning Creditors commenced Case 1 for the obvious purpose of ensuring that Prime Capital's fraud would stop and its assets and liabilities could be liquidated in a single, public forum, and that no single creditor could win the proverbial "race to the courthouse".

56. On December 22, 2023, upon order of the Bankruptcy Court, the United States Trustee (the "U.S. Trustee") appointed Christian H. Dribusch ("Dribusch") as the interim chapter 7 trustee of Prime Capital's estate.

57. Rather than submit to the orderly winddown or restructuring of Prime Capital's business in Case 1, Roglieri pushed Prime Capital in an entirely different direction. Roglieri caused Prime Capital to contest the involuntary petition on the basis that at least two of the Petitioning Creditors' claims were allegedly subject to a bona fide dispute because litigation concerning their claims was pending. See Debtor's Motion for Judgment Dismissing the Petition, Case 1 Docket No. 72, p.1.

58. Roglieri funded fighting Case 1 by defrauding a final victim. Beginning in or around October 2023, 1800 Park Avenue LLC ("1800 Park") was negotiating a contemplated $105 million loan from Prime Capital under Prime Capital's standard model, pursuant to which Prime Capital issued a "Terms and Contingent Letter of Intent" that was executed by 1800 Park on October 25, 2023. The term sheet contemplated an ICA Deposit of $26,277,562.

59. On December 12, 2023, Prime Capital issued a "Commitment to Fund Letter" to 1800 Park for a line of credit in the amount of $98,905,467, which was executed by both Roglieri

and Jeffrey Huston of 1800 Park.

60. On December 18, 2023, one day before the commencement of Case 1, 1800 Park received draft loan documents that for the first time included Prime Commercial as the lender instead of Prime Capital.

61. Three (3) days after the commencement of Case 1, on December 22, 2023, 1800 Park entered into a deposit agreement with Prime Commercial, pursuant to which 1800 Park agreed to make an initial ICA Deposit of $5,000,000 in connection with a contemplated loan from Prime Commercial (the "1800 Park Deposit"). Contemporaneously, 1800 Park made the 1800 Park Deposit which was received into Prime Capital's Key Bank Account No. ****2233 due to Roglieri and Humphrey's failure to change the account number from Prime Capital's to Prime Commercial's. 1800 Park was completely unaware of the commencement of Case 1 against Prime Capital.

62. Immediately upon receipt of the 1800 Park Deposit on December 22, 2023, Prime Capital transferred the 1800 Park Deposit to Prime Commercial's Key Bank Account No. ****4465.

63. Roglieri and Humphrey used the 1800 Park Deposit for, among other things, the following purposes: (i) funding a $50,000 retainer to Cullen and Dykman LLP, and a $400,000 retainer to Hogan Lovells US LLP, to fight the Petitioning Creditors in Case 1; (ii) funding a $100,000 retainer to Pashman Stein to represent Roglieri personally in his bankruptcy proceeding; (iii) funding an additional $950,000 to Caruso Home Builders under an existing loan; (iv) paying $434,429.47 to Ai Design on account of a custom car buildout for Roglieri; (v) transferring $526,000 to CCTG; (vi) paying $84,000 to Wrist Aficionado for a wristwatch for Roglieri; and (vii) transferring $2,000,000 to CPH LLC, which is believed to be an entity owned by an affiliate

of Humphrey.

64. On January 8, 2024, the Petitioning Creditors filed their own motion to dismiss Case 1 [Case 1 Docket No. 74], which motion was granted by the Court on January 9, 2024 [Case 1 Docket No. 87]. Thereafter, Dribusch was discharged from his duties as chapter 7 trustee.

65. Three days after dismissal of Case 1, on January 12, 2024, Petitioning Creditor Compass-Charlotte commenced an action in the United States District Court for the Northern District of New York (the "District Court") under Case No. 24-cv-00055 (MAD) (CFH) (N.D.N.Y. Jan. 12, 2024) (the "Receivership Case"), seeking, among other things, the appointment of a federal equity receiver to take possession and control of Prime Capital's assets and affairs. That same day, the District Court entered an order appointing Paul Levine as the temporary receiver (the "Receiver") [Receivership Case Docket No. 8].

66. Roglieri directed Prime Capital to file an emergency motion on behalf of Prime Capital to, among other things, dismiss the Receivership Case. [Id. at Docket No. 12-14]. On January 24, 2024, the District Court entered a memorandum decision and order making the Receiver's appointment permanent and defining his powers with respect to Prime Capital and its property and denying Prime Capital's motion to dismiss the case. [Id. at Docket No. 56].

67. On February 15, 2024, Roglieri filed a voluntary petition for relief under subchapter V of chapter 11 of the Bankruptcy Code commencing Case No. 24-10157 (REL) (the "Roglieri Case").

68. On May 14, 2024, Prime Capital, by and through the Receiver, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court commencing Case No. 24-10531 ("Case 2").

69. On May 15, 2024, the Court entered an order converting Roglieri's case to one

under chapter 7 of the Bankruptcy Code. Roglieri Case at Docket No. 159. Thereafter, the U.S. Trustee appointed Dribusch as the interim chapter 7 trustee (the "Roglieri Trustee") [Id. at Docket No. 160].

70. On July 23, 2024, the Court entered a memorandum decision and order dismissing Case 2 finding essentially that the Receiver did not have the authority to file Case 2 on behalf of Prime Capital and that the Roglieri Trustee did not have the ability to waive the defect and ratify the filing *ex post facto* [Id. at Docket No. 85].

71. The Roglieri Trustee, who at the time was in possession and control of all membership interests of Prime Capital by and through the Roglieri bankruptcy estate, exercised the necessary powers and executed the necessary documents to assume control of Prime Capital. On September 16, 2024, the Roglieri Trustee, in his capacity as the authorized agent for Prime Capital, filed a voluntary bankruptcy petition on behalf of Prime Capital for relief under chapter 11 of the Bankruptcy Code.

72. In or around May 23, 2025, the Roglieri Trustee resigned and on May 27, 2025, Marianne T. O'Toole was appointed successor chapter 7 trustee of the Roglieri bankruptcy estate (the "Successor Roglieri Trustee"). On June 3, 2025, the Successor Roglieri Trustee filed a consent to the appointment of a chapter 11 trustee in Prime Capital's case [Docket No. 280]. On June 5, 2025, the Court entered an order directing the U.S. Trustee to appoint a chapter 11 trustee [Docket No. 282], and that same day the U.S. Trustee appointed Yann Geron as the chapter 11 trustee (the "Prime Trustee") of Prime Capital [Docket No. 285], which appointment was confirmed by order of the Court on June 10, 2025 [Docket No. 287].

73. The Prime Trustee served in that capacity until on or around February 25, 2026, when the Plan went effective and the Plan Administrator was appointed.

74. On April 22, 2026, pursuant to Section 5.1 of the Plan Administrator Agreement, Yann Geron, in his capacity as Plan Administrator, resigned.

75. On April 22, 2026, pursuant to Section 2.3 of the Plan Administrator Agreement, the Oversight Committee appointed Fred Stevens, as successor Plan Administrator, effective immediately as of April 22, 2026 and Fred Stevens agreed to serve as successor Plan Administrator.

**D. The Ponzi Finding**

76. Pursuant to the *Order Confirming the Plan*, dated February 11, 2026 [Docket No. 401], the Bankruptcy Court found for the reasons stated therein that Prime Capital "was an advance pay/Ponzi scheme since its formation". See id., at p.16. That order is now final and unappealable. Accordingly, the Ponzi scheme presumption applies to Prime Capital.

77. Under the Ponzi scheme presumption, transfers made by Prime Capital, the Ponzi scheme operator, are presumed to have been made with actual fraudulent intent. See, e.g., *Donell v. Kowell*, 533 F.3d 762 (9th Cir. 2008); *In re Manhattan Inv. Fund Ltd.*, 397 B.R. 1 (S.D.N.Y. 2007).

**E. The Criminal Convictions of Roglieri, Humphrey, and Snyder, and Related Forfeiture**

***(i) Roglieri – Criminal and Civil Forfeiture Cases***

78. On May 28, 2024, the United States of America (the "Government") filed a sealed criminal complaint against Kris Roglieri alleging probable cause exists for charging Roglieri with wire fraud committed in violation of 18 U.S.C. § 1343, commencing the case of *United States of America v. Kris Roglieri*, Case No. 24-MJ-261 (CFH) (N.D.N.Y.) (the "USA v. Roglieri").

79. On May 31, 2024, Roglieri was arrested by the Federal Bureau of Investigation, and on June 3, 2024, the District Court ordered Roglieri's detention without bail pending trial in

the case [Id. at Docket No. 11].

80. On September 19, 2024, a federal grand jury returned an indictment charging Roglieri with five counts of wire fraud in violation of 18 U.S.C. § 1343.

81. On October 22, 2024, the Government commenced a civil forfeiture case against certain property that it alleged was the proceeds of Prime Capital's principals' criminal activity under the caption *United States of America v. One 2003 Ferrari Enzo AB Version E, et al.*, Case No. 24-cv-1345 (MAD/DJS) (N.D.N.Y.) (the "Civil Forfeiture Case"). The following property was named in the Civil Forfeiture Case through the original and amended complaints much of which was included in the criminal forfeiture claims asserted by the Government in USA v. Roglieri:

a. One 2003 Ferrari Enzo AB Version E, VIN #: ZFFCZ56B000132659;

b. One 2014 Ferrari LaFerrari, VIN #: ZFF76ZHB000203166;

c. One 2022 Mercedes Benz, VIN #: W1NYC8AJXNX445045;

d. One 1982 Mercedes Benz 500SL, VIN #: WDB10704612001675;

e. One 1989 Mercedes Benz 560 SEL, VIN #: WDB1260391A497466;

f. One 2007 Mercedes Benz SLR McLaren, VIN #: WDDAJ76F27M001391;

g. One 1987 Mercedes Benz 560, VIN #: WDB1260451A315331;

h. One 2004 Porsche Carrera, VIN #: WP0ZZZ98Z4L000069;

i. One 2022 Ferrari 812 Competizione, VIN #: ZFF03TLA5N0277054;

j. One 2020 Mercedes Benz GT63C4S, VIN #: WDD7X8KB3LA012445;

k. One 2006 Maserati MC 12 Corse, VIN #: ZAMDF44B000029626;

l. One 2023 Mercedes Benz, VIN #: W1K6X7KB5PA204980;

m. One Ferrari Engine Table;

n. $223,365.00 in U.S. currency seized from Thread Bank Account ending 7554 held in the name of ABBJ, LLC;

o. $467,810.00 in U.S. currency seized from Thread Bank Account ending 1832 held in the name of Capital Investments US, LLC;

p. Refund in the amount of $72,825.83 in U.S. Currency seized from Ai Design;

q. One Richard Mille RM011 Watch with serial number 2722;

r. One Richard Mille RM 65-01 Watch;

s. One Rolex Watch, Serial Number: Y74R6549;

t. One Rolex Watch, Serial Number: 7P65S042;

u. One Rolex Watch, Serial Number: 0WU66577;

v. One Rolex Watch, Serial Number: 65R11547;

w. One Rolex Watch, Serial Number: 8S927086; and

x. Real property commonly known as 600 Linkhorn Drive, Virginia Beach, VA 23451

(collectively, the "Forfeiture Property").

