**KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS, LLP**
286 Madison Avenue, 11th Floor
New York, NY 10017
Telephone: (212) 972-3000
Facsimile: (212) 972-2245
Fred Stevens
Lauren C. Kiss
Kevin B. Collins

*Counsel to Plaintiff Fred Stevens, Plan Administrator*

**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>PRIME CAPITAL VENTURES, LLC,<br><br>Debtor. | Chapter 11<br><br>Case No. 24-11029 (PGR) |
| FRED STEVENS, as Plan Administrator,<br><br>Plaintiff,<br><br>-against-<br><br>B AND R ACQUISITION PARTNERS LLC and JHM LENDING VENTURES LLC,<br><br>Defendants. | Adv. Pro. No. 26-________ |

**COMPLAINT SEEKING (I) THE AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. §§ 544(a), 548(a)(1)(A) AND (B), AND 550(a) AND N.Y. DCL §§ 273, 274, 276 AND 276-a; AND (II) PAYMENT OF PRE-JUDGMENT INTEREST AND ATTORNEYS' FEES**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........................................ 1

JURISDICTION AND VENUE ........................................ 3

BASIS FOR RELIEF ........................................ 4

PARTIES ........................................ 4

FACTS COMMON TO ALL CAUSES OF ACTION ........................................ 5

A. The Players ........................................ 5

B. The Ponzi Scheme ........................................ 8

i. The Fraud Concept ........................................ 8

ii. The Origin of the Fraud ........................................ 12

iii. The Proliferation of the Fraud ........................................ 15

iv. The Collapse ........................................ 16

C. The Bankruptcy Cases and Federal Equity Receivership ........................................ 18

D. The Ponzi Finding ........................................ 23

E. The Criminal Convictions of Roglieri, Humphrey, and Snyder, and Related Forfeiture .. 23

i. Roglieri – Criminal and Civil Forfeiture Cases ........................................ 23

ii. Humphrey – Criminal Case ........................................ 26

iii. Snyder – Criminal Case ........................................ 26

F. The Defendants and the Instant Transfers ........................................ 27

i. The Original Lending Transaction ........................................ 27

ii. The Arbitration Award, the Receivership Case, and the Transfer ........................................ 27

iii. Dismissal of Case 2, Relief from Stay in Case 3, and the Civil Forfeiture Case ........................................ 28

iv. The Defendants Filed Proofs of Claim ........................................ 29

v. The Defendants Refused to Toll the Plan Administrator's Time to Assert These Claims ........ 29

FIRST CAUSE OF ACTION ........ 30

SECOND CAUSE OF ACTION ........ 31

THIRD CAUSE OF ACTION ........ 32

FOURTH CAUSE OF ACTION ........ 33

Fred Stevens (the "Plan Administrator" or "Plaintiff"), in his capacity as the Plan Administrator for Prime Capital Ventures, LLC, the above-captioned debtor ("Prime Capital" or the "Debtor"), by and through his counsel, Klestadt Winters Jureller Southard & Stevens, LLP, as and for his complaint (the "Complaint") herein against B and R Acquisition Partners LLC ("B&R") and JHM Lending Ventures LLC ("JHM," collectively with B&R, the "Defendants," each a "Defendant") seeking, among other things, (I) the avoidance and recovery of fraudulent transfers pursuant to 11 U.S.C. §§ 544(a), 548(a)(1)(A) and (B), and 550(a), and N.Y. Debtor and Creditor Law §§ 273, 274, 276, and 276-a, and (II) payment of all pre-judgment interest and attorneys' fees; alleges as follows:

## PRELIMINARY STATEMENT

Prime Capital was an advance-pay lending and Ponzi scheme created and operated by its principal, Kris Roglieri ("Roglieri"), and his co-conspirator, Kimberly Humphrey ("Humphrey"). Roglieri and Humphrey defrauded dozens of prospective borrowers out of well over $100 million based upon the false premise that Prime Capital had the present ability to fund large commercial loans to the victims. Prime Capital told the victims that the deposits were a precondition to Prime Capital funding the loans. In truth, Prime Capital had no ability to fund any loans as its only source of funds was the deposits obtained from new victims. Predictably, Prime Capital's fraud only lasted two short years from December 2021 to December 2023 before imploding under the weight of lawsuits brought by victims throughout the country seeking the return of their deposits and other damages.

Prime Capital took in at least $179 million in victim deposits and it used the proceeds of its fraud to: (i) purchase over $25 million in automobiles, jewelry, and other luxury items, for Roglieri and Humphrey; (ii) purchase a $4 million luxury property in Virginia Beach for

Humphrey's use; (iii) prop up unrelated business ventures with over $10 million in cash transfers; (iv) make a $20 million highly speculative investment which itself turned out to be a fraud on Prime Capital; and (v) return deposits or make advances under the loans totaling approximately $109 million using the deposits from new victims in order to avoid the fraud from being discovered. Roglieri, Humphrey, and Humphrey's brother, Chris Snyder, have all been convicted of wire fraud charges and/or other crimes in connection with their operation of the Prime Capital Ponzi scheme.

Each and every transfer made by Prime Capital was in furtherance of its fraud and done with actual intent to hinder, delay, and defraud present and future creditor victims. Accordingly, the Plan Administrator is seeking the recovery of transfers made by Prime Capital including those to the Defendants so that recoveries can be distributed to Prime Capital's creditor victims equally.

In the instant case, B & R was a victim of Prime Capital who was duped into making a deposit on the pretext that it would lead to a loan from Prime Capital. However, unlike other victims, the Defendants succeeded in obtaining a judgment lien against Prime Capital's real property at 600 Linkhorn Drive, Virginia Beach, Virginia 23451 (the "Virginia Beach Property") while Prime Capital was in between bankruptcy proceedings and the subject of a federal equity receivership. The Defendants' taking a lien against the Virginia Beach Property constituted a transfer (the "Transfer") of Prime Capital's property. The Transfer occurred while a receiver appointed by the United States District Court was granted "exclusive dominion and control over all of the assets" of Prime Capital which authority was vested in and extended to all of Prime Capital's real property, equitable property, tangible and intangible personal property, interest, or assets of any nature, wherever located."[1] The Transfer and creation of the judgment lien against

---

[1] See *Compass-Charlotte 1031, LLC v. Prime Capital Ventures, LLC, et al.*, Case No. 24-cv-55 (MAD/CFH), Decision

the Virginia Beach Property without relief from the District Court was an improper act intended to frustrate the Receiver's exclusive control over Prime Capital's property, including the Virginia Beach Property.

At this time, the Virginia Beach Property is the subject of a civil forfeiture proceeding brought by the United States of America at *United States of America v. One 2003 Ferrari Enzo AB Version E, et al.*, Case No. 24-cv-1345 (MAD/DJS) (N.D.N.Y.) (the "Civil Forfeiture Case"). The Defendants and the Government are currently engaged in litigation with respect to the validity of Defendants' judgment lien against the Virginia Beach Property in light of the forfeiture. The Plan Administrator proposed that the Defendants agree to toll the Plan Administrator's claims to challenge the Transfer until after completion of the Civil Forfeiture Case. The Defendants refused necessitating the Plan Administrator's commencement of this action to preserve his claims in the event that the Defendants are successful in their litigation with the Government.

Accordingly, in the event that the Defendants are successful in asserting that their judgment lien against the Virginia Beach Property is superior to the Government's forfeiture claims in the Civil Forfeiture Case, then the Plan Administrator seeks recovery of the Transfer as a fraudulent transfer together with interest and costs so that they can be redistributed to all of Prime Capital's victims on a *pro rata* basis. Upon return of the Transfer, the Plan Administrator will allow the Defendants' claim in the amount of the returned Transfer so that they can participate in the recoveries equally with Prime Capital's other victims and creditors.