82. By plea agreement dated November 13, 2025, Roglieri pled guilty to one count of conspiracy to commit wire fraud in violation of 18 U.S.C. §§ 1349, 1343, and submitted to the forfeiture of all Forfeiture Property plus entry of a money judgment in favor of the Government of $55,484,674.84 (the "Roglieri Plea") [USA v. Roglieri at Docket No. 90].

83. Among other things, Roglieri admitted that Prime Capital never secured a proven, demonstrated or realized source of loan funding, and that he "and his co-conspirators used ICA payments from newer borrower clients to partially fund loans to, and to refund ICA payments to older borrower clients" [Id. at ¶5(g)]. Roglieri further admitted that he "also drew on ICA payments to pay his own personal debts (including money owed to the Internal Revenue Service),

enrich himself, and purchase million-dollar vehicles, luxury watches and jewelry, and domestic and international travel by private jet. . . and to pay Humphrey, Snyder, and [an unidentified] Individual-1" [Id.].

84. On April 3, 2026, Roglieri was sentenced to 97 months in federal prison and is currently serving that sentence.

***(ii) Humphrey – Criminal Case***

85. By plea agreement dated June 10, 2025, filed at or around the same time as the commencement of *United States of America v. Kimberly Humphrey a/k/a Kimberly Owen*, Case No. 25-cr-238 (MAD) (N.D.N.Y.) ("USA v. Humphrey"), Humphrey pled guilty to two counts of conspiracy to commit wire fraud in violation of 18 U.S.C. §§ 1349, 1343, and one count of health care fraud in violation of 18 U.S.C. § 1347, and consented to entry of a judgment directing the defendant's payment of restitution in full to any person or entity who qualifies as a victim of Prime Capital under 18 U.S.C. § 3663 or § 3663A (the "Humphrey Plea") [Id. at Docket No. 4].

86. Humphrey is currently awaiting sentencing with a sentencing hearing currently scheduled for October 28, 2026.

***(iii) Snyder – Criminal Case***

87. By plea agreement dated May 16, 2025, filed at or around the same time as the commencement of *United States of America v. Christopher Snyder*, Case No. 25-cr-195 (MAD) (N.D.N.Y.) ("USA v. Snyder"), Snyder pled guilty to one count of conspiracy to commit wire fraud in violation of 18 U.S.C. §§ 1349, 1343, and consented to entry of a judgment directing the defendant's payment of restitution in full to any person or entity who qualifies as a victim of Prime Capital under 18 U.S.C. § 3663 or § 3663A (the "Snyder Plea") [Id. at Docket No. 4].

88. On April 16, 2026, Snyder was sentenced to 15 months in federal prison and is currently serving that sentence.

**F. Defendants' Legal Obligations and Establishment of the Berone Accounts**

***(i) Defendants' Know Your Customer Duties Under Federal Law***

89. Congress established the Federal Financial Institutions Examination Council ("FFEIC") in 1979. FFEIC is an interagency body comprised of the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the National Credit Union Administration, the Office of the Comptroller of the Currency, and the Consumer Financial Protection Bureau. FFEIC prescribes uniform principals, standards, and report forms for the federal examination of financial institutions and makes recommendations to promote uniformity in the supervision of financial institutions.[29]

90. The FFEIC Bank Secrecy Act (BSA)/Anti-Money Laundering (AML) Examination Manual provides guidance to examiners for carrying out BSA/AML and Office of Foreign Assets Control ("OFAC") examinations. An effective BSA/AML compliance program requires sound risk management; therefore, the manual also provides guidance on identifying and controlling risks associated with money laundering and terrorist financing. The manual contains an overview of BSA/AML compliance program requirements, BSA/AML risks and risk management expectations, industry sound practices, and examination procedures. The development of the manual was a collaborative effort of the federal and state banking agencies and the Financial Crimes Enforcement Network ("FinCEN"), a bureau of the U.S. Department of the Treasury, to ensure consistency in the application of the BSA/AML requirements.[30]

91. The BSA was designed to help identify the source, volume, and movement of currency and other monetary instruments transported or transmitted into or out of the United States

[29] See Mission | FFIEC, https://www.ffiec.gov/about/mission (last visited Aug. 27, 2026).
[30] See 2014 FFIEC Bank Secrecy Act/Anti-Money Laundering Examination Manual, https://bsaaml.ffiec.gov/manual (last visited Aug. 27, 2026).

or deposited in financial institutions. The statute sought to achieve that objective by requiring individuals, banks, and other financial institutions to file currency reports with the U.S. Department of the Treasury (U.S. Treasury), properly identify persons conducting transactions, and maintain a paper trail by keeping appropriate records of financial transactions. These records enable law enforcement and regulatory agencies to pursue investigations of criminal, tax, and regulatory violations, if warranted, and provide evidence useful in prosecuting money laundering and other financial crimes.[31]

92. The federal banking agencies require each bank under their supervision, like RBC, to establish and maintain a BSA compliance program.

93. RBC Capital is a member of FINRA and subject to FINRA Rule 3310 which requires it to develop and implement a written BSA/AML compliance program reasonably designed to achieve and monitor the firm's compliance with the BSA. RBC Capital's BSA/AML compliance requirements are further mandated by SEC Rule 17a-8.= (17 CFR § 240.17a-8).

94. In accordance with the USA PATRIOT Act, FinCEN's regulations require certain financial institutions to establish an AML compliance program that guards against money laundering and terrorist financing and ensures compliance with the BSA and its implementing regulations.

95. As part of a strong BSA/AML compliance program, the federal banking agencies, the SEC, and FINRA, seek to ensure that financial institutions have policies, procedures, and processes to identify and report suspicious transactions to law enforcement.

96. Financial institutions must be able to identify and take appropriate action once put on notice of any of a series of anomalies in account behavior or "red flags" that could indicate

---

[31] See Id.

unusual or suspicious activity.

97. FFIEC has identified an extensive list of BSA and AML red flags.[32]

98. Each of the Defendants was required to, and did in fact, establish and maintain a BSA/AML compliance program at all relevant times.

99. In order to fulfill their obligations, the Defendants utilized sophisticated account activity monitoring systems to identify banking transactions or patterns that reflect anomalies or raise "red flags" indicative of potentially improper or illegal activity.

100. A core aspect of the Defendants' anti-money laundering compliance, as required by federal law, is KYC (or Know Your Customer).

101. KYC refers to the process the Defendants (and other financial institutions) follow to verify the identity of its customers, assess their risk profile, and monitor their transactions upon account opening and throughout the banking relationship.

102. KYC is a vital tool for detecting and preventing illicit activities such as financial

---

[32] The FFEIC examples of potentially suspicious activities, or "red flags", include (but are not limited to):

1. Customer uses a personal account for business purposes.
2. Customer has established multiple accounts in various corporate or individual names that lack sufficient business purpose for the account complexities or appear to be an effort to hide the beneficial ownership from the bank.
3. The customer's background differs from that which would be expected on the basis of his or her business activities.
4. Many funds transfers are sent in large, round dollar, hundred dollar, or thousand dollar amounts.
5. Funds transfer activity is unexplained, repetitive, or shows unusual patterns.
6. Payments or receipts with no apparent links to legitimate contracts, goods, or services are received.
7. Funds transfers are sent or received from the same person to or from different accounts.
8. Unusually high level of transactions initiated over the Internet or by telephone.
9. The currency transaction patterns of a business show a sudden change inconsistent with normal activities.
10. A large volume of cashier's checks, money orders, or funds transfers is deposited into, or purchased through, an account when the nature of the accountholder's business would not appear to justify such activity.
11. A retail business has dramatically different patterns of currency deposits from similar businesses in the same general location.
12. Unusual transfers of funds occur among related accounts or among accounts that involve the same or related principals.
13. Goods or services purchased by the business do not match the customer's stated line of business.
14. Payments for goods or services are made by checks, money orders, or bank drafts not drawn from the account of the entity that made the purchase.
15. Loans are made for, or are paid on behalf of, a third party with no reasonable explanation.

crimes, money laundering, and other illegal activities.

103. The four primary objectives of KYC are: 1) customer identification; 2) risk management; 3) regulatory compliance; and 4) trust building to prevent financial crimes and ensure the economic system's integrity.

104. At all relevant times hereto, each Defendant's KYC process consisted of several legally required steps including:

a. **Customer onboarding**: When a new customer established a relationship with a Defendant, the Defendant was required to collect and verify the customer's identification and other relevant information.

b. **Customer Identification Program ("CIP")**: Under the CIP, each Defendant was required to collect basic customer information (such as name, date of birth, address, and identification number). Each Defendant was also required to verify the customer's identity by comparing the provided information with documents (e.g., passports, driver's license, or Social Security card). With this information, the Defendant would determine whether the customer appeared on any government sanction lists (e.g., watchlists, blacklists, Blocked Persons List, Financial Action Task Force Lists, Transparency Index lists, State Sponsors of Terrorism list, etc.). The Defendant then runs the information through a reporting agency, checks prior bank references, and obtains (i) a financial statement for the business; (ii) a description of the customer's principal line of business; (iii) a list of major suppliers and customers and their geographic locations; (iv) a description of the business's primary trade area, and whether international transactions are expected to be routine; and (v) a description of the business operations (i.e., retail versus

wholesale), and the anticipated volume of cash sales.

c. **Customer Due Diligence ("CDD")**: Each Defendant was required to understand the purpose and nature of the business relationship with its customers. Among other things, each Defendant had to determine the types of products and services the customer was interested in, the expected transaction volume, and the reasons for establishing the relationship. The CDD process involved collecting more detailed information about the customer, including their financial history, source of funds, and the intended nature of their business relationship. This process helped each Defendant assess the risk associated with the customer and determine if they were involved in illicit activities.

d. **Enhanced Due Diligence ("EDD") for High-Risk Customers**: When a Defendant conducted EDD, it was required to perform background checks, conduct additional document verification, and conduct heightened scrutiny of account activity on an ongoing basis. This included investigating the reasons for such account activity and, if necessary, filing Suspicious Activity Reports with relevant law enforcement authorities.

e. **Ongoing Monitoring**: The Defendants were required to scrutinize customer transactions on an on-going basis to detect unusual patterns or activities that may indicate money laundering, terrorist financing, or other financial crimes. Each Defendant was required to have systems in place to identify and flag such transactions for further investigation. Each Defendant was required to continuously monitor its customers' transactions and activities to ensure they remained compliant with regulations and that their risk profile remained unchanged. This

involved reviewing account activity, conducting periodic reviews, and updating customer information. Each Defendant was required to be on the lookout for activity that was disproportionate to the customer's known business.

***(ii) RBC Capital's KYC Process and Onboarding of Berone***

105. On or around November 5, 2021, Berone entered into an Investor Advisor Service Agreement with RBC Capital division RBC Advisor Services for the purpose of opening accounts for Berone's "customers" at RBC Capital in connection with Berone's purported business of advising customers with respect to investments in the securities markets and facilitating customers' purchase and sale of securities. The agreement annexed a pricing schedule for common fees charged by RBC Capital in connection with the execution of equity, fixed income, options, and mutual fund trades, among other activities.

106. On December 17, 2021, Beguesse executed a "Certification of Investment Powers" certifying his ability to bind Berone Capital with respect to transactions with RBC Capital.