## JURISDICTION AND VENUE

1. This adversary proceeding relates to the chapter 11 bankruptcy case captioned *In re Prime Capital Ventures, LLC*, Case No. 24-11029 (PGR), pending in the United States

---

and Order at Dkt. No. 56, p. 22 (N.D.N.Y. Jan. 24, 2024) (D'Agostino, J.).

Bankruptcy Court for the Northern District of New York before the Honorable Patrick G. Radel, United States Bankruptcy Judge (the "Bankruptcy Court").

2. The Bankruptcy Court has jurisdiction over this adversary proceeding by virtue of 28 U.S.C. §§ 157(a) and (b) and 1334(b), and Rule 81.1 of the Local Rules for the United States District Court for the Northern District of New York referring matters arising under Title 11 of the United States Code (the "Bankruptcy Code") to the Bankruptcy Court.

3. The Plan Administrator consents to the entry of final orders or judgments by the Bankruptcy Court with respect to all matters and claims raised by this Complaint.

4. Venue is proper in this district pursuant to 28 U.S.C. § 1409(a) because this proceeding arises in a case under the Bankruptcy Code.

**BASIS FOR RELIEF**

5. This adversary proceeding is brought pursuant to sections 544(a), 548(a)(1)(A) and (B), and 550(a)(1) of the Bankruptcy Code, and sections 273, 274, 276 and 276-a of the New York Debtor and Creditor Law ("NY DCL").

**PARTIES**

6. Pursuant to the terms of that certain *Trustee's Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan") [Docket No. 369-1][2] confirmed by Order of the Bankruptcy Court dated February 11, 2026 [Docket No. 401], the Plan Administrator and his predecessor were appointed and granted the standing, power, and authority to assert the claims in this Complaint. The Plan Administrator maintains offices at c/o Klestadt Winters Jureller Southard & Stevens, LLP, 286 Madison Avenue, 11th Floor, New York, New York 10017.

---

[2] Any citation to "Docket No." contained herein shall refer to the docket entries within the bankruptcy case fashioned *In re Prime Capital Ventures, LLC*, Case No. 24-11029 (PGR) pending before the United States Bankruptcy Court for the Northern District of New York.

7. Prime Capital is a limited liability company organized under the laws of the state of Delaware. While it was operating, Prime Capital's principal place of business was 66 South Pearl Street, Albany, New York 12207. Prime Capital's bankruptcy estate is now under the control of the Plan Administrator and overseen by its Oversight Board comprised of Compass-Charlotte 1031, LLC, 526 Murfreesboro, LLC, Piper Capital Funding, LLC, and ER Tennessee LLC.

8. Roglieri is an individual who is currently residing at the Danbury Federal Correctional Facility, 33 ½ Pembroke Station, Route 37, Danbury, Connecticut 06811. Roglieri was the sole owner of Prime Capital's membership interests.

9. Humphrey is an individual who is, upon information and belief, currently residing at 506 Cavalier Drive, Virginia Beach, Virginia 23451. Humphrey is awaiting sentencing and potential incarceration. Humphrey was the Executive Vice President of Prime Capital.

10. B and R Acquisition Partners LLC is a limited liability company organized under the laws of the state of Texas. B&R maintains an address for service of process at c/o Cogency Global Inc., 1601 Elm St., Suite 4360, Dallas, Texas 75201. B&R also maintains an address for the conduct of business at 407 S. Kingshighway Street, Sikeston, Missouri 63801.

11. JHM Lending Ventures LLC is a limited liability company organized under the laws of the state of Delaware. JHM maintains an address for service of process at c/o Resident Agents Inc., 8 The Green, Suite R, Dover, Delaware 19901.

## FACTS COMMON TO ALL CAUSES OF ACTION

### A. The Players

12. Roglieri is an Albany-area entrepreneur and commercial finance executive who was actively involved in the commercial lending and finance training sectors.

13. Prior to the formation of Prime Capital, Roglieri created, owned, and managed

several other businesses.

14. On or around July 26, 2006, Prime Commercial Lending, LLC ("Prime Commercial") was formed by Roglieri as a New York limited liability company. Prime Commercial was a small lender that made loans as small as $22,000 to businesses and up to $2 million on commercial real estate.

15. Other businesses created and operated by Roglieri include Commercial Capital Training Group ("CCTG"), a training organization for commercial finance brokers, and The Finance Marketing Group, a marketing company serving financial services businesses.

16. Roglieri also maintained certain entities associated with his collecting and showing exotic luxury sports cars including Shark Ventures LLC and FUPME, LLC.

17. Prior to his arrest in May 2024, Roglieri maintained a larger-than-life persona. Among other things, Roglieri wore flashy clothes, collected luxury wristwatches, smoked expensive cigars, and maintained a large fleet of luxury sportscars that he would show with the team name and Instagram handle "@teamloansharks" often emblazoned with the moniker "F—K YOU…PAY ME". Pictured here is Roglieri from his now removed Instagram page smoking a cigar while leaning against a sportscar after being pulled over by the police, in his garage amongst some of his cars, partying in Las Vegas with his girlfriend, on a private jet (actually posted from @postureupson with @teamloansharks tagged), and gambling at the Casino de Monte-Carlo, and partying with three friends on a yacht in the French Riviera from a video taken in October 2023 while Prime Capital was imploding:

















18. Roglieri was by all counts very successful in his prior ventures and already lived an opulent lifestyle long before starting Prime Capital in December 2021.

19. Humphrey is a lifelong resident of Virginia Beach, Virginia. Roglieri met Humphrey in or around the late 2010's when she allegedly purchased and took a commercial loan broker training course from Roglieri's CCTG along with her brother, Chris Snyder ("Snyder").

20. In 2020, CCTG published an hourlong podcast interview of Humphrey by Roglieri where the two talk at length about her history, their professional relationship, and the commercial

loan business:[3]




21. According to Humphrey's LinkedIn page, she sourced "the Debt and Equity for Deals $100MM+", and started as an Executive Vice President of Prime Commercial in or around November 2019.[4]

22. Upon information and belief based upon Humphrey's statements on the CCTG podcast, Snyder was partners with Humphrey in their lending enterprise, Capital Atlantic Solutions, which operated at or around the same time that Humphrey was also working for Prime Commercial.

**B. The Ponzi Scheme**

***(i) The Fraud Concept***

23. Prime Capital was formed on December 14, 2021, and purported to be a legitimate alternative (or nonbank) commercial lender. Prime Capital advertised proudly that:

---

[3] See Commercial Capital Training Group, LLC, Entrepreneurs in Finance | Episode 7 | Kimmy Humphrey [Video], August 24, 2022, https://www.youtube.com/watch?v=aL3qXCAYP-M&t=1437s (YouTube) at 11:36.
[4] See Kimberly H, *LinkedIn*, https://www.linkedin.com/in/kimberly-h-351800198/ (last visited July 22, 2026).




*See* Prime Commercial Lending, Prime Capital Ventures & The Bailey [Video], May 16, 2022, https://www.youtube.com/watch?v=A4_RKBepUkA (YouTube) at 0:21.

24. Generally, alternative lenders offer borrowers some significant benefits over traditional bank lenders by having simpler application processes, fewer underwriting requirements, different and more flexible financing products, and more rapid funding.[5] Roglieri confirmed that this was Prime Capital's business model claiming that he "saw a rising demand from borrowers who needed to move projects forward with as little static as possible" and that Prime Capital could "provide solutions that are less restrictive than your average bank and offer generous terms that favor borrowers."[6] The disadvantage of going to an alternative lender is that they typically charge higher interest rates than what may be available at a traditional bank.[7] Prime Capital on the other hand offered all of the advantages of an alternative lender, while offering interest rates well below market.

25. On May 2, 2022, Prime Capital described its business in an article in DealMaker Magazine, a publication that Roglieri purportedly owned or started, as "a fund specifically

---

[5] See Calio, V., June 20, 2024, Traditional Bank vs. Alternative Lender, kapitus.com, https://kapitus.com/blog/manage-your-money/financing/traditional-bank-vs-alternative-lender-which-is-better-for-your-small-business-kapitus/.