107. On February 4, 2022, Beguesse and Stone signed on behalf of Berone a: (i) "New Account Application" for an investor advisor account at RBC Capital; and (ii) "Certification of Investment Powers" declaration for RBC Capital wherein they indicated that Berone may enter into borrowing transactions with RBC Capital and may grant a security interest in an account in favor of RBC Capital with the noted account no. 9G6-0001.

108. On Berone Capital's New Account Application, it was named as the "Advisor" with a listed address of 3595 Canton Rd., Ste. 312-223, Marietta, Georgia 30066, a UPS Store in a strip mall in Marietta, Georgia:




109. The account applied for was under the umbrella of Berone Capital as advisor but was for the Berone Fund as a client of Berone Capital. The legal address given for the Berone Fund where RBC Capital did not permit the use of PO boxes was 530 Delphinium Way, Acworth, Georgia 30102, a personal residence owned by Stone's parents, Byron and Lishia Stone:



110. The new account application contained an employment identification number for the Berone Fund, a telephone number, and Stone's birthdate and social security number. The application contained almost no information and there is no indication that RBC Capital had conducted additional due diligence regarding Berone Capital or the Berone Fund including requesting or obtaining any of the following: (i) financial statements for the businesses; (ii) a description of the customer's principal line of business; (iii) a list of major customers and their

geographic locations; (iv) a description of the business's primary trade area, and whether international transactions are expected to be routine; or (v) a description of the business operations and the anticipated volume of cash sales.

***(iii) Establishment and Early Use of Berone's RBC Accounts***

111. Two accounts were opened at RBC Capital for Berone in or around May 2022 as follows:

a. A "Settlement Ledger" account for Berone Capital under Account No. 9G6-99750 (the "Berone RBC Settlement Account") with a mailing address at the UPS Store; and

b. An advisor account for the Berone Fund with Berone Capital as advisor under Account No. 9G6-00011 (the "Berone RBC Account") with a mailing address at Stone's parents' house.

112. The Berone RBC Account received its first deposit of $1,000,000 on May 3, 2022 from an unknown source. Over the next four months, Berone transferred over $600,000 of the initial deposit to other bank accounts in its own name as follows:

| Date | Transferee | Amount | Stated Purpose |
|---|---|---|---|
| 06/06/2022 | Berone Fund<br>Signature Bank Account | $350,000.00 | ADMINISTRATIVE + MARKETING PURCHASES |
| 07/08/2022 | Berone Capital<br>Signature Bank Account | $120,000.00 | 3rd Q OPERATIONAL COSTS |
| 09/27/2022 | Berone Capital<br>Signature Bank Account | $144,679.45 | Operational Expenses |

**G. The Berone/Reign Fraud and Illicit Use of the Berone RBC Account**

***(i) Hooking Roglieri – The Berone/Reign Parties Got Prime Capital's $20 Million***

113. Mills is or was the COO of Reign. Mills was at one point a licensed attorney in the State of Florida. In 2008, Mills was disbarred following a felony conviction for one count of

conspiracy to commit bank fraud in violation of 18 U.S.C. § 1349 in the matter of *United States of America v. Gary Mark Mills*, Case No. 07-cr-20773 (S.D.F.L. Jan. 24, 2008).

114. According to Roglieri, Mills had previously enrolled in Roglieri's training course and was "promoting private placement investment opportunities on LinkedIn." Roglieri claims that he contacted Mills for the purpose of obtaining access to capital in order to fund the loans being promised to clients by Prime Capital, and that Mills represented that he could help Prime Capital access funds but would require $20 million in deposits by Prime Capital as a minimum threshold to access Reign's "trading platform".

115. Prime Capital and Reign entered into a "Joint Venture Agreement", dated as of September 28, 2022 (but purportedly signed on September 20, 2022) (the "Reign Joint Venture"), pursuant to which Prime Capital would commit $20 million to an account with a hedge fund and the parties would create a joint venture and that Reign would be "authorized to enter into Private Placement contracts, . . . , under [Reign's] name to facilitate and assist in the process of entering into an investment structure or facilitate a private placement investment opportunity".

116. At the same time as entry into the Reign Joint Venture, Prime Capital, Reign, and Aaron Etra ("Etra") entered into an escrow agreement dated September 28, 2022 (the "Etra Escrow Agreement"), pursuant to which, Etra would serve as an escrow agent with respect to the joint venture.

117. Prime Capital and Reign then entered into a "Trade Agreement for Prime Capital Ventures, LLC No. PCV-RFI-20M-092022", dated October 2, 2022 (the "Reign Trade Agreement"). The Reign Trade Agreement was executed by Roglieri as CEO of Prime Capital and Johnson as CEO of Reign. Pursuant to the Reign Trade Agreement, Prime Capital was required to transfer $20 million to "the hedge fund, [Berone]. . , so that the hedge fund can provide

[Reign] the ability to create an account at BNP Paribas and take said account into the Program [defined previously as 'a financial private commercial transaction']".

118. On October 4, 2022, Johnson introduced Roglieri to a Frank Fosco for the purported purpose of obtaining lending capital for Prime Capital. In connection therewith, Fosco sent a sample agreement, dated the prior day on October 3, 2022 (the "World Film Agreement"), pursuant to which lender Quattro Capital LLC or Quattro Canti LLC (different names appear in the document), was lending $203,100,000 to a "World Film Group, LLC" and Karo was serving as the escrow agent.

119. The World Film Agreement was purportedly signed by Quattro Capital LLC by Nick Del Franco, as Chief Executive Officer. Karo was a co-debtor with Nick Del Frano among others on an amended judgment, dated December 8, 2021, in the amount of $3,001,250 entered by the Oregon Supreme Court in the matter of *Twenty Second Street LLC vs. Big Boots LLC, et al.*, Case No. 19-cv-44997 (Circuit Court of Jackson County, Oregon, Dec. 8, 2021) wherein the Court found as follows:

> The Court also specifically found that defendant **Martin Karo released funds from his law practice's IOLTA trust account on February 27, 2019 while acting as a claimed "neutral escrow" without appropriate authorization and contrary to the explicit directions of plaintiff and thereafter falsely advised Plaintiff that the funds were still in trust** and would not be released even though he had disbursed such funds to undetermined recipients. **The court described such conduct of Martin Karo as nothing less than appalling**.

Judgment, p.2 (emphasis added).

120. On October 6, 2022, Roglieri replied to Frank Fosco with a copy to Johnson, Mills, and Karo, declining to enter into any transaction and citing as reasons numerous misspellings and grammatical errors in the purported World Film Group agreement. Roglieri specifically objected to Karo's service as an escrow agent in the agreement.

121. On October 9, 2022, Stone sent an email on behalf of Berone representing that if the transaction fails, Berone will return the full $20 million to Prime Capital. On October 10, 2022, Roglieri sent an email to Stone with copy to Mills and Beguesse, requesting confirmation that if the transaction fails that the $20 million deposited will be returned within two weeks. Mills responded and confirmed that "it would be the whole $20,000,000 that is returned" and that the "timeframe of two weeks is reasonable and should be able to be accomplished."

122. On October 24, 2022, Prime Capital transferred $20 million from its Citibank Account No. **6945 to Berone at its Berone RBC Account.

***(ii) Unbeknownst to Roglieri, the Enterprise Defendants Took Prime Capital's Money***

123. Berone is "a registered investment advisor" and "owes a fiduciary duty to its clients". According to Beguesse, Prime Capital was one of Berone's clients.[33]

124. Pursuant to the Reign Trade Agreement, Berone was not allowed to withdraw Prime Capital's principal or use it for any transaction outside of Berone. Reign Trade Agreement, § 2.1.7. Berone completely ignored that prohibition almost immediately.

125. On or around October 26, 2022, two days after receiving Prime Capital's funds that were to remain in the Berone RBC Account, Berone transferred $3.4 million to its own Signature Bank Account no. ***3727 ("Berone Signature Account"), and $6 million to Karo's IOLTA account at Well Fargo Account No. ***0248 (the "Karo WF Escrow Account").

126. On October 26, 2022, Karo transferred the $6 million of Prime Capital's funds received from Berone in the Karo WF Escrow Account to Karo's IOLTA JP Morgan Chase Bank Account No. ***9032 (the "Karo Chase Escrow Account"). The Karo Chase Escrow Account had

[33] See Receivership Action, Beguesse Declaration, Dkt. No. 148-1, para. 21.

no funds or deposits at the time of receipt of the $6 million of Prime Capital's funds from Berone following transfer from the Karo WF Escrow Account.

127. According to his LinkedIn page, Karo received his bachelor's degree from Princeton University in 1984 and his law degree from University of Michigan in 1987. According to the LinkedIn page, Karo has served as "Senior Counsel" at Global Business Resource Associates since July 2011.

128. Starting on October 28, 2022 and concluding a week later on November 4, 2022, Berone used $1,572,200.50 of Prime Capital's funds transferred to the Berone Signature Account to make several luxury purchases as follows:

| Date | Transferee | Presumed Purpose | Amount |
|---|---|---|---|
| 10/28/2022 | MaxxVin LLC | Luxury Automobiles | $283,000.00 |
| 10/28/2022 | Ferrari of Central Florida Inc. | Luxury Automobiles | $281,200.50 |
| 11/01/2022 | ATL Hawks, LLC | NBA Season Tickets | $58,000.00 |
| 11/01/2022 | Jet Linx Aviation | Private Jet Travel | $100,000.00 |
| 11/04/2022 | Phoenix American Fin. Svsc. | Private Jet Travel | $850,000.00 |

129. Those transfers made by Berone for luxury purchases were not discovered until later in or around February 2024 when Compass-Charlotte and the Receiver obtained the relevant bank statements. Beguesse later explained in testimony in the Receivership Case that the "[luxury] vehicles are not utilized for personal use" and that "[t]hey were purchased as part of [Berone's] marketing efforts, as Berone markets its services to celebrity entertainers and athletes, which come with certain expectations of wealthy clients that their investment advisors are also successful."[34] Beguesse further testified that he had never flown in a private jet but that "Berone did fly a prospect on a private jet to an athletic event" because the "prospect was a first round NBA draftee who was interested in placing $7 million in investments with Berone."[35]

---

[34] See Receivership Action, Beguesse Declaration, Dkt. No. 157, para. 14.
[35] See Id. at para. 15.

130. On November 8, 2022, Berone transferred another $5.9 million from the Berone RBC Account to the Berone Signature Account. Berone included the following handwritten note on the transfer request form submitted to RBC Capital: "Bridge loan opportunity w/ Quattro Capital". Berone then immediately transferred the $5.9 million from the Berone Signature Account to the Karo Chase Escrow Account, for a total of $11.9 million transferred to the Karo escrow accounts.