[6] Prime Commercial Lending, March 17, 2022, Albany, New York's Prime Commercial Lending Funds the First 5-Star Hotel in Atlanta, GA Through Prime's Real Estate Fund, Prime Capital Ventures, [Press release] https://www.prnewswire.com/news-releases/albany-new-yorks-prime-commercial-lending-funds-the-first-5-star-hotel-in-atlanta-ga-through-primes-real-estate-fund-prime-capital-ventures-301505069.html.

[7] See Calio, V., June 20, 2024, Traditional Bank vs. Alternative Lender, *supra*.

designed to provide capital for large development, commercial development and commercial real estate transactions from $50 million to more than $1 billion."[8] Prime Capital offered non-recourse loans with interest rates of 4 to 6% with interest only payments.[9] At the exact same time, interest rates were rising rapidly in response to inflationary pressure. At the time of Prime Capital's advertisement (May 2022), the prime interest rate was 4%, rising to 4.75% a month later, then to 6.25% by September 21, 2022, and peaking at 8.5% on July 26, 2023.[10] 15-year mortgages followed the same trend starting at 4.52% on May 5, 2022 and peaking at 7.03% on October 26, 2023.[11]

26. In order to be a successful lender, Prime Capital would have had the impossible task of obtaining capital at well below the 4 to 6% that it was offering to its prospective borrowers. In truth, Prime Capital had no known legitimate source of capital to lend to prospective borrowers. Instead, it obtained its capital by converting its prospective borrowers' own funds.

27. Prime Capital required as a condition of providing a loan that its prospective borrower provide 20% of the contemplated loan as an upfront deposit (defined as an "ICA Deposit," or collectively, the "ICA Deposits"). Roglieri stated that borrowers "have to come to the table with at least 20% and that's just an important function of how our product works."[12] Prime Capital claimed that it would hold the ICA Deposit "as prepaid interest throughout the term of the loan."[13] As interest payments became due, Prime Capital represented that it "would just

---

[8] See Koplin, I., May 2, 2022, Roglieri Unveils Prime Capital Ventures, Prime Commercial Lending's Newest Fund, dealmaker-magazine.com, https://www.dealmaker-magazine.com/magazine/roglieri-unveils-prime-capital-ventures-prime-commercial-lendings-newest-fund.
[9] See Id.
[10] See https://www.fedprimerate.com/wall_street_journal_prime_rate_history.htm.
[11] See Freddie Mac https://www.freddiemac.com/pmms.
[12] See Koplin, I., May 2, 2022, Roglieri Unveils Prime Capital Ventures, Prime Commercial Lending's Newest Fund, dealmaker-magazine.com.
[13] See Id.

deduct it from the [ICA DEPOSIT]".[14] Prime Capital admitted that this was "a unique way of doing things" but claimed that it "ensures [Prime Capital's] payback, and [the ICA Deposit] serves as additional collateral for the loan throughout the term."[15]

28. In an email dated April 27, 2023, Humphrey responded as follows to a prospective client's question about whether Prime Capital could transfer an ICA Deposit without a client's permission:

> When we pull through the hf [hedge fund], it [the ICA Deposit] gets locked by RBC [Royal Bank of Canada], Goldman [Sachs] or Interactive [Brokers] themselves. And it doesn't get unlocked until the line is completely paid back. In other words, if the ICA is $10m and the facility is $50m- RBC locks the 10m at the time they make the 50m facility available. It doesn't leave the account but we can't do anything with if bc [because] they collateralized it. Once we pay the 50m back they unlock the 10m.[16]

29. As Roglieri explained to a borrower client during a recorded Zoom call in December 2023:

> So with our process, we usually require anywhere from 20 to 30 percent down on, based on the total capital stack. . . We call that the essentially the ICA, it's an Interest Credit Account. We require that down payment in the form of cash to us because we view it as, it really performs three functions for us . . . number one, the ICA is considered essentially additional collateral for the loan throughout the term. Number two, it acts as pre-paid interest reserves, so theoretically our client never has to make a payment for us, payment to us on a quarterly or monthly basis when that money gets deposited in an account that we control in our name. The client . . . would get a statement every month or every quarter showing how much was drawn down and the interest that is due on that and that is essentially how we get paid back through that ICA account through the term. . . . There really isn't any risk. The [ICA] money gets put into a pledged account.[17]

30. All of Prime Capital's representations regarding the ICA Deposits and Prime Capital's ability to fund loans were false. ICA Deposits were not deposited into pledged accounts

---

[14] Id.
[15] Id.
[16] See USA v. Humphrey, Case No. 25-cr-00238, Docket No. 4, ¶5(d) (N.D.N.Y. June 10, 2025).
[17] See USA v. Roglieri, Case No. 24-cr-00392, Docket No. 90, ¶5(e) (N.D.N.Y. Nov. 13, 2025).

and Prime Capital had no ability to fund loans. In fact, Prime Capital's only source of capital was from obtaining ICA Deposits from victims, and many ICA Deposits were consumed immediately upon receipt by Prime Capital.

31. The ICA Deposits were an investment by the borrower victims to get access to Prime Capital's promise of cheap and readily available capital. A loan from Prime Capital would theoretically allow a prospective borrower to invest in its underlying business and hopefully make big returns. Prime Capital's prospective borrowers did not appear to have other viable sources of capital, or at least not any as inexpensive as what Prime Capital was offering. Prime Capital further enticed prospective borrowers with what appear to have been very little underwriting and collateral requirements. Prime Capital also did not require personal guarantees or recourse on the loans.

***(ii) The Origin of the Fraud***

32. In order to sell a business model that seemed entirely impossible if properly understood, and to get prospective borrowers to give Prime Capital new ICA Deposits, Prime Capital had to demonstrate that it actually made loans. It did this by, among other ways, fraudulently claiming to have made a "$188,000,000 funding of ALUX Properties, LLC and their project 'The Bailey' which will be the only 5-star hotel in Atlanta".[18]

---

[18] See Prime Commercial Lending, Prime Capital Ventures & The Bailey [Video], May 16, 2022, https://www.youtube.com/watch?v=A4_RKBepUkA (YouTube) at 0:13:




See also, Prime Commercial Lending, March 17, 2022, Albany, New York's Prime Commercial Lending Funds the First 5-Star Hotel in Atlanta, GA Through Prime's Real Estate Fund, Prime Capital Ventures, [Press release].

33. Prime Capital made a glitzy promotional video published on YouTube in May 2022 where it boasted about making this loan. The video featured Roglieri and others traipsing around the wooded area in Atlanta where "The Bailey" was going to be constructed. The alleged principal of ALUX Properties, LLC ("ALUX"), Brandon Wheeless, expressed his appreciation in the video stating that "access to this type of capital with trusted individuals that you close deals with definitely makes life a heck of a lot easier for us and the company so we are fast-tracking to grow at an exponential rate moving forward."[19] Depicted here are Messrs. Wheeless and Roglieri surveying the site, along with the "after" rendering of "The Bailey" contained in Prime Capital's video advertisement[20]:






34. In reality, Prime Capital never made any such loan to ALUX. There is no "The Bailey" hotel in Atlanta. According to Prime Capital's books and records, Brandon Wheeless, the purported principal of ALUX and third-party borrower of Prime Capital, was actually on Prime Capital's payroll and received a total of $200,000 from Prime Capital in $10,000 monthly payments between July 7, 2022 and September 18, 2023.