131. In one of the very few online appearances, on November 9, 2022, just two weeks after Prime Capital sent the $20 million to Berone, OCC Lawyers, a law firm in the Dominican Republic, posted a video featuring Beguesse and Stone eating a lavish dinner and celebrating a closing at the seaside Jellyfish Restaurant in Punta Cana with the caption "[t]hrough this video, you will learn about the closing experience lived by Mr. Jeremiah Beguesse and Mr. Fabian Stone"[36]:

---

[36] See Punta Cana Lawyers, Royal closing Jellyfish [video], Nov. 9, 2022, https://www.youtube.com/watch?v=slkt1Y2IkyY (YouTube) at 1:07. The Berone Defendants have almost no online presence. In one of the only other examples, Beguesse and possibly Stone are featured in another OCC Lawyers video published on Dec. 31, 2024 at a "white party". See Punta Cana Lawyers, OCC Lawyers 2024 White Party: Celebrating Success & Connections [video], Dec. 31, 2024 (YouTube) at 0:29:





132. By December 16, 2022, Karo distributed almost all of the $11.9 million of Prime Capital's funds received from Berone from the Karo Chase Escrow Account in the following transfers:

| Date of Transfer | Transferor/Transferee | Amount | Karo Chase Escrow Balance |
|---|---|---|---|
| 10/27/2022 | [redacted] | | $0.00 |
| 10/28/2022 | Prime Capital/Berone | $6,000,000.00 | $6,000,000.00 |
| 10/31/2022 | Shaw Concepts LLC for "Return of Escrow For Blue Ocean" | ($300,000.00) | $5,700,000.00 |
| 10/31/2022 | Fran Karo for "Repayment of Loan" | ($140,000.00) | $5,560,000.00 |
| 10/31/2022 | Quattro Capital LLC for "My lb Brick Loan Tm" | ($5,100,000.00) | $460,000.00 |
| 11/09/2022 | Prime Capital/Berone | $5,900,000.00 | $6,360,000.00 |
| 11/10/2022 | Martin Karo – Withdrawal to checking account or cashier's check to Martin Karo | ($208,000.00) | $6,152,000.00 |
| 11/10/2022 | Martin Karo – Withdrawal to checking account | ($5,000,000.00) | $1,152,000.00 |
| 11/10/2022 | Martin Karo – Withdrawal to checking account | ($692,000.00) | $460,000.00 |
| 11/29/2022 | Poppa Gs Quality Meats for "Yumipaws Inc./Nick Del Franco OR Ron Barzila" | ($2,264.80) | $457,735.20 |
| 12/16/2022 | Martin Karo – Withdrawal to checking account or cashier's check to Martin Karo | ($455,388.22) | $2,346.98 |

133. According to testimony of Beguesse given in March 2024, the transfers by Berone to the Karo WF Escrow Account and Karo Chase Escrow Account were verbally authorized by

Roglieri.[37] Roglieri vehemently denies giving such authorization.

134. From October to December 2022, Roglieri, Stone, Mills, Beguesse, and Johnson had significant correspondence over Roglieri's failed attempts to get online access to the account where the Berone Parties and Reign Parties claimed that Prime Capital's funds were held. Stone, Mills, Beguesse, and Johnson provided myriad excuses for the inability to provide Roglieri with the access.

***(iii) Highly Suspicious Activity Related to the Fraud Was Ignored by RBC Capital***

135. The $20 million received from Prime Capital into the Berone RBC Account on October 24, 2022, was twenty times (20X) the total amount ever deposited into the account before.

136. The Berone RBC Account was an investment advisor account and as such, it was created for the stated purpose of Berone Capital "advising customers with respect to investments in the securities markets and facilitating customers' purchase and sale of securities". Investor Advisor Service Agreement (Nov. 5, 2021). In reality, the Berone RBC Account was only used for minimal securities markets transactions. As set forth in detail below, the Berone RBC Account was used simply as a cash pass-through operation where the volume of wire transfers from the account for reasons completely inconsistent with a investor advisory account at a broker dealer dwarfed the amount of any facially legitimate securities transactions.

137. Prime Capital's funds were transferred by Berone in several transfers that were highly irregular and classic "red flags". Berone transferred over $15 million of the $20 million almost immediately as follows:

---

[37] See Receivership Action, Beguesse Declaration, Dkt. No. 157, para. 12.

| Date | Transferee | Amount | Stated Purpose |
|---|---|---|---|
| 10/27/2022 | Berone Capital<br>Signature Bank Account | $3,400,000.00 | NO STATED PURPOSE |
| 10/27/2022 | Karo WF Escrow Account | $6,000,000.00 | Joint Investment w/ Reign Capital |
| 11/08/2022 | Karo Chase Escrow Account | $5,900,000.00 | Bridge loan opportunity w/ Quattro Capital |
| 01/23/2023 | Escrow Agent for Alexander Capital Ventures, LLC Series Delta-2 Interests | $500,000.00 | FOR BERONE CAPITAL FUND LP PURCHASE OF PRIVATE EQUITY INTERESTS (TEVVA) |
| 03/16/2023 | Phoenix American Financial Services as Trustee for LHL Strategies | $1,700,000.00 | SERIES B PREFERRED PURCHASE |
| 03/20/2023 | Alexander Capital Ventures, LLC Series Alpha-2 Interests | $500,000.00 | PURCHASE OF PRIVATE EQUITY INTEREST (INSTA CART) |
| 04/26/2023 | Berone Capital<br>Signature Bank Account | $257,000.00 | Operational Expenses |
| 08/01/2023 | Berone Capital<br>Signature Bank Account | $10,000.00 | Operational Expenses |
| 08/03/2023 | Bois D'Arc | $50,000.00 | INITIAL CAPITAL CONTRIBUTION TO BOIS D'ARC |
| 08/08/2023 | Late Stage Investment Fund XLVI LLC | $100,002.50 | CAPITAL ALLOCATION TO TRILLER IPO |

138. The foregoing transfers are highly suspicious and classic "red flags" under the FFEIC for an investor advisor account for at least the following reasons:

a. An investor advisor account with a broker-dealer, is typically used to hold, clear, settle, and transact in securities within the account, and not a single one of the foregoing transfers is for that purpose;

b. The $20 million deposit from Prime Capital was from a third party with which Berone had no prior relationship and in an amount that was twenty times (20x) the amount that had ever been deposited before;

c. Three days after receipt of the $20 million from Prime Capital, Berone sent by wire transfer the round number of $3.4 million to its own outside account and did not

provide any purpose on the transfer request form[38];

d. Also three days after receipt of the $20 million from Prime Capital, Berone sent by wire transfer the round number of $6 million to the Karo WF Escrow Account for the vague stated purpose of "Joint Investment w/ Reign Capital"[39];

e. Just two weeks after receipt of the $20 million from Prime Capital, Berone sent by wire transfer the round number of $5.9 million to the Karo Chase Escrow Account, which is the same lawyer but a second escrow account from the one used just two weeks prior, for the vague stated purpose of "Bridge loan opportunity w/ Quattro Capital"[40];

f. In 2023, Berone sent in a series of wire transfers just over $3.1 million for what appear to be private equity or securities transactions outside of the trading platform provided by RBC Capital[41]; and

g. In numerous instances Beguesse signed wire transfer forms as both the client and financial advisor attestor eliminating any pretense that there were internal controls or segregation of duties in or between Berone Capital and the Berone Fund.[42]

---

[38] FFEIC red flags nos. 4 and 5 (Large transfers in round dollar amounts for unexplained reasons); nos. 6 and 7 (no links to legitimate contracts/goods/services; transfers to/from same person via different accounts).
[39] Id.
[40] Id.
[41] Id.; Account misuse inconsistent with stated purpose.
[42] Beguesse signed the following wire transfer forms as both client and financial advisor attestor:

| Wire Amount | Date | Client Signer | FA Attestor | Purpose |
|---|---|---|---|---|
| $3,400,000 | 10/27/2022 | Beguesse | Beguesse | (blank — no purpose given) |
| $144,679.45 | 9/27/2022 | Beguesse | Beguesse | "Operational Expenses" |
| $120,000 | 07/08/2022 | Beguesse | Beguesse | "3rd Q Operational Costs" |
| $500,000 | 01/25/2023 | Beguesse | Beguesse | "Purchase of Private Equity Interests (Tevva)" |
| $500,000 | 03/20/2023 | Beguesse | Beguesse | "Purchase of Private Equity Interest (Instacart)" |
| $257,000 | 04/26/2023 | Beguesse | Beguesse | "Operational Expenses" |
| $1,865,000 | 10/16/2023 | Beguesse | Beguesse | "Capital Distribution" |
| $1,700,000 | Undated | Beguesse | Beguesse | "Phoenix American FBO LHL Strategies" |

139. RBC Capital elected to do nothing about this highly suspicious activity while continuing to earn interest, fees, and commissions in connection with Berone's accounts.

140. Beguesse's routine signing of wire transfer forms as both client and advisor violated RBC Capital's own protocol. The purpose of the two signatures is to ensure that an independent party at the advisory firm (Berone Capital) authenticated the client's identity and signature (Berone Fund). RBC Capital's wire form design mirrors the BSA/AML principal that financial institutions must have systems in place to identify and flag unusual transactions for further investigation, and that no single individual should be able to unilaterally direct the movement of funds without independent oversight. By signing in both places, Beguesse was certifying that he verbally confirmed with himself that his own wire instruction was genuine, eliminating the entire purpose of the verbal-verification requirement – to catch unauthorized or fraudulent disbursements through an independent check.

141. By processing numerous wires where Beguesse was signing as both the client and the advisor, most of which tripped two or more FFEIC red flags, RBC Capital became an active participant in the fraud against Prime Capital permitting Berone to transfer out a majority of Prime Capital's $20 million in just days.

***(iv) Berone was Using the Berone RBC Account to Operate a Clear Pass-Through Money Laundering Scheme With the Proceeds of its Fraud***

142. A pass-through scheme uses an account as a waystation: money arrives, sits briefly, and is forwarded elsewhere, with the account serving as a laundering layer that creates distance between the source and the ultimate destination. The round-dollar pattern of wire transfers out of

| | | | | |
|---|---|---|---|---|
| $100,002.50 | ~03/2023 | Beguesse | Beguesse | "Capital Allocation to Triller IPO" |
| $5,900,000 | 11/08/2022 | Beguesse | Beguesse | (to Berone Capital Fund LP at Signature Bank) |

the Berone RBC was consistent with this structure because: (i) the critical deposit was $20 million from Prime Capital, a single, round-number inbound transfer that was twenty (20x) times the amount that had ever been deposited in a Berone account before; and (ii) the outbound flows were rapid, round, and almost entirely consumed the inbound deposit where within two weeks, $15.3 million of the $20 million deposit was gone.

143. Any trading activity in the Berone RBC Account, which was supposed to be the account's primary purpose, was a veneer and not the account's primary function. While the round-dollar wire transfers were moving millions out of the account, the on-platform securities trading, what the account was supposed to be used for, was dramatically smaller scale. The securities trading, denominated in the irregular amounts characteristic of genuine market activity, was a fraction of the round-dollar wire volume. RBC Capital or any financial institution could tell precisely what the account was being used for.

144. Further, the round-dollar wires correlated with non-brokerage recipients with most of Prime Capital's funds being sent to Berone's own account ($3.4 million), the Karo WF Escrow Account ($6 million), the Karo Chase Escrow Account ($5.9 million), Phoenix American Financial Services ($1.7 million), Alexander Capital Ventures LLC (two transfers of $500k), an individual named Matthew Cummings ($50k), and Bois D'Arc ($50k). In a legitimate brokerage context, cash leaves an account to settle securities purchases – and those settlements occur within the broker-dealer's own clearance and settlement infrastructure, not by outbound wire to third-party bank accounts. The pattern makes clear that the money was never meant to stay and be invested; it was meant to pass through the brokerage on its way to its real destination.