35. ALUX, the purported borrower, was placed into a receivership by the Georgia Superior Court on September 13, 2022 in connection with a lawsuit where the plaintiffs alleged,

---

[19] See Id. at 3:44 (transcribed by counsel).
[20] See Id. at 2:58 and 1:35, respectively.

among other things, to have been defrauded out of $10 million.[21] Featured in that litigation was an entity called Blackwater Capital Group, LLC ("Blackwater") which purported to act as a lender to the project, not unlike Prime Capital in its promotional video.[22] Blackwater's lending agreement was dated December 14, 2021, the exact date that Prime Capital was formed, and was nearly identical in form and substance to the form of lending agreement employed by Prime Capital.[23] Compared here are the first pages of the table of contents of Blackwater's December 14, 2021 lending agreement (on the left), and Prime Capital's April 24, 2023 lending agreement with creditor Compass-Charlotte (on the right)[24]:

Case 1:24-cv-00055-MAD-PJE Document 1-21 Filed 01/12/24 Page 92 of 302

DocuSign Envelope ID: 0CAFC338-732D-4304-B32B-FA350CA8AA9E

TABLE OF CONTENTS


| | Page |
|---|---|
| **RECITALS** | 1 |
| **ARTICLE 1 DEFINITIONS** | |
| **Section 1.1.** Certain Defined Terms | 2 |
| **ARTICLE 2 THE CREDIT** | |
| **Section 2.1.** Line of Credit Amount | 4 |
| **Section 2.2.** Line of Credit Documents | 4 |
| **ARTICLE 3 TERM, INTEREST AND PAYMENTS** | |
| **Section 3.1.** Initial Term | 5 |
| **Section 3.2.** Extended Term | 5 |
| **Section 3.3.** Applicable Interest Period | 5 |
| **Section 3.4.** Interest Rate Calculation | 5 |
| **Section 3.5.** Interest Payments | 6 |
| **Section 3.6.** Reserves | 6 |
| **Section 3.7.** Risk Management Protection for ICA Payment | 6 |
| **Section 3.8** Prepayment | 6 |
| **Section 3.9.** Interest Credit Account | 6 |
| **Section 3.10.** Fees | 7 |
| **Section 3.11.** Line of Credit Extension Fees | 7 |
| **Section 3.12.** Legal and Incidental Fees, Charges and Costs | 7 |
| **Section 3.13.** Line of Credit Disbursement Account | 7 |
| **Section 3.14.** Taxes | 8 |
| **ARTICLE 4 CONDITIONS TO CLOSING AND DISBURSEMENT** | |
| **Section 4.1.** Delivery of the LOC Documents | 8 |
| **Section 4.2.** Authority | 8 |
| **Section 4.3.** Liens | 9 |
| **Section 4.4.** Litigation | 9 |
| **Section 4.5.** Events of Default | 9 |
| **Section 4.6.** Purchase and Agreement Contracts | 9 |
| **Section 4.7.** Compliance with Certain Requirements | 9 |
| **Section 4.8.** Evidence of Insurance | 9 |
| **Section 4.9.** Financial Statements | 10 |
| **Section 4.10.** Business Pro Forma | 10 |
| **Section 4.11.** Management Plan | 10 |
| **Section 4.12.** Material Change | 10 |
| **Section 4.13.** Non-Subordination | 10 |
| **Section 4.14.** Borrower JV Governing Agreement | 10 |
| **Section 4.15.** Securitization | 11 |
| **ARTICLE 5 USE OF LINE OF CREDIT PROCEEDS** | |
| **Section 5.1.** Development Costs | 11 |


Revised 3/17/21

DocuSign Envelope ID: Case 1:24-cv-00055-MAD-PJE Document 1-29 Filed 01/12/24 Page 3 of 61

TABLE OF CONTENTS


| | Page |
|---|---|
| **RECITALS** | 1 |
| **ARTICLE 1 DEFINITIONS** | |
| **Section 1.1.** Certain Defined Terms | 2 |
| **ARTICLE 2 THE CREDIT** | |
| **Section 2.1.** Line of Credit Amount | 4 |
| **Section 2.2.** Line of Credit Documents | 4 |
| **ARTICLE 3 TERM, INTEREST AND PAYMENTS** | |
| **Section 3.1.** Initial Term | 5 |
| **Section 3.2.** Extended Term | 5 |
| **Section 3.3.** Applicable Interest Period | 5 |
| **Section 3.4.** Interest Rate Calculation | 5 |
| **Section 3.5.** Interest Payments | 6 |
| **Section 3.6.** Reserves | 6 |
| **Section 3.7.** Intentionally Omitted | 6 |
| **Section 3.8.** Prepayment | 6 |
| **Section 3.9.** Interest Credit Account | 6 |
| **Section 3.10.** LOC Fee | 7 |
| **Section 3.11.** Line of Credit Extension Fees | 7 |
| **Section 3.12.** Legal and Incidental Fees, Charges and Costs | 7 |
| **Section 3.13.** Taxes | 8 |
| **ARTICLE 4 CONDITIONS TO CLOSING AND DISBURSEMENT** | |
| **Section 4.1.** Delivery of the LOC Documents | 8 |
| **Section 4.2.** Authority | 8 |
| **Section 4.3.** Liens | 9 |
| **Section 4.4.** Litigation | 9 |
| **Section 4.5.** Events of Default | 9 |
| **Section 4.6.** Purchase and Agreement Contracts | 9 |
| **Section 4.7.** Compliance with Certain Requirements | 9 |
| **Section 4.8.** Evidence of Insurance | 9 |
| **Section 4.9.** Financial Statements | 10 |
| **Section 4.10.** Business Pro Forma | 10 |
| **Section 4.11.** Management Plan | 10 |
| **Section 4.12.** Material Change | 10 |
| **Section 4.13.** Non-Subordination | 10 |
| **Section 4.14.** Borrower Governing Agreement(s) | 10 |
| **Section 4.15.** Securitization | 11 |
| **ARTICLE 5 USE OF LINE OF CREDIT PROCEEDS** | |
| **Section 5.1.** Development Costs | 11 |


[21] See Capstone Diagnostics One, L.P., et al. v. Bailey LLC, et al., Case No. 2022cv366001 (GA Sup. Ct., Fulton Cty., Sept. 22, 2024).
[22] See Id., Judgment entered June 24, 2023.
[23] See Id., Verified Complaint, Exhibit E, executed June 9, 2022.
[24] See Id., compared to Exhibit 29 to the Complaint filed in Compass-Charlotte v. Prime Capital Ventures, LLC, et al., Case No. 24-cv-55 (MAD) (N.D.N.Y. Jan. 12, 2024).

36. Upon information and belief, Roglieri and Humphrey met Blackwater and ALUX in connection with trying to arrange the funding for ALUX's ICA Deposit to Blackwater through Prime Commercial. That is where they learned of the concept and decided to form Prime Capital to copy the fraudulent concept apparently devised by Blackwater.

***(iii) The Proliferation of the Fraud***

37. Roglieri and Humphrey saw "success" almost immediately with the Prime Capital fraud. ICA Deposits on loans that Prime Capital had absolutely no ability to fund started flowing in at a rapid rate.

38. Prime Capital took several steps to advertise and proliferate its fraud. Among other things, it:

a. advertised heavily on YouTube by boasting about loans that never existed including the alleged $188 million to ALUX to build "The Bailey", that it "gained prominence by committing $17 billion with a South Korean firm for projects in the United States and abroad,"[25] and that it had provided "$2.3 billion in funding for the first stage of a massive five-year, five-stage $22 billion project" "[i]n the heart of Dubai";[26]

---

[25] See Prime Commercial Lending, March 17, 2022, Albany, New York's Prime Commercial Lending Funds the First 5-Star Hotel in Atlanta, GA Through Prime's Real Estate Fund, Prime Capital Ventures, [Press release]; see also Prime Commercial Lending, Prime Commercial Lending Commits to Lending $17 Billion [Video], Jan. 21, 2022, https://www.youtube.com/watch?v=PmvtmdkBUlo (YouTube) at 0:13:




[26] Koplin, I., May 2, 2022, Roglieri Unveils Prime Capital Ventures, Prime Commercial Lending's Newest Fund, dealmaker-magazine.com, https://www.dealmaker-magazine.com/magazine/roglieri-unveils-prime-capital-ventures-prime-commercial-lendings-newest-fund.

b. used large law firms like Sheppard, Mullin, Richter & Hampton LLP, to represent it in its loan transactions to add legitimacy to its business model, and even featured Ned Trombly, a partner of Barclay Damon LLP, as its "Lead Counsel" on its website; and

c. in the few loans that it funded in whole or in part, it got the borrowers to participate in video advertisements designed to attract new victims to the fraud.[27]

39. Prime Capital got its first ICA Deposit for prospective borrower Indigo Pharmaceutical, LLC ("Indigo") on June 3, 2022 and July 22, 2022 in the amounts of $1 million and $2 million, respectively. From there, the ICA Deposits started to flow – (i) on July 18, 2022 Prime Capital received a $1.4 million ICA Deposit for Norwell Ventures, LLC, (ii) on September 21, 2022 and September 22, 2022 Prime Capital received a $20 million ICA Deposit for Onward Partners, LLC and (iii) on October 13, 2022, Prime Capital received a $3 million ICA Deposit for Lake's Edge Development Group, LLC.