145. RBC Capital had clear proof that the wire amounts were not generated by market activity, the wires reflect pre-arranged cash movements, not investment executions, the Berone

RBC Account was being used primarily as a cash conduit, the Berone RBC Account was being used to create laundering layers, and the pattern matched numerous recognized BSA/AML red flags. Still, RBC Capital permitted Berone to operate its fraudulent enterprise from the Berone RBC Account.

***(v) Prime Capital Realized Something was Wrong and Demanded its Money Back***

146. During January 2023, Roglieri made repeated demands to Reign and Berone to terminate the transaction and return the $20 million. On January 25, 2023, Mills assured Roglieri by email that "[w]e will begin the process of unwinding everything and as soon as we are finished and Berone can return the capital, they will."

147. Beguesse and Stone made repeated misrepresentations to Roglieri regarding Prime Capital's $20 million. In sum, Beguesse and Stone represented that Berone had in fact sent the funds to the Karo WF Escrow Account but that the transfer was actually on account of funds borrowed by Reign and collateralized with Prime Capital's deposits in the Berone RBC Account or a Prime Capital subaccount thereof. In this way, Berone could fraudulently represent that Prime Capital's $20 million was still on deposit in the Berone RBC Account but provide an excuse for why Berone could not access and return the funds to Prime Capital.

148. To support its false claim, Berone, by and through Beguesse and Stone, doctored bank statements for the Berone RBC Account to show that Prime Capital's funds were still largely intact when in fact, the funds had been transferred. Beguesse and Stone then transmitted those falsified statements for all periods from November 1, 2022, to September 30, 2023, to Roglieri and Prime Capital via email.

***(vi) Prime Capital Sued the Reign Parties (but not the Berone Parties)***

149. Relying on the falsified bank statements and misrepresentations made by Beguesse and Stone, Roglieri appears to have believed the false claims and concluded that only Reign,

Reign's principals, and Karo were at fault for Prime Capital being unable to access its funds.

150. On or around February 10, 2023, Prime Capital retained the law firm of Girvin Ferlazzo, PC to assist in getting its funds back. On or around February 12 or 13, 2023, Prime Capital's attorney, Daniel Rubin of Girvin Ferlazzo, PC, had a conversation regarding Prime Capital's claims against Reign with Juan Carlos A. Marquez ("Marquez"), an attorney purporting to be "General Counsel" to Reign according to his email signature block from his juancarlosmarquez-gc@reignfi.com email address.

151. On February 13, 2023, Marquez sent an email to Daniel Rubin and represented that "Reign had taken a margin on its account, and circumstances beyond Reign's control and knowledge resulted in the blockage [that has prevented Reign from releasing the purported lien on Prime Capital's funds]". Marquez represented that "[t]he release of the capital on Tuesday should allow Berone Capital to arrange for the return of Prime Capital's funds." Marquez did not disclose that Prime Capital's funds had actually been transferred out of the Berone RBC Account, that Karo had already disbursed the $11.9 million that he had received from the Karo WF Escrow Account and Karo Chase Escrow Account, or any other relevant information.

152. According to his LinkedIn page, Marquez received his JD from Georgetown University in 1991 and that he has been the "Interim Chairman" or Reign Global Holdings, B.V. since September 2023. In addition, Marquez maintains an office for the practice of law at the Marquez Intellectual Property Law Office with offices at 1629 K Street, NW Ste 300, Washington, DC 20006.

153. On February 15, 2023, Prime Capital commenced an action captioned *Prime Capital Ventures, LLC v. Reign Financial International, Inc., Giorgio Johnson, Gary Mills and Martin Karo*, in the United States District Court for the Northern District of New York under Civil

Case no. 23-cv-00207 (FJS/DJS) ("Prime v. Reign").

154. On or around June 12, 2023, the defendants in Prime v. Reign filed a motion to dismiss the complaint or to compel arbitration pursuant to the terms of the Reign Joint Venture and/or the Reign Trade Agreement. That motion has been fully submitted and the Prime v. Reign case has been stagnate without progress or discovery since that time.

**H. Prime Capital Opened its Own Account at RBC Capital Under the Berone Umbrella Which Prime Capital Used in its own Fraud**

155. The allegations made by Prime Capital in its pleadings filed in the Prime v. Reign case repeat the misrepresentations made by Berone to Prime Capital. It appears that Prime Capital believed Berone's lies and falsified bank statements showing that Prime Capital's funds were still intact in the Berone RBC Account. Accordingly, Roglieri continued to correspond and try to do business with the Berone Parties after the commencement of Prime v. Reign.

156. Text conversations between Roglieri, Humphrey, Gregory Caito, an internal attorney purporting to represent Prime Capital ("Caito"), Beguesse and Stone, over the course of March to September, 2023, consistently demonstrate that Beguesse and Stone made repeated false claims about Prime Capital's funds, access to capital, access to a Bloomberg terminal, and other things, in order to obfuscate the fraud and buy time.

***(i) RBC Capital's KYC Process and Onboarding of Prime Capital***

157. Starting in June 2023, Berone worked with Prime Capital to establish an investment advisor account for Prime Capital at RBC Capital under the Berone Capital advisor umbrella, like the Berone Fund's Berone RBC Account where Prime Capital's $20 million had been deposited. Berone's advisor account for Prime Capital was assigned account no. 9G6-00017 (the "Prime Capital RBC Account").

158. The application for the Prime Capital RBC Account was signed by Roglieri on

behalf of Prime Capital and Beguesse as Prime Capital's Financial Advisor.

159. At the time of obtaining the Prime Capital RBC Account under the Berone umbrella, Berone had already dissipated all but around $2.2 million of Prime Capital's $20 million deposited less than a year before in a series of suspicious transactions as set forth above.

160. The new account application contained an employment identification number for Prime Capital, a telephone number, and Roglieri's birthdate, social security number, and home address. In addition, RBC Capital obtained a photocopy of Roglieri's passport, and a copy of a purported Operating Agreement for Prime Capital, which was undated and unsigned. The application contained almost no information and there is no indication that RBC Capital had conducted additional due diligence regarding Prime Capital (or its purported investment advisor, Berone Capital) including requesting or obtaining any of the following: (i) financial statement for the businesses; (ii) a description of the customer's principal line of business; (iii) a list of major customers and their geographic locations; (iv) a description of the business's primary trade area, and whether international transactions are expected to be routine; or (v) a description of the business operations and the anticipated volume of cash sales.

***(ii) Prime Capital Uses the Prime Capital RBC Account to Defraud ER Tennessee***

161. On September 21, 2023, ER Tennessee LLC ("ER Tennessee") funded an ICA Deposit for prospective borrower 1322 Developments, LLC ("1322"), by transferring $14,250,000.00 ($15 million ICA Deposit less $750,000 in agreed fees) to Prime Capital's RBC Account (the "ER Funds").

162. Prime Capital converted the ER Funds for its own use. On September 26, 2023, only five days after receipt of the ER Funds, Prime Capital transferred $7 million of the ER Funds to its own account at Farmers State Bank and subsequently transferred those funds to third parties. On the "Request for Domestic Wired Funds", Prime Capital stated that the purpose of the

transaction was "RETURN OF FUNDS", although the transfer was clearly just a transfer from one Prime Capital account to another.[43] The request was signed by both Roglieri and Beguesse on behalf of Berone Capital as Prime Capital's "Financial Advisor".

***(iii) The Highly Suspicious RBC Prime Capital Loan***

163. After Prime Capital's near immediate transfer of $7 million of the $14.25 million in ER Funds that were deposited into the Prime Capital RBC Account, Prime Capital was left with only $7.25 million.

164. On October 3, 2023, Prime Capital applied for a $6 million line of credit with RBC and pledged the approximately $7.25 million in ER Funds still in the Prime Capital RBC Account as security for the loan.

165. Virtually nothing was completed on the Line of Credit Application filled out and signed by Roglieri on behalf of Prime Capital. The stated purpose of the loan according to the application was "General liquidity purposes".

166. RBC accepted the pledge and granted the line of credit no. 485037 (the "RBC LOC"). The RBC LOC agreement was signed by Roglieri on behalf of Prime Capital, Brent Bizyak, WM Head of Credit, North America, on behalf of RBC, and Joseph Luino, Head of Lending Services, on behalf of RBC Capital. The RBC LOC was collateralized by the "securities, commodities, and other property now or hereafter held, carried, or maintained in the securities accounts" including the Prime Capital RBC Account.

167. Although the RBC LOC application was dated October 3, 2023, an internal document produced by RBC titled "ETR – BASIC REPORT" was stamped submitted on

[43] FFEIC red flags nos. 4 and 5 (Large transfers in round dollar amounts for unexplained reasons); nos. 6 and 7 (no links to legitimate contracts/goods/services; transfers to/from same person via different accounts).

September 27, 2023 with respect to the RBC LOC. In that document, RBC indicated that KYC [Know Your Customer] analysis was "Current & Complete" for Prime Capital. In fact, there was no indication that RBC had conducted any meaningful KYC analysis or made any of the following important inquiries: (i) what Prime Capital's business was; (ii) why Prime Capital would open an account under the Berone umbrella; or (iii) why Prime Capital would take the RBC LOC for "liquidity purposes" and simply borrow against its own cash at a rate of over 7%.

168. At the time of entry into the RBC LOC, Prime Capital, a company with only a single shareholder that was not even two years old at the time, was already a defendant in multiple lawsuits including, among others: (i) Truss Financial LLC v. Prime Capital, et al., Index No. 2023/510389 (N.Y.Sup. Ct. Kings Cty. Apr. 5, 2023) (seeking and subsequently obtained the return of $13.4 million); (ii) B&R Acquisition Partners v. Prime Capital (JAMS Arb., Aug. 2023) (seeking return of $4.3 million); (iii) Sturm v. Prime Capital, Case No. 23-cv-1033 (N.D.N.Y. Aug. 22, 2023) (seeking return of $2 million); (iv) Camshaft CRE 1, LLC v. Prime Capital, Case No. 2023-023173 (Fla. Circ. Ct., Miami-Dade Cty., Sept. 15, 2023) (seeking return of $12.4 million); and (v) The Lion Group DFW, LLC v. Prime Capital, Case No. 23-DCV-34617 (Tex. Dist. Ct., 146th Dist., Sept. 21, 2023).

169. According to the "Statement of Purpose for an Extension of Credit Secured by Margin Stock—FR U-1" completed by Prime Capital and executed by Roglieri and Ashley Johnson on behalf of RBC, the collateral for the RBC LOC was "at least in part, . . . the value of securities pledged as collateral for the Line of Credit thereunder." In fact, Prime Capital never purchased, sold, or traded any securities at all through the Prime Capital RBC Account. Indeed, the only content of the Prime Capital RBC Account was the single cash deposit of the ER Funds.

170. On October 11, 2023, Prime Capital drew $5 million on the RBC LOC and on

October 16, 2023, it drew the remaining $1 million. Thus, although the stated purpose of the loan was for "General liquidity purposes", Prime Capital drew the entire $6 million in credit availability in just two draws within five (5) days of each other and secured the loan with cash in the Prime Capital RBC Account which is definitionally liquid. Still, RBC Capital and RBC apparently did not conduct any internal investigation regarding Prime Capital's conduct or use of the Prime Capital RBC Account. Nor did RBC inquire as to why Prime Capital would want or need to borrow against its own cash at an interest rate nearing 7%.