40. In total, Prime Capital took in approximately $179 million in ICA Deposits, of which approximately $109 million were returned to borrowers or advanced under the respective line of credit agreement and approximately $70 million was consumed by Roglieri, Humphrey, and Snyder, leaving no less than 16 victims left holding the bag with claims totaling over $100 million.

***(iv) The Collapse***

41. Having no legitimate source of capital to fund loans, Prime Capital's collapse was inevitable.

[27] See Prime Commercial Lending, Prime Capital Ventures Presents Indigo Pharmaceutical in Las Vegas, NV [Video], April 20, 2023, https://www.youtube.com/watch?v=GvmECqnuBkY&t=326s (YouTube); and Prime Commercial Lending, Prime Capital Ventures Presents Home Rentals in Carbondale, IL [Video], March 3, 2023, https://www.youtube.com/watch?v=8D5GRnKecG0.

42. Near the beginning, Humphrey expressed some concern over the inability to fund promised loans but was quickly shut down by Roglieri. For example, in June 2022, Prime Capital accepted a $1 million ICA Deposit from Indigo even though it had no ability to fund the $20 million loan that Indigo was seeking. On July 8, 2022, Humphrey sent an email to Roglieri titled "Do not sign docs for pharmacy," in which she wrote, "You have no way to get them funded in 60 days now. You never ducking listen. Should have never taken in the money. But we're down to 60 days so do not sign the docs." Roglieri responded "Get yourself under control. NOW." Roglieri signed the documents and Humphrey continued to participate actively in Prime Capital's fraud from that time until its collapse.

43. Once prospective borrowers realized that they were not getting their loans funded, they began demanding the return of the ICA Deposits. However, Prime Capital had squandered tens of millions of dollars in the ICA Deposits for the benefit of Roglieri, Humphrey, and Snyder, on speculative investments, propping up Roglieri's other businesses, and to purchase million-dollar vehicles, luxury watches and jewelry, domestic and international travel by private jet, and a home in Virginia Beach for Humphrey's use. Thus, when prospective borrowers demanded the return of their ICA Deposits, Prime Capital was unable to meet the demand unless it could obtain new ICA Deposits from additional victims.

44. By the end of 2023, Prime Capital was besieged by litigation brought by its victims leading to its final collapse.[28] Text messages between Humphrey and Snyder revealed Prime

---

[28] See, e.g., Truss Financial LLC v. Prime Capital, et al., Index No. 2023/510389 (N.Y.Sup. Ct. Kings Cty. Apr. 5, 2023) (seeking and subsequently obtained the return of $13.4 million); B&R Acquisition Partners v. Prime Capital (JAMS Arb., Aug. 2023) (seeking return of $4.3 million); Sturm v. Prime Capital, Case No. 23-cv-1033 (N.D.N.Y. Aug. 22, 2023) (seeking return of $2 million); Camshaft CRE 1, LLC v. Prime Capital, Case No. 2023-023173 (Fla. Circ. Ct., Miami-Dade Cty., Sept. 15, 2023) (seeking return of $12.4 million); The Lion Group DFW, LLC v. Prime Capital, Case No. 23-DCV-34617 (Tex. Dist. Ct., 146th Dist., Sept. 21, 2023) (demand unknown); Onward Holding, LLC, v. Prime Capital, et al., Case No. 23-cv-833 (D. Utah Nov. 13, 2023) (seeking return of $4 million).

Capital's desperation to keep defrauding new victims. For example, on April 9, 2023, the two had the following text exchange:

| Sender | Message |
|---|---|
| Humphrey | Fuck |
| | 350 is not coming |
| Snyder | At all?? |
| | Shit |
| | Why? |
| Humphrey | Bc [a borrower]'s investor wants to look over all docs |
| | And said it will take a couple days |
| | We need it for [a different borrower] today |

and on September 19, 2023, the two corresponded as follows:

| Sender | Message |
|---|---|
| Humphrey | If we don't get a closing in today |
| | It's over |
| | Nothing we can do anymore |
| Snyder | We gotta start selling some stuff off so we can pay our bills. I need cash. |
| | Is there any point in having the csll [call] w [a prospective borrower] today then? He won't be able to wire today |
| Humphrey | Doubtful |
| | It killed us when, no LOIs [letters of intent] or closings happened |
| | Everyone requested ICA and dds [due diligence fees] back |
| | And we can't come back from it |
| | There are [law]suits all over |
| | Kris threw in the towel |

See USA v. Humphrey, Case No. 25-cr-00238, Dkt. No. 4, ¶5(i) (N.D.N.Y. June 10, 2025).

45. Even after those damning text exchanges, Prime Capital continued to solicit, take in, and rapidly consume ICA Deposits including those from 1322 Developments, LLC, by its lender ER Tennessee, in September 2023 in the amount of $14,249,832, and 1800 Park Avenue LLC in December 2023 in the amount of $5 million.

**C. The Bankruptcy Cases and Federal Equity Receivership**

46. On December 19, 2023, Compass-Charlotte 1031, LLC ("Compass-Charlotte"),

526 Murfreesboro, LLC ("526 Murfreesboro"), and Newlight Technologies, Inc. (Newlight, and together with Compass-Charlotte and 526 Murfreesboro, the "Petitioning Creditors") filed an involuntary petition against Prime Capital for relief under chapter 7 of the Bankruptcy Code commencing Case No. 23-11302 ("Case 1"). The Petitioning Creditors commenced Case 1 for the obvious purpose of ensuring that Prime Capital's fraud would stop and its assets and liabilities could be liquidated in a single, public forum, and that no single creditor could win the proverbial "race to the courthouse".

47. On December 22, 2023, upon order of the Bankruptcy Court, the United States Trustee (the "U.S. Trustee") appointed Christian H. Dribusch ("Dribusch") as the interim chapter 7 trustee of Prime Capital's estate.

48. Rather than submit to the orderly winddown or restructuring of Prime Capital's business in Case 1, Roglieri pushed Prime Capital in an entirely different direction. Roglieri caused Prime Capital to contest the involuntary petition on the basis that at least two of the Petitioning Creditors' claims were allegedly subject to a bona fide dispute because litigation concerning their claims was pending. See Debtor's Motion for Judgment Dismissing the Petition, Case 1 Docket No. 72, p.1.

49. Roglieri funded fighting Case 1 by defrauding a final victim. Beginning in or around October 2023, 1800 Park Avenue LLC ("1800 Park") was negotiating a contemplated $105 million loan from Prime Capital under Prime Capital's standard model, pursuant to which Prime Capital issued a "Terms and Contingent Letter of Intent" that was executed by 1800 Park on October 25, 2023. The term sheet contemplated an ICA Deposit of $26,277,562.

50. On December 12, 2023, Prime Capital issued a "Commitment to Fund Letter" to 1800 Park for a line of credit in the amount of $98,905,467, which was executed by both Roglieri

and Jeffrey Huston of 1800 Park.