171. In truth, RBC ignored all the suspicious activity and declined to conduct even a rudimentary KYC analysis because the deal was that good. RBC was earning over a 7% return on a loan with absolutely no risk because it was secured by cash in an account at its own subsidiary, RBC Capital. In sum, RBC was making well over $400,000 per year on a risk-free loan.

172. In connection with the creation of the Prime Capital RBC Account and the RBC LOC, on October 16, 2023, Berone returned $1,865,000.00 of the $20,000,000.00 to Prime Capital with a disclosed purpose of the transaction described as a "Capital Distribution" according to the transfer request form signed by Beguesse.

***(iv) Prime Capital Finally Figured Out That it was Defrauded by the Berone Parties***

173. As Prime Capital started to succumb to litigation against it in late-2023, Roglieri appeared to still believe that only the Reign Parties, and not Berone and its principals, were the wrongdoers. Following the commencement of Case 1, from December 29, 2023, to January 2, 2024, Roglieri and Beguesse exchanged the following text messages where Roglieri instructs Beguesse not to respond to trustee Dribusch, a request that Beguesse obliges, and Roglieri informs Beguesse that "Rein [*sic*] is going to be indicted by fbi" and that he "had a meeting with them" and "[s]aid nothing but good things about [Berone]":




174. On or around January 21, 2024, Roglieri and Prime Capital appear to have finally determined that Berone and its principals defrauded Prime Capital along with Reign and its principals. In text communications that day to Prime Capital's counsel, Daniel Rubin, Roglieri informed him that "[w]e got huge developments in our case that was just found out on berrone, karo, and reign", that "[s]imply put it's fuckijg cracy", that "you [Rubin] were right" "[t]he whole time", "[b]ut its worse then we thought", "[l]ike they were all in on it" "[a]ll of them".

175. On January 24, 2024, RBC demanded repayment of the outstanding RBC LOC from Prime Capital in the amount of $6,064,700.18. On January 31, 2024, RBC deducted $6,065,813.73 from the ER Funds in repayment of the RBC LOC. On February 6, 2024, RBC remitted the balance of the ER Funds from the Prime Capital RBC Account in the amount of $1,248,369.84 to the Receiver.

***(v) Berone Named as Defendants in the Receivership Action***

176. During Case 1, counsel for Prime Capital provided to Compass-Charlotte a

purported statement for the Prime Capital RBC Account for December 2023 showing an ending account value of $52,364,000 in the account.

177. Upon dismissal of Case 1, Compass-Charlotte commenced the Receivership Action against Prime Capital and named four Berone related entities as defendants in the Receivership Action, including Berone Capital and the Berone Fund, in order to give the Receiver powers and control over the purported funds at RBC Capital in either the Berone RBC Account or the Prime Capital RBC Account so that they could be protected and preserved for the benefit of Prime Capital's victims. Berone failed to appear or respond to Compass-Charlotte's emergency motion for the appointment of a receiver.

178. By decision and order dated January 24, 2024, the District Court appointed the Receiver and granted him ordinary powers over Prime Capital and the named Berone Parties.

179. Compass-Charlotte and the Receiver learned through discovery that the Prime Capital RBC Account statement was forged and that the account did not have anything close to the $52,364,000 in it.

180. On or around March 8, 2024, the Berone defendants filed a motion seeking relief from the Receivership. Receivership Action, Dkt. No. 148. On March 19, 2024, the District Court entered an order declining to relieve the Berone defendants from the receivership stating, among other things, that "[t]here is evidence that the Berone Defendants have spent Prime Capital's money on luxury expenses and sent millions of dollars to an attorney" and taking note that "[p]erhaps most alarming to the Court was the Berone Defendants' representation that Prime Capital provided verbal authorization, over the telephone, to Berone, to wire $11.9 million to Mr. Karo." Receivership Action, Decision, Dkt. No. 160, pp. 39-40.

181. By decision dated June 24, 2024, the District Court relieved the Berone defendants

from the receivership for the sole reason that "there is no evidence that [Compass-Charlotte's] money was ever held by the Berone Defendants". Receivership Action, Decision, Dkt. No. 184, p. 15. However, the District Court stated "there are several facts that appear problematic to the Court when considering whether the Berone Defendants engaged in fraudulent conduct." Id. at p. 6. Among other things, the District Court noted with respect to Beguesse's claim that he was verbally authorized by Roglieri to make the transfers to Karo that "[it] also strains credulity that a reputable business would send millions of dollars via wire transfer according to only a verbal authorization." Id. at p. 7. The District Court further noted that "[t]he 'records' submitted by the Berone Defendants to the Receiver have been scarce and questionable", that the records provided by Berone do "not, in any way, substantiate the legitimacy of the Berone Defendants' business", and that "despite being able to buy expensive luxury vehicles for their business, [the Berone Defendants] work out of the basement of one of the principal's parents' homes". Id. at p. 7. The District Court agreed "with [Compass-Charlotte] and the Receiver that the Berone Defendants' business practices, particularly those connected to Prime Capital and Kris Roglieri, are surrounded by questions of legitimacy and legality." Id.

182. On December 16, 2024, each of Berone Capital, LLC, Berone Capital Partners LLC, and Berone Capital Fund, LP, filed Proofs of Claim 25 to 27, respectively, against Prime Capital's bankruptcy estate asserting in sum that their inclusion in the Receivership Action as a result of "the Debtor's improper, willful and malicious acts and wholly false allegations" when there was "not one shred of evidence that damages were incurred by the Debtor. . . from the actions of any Berone entities" Berone was not "able to pursue opportunities coming into 2024 [Berone had] been working on for the last two years" causing total damages to Berone in "An Amount in Excess of $30,000,000.00" (emphasis in original addendum).

***(vi) RBC Capital Finally Debanks Berone***

183. On March 4, 2024, RBC Capital sent a letter to Berone Capital and the Receiver terminating the relationship effective June 5, 2024.

184. After everything that happened, RBC Capital did not take any steps to prohibit Berone's use of its facilities and platform until forty (40) days after Berone was in receivership.

***(vii) The SEC Sued Berone, Reign, and Their Respective Principals***

185. On May 7, 2026, the Securities and Exchange Commission ("SEC") commenced an action in the United States District Court for the Southern District of Florida by filing a complaint (the "SEC Reign/Berone Complaint") against Reign, Johnson, Mills, Berone, Beguesse, and Stone, among others in an action captioned *SEC v. Reign, et al.*, Case No. 26-cv-23237 (S.D.F.L. May 7, 2026) (the "SEC v. Reign/Berone").

186. The allegations in the SEC Reign/Berone Complaint describe several fraudulent schemes engaged in by Reign and its principals and include significant historical facts demonstrating the origin of the fraud perpetrated against Prime Capital, which was dubbed "Investor C" by the SEC. The SEC alleged that "the Reign Defendants knowingly or with severe recklessness offered and sold a $20 million investment despite having no reasonable basis to believe that it could deliver the results or maintain the security of the funds as promised." SEC Reign/Berone Complaint, ¶ 101. If true, the SEC's allegations in the SEC Reign/Berone Complaint demonstrate that Prime Capital was defrauded by the Berone/Reign Parties precisely as alleged in this Complaint.

187. According to the SEC, "[Berone, Beguesse, and Stone] knowingly or with severe recklessness misappropriated assets from the [Berone RBC Account] in violation of their fiduciary duties, the terms of the Berone Fund documents, and their representations to [Prime Capital]." *Id.* at ¶ 123. The SEC repeated many of the allegations set forth by the Plan Administrator above, but

further alleged that "[t]he Berone Defendants' misappropriation of Investor C's funds for their own use and personal benefit breached the Berone Fund's governing documents, Berone's fiduciary duties, the agreement with [Prime Capital] to return all his money, and any reasonable investment purpose." *Id.* at ¶ 137.

***(viii) The Plan Administrator has Standing to Assert Claims Against RBC and RBC Capital That Originally Belonged to Victims***

188. Pursuant to the confirmed Plan, creditors of Prime Capital were given the opportunity to assign certain claims to the Plan Administrator for investigation and pursuit. See Plan, §4.2.

189. The form of assignment provided for the assignment of claims described as follows:

> The undersigned, a holder of a Class 2 General Unsecured Claim (a "Creditor") against Prime Capital Ventures, LLC (the "Debtor"), or an assignee, heir, successor, or duly authorized estate representative of such Creditor, does hereby irrevocably assign, give over, transfer, and convey, to the Plan Administrator appointed in the Trustee's Plan of Liquidation Pursuant to Chapter 11 of the United States Bankruptcy Code (the "Plan"), any and all claims, demands, causes of action, class in action, and other obligations of any type or description, whether known or unknown, liquidated or unliquidated, asserted or unasserted, whether arising in tort, contract or other basis or theory, which the undersigned has or may have that are related to the Debtor's and Kris Roglieri's ("Roglieri") conduct of the Debtor's business, and the Creditor's claim against the Debtor's or Roglieri's bankruptcy estates. Such claims include, but may not be limited to: (i) any claims against the Debtor's former attorneys, accountants, auditors, or other professionals, in connection with aiding and abetting any breach of fiduciary duty owed by Roglieri to the Debtor or the Debtor's creditors, fraud, aiding and abetting fraud on the part of the Debtor or Roglieri, or otherwise; (ii) any claims against banks or any other financial institutions used by the Debtor or Roglieri, or that are involved in transactions with the Debtor, in connection with aiding and abetting any breach of fiduciary duty owed by Roglieri to the Debtor or its creditors, fraud, aiding and abetting fraud on the part of the Debtor or Roglieri, unjust enrichment, aiding and abetting conversion by the Debtor or Roglieri, or otherwise; and (iii) any other claims against third parties related to the Debtor's or Roglieri's wrongdoing that if pursued by the Debtor or its estate may be subject to the defense of *in pari delicto* or the Wagoner Rule (collectively, the "Assigned Claims").
>
> The assignment of the Assigned Claims is made without warranty or representation of any kind other than that undersigned represents that the Assigned Claims have not previously been assigned or conveyed to any other persons. This assignment is subject to the relevant provision of the Plan and incorporates provisions by reference.

190. To date, several creditors of Prime Capital have executed and delivered assignments of claims to the Plan Administrator including 526 Murfreesboro, LLC, Camshaft CRE 1 LLC, Compass-Charlotte, CoNextions Medical Inc., ER Tennessee, HCW Biologics Inc., Onward Holdings Ltd., and Piper Capital Funding LLC (the "Assigning Creditors").

191. Accordingly, the Plan Administrator as assignee is fully empowered to assert any claims against the Defendants that may have belonged to the Assigning Creditors including ER Tennessee.