51. On December 18, 2023, one day before the commencement of Case 1, 1800 Park received draft loan documents that for the first time included Prime Commercial as the lender instead of Prime Capital.

52. Three (3) days after the commencement of Case 1, on December 22, 2023, 1800 Park entered into a deposit agreement with Prime Commercial, pursuant to which 1800 Park agreed to make an initial ICA Deposit of $5,000,000 in connection with a contemplated loan from Prime Commercial (the "1800 Park Deposit"). Contemporaneously, 1800 Park made the 1800 Park Deposit which was received into Prime Capital's Key Bank Account No. ****2233 due to Roglieri and Humphrey's failure to change the account number from Prime Capital's to Prime Commercial's. 1800 Park was completely unaware of the commencement of Case 1 against Prime Capital.

53. Immediately upon receipt of the 1800 Park Deposit on December 22, 2023, Prime Capital transferred the 1800 Park Deposit to Prime Commercial's Key Bank Account No. ****4465.

54. Roglieri and Humphrey used the 1800 Park Deposit for, among other things, the following purposes: (i) funding a $50,000 retainer to Cullen and Dykman LLP, and a $400,000 retainer to Hogan Lovells US LLP, to fight the Petitioning Creditors in Case 1; (ii) funding a $100,000 retainer to Pashman Stein to represent Roglieri personally in his bankruptcy proceeding; (iii) funding an additional $950,000 to Caruso Home Builders under an existing loan; (iv) paying $434,429.47 to Ai Design on account of a custom car buildout for Roglieri; (v) transferring $526,000 to CCTG; (vi) paying $84,000 to Wrist Aficionado for a wristwatch for Roglieri; and (vii) transferring $2,000,000 to CPH LLC, which is believed to be an entity owned by an affiliate

of Humphrey.

55. On January 8, 2024, the Petitioning Creditors filed their own motion to dismiss Case 1 [Case 1 Docket No. 74], which motion was granted by the Court on January 9, 2024 [Case 1 Docket No. 87]. Thereafter, Dribusch was discharged from his duties as chapter 7 trustee.

56. Three days after dismissal of Case 1, on January 12, 2024, Petitioning Creditor Compass-Charlotte commenced an action in the United States District Court for the Northern District of New York (the "District Court") under Case No. 24-cv-00055 (MAD) (CFH) (N.D.N.Y. Jan. 12, 2024) (the "Receivership Case"), seeking, among other things, the appointment of a federal equity receiver to take possession and control of Prime Capital's assets and affairs. That same day, the District Court entered an order appointing Paul Levine as the temporary receiver (the "Receiver") [Receivership Case Docket No. 8].

57. Roglieri directed Prime Capital to file an emergency motion on behalf of Prime Capital to, among other things, dismiss the Receivership Case. [Id. at Docket No. 12-14]. On January 24, 2024, the District Court entered a memorandum decision and order making the Receiver's appointment permanent and defining his powers with respect to Prime Capital and its property and denying Prime Capital's motion to dismiss the case. [Id. at Docket No. 56].

58. On February 15, 2024, Roglieri filed a voluntary petition for relief under subchapter V of chapter 11 of the Bankruptcy Code commencing Case No. 24-10157 (REL) (the "Roglieri Case").

59. On May 14, 2024, Prime Capital, by and through the Receiver, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court commencing Case No. 24-10531 ("Case 2").

60. On May 15, 2024, the Court entered an order converting Roglieri's case to one

under chapter 7 of the Bankruptcy Code. Roglieri Case at Docket No. 159. Thereafter, the U.S. Trustee appointed Dribusch as the interim chapter 7 trustee (the "Roglieri Trustee") [Id. at Docket No. 160].

61. On July 23, 2024, the Court entered a memorandum decision and order dismissing Case 2 finding essentially that the Receiver did not have the authority to file Case 2 on behalf of Prime Capital and that the Roglieri Trustee did not have the ability to waive the defect and ratify the filing *ex post facto* [Id. at Docket No. 85].

62. The Roglieri Trustee, who at the time was in possession and control of all membership interests of Prime Capital by and through the Roglieri bankruptcy estate, exercised the necessary powers and executed the necessary documents to assume control of Prime Capital. On September 16, 2024, the Roglieri Trustee, in his capacity as the authorized agent for Prime Capital, filed a voluntary bankruptcy petition on behalf of Prime Capital for relief under chapter 11 of the Bankruptcy Code ("Case 3").

63. In or around May 23, 2025, the Roglieri Trustee resigned and on May 27, 2025, Marianne T. O'Toole was appointed successor chapter 7 trustee of the Roglieri bankruptcy estate (the "Successor Roglieri Trustee"). On June 3, 2025, the Successor Roglieri Trustee filed a consent to the appointment of a chapter 11 trustee in Prime Capital's case [Docket No. 280]. On June 5, 2025, the Court entered an order directing the U.S. Trustee to appoint a chapter 11 trustee [Docket No. 282], and that same day the U.S. Trustee appointed Yann Geron as the chapter 11 trustee (the "Prime Trustee") of Prime Capital [Docket No. 285], which appointment was confirmed by order of the Court on June 10, 2025 [Docket No. 287].

64. The Prime Trustee served in that capacity until on or around February 25, 2026, when the Plan went effective and the Plan Administrator was appointed.

65. On April 22, 2026, pursuant to Section 5.1 of the Plan Administrator Agreement, Yann Geron, in his capacity as Plan Administrator, resigned.

66. On April 22, 2026, pursuant to Section 2.3 of the Plan Administrator Agreement, the Oversight Committee appointed Fred Stevens, as successor Plan Administrator, effective immediately as of April 22, 2026 and Fred Stevens agreed to serve as successor Plan Administrator.

**D. The Ponzi Finding**

67. Pursuant to the *Order Confirming the Plan*, dated February 11, 2026 [Docket No. 401], the Bankruptcy Court found for the reasons stated therein that Prime Capital "was an advance pay/Ponzi scheme since its formation". See id., at p.16. That order is now final and unappealable. Accordingly, the Ponzi scheme presumption applies to Prime Capital.

68. Under the Ponzi scheme presumption, transfers made by Prime Capital, the Ponzi scheme operator, are presumed to have been made with actual fraudulent intent. See, e.g., *Donell v. Kowell*, 533 F.3d 762 (9th Cir. 2008); *In re Manhattan Inv. Fund Ltd.*, 397 B.R. 1 (S.D.N.Y. 2007).

**E. The Criminal Convictions of Roglieri, Humphrey, and Snyder, and Related Forfeiture**

***(i) Roglieri – Criminal and Civil Forfeiture Cases***

69. On May 28, 2024, the United States of America (the "Government") filed a sealed criminal complaint against Kris Roglieri alleging probable cause exists for charging Roglieri with wire fraud committed in violation of 18 U.S.C. § 1343, commencing the case of *United States of America v. Kris Roglieri*, Case No. 24-MJ-261 (CFH) (N.D.N.Y.) (the "USA v. Roglieri").

70. On May 31, 2024, Roglieri was arrested by the Federal Bureau of Investigation, and on June 3, 2024, the District Court ordered Roglieri's detention without bail pending trial in

the case [Id. at Docket No. 11].

71. On September 19, 2024, a federal grand jury returned an indictment charging Roglieri with five counts of wire fraud in violation of 18 U.S.C. § 1343.