**I. RBC has a Recent and Well-Document History of Failing to Comply with AML Standards**

192. The Financial Transactions and Reports Analysis Centre of Canada ("FINTRAC") announced that following a compliance examination in 2022, it imposed an administrative monetary penalty of C$7,475,000 on November 3, 2023 against RBC for non-compliance with Part 1 of the Proceeds of Crime (Money Laundering) and Terrorist Financing Act and its associated Regulations, which are the Canadian equivalent to the BSA/AML regulations in the United States.[44]

193. In sum, FINTRAC found that RBC:

a. failed to submit suspicious transaction reports where there were reasonable grounds to suspect that transactions were related to a money laundering offence;

b. failed to provide information in the prescribed form and manner in suspicious transactions reports; and

c. failed to keep written policies and procedures to date.[45]

---

[44] FINTRAC, *FINTRAC imposed an administrative monetary penalty on the Royal Bank of Canada*, Dec. 3, 2023, https://fintrac-canafe.canada.ca/new-neuf/nr/2023-12-05-eng?utm_source=chatgpt.com (last reviewed Aug. 28, 2026).
[45] Id.

194. The FINTRAC findings highlighted major institutional failings in reporting suspicious activity by RBC, the ultimate parent company of RBC Capital. While the C$7,475,000 fine imposed by FINTRAC is inconsequential to an institution as massive as RBC, it was the largest fine imposed by FINTRAC for the preceding 3 years and accounted for nearly 29% of all fines issued during the corresponding annual period. In fact, it was the second largest fine ever imposed by FINTRAC against a bank, and the third largest overall.

## FIRST CAUSE OF ACTION

| | |
|---|---|
| **Cause of Action:** | **Avoidance and Recovery of Actual Fraudulent Transfers and Allowance of Claim** |
| **Statute or Common Law:** | **11 U.S.C. §§ 502(h), 544(a), 548(a)(1)(A) and 550; NY DCL §§ 273(a)(1) and 274 (NY UVTA)** |
| **Affected Defendants:** | **RBC** |

195. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 194 of this Complaint as if fully set forth at length herein.

196. Prime Capital made the following transfers (the "Transfers"):

| Date | Description | Value |
|---|---|---|
| 10/3-11/2023 | Grant of a security interest in the contents of the Prime Capital RBC Account | (see below) |
| 11/27/2023 | Partial payment on interest and fees | $23,000.00 |
| 12/15/2023 | Partial payment on interest and fees | $34,000.00 |
| 01/31/2024 | Deduction from Prime Capital RBC Account | $6,065,813.73 |
| | **TOTAL:** | **$6,122,813.73** |

197. The Transfers were made by Prime Capital from funds that it had obtained from ER Tennessee by fraud. Thus, at the time the Transfers were made, Prime Capital had incurred or was about to incur liabilities which remain unpaid to this day.

198. The Transfers were made intentionally by Prime Capital and its principals in

furtherance of Prime Capital's Ponzi and advance pay lending fraudulent scheme.

199. RBC and its subsidiary, RBC Capital, did almost no due diligence on Prime Capital, or its so-called investment advisor, Berone Capital, prior to receipt of the Transfers.

200. RBC engaged in the RBC LOC because it was a risk-free loan secured by Prime Capital's cash and earned interest for RBC at approximately 7.5% per annum resulting in a return to RBC of $122,813.73 in just three months.

201. RBC never inquired or investigated why Prime Capital would borrow against its own cash for so-called "General liquidity purposes".

202. RBC was the direct recipient of the Transfers.

203. At the time of the first Transfer, Prime Capital was a defendant in numerous public lawsuits wherein it was accused of breaching its agreements, fraud, and other bad acts, including, but not limited to: (i) Truss Financial LLC v. Prime Capital, et al., Index No. 2023/510389 (N.Y.Sup. Ct. Kings Cty. Apr. 5, 2023) (seeking and subsequently obtained the return of $13.4 million); (ii) B&R Acquisition Partners v. Prime Capital (JAMS Arb., Aug. 2023) (seeking return of $4.3 million); (iii) Sturm v. Prime Capital, Case No. 23-cv-1033 (N.D.N.Y. Aug. 22, 2023) (seeking return of $2 million); (iv) Camshaft CRE 1, LLC v. Prime Capital, Case No. 2023-023173 (Fla. Circ. Ct., Miami-Dade Cty., Sept. 15, 2023) (seeking return of $12.4 million); and (v) The Lion Group DFW, LLC v. Prime Capital, Case No. 23-DCV-34617 (Tex. Dist. Ct., 146th Dist., Sept. 21, 2023). RBC ignored the foregoing pending litigation in making its decision to lend to Prime Capital because of the financial incentive to do so.

204. Prime Capital was a Ponzi scheme since its inception and never had any assets or funds that were not obtained by its victims under fraudulent pretenses or purchased with the proceeds of the fraud. Accordingly, Prime Capital was at all times insolvent and had no capital.

205. The Transfers were made by Prime Capital, at the direction of its principal, with actual intent to hinder, delay, and/or defraud Prime Capital's creditors and victims, and individuals and entities to which Prime Capital would become obligated.

206. Based upon the foregoing, the Plan Administrator is entitled to an order and judgment against RBC avoiding the Transfers, directing that the subject of the Transfers or their value in the amount of not less than $6,122,813.73 be returned to Prime Capital's bankruptcy estate for the benefit of its victims, together with interest and fees, and upon return of the Transfers, granting and allowing a general, unsecured claim against Prime Capital's bankruptcy estate in the amount of $6,122,813.73 pursuant to 11 U.S.C. § 502(h).

**SECOND CAUSE OF ACTION**

| | |
|---|---|
| **Cause of Action:** | **Attorneys' Fees for Avoidance of Actual Fraudulent Transfers** |
| **Statute or Common Law:** | **11 U.S.C. § 544(a); NY DCL § 276-a (NY UVTA)** |
| **Affected Defendants:** | **RBC** |

207. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 206 of this Complaint as if fully set forth at length herein.

208. The Transfers were made by Prime Capital with actual intent to hinder, delay, and defraud present and future creditors.

209. As set forth above, RBC engaged in the nonsensical lending transaction because it was a risk-free way to earn an approximately 7.5% return on its money.

210. At the time the Transfers were made, Prime Capital had incurred or was about to incur a liability which remains unpaid to this day. This fact was evident from the public record because the following public proceedings against Prime Capital were pending at the time of entry

into the RBC LOC: (i) Truss Financial LLC v. Prime Capital, et al., Index No. 2023/510389 (N.Y.Sup. Ct. Kings Cty. Apr. 5, 2023) (seeking and subsequently obtained the return of $13.4 million); (ii) B&R Acquisition Partners v. Prime Capital (JAMS Arb., Aug. 2023) (seeking return of $4.3 million); (iii) Sturm v. Prime Capital, Case No. 23-cv-1033 (N.D.N.Y. Aug. 22, 2023) (seeking return of $2 million); (iv) Camshaft CRE 1, LLC v. Prime Capital, Case No. 2023-023173 (Fla. Circ. Ct., Miami-Dade Cty., Sept. 15, 2023) (seeking return of $12.4 million); and (v) The Lion Group DFW, LLC v. Prime Capital, Case No. 23-DCV-34617 (Tex. Dist. Ct., 146th Dist., Sept. 21, 2023).

211. At the time that it made the Transfers, Prime Capital: (i) was insolvent or became insolvent as a result of the Transfers; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Prime Capital was an unreasonably small capital; and/or (iii) intended to incur, or believed that Prime Capital would incur debts that would be beyond Prime Capital's ability to pay as such debts matured.

212. Based upon the foregoing, the Plan Administrator is entitled to recover reasonable attorneys fees from RBC pursuant to NY DCL § 276-a.

---

**THIRD CAUSE OF ACTION**

| | |
|---|---|
| **Cause of Action:** | **Aiding and Abetting Conversion** |
| **Plaintiff Standing:** | **As Plan Administrator on Behalf of Prime Capital's Bankruptcy Estate** |
| **Statute or Common Law:** | **Common Law** |
| **Affected Defendants:** | **RBC Capital** |

---

213. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 212 of this Complaint as if fully set forth at length herein.

214. Prime Capital wrongfully asserted dominion and control over the innocent victim

funds deposited into the Berone RBC Account. Victims were told that their funds or "ICA Deposits" would be held and maintained for their benefit for the purpose of servicing interest on the loans they were to receive from Prime Capital, but in reality they were largely used to prop up Roglieri's other businesses, for lavish personal expenditures, and to repay earlier victims.

215. Berone wrongfully asserted dominion and control over Prime Capital's funds deposited into the Berone RBC Account. Prime Capital was told unequivocally that its funds which were obtained from its own fraud victims would be held and returned if the subject transactions with Reign did not go through. In reality, Prime Capital's funds were used to fund unauthorized transactions with the Reign Parties, Berone's co-conspirators, and to purchase private jet travel, luxury automobiles, Atlanta Hawks tickets, and other personal expenditures for Berone's principals.

216. RBC Capital had actual knowledge of Berone's fraudulent use of its account to secure and convert funds from Prime Capital. As described in more detail above, this actual knowledge came from, *inter alia*, RBC Capital's access to and observation of highly suspicious activity in the Berone RBC Account.

217. RBC Capital rendered substantial assistance to, and aided and abetted Berone's conversion of Prime Capital's funds, by accepting a large $20 million deposit, allowing Berone, to transfer out the majority of Prime Capital's funds almost immediately, allowing the Berone RBC Account to remain open long after Berone and Prime Capital were put into a receivership by the U.S. District Court, and by continuing to process transactions involving the disbursement of Prime Capital's funds, all as described in more detail above. Simply put, Berone's fraud could not have happened and continued without RBC Capital's substantial assistance.

218. To date, only $1.865 million of the $20 million Transfer has been returned to Prime

Capital.

219. But for RBC Capital's substantial assistance, Berone would not have been able to convert Prime Capital's funds and/or Prime Capital's funds would have been recovered or preserved.

220. RBC Capital is liable for all damages actually and proximately caused to Prime Capital's bankruptcy estate as a result of Berone's conversion of Prime Capital's funds by using RBC Capital's institution and platform in an amount not less than $18,135,000.00, and the Plan Administrator is entitled to a judgment against RBC Capital thereon, together with pre-judgment interest and costs.

---

**FOURTH CAUSE OF ACTION**

| | |
|---|---|
| **Cause of Action:** | **Aiding and Abetting Conversion** |
| **Plaintiff Standing:** | **Plan Administrator, as Assignee of the Assigning Creditors** |
| **Statute or Common Law:** | **Common Law** |
| **Affected Defendants:** | **RBC Capital** |

---

221. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 220 of this Complaint as if fully set forth at length herein.

222. This Cause of Action is asserted by the Plan Administrator in his capacity as the assignee of claims against RBC Capital among others by Prime Capital's victim and creditor ER Tennessee, among other creditors and victims of the Prime Capital Ponzi scheme.

223. Prime Capital wrongfully asserted dominion and control over ER Tennessee's funds deposited into the Prime Capital RBC Account. ER Tennessee was told that its funds or "ICA Deposit" would be held and maintained for its benefit for the purpose of servicing interest on the loan it was to receive from Prime Capital. In reality, $7 million of the ER Funds were

transferred out to another bank account in Prime Capital's name five (5) days after receipt, and the remaining $7.25 million was used to secure the fully drawn $6 million RBC LOC.

224. RBC Capital had actual knowledge of Prime Capital's fraudulent use of its account at the bank to secure and convert funds from ER Tennessee. As described in more detail above, this actual knowledge came from, *inter alia*, RBC's access to and observation of highly suspicious activity in the Prime RBC Account, and the related Berone RBC Account that was also under Berone Capital's advisor umbrella.