72. On October 22, 2024, the Government commenced a civil forfeiture case against certain property that it alleged was the proceeds of Prime Capital's principals' criminal activity in the Civil Forfeiture Case under the caption *United States of America v. One 2003 Ferrari Enzo AB Version E, et al.*, Case No. 24-cv-1345 (MAD/DJS) (N.D.N.Y.). The following property was named in the Civil Forfeiture Case through the original and amended complaints much of which was included in the criminal forfeiture claims asserted by the Government in USA v. Roglieri:

a. One 2003 Ferrari Enzo AB Version E, VIN #: ZFFCZ56B000132659;

b. One 2014 Ferrari LaFerrari, VIN #: ZFF76ZHB000203166;

c. One 2022 Mercedes Benz, VIN #: W1NYC8AJXNX445045;

d. One 1982 Mercedes Benz 500SL, VIN #: WDB10704612001675;

e. One 1989 Mercedes Benz 560 SEL, VIN #: WDB1260391A497466;

f. One 2007 Mercedes Benz SLR McLaren, VIN #: WDDAJ76F27M001391;

g. One 1987 Mercedes Benz 560, VIN #: WDB1260451A315331;

h. One 2004 Porsche Carrera, VIN #: WP0ZZZ98Z4L000069;

i. One 2022 Ferrari 812 Competizione, VIN #: ZFF03TLA5N0277054;

j. One 2020 Mercedes Benz GT63C4S, VIN #: WDD7X8KB3LA012445;

k. One 2006 Maserati MC 12 Corse, VIN #: ZAMDF44B000029626;

l. One 2023 Mercedes Benz, VIN #: W1K6X7KB5PA204980;

m. One Ferrari Engine Table;

n. $223,365.00 in U.S. currency seized from Thread Bank Account ending 7554 held

in the name of ABBJ, LLC;

o. $467,810.00 in U.S. currency seized from Thread Bank Account ending 1832 held in the name of Capital Investments US, LLC;

p. Refund in the amount of $72,825.83 in U.S. Currency seized from Ai Design;

q. One Richard Mille RM011 Watch with serial number 2722;

r. One Richard Mille RM 65-01 Watch;

s. One Rolex Watch, Serial Number: Y74R6549;

t. One Rolex Watch, Serial Number: 7P65S042;

u. One Rolex Watch, Serial Number: 0WU66577;

v. One Rolex Watch, Serial Number: 65R11547;

w. One Rolex Watch, Serial Number: 8S927086; and

x. The Virginia Beach Property described in the complaint as the "Real property commonly known as 600 Linkhorn Drive, Virginia Beach, VA 23451"

(collectively, the "Forfeiture Property").

73. By plea agreement dated November 13, 2025, Roglieri pled guilty to one count of conspiracy to commit wire fraud in violation of 18 U.S.C. §§ 1349, 1343, and submitted to the forfeiture of all Forfeiture Property plus entry of a money judgment in favor of the Government of $55,484,674.84 (the "Roglieri Plea") [USA v. Roglieri at Docket No. 90].

74. Among other things, Roglieri admitted that Prime Capital never secured a proven, demonstrated or realized source of loan funding, and that he "and his co-conspirators used ICA payments from newer borrower clients to partially fund loans to, and to refund ICA payments to older borrower clients" [Id. at ¶5(g)]. Roglieri further admitted that he "also drew on ICA payments to pay his own personal debts (including money owed to the Internal Revenue Service),

enrich himself, and purchase million-dollar vehicles, luxury watches and jewelry, and domestic and international travel by private jet. . . and to pay Humphrey, Snyder, and [an unidentified] Individual-1" [Id.].

75. On April 3, 2026, Roglieri was sentenced to 97 months in federal prison and is currently serving that sentence.

***(ii) Humphrey – Criminal Case***

76. By plea agreement dated June 10, 2025, filed at or around the same time as the commencement of *United States of America v. Kimberly Humphrey a/k/a Kimberly Owen*, Case No. 25-cr-238 (MAD) (N.D.N.Y.) ("USA v. Humphrey"), Humphrey pled guilty to two counts of conspiracy to commit wire fraud in violation of 18 U.S.C. §§ 1349, 1343, and one count of health care fraud in violation of 18 U.S.C. § 1347, and consented to entry of a judgment directing the defendant's payment of restitution in full to any person or entity who qualifies as a victim of Prime Capital under 18 U.S.C. § 3663 or § 3663A (the "Humphrey Plea") [Id. at Docket No. 4].

77. Humphrey is currently awaiting sentencing with a sentencing hearing currently scheduled for October 28, 2026.

***(iii)Snyder – Criminal Case***

78. By plea agreement dated May 16, 2025, filed at or around the same time as the commencement of *United States of America v. Christopher Snyder*, Case No. 25-cr-195 (MAD) (N.D.N.Y.) ("USA v. Snyder"), Snyder pled guilty to one count of conspiracy to commit wire fraud in violation of 18 U.S.C. §§ 1349, 1343, and consented to entry of a judgment directing the defendant's payment of restitution in full to any person or entity who qualifies as a victim of Prime Capital under 18 U.S.C. § 3663 or § 3663A (the "Snyder Plea") [Id. at Docket No. 4].

79. On April 16, 2026, Snyder was sentenced to 15 months in federal prison and is currently serving that sentence.

**F. The Defendants and the Instant Transfer**

***(i) The Original Lending Transaction***

80. B&R entered into a Business Expansion Line of Credit Agreement (the "Credit Agreement") with Prime Capital. Pursuant to the Credit Agreement, Prime Capital agreed to lend B&R up to $22,575,000.00 to be used to fund an asset purchase (the "Loan"). In return, B&R was required to deliver to Prime Capital a $4.3 million ICA Deposit (the "B&R ICA") which would be used to prepay interest following the closing and funding of the Loan. B&R did in fact deliver the B&R ICA to Prime Capital.

81. On June 15, 2023, B&R terminated the Credit Agreement and demanded the return of the B&R ICA Deposit in accordance with the terms of the Credit Agreement.

82. On August 21, 2023, the Defendants instituted an arbitration proceeding (the "Arbitration") against Prime Capital in order to recover the B&R ICA, as well as institute other claims for damages, breach of contract, conversion and fraud.

83. On November 20, 2023, the Defendants bifurcated their claims in an attempt to expedite the return of the B&R ICA and filed a Motion for Summary Disposition, seeking an order and award based on the undisputed facts that Prime Capital was required to return the B&R ICA.

***(ii) The Arbitration Award, the Receivership Case, and the Transfer***

84. Three days after commencement of the Receivership Case, on January 15, 2024, the arbitrator in the Arbitration awarded the Defendants $4,300,000.00 in monetary damages against Prime Capital (the "Award").

85. On January 18, 2024, the Defendants applied for an order to confirm the Award, filed as *In the Matter of the Application of B and R Acquisition Partners, LLC and JHM Lending Ventures, LLC v. Prime Capital Ventures, LLC*, Index No. 900844-24, Supreme Court, State of New York, Third Judicial District, Albany County (the "Confirmation Proceeding").

86. On January 24, 2024, Judge D'Agostino in the District Court entered an order making the Receiver the permanent receiver of Prime Capital's property and granting the Receiver "exclusive dominion and control over all of the assets" of Prime Capital which authority was vested in and extended to all of Prime Capital's real property, equitable property, tangible and intangible personal property, interest, or assets of any nature, wherever located." Receivership Case, Dkt. No. 56, p. 22.

87. On February 8, 2024, a judgment was issued in the Confirmation Proceeding confirming the Award (the "Judgment").

88. The Defendants proceeded to domesticate their Judgment against Prime Capital in the Circuit Court of Virginia Beach, Virginia, pursuant to Virginia Code 8.01-465.3. Notice of this domestication was filed in the City of Virginia Beach, Virginia Judgment Lien Docket as Instrument No. 202404002909 on February 28, 2024 (the "Judgment Lien").

89. The filing of the Judgment Lien resulted in the Transfer of Prime Capital's interest in the Virginia Beach Property.

90. The Defendants have retained the full amount and/or benefit of the Transfer.

***(iii)Dismissal of Case 2, Relief From Stay in Case 3, and the Civil Forfeiture Case***

91. On May 14, 2024, the Receiver commenced Case 2 as a voluntary chapter 11 case for Prime Capital. The Receiver sought, among other things, the ability to avoid the Transfer as a preferential transfer under section 547(b) of the Bankruptcy Code.