225. RBC Capital rendered substantial assistance to, and aided and abetted Prime Capital's conversion of ER Tennessee's ER Funds, by accepting a large $14.25 million deposit, allowing Prime Capital to transfer out $7 million of the ER Funds to itself within five (5) days of the initial deposit, and facilitating its parent, RBC, to secure the remaining ER Funds in order to make a lucrative risk-free loan. Simply put, Prime Capital's fraud could not have happened and continued without RBC Capital's substantial assistance and institutional legitimacy.

226. To date, only $1,248,369.84 of the $14,250,000.00 in ER Funds has been returned to Prime Capital.

227. But for RBC Capital's substantial assistance, Prime Capital would not have been able to convert the ER Funds and/or the ER Funds would have been recovered or preserved.

228. RBC Capital is liable for all damages actually and proximately caused to ER Tennessee, and Prime Capital's bankruptcy estate as its assignee and proxy, as a result of Prime Capital's conversion of the ER Funds by use of RBC Capital's institution and platform in an amount not less than $13,001,630.16, and the Plan Administrator is entitled to a judgment against RBC Capital thereon, together with pre-judgment interest and costs.

**FIFTH CAUSE OF ACTION**

| | |
|---|---|
| **Cause of Action:** | **Aiding and Abetting Fraud** |
| **Plaintiff Standing:** | **As Plan Administrator on Behalf of Prime Capital's Bankruptcy Estate** |
| **Statute or Common Law:** | **Common Law** |
| **Affected Defendants:** | **RBC Capital** |

229. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 228 of this Complaint as if fully set forth at length herein.

230. Prime Capital perpetrated the fraudulent advance pay lending and Ponzi scheme as set forth herein.

231. In turn, Berone perpetrated a fraudulent scheme on Prime Capital as set forth herein.

232. RBC Capital had actual knowledge of Berone's fraudulent scheme. As described in more detail above, this actual knowledge came from, *inter alia*, RBC Capital's due diligence, and its sophisticated account activity monitoring systems prior to and throughout the course of its banking relationship with Berone. RBC Capital observed and monitored significant highly suspicious transactions by Berone and decidedly took no action.

233. RBC Capital rendered substantial assistance to, and aided and abetted Berone's fraudulent scheme, by accepting Prime Capital's deposit, which was twenty times (20x) any other amount ever deposited into the Berone RBC Account or any other accounts under the Berone Capital advisory umbrella, and allowing Berone to almost immediately transfer by wire transfer the majority of Prime Capital's $20 million in a series of unexplained wire transfers wholly inconsistent with an investor advisory account maintained at a broker dealer like RBC Capital. RBC Capital's permitting this behavior allowed Berone to deceive Prime Capital for fifteen (15) months while representing to Prime Capital that its funds were still intact in the Berone RBC

Account. Berone's fraud could not have continued without RBC Capital's substantial assistance.

234. RBC Capital is liable for all damages actually and proximately caused to Prime Capital and its victims as a result of Berone's fraud.

235. To date, only $1.865 million of the $20 million Transfer has been returned to Prime Capital.

236. But for RBC Capital's substantial assistance, Berone would not have been able to perpetrate its fraud against Prime Capital and/or Prime Capital's funds would have been recovered or preserved.

237. RBC Capital is liable for all damages actually and proximately caused to Prime Capital's bankruptcy estate as a result of Berone's defrauding Prime Capital by using RBC Capital's institution and platform in an amount not less than $18,135,000.00, and the Plan Administrator is entitled to a judgment against RBC Capital thereon, together with pre-judgment interest and costs.

**SIXTH CAUSE OF ACTION**

| | |
|---|---|
| **Cause of Action:** | **Aiding and Abetting Fraud** |
| **Plaintiff Standing:** | **Plan Administrator, as Assignee of the Assigning Creditors** |
| **Statute or Common Law:** | **Common Law** |
| **Affected Defendants:** | **RBC Capital** |

238. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 237 of this Complaint as if fully set forth at length herein.

239. This Cause of Action is asserted by the Plan Administrator in his capacity as the assignee of claims against RBC Capital among others by the Assigning Creditors.

240. Prime Capital wrongfully asserted dominion and control over ER Tennessee's

funds deposited into the Prime Capital RBC Account. ER Tennessee was told that its funds or "ICA Deposit" would be held and maintained for its benefit for the purpose of servicing interest on the loans they were to receive from Prime Capital. In reality, $7 million of the ER Funds were transferred out to another bank account in Prime Capital's name five (5) days after receipt, and the remaining $7.25 million was used to secure the fully drawn $6 million RBC LOC.

241. RBC Capital had actual knowledge of Prime Capital's fraudulent scheme. As described in more detail above, this actual knowledge came from, *inter alia*, RBC Capital's due diligence, its sophisticated account activity monitoring systems prior to and throughout the course of its banking relationship with Prime Capital.

242. In addition, the Prime Capital RBC Account was established under the Berone Capital investment advisor umbrella like the Berone RBC Account before it which was used by Berone to defraud Prime Capital out of $20 million. Accordingly, RBC Capital further had actual knowledge of Berone's fraudulent scheme from, *inter alia*, RBC Capital's due diligence, its sophisticated account activity monitoring systems prior to and throughout the course of its banking relationship with Berone, which predated the establishment of the Prime Capital RBC Account by over a year.

243. RBC Capital rendered substantial assistance to, and aided and abetted Prime Capital's fraudulent scheme, by accepting the ER Funds, which were the first and only funds deposited into the Prime Capital RBC Account, and allowing Prime Capital to immediately transfer $7 million of the $14.25 million in ER Funds to its own account just five (5) days after receipt without any meaningful explanation, and facilitating its parent, RBC, to secure the remaining ER Funds in order to make a lucrative risk-free loan. Simply put, Prime Capital's fraud could not have happened and continued without RBC Capital's substantial assistance and

institutional legitimacy.

244. To date, only $1,248,369.84 of the $14,250,000.00 in ER Funds has been returned to Prime Capital.

245. But for RBC Capital's substantial assistance, Prime Capital would not have been able to perpetrate its fraud against ER Tennessee and/or the ER Funds would have been recovered or preserved.

246. RBC Capital is liable for all damages actually and proximately caused to ER Tennessee, and Prime Capital's bankruptcy estate as its assignee and proxy, as a result of Prime Capital's fraud against ER Tennessee by use of RBC Capital's institution and platform in an amount not less than $13,001,630.16, and the Plan Administrator is entitled to a judgment against RBC Capital thereon, together with pre-judgment interest and costs.

## SEVENTH CAUSE OF ACTION

| | |
|---|---|
| **Cause of Action:** | **Aiding and Abetting Breach of Fiduciary Duties** |
| **Plaintiff Standing:** | **As Plan Administrator on Behalf of Prime Capital's Bankruptcy Estate** |
| **Statute or Common Law:** | **Common Law** |
| **Affected Defendants:** | **RBC Capital** |

247. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 246 of this Complaint as if fully set forth at length herein.

248. Berone Capital has admitted that it owed a fiduciary duty to Prime Capital.

249. Berone Capital was required to discharge its fiduciary duty to Prime Capital in good faith, with ordinary care, and in a manner reasonably believed to be in their best interests.

250. Berone Capital breached its fiduciary duty to Prime Capital by converting,

transferring, taking, or otherwise depriving Prime Capital of its $20 million without its authorization or consent, and for its own personal benefit in connection with the fraud perpetrated by the Berone/Reign Parties.

251. RBC Capital was well aware of Berone Capital's fiduciary obligations to its clients like Prime Capital, in connection with investment advisor accounts like the Berone RBC Account.

252. RBC Capital rendered substantial assistance to, and aided and abetted Berone Capital's breach of fiduciary duty to clients of by accepting Prime Capital's deposit, which was twenty times (20x) any other amount ever deposited into the Berone RBC Account or any other accounts under the Berone Capital advisory umbrella, and allowing Berone to almost immediately transfer by wire transfer the majority of Prime Capital's $20 million in a series of unexplained wire transfers wholly inconsistent with an investor advisory account maintained at a broker dealer like RBC Capital. RBC Capital's permitting this behavior allowed Berone to deceive Prime Capital for fifteen (15) months while representing to Prime Capital that its funds were still intact in the Berone RBC Account. Berone's fraud could not have continued without RBC Capital's substantial assistance.

253. RBC Capital is liable for all damages actually and proximately caused to Prime Capital and its victims as a result of Berone Capital's breach of fiduciary duties to Prime Capital.

254. To date, only $1.865 million of the $20 million Transfer has been returned to Prime Capital.

255. But for RBC Capital's substantial assistance, Berone would not have been able to breach its fiduciary duties to Prime Capital and/or Prime Capital's funds would have been recovered or preserved.

256. RBC Capital is liable for all damages actually and proximately caused to Prime

Capital's bankruptcy estate as a result of Berone Capital's breach of fiduciary duties to Prime Capital accomplished by using RBC Capital's institution and platform in an amount not less than $18,135,000.00, and the Plan Administrator is entitled to a judgment against RBC Capital thereon, together with pre-judgment interest and costs.

## EIGHTH CAUSE OF ACTION

| | |
|---|---|
| **Cause of Action:** | **Pre-Judgment Interest and Attorneys' Fees** |
| **Statute or Common Law:** | **Mixed – 11 U.S.C. § 550(a); 28 U.S.C. § 1961; NY CPLR §§ 5001 and 5004** |
| **Affected Defendants:** | **All Defendants** |

257. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 256 of this Complaint as if fully set forth at length herein.

258. The Plan Administrator is entitled to a judgment awarding him pre-judgment interest with respect to the claims asserted in this Complaint from the inception of the relevant cause of action to the date of judgment.

[*Continued on Next Page*]

**WHEREFORE**, the Plaintiff demands judgment against the Defendants as follows:

A. Against Royal Bank of Canada on the First Cause of Action, in the total amount of not less than $6,122,813.73, plus all attorneys' fees, costs, and additional damages;

B. Against RBC Capital Markets, LLC, including its divisions RBC Advisor Services, RBC Clearing & Custody, and RBC Wealth Management on the Third, Fifth and Seventh Causes of Action, in the total amount of not less than $18,135,000.00;

C. Against RBC Capital Markets, LLC, including its divisions RBC Advisor Services, RBC Clearing & Custody, and RBC Wealth Management on the Fourth and Sixth Causes of Action, in the total amount of not less than $13,001,630.16;

D. Against all Defendants on the Second and Eighth Causes of Action, an amount to be determined at trial on account of all attorneys' fees, costs, and other damages of Prime Capital's bankruptcy estate, plus prejudgment interest; and

[*Continued on Next Page*]

E. Granting the Plan Administrator such other and further relief as this Court deems just and proper.

Dated: New York, New York
September 15, 2026

**KLESTADT WINTERS JURELLER SOUTHARD & STEVENS, LLP**

By: */s/ Fred Stevens*

Fred Stevens
Lauren C. Kiss
Kevin B. Collins
286 Madison Avenue, 11th Floor
New York, New York 10017
Tel: (212) 972-3000
Fax: (212) 972-2245
Email: fstevens@klestadt.com
lkiss@klestadt.com
kcollins@klestadt.com

*Counsel to the Plaintiff Plan Administrator*