92. In order to avoid having the Transfer avoided as a preferential transfer, the Defendants moved to dismiss Case 2 on the basis that the Receiver lacked standing. By decision and order dated July 23, 2024, the Bankruptcy Court dismissed Case 2 and found that the District Court had not authorized the Receiver to file a bankruptcy petition for Prime Capital.

93. Following the commencement of Case 3, on November 19, 2024, the Defendants

filed a motion for relief from the automatic stay in order to execute upon their Judgment Lien and liquidate the Virginia Beach Property as a judgment lienholder [Docket No. 56].

94. On December 30, 2024, the Bankruptcy Court granted the Defendants' motion for relief from the automatic stay permitting the Defendants to execute upon their Judgment Lien against the Virginia Beach Property.

95. Approximately two weeks later, on January 15, 2025, the Government amended its complaint in the Civil Forfeiture Case to include the Virginia Beach Property.

96. The Defendants have actively challenged the Government's forfeiture case against the Virginia Beach Property and on March 18, 2026, the District Court entered a Memorandum-Decision & Order ruling for the Government and striking the Defendants' claim against the Virginia Beach Property. Civil Forfeiture Case, Docket No. 66, p. 16 (D'Agostino, J.) (Mar. 18, 2026). The Defendants have taken an appeal of the District Court's order to the Second Circuit Court of Appeals and that appeal is pending.

***(iv) The Defendants Filed Proofs of Claim***

97. The Defendants have filed a total of four proofs of claim against Prime Capital's bankruptcy estate asserting what appear to be collective claims in the amount of $4,559,006.85 [Claim Nos. 18, 19, 20, and 21] (collectively, the "Defendant Claims").

***(v) The Defendants Refused to Toll the Plan Administrator's Time to Assert These Claims***

98. Prior to filing this Complaint, the Plan Administrator asked the Defendants through counsel to toll the Plan Administrator's time to commence the claims brought by this Complaint pending a final adjudication of the Government's and the Defendants' rights in and to the Virginia Beach Property. The Defendants declined to do so necessitating the commencement of this case.

## FIRST CAUSE OF ACTION

| | |
|---|---|
| **Cause of Action:** | **Avoidance of Actual Fraudulent Transfers** |
| **Statute or Common Law:** | **11 U.S.C. §§ 544(a) and 548(a)(1)(A); NY DCL § 273(a)(1) (NY UVTA)** |
| **Affected Defendants:** | **All Defendants** |

99. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 98 of this Complaint as if fully set forth at length herein.

100. The Transfer constituted a transfer of money, property, and value of Prime Capital.

101. At the time the Transfer was made, Prime Capital had incurred or was about to incur a liability which remains unpaid to this day.

102. The Transfer was made intentionally by Prime Capital and its principals in furtherance of Prime Capital's Ponzi scheme and in order to keep the fraud from being discovered. Alternatively, the Transfer was made involuntarily by legal action taken by the Defendants in direct violation of the District Court's grant of exclusive control over the Virginia Beach Property to the Receiver.

103. Prime Capital was a Ponzi scheme since its inception and never had any assets or funds that were not obtained by its victims under fraudulent pretenses or purchased with the proceeds of the fraud. Accordingly, Prime Capital was at all times insolvent and had no capital.

104. The Transfer was made with actual intent to hinder, delay, and/or defraud Prime Capital's creditors and victims, and the Receiver appointed by the District Court.

105. At the time of the Transfer, the Defendants knew that Prime Capital was not a legitimate enterprise and had obtained the Award, Judgment, and Judgment Lien on that basis.

106. Also, at the time of the Transfer, the Defendants knew that the District Court had granted the Receiver exclusive dominion and control over Prime Capital's assets, including the

Virginia Beach Property. The Defendants did not seek the authority or permission of the District Court, or relief from the District Court's orders, prior to placing the Judgment Lien against the Virginia Beach Property.

107. Based upon the foregoing, the Plan Administrator is entitled to an order and judgment against each of the Defendants avoiding the Transfer and directing that the subject of the Transfer or its value be returned to Prime Capital's bankruptcy estate for the benefit of its victims, together with interest and fees thereon. Upon return of the Transfer, the Defendants are entitled to hold a general, unsecured claim against Prime Capital in the amount of the returned Transfer.

**SECOND CAUSE OF ACTION**

| | |
|---|---|
| **Cause of Action:** | **Attorneys' Fees for Avoidance of Actual Fraudulent Transfers** |
| **Statute or Common Law:** | **11 U.S.C. § 544(a); NY DCL § 276-a (NY UVTA)** |
| **Affected Defendants:** | **All Defendants** |

108. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 107 of this Complaint as if fully set forth at length herein.

109. The Transfer was a fraudulent transfer made in furtherance of Prime Capital's fraud with actual intent to hinder, delay, and defraud present and future creditor victims.

110. At the time the Transfer was made, Prime Capital had incurred or was about to incur a liability which remains unpaid to this day.

111. Based upon the foregoing, the Plan Administrator is entitled to recover reasonable attorney's fees pursuant to NY DCL § 276-a.

**THIRD CAUSE OF ACTION**

| | |
|---|---|
| **Cause of Action:** | **Recovery of Avoidable Transfers or Value Thereof From All Initial, Immediate or Mediate Transferees** |
| **Statute or Common Law:** | **11 U.S.C. § 550(a)** |
| **Affected Defendants:** | **All Defendants** |

112. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 111 of this Complaint as if fully set forth at length herein.

113. Upon avoidance of the Transfer, the Plan Administrator is entitled to recover for the benefit of the estate the property transferred, or the value thereof, from the initial transferee, the individual or entity for whose benefit such transfer was made, or any immediate or mediate transferee of such initial transferee.

114. Each Defendant was an initial transferee of the Transfer or an entity for whose benefit the Transfer was made.

115. Based upon the foregoing, the Plan Administrator is entitled to a judgment against each recipient of a Transfer, any beneficiary of such Transfer, and any subsequently identified immediate or mediate transferee of such initial transferee of the Transfer, for the full value of the applicable Transfer.

**FOURTH CAUSE OF ACTION**

| | |
|---|---|
| **Cause of Action:** | **Pre-Judgment Interest and Attorneys' Fees** |
| **Statute or Common Law:** | **Mixed – 11 U.S.C. § 550(a); 28 U.S.C. § 1961; NY CPLR §§ 5001 and 5004** |
| **Affected Defendants:** | **All Defendants** |

116. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 115 of this Complaint as if fully set forth at length herein.

117. The Plan Administrator is entitled to a judgment awarding him pre-judgment interest with respect to the claims asserted in this Complaint from the inception of the relevant cause of action to the date of judgment.

**WHEREFORE**, the Plaintiff demands judgment against the Defendants as follows:

A. Against the Defendants, jointly and severally, on the First and Third Causes of Action, a judgment in an amount not less than $4,500,000.00;

B. Against the recipient of any immediate, mediate or subsequent transfer of the subject Transfer on the Third Cause of Action avoiding such Transfer or the value thereof;

C. Against each Defendant on the Second and Fourth Causes of Action, an amount to be determined at trial on account of all attorneys' fees, costs, and prejudgment interest; and

[*Continued on Next Page*]

D. Granting the Plan Administrator such other and further relief as this Court deems just and proper.

Dated: New York, New York
September 16, 2026

**KLESTADT WINTERS JURELLER SOUTHARD & STEVENS, LLP**

By: */s/ Fred Stevens*

Fred Stevens
Lauren C. Kiss
Kevin B. Collins
286 Madison Avenue, 11th Floor
New York, New York 10017
Tel: (212) 972-3000
Fax: (212) 972-2245
Email: fstevens@klestadt.com
lkiss@klestadt.com
kcollins@klestadt.com

*Counsel to the Plaintiff Plan Administrator